Scott R. Kipnis
Nicholas B. Malito
HOFHEIMER GARTLIR & GROSS, LLP
530 Fifth Avenue
New York, New York  10036
Telephone: (212) 944-0500
Facsimile: (212) 897-4980
skipnis@hgg.com
nmalito@hgg.com

-and-

Dean C. Waldt (Admitted *Pro Hac Vice*)
Mariah Murphy (Admitted *Pro Hac Vice*)
BALLARD SPAHR LLP
210 Lake Drive East, Suite 200
Cherry Hill, New Jersey  08002
Telephone: (856) 761-3400
Facsimile: (856) 761-1020
waldtd@ballardspahr.com
murphym@ballardspahr.com

*Counsel for Access to Loans for Learning Student
Loan Corporation*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------- :

THE BANK OF NEW YORK MELLON : Case No. 10-cv-4424 (JPO) (AJP)
TRUST COMPANY, N.A., :
:
                Plaintiff, :
:
      v. :
:
DEPFA BANK PLC and LLOYDS TSB :
BANK PLC, :
:
                Defendants. :
---------------------------------------------------- :
DEPFA BANK PLC, :
:
             Third-Party Plaintiff, :
:
      v. :
:
ACCESS TO LOANS FOR LEARNING :
STUDENT LOAN CORPORATION, :
:
            Third-Party Defendant, :
:

```
                    and                    :
                                           :
JPMORGAN CHASE BANK, N.A.,                  :
                                           :
                Third-Party Defendant.     :
-------------------------------------------  :
LLOYDS TSB BANK PLC,                        :
                                           :
                Third-Party Plaintiff,     :
        v.                                 :
                                           :
ACCESS TO LOANS FOR LEARNING                :
STUDENT LOAN CORPORATION,                   :
                                           :
                Third-Party Defendant.     :
-------------------------------------------  :
```

**THIRD PARTY DEFENDANT ACCESS TO LOANS FOR LEARNING
STUDENT LOAN CORPORATION'S PROPOSED FINDINGS OF FACT AND
<u>CONCLUSIONS OF LAW IN SUPPORT OF ITS PRETRIAL MEMORANDUM</u>**

Third party defendant, Access To Loans For Learning Student Loan Corporation

("ALL") by and through its undersigned counsel Ballard Spahr LLP and Hofheimer Gartlir &

Gross LLP pursuant to the Court's August 12, 2010 Pre-Trial Scheduling Order and the Court's

Individual Practices hereby submits the following Proposed Findings of Fact and Conclusions of

law in support of its Pre-Trial Memorandum.[1]

**I.      Proposed Findings of Fact**

ALL incorporates by reference the Stipulated Facts set forth in the parties Joint

Pre-Trial Order.  In addition to the stipulated facts, ALL submits the following proposed factual

findings:

1.      This case arises as a direct result of the insolvency and liquidation of

Ambac Assurance Corporation ("Ambac"), due to the collapse of the subprime mortgage market

---

[1]      ALL incorporates by reference its Pre-Trial Memorandum, the Joint Pre-Trial Order and the exhibits
thereto.  ALL reserves its rights to supplement or amend its submissions as necessary prior to and after trial.

in the United States.

2.      The transactions underlying this litigation involve the issuance, servicing and purchase of bonds between commercial parties.

3.      These transactions are governed by a series of complex documents expressly providing for the rights and obligations of each party.

4.      Due to its demise, Ambac has admitted its inability to honor the contractual obligations it made to defendants Depfa Bank PLC ("Depfa") and Lloyds TSB Bank PLC ("Lloyds").

5.      ALL is a California nonprofit public benefit corporation which acquires loans made to students under the Higher Education Act of 1965, as amended to further their post-secondary education (the "Student Loans").

6.      ALL issues bonds traded by investors in the public market which are payable from the revenues generated from a portfolio of student loans.

7.      Bonds issued by ALL are expressly limited as to the source of payment and are payable solely from the revenues and receipts made available from the student loans financed with the proceeds of the bonds.

8.      The issuer of the bonds agreed to reimburse the banks over time as the bonds were remarketed and resold to public investors.

9.      The agreements governing these transactions were designed to provide short term liquidity to allow the repurchase, remarketing and resale of bonds.  These agreements

are commonly referred to as "standby bond purchase agreements" because the banks were paid a fee to "standby" as a liquidity provider.

10.     Under such agreements, a bank did not expect to hold repurchased bonds for any extended period of time, but rather anticipated a short holding period until the bonds were remarketed and resold to new investors.

11.     Under each standby bond purchase agreement, in the unlikely event that the bonds purchased by a bank could not be remarketed and resold to the public, the tendered bonds purchased by the bank from the public bondholder would be converted into "bank bonds" pursuant to which the issuer of the bonds would agree to repay the bank for the funds used to purchase the publicly held bonds over a given period of time, typically referred to as a "term out period".

12.     Issuers and liquidity providers negotiated the interest rate and the repayment terms, including the term out period.

13.     Ambac was engaged in the business of insuring the payment of bonds (including bank bonds) issued by state and local governments and non-profit entities such as ALL.  Ambac was very active in providing insurance for student loan bonds.

14.     Until 2008, Ambac was rated AAA/Aaa (the highest rating possible) by each of the major bond rating agencies and was viewed by public bond purchasers and liquidity providers, such as Depfa and Lloyds, as a trustworthy credit provider.

15.     Ambac became insolvent and entered a conservatorship in the State of Wisconsin in 2009.

16.     Depfa and Lloyds are both major banks that were historically active in providing standby bond purchase agreements for the issuance of bonds, including student loan bonds.

17.     Banks such as Depfa and Lloyds often competed with each other to provide liquidity facilities for student loan bonds and other types of bonds and sought to distinguish themselves based on factors such as pricing and the relative term out period during which they allowed the issuer of the bonds to repay any advances made to repurchase bonds.  *See* Park Dep. 37: 2-15; 52:14-54:23.

18.     Student loan bonds, such as those involved in this case, are complex debt instruments and the documents which govern the issuance of these bonds are carefully negotiated and involve many economic factors, particularly with respect to the allocation of the various risks.

19.     In this case, Ambac was paid a premium to provide an insurance policy that guaranteed the ultimate payment on the bonds.  In other words, Ambac agreed that if the student loans ALL pledged for the repayment of the bonds did not provide sufficient resources to pay the bonds, Ambac would make the payment.  Such insurance was a credit enhancement that made the bonds highly marketable and attractive to institutional investors.

20.     Depfa and Lloyds required that Ambac provide a special rider to its insurance policy to provide that when ALL's reimbursement obligation to each of the banks respectively came due, if the proceeds of the pledged student loan portfolio pledged to support the bonds was insufficient to provide adequate funds to make the required payments, Ambac guaranteed this payment.  Thus, Ambac provided assurance to the banks that they would be

limited to the role of short-term liquidity provider because Ambac would provide the ultimate

source of payment to bondholders, whether they were investors or the bank providing a liquidity

facility.

21.     The central document typically entered into in connection with the

issuance of student loan bonds is a trust indenture.  The trust indenture governs the issuance of

the related bonds and engages a bond trustee to act as a fiduciary to hold the pledged loans and

make payments to the holders of the bonds and others from the revenues and assets in the trust it

administers.

22.     A typical student loan trust indenture would serve as a master indenture

and contemplate the issuance, from time to time, of an unlimited amount of bonds under

supplemental indentures so long as the conditions for each issuance were met.  Unless otherwise

specified in the trust indenture, the ultimate source of payment of bonds of a designated priority

(i.e. senior or subordinate) would be a pledging of the trust assets which secured such

obligations.

23.     The 2005 Bonds were insured by Ambac.  Trial Ex. 34.

24.     The 2005 Bonds had an interest rate that reset, and the owners of the 2005

Bonds had the right to tender their bonds for purchase, every 7 days.  Trial Ex. 4.

25.     The General Indenture provided that ALL could issue Additional Bonds.

26.     In August 2006, ALL issued its Student Loan Program Revenue Bonds,

Senior Series 2006 V-A-3, Senior Series V-A-4 and Senior Series V-A-5 (the "2006 Bonds"), on

a parity with the 2005 Bonds, pursuant to the General Indenture and a Second Supplemental

Indenture between ALL and JPM (the "Second Supplemental Indenture" and collectively with the General Indenture and the First Supplemental Indenture, the "Indenture").  Trial Exs. 1,3.

27.     The 2006 Bonds were structured very similar to the 2005 Bonds in that the proceeds were used to finance student loans, the 2006 Bonds were insured by Ambac, with a rate reset and owners having the right to tender every 7 days and with liquidity provided under a similar Standby Bond Purchase Agreement.  Trial Ex. 5.

28.     In connection with the issuance of the 2006 Bonds, ALL had several banks (including Depfa) bid to provide the liquidity facility.

29.     Lloyds provided the most favorable bid and ALL and JPM, as trustee, entered into a Standby Bond Purchase Agreement (the "Lloyds Standby Agreement" and collectively with the Depfa Standby Agreement, the "Standby Agreements") with Lloyds.  *See* Peterson Dep. 61:5-24.

30.     The Lloyds Standby Agreement provided that in the event Lloyds was required to purchase the bonds, and the bonds could not be resold to the public, ALL would repay Lloyds by making principal and interest payments on a quarterly basis over 5 years with interest at a variable rate specified in the Lloyds Standby Agreement.

31.     Ambac's credit was downgraded as part of the financial crisis of 2008.  As a result, the holders of all of the 2005 Bonds and the 2006 Bonds tendered their bonds for purchase.  All of the 2005 Bonds and 2006 Bonds were subsequently purchased by Depfa and Lloyds, respectively, as required by each of the related Standby Agreements.

32.     Because of the insolvency of Ambac, the bonds could not be remarketed

and resold, since the absence of credit insurance rendered the bonds unmarketable.

33.     In addition, as a result of Ambac's insolvency, Ambac is not expected to be able to fulfill its contractual obligations to Depfa and Lloyds and the two liquidity providers are left holding bonds on a long-term basis.  This arrangement was never contemplated by the parties to the transaction nor are the controlling documents specifically designed to address this situation.

34.     As required by each of the Standby Agreements, ALL began making payments to Depfa and Lloyds from sources available in the trust under the terms of the Indenture.

35.     Depfa began to dispute the amounts that it and Lloyds were being paid by the Trustee.  In 2009, in an apparent attempt to create an issue regarding repayment of the bonds, Depfa claimed for the first time that its consent was required for the issuance of the 2006 Bonds.  *See* Peterson Dep. 84:4-17.  Depfa, however, is incorrect.

36.     Pursuant to the Indenture and the Standby Agreements, any recovery by Depfa or Lloyds, or any other party is expressly limited to the trust assets.

37.     At ALL's request, Depfa has acknowledged its limited recourse pursuant to a Stipulation, attached hereto as Exhibit A.

38.     Depfa was not afforded the right to consent to issuance of additional bonds.

39.     Depfa's consent was not required for the issuance of the 2006 bonds.

40.     The General Indenture allowed for not only the issuance of an original series of Bonds but also clearly and unambiguously permitted and anticipated the issuance of additional Bonds under supplements to the General Indenture.

41.     Depfa was not granted, as part of the 2005 transaction, that its consent be sought and obtained for the issuance of the 2006 bonds.

42.     Depfa's own counsel involved in the 2005 transaction stated that she did not recall any discussions during the 2005 transaction regarding Depfa's right to consent to the issuance of additional bonds, or any right of Depfa to limit the redemption schedule or maturity period of additional bonds.  *See* Davis Dep. 43:4-46:7.

43.     Bond counsel to the 2005 transaction agreed that she too did not recall any discussions in 2005 regarding Depfa asserting or negotiating for a right to consent to or limit the issuance of additional bonds.  *See* Bayus Dep. 38:5-9; 39:9-17.

44.     The same professionals involved in the 2005 transaction were also involved in the 2006 transaction.  At the time of the 2006 transaction, none of these professionals raised the issue of needing Depfa's consent prior to the issuance of the 2006 Bonds or the execution of the Second Supplemental Indenture.

45.     Depfa was fully aware of the 2006 bond transaction and never asserted that its consent was required.  *See* Davis Dep. 34:21-37:15.

46.     Depfa's lead representative in the ALL bond transactions, David Park, frankly admits in his deposition that he knew about and bid on the 2006 bond transaction, but didn't think about the question of whether Depfa's consent was required until after all of the

2005 Bonds had become bank bonds.  *See* Park Dep. 47: 14-18; 97:10-98:12.

47.     Between 2006 and 2008 (before the 2005 Bonds and the 2006 Bonds became bank bonds due to Ambac's insolvency), the transaction operated as anticipated and Depfa raised no issue.

48.     It was not until 2009, when Depfa began questioning the payments made and recognized that the Ambac insurance upon which it had relied would not be available to cover the full amount of the repurchase of the 2005 Bonds that Depfa started to question the issuance of 2006 Bonds and the Second Supplemental Indenture.  *See* Park Dep. 97:10-98:12; Peterson Dep. 84:4-17.

49.     The respective "term-out" periods for Depfa and Lloyd's are different (semi-annually over 10 years in the case of the Depfa Standby Agreement and quarterly over 5 years in the case of the Lloyds Standby Agreement).  Trial Exs. 4,5.

50.     The 2005 Bonds and the 2006 Bonds were purchased by the respective banks on various dates (16 separate dates) over a period of four (4) months.

51.     Many of the dates are within days of other purchase dates.

52.     The calculation of the redemption payments were dependent upon several factors outside of ALL's control.  For example, ALL received information from the entities servicing the student loans only once a month, and on dates that did not correspond with the purchase dates.

53.     Thus, it was impossible to make the redemption payments on each quarter

and semi-annual date corresponding to each individual purchase date, due to the need to ascertain fund balances and make accruals and payments prior to determining the amounts available for bond redemption.  *See* Peterson Dep. 22:11-23:17; 29:23-30:9; 205:15-206:2.

54.    Due to the impossibility of making payments on each quarter and semi annual date corresponding to each individual purchase date, ALL applied available funds to the repayment of the 2005 Bonds and the 2006 Bonds, after making the payments and accruals required by the Standby Agreements and the Indenture.  *See* Peterson Dep. 120:8-22.

55.    Initially when payments were made to Depfa and Lloyds under the Standby Agreements, ALL calculated payments to reflect the five and ten year term out periods in the Standby Agreements.  *See* Peterson Dep. 120:23-121:13.

56.    However, Depfa disagreed with this payment calculation methodology. Based upon Depfa's disagreement, for the last two payments before this interpleader action was initiated, ALL calculated payments as requested by Depfa.

57.    Lloyds, however, disagreed with this payment calculation methodology.

58.    Both Lloyds and Depfa insisted that the payment calculation methodology that favored their respective positions was correct.

59.    Shortly thereafter, BNY Mellon initiated this interpleader action, and further payments were held in abeyance.

60.    Although the terms of Depfa and Lloyds redemption schedules are different, to date, Depfa has received a greater payout than Lloyds.

61.     To date, Depfa has been paid $46,977,100 in interest and redemption payments, while Lloyds has been paid $41,625,470 in interest and redemption payments.

## II.     Proposed Conclusions of Law

1.     ALL is not liable to Depfa for Breach of Contract (Failure to Obtain Prior Written Consent to Amend the Trust Indenture) and judgment should be entered in ALL's favor on Count I of Depfa's cross-claims.

2.     ALL is not liable to Depfa for Breach of Contract (Failure to Make Mandatory Redemption Payments) and judgment should be entered in favor of ALL on Count II of Depfa's cross-claims.

3.     ALL is not liable to Depfa for Indemnification and judgment should be entered in favor of ALL on Count V of Depfa's cross-claims.

4.     ALL is not liable to Lloyds for Breach of Contract for Failure to Make Mandatory Redemption Payments and judgment should be entered in ALL's favor on Count I of Lloyds' Third Party Complaint.

5.     ALL is not liable to Lloyds for Breach of Contract for Failure to Provide an Accounting and judgment should be entered in favor of ALL on Count II of Lloyds' Third Party Complaint.

6.     ALL is not liable to Lloyds for Attorneys' Fees, Expenses and Costs and judgment should be entered in favor of ALL on Count IV of Lloyds' Third Party Complaint.

7.     ALL is not liable to Lloyds for Indemnification and judgment should be

entered in favor of ALL on Count V of Lloyds' Third Party Complaint.

        8.     ALL is not liable to JPM Chase for Indemnification and judgment should be entered in favor of ALL on JPM Chase's cross-claim against ALL for indemnification..

        9.     ALL is not liable in damages to any party asserting affirmative claims against ALL pursuant to the non-recourse provisions of the General Indenture and the Standby Agreements.

Dated: New York, New York
       October 31, 2011

                          Respectfully submitted,

                          **HOFHEIMER GARTLIR & GROSS, LLP**

                          By: /s/Nicholas B. Malito
                          Scott R. Kipnis
                          Nicholas B. Malito
                          530 Fifth Avenue
                          New York, New York  10036
                          Telephone: (212) 944-0500
                          Facsimile: (212) 897-4980
                          skipnis@hgg.com
                          nmalito@hgg.com

                          -and-

                          **BALLARD SPAHR LLP**
                          Dean C. Waldt (Admitted *Pro Hac Vice*)
                          Mariah Murphy (Admitted *Pro Hac Vice*)
                          210 Lake Drive East, Suite 200
                          Cherry Hill, New Jersey  08002
                          Telephone: (856) 761-3400
                          Facsimile: (856) 761-1020
                          waldtd@ballardspahr.com
                          murphym@ballardspahr.com

                          *Counsel for Access to Loans for Learning Student Loan Corporation*