UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

THE BANK OF NEW YORK MELLON TRUST
COMPANY, N.A.,

                 Plaintiff-Counterclaim Defendant,

    -against-

DEPFA BANK PLC and LLOYDS TSB BANK PLC,

                 Defendants-Counterclaimants.

---

DEPFA BANK PLC,

              Third-Party Plaintiff,

    -against-

ACCESS TO LOANS FOR LEARNING
STUDENT LOAN CORPORATION and
JPMORGAN CHASE BANK, N.A.,

            Third-Party Defendants.

---

LLOYDS TSB BANK PLC,

              Third-Party Plaintiff,

    -against-

ACCESS TO LOANS FOR LEARNING
STUDENT LOAN CORPORATION,

            Third-Party Defendant.

Case No.: 10-CV-4424 (JPO) (AJP)

## THE BANK OF NEW YORK MELLON TRUST COMPANY N.A.'S
## PRETRIAL MEMORANDUM

Judith A. Archer
Sarah E. O'Connell
Fulbright & Jaworski, LLP
666 Fifth Avenue
New York, New York 10103
(212) 318-3000
*Attorneys for the Bank of New York
Mellon Trust Company, N.A.*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. iv

PRELIMINARY STATEMENT ............................................................................ 1

STATEMENT OF FACTS ................................................................................... 4

    The 2005 Bond Transaction ....................................................................... 4

    The Indenture ............................................................................................. 5

    The First Supplemental Indenture and Depfa Standby Bond Purchase Agreement .......... 7

    Administration of the Trust Assets .............................................................. 8

    The 2006 Bond Transaction ....................................................................... 9

    The Second Supplemental Indenture and the Lloyds SBPA ...................... 10

    Opinion Letter and Certifications as to the Propriety of the 2006 Transaction ............. 11

    Redemption Payments .............................................................................. 12

    The Instant Dispute .................................................................................. 15

ARGUMENT ................................................................................................... 17

    I.     DEPFA'S AND LLOYDS' CLAIMS AGAINST BNY MELLON FAIL BECAUSE BNY MELLON DOES NOT OWE FIDUCIARY DUTIES TO THE BONDHOLDERS AND BECAUSE BNY MELLON COMPLIED WITH ITS OBLIGATIONS UNDER THE INDENTURE .......... 20

          A.    Depfa's and Lloyds' Breach of Fiduciary Duty Claims Fail As a Matter of Law Because They Are Duplicative of Depfa's and Lloyds' Breach of Contract Claims ........................................ 21

          B.    Depfa's and Lloyds' Breach of Fiduciary Duty Claims Fail Because BNY Mellon Does Not Owe Fiduciary Duties to Either Depfa or Lloyds ................................................................... 22

               1.    California Law Does Not Impose a Fiduciary Duty on Indenture Trustees .............................................................. 22

               2.    Industry Custom Does Not Impose a Fiduciary Duty On Indenture Trustees .............................................................. 24

               3.    BNY Did Not Assume a Fiduciary Duty under the Language of the Indenture .............................................. 25

                     a.    A Single Use of the Word Fiduciary Cannot Create a Fiduciary Duty Where One Would Not Otherwise Exist ........................................................ 25

                     b.    The Specific Previsions of the Indenture Prevail over the Single, Generalized Use of a Term ........... 26

**TABLE OF CONTENTS**
(continued)

Page

      c.    Where the Trustee is Protected by Boilerplate Indenture Provisions, any Deviation from Industry Standard must be Express and Obvious ........................... 27

      d.    Any Inference of Pre-Default Fiduciary Duties to the Trustee Would Obviate Critical Provisions of the Indenture ................................................................... 28

II.    THE INDENTURE PROVIDED NO RIGHT OF DEPFA TO CONSENT TO SUPPLEMENTAL INDENTURES OR SUBSEQUENT LIQUIDITY TERMS ............................................................................................. 30

    A.    The Negotiations of the Parties Show that Depfa Asked for but Was Not Granted The Consent Right it Now Claims .............................. 32

    B.    Depfa's Conduct Demonstrates That it Did Not Believe it Had the Right to Consent ...................................................................................... 32

    C.    Other Transaction Documents Contradict Depfa's Consent Claim ......... 36

    D.    The Consent Right That Depfa Now Claims Is Not Customary in the Industry and Would Have Been Clearly Expressed in the Documents ................................................................................................ 39

    E.    The Second Supplemental Indenture Was Not an Amendment to the Indenture ............................................................................................ 41

III.   DEPFA'S CHALLENGE TO LLOYDS' BONDS AS NOT IN PARITY IS CONTRARY TO THE UNDERSTANDING OF THE PARTIES AND THE INDUSTRY ..................................................................................... 42

    A.    The Meaning of Parity ........................................................................... 42

    B.    Depfa's Theory of Parity Conflicts with Industry Custom ..................... 44

    C.    Depfa's Creation of a New Theory of Parity for the Instant Litigation ................................................................................................. 45

IV.   THE TRUSTEE WAS ENTITLED TO RELY ON OPINIONS OF COUNSEL AND DIRECTIONS FROM ALL, AND HAD NO DUTY TO MAKE REDEMPTION PAYMENTS WITHOUT DIRECTION, TO QUESTION ALL'S REDEMPTIONS OR TO DUPLICATE ALL'S WORK IN DETERMINING WHETHER AND WHEN FUNDS WERE AVAILABLE FOR REDEMPTIONS ................................................................. 46

    A.    The Indenture Clearly Authorizes BNY Mellon To Rely on Instructions from the Issuer and Opinions of Counsel ............................. 47

    B.    Practice in the Industry Creates Only a Limited Duty of the Trustee To Review Opinions of Counsel and Instructions from the Issuer .......... 49

**TABLE OF CONTENTS**
(continued)

**Page**

1. The opinions of counsel received by the Trustee comport with the Indenture ........................................................................ 51

2. The Trustee properly relied on Directions from ALL ................. 54

C. The Exculpatory Provisions of the Indenture Do Not Create an Affirmative Duty of Care ........................................................... 57

V. NO CONDUCT OF THE TRUSTEE CAUSED ANY DAMAGE TO LLOYDS OR DEPFA ............................................................................. 59

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*AG Cap. Funding Partners, L.P. v. State St. Bank & Trust Co.*,
 11 N.Y.3d 146, 866 N.Y.S.2d 578 (2008) ....................................................22

*Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London*,
 136 F.3d 82 (2d Cir. 1998)...........................................................................32

*Alitalia Linee Aeree Italiane, S.p.A. v. Airline Tariff Publ'g Co.*,
 580 F. Supp. 2d 285 (S.D.N.Y. 2008)..........................................................21

*Am. Alternative Ins. Corp. v. Superior Court*,
 37 Cal. Rptr. 3d 918 (Ct. App. 2006) ..........................................................25

*Am. Home Assurance Co. v. Merck & Co.*,
 462 F. Supp. 2d 435 (S.D.N.Y. 2006)..........................................................53

*Banco Espirito Santo de Investimento, S.A. v. Citibank, N.A.*,
 2003 U.S. Dist. LEXIS 23062 (S.D.N.Y. Dec. 22, 2003) ...........................58

*Birnbaum v. Birnbaum*,
 73 N.Y.2d 461, 541 N.Y.S.2d 746 (1989) ...................................................24

*Cachil Dehe Band of Wintun Indians v. California*,
 618 F.3d 1066 (9th Cir. 2010) .....................................................................26

*Compagnia Importazioni Esportazioni Rappresentanze v. L-3 Communs. Corp.*,
 703 F. Supp. 2d 296 (S.D.N.Y. 2010)..........................................................33

*Cruden v. Bank of N.Y.*,
 957 F.2d 961 (2d Cir. 1992)...................................................................53, 59

*Dell'Oca v. The Bank of N.Y. Trust Co., N.A.*,
 159 Cal. App. 4th 531 (1st App. Dist. 2008)............................22, 23, 24, 49

*Donovan v. Bierwirth*,
 680 F.2d 263 (2d Cir.), *cert. denied*, 459 U.S. 1069 (1982).......................29

*Elliot Assocs. V. J. Henry Schroder Bank & Trust Co.*,
 838 F.2d 66 (2d Cir. 1988)......................................................................22, 47

*Fischer & Mandell LLP v. Citibank, N.A.*,
 632 F.3d 793 (2d Cir. 2011).........................................................................30

*Fruition, Inc. v. Rhoda Lee, Inc.*,
 1 A.D.3d 124 (1st Dep't 2003) .....................................................................59

## TABLE OF AUTHORITIES
(continued)

Page

*Goldman v. Comm'r of Internal Revenue,*
  39 F.3d 402 (2d Cir. 1994)......................................................................................31

*Gordon v. Vincent Youmans, Inc.,*
  358 F. 2d 261 (2d Cir. 1965)...............................................................................34, 36

*Hazzard v. Chase Nat'l Bank,*
  159 Misc. 57, 287 N.Y.S. 541 (Sup. Ct. N.Y. Cnty. 1936), *aff'd,* 257 A.D. 950, 14
  N.Y.S.2d 147 (1st Dep't 1939), *aff'd,* 282 N.Y. 652, 26 N.E.2d 801, *cert. denied,* 311
  U.S. 708 (1940)......................................................................................................22

*Howard v. Shay,*
  100 F.3d 1484 (9th Cir. 1996) ...............................................................................29

*Irving v. Ebix, Inc.,*
  No. 10-CV-762, 2010 U.S. Dist. LEXIS 80443 (S.D. Cal. Aug. 10, 2010) .....................25, 26

*Israel Disc. Bank Ltd v. Gottesman,*
  544 F.2d 80 (2d Cir. 1976).....................................................................................31

*Israel v. Chabra,*
  601 F.3d 57 (2d Cir. 2010).....................................................................................26

*Jadwin v. Cnty. of Kern,*
  610 F. Supp. 2d 1129 (E.D. Cal. 2009)....................................................................26

*Kaiser Cement v. Ins. Co. of State of Pennsylvania,*
  196 Cal. App. 4th 140 (2d App. Dist. 2011)...........................................................29, 52

*LNC Invs., Inc. v. First Fid. Bank,*
  935 F. Supp 1333 (S.D.N.Y. 1996) .................................................................22, 23, 29

*Luizzi v. Pro Transport, Inc.,*
  2011 WL 1655567 (E.D.N.Y. 2011).........................................................................53

*Marx & Co. v. Diners' Club, Inc.,*
  550 F.2d 505 (2d Cir. 1977)...................................................................................53

*Masonek v. Wells Fargo Bank, Nat'l Assoc.,*
  No. SA ML 10-2145 DOC (RNBx), 2010 U.S. Dist. LEXIS 143439 (C.D. Cal. Aug.
  31, 2010) ................................................................................................................58

*MBIA Ins. Corp. v. Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A.,*
  No. 09-Civ.-10093, 2011 U.S. Dist. LEXIS 31307 (S.D.N.Y. Mar. 25, 2011) ................37, 39

**TABLE OF AUTHORITIES**
(continued)

Page

*McCarthy v. Am. Int'l Group, Inc.*,
    283 F.3d 121 (2d Cir. 2002)..........................................................................35

*Meckel v. Cont'l Res. Co.*,
    758 F.2d 811 (2d Cir. 1985..........................................................................23

*Meckel v. Cont'l Res. Co.*,
    758 F.2d 811 (2d Cir. 1985)..............................................................22, 23, 47

*Media Sport & Arts s.r.l. v. Kinney Shoe Corp.*,
    1999 U.S. Dist. LEXIS 16035 (S.D.N.Y. Oct. 19, 1999) .......................................53

*N.Y. State Med. Care Facilities Fin. Agency v. Bank of Tokyo Trust Co.*,
    163 Misc. 2d 551, 621 N.Y.S.2d 466 (Sup. Ct. N.Y. Cnty. 1994) .........................22

*Nat'l Market Share, Inc. v. Sterling Nat'l Bank*,
    392 F.3d 520 (2d Cir. 2004)..........................................................................59

*New Windsor Volunteer Ambulance Corps, Inc. v. Meyers*,
    442 F.3d 101 (2d Cir. 2006)......................................................................33, 34

*New York Marine and Gen. Ins. Co. v. LaFarge N. Am., Inc.*,
    599 F.3d 102 (2d Cir. 2010)..........................................................................52

*Pantone, Inc. v. Esselte Letraset Ltd.*,
    691 F. Supp. 768 (S.D.N.Y. 1988) ...............................................................30, 32

*Postal Instant Press, Inc. v. Sealy*,
    43 Cal. App. 4th 1704 (2d App. Dist. 1996)........................................................59

*Rowe v. Great Atl. & Pac. Tea Co.*,
    385 N.E.2d 566 (N.Y. 1978)..........................................................................41

*Rowe v. Great Atl. & Pac. Tea Co., Inc.*,
    46 N.Y.2d 62 (1978) ...................................................................................31

*S.N.J. Rail Grp., LLC v. Lumbermens Mut. Cas. Co.*,
    No. 06-Civ.-4946, 2007 U.S. Dist. LEXIS 58510 (S.D.N.Y. Aug. 13, 2007).........................31

*Semi-Tech Litig., LLC v. Bankers Trust Co.*,
    353 F. Supp. 2d 460, *aff'd in part and rev'd in part on other grounds*, Nos. 05-1155-
    bk, 05-1485-bk, 2006 U.S. App. LEXIS 17496 (2d Cir. May 31, 2006) ...............................50

*Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*,
    691 F.2d 1039 (2d Cir. 1982)......................................................................27, 28

## TABLE OF AUTHORITIES
(continued)

Page

*Shawmut Bank, N.A. v. Kress Assocs.,*
  33 F.3d 1477 (9th Cir. 1994) .......................................................21, 22, 23, 47, 48, 59

*SNS Bank, N.V. v. Citibank, N.A.,*
  7 A.D.3d 352 (1st Dep't 2004) ...........................................................................25

*VKK Corp. v. Nat'l Football League,*
  244 F.3d 114 (2d Cir. 2001)..............................................................................31

*Wall St. Network, Ltd. v. N.Y. Times Co.,*
  164 Cal. App. 4th 1171 (2d App. Dist. 2008)................................................................30

*Wells Fargo Bank v. FSI, Financial Solutions,*
  196 Cal. App. 4th 1559 (4th App. Dist. 2011)............................................................59

*Wolf v. Sup. Ct.,*
  107 Cal. App. 4th 25 (Ct. App. 2003)....................................................................23

### RULES AND STATUTES

CAL. CIV. CODE § 1636..............................................................................................26

CAL. CIV. CODE § 1641 .........................................................................................29, 52

Fed. R. Civ. P. 26..................................................................................................61

Fed. R. Civ. P. 37(c) ...............................................................................................61

Trust Indenture Act of 1939....................................................18, 22, 25, 27, 28, 29, 43

Trust Indenture Act of 1939 § 310(b)(1) ...................................................................44

Trust Indenture Act of 1939 § 315...........................................................................22

Trust Indenture Act of 1939 § 315(a)(1).....................................................................25

### OTHER AUTHORITIES

MARTIN D. SKLAR, THE CORPORATE INDENTURE TRUSTEE: GENUINE FIDUCIARY OR MERE
  STAKEHOLDER?, 106 BANKING L.J. 42 (1989).................................................................23

Municipal Securities Rulemaking Board, *Glossary of Municipal Securities Terms*
  (2d Ed.) ........................................................................................................42

RESTATEMENT (SECOND) OF CONTRACTS § 202(4) (1979) ...............................................33

# TABLE OF AUTHORITIES
(continued)

Page

ROBERT I. LANDAU & JOHN E. KRUEGER, CORPORATE TRUST ADMINISTRATION AND
MANAGEMENT 30 (5th ed. 1998) ............................................................................23, 24, 49, 58

ROBERT I. LANDAU & ROMANO I. PELUSO, CORPORATE TRUST ADMINISTRATION &
MANAGEMENT 42 (6th ed. 2008) ...........................................................17, 18, 23, 24, 25, 29, 44

Interpleader Plaintiff/Counterclaim Defendant The Bank of New York Mellon Trust Company N.A. ("BNY Mellon"), by its undersigned counsel, hereby submits its Pretrial Memorandum.

## PRELIMINARY STATEMENT

This action, quite simply, boils down to a case of investor's remorse. Depfa Bank PLC ("Depfa"), a large, sophisticated, multinational bank, agreed in 2005 to act as liquidity provider for a series of student loan-backed bonds. Depfa knew that it might be called upon to buy the bonds in certain circumstances – such is the nature of a liquidity provider. In return for that risk, Depfa would receive liquidity fees as well as repayment of principal and interest should it be called upon to purchase the bonds. Because Depfa agreed to a 10-year liquidity term, it negotiated a high interest rate to compensate for its longer risk period. The bonds were insured by Ambac Assurance Corp. ("Ambac"), but Depfa clearly understood (and it was fully disclosed) that there was a risk that economic factors or the financial condition of the insurer could prevent Depfa from fully recouping its investment. Despite these known risks, Depfa eagerly bid to provide liquidity for an issuance of additional bonds (permitted by the Indenture) in 2006, but lost to Lloyds TSB Bank plc ("Lloyds").

Unfortunately, these risks came to pass. Ambac was downgraded and Depfa and Lloyds were forced to buy the bonds. The severe economic downturn beginning in 2008, and Ambac's collapse, left Depfa and Lloyds without recourse to the insurance policy and facing a deteriorating pool of assets. These factors have given rise to the dispute at the heart of this case - - how the remaining assets of the trust should be divided between Depfa and Lloyds.

Not content to abide by the terms of its agreement and bear the consequences of the risk it willingly assumed, Depfa seeks to shift liability to, among other parties, the Trustee (originally JP Morgan Chase Bank, N.A. ("JPMC"), succeeded by BNY Mellon (collectively, the

55755828.1

1

"Trustee")).  Depfa and Lloyds would have the Court drastically expand the duties that the Trustee agreed to undertake and that the law and industry custom impose.   This ignores the fundamental nature of these bond transactions and the well-accepted roles the various parties play, as the testimony at trial will show.   An indenture trustee traditionally has a limited, ministerial role in a bond transaction.  It acts at the issuer's direction, without specific authority to act on its own except to process or effectuate those directions.  A trustee is not involved in negotiating the business terms of the deal or memorializing those terms.  The Trustee's limited role is express in the indenture, subject to significant protections, and reflective of the fact that its compensation is many magnitudes lower than all of the other parties.  In fact, Depfa's claims are so inconsistent with the Trustee's limited role that there is only one explanation for them -- Depfa sees JPMC and BNY Mellon as "deep pockets" in light of ALL's assertion that there is no recourse to the Issuer for Depfa's claims.  Any loss to Depfa or Lloyds can hardly be attributed to the conduct of the Trustee.

Depfa unquestionably understood the risks of its investment, but now looks to place itself in a much better position than it ever bargained for.  Depfa contends that the issuance of bonds in 2006 was improper because Depfa has the right to consent to such transaction and did not -- a right Depfa never asserted until mid-2009.  Having bid to provide liquidity for the 2006 issuance, Depfa knew additional bonds were being issued pursuant to a supplemental indenture and knew that the winning bidder had likely bid terms that differed from its own.  When Depfa learned that Lloyds would be the liquidity provider for the 2006 issue, it raised no objection, complaint or concern.  Depfa never indicated at that time, or for 3 more years, that its consent was needed for the issuance of additional bonds, the entry of a supplemental indenture or the Lloyds liquidity facility.  The same lawyer represented Depfa in 2005 and Lloyds in 2006, and she confirms that

she never believed or raised with any other party to the transaction the idea that any consent right of Depfa was implicated by the 2006 transaction.

Depfa relies on a provision requiring its consent to amendments or modifications to the Indenture – a provision that expressly omits consent to supplements, the standard vehicle for issuing additional bonds in the industry and under the Indenture here. The language of the contracts, the negotiations and the parties' course of performance will all overwhelmingly demonstrate that Depfa did not have the right to consent to the 2006 transaction. Depfa's main negotiator will concede (if consistent with his deposition) that in 2006 Depfa did not believe it had such a right. Equally damning, Depfa's own counsel and the drafter of the relevant provision confirms that no such consent right was agreed to.

Also, Depfa claims that additional senior bonds could only be issued in "parity" with Depfa's, and that the Lloyds bonds were not in parity because they had a shorter, faster redemption schedule. But the parties – Access to Loans for Learning Student Loan Corporation ("ALL"), the Trustee, Lloyds, even Depfa – as well as their experts, will testify consistently that parity means having an equal security interest in the collateral in the trust. Bonds may be in parity even though they have different interest rates, maturity dates and redemption schedules. In fact, parity has nothing to do with the redemption terms of the bonds, as will be confirmed by experienced industry experts.

Depfa seeks to impose liability on the Trustee for not preventing the Lloyds transaction, though it cannot justify why the Trustee should have done so in light of the determinations of the other parties and their counsel that the transaction was proper and permissible, which the Trustee was entitled to and protected in relying on under the Indenture. Depfa also tries to hold the Trustee responsible for redemption payments to Lloyds that it processed at the express direction

of ALL, the only party under the contracts obligated and sufficiently informed to make redemptions. Depfa's arguments would wholly negate the standard protections to which the Trustee was entitled under the Indenture, namely reliance on opinions of counsel as to the propriety of the Lloyds transaction and on directions from ALL for the timing and amount of redemption payments. Lloyds also contends that the Trustee is somehow liable because ALL did not direct it to make quarterly redemption payments, an obligation that is ALL's, not the Trustee's, but again the Trustee was protected in relying on ALL's directions especially given the fact that the Trustee did not have information sufficient to calculate redemption payments.

By its contra-contractual claims, Depfa seeks to rewrite its deal, giving itself a consent right that was expressly rejected, keeping its own significantly higher interest rate while at the same time changing its redemption terms to ones that were not and would never have been granted. Because the evidence will show that Depfa and Lloyds' counter, cross and third party claims cannot be sustained, they do nothing but distract from the central issue in this case. At bottom, this case is a quintessential declaratory judgment case. Depfa and Lloyds each have recourse to one pool of assets. Their competing claims have placed the Trustee in the untenable position of facing suit no matter what action it takes, and are ripe for resolution by the Court.

## STATEMENT OF FACTS

At trial of this matter, the testimony of witnesses and the documentary evidence -- or by the failure of contrary evidence of Depfa and Lloyds -- will establish the following:

### The 2005 Bond Transaction

ALL is a non-profit issuer of bonds backed by, among other things, federally guaranteed student loans. In 2005, ALL determined to issue $190 million in Series V A-1 and A-2 bonds to be backed by such loans, and solicited bids from banks, including Depfa and Lloyds, to act as

liquidity provider for the bonds. (*See, e.g.,* Trial Ex. 14, 15; Stipulated Facts No. 13)[1] Depfa

submitted a bid in May 2005, which ALL accepted.  (*See* Trial Ex. 15; Stipulated Facts No. 14)

Depfa agreed to provide liquidity for a period of 10 years. (Trial Ex. 15)  As a result of that long

period, Depfa and ALL agreed to a high interest rate of Prime + 1.5%.  (*Id.*)  In return for

agreeing to provide such liquidity, Depfa also would receive liquidity fees in the amount of 17.5

basis points on the balance of outstanding bonds.  (*Id.*)

The Bonds were insured against default by Ambac, which agreed to pay any unpaid bond

principal at the stated maturity dates and interest on required interest payment dates. (Trial Ex.

34; Stipulated Facts No. 9)  The Offering Statement for the 2005 bonds summarized the various

indenture provisions and set forth Risk Factors, including that "there can be no assurance that the

Insurer [Ambac] will have sufficient revenues to enable it to make timely payments under the

Insurance Policy." (Trial Ex. 28 at TS-10 (ALL0000450))

In connection with the 2005 Transaction, the Parties entered into various agreements,

including, among others, the Indenture, First Supplemental Indenture and Depfa Standby Bond

Purchase Agreement.  (Trial Exs. 1, 2 & 4)

**The Indenture**

ALL and JPMC entered into the Indenture, the overall purpose of which was to facilitate

the issuance of Series V bonds. (Trial Ex. 1 at 1)  The Indenture was a Master Indenture, as that

term is known in the bond industry, because it specifically authorized and contemplated that

more than one issuance of bonds would be made thereunder.  (Davis Tr. at 180:7-14, 194:2-12;

Peterson Tr. at 17:25-18:6; Landau Tr. at 173:13-174:3)[2] The Indenture contemplated that the

---

[1]        References herein to "Trial Ex. __" are to the Joint Exhibits submitted herewith.  References herein to "Stipulated Facts" are to the Stipulated Statements of Fact or Law contained in the Joint Pretrial Order.

[2]        References herein to deposition transcripts shall be to, *e.g.*, "Davis Tr. at ___".  By agreement of the parties, only the transcripts of those witnesses not providing in-person testimony (Elaine Bayus, Christopher

issuance of different series of bonds would be accomplished by means of supplemental indentures, which is also standard in the bond industry. (Trial Ex. 1 at 3)

> The Indenture, governed by California law (Trial Ex. 1 at § 11.7), expressly states:
>
>> "Bonds may be issued under the provisions of this Indenture, but only in accordance with this Article, in amounts which shall not be limited except as specified with respect to any series of Bonds in the Supplemental Indenture providing for the issuance thereof. Additional Bonds may be issued on a parity with Senior bonds. . . theretofore Outstanding . . . ."

(Trial Ex. 1 at § 2.01)  The Indenture goes on to provide:  "Bonds of any series shall bear interest, mature, be subject to redemption or tender, and have such other terms as shall be set forth in the Supplemental Indenture pursuant to which such Bonds are authorized to be issued." (*Id*. at § 2.4)  The Indenture also includes various provisions about the terms, payment, form, transfer, authentication and redemption of bonds issued thereunder. (*Id*. at Art. II)

The Indenture permits ALL and the Trustee, "without the consent of or notice to any of the Owners," to enter into any Supplemental Indenture for a variety of purposes, including "the issuance of any series of Bonds." (Trial Ex. 1 at § 7.1)  It sets forth the priority in which various expenses would be paid out of the Trust assets (the "Waterfall") (*id*. at § 5.3(B), and the specific duties undertaken by the Trustee (*id*. at Art. X).  It also includes remedies available to the bondholders in the event of default. (*Id*. at § 9)

Depfa and its counsel were involved in negotiating the Indenture and thus were aware of its terms. (Davis Tr. at 19:18-20:4)  Depfa could have decided not to enter into the transaction if it was not satisfied with the terms of the Indenture. (Davis Tr. at 20:14-21:5)  Accordingly,

---

Chapman and Elizabeth Davis) have been designated.  Therefore, BNY Mellon is not including the pages of other transcripts.  BNY Mellon is willing to submit full or excerpted copies of any other transcript at the Court's request.

Depfa was well aware that additional bonds were authorized and would be issued pursuant to a Supplemental Indenture.

**The First Supplemental Indenture and Depfa Standby Bond Purchase Agreement**

ALL, Depfa and JPMC executed a First Supplemental Indenture simultaneously with the Indenture to effectuate the issuance of Series V A-1 and A-2 bonds. (Trial Ex. 2; Stipulated Facts at 2)  Section 13.3 of the First Supplemental Indenture designates the Series A-1 and A-2 bonds as Senior Bonds, which is the highest level of priority of bond repayment under Section 5.3(B) of the Indenture, the Waterfall. (Trial Ex. 2 at § 13.3)  A Standby Bond Purchase Agreement (the "Depfa SBPA") was executed between Depfa, ALL and JPMC, which governed the terms of Depfa's liquidity facility. (Trial Ex. 4; Stipulated Facts at 3)  The Depfa SBPA was drafted by Depfa's counsel and is governed by New York law. (Trial Ex. 4 at § 8.03; Davis Tr. at 17:6-12)  Depfa was obligated thereunder to serve as the buyer of last resort for all outstanding Series A-1 and A-2 Bonds under certain circumstances. (Trial Ex. 4 at § 2.01)  In the event that Depfa was required to purchase the bonds, the Depfa SBPA provides that they be redeemed in semiannual installments over a 10 year period from funds available in the Revenue account, after taking into consideration the payment or set aside of certain Waterfall expenses. (Trial Ex. 4 at § 3.02)

Section 5.03(a) of the Depfa SBPA provides that ALL shall not "[a]mend, modify, terminate or grant, or permit the amendment, modification, termination or grant of, any waiver under, or consent to, or permit or suffer to occur any action or omission which results in, or is equivalent to, an amendment, modification, or grant of a waiver under the Policy or the Indenture without the prior written consent of [Depfa]." [3]  (Trial Ex. 4 at § 5.03(a))  Nowhere does that

---

[3]         The sections of the Depfa SBPA relied on by Depfa apply only to the Issuer, and are not obligations or covenants undertaken by the Trustee.  Depfa argues that they apply to the Trustee based on a

section reference the issuance of additional bonds or a "supplement" to the Indenture. (*Id.*) Nothing in Section 5.03(a) or elsewhere in the Depfa SBPA prevented ALL from issuing additional bonds, only from amending the terms of the Indenture relating to Depfa's bonds. (*See* Trial Ex. 4)  The language set forth above does not negate the Indenture's express authorization to ALL to enter into a Supplemental Indenture for the issuance of additional series of bonds, and to do so without the consent of any bondholders.

**Administration of the Trust Assets**

In addition to being the bond issuer, ALL acted as the Program Administrator responsible for, among other things, causing bond redemptions, causing payment of program expenses under the Indenture Waterfall, contracting with loan servicers, ensuring compliance with the Higher Education Act, and keeping proper books and records. (*See, e.g.*, Trial Ex. 1 at § 6)  Pursuant to the Indenture, ALL and the Trustee established several trust accounts, including a Revenue Account (the "Revenue Account"), a Payment Account (the "Payment Account") and a Loan Account (the "Loan Account").  (Trial Ex. 1 at § 5.2)  All revenues arising from the student loans and other earnings from the assets in the trust estate were deposited by the loan servicing companies directly into the Revenue Account, and the Trustee would pay expenses out of the Revenue Account in the order of priority identified in the Indenture, at the direction of ALL. (Trial Ex. 1 at § 5.3)  After the close of a given month, the loan servicers would provide reports detailing what percentage of payments in the prior month represented payments of interest on the student loans and what percentage represented payment of principal.  (Peterson Tr. at 89:5-25)  ALL would direct the Trustee to make appropriate transfers between accounts, including the transfer of principal recoveries to the Loan Account.  (Peterson Tr. at 88:25-89:4; 90:1-14)  The

---

provision of the First Supplemental Indenture (Trial Ex. 2 at § 14.4).  This argument presumes, however, that Depfa had the right to consent, which it does not.

Indenture also requires the Trustee, at ALL's direction, to transfer funds remaining in the Revenue Account on each interest payment date or other payment date for the Senior Bonds to pay interest due on such date, and to pay the principal of Senior Bonds due on maturity. (Trial Ex. 1 at § 5.3(B)(5))

**The 2006 Bond Transaction**

In 2006, ALL determined to issue an additional $190 million in Series V bonds under the Indenture.  ALL once again invited several banks to bid to act as liquidity providers for the new bond issuance.  (Trial Exs. 39, 40)  Lloyds and Depfa, along with other banks, submitted bids to be the liquidity provider for the 2006 bond issuance.  (Trial Exs. 41, 43, 181, 183; Stipulated Facts No. 13; Peterson Tr. at 56:21-57:1, 58:12-18, 60:19-21) As it had in 2005, Depfa bid a 10 year liquidity term with a higher interest rate.  Lloyds bid a 5 year liquidity term, with a lower interest rate and better pricing.  Ultimately, ALL chose Lloyds as the liquidity provider for the 2006 bonds.  (Stipulated Facts No. 14)  Aside from the attractiveness of Lloyd's pricing, choosing Lloyd's also gave ALL diversity in that its credit exposure would be distributed over more than one bank.  (Peterson Tr. at 60:5-18; O'Neill Tr. at 204:8-20)

In or around June of 2006, Martha Peterson notified Depfa that it was not the winning bidder for the 2006 transaction.  (Peterson Tr. at 61:5-62:12)  When asked by David Park of Depfa, Peterson informed Park that Lloyds was the winning bidder.  (*Id.*)  Park had experience in bidding as a liquidity provider.  He knew that not all banks bid the same term length or interest rate, and Peterson told him that Lloyds had bid a shorter liquidity term.  (Peterson Tr. at 63:10-13)  Park knew (or should have known) that Lloyds could have a different redemption schedule and different interest rate than Depfa did.  (Park Tr. at 204:19-205:6)  This was typical in the industry.  (Davis Tr. at 71:10-13)  He did not ask Peterson what the terms of Lloyds' bid were. (Peterson Tr. at 61:9-62:20)  Neither during that call, nor at any point thereafter until 2009 did

55755828.1

9

Park assert that ALL could not issue additional bonds or enter into a Supplemental Indenture without Depfa's consent. (Peterson Tr. at 84:7-17)  Nor did he tell Peterson that ALL should have gotten Depfa's consent to the Lloyds liquidity facility. (*Id.*)  In fact, Park did not believe in 2005 or 2006 that Depfa had the right to consent to any of those things. (Park Tr. at 97:2-18)

**The Second Supplemental Indenture and the Lloyds SBPA**

A Second Supplemental Indenture between ALL and JPMC, as Trustee, dated as of August 1, 2006 (the "Second Supplemental Indenture"), was executed with respect to the issuance of the Lloyds' Bonds. (Trial Ex. 3)  Section 13.3 of the Second Supplemental Indenture provides that the Series V A-3, A-4 and A-5 Bonds would be redeemed as provided in the Standby Bond Purchase Agreement by and among ALL, JPMC and Lloyds (the "Lloyds SBPA"). (Trial Ex. 3 at § 13.3)  As with the Depfa SBPA, the Lloyds SPBA obligated Lloyds to serve as the buyer of last resort for all outstanding Series A-3, A-4 and A-5 Bonds under certain circumstances. (Trial Ex. 5 at § 2.01)  The 2006 bonds were also insured by Ambac. (Trial Ex. 69; Stipulated Facts No. 9)  Unlike the Depfa SBPA, however, the Lloyds SBPA provides that the Series A-3, A-4 and A-5 Bonds would be redeemed in quarterly installments over a 5 year period. (Trial Ex. 5 at § 3.02)  The Lloyds interest rate is significantly lower than that of Depfa, namely LIBOR + 1.75%, which reflects Lloyds' shorter term. (*Id.*)  Within the Second Supplemental Indenture, separate from the provisions relating to the issuance of the Series V A-3, A-4 and A-5 bonds, is a section entitled "Amendments." (Trial Ex. 3 at § 17.5)  That section sets forth minor amendments to several Indenture provisions, and the evidence will show that All did consult Depfa about those. (Trial Ex. 49)

The Series V A-3, A-4 and A-5 Bonds were issued on August 2, 2006, as a result of which significant additional collateral was added to the Master Trust. (Trial Ex. 3; Peterson Tr. at 85:2-5)

55755828.1

**Opinion Letter and Certifications as to the Propriety of the 2006 Transaction**

Before the closing of the 2006 Transaction, counsel for various parties issued opinion letters addressing the validity of the transaction.  Counsel to ALL, Sonnenschein Nath & Rosenthal LLP ("Sonnenschein"), issued two letters stating, *inter alia*, that the (i) Indenture (defined to include the Second Supplemental Indenture) and the Lloyds SBPA were valid and binding obligations of ALL; (ii) the execution and delivery of the Indenture and the Lloyds SBPA would not conflict with or constitute a breach of any other agreement to which ALL is a party or bound; (iii) the Second Supplemental Indenture was authorized or permitted by the Indenture; and (iv) the Second Supplemental Indenture was duly executed by ALL.  (Trial Exs. 63 & 64)  Orrick Herrington & Sutcliffe, bond counsel on the transaction, issued an opinion letter stating that, as bond counsel, it had reviewed the other opinions of counsel, and that counsel to ALL (Sonnenschein) was of the opinion that, *inter alia*, the Second Supplemental Indenture had been duly executed and delivered by, and constituted a valid and binding obligation of ALL.  (Trial Ex. 67)  Counsel to JPMC issued an opinion stating that JPMC had duly authorized, executed and delivered the Supplemental Indenture and Lloyds SBPA and that both documents were valid and legally binding obligations of JPMC.  (Trial Ex. 66)  Similarly counsel to Lloyds issued an opinion stating that Lloyds SBPA constituted the legal, valid and binding obligation of Lloyds, and was enforceable against Lloyds in accordance with the terms thereof.  (Trial Ex. 65)  Bond counsel, as well as counsel to Lloyds and the Trustee had each been involved in the 2005 Transaction and were familiar with the documents that had been executed in connection with that transaction.

In addition to the opinion letters, ALL issued a "Closing Certificate of the Corporation" further opining as to the validity of the 2006 Transaction.  (Trial Ex. 59)  The Closing Certificate certifies that "[a]ll necessary action required to be taken by [ALL] in connection with, and all

conditions precedent to, the authorization, execution, issuance, delivery and performance" of the documents executed in connection with the 2006 Transaction, including the Second Supplemental Indenture and Lloyds SBPA, "have been taken or fulfilled." (Trial Ex. 59 at 3, ¶ 10)  The Closing Certificate also certifies that the execution and delivery of the transaction documents, including the Second Supplemental Indenture and the Lloyds SBPA, would not conflict with or constitute a breach of any other agreement to which ALL is a party or bound. (Trial Ex. 59 at 4, ¶ 14)

JPMC also received the advice of its own counsel, Charles Waters, that the documents associated with the 2006 Transaction were acceptable, valid and consistent with the Trustee's obligations.  Relying on such advice, JPMC executed a Certificate and Receipt of the Trustee (the "Trustee's Certificate").  (Trial Ex. 71)  In the Trustee's Certificate JPMC certified, *inter alia*, that the Indenture, defined to include the Second Supplemental Indenture, were legal, valid and binding obligations of the Trustee, and the Trustee's consent to these documents, including the Lloyds SBPA, do not result in a breach or default under any agreement to which the Trustee is a party or may be bound.  (*Id.*)  The Trustee received, and relied upon, the opinion of its counsel in executing the Trustee's Certificate.

**Redemption Payments**

Ambac suffered severe financial difficulties as a result of a downgrade of its credit ratings by all three credit agencies in early 2008.  (Stipulated Facts No. 21)  Attempts to remarket the bonds were unsuccessful, and accordingly Depfa and Lloyds were called upon to purchase all of the bonds in their respective series between February and June 2008.  (Stipulated Facts No. 22)  By the terms of Depfa's SBPA, "[t]he Issuer agree[d] to cause the redemption of Bank Bonds in semiannual installments, commencing on the date which is six months after the Bank Purchase Date, from all amounts on deposit in the Revenue Fund after giving effect to the

55755828.1

transfers required pursuant to paragraphs First through Fifth of Section 5.3(B) of the General Indenture; provided that in any event all of the then unpaid principal amount of Bank Bonds shall be redeemed on the date which is the tenth anniversary of the Bank Purchase Date." (Trial Ex. 4 at § 3.02(a))[4]  The Lloyds SBPA had the same provision except that redemptions to Lloyds were to be in quarterly installments, commencing three months after the Bank Purchase Date, and all unpaid principal would be paid on the fifth anniversary.  (Trial Ex. 5 at § 3.02(a))

The language referring to "amounts on deposit" in Section 3.02 was required by Ambac, which insistent on "cash flow amortization," not a "set amortization schedule."  (Davis Tr. at 63:17-64:3, 80:9-19) There would not be set redemption dates in equal or specified installments. Whether, when and what amounts of redemption took place would depend on available cash, which would be determined by ALL.  (Roemlein Tr. at 159:14-160:6; Peterson Tr. at 244:23-245:3)  The SBPAs require that ALL calculate amounts available for redemption only after payment or set aside of amounts to ensure payment of expenses in the first five steps of the Indenture waterfall.  (Trial Exs. 4 and 5 at § 3.02)  Recognizing that amounts might not be available for redemption on a given date, the SBPAs provide that if the principal amount of any Bank Bond is not paid when due, "such overdue principal payment or other obligation shall bear interest from the date such principal amount . . . was due until paid in full . . . ."  (Trial Exs. 4 and 5 at § 3.03)

The Indenture also provides that Bonds "shall be subject to special redemption at the determination of [ALL], at any time, in whole or in part in Authorized Denominations, at a price of par plus accrued interest to the date of redemption, in an amount not to exceed moneys on deposit in the Loan Account and Revenues or Recoveries of Principal . . . which are not expected

---

[4]        The "Bank Purchase Date" is defined in the SBPAs as the date on which Depfa or Lloyds purchases the Bank Bonds.  (Trial Exs. 4 and 5 at 2)

to be used to finance Eligible Loans." (Trial Ex. 1 at § 3.8)  It further provides that "Notice of redemption of Bonds, unless otherwise specified by Supplemental Indenture, shall be given by the Trustee, at the Direction of the Corporation . . . ." (*Id.*)  "Prior to the date fixed for redemption, funds shall be deposited with the Trustee to pay, and the Trustee is hereby authorized and directed to apply such funds to the payment of, the Bonds called, together with accrued interest and premium, if any, thereon to the redemption date." (*Id.*)

Neither of the SBPAs or the Indenture require the Trustee to cause redemption payments, and all relevant references to redemption in both SBPAs and the Indenture are to the Trustee following the direction of ALL. (*See, e.g.,* Trial Exs. 3 and 4 at § 3.02) Thus, the Trustee was *neither required nor authorized* to make redemption payments unless directed to do so by ALL.

Prior to November 2009, the Trustee made redemption payments out of the Payment Account, at all times acting at the direction of ALL. (Stipulated Facts No. 25)  ALL advised BNY Mellon as to the dates on which redemption payments should be made and specified which bonds would be redeemed and in what amounts. (*See* Trial Exs. 82, 84, 95, 96, 130, 135, 166) ALL also directed BNY Mellon to give notice of redemption to Depfa and Lloyds and provided a form of notice. (*Id.*)  BNY Mellon would then process the payments through the Depository Trust Company. (Roemlein Tr. at 48:14-49:2; 264:3-10)  The following redemption payments were made on the following dates:

| Redemption Date | Series V-A-1 Depfa | Series V-A-2 Depfa | Series V-A-3 Lloyds | Series V-A-4 Lloyds | Series V-A-5 Lloyds |
|---|---|---|---|---|---|
| 10/27/08 | | | $ 5,300,000 | $ 3,600,000 | $ 3,600,000 |
| 11/12/08 | $ 3,300,000 | $ 2,900,000 | | | |
| 1/6/09 | $ 1,700,000 | $ 1,500,000 | $ 1,300,000 | $ 900,000 | $ 900,000 |
| 4/10/09 | | | $ 500,000 | $ 300,000 | $ 300,000 |
| 4/22/09 | $ 300,000 | $ 300,000 | | | |
| 7/1/09 | $ 1,300,000 | $ 1,200,000 | $ 2,100,000 | $ 1,400,000 | $ 1,400,000 |
| 10/5/09 | $ 600,000 | $ 400,000 | $ 400,000 | $ 300,000 | $ 300,000 |
| 11/5/09 | $ 870,000 | $ 580,000 | $ 580,000 | $ 435,000 | $ 435,000 |

(Stipulated Facts No. 25)  A total of $14,950,000 was paid to Depfa for redemption of the Series

V A-1 and A-2 bonds, and $24,050,000 was paid to Lloyds for redemption of Series V A-3, A-4

and A-5 bonds.  (*Id.*)

Interest was paid by the Trustee on redeemed bonds, confirming calculations with all

other parties.  (Stipulated Facts No. 27; Roemlein Dep. at 142:15-143:6)  The Trustee also made

interest payments semiannually, in January and July, the amounts of which were confirmed by

all parties, including Depfa and Lloyds.  (Stipulated Facts No. 27; Roemlein Dep. at 245:19-23)

The total interest paid to date is $32,027,100 to Depfa, and $17,575,470 to Lloyds.  (*Id.*)  There

is no claim in this action by either Depfa or Lloyds that it did not receive the full amount of

semiannual interest payments.  (*See* Dkt. 26, 39)

## The Instant Dispute

By letter dated November 27, 2009, Depfa advised ALL, for the first time, that it

believed ALL had no legal right to make any past redemption payments to Lloyds and no right to

make any future payments to Lloyds unless and until ALL repaid Depfa any and all amounts due

on the outstanding bonds in Series V-A-1 and V-A-2 in full.  (Trial Ex. 12)  Depfa further

claimed that BNY Mellon would be in breach of its fiduciary duties and contractual obligations

as Trustee if it permitted further redemption payments to Lloyds.  (*Id.*)

On or about December 1, 2009, Lloyds agreed to suspend payments from the Payment

Account, so that the parties could attempt to resolve the dispute.  (Trial Ex. 141; Stipulated Facts

No. 26)  Depfa confirmed its agreement with this approach.  (*Id.*)  The Trustee received no

further communications from either Lloyds or Depfa until it learned from ALL at the end of

March that Lloyds wanted payments to resume.  On March 31, 2010, after receiving permission

from Depfa, the Trustee communicated Depfa's November 27, 2009 letter to Lloyds, ALL and

Ambac, and asked that the parties confirm their positions.  (Trial Ex. 154)

55755828.1

By letter to the Trustee dated April 6, 2010, Depfa reasserted its position that ALL had no legal right to make further redemption payments on the Bonds owned by Lloyds until it redeemed all of the outstanding Bonds owned by Depfa. (Trial Ex. 156)  Depfa alleged that ALL and the Trustee had breached the Depfa SBPA by not obtaining its consent to the issuance of the Bonds now owned by Lloyds.  (*Id.*)  The unauthorized "Lloyds Transaction," Depfa claimed, did not relieve ALL of its duty to make scheduled mandatory redemptions to Depfa under the Depfa SBPA.  (*Id.*)  Lloyds responded by letter dated April 22, 2010, and asserted that ALL was not required to obtain Depfa's consent prior to issuing the Series V-A-3, V-A-4 and V-A-5 bonds, and even if such consent were required, payments due and owing under the Indenture were not affected by the alleged breach.  (Trial Ex. 161)  Lloyds demanded that the Trustee resume redemption payments and alleged that by failing to make payments to Lloyds since November 2009, ALL and the Trustee breached their contractual and fiduciary obligations to Lloyds. (*Id.*)

As a result of the competing positions of Depfa and Lloyds, the Trustee was and remains unable to take action with respect to redemptions without being subject to conflicting claims. Accordingly, BNY Mellon filed this Interpleader action on June 3, 2010, seeking to have the Court determine the dispute between Depfa and Lloyds.  As of the filing of the Interpleader Complaint, approximately $7.5 million was held in the Payment Account for redemptions.  That $7.5 million remains in a Redemption account.  Currently, an additional approximately $32,076,000 is held in the Revenue Account, and $1,330,000 is held in the Loan Account.

Depfa and Lloyds both assert claims against BNY Mellon for breach of contract and breach of fiduciary duty.  (Dkt. 26 at ¶¶ 120-26; Dkt 39 at ¶¶ 55-67)  The crux of Depfa's claims for breach of contract and fiduciary duty is that BNY Mellon breached its obligations to Depfa

by making redemption payments to Lloyds before satisfying Depfa's alleged right to repayment in full of all outstanding Senior Series V Bonds held by Depfa. (Dkt. 26 at ¶¶ 120-26) Lloyds, on the other hand, bases its claims for breach of contract and fiduciary duty on the Trustee's alleged failure to make mandatory quarterly redemption payments to Lloyds, but only seeks recovery through September 2009. (Dkt. 39 at ¶¶ 55-67)[5] Both Depfa and Lloyds also seek declarations that they are entitled to the payment of principal and interest on the terms of their respective Liquidity Facilities. (Dkt. 26 at ¶¶ 127-31; Lloyds Counterclaims ¶¶ 75-93)

In addition to the claims against BNY Mellon, Depfa has filed a claim against JPMC for breach of contract and third party claims against ALL for breach of contract and indemnification. (*See* Dkt. 26) Lloyds has also filed third party claims against ALL for breach of contract, accounting, declaratory judgment and indemnity. (*See* Dkt. 39)

## ARGUMENT

To fully understand the baselessness of Depfa and Lloyd's claims, it is necessary to place the Trustee's role in context, as it developed in bond transactions such as the ones at issue here. From its inception, the role of the indenture trustee has been different from that of an ordinary trustee. Unlike an ordinary trustee, an indenture trustee was never conceived of as a sole guardian of the interests of the trust beneficiaries. Rather, the indenture trustee was created as a matter of administrative convenience. Very early corporate mortgages ran directly to the bondholders, and on default all the bondholders were required individually to join the petition for foreclosure. (ROBERT I. LANDAU & ROMANO I. PELUSO, CORPORATE TRUST ADMINISTRATION AND MANAGEMENT 61 (6th ed. 2008)) The indenture trustee was created so that mortgages could run to a single source for the benefit of all bondholders. (*Id.*) Early on, the indenture

---

[5]    Lloyds also counterclaimed for an accounting of all payments into and out of the Revenue and Payment Accounts (Dkt. 39 at ¶¶ 68-74), but has indicated its intent to drop that claim.

trustee was often simply an officer of the issuer.  (*Id.*)  As corporate indentures become more common and more complex, issuers increasingly selected outside individuals, and later institutions, to act as indenture trustee.  (*Id.* at 61-62)  Banks often accepted trusteeships for no compensation, viewing the position as a basic administrative service for their corporate customers in the nature of escrows.  (*Id.* at 62)  Trustee's often exhibited a level of care in the execution of their duties commensurate with their level of compensation, but efforts to increase the compensation of indenture trustees met with stiff resistance.  (*Id.*)  Accordingly, trust indentures developed detailed provisions emphasizing the restricted duties, authority, and liabilities of the trustee.  (*Id.*)

Although the function of the indenture trustee has evolved over time, and was codified in some respects in the Trust Indenture Act of 1939, its essential characteristics remain unchanged in many critical respects.  The modern indenture trustee is still paid relatively little (*id.* at 41-42), "normally has no pre-default discretionary power and only limited authority" (*id.* at 41), "has no control of the obligor's business . . . or, except for infrequent and unusual circumstances, any voice in the management of its affairs" (*id.* at 40), and "has no possession, or right to possession, of the mortgaged property until after default occurs" (*id.* at 40).  Given that, it is easy to understand the conclusion that "[e]fforts to subject [the trustee] under these conditions to the same degree of care with respect to the security as is required of an ordinary trustee . . . would make the position of the indenture trustee untenable and render financing of this type almost impossible."  (*Id.* at 40)

Consistent with the historical limitations of the Trustee's role, the Indenture here includes various boilerplate provisions as to the scope of the Trustee's duties pre and post default, including standard protections on which the Trustee may rely.   Specifically, Section 10.2(a)(1)

provides that prior to the occurrence of an Event of Default of which it has or is deemed to have notice, "the Trustee undertakes to perform such duties *and only such duties* as are specifically set forth in this Indenture, and *no implied covenants or obligations* shall be read into this Indenture against the Trustee . . . ." (Trial Ex. 1 § 10.2(a)(1) (emphasis added))

Section 10.2(a)(2) provides, *inter alia*, that the Trustee may conclusively rely on the truth of the statements expressed in certificates furnished to the Trustee and conforming to the requirements of the Indenture, absent negligence or bad faith on the part of the Trustee. (Trial Ex. 1 at § 10.2(a)(2))  Section 10.3 provides that the Trustee may rely, and is protected in acting or refraining from acting, upon any "certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, approval, bond, debenture or other paper or document believed by it to be genuine and to have been signed or presented by the proper party." (Trial Ex. 1 at § 10.3)  More specifically, "whenever in the administration of this Indenture, the Trustee deems it desirable that a matter be proved or established prior to taking suffering or omitting any action hereunder, including payment of moneys out of an account, the Trustee . . . may, in the absence of bad faith on its part, rely upon a Certificate or Direction signed by an Authorized Officer of the corporation." (Trial Ex. 1 at § 10.3(c))  Direction, in turn, is defined to mean a written direction, order, request, requisition or similar instrument signed by an authorized officer of ALL and permitted by the Indenture. (Trial Ex. 1 at 5)

"[T]he Trustee is not required to make any inquiry or investigation into the facts or matters stated in any Certificate, Direction, resolution, statement, instrument, opinion, report, notice, request, consent, order, approval, bond, debenture or other paper or document . . . ." (Trial Ex. 1 at § 10.3(f))  Finally, ALL agreed to indemnify the Trustee from "any loss, liability or expense incurred without negligence or bad faith on its part, arising out of . . . [the]

administration of the office of the Trustee under this Indenture." (Trial Ex. 1 at § 10.5(c))  As

security for the performance by ALL of its obligation under Section 10 of the Indenture the

Trustee has a lien upon all property it holds thereunder (with certain exceptions).  (Trial Ex. 1 at

§ 10.5)

I.   **DEPFA'S AND LLOYDS' CLAIMS AGAINST BNY MELLON FAIL BECAUSE BNY MELLON DOES NOT OWE FIDUCIARY DUTIES TO THE BONDHOLDERS AND BECAUSE BNY MELLON COMPLIED WITH ITS OBLIGATIONS UNDER THE INDENTURE**

Depfa's and Lloyds' claims against BNY Mellon are contradicted by the relevant law, the

standards and practices in the bond industry, and the facts of this case.  Depfa claims that JPMC,

the original Trustee, breached the Indenture and its alleged fiduciary duties by entering into the

2006 transaction and executing the Second Supplemental Indenture.  (Dkt. 26 at ¶¶ 134-137)

Although Depfa does not assert that claim against BNY Mellon, it does allege that BNY Mellon

made redemption payments to Lloyds in violation of the transaction documents and its alleged

fiduciary duties, which raises against BNY all of the issues of Depfa's consent rights.  (Dkt. 26 at

¶¶ 138-145)  If the Court finds that the Lloyds transaction was not in violation of Depfa's SBPA

or that the Trustee justifiably relied on opinions of counsel as to the propriety of that transaction,

then as a matter of law the Trustee did nothing wrong in making redemption payments to Lloyds

at ALL's direction.  Even if the Court finds the Lloyds transaction was improper, the Trustee is

nonetheless protected by its having relied on various opinions of counsel and certificates.  *See*

*infra* Section IV.

Lloyds asserts counterclaims against BNY Mellon claiming that it breached the various

agreements and alleged ficuciary duties by failing to make redemption payments from May

through September of 2008.  (Dkt. 39 at ¶¶ 55-67)  BNY Mellon made redemption payments as

directed by ALL and it was fully entitled to rely on ALL's payment directions pursuant to

55755828.1

Section 10.3 of the Indenture.  The Trustee acted at all times in reliance on those directions, was

entitled to do so under the Indenture and did so in good faith.  As a result, even were the Trustee

found liable for making or failing to make payments, it would be entitled to indemnification.

A.   **Depfa's and Lloyds' Breach of Fiduciary Duty Claims Fail As a Matter of Law Because They Are Duplicative of Depfa's and Lloyds' Breach of Contract Claims**

Unlike a trustee for a personal trust, an indenture trustee does not have overarching

fiduciary duties.  Rather, its duties are limited to those set forth in the indenture.  The Indenture

here expressly states "the Trustee undertakes to perform such duties and only such duties as are

specifically set forth in this Indenture, and no implied covenants or obligations shall be read into

this Indenture against the Trustee."  (Trial Ex. 1 at § 10.2(a)(1))

Where, as here, the Indenture contains a "limiting clause" to the effect that "the trustee's

obligations are confined to the scope of the contract, and do not extend to common law fiduciary

duties," claims for breach of fiduciary duty are properly dismissed  *Shawmut Bank, N.A. v. Kress*

*Assocs.*, 33 F.3d 1477, 1502 (9th Cir. 1994).  *See also Alitalia Linee Aeree Italiane, S.p.A. v.*

*Airline Tariff Publ'g Co.*, 580 F. Supp. 2d 285, 294 (S.D.N.Y. 2008) ("Where a fiduciary duty is

based upon a comprehensive written contract between the parties, a claim for breach of fiduciary

duty is duplicative of a claim for breach of contract." (citations omitted)).  The Ninth Circuit in

*Shawmut* affirmed summary judgment with respect to the breach of fiduciary duty claim on this

ground.  33 F.3d at 1502.  The provision at issue in *Shawmut* stated that: "'the trustee, prior to

the occurrence of an Event of Default and after the curing of all Events of Defaults which may

have occurred, undertakes to perform such duties and only such duties as are specifically set

forth in this Indenture.'"  That provision is virtually identical to Section 10.2(a) of the Indenture

herein.  (*See* Trial Ex. 1 at § 10.2(a))

The claims for breach of fiduciary duty asserted by Depfa and Lloyds are based on the precise subject matter, contractual provisions, and allegedly wrongful acts as their claims for breach of contract, and provide no additional basis for a fiduciary duty claim. (*See* Dkt 26 at ¶¶ 142-145; Dkt. 39 at ¶¶ 64-67) Judgment should be entered in the Trustee's favor on the breach of fiduciary duty as a matter of law.

**B.    Depfa's and Lloyds' Breach of Fiduciary Duty Claims Fail Because BNY Mellon Does Not Owe Fiduciary Duties to Either Depfa or Lloyds**

1.    California Law Does Not Impose a Fiduciary Duty on Indenture Trustees[6]

Depfa's and Lloyds' breach of fiduciary duty claims fail because neither can establish the existence of a fiduciary duty.   An indenture trustee's "responsibilities, obligations and legal liability as indenture trustee are not to be confused with those of the [ordinary] trustee or the administrator." *Dell'Oca v. The Bank of N.Y. Trust Co., N.A.*, 159 Cal. App. 4th 531, 537 (1st App. Dist. 2008).   "The duty which is imposed under an indenture of trust is not a traditional fiduciary duty." *Shawmut Bank, N.A.*, 33 F.3d at 1491.   "Unlike the ordinary trustee, who has historic common-law duties imposed beyond those in the trust agreement, an indenture trustee is

---

[6]    The Indenture is governed by California law. (Trial Ex. 1 at § 11.7.) New York law, however, is in accord and California Courts often cite New York decisions. "Under New York law, the pre-default duties of an indenture trustee, unlike those of an ordinary trustee, generally are limited to the duties imposed by the indenture." *LNC Invs., Inc. v. First Fid. Bank*, 935 F. Supp 1333, 1346 (S.D.N.Y. 1996) (citing *Elliot Assocs. V. J. Henry Schroder Bank & Trust Co.*, 838 F.2d 66, 71 (2d Cir. 1988); *Meckel v. Cont'l Res. Co.*, 758 F.2d 811, 816 (2d Cir. 1985) (citing *Hazzard v. Chase Nat'l Bank*, 159 Misc. 57, 287 N.Y.S. 541 (Sup. Ct. N.Y. Cnty. 1936), *aff'd*, 257 A.D. 950, 14 N.Y.S.2d 147 (1st Dep't 1939), *aff'd*, 282 N.Y. 652, 26 N.E.2d 801, *cert. denied*, 311 U.S. 708 (1940)); *see also N.Y. State Med. Care Facilities Fin. Agency v. Bank of Tokyo Trust Co.*, 163 Misc. 2d 551, 621 N.Y.S.2d 466, 470 (Sup. Ct. N.Y. Cnty. 1994).

While not directly applicable to this case, New York and California common law is also consistent with the federal Trust Indenture Act of 1939 ("TIA"), which expressly limits the liability of an indenture trustee to the "performance of such duties as are specifically set out in such indenture." TIA at § 315. *See AG Cap. Funding Partners, L.P. v. State St. Bank & Trust Co.*, 11 N.Y.3d 146, 156, 866 N.Y.S.2d 578 (2008) ("New York state and federal case law are consistent with [the TIA]."); *Elliot Assocs.*, 838 F.2d at 71 ("It is equally well-established under state common law that the duties of an indenture trustee are strictly defined and limited to the terms of the indenture.") (citation omitted); *see also* Trial Ex. 186 at ¶ 15 ("While [the TIA] has been legislated only for publicly sold corporate securities, over the past 70 years it has become the basis for the administration of all corporate and municipal securities having a trustee.").

more like a stakeholder whose duties and obligations are exclusively defined by the terms of the indenture agreement." *Id.* (quoting *Meckel v. Cont'l Res. Co.*, 758 F.2d 811, 816 (2d Cir. 1985; citing *Elliot Assocs. v. J. Henry Schroder Bank & Trust Co.*, 838 F.2d 66, 71 (2d Cir. 1988)); *Dell'Oca*, 159 Cal. App. 4th at 537 (quoting same). In fact, California courts have relied on the treatise co-authored by Robert Landau, the expert retained by the Trustee herein, for the proposition that "'there is no basis for holding, as some courts have tried to do, that the trustee owes to each holder duties or obligations not specifically spelled out in the contract or required of it by statute or regulation.'" *Dell'Oca*, 159 Cal. App. 4th at 537 & n.3 (quoting ROBERT I. LANDAU & JOHN E. KRUEGER, CORPORATE TRUST ADMINISTRATION AND MANAGEMENT 30 (5th ed. 1998)). "The existence of a 'trust' is necessary to create and define the [indenture] trustee's interest in and relation to the security and the contract, but its relationship to the security and security holders is essentially contractual rather than fiduciary." *Id.*

The distinction between an indenture trustee and an ordinary trustee stems from, among other things, the fact that, unlike an ordinary trustee, an indenture trustee acts in the interest of both the issuer and the bondholders, and therefore its loyalties are divided. *See Dell'Oca*, 159 Cal. App. 4th at 537 ("An indenture trustee is not subject to the ordinary trustee's duty of undivided loyalty." (quoting *Meckel*, 758 F.2d at 816)); *Shawmut*, 33 F.3d at 1491 (same); *see also* ROBERT I. LANDAU & ROMANO I. PELUSO, CORPORATE TRUST ADMINISTRATION & MANAGEMENT 42 (6th ed. 2008).[7] Such divided loyalty is antithetical to the existence of a fiduciary duty to the bondholders, which would require an undivided loyalty to those bondholders. *See Wolf v. Sup. Ct.*, 107 Cal. App. 4th 25, 30 (Ct. App. 2003) (observing that the

---

[7]      The same is true under New York law. *LNC Invs.*, 935 F. Supp. at 1347 ( "The role of an indenture trustee differs from that of an ordinary trustee because the indenture trustee must consider the interests of the issuer as well as the investors, and because its obligations are defined primarily by the indenture rather than by the common law of trusts.") (citing MARTIN D. SKLAR, THE CORPORATE INDENTURE TRUSTEE: GENUINE FIDUCIARY OR MERE STAKEHOLDER?, 106 BANKING L.J. 42 (1989)).

duty of undivided loyalty is "inherent" in fiduciary relationships).[8] This paradox is especially highlighted by the facts here, where the bondholders are at odds about their rights.

### 2. Industry Custom Does Not Impose a Fiduciary Duty On Indenture Trustees

Industry custom conforms with case law refusing to impose a fiduciary duty on indenture trustees. "It is universally recognized that prior to default, the indenture trustee is simply the administrator of a contract. Its duties are purely ministerial in nature and are always spelled out in the indenture and other controlling documents." Trial Ex. 186 at ¶ 15; *see also Dell'Oca*, 159 Cal. App. 4th at 537 & n.3 (quoting LANDAU & KRUEGER 23, 27-29; discussing industry custom and practice regarding limited duties of indenture trustee).

The fees typically paid to an indenture trustee reflect the limited duties customarily assigned to and assumed by an indenture trustee. "The fees received by the indenture trustee are nominal in relation to the amount of indenture securities outstanding or the value of the trust estate." LANDAU & PELUSO at 41-42. Consistent with this industry practice, BNY Mellon receives relatively little remuneration under the Indenture, especially as compared to the other parties. The Trustee's fees were 3 basis points per annum for its services, while ALL earned 50 basis points as program administrator, and Depfa and Lloyds earned 17.5 and 14 points per annum, respectively, as liquidity providers. (Trial Exs. 6, 7) This level of compensation makes sense only in light of the narrowly tailored duties and liabilities of the indenture trustee. Stated another way, "[i]f it were to be held accountable for the full measure of discretion and fiduciary responsibilities common to the ordinary trust, the amount for which it might be potentially liable

---

[8]     Again, New York law is in accord. *See Birnbaum v. Birnbaum*, 73 N.Y.2d 461, 466, 541 N.Y.S.2d 746, 748 (1989) ("[I]t is elemental that a fiduciary owes a duty of undivided and undiluted loyalty to those whose interests the fiduciary is to protect.")

would be out of all proportion to the compensation the obligor company or government entity could pay." LANDAU & PELUSO at 42.

     3.    **BNY Did Not Assume a Fiduciary Duty under the Language of the Indenture**

         a.    **A Single Use of the Word Fiduciary Cannot Create a Fiduciary Duty Where One Would Not Otherwise Exist**

Depfa and Lloyds may argue that BNY Mellon assumed a fiduciary duty under Section 10.1 of the Indenture, which states, "The trustee shall signify its acceptance of the duties and obligations of Trustee as fiduciary for the Owners by executing this Indenture." (Trial Ex. 1 at § 10.1) But this single use of the word "fiduciary" cannot withstand the contrary weight of the TIA,[9] the common law of California (and New York) (*see supra* Section II(B)(1)); the practice in the industry (*see supra* Section II(B)(2)); Landau Tr. at 205:8-16 (stating that, in his experience in the trust industry, he would not expect a Trustee to have pre-default fiduciary duties, even if the Indenture contained the word "fiduciary")); and the remainder of the Indenture, *see Irving v. Ebix, Inc.*, No. 10-CV-762, 2010 U.S. Dist. LEXIS 80443, at *21 (S.D. Cal. Aug. 10, 2010) ("Moreover, California courts 'consider the contract as a whole and interpret the language in context, rather than interpret a provision in isolation.'" (quoting *Am. Alternative Ins. Corp. v. Superior Court*, 37 Cal. Rptr. 3d 918, 922 (Ct. App. 2006)).[10]

---

[9]    The provisions of Section 10 "are clearly based on similar provisions in a TIA qualified indenture, in accordance with custom and practice in the corporate trust industry." (Trial Ex. 186 at ¶ 18.) Like the TIA, the language of Section 10 precludes inference of any relationship or duty not explicitly set out in the Indenture. (*See* TIA § 315(a)(1) (providing that, absent contrary language in the indenture, the indenture is automatically deemed to protect the indenture trustee from liability for any duty not specifically set out in the indenture); Trial Ex. 1 at § 10.2(a)(1) (providing that the Trustee undertakes to perform only those duties specifically set out in the Indenture, and no additional covenants may be implied against the Trustee).)

[10]    New York law is in accord. "The use of the word fiduciary . . . cannot alone establish fiduciary duties on the part of the named person or entity." *SNS Bank, N.V. v. Citibank, N.A.*, 7 A.D.3d 352, 356 (1st Dep't 2004) (internal quotation omitted) (affirming dismissal of fiduciary duty claim against financial manager where existence of fiduciary relationship was supported solely by use of the word "fiduciary" in brochure).

The drafter of the Indenture, Elaine Bayus, has testified that Section 10.1 is a standard provision that has been carried forward through many trust indenture agreements. (Bayus Tr. at 93:15-94:2)  At the time of drafting, Section 10.1 was not intended to create any additional duties or obligations for the trustee that were not specifically provided for in Section 10.2.[11] (*See id.* at 94:10 – 94:23)  There is no evidence that the imposition of heightened duties pre-default was discussed, and the Trustee will testify that it certainly never understood that to be the case. Because nothing else in the language of the Indenture or the actions of the parties establishes the existence of a pre-default fiduciary duty, this lone use of the word "fiduciary" in a general, prefatory, provision cannot support Depfa's and Lloyds' fiduciary duty claims.

> **b.      The Specific Previsions of the Indenture Prevail over the Single, Generalized Use of a Term**

Any attempted inference from the isolated appearance of the word "fiduciary" in the introduction to Section 10 is overwhelmed by the remainder of the section, which carefully details the Trustee's narrow duties, liabilities, and protections. (*See infra* Section III(A).)  "It is a 'well established principle of contract interpretation' in California that 'when a general and a particular provision are inconsistent, the particular and specific provision is paramount to the general provision.'"  *Irving*, 2010 U.S. Dist. LEXIS 80443, at *21 (quoting *Jadwin v. Cnty. of Kern*, 610 F. Supp. 2d 1129, 1190 (E.D. Cal. 2009)).  Depfa's own expert agrees. (Thel Tr. at 144:2-12)

Section 10 extensively details the scope and nature of the Trustee's duties. (*See* Trial Ex. 1 at §10)  It makes clear that the Trustee undertakes only the duties set forth, and that no

---

[11]     This is the appropriate period for inquiry. *Cachil Dehe Band of Wintun Indians v. California*, 618 F.3d 1066, 1073 (9th Cir. 2010) (courts should "'give[] effect to the mutual intention of the parties as it existed' at the time the contract was executed" (quoting CAL. CIV. CODE § 1636)). *Accord Israel v. Chabra*, 601 F.3d 57, 65 n.2 (2d Cir. 2010) ("[I]n the absence of circumstances requiring us to apply judicial estoppels, our role in interpreting a contract is to give effect to the intent of the parties at the time of the contract's making, not the position they found it necessary to adopt during litigation.")

covenants or obligations should be implied. (Trial Ex. 1 at § 10.2(a)(1)) Section 10 also describes when the Trustee is entitled to rely on the truth of statements from the Issuer in general (Trial Ex. 1 at § 10.2(a)(2)) and specifically with regard to the issuance of payments from the trust accounts (*Id*. at § 10.2(c)). It details when the Trustee may solicit and rely on opinions of counsel. (*Id*. at § 10.3(f)) Section 10.3 describes the Trustee's right to rely on any document believed to be genuine and signed by the proper parties. (*Id*. at § 10.3(a)) It defines the Trustee's liability for actions of Responsible Officers and for the Trustee's own action or inaction at the direction of the bondholders. (*Id*. at § 10.2(c)) It also distinguishes between the Trustee's discretion and its obligations. (*Id*. at § 10.3(l)) These specific and narrowly tailored duties rebut any potential inference that the Trustee undertook broad fiduciary duties.

c.    **Where the Trustee is Protected by Boilerplate Indenture Provisions, any Deviation from Industry Standard must be Express and Obvious**

The provisions of Article X of the Indenture are boilerplate provisions common across the industry. (*See* Trial Ex. 186 at ¶ 18 (observing that the provisions of section 10 of the Indenture are "clearly based on similar provisions in a TIA qualified indenture, in accordance with custom and practice in the corporate trust industry" and referring to the various provisions of section 10 as "universally accepted," "universally followed," and "the standard"); Bayus Tr. at 93:15-94:2) Such boilerplate provisions spring from, and are intended to efficiently express, well-worn industry standards. *See Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1048 (2d Cir. 1982) (holding that boilerplate provisions "are thus not the consequence of the relationship of particular borrowers and lenders and do not depend upon particularized intentions of the parties to an indenture").[12]

---

[12]    Although this argument relies on New York law, California law does not appear to have addressed this issue and is not, therefore, inconsistent.

Uniformity should be a guiding principle when interpreting boilerplate provisions. *Id.* Uniformity of interpretation preserves the industry standards that form the basis of boilerplate provisions and is essential to the efficiency of the capital markets. *Id.*; *see also* Thel Tr. at 27:4-18 (stating that case-by-case application of state law "can cause a nightmare if Corporate Bond Indentures were put in front of juries" and that New York courts "take the position that in construing Trust Indentures and, probably, corporate articles, that they should be construed in a consistent manner across courts"). Therefore, extrinsic evidence of the parties' mutual understanding of such provisions is admissible only where it shows a "deliberate and enduring course of conduct" *contrary to* the standard industry interpretation. *Sharon Steel*, 691 F.2d at 1049 (affirming trial court's rejection of plaintiff's unique interpretation of boilerplate provisions based on "a few statements over a two-week period").

Here, neither Depfa nor Lloyds can offer evidence of a any understanding – much less a deliberate and enduring course of conduct demonstrating a mutual understanding – among the parties that BNY Mellon was a fiduciary of the bondholders pre-default. There is no evidence of course of conduct or intent to deviate from or expand the standard Trustee role. Therefore, in light of industry standards and judicial decisions interpreting such provisions under the TIA and common law, this Court should find that Section 10 of the Indenture does not create a fiduciary duty of the Trustee to the bondholders. *See id.*

> d. **Any Inference of Pre-Default Fiduciary Duties to the Trustee Would Obviate Critical Provisions of the Indenture**

A post-litigation attribution of pre-default fiduciary duties to the Trustee would render meaningless the provision of the Indenture intended to elevate the Trustee's duty of care upon an event of default. The Indenture expressly distinguishes the pre-default duties discussed above from the trustee's post-default duties. (*Compare* Trial Ex. 1 at § 10.2(a) ("Prior to the

occurrence of an Event of Default . . . .") *with* Trial Ex. 1 at § 10.2(b) ("In case of Event of Default . . . .").)  The purpose of Section 10.2(b) of the Indenture is to set forth the Trustee's post-default duty of care:[13]

> In case of an Event of Default . . . the Trustee shall exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in their exercise, as a prudent person would exercise or use in the conduct of such person's own affairs.

(Trial Ex. 1 at § 10.2(b).)  This elevation of the Trustee's duty of care is appropriate because, after an event of default, the Trustee acts solely in the interests of the bondholders.  *LNC Invs.*, 935 F. Supp. at 1347 ("After an event of default, however, the loyalties of an indenture trustee no longer are divided between the issuer and the investors, and as a consequence, New York law reallocates the indenture trustee's fiduciary duties to reflect that change.")

The prudent person standard is an articulation of the duties of a fiduciary.  *See, e.g.*, *Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996) (discussing the application of the prudent person standard to ERISA fiduciaries) (citing *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir.), *cert. denied*, 459 U.S. 1069 (1982)).  Since Section 10.2(b) of the Indenture imposes fiduciary duties on the Trustee after an event of default, the inference of *pre-default* fiduciary duties would render Section 10.2(b) superfluous.  Such an outcome conflicts with the principle of contract construction that a contract should be read to give effect to all its provisions.  *See* CAL. CIV. CODE § 1641 ("The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other."); *Kaiser Cement v. Ins. Co. of State of Pennsylvania*, 196 Cal. App. 4th 140, 155 (2d App. Dist. 2011) (citing § 1641).

---

[13]    Again, this shift in the standard of care is consistent with the TIA as well as custom and practice in the industry.  LANDAU & PELUSO at 252-53 (describing the legislative and industrial development of the prudent person standard).

## II.   THE INDENTURE PROVIDED NO RIGHT OF DEPFA TO CONSENT TO SUPPLEMENTAL INDENTURES OR SUBSEQUENT LIQUIDITY TERMS

Depfa manufactures a consent right – a right it did not believe it had in 2006 – in an attempt to nullify the Lloyds transaction.  Depfa contends that ALL and JPMC breached the Depfa SBPA, specifically Section 5.03(a), which states that the Issuer shall not: "[a]mend, modify, terminate or grant, or permit the amendment, modification, termination or grant of, any waiver under, or consent to, or permit or suffer to occur any action or omission which results in, or is equivalent to, an amendment, modification, or grant of a waiver under the Policy or the Indenture without the prior written consent of [Depfa]."  (Trial Ex. 4 at § 5.03)  This provision, however, unambiguously and intentionally omits and does not apply to supplements to the Indenture, such as the Second Supplemental Indenture used to issue the Lloyds bonds.

In order to establish a breach of contract, Depfa bears the burden of proving the following elements:  "(1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) damage to the plaintiff therefrom." *Wall St. Network, Ltd. v. N.Y. Times Co.*, 164 Cal. App. 4th 1171 (2d App. Dist. 2008); *see also Fischer & Mandell LLP v. Citibank, N.A.*, 632 F.3d 793, 799 (2d Cir. 2011).  The starting point of a contract dispute is, of course, the language of the contract.  "The objective in any question of the interpretation of a written contract, of course, is to determine what is the intention of the parties as derived from the language employed." *Pantone, Inc. v. Esselte Letraset Ltd.*, 691 F. Supp. 768, 771 (S.D.N.Y. 1988) (quotation omitted).

Depfa contends that ALL and the Trustee violated Section 5.03(a) by failing to obtain Depfa's consent before entering into the Second Supplemental Indenture and Lloyds' SBPA.[14]

---

[14]   Because section 5.03(a) does not apply to the Trustee and only binds ALL, Depfa relies on Section 14.4(f) of the First Supplemental Indenture, which provides:

(Dkt. 26 at ¶ 136) That Section speaks only of amendments or modifications; the word supplement is not included.    (*See* Trial Ex. 4 at § 5.03(a))  This is significant because a supplement to an indenture is a term of art in the industry and is generally the mechanism for issuing additional bonds under a Master Indenture, as was the case here.  (Trial Ex. 192 at 2-3; Peterson Tr. at 53:5-7; Roemlein Tr. at 130:22-131:11)  Nor should, as Depfa suggests, the word supplement be implied in section 5.03.  "[C]ourts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include."  *Rowe v. Great Atl. & Pac. Tea Co., Inc.*, 46 N.Y.2d 62, 72 (1978).  Further, under the doctrine of *expressio unius est exclusio alterius*, the expression of certain terms – *i.e.,* amendment modification – means the exclusion of others.  *VKK Corp. v. Nat'l Football League*, 244 F.3d 114, 130 (2d Cir. 2001); *Israel Disc. Bank Ltd v. Gottesman*, 544 F.2d 80, 82 (2d Cir. 1976).

The provision is unambiguous that consent to supplemental indentures and additional bond issuances was not required.  *Goldman v. Comm'r of Internal Revenue*, 39 F.3d 402, 406 (2d Cir. 1994) ("[W]here the language of a contract is unambiguous, its meaning must be determined from the four corners of the instrument without resort to extrinsic evidence of any nature." (internal quotations removed)); *see also S.N.J. Rail Grp., LLC v. Lumbermens Mut. Cas. Co.*, No. 06-Civ.-4946, 2007 U.S. Dist. LEXIS 58510, *22-25 (S.D.N.Y. Aug. 13, 2007) (collecting cases on contract interpretation).  Even were the Court to determine that Section 5.03(a) is

---

The trustee hereby acknowledges that the Corporation has entered into an agreement with the Liquidity Provider pursuant to which the consent of the Liquidity Provider is required for certain actions under the Indenture, and the Trustee and the Corporation agree that no such action shall be taken without such consent.

(Trial Ex. 2 at §14.4(f))  Depfa is neither a party nor third party beneficiary of the Indenture and its supplements, and therefore cannot enforce section 14.4(f).   Rather than repeat the arguments fully herein, BNY Mellon hereby incorporates in its entirety Point II of Third-Party Defendant/Crossclaimant JP Morgan Chase Bank, N.A.'s Pretrial Memorandum of Law, demonstrating that Depfa is not a third party beneficiary of the Indenture and its supplements.

ambiguous, however, extrinsic evidence overwhelmingly demonstrates that Depfa was not given the right to consent to supplemental indentures or subsequent liquidity facilities.

A.      **The Negotiations of the Parties Show that Depfa Asked for but Was Not Granted The Consent Right it Now Claims**

Where contract language is ambiguous, the Court may look to the negotiations of the parties to determine their intent. *Pantone*, 691 F. Supp. at 774 (looking to parties' negotiations, since "the consideration of a written instrument is always open to inquiry, and a party may show that the design and object of the agreement was different from what the language, if considered alone, would indicate" (internal quotation omitted)).  In the course of negotiating Depfa's SBPA and the Indenture, ALL explained that the Indenture would be a "Master Trust," to support multiple bond issues, that the transaction's structure was intended to facilitate ALL's issuance of additional bonds and that ALL would need flexibility as to future liquidity providers.  (Peterson Tr. at 191:23-192:14; O'Neill Tr. at 121:15-123:14; *see also* Landau Tr. at 173:13-174:3)  When Depfa voiced a concern about future liquidity providers, ALL told Depfa that it would not give Depfa "gatekeeper control over subsequent liquidity providers.  That's just not going to happen." (O'Neill Tr. at 121:15-123:14)  Retaining flexibility over future issuances was so critical that, had Depfa not agreed to go forward on those terms, ALL would have found a different liquidity provider.  (Peterson Tr. at 191:23-192:14)

B.      **Depfa's Conduct Demonstrates That it Did Not Believe it Had the Right to Consent**

Second only to the terms of a contract, the parties' course of performance provides the most compelling evidence of their intent.[15]  "'Where an agreement involves repeated occasions

---

[15]      This is also true even before ambiguity is determined, which is after examining "the context of the entire integrated agreement and . . . the customs, practices, usages and terminology generally understood in a particular trade or business." *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London*, 136 F.3d 82, 86 (2d Cir. 1998)

for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement.'" *New Windsor Volunteer Ambulance Corps, Inc. v. Meyers*, 442 F.3d 101, 112 (2d Cir. 2006) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 202(4) (1979)).   Here, Depfa was aware of and had numerous opportunities to object on the basis of its purported consent right to the 2006 Bond Transaction and subsequent Lloyds redemptions.   (*See, e.g.,* Peterson Tr. at 61:5-62:16)   Nonetheless, it raised no objection until 2009, when it was clearly positioning itself for litigation.   (*See* Trial Ex. 12; Peterson Tr. at 84:7-17)   Such later conduct should be disregarded.   *Compagnia Importazioni Esportazioni Rappresentanze v. L-3 Communs. Corp.*, 703 F. Supp. 2d 296, 307 & n.12 (S.D.N.Y. 2010) (defendant's course of performance, which contradicted defendants' claims in court, "suggests that defendant's argument here is litigation driven").

    In or around June 2006, after ALL chose Lloyds over Depfa to be the liquidity provider on the 2006 Bond Transaction, Peterson informed David Park of Depfa that Lloyds was the winning bidder.   (Peterson Tr. at 61:5-62:12)   Park had experience in bidding as a liquidity provider.   (Park 27:2-7)   He knew that not all banks would bid the same term length or interest rate, and Peterson told him that Lloyds had bid a shorter liquidity term.   (Park Tr. at 204:19-205:6; Peterson Tr. at 62:21-63:9)   In fact, Park offered ALL an even longer term than the 10 years it had unsuccessfully bid.   (Trial Ex. 43)   Park knew (or should have known) that Lloyds could have a different redemption schedule and different interest rate than Depfa did.   (Park Tr. at 204:19-205:6)   This was typical in the industry.   (Davis Tr. at 71:10-13)   In fact, Depfa was known in the industry for bidding longer terms.   (Watkins Tr. at 193:17-25)   He did not ask Peterson what the terms of Lloyds' bid were.   (Peterson Tr. at 61:9-62:20)   Nor did he ask

anyone at the Trustee. (Park Tr. at 57:20-24) Park was familiar with the fact that additional bonds would be issued by Supplemental Indenture, as that is typical in the industry and how the Depfa bonds were issued in 2005. (Trial Ex. 2; Park Tr. at 31:18-32:22; Landau Tr. at 173:13-174:3) Around the time of the 2006 Bond Transaction, Park never told Peterson that ALL could not issue additional bonds without Depfa's consent. (Peterson Tr. at 84:7-17) He never said that ALL could not enter into a Supplemental Indenture without Depfa's consent. Nor did he tell Peterson that ALL should have gotten Depfa's consent to the Lloyds liquidity facility.[16] (*Id.*) Depfa also stood silent in 2008, when the bonds became bank bonds and ALL began making redemption payments to Depfa and Lloyds. (*See, e.g.,* Trial Ex. 81 (raising question of timing of redemptions, not consent); Trial Ex. 83 (raising questions about timing and methodology of redemptions, not consent)) "There is no better way of ascertaining the meaning and construction of a written contract than to look at the acts and conduct of the parties under it." *Gordon v. Vincent Youmans, Inc.*, 358 F. 2d 261, 264 (2d Cir. 1965) (quotation removed). *See also New Windsor Volunteer Ambulance Corps., Inc.*, 442 F.3d at 112 ("There is no surer way to find out what parties meant, than to see what they have done . . . Parties in such cases often claim more, but rarely less than they are entitled to." (internal quotations omitted)) Here, Depfa's conduct is consistent with its belief that it not have the right to consent to the 2006 transaction.

In addition, Elizabeth Davis, Depfa's counsel in connection with the 2005 Bond Transaction as well as Lloyds' counsel in connection with the 2006 Bond Transaction, (Stipulated Facts Nos. 12, 17) testified that she did not suggest to anyone, and did not believe, in 2005 or 2006 that Depfa had any right to consent to supplemental indentures. (Davis Tr. at 208:21-209:9) Davis was the primary drafter of Depfa's SBPA (Davis Tr. at 17:6-12), and

---

[16]   Nor did Park tell anyone at the Trustee in or around 2006 that ALL or the Trustee should have gotten Depfa's consent to the transaction. (Park Tr. at 219:18-220:5)

testified that the word supplement was intentionally omitted from section 5.03(a), though she declined on advice of counsel to specify the reason on privilege grounds. (Davis Tr. at 39:12-40:25) Davis was also the principle drafter of the Lloyds' SBPA, and she knew that Lloyds had a shorter, faster redemption schedule than Depfa. (Davis Tr. at 205:19-206:4) Yet, she never believed that that fact was a breach of Depfa's agreements or that Depfa and Lloyds had any conflicting positions.[17] (Davis Tr. at 30:16-23) To the extent that the scope of the consent right is ambiguous, it should be construed against Depfa, the drafter of the SBPA. *McCarthy v. Am. Int'l Group, Inc.*, 283 F.3d 121, 124 (2d Cir. 2002).

The failure of Depfa and its counsel to contest, object to or complain about the 2006 Bond Transaction is evidence that Depfa did not believe it had been granted the right to consent to supplemental indentures or additional bond issuances. In fact, Park now admits that he did not believe in 2006 that Depfa had the right to consent to any of those things. (Park Tr. at 97:2-18) It was not until after Depfa had to purchase the Bank Bonds that it asked about and learned the terms of the Lloyds deal. (Park Tr. at 73:23-74:7) And it was only after Depfa knew it was at risk of not being repaid its full liquidity investment – and hired litigation counsel – that it concocted the idea that it always had the right to consent to supplement indentures, the issuance of additional bonds and the terms of subsequent liquidity facilities. (Park Tr. at 161:2-162:2; Trial Ex. 132) This failure to speak up for years also amounts to a waiver and/or estoppels of Depfa's claims. BNY Mellon hereby fully incorporates JPMC's waiver argument as set forth in Section V of the JPMC Pretrial Memorandum.

---

[17]     It is significant that despite Depfa's claims here, Ms. Davis continued to represent Depfa for years after the 2006 Bond Transaction, until 2010 (Davis Tr. at 201:21-202:6), and no one from Depfa has ever indicated to her that they they intended to assert any claim against her. (*Id.* at 202:3-6)

**C.    Other Transaction Documents Contradict Depfa's Consent Claim**

Depfa will also argue that even though the word supplement is not contained in Section 5.03(a), that Section's use of the word "amendment" includes and is synonymous with supplement.   The other transaction documents executed at the same time as Depfa's SBPA, however, put Depfa on notice that ALL intended to issue additional Bonds after the 2005 Bond Transaction by way of supplemental indentures (Trial Ex. 1 at 3) and made clear the Parties' intent and understanding that supplements are not the same as amendments to indentures.   As Depfa well knew, the Indenture specifically contemplated and authorized subsequent bond issuances by way of supplemental indentures.[18]   (Trial Ex. 1 at 3)   New York courts follow the well-established principle that "all writings that form part of a single transaction and are designed to effectuate the same purpose be read together, even though they were executed on different dates and were not all between the same parties."  *Gordon*, 358 F.2d at 263.   Taken together, the transaction documents here demonstrate even more clearly the parties' intended distinction between supplement and amendment.

Other provisions of the Depfa SBPA refer to the terms supplement and amendment distinctively, which indicates the Parties' intent that they be separate and not synonymous.  The first "Whereas" clause of Depfa's SBPA refers to the Indenture "as amended and supplemented from time to time."   (Trial Ex. 4 at 1)   Significantly, the definitions of "Series V-A-1 Remarketing Agreement" and "Series V-A-2 Remarketing Agreement" include the phrase "as the same may be amended, modified *or supplemented* from time to time."   (Trial Ex. 4 at 5) (emphasis added)  The difference between those two definitions and Section 5.03(a) is striking –

---

[18]        In the context of the authority to issue additional bonds provided in the Indenture, it would have made no business sense for ALL to give Depfa the right in its SBPA to consent to such additional bonds.  Such a consent right would have made it more difficult to issue subsequent bonds, and ALL did not and would not have agreed to it.  (Peterson Tr. at 191:23-192:14)

the Parties clearly intended to include "supplement" and that "supplement" be distinct from "amend" or "modify." (*Compare* Trial Ex. 4 at 5 *with* Trial Ex. 4 at 5.03(a))  Clearly, had they intended Section 5.03(a) to apply to supplements or supplemental indentures, they would have drafted it that way. *See MBIA Ins. Corp. v. Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A.*, No. 09-Civ.-10093, 2011 U.S. Dist. LEXIS 31307, *23-26 (S.D.N.Y. Mar. 25, 2011) (declining to imply term omitted from a particular provision where the parties' sophisticated draftspeople had repeatedly used the term elsewhere in the agreement).

Similarly, the Indenture draws a distinction between an amendment and a supplement – further evidence that the Parties intended supplement to be excluded from Section 5.03(a).  The Indenture repeatedly refers to "amendments or supplements" or to the Indenture being "amended or supplemented."  "Supplemental Indenture" is a term defined as "any indenture, supplemental to *or* amendatory of this Indenture." (Trial Ex. 1 at 12 (emphasis added)  The Indenture further states, "This Trust Indenture, together with any and all Supplemental Indentures, may hereafter be cited by the Corporation and is hereinafter sometimes referred to as the Indenture. (Trial Ex. 1 at ¶ 1.1)

This distinction between "amendment" and "supplement" is further underscored by the language of other provisions of the Indenture that do not apply here but reflect the Parties' clear intent to treat supplements and amendments differently.  Section 7.1 of the Indenture permits ALL and the Trustee, "without consent of or notice to any of the Owners," to enter into any agreement *supplemental* to the Indenture or Supplemental Indenture "to provide for the issuance of any series of Bonds, and in connection therewith to provide for rights, preferences, privileges,

terms and conditions applicable only to such series of Bonds . . . ."[19] (Trial Ex. 1 at § 7.1)

Section 7.2 provides that *supplemental indentures* may be entered into "from time to time" and

that nothing in Section 7.2 shall be construed to limit any requirement in any other document

requiring "the consent of any other party to any *Supplemental Indenture*." (*Id*. at § 7.2 (emphasis

added, capitalization in original))   Section 7.5, while similarly inapplicable, addresses the

requirements for certain modifications or amendments of the Indenture, and in a parallel to

Section 7.2, provides that "[n]othing herein shall be construed to limit any requirement in any

other document . . . which requires the consent of any other party to *any modification to or*

*amendment of* this Indenture." (*Id*. at § 7.5 (emphasis added))[20]   Thus, the Parties not only used

amendment and supplement distinctly, they recognized that there might be, on the one hand, a

consent right to Supplemental Indentures and, on the other hand, a separate consent right to any

modification or amendment.   Section 5.03(a) of the Depfa SBPA is unquestionably the latter.

Depfa has often relied on Section 7.5 as support for its argument that section 5.03 of the SBPA is

not limited by the indenture.   The fact that it relies on that provision dealing with modifications

or amendments, as opposed to the provision in Indenture Section 7.2 addressing consent to

Supplemental Indentures, is telling.   Even Depfa recognizes that it does not have the right to

consent to any Supplemental Indenture.

    The drafters of the Indenture, therefore, made a clear distinction between "amendments"

and "supplements," setting forth different consent requirements for each in different

circumstances, and the Depfa SBPA only speaks of consent in connection with amendments or

modifications, not supplements.   Given the use of "supplement" throughout the Indenture, the

---

[19]    At the time of the 2006 Transaction, Depfa was not an "Owner" – it only became one after it purchased the bonds.   Even if it had been an Owner in 2006, however, consent was not required.   (*See* Trial Ex. 4 at 5.03(a))

[20]    Depfa mistakenly relies on this provision to support its argument, but it does not enlarge the consent requirement or create one where none exists.

Parties' decision to omit that word in Section 5.03 of the Depfa SBPA is significant and demonstrates their intent that Depfa not have a right to consent to supplemental indentures and issues of additional bonds. *See MBIA Ins. Corp.,* 2011 U.S. Dist. LEXIS 31307, *23-26. The very first draft of the Indenture reflects separate sections addressing supplements separately from amendments. (Bayus Tr. at 29:10-31:2)  The sections were eventually combined by Elaine Bayus, bond counsel, though they retain the distinction between the terms supplement and amendment. (*Id.*)  Bayus will testify that the terms supplement and amendment were used distinctively, and not as synonyms. (Bayus Tr. at 35:21-36:6)  Had the parties intended them to be synonymous, there would have been no need to maintain that distinction.  Depfa's own lawyer for the 2005 Bond Transaction also confirms that supplements were intended to be different than amendments. (Davis Tr. at 39:12-21; 41:10-24)

### D.   The Consent Right That Depfa Now Claims Is Not Customary in the Industry and Would Have Been Clearly Expressed in the Documents

The right of a liquidity provider to consent to subsequent bond issues – whether under the same indenture, a supplemental indenture or a subsequent liquidity facility – was not and is not typical or customary in the bond industry.  The testimony will establish that those witnesses (fact and expert) with extensive experience in bond transactions had never seen a consent right of one liquidity provider to either supplemental indentures or subsequent liquidity facilities or their terms.  (Pope Tr. at 65:12-66:8; Landau Tr. at 179:4-180:5)

Davis, Depfa's counsel in the 2005 Transaction and the primary drafter of the Depfa SBPA, confirms that it was not industry custom to permit liquidity providers to consent to supplemental indentures and that the 2006 Transaction followed custom.  (Davis Tr. at 208:21-209:9)  In an early draft of the Indenture, Davis marked a handwritten comment stating "no amendments without consent of liquidity provider" next to the section entitled "Amendments."

(Trial Ex. 12 at KR-DEPFA0001127)  No such comment appeared next to the section entitled

"Supplements."  (*See* Trial Ex. 12)  Davis testified:

> Q:    Please go back to Davis Exhibit 12, page 52 [Trial Exhibit 27].
>
> A     Davis 12 you said?  Okay, got it.
>
> Q     And please turn to page 52.
>
> A     Okay.
>
> Q     Do you see your handwritten comment about "no amendments without consent of liquidity provider"?
>
> A     I do.
>
> Q     Why did you put that comment at the beginning of Article VIII, entitled "Amendments," and not put such a comment at the beginning of Article VII, entitled "Supplemental Indentures"?
>
>     MR. BERMAN:  Object to the form.
>
> THE WITNESS:  Well, in my experience, it's not customary for liquidity providers in insured transactions to have consent rights over supplemental indentures.
>
> Q     (By Mr. Barres)  And did this transaction follow the normal custom, in your understanding, in 2005?
>
> A     In that regard, yes.

(Davis Tr. at 208:14-209:9)  Mr. Landau and Mr. Pope, experts for the Trustee and Lloyds,

respectively, also confirm this industry custom.  (Trial Ex. 186; Trial Ex. 187)  Such consent

rights were rarely, if ever, granted.  (*See* Trial Ex. 186)  Had Depfa been granted such a right in

2005, it would have been spelled out expressly and clearly in the SBPA or other transaction

document.  (Trial Ex. 186; Trial Ex. 187.  *See also* Trial Ex. 4)  It was not.  In fact, the evidence

will show that Depfa asked for the right to consent to subsequent liquidity terms and ALL flatly

rejected that request, telling Depfa it could not be the gatekeeper for future liquidity providers.

(O'Neill Tr. at 121:15-123:14; Peterson Tr. at 191:23-192:14)  Depfa's expert, Joel Powers, contends that Depfa had the right to consent to the issuance of additional bonds because such right was not expressly excluded.  (Trial Ex. 189 at 8)  This flies in the face of well-settled law. *See Rowe v. Great Atl. & Pac. Tea Co.*, 385 N.E.2d 566, 571-72 (N.Y. 1978) ("[C]ourts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include. . . . [L]ack of foresight does not create rights or obligations.")

Counsel for ALL in the 2006 transaction also did not believe the transaction violated any rights of Depfa, providing an opinion letter confirming its belief that the Second Supplemental Indenture did not violate any existing contract or obligation of ALL, which would include the Indenture, First Supplemental Indenture and the Depfa SBPA.  (Trial Ex. 63) Various other certificates and opinions confirm that all parties agreed. (*See infra* at IV.B)

### E.   The Second Supplemental Indenture Was Not an Amendment to the Indenture

Alternatively, to square its argument with Section 5.03(a), Depfa may claim the Second Supplemental Indenture "amounted to" or was the "equivalent of an amendment."  The Second Supplemental Indenture did not amend the Indenture – expressly, impliedly or in any other way – by allowing for the issuance of additional bonds.  The Indenture already permitted such issuances and established terms for the authentication, terms, payment, form and delivery of such bonds under supplemental indentures.  (Trial Ex. 1 at Art. II)  The Second Supplemental Indenture merely effectuated the existing Indenture terms and carried out the overarching purpose of the Indenture – to issue additional bonds backed by the same master trust.  The operative portion of the Second Supplemental Indenture relating to the Issuance of the new bond series to be purchased by Lloyds was a supplement, not an amendment to the Indenture.  The

"Whereas" clauses make this distinction clear:  ALL seeks to "provide for the issuance of Bonds in the amounts and designated as provided herein" and "*also* desires to amend certain provisions of the Indenture." (Trial Ex. 3 at 1 (emphasis added).   The only section of the Second Supplemental Indenture that constituted an "amendment" rather than a "supplement" was Section 17.5, expressly entitled "Amendments," which amended the language of several Indenture provisions.  Depfa does not complain about those amendments and, in fact, it appears Park was aware of and consented to some of them.  (Trial Ex. 49)  The Second Supplemental Indenture was permitted by the Indenture, was not precluded by the Depfa Liquidity Facility, and was not subject to Depfa's consent.

## III.   DEPFA'S CHALLENGE TO LLOYDS' BONDS AS NOT IN PARITY IS CONTRARY TO THE UNDERSTANDING OF THE PARTIES AND THE INDUSTRY

It is unclear whether Depfa will assert that the Lloyds transaction violated the Indenture because additional bonds may only be issued if they are in "parity" and the Lloyds bonds are not in "parity" with Depfa's so that no redemptions should have been made to Lloyds at all, or whether Depfa will simply claim that any redemption payments made should have been on a pro rata basis.  The word "parity" is noticeably absent from Depfa's complaint (Dkt. 26), making its interpretation and use of the term a moving target.

The concept of parity, understood in the securities industry to apply where multiple series of bonds are secured by a common claim, at the same level of priority, against specified collateral, has been applied consistently in the bond industry for many years.  Depfa's garbled and inconsistent application of the concept, however, has not.

### A.   The Meaning of Parity

The *Glossary of Municipal Securities Terms*, Second Edition, published by the Municipal Securities Rulemaking Board, defines "parity bonds" as "two or more issues of bonds that have

55755828.1

the same priority of claim or lien against pledged revenues or other security." (Trial Ex. 191) This understanding of parity is shared by representatives of all parties in this case, including Depfa. (*See* Watkins Tr. at 60:15-25 (parity means "an equal interest in the underlying collateral security"); Peterson Tr. at 34:13-35:1 (senior bonds have equal interest to and equal rights in the underlying collateral); Park Tr. at 124:6-125:11 (parity means "equal as to collateral"); Roemlein Tr. at 86:9-18 ("on a parity with . . . would be two or more series of bonds that . . . have the same level of claim or lien on trust assets"). Industry experts confirm this interpretation. (Trial Ex. 187 ("Parity is a simple security concept under which multiple series of bonds are secured as to timely payment by a common claim, at the same level of priority, against specific security granted by the borrower."); Trial Ex. 186 (parity understood in the securities industry "to apply to the level of seniority of a bond issue as compared to another bond issue from the same issuer"). In this case, the Indenture contemplated several possible series of bonds:  Senior Bonds, Senior Subordinate Bonds, Subordinate Bonds and Junior Subordinate Bonds. (Trial Ex. 1 at 4)  Bonds within the same series are in parity with each other and share the same level of claim to the underlying collateral. (*See, e.g.,* Trial Ex. 187 at 8)

The concept of parity most often comes into play when there is a shortfall of some type, occurring in bankruptcy liquidation or other acceleration. (Trial Ex. 187 at 8; Trial Ex. 186 at 13)  If the debt has been accelerated, making all principal and accrued interest immediately due and payable, payments are then made pro rata to each parity debt holder. (Trial Ex. 187 at 8)  In the absence of default or acceleration, payments are made pursuant to the terms of the bond documents including, in this case, the SBPAs. (Trial Ex. 187 at 8)

The issue of parity is particularly sensitive for the Trustee.  While an indenture trustee does not have the same duty of loyalty as a personal trustee (*see* Section I.B, *infra*), the TIA

recognizes a potential conflict of interest arising from the same trustee acting for "more than one series of securities . . . under single indenture of an obligor." (TIA § 310(b)(1)) While such conflict may not be realized unless and until an event of default, the trustee must consider these potential conflicts at the outset of a transaction when determining whether to accept an engagement. *See* Landau & Peluso, Corporate Trust Administration and Management, at 70-71.

### B.    Depfa's Theory of Parity Conflicts with Industry Custom

Depfa's theory of parity deviates sharply from the commonly held understanding in the bond industry. Under Depfa's theory, senior bondholders have "an equal and ratable claim to proceeds from the sale of liquidated collateral and an equal and ratable claim to collateral liquidated through principal recoveries during the term-out period." (Trial Ex. 189 at 5, ¶ II.A) Further, "[b]ond series are not in parity if liquidated collateral is not distributed ratably, whether before or after an event of default or an acceleration of principal." (*Id.*) While there are some facial similarities between this manufactured concept and the universally understood definition, a closer examination reveals the absurdity of this position.

Depfa argues that for bonds to remain in parity, a statement that assumes that bonds can begin in parity and somehow move out of it, payments of principal from liquidated collateral must be made pro rata to bondholders within a series. (Trial Ex. 189 at 5, ¶ II.B) Under this concept, any revenues from the repayment of principal or interest on the underlying student loans, must be split, pro rata, between the two banks. (*Id.*) If a payment on a mandatory redemption date would exceed such pro rata share, the excess should be retained in the trust to make future principal payments on a pro rata basis. (*Id.*) Depfa suggests that because the Lloyds bonds have faster and more frequent redemptions, ALL and the Trustee must somehow set aside enough funds to ensure that the Depfa bonds are redeemed on a pro rata basis regardless of their

different payment schedules. (Trial Ex. 189 at 16-16) As Mr. Pope recognized, Depfa's "version of parity, in effect, would require a trustee to violate its duties by ignoring the terms of the indenture." (Trial Ex. 192 at 7)

Not surprisingly, Depfa's novel parity theory would apply only to principal payments (to which Lloyds is entitled to on a more frequent schedule), but not to interest payments (to which Depfa has a much higher rate). (Trial Ex. 189 at 20) Depfa's expert sees no inconsistency with permitting one series of senior bonds to receive higher interest payments than another series on a parity with it, and therefore receive a greater proportion of the collateral available to pay interest. (*Id.*; Powers Tr. at 223:12-224:8) The rationale for this disparate treatment is explained by the fact that interest is a "contracted-for right" (Trial Ex. 189 at 21) – a position that ignores completely the fact that the redemption schedule and term out are also contracted-for terms and that the interest rate on a liquidity transaction is a reflection of a shorter or longer term.

Depfa asserts that two series of bonds may be issued on a parity with one another, but, as a result of the payments they receive, fall out of parity. (Powers Tr. at 251:12-253:8 ("Q: Based on your understanding of the concept of parity, would it be possible for bonds to start in parity and at somehow – some point later in time come out of parity? [Objection] A: I would think that would be possible, yes.") Were that possible, a trustee would be unable to consider future conflicts when undertaking an engagement. Rather, it would have to closely monitor the payments and, if one payment was not made on a pro rata basis, immediately withdraw from the engagement in order to avoid a possible conflict. That is simply unrealistic, commercially unreasonable and nonsensical.

C. **Depfa's Creation of a New Theory of Parity for the Instant Litigation**

Depfa's concept of parity was manufactured even more recently than its alleged consent right. The term "parity" appears nowhere in Depfa's Amended Answer, Counterclaims,

55755828.1

Crossclaims, and Third-Party Complaint, and Answer to Crossclaim. (Dkt. No. 26) When the parties submitted briefing to Judge Cote in advance of her initial, non-binding ruling as to the interpretation of the parties' agreements, the issue of parity was not addressed. Instead, it was only after hearing Judge Cote's skepticism regarding its consent rights that Depfa even raised the issue of parity. Prior to that point, Depfa had never contended that the Depfa and Lloyds bonds were not on a parity with each other.

## IV. THE TRUSTEE WAS ENTITLED TO RELY ON OPINIONS OF COUNSEL AND DIRECTIONS FROM ALL, AND HAD NO DUTY TO MAKE REDEMPTION PAYMENTS WITHOUT DIRECTION, TO QUESTION ALL'S REDEMPTIONS OR TO DUPLICATE ALL'S WORK IN DETERMINING WHETHER AND WHEN FUNDS WERE AVAILABLE FOR REDEMPTIONS

Consistent with industry custom and practice, the Trustee was entitled to rely on directions, certificates or other documents in the course of carrying out its duties, and counsel opinions and certificates verifying that the entry into the Second Supplemental Indenture was permissible under the Indenture. (Trial Ex. 1 at §§ 10.2(a)(2), 10.3(a), (b), (d)) Even were ALL required to obtain Depfa's consent prior to the entry into the Second Supplemental Indenture, therefore, the Trustee was provided with a number of documents that it was entitled to and did rely on as to the permissibility of the transaction. First, the Trustee was provided with a "Closing Certificate of the Corporation" from ALL certifying that "all conditions precedent have been met" and that the execution of the Second Supplemental Indenture "will not constitute a breach under any contract or agreement" to which ALL is party. (Trial Ex. 58) The Trustee is entitled and protected in relying on such certification. (Trial Ex. 1 at § 10.2(a)(2)) The Trustee also received opinion letters from counsel for ALL that addressed the propriety of the 2006 Bond Transaction (Trial Exs. 63, 64) and the Trustee's reliance on these letters absolves it of any liability in connection with the transaction. (Trial Ex. 1 at § 10.3(a)) Depfa appears to assert that the Trustee should have walked away from the transaction, despite the fact that the closing

55755828.1

table was lined with opinions that the deal was properly entered into and did not constitute a breach of any agreements to which ALL was a party. That would be absurd. To the contrary, BNY Mellon acted in good faith, not negligently, and it is not liable to Depfa and entitled to be fully indemnified for its actions.

Similarly, BNY Mellon properly relied on instructions from ALL regarding the timing and amount of redemptions. (*See* Trial Exs. 82, 84, 95, 96, 130, 135, 166)  there are no contractual provisions that require BNY Mellon to make redemption payments without being directed by ALL. And BNY Mellon did not have sufficient information to calculate whether cash was available for redemptions – that was a duty of ALL. (Peterson Tr. at 244:23-245:3; Roemlein Tr. at 159:14-160:6) Depfa and Lloyds contend that BNY Mellon was not entitled to rely on these opinions and instructions and should have conducted its own investigation into the accuracy of the contents of these documents as well as their compliance with the Indenture. These allegations are inconsistent with industry practice, the role of the Trustee, and the clear and unambiguous language of the Indenture.[21]

### A.    The Indenture Clearly Authorizes BNY Mellon To Rely on Instructions from the Issuer and Opinions of Counsel.

Article 10 of the Indenture sets forth the rights and responsibilities of the Trustee. Under California law, these provisions establish the bounds of the Trustee's liability. *Shawmut*, 33 F.3d at 1491 (holding that the indenture trustee's "duties and obligations are *exclusively* defined by the terms of the indenture agreement" (emphasis added) (quoting *Merkel*, 758 F.2d at 816; citing *Elliot Assocs.*, 838 F.2d at 71)).[22]   (*See also supra* Section I.B)  The Indenture expressly

---

[21]    Also, to the extent Depfa and Lloyds seek to recover for alleged breaches of the Indenture or Supplements thereto, they are not parties to or intended third party beneficiaries thereof. *See* Third-Party Defendant/Crossclaimant JP Morgan Chase Bank, N.A.'s Pretrial Memorandum of Law at Point II.

[22]    In *Shawmut*, the Court noted that, to the extent an indenture trustee's liability is not limited to the terms of the Indenture by default, the inclusion of an exculpatory clause in the Indenture is sufficient to so limit the

disclaims any implied covenants or obligations that might be read into the Indenture against the Trustee. (Trial Ex. 1 at § 10.2(a)(1))  And any permissive right of the Trustee to act under any provision of the Indenture does not create a duty or obligation to so act. (Trial Ex. 1 at § 10.3(l))

The Indenture affords expansive protections for the Trustee to rely on representations, directions and opinions of the Issuer and counsel.  The Trustee may conclusively rely on the truth of the statements expressed in certificates furnished to the Trustee and conforming to the requirements of the Indenture, in the absence of negligence or bad faith on the part of the Trustee. (Trial Ex. 1 at § 10.2(a)(2))  The Trustee may rely, and *is protected in acting*, upon any "resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, approval, bond, debenture or other paper or document" believed by it to be genuine and to have been presented by the proper party, including in connection with the payment of moneys out of an Account. (Trial Ex. 1 at §§ 10.3(a)-(d))[23]  Further, the Trustee is not required to make any inquiry or investigation into the facts or matters stated in any paper or document on which it is authorized to rely. (Trial Ex. 1 at § 10.3(f))

These rights of reliance are necessary because the Indenture limits the Trustee's authority to act independently of the Issuer. (Trial Ex. 186 at ¶ 16 (The trust indenture "not only prescribes rules of conduct for the issuer but also defines the limits of the indenture trustee's authority.").)  "This lack of discretionary authority also means that it is the trustee's responsibility to follow instructions given to it by those persons/entities that it reasonably believes to have the proper authority to do so under the appropriate provisions of the indenture."

---

trustee's liability.  *Shawmut*, 33 F.3d at 1491 n.9.  As the *Shawmut* court observed, "The Indenture in this case contains such a clause." *Id*; *see also* Trial Ex. 1 at § 10.2(a)(1).  Therefore, whether by operation of the general rules governing indenture agreements or by operation of the specific terms of this Indenture, the BNY Mellon's duties and obligations are *exclusively* defined by the terms of the Indenture. *Shawmut*, 33 F.3d at 1491.

[23]        "Certificate" is defined, in part, as "a signed document either attesting to or acknowledging the circumstances, representations or other matters therein stated or set forth or setting forth matters to be determined pursuant to this Indenture." (Trial Ex. 1 at § 1.2.)

*Id. See also Dell'Oca*, 159 Cal. App. 4th at 537 n.3 ("[The trustee] has only the authority and powers granted by the indenture and is subject to all its restrictions and limitations. Except to the limited extent specified, the trustee has no right or authority to represent or act for the security holders or to substitute its judgment for theirs." (quoting LANDAU & KRUEGER at 27-30)).

**B.      Practice in the Industry Creates Only a Limited Duty of the Trustee To Review Opinions of Counsel and Instructions from the Issuer.**

The provisions of Section 10 conform to custom and practice in the industry, which does not impose a general obligation on an indenture trustee to look behind instructions from an issuer or opinions of counsel. (*See, e.g.*, Peterson Tr. at 104:08-11; 247:13-22; Roemlein Tr. at 45:19-46:22; *see also* Trial Ex. 186 at ¶ 12 ("Such indenture trustee does *not* occupy the role of a watchdog, overseeing the activities of the issuer.").)  The Trustee is not required to second guess instructions to make redemptions (*see, e.g.*, Landau Tr. at 125:8-16); independently verify the amounts of those redemptions (*see, e.g., id.* at 214:19 – 217:2; Peterson Tr. 244:23–245:10); calculate redemption schedules (*see, e.g.*, Landau Tr. at 211:15-21); or ensure that redemption payments are made on scheduled redemption days.[24]  Similarly, the Trustee is not obligated to conduct its own independent analysis of the accuracy of counsel opinion letters it receives. (Trial Ex. 1 at § 10.3(d))  The Indenture specifically relieves the Trustee of the duty to "make any inquiry or investigation in the matters covered by [documents received pursuant to Sections 10.3(a) and (d)]." (Trial Ex. 186 at ¶ 18; *see also* Trial Ex. 1 at § 10.3)

The Trustee must verify that any instruction from the Issuer regarding a redemption or other payment of funds from the trust simply comports with the Indenture. (Landau Tr. at 57:4 –

---

[24]       The covenant to make scheduled redemption payments is the Issuer's, not the Trustee's. (Landau Tr. at 214:23-215:16.)  Further, the right of redemption belongs to the bondholder, and it is ultimately the bondholder's responsibility to address the Issuer's failure to instruct scheduled redemption payments. (Landau Tr. at 221:13-222:12.)  Additionally, the Trustee often cannot calculate the redemptions without directions from the Issuer because the Trustee lacks the necessary information.   (Landau Tr. at 222:13 – 224:22)  That was the case here.

55755828.1

58:8)   The same is true for counsel opinion letters.   (Trial Ex. 1 at § 10.3(d))   This test of "comportment" is limited and involves three steps, which are universally recognized in the industry (*Id.* at 57:8-9).   The Trustee must verify that:   (1) the document received is a type the Trustee is supposed to receive under the Indenture (*id.* at 57:12-15); (2) the document "comports with the requirements of the Indenture"; and (3) the document is signed by an appropriate or authorized person (*id.* at 58:8-9).

The first and third steps do not appear to be at issue in this case but are easily satisfied in any event.   The Issuer's directions were required under the indenture for the Trustee to process redemption payments (*see generally* Trial Ex. 1 at § 3.8; Trial Ex. 4 at § 3.02; Trial Ex. 5 at § 3.02), and the Trustee was entitled to rely on and solicit opinions of counsel (Trial Ex. 1 at § 10.3(a), (d)).   Neither Depfa nor Lloyds has ever contended that the directions, certificates, or opinions relied on by the Trustee were not signed by an appropriate or authorized person.

Depfa (and Lloyds) may contest the second element of the test by claiming that the directions, certificates, and opinions on which the Trustee relied did not comport with the requirements of the Indenture.   This second step, however, only requires the Trustee to examine the form of the document it relies on to confirm that it contains the recitations and representations required by the Indenture; it does not require the Trustee to undertake an independent analysis of the accuracy of the individual representations in the direction or opinion. *See Semi-Tech Litig., LLC v. Bankers Trust Co.*, 353 F. Supp. 2d 460, 477, *aff'd in part and rev'd in part on other grounds*, Nos. 05-1155-bk, 05-1485-bk, 2006 U.S. App. LEXIS 17496 (2d Cir. May 31, 2006) (finding that officers certificates did not conform with the requirements of the indenture because they did not contain certain recitals specifically required by the indenture).

1.      **The opinions of counsel received by the Trustee comport with the Indenture**

The opinions of counsel were documents on which the Trustee was authorized to rely. (Trial Ex. 1 at § 10.3(d))[25]  The two opinion letters from Sonnenschein, counsel for ALL in the 2006 Transaction, certified, among other things, that the Second Supplemental Indenture would not breach any existing contractual obligations of ALL, which includes the Indenture, Depfa SBPA and First Supplemental Indenture.  (*See* Trial Ex. 63 ("First Opinion Letter"); Trial Ex. 64 ("Second Opinion Letter").)   The First and Second Opinion Letters contained the type of information required, including verification that the opinions were based on an analysis of all of the governing documents.  (*See* Trial Ex. 1 at § 7.3(B)(ii))  And the Opinions were signed by authorized attorneys for counsel entitled to issue such opinions to the Trustee.  (*See* Trial Exs. 63, 64)  Also, ALL provided a Closing Certificate certifying, among other things, that (i)"[a]ll necessary action required to be taken by [ALL] in connection with, and all conditions precedent to, the authorization, execution, issuance, delivery and performance" of the documents executed in connection with the 2006 Transaction "have been taken or fulfilled" (Trial Ex. 59 at 3, ¶ 10); and (ii) the execution and delivery of the transaction documents, including the Second Supplemental Indenture and the Lloyds SBPA, would not conflict with or constitute a breach of any other agreement to which ALL is a party or bound.  (*Id*. at 4, ¶ 14)

The broad test of "comportment" with the Indenture applies to opinions of counsel. "[The trustee is] required to read the Counsel's opinion to make sure that it comports with the requirements of the Indenture.  But it doesn't have to go behind it to do an analysis of it . . . ." (Landau Tr. at 69:10-12; 77:12-23)  Indeed, were a Trustee required to question and ascertain the

---

[25]      To avoid duplication, BNY Mellon hereby fully herein incorporates the related discussion of reliance on opinions of counsel in connection with the 2006 Transaction in Sections I.A-C of Third-Party Defendant/Crossclaimant JP Morgan Chase Bank, N.A.'s Pretrial memorandum of Law dated October 31, 2011.

accuracy of every statement in an opinion of counsel, undertaking the same investigation and review of opinion counsel (which could require hiring its own counsel), there would be no point in the provision permitting reliance on the opinion.  That would violate the well-established rules that a contract is to be read so as to give effect to all of its provisions.  *New York Marine and Gen. Ins. Co. v. LaFarge N. Am., Inc.*, 599 F.3d 102, 116 (2d Cir. 2010); CAL. CIV. CODE § 1641; *Kaiser Cement*, 196 Cal. App. 4th at 155.  Further, the Trustee may rely on an opinion of counsel without directly consulting with the counsel issuing the opinion.  (*Id.* at 105:9-13, 106:16-107:4.; Trial Ex. 1 at § 10.3(a), (d))

Depfa argues that the counsel opinion letters did not comply with the Indenture because they did not specifically name the First Supplemental Indenture or the Depfa SBPA.  (*See* Trial Ex. 194 ¶¶ 16-17.)  However, these letters certified that the Indenture, defined to include the Second Supplement, did not "conflict or constitute a breach or default under . . . *any* agreement, contract, or other instrument to which the corporation is a party or by which the corporation is bound."  (Trial Ex. 63 (epmahsis added))  It did not limit that certification to documents expressly named in the opinion letter.  (*Id.*)

The First Supplemental Indenture became a part of the Indenture as soon as it was executed, and any general reference to compliance with the Indenture necessarily implies compliance with any amendments to the Indenture then in existence.  (*See* Landau Tr. at 118:14-119:7, 120:2-121:20 (clarifying that references to the Indenture implicitly include all amendments and supplements); (Pope Tr. at 133:7-135:3. (explaining that the "non-contravention language" in the Second Opinion Letter encompassed all amendments and supplements to the Indenture then in existence); Trial Ex. 1 at 6.)  This is reinforced by the fact that the Indenture defines "Indenture" as meaning "this Trust Indenture and any amendments or

supplements made in accordance with its terms." (Trial Ex. 1 at 6)  A separate reference to a specific provision or document incorporated into the Indenture is not required for a general certification of compliance with the Indenture. *See Cruden v. Bank of N.Y.*, 957 F.2d 961, 971 (2d Cir. 1992) (inferring compliance with indenture provisions not named in opinion letter based on counsel's reference to compliance with related provisions and its statement that the supplemental indenture did not breach the terms of any indenture known to counsel by which its client was bound).  Therefore, BNY Mellon properly relied on the opinions of counsel advising that the Supplemental Indenture was proper under, and did not violate, the terms of the Indenture. (Trial Ex. 186 at ¶ 19.)

One of Depfa's experts opined that the Trustee was not entitled to rely on the Sonnenschein opinion letters because they did not contain the exact language specified in Indenture § 7.3(B).   (Trial Ex. 194 at ¶¶ 16-17)   That section provides that prior to any supplement becoming effective, the Trustee must receive opinions of counsel "to the effect that" the supplement has been "duly and lawfully entered into in accordance with the provisions of this Indenture, is authorized or permitted by this Indenture, and is valid and binding upon the Corporation and the Trustee." (Trial Ex. 1 at § 7.3(B))  This opinion is no more than improper contract construction from an expert witness. *See Marx & Co. v. Diners' Club, Inc.*, 550 F.2d 505, 510 (2d Cir. 1977); *Am. Home Assurance Co. v. Merck & Co.*, 462 F. Supp. 2d 435, 449 (S.D.N.Y. 2006); *Media Sport & Arts s.r.l. v. Kinney Shoe Corp.*, 1999 U.S. Dist. LEXIS 16035, *9 (S.D.N.Y. Oct. 19, 1999); *Luizzi v. Pro Transport, Inc.*, 2011 WL 1655567, at *2-3 (E.D.N.Y. 2011)  More importantly, however, it misreads the Indenture and the opinion letters.

The opinion letters – and in particular, Second Opinion Letter – satisfy § 7.3(B).  The three requirements of that section -- due entry, authorization/permission by the Indenture, and the

valid and binding nature of the supplement – are all addressed in paragraph (f) of the Second Opinion Letter. (Trial Ex. 64)  Although they do not use the exact words of section 7.3(B), that is not what it requires.   The opinion need only use words "to the effect of" the three requirements. (Trial Ex. 1 at § 7.3(B))  It clearly does that, Thel's hypertechnical construction to the contrary.   Moreover, nothing in Article X (or otherwise) limits the Trustee's protections from and reliance on counsel opinions to those that conform with exactitude to § 7.3(B). (*See* Trial Ex. 1 at Art. 10)

## 2.   The Trustee properly relied on Directions from ALL

Similarly, the Trustee is not required to conduct an independent investigation into every Direction it received from the Issuer.  The authority and obligation to issue redemptions is one that the trust documents grant exclusively to ALL.  The Issuer shall "cause the redemption of Bank Bonds." (Trial Ex. 4 at § 3.02; Trial Ex. 5 at § 3.02; Peterson Tr. at 245:7-10)  It is also up to the determination of the Issuer as to whether to cause special redemptions. (Trial Ex. a at § 3.8)  The role of the Trustee is simply as processor, to facilitate the issuance of redemptions pursuant to the Issuer's directions. (Trial Ex. 1 at § 3.8 (providing procedures for notice and redemption at the direction of the Issuer); *id.* at § 5.4(a) (discussing Trustee "as directed by the Corporation" paying out of the Loan Account); Trial Ex. 186 at ¶ 21 (The Trustee's role in the redemption process "was essentially that of a 'processor' of the Issuer's responsibility to cause redemptions of Bonds under Section 3.02 of the [Liquidity Facilities]."); Roemlein Tr. at 45:19-4)  ALL's agreement to indemnify the Trustee is further evidence of its protected position. (*See* Trial Ex. 1 at § 10.5(c))

The Trustee must only verify that the direction or opinion is *complete*, and has the information necessary to permit the Trustee to effectuate it, not that it is *accurate*.  "For example, if the obligor is required to give a direction to the Trustee with respect to a conversion rate, then

that certification has to include language with respect to the conversion rate, not whether it's correct or not." (Landau Tr. at 57:17-23; *see also* Roemlein Tr. at 112:20-113:9 (stating that the Trustee "know[s] generally what should be paid out of the trust accounts" and examines a direction of the issuer only to see if "something looks like it's totally out of whack and should not be paid."); *id*. at 113:10-25, 172:20-173:9)

Directions for the issuance of redemptions were a type of document the Trustee was supposed to receive under the Indenture. (*See generally* Trial Ex. 1 at § 3.8.) The directions contained the required information regarding the timing and amount of the redemption to be issued. (*See, e.g.,* Trial Exs. 82, 84, 95, 96, 130, 135, 166; Roemlein Dep. at 173:20-174:15) They also were signed by authorized individuals at ALL. (*Id*.) Under these circumstances, BNY Mellon's reliance on these directions was reasonable, in good faith, and authorized by the Indenture. (Trial Ex. 1 at §§ 10.2(a)(2), 10.3(a)-(d), (f); Trial Ex. 186 at ¶¶ 20-21.)

The directions, certificates, and opinions upon which BNY Mellon relied clearly complied with the three factor test. (*See, e.g.,* Trial Exs. 61, 63, 64, 82, 84, 95, 96, 130, 135, 166)

Depfa and Lloyds cannot demonstrate that there were delays or improper redemptions in the period before October 2008. And there is certainly no basis for the claim that the Trustee should or could have acted independently of ALL to make redemptions where ALL did not direct. They offer only expert testimony that supplants ALL's real-time judgment with their own hindsight views of the timing and amounts of accruals that ALL should have made, yielding different results of how much cash should have been available. (Trial Ex. 193 at ¶ 18) They fail to consider that the Indenture provisions are not detailed and specific as to how ALL must

calculate cash available for redemption, and ignore the discretion that those provisions give ALL.

Depfa's expert, Scott Friedland, also ignores the plain language of Depfa's own SBPA, Section 3.02(a) of which only speaks of amount in the "Revenue Account" being used for redemptions. Notwithstanding that language, Friedland calculates what he contends is cash available from both the Revenue and Loan Accounts for redemption on every quarterly (for Lloyds) and semi-annually (for Depfa) anniversary of each of their Bank Purchase Dates, and contends that such cash was available "to satisfy the higher priority requirements of the Waterfall and still redeem some amount of Bank Bonds on those dates." (Trial Ex. 188 at 4) His inclusion of the Loan Account resulted in amounts that he claims are available that are many magnitudes higher than would be "available" if he only considered the Revenue Account. (*Id*. at Ex. C) Friedland never says how much cash should have been used, on what dates, and how many bonds should have been redeemed at a given time. (Friedland Dep. at 162:13-20) He also testified that he is expressing no opinion as to the reasonableness of ALL's behavior in connection with the issues in his report, which includes calculating available cash and making redemption payments. (Friedland Tr. at 160:20-25) He expressly states that he is not offering any opinion as to whether Depfa or Lloyds suffered damages, and has given no thought as to how to go about doing that. (Friedland Tr. 159:15-160:11) He also expresses no opinion as to whether the Trustee has any liability here or as to the scope of the Trustee's duties. (*Id*. at 160:12-161:11)

Lloyds' expert, Jack Blumenthal, recreates the entire cash flow process of the trust from January 1, 2008 through July 1, 2011 (and in his updated and revised report, through August 31, 2011), for the Revenue, Loan, Payment, Operating and Reserve Account. (Trial Ex. 195) He

substituted his assumptions as to what ALL's directions and instructions to the Trustee should have been. (Trial Ex. 193 at ¶ 20) He considers, under different scenarios, amounts only in the Revenue Account and amounts in both that and the Loan Account. (Trial Ex. 195 at 5, 13) He computed amounts he claims are owed from the trust estate, not from the Trustee, and confirmed that he did not calculate damages as against the Trustee. (Blumenthal Tr. at 195:10-196:10) Thus, his testimony addresses how the trust estate should have been and should in the future be split between Lloyds and Depfa. (Blumenthal Tr. at 290:7-291:9) He has expressed no opinion on (i) whether ALL acted consistent with the standard of professional care as a program administrator (Blumenthal Tr. at 191:12-22); (ii) whether ALL acted prudently or imprudently with respect to its responsibilities as a program administrator (*id*.); (iii) whether ALL acted reasonably in connection with its duties as a program administrator (*id*. at 191:23-192:4); (iv) whether ALL or the Trustee breached the indenture or other duty (*id*. at 189:19-190:2; 190:14-18). He repeatedly states that he is offering no opinion about the actions of the Trustee. (*Id*. at 189:19-190:2; 190:14-18; 196:5-10) He also admits that Peterson and ALL had the ability to use its business judgment or discretion in calculating the amounts that were appropriately accrued under the waterfall in determining available cash for redemption. (*Id*. at 283:12-21)

The evidence offered by Depfa and Lloyds does not support any claim that the Trustee acted improperly in relying on the driectsion of ALL.

### C. The Exculpatory Provisions of the Indenture Do Not Create an Affirmative Duty of Care.

As discussed, Section 10 of the Indenture provides broad protections for the Trustee, limited only by any negligence, willful misconduct, or bad faith on the part of the Trustee. The Trustee may conclusively rely on certificates, absent negligence or bad faith (Indenture § 10.2(a)(2)), may rely on directions from the issuer, absent bad faith (Trial Ex. 1 at § 10.2(c)),

may rely on opinions of counsel, absent bad faith (*id*. at § 10.3(d)), and is generally protected in the exercise of its discretion, except for its own negligence or willful misconduct (*id*. at § 10.2(c)).

These provisions do not create a separate duty of care that would require BNY Mellon to independently verify instructions from the issuer or opinions of counsel. "Good faith" and other such protective provisions act solely as exculpatory provisions to protect the indenture trustee from unintended liability; they do not create an independent duty of care that would *increase* the trustee's liability. *Masonek v. Wells Fargo Bank, Nat'l Assoc.*, No. SA ML 10-2145 DOC (RNBx), 2010 U.S. Dist. LEXIS 143439, at *28-29 (C.D. Cal. Aug. 31, 2010) (holding that clause protecting the indenture trustee from liability for actions it took or refrained from taking in good faith and in the absence of willful misconduct or negligence was exculpatory and did not impose an affirmative duty of care) (citing *Banco Espirito Santo de Investimento, S.A. v. Citibank, N.A.*, 2003 U.S. Dist. LEXIS 23062 (S.D.N.Y. Dec. 22, 2003)).

On the contrary, the "good faith" provisions impose a duty on a trustee only if it obtains *actual knowledge* that the document or opinion on which it seeks to rely is incorrect. *Masonek*, 2010 U.S. Dist. LEXIS 143439 at *23 ("In the indenture trustee context, acting in good faith means that the trustee does not have actual knowledge contradicting information in the particular certificate or opinion.") (citing LANDAU & KRUEGER at 67); *see also* Landau Tr. at 123:13- 126:10 (Trustee could rely on opinion of counsel unless it had actual knowledge that representations in the opinion were false; Trustee empowered to act under Section 5.03(a) of Depfa Liquidity Facility only upon actual knowledge relevant to the provision). Neither Depfa nor Lloyds alleges that BNY Mellon had actual knowledge that any direction or opinion upon

which it relied was incorrect or false.[26]   Therefore, BNY Mellon had a right to rely on those directions and opinions and is completely protected by the law and the Indenture in having done so.

## V.   NO CONDUCT OF THE TRUSTEE CAUSED ANY DAMAGE TO LLOYDS OR DEPFA

Depfa and Lloyds must demonstrate that their claimed damages were caused by and are directly traceable to a breach by BNY Mellon. *Shawmut Bank*, 33 F.3d at 1498, n. 19, 20; *Postal Instant Press, Inc. v. Sealy*, 43 Cal. App. 4th 1704, 1709 (2d App. Dist. 1996) ; *Nat'l Market Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir. 2004).   Damages must not be remote or the result of other intervening causes.   *See Wells Fargo Bank v. FSI, Financial Solutions*, 196 Cal. App. 4th 1559, 1574 (4th App. Dist. 2011); *Fruition, Inc. v. Rhoda Lee, Inc.*, 1 A.D.3d 124, 125 (1st Dep't 2003).

It may well be the case that both Depfa and Lloyds lose money on their investments in the Series V bonds, but that has nothing to do with conduct of the Trustee.   After Ambac's downgrade and rehabilitation proceeding, Depfa and Lloyds lost recourse to the policy (although it should be noted that Ambac may still contribute to the Trust, either in settlement or part of its rehabilitation).   When asked about what went wrong with this deal, Lloyds' expert, who worked on thousands of bond transactions, stated: "a very large part of this problem came about because AMBAC got downgraded.   And they got downgraded because what they – what they did was credit default swaps that turned out to be a very bad decision."   (Blumenthal Tr. at 288:20-289:16)   He also stated that the trust estate is deteriorating because of "negative arbitrage,"

---

[26]      Moreover, there is no allegation and will be no evidence of bad faith on the part of BNY Mellon here.   "Nor is the Trustee's good faith put into question merely by virtue of the fact that the opinion relied upon may have been wrong; to so hold would eviscerate the opinion of counsel defense." *Cruden*, 957 F.2d at 972.

which is simply that the interest being paid out to the bondholders, net of expenses, is higher than the interest being earned on the trust assets. (Blumenthal Tr. at 287:12-17)

The idea that the Trustee, with its limited duties, expansive protections and significantly lower compensation than all other parties to the deal, should be liable for Depfa's losses is nonsensical. Depfa will be unable to satisfy its burden of proving that, even had the Trustee has some duty to object to the Lloyds transaction, the other parties would not have gone through with it. Given all of the opinion letters and certifications as to the propriety of the transaction, it would be rank speculation to conclude that the Trustee would have been able to halt the transaction. Indeed, it is more likely that the Trustee would have been replaced and the transaction would have proceeded in any event. It is also the height of irony that Depfa – which now claims to have believed it had to consent to the transaction – sat back and said nothing to enforce its rights while now complaining that the Trustee should have spoken up.

Further, even assuming BNY Mellon had a duty to take some unspecified action with respect to redemption payments, neither Depfa nor Lloyds can establish that any question by the Trustee would have caused ALL to redeem differently than it did. And again, during the period in 2008 where redemptions were not made, neither Lloyds nor Depfa went to the Trustee to ask about allegedly delayed redemptions.

To the extent either claim to be damaged as a result of alleged delayed redemption payments, both failed to mitigate their damages by complaining to either ALL or the Trustee about such allegedly delayed payments. Depfa's own expert's calculations as to amounts in the trust accounts demonstrates that as of November 2009, all monies that could have distributed to Depfa and Lloyds were distributed.[27]  To the extent there was any delay, both parties were

---

[27]    Lloyds' claims against BNY Mellon only seek damages up to September 2009, the last redemption payment before the parties agreed to hold off on redemptions while trying to resolve disputes. (*See* Dkt. 39 at ¶ 56)

55755828.1

compensated by interest payments, which is exactly what was contemplated by their respective SBPAs.

Moreover, neither Depfa nor Lloyds can establish that it suffered any damages compensable by BNY Mellon.   As set forth in BNY Mellon's Motion *in limine* to Preclude Depfa and Lloyds from Presenting Damages Evidence Pursuant to Fed. R. Civ. P. 37(c), neither Depfa nor Lloyds have met their obligations to disclose their damage calculations and methodology as against the Trustee.   Neither disclosed their theory or calculation of damages as against BNY Mellon in their respective Rule 26 disclosure, neither responded to discovery requests seeking documents supporting such damages.   Because neither party has satisfied their obligations and provided BNY Mellon with notice of their damage theory and calculation, and such failure was neither substantially justified nor harmless to BNY Mellon, the Court should grant BNY Mellon's motion.

## CONCLUSION

For all of the foregoing reasons, neither Depfa nor Lloyds will be able to satisfy their burden of proof to establish their claims against BNY Mellon, which claims fail as a matter of law and fact.   BNY Mellon will ask the Court to enter judgment against Depfa and Lloyds and for BNY Mellon on each of their respective claims.   BNY Mellon also will ask the Court to determine its declaratory judgment claim and decide the dispute between Depfa and Lloyds. BNY Mellon stands ready to comply with any order of the court as to making payments to Depfa and Lloyds.

Dated:  October 31, 2011
       New York, New York                Respectfully submitted,

By: _____
         Judith A. Archer
Sarah E. O'Connell
Fulbright & Jaworski, LLP
666 Fifth Avenue
New York, New York 10103
Tel.:  (212) 318-3000
Fax:  (212) 318-3400
jarcher@fulbright.com
soconnell@fulbright.com

*Attorneys for Plaintiff/Counterclaim Defendant*
*The Bank of New York Mellon Trust Company, N.A.*