UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

THE BANK OF NEW YORK MELLON TRUST
COMPANY, N.A.,

                    Plaintiff-Counterclaim Defendant,

    -against-

DEPFA BANK PLC and LLOYDS TSB BANK PLC,

                    Defendants-Counterclaimants.

DEPFA BANK PLC,

                 Third-Party Plaintiff,

    -against-

ACCESS TO LOANS FOR LEARNING
STUDENT LOAN CORPORATION and
JPMORGAN CHASE BANK, N.A.,

                Third-Party Defendants.

Case No.: 10-CV-4424 (JPO) (AJP)

LLOYDS TSB BANK PLC,

                 Third-Party Plaintiff,

    -against-

ACCESS TO LOANS FOR LEARNING
STUDENT LOAN CORPORATION,

                Third-Party Defendant.

## THE BANK OF NEW YORK MELLON TRUST COMPANY N.A.'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Judith A. Archer
Sarah E. O'Connell
Fulbright & Jaworski, LLP
666 Fifth Avenue
New York, New York 10103
(212) 318-3000
*Attorneys for the Bank of New York
Mellon Trust Company, N.A.*

55756112.3

Bank of New York Mellon Trust Company, N.A. ("BNY Mellon") hereby submits the following proposed findings of fact and conclusions of law that it believes should be adopted by the Court.

## PROPOSED FINDINGS OF FACT

1.      Access to Loans for Learning Student Loan Corporation ("ALL") is a non-profit issuer of bonds backed by, among other things, federally guaranteed student loans.

2.      In 2005, ALL determined to issue $190 million in Series V A-1 and A-2 bonds to be backed by such loans, and solicited bids from banks, including DEPFA Bank plc ("Depfa") and Lloyds TSB Bank plc ("Lloyds"), to act as liquidity provider for the bonds.  (*See, e.g.,* Trial Ex. 14, 15; Stipulated Facts No. 13)[1]

3.      Depfa submitted a bid in May 2005 to act as the liquidity provider for the ALL Series V A-1 and A-2 bonds, which ALL accepted.  (*See* Trial Ex. 15; Stipulated Facts No. 14)

4.      Depfa agreed to provide liquidity for a period of 10 years.  (Trial Ex. 15)

5.      As a result of that long period, Depfa and ALL agreed to a high interest rate of Prime + 1.5%.  (*Id.*)

6.      In return for agreeing to provide such liquidity, Depfa also would receive liquidity fees in the amount of 17.5 basis points on the balance of outstanding bonds.  (*Id.*)

7.      The Bonds were insured against default by Ambac, which agreed to pay any unpaid bond principal at the stated maturity dates and interest on required interest payment dates. (Trial Ex. 34; Stipulated Facts No. 9)

8.      The Offering Statement for the 2005 bonds summarized the various indenture provisions and set forth Risk Factors, including that "there can be no assurance that the Insurer

---

[1]      References herein to "Trial Ex. __" are to the Joint Exhibits submitted herewith.  References herein to "Stipulated Facts" are to the Stipulated Statements of Fact or Law contained in the Joint Pretrial Order. References herein to deposition testimony shall be to "[Deponent] Tr. at page:line."

[Ambac] will have sufficient revenues to enable it to make timely payments under the Insurance Policy." (Trial Ex. 28 at TS-10 (ALL0000450))

9.      In connection with the 2005 Transaction, ALL and JPMorgan Chase Bank, N.A. ("JPMC") entered into the Indenture, the overall purpose of which was to facilitate the issuance of Series V bonds.  (Trial Ex. 1 at 1)

10.      The Indenture was a Master Indenture, as that term is known in the bond industry, because it specifically authorized and contemplated that more than one issuance of bonds would be made thereunder.  (Davis Tr. at 180:7-14, 194:2-12; Peterson Tr. at 17:25-18:6; Landau Tr. at 173:13-174:3; Chapman Tr. at 71:10-15)

11.      The Indenture is governed by California law.  (Trial Ex. 1 at § 11.7)

12.      Section 2.01 of the Indenture states:

Bonds may be issued under the provisions of this Indenture, but only in accordance with this Article, in amounts which shall not be limited except as specified with respect to any series of Bonds in the Supplemental Indenture providing for the issuance thereof.  Additional Bonds may be issued on a parity with Senior bonds. . . theretofore Outstanding . . . . (Trial Ex. 1 at § 2.01)

13.      The Indenture provides that "Bonds of any series shall bear interest, mature, be subject to redemption or tender, and have such other terms as shall be set forth in the Supplemental Indenture pursuant to which such Bonds are authorized to be issued." (*Id*. at § 2.4)

14.      The Indenture includes various provisions about the terms, payment, form, transfer, authentication and redemption of bonds issued thereunder.  (Trial Ex. 1 at Art. II)

15.      The Indenture permits ALL and the Trustee, "without the consent of or notice to any of the Owners," to enter into any Supplemental Indenture for a variety of purposes, including "the issuance of any series of Bonds."  (Trial Ex. 1 at § 7.1)

16.     The Indenture sets forth the priority in which various expenses would be paid out of the Trust assets (the "Waterfall") (*id.* at § 5.3(B), and the specific duties undertaken by the Trustee (*id.* at Art. X).

17.     The Indenture includes remedies available to the bondholders in the event of default.  (*Id.* at § 9)

18.     Depfa and its counsel were involved in negotiating the Indenture.  (Davis Tr. at 19:18-20:4)

19.     In connection with the 2005 Issuance, Depfa was represented by Elizabeth Davis of Kutak Rock LLP ("Kutak Rock").  (Stipulated Facts No. 12)

20.     Depfa could have decided not to enter into the transaction if it was not satisfied with the terms of the Indenture.  (Davis Tr. at 20:14-21:5)

21.     ALL, Depfa and JPMC executed a First Supplemental Indenture simultaneously with the Indenture to effectuate the issuance of Series V A-1 and A-2 bonds.  (Trial Ex. 2; Stipulated Facts at 2)

22.     Section 13.3 of the First Supplemental Indenture designates the Series A-1 and A-2 bonds as Senior Bonds, which is the highest level of priority of bond repayment under Section 5.3(B) of the Indenture, the Waterfall.  (Trial Ex. 2 at § 13.3)

23.     A Standby Bond Purchase Agreement (the "Depfa SBPA") was executed between Depfa, ALL and JPMC, which governed the terms of Depfa's liquidity facility.  (Trial Ex. 4; Stipulated Facts at 3)

24.     The Depfa SBPA is governed by New York law.  (Trial Ex. 4 at § 8.03)

25.     The Depfa SBPA was drafted by Depfa's counsel.  (Davis Tr. at 17:6-12)

26.     Depfa was obligated under the Depfa SBPA to serve as the buyer of last resort for all outstanding Series A-1 and A-2 Bonds under certain circumstances.  (Trial Ex. 4 at § 2.01)

27.     In the event that Depfa was required to purchase the bonds, the Depfa SBPA provides that they be redeemed in semiannual installments over a 10 year period from funds available in the Revenue account, after taking into consideration the payment or set aside of certain Waterfall expenses.  (Trial Ex. 4 at § 3.02)

28.     Section 5.03(a) of the Depfa SBPA provides that ALL shall not "[a]mend, modify, terminate or grant, or permit the amendment, modification, termination or grant of, any waiver under, or consent to, or permit or suffer to occur any action or omission which results in, or is equivalent to, an amendment, modification, or grant of a waiver under the Policy or the Indenture without the prior written consent of [Depfa]."  (Trial Ex. 4 at § 5.03(a))

29.     That section does not reference the issuance of additional bonds or a "supplement" to the Indenture.  (*Id.*)

30.     Nothing in Section 5.03(a) or elsewhere in the Depfa SBPA prevented ALL from issuing additional bonds, only from amending the terms of the Indenture relating to Depfa's bonds.  (*See* Trial Ex. 4)

31.     In addition to being the bond issuer, ALL acted as the Program Administrator responsible for, among other things, causing bond redemptions, causing payment of program expenses under the Indenture Waterfall, contracting with loan servicers, ensuring compliance with the Higher Education Act, and keeping proper books and records.  (*See, e.g.,* Trial Ex. 1 at § 6)

32.     Pursuant to the Indenture, ALL and the Trustee established several trust accounts, including a Revenue Account (the "Revenue Account"), a Payment Account (the "Payment Account") and a Loan Account (the "Loan Account"). (Trial Ex. 1 at § 5.2)

33.     All revenues arising from the student loans and other earnings from the assets in the trust estate were deposited by the loan servicing companies directly into the Revenue Account, and the Trustee would pay expenses out of the Revenue Account in the order of priority identified in the Indenture, at the direction of ALL. (Trial Ex. 1 at § 5.3)

34.     After the close of a given month, the loan servicers would provide reports detailing what percentage of payments in the prior month represented payments of interest on the student loans and what percentage represented payment of principal. (Peterson Tr. at 89:5-25)

35.     ALL would direct the Trustee to make appropriate transfers between accounts, including the transfer of principal recoveries to the Loan Account. (Peterson Tr. at 88:25-89:4; 90:1-14)

36.     The Indenture also requires the Trustee, at ALL's direction, to transfer funds remaining in the Revenue Account on each interest payment date or other payment date for the Bonds to pay interest due on such date, and to pay the principal of Senior Bonds due on maturity. (Trial Ex. 1 at § 5.3(B)(5))

37.     In 2006, ALL determined to issue an additional $190 million in Series V bonds under the Indenture.

38.     ALL invited several banks to bid to act as liquidity providers for the new bond issuance. (Trial Exs. 39, 40)

39.     Lloyds and Depfa, along with other banks, submitted bids to be the liquidity provider for the 2006 bond issuance.  (Trial Exs. 41, 43, 181, 183; Stipulated Facts No. 13; Peterson Tr. at 56:21-57:1, 58:12-18, 60:19-21)

40.     As it had in 2005, Depfa bid a 10 year liquidity term with a higher interest rate. (Trial Ex. 43)

41.     Lloyds bid a 5 year liquidity term, with a lower interest rate.  (Trial Ex. 41)

42.     Ultimately, ALL chose Lloyds as the liquidity provider for the 2006 bonds. (Stipulated Facts No. 14)

43.     Part of ALL's rationale in choosing Lloyds was the diversity in credit exposure that would be created.  (Peterson Tr. at 60:5-18; O'Neill Tr. at 204:8-20)

44.     In connection with the 2006 Issuance, Lloyds was represented by Elizabeth Davis of Kutak Rock.  (Stipulated Facts No. 17)

45.     In or around June of 2006, Martha Peterson notified Depfa that it was not the winning bidder for the 2006 transaction.  (Peterson Tr. at 61:5-62:12)

46.     When asked by David Park of Depfa, Peterson informed Park that Lloyds was the winning bidder.  (*Id.*)

47.     Park had experience in bidding as a liquidity provider.  (Park Tr. at 27:2-7)

48.     Park knew that not all banks bid the same term length or interest rate, and Peterson told him that Lloyds had bid a shorter liquidity term.  (Park Tr. at 204:19-205:6; Peterson Tr. at 63:10-13)

49.     Park knew (or should have known) that Lloyds could have a different redemption schedule and different interest rate than Depfa did.  (Park Tr. at 204:19-205:6)

50.     Bidding of different terms was typical in the industry.  (Davis Tr. at 71:10-13)

51.     Park did not ask Peterson what the terms of Lloyds' bid were.  (Peterson Tr. at 61:9-62:20)

52.     Neither during that call, nor at any point thereafter until 2009 did Park assert that ALL could not issue additional bonds or enter into a Supplemental Indenture without Depfa's consent.  (Peterson Tr. at 84:7-17)

53.     Park did not tell Peterson that ALL should have gotten Depfa's consent to the Lloyds liquidity facility.  (*Id.*)

54.     Park did not believe in 2005 or 2006 that Depfa had the right to consent to the issuance of additional bonds, the Second Supplemental Indenture, or the Lloyds SBPA.  (Park Tr. at 97:2-18)

55.     A Second Supplemental Indenture between ALL and JPMC, as Trustee, dated as of August 1, 2006 (the "Second Supplemental Indenture"), was executed with respect to the issuance of the Lloyds' Bonds.  (Trial Ex. 3)

56.     Section 13.3 of the Second Supplemental Indenture provides that the Series V A-3, A-4 and A-5 Bonds would be redeemed as provided in the Standby Bond Purchase Agreement by and among ALL, JPMC and Lloyds (the "Lloyds SBPA").  (Trial Ex. 3 at § 13.3)

57.     The Lloyds SPBA obligated Lloyds to serve as the buyer of last resort for all outstanding Series A-3, A-4 and A-5 Bonds under certain circumstances.  (Trial Ex. 5 at § 2.01)

58.     The 2006 bonds were also insured by Ambac.  (Trial Ex. 69; Stipulated Facts No. 9)

59.     The Lloyds SBPA provides that the Series A-3, A-4 and A-5 Bonds would be redeemed in quarterly installments over a 5 year period.  (Trial Ex. 5 at § 3.02)

60.     The Lloyds interest rate on bank bonds is LIBOR + 1.75%, which reflects Lloyds' shorter term.  (*Id.*)

61.     Section 17.5 of the Indenture, entitled "Amendments" sets forth minor amendments to several Indenture provisions.  (Trial Ex. 3 at § 17.5)

62.     ALL consulted Depfa about at least some of the amendments set forth in Section 17.5.  (Trial Ex. 49)

63.     The Series V A-3, A-4 and A-5 Bonds were issued on August 2, 2006, as a result of which significant additional collateral was added to the Master Trust. (Trial Ex. 3; Peterson Tr. at 85:2-5)

64.     Before the closing of the 2006 Transaction, counsel for various parties issued opinion letters opining on the validity of the transaction. (*See, e.g.,* Trial Exs. 63-68)

65.     Counsel to ALL, Sonnenschein Nath & Rosenthal LLP ("Sonnenschein"), issued two letters stating, *inter alia*, that the (i) Indenture (defined to include the Second Supplemental Indenture) and the Lloyds SBPA were valid and binding obligations of ALL; (ii) the execution and delivery of the Indenture and the Lloyds SBPA would not conflict with or constitute a breach of any other agreement to which ALL is a party or bound; (iii) the Second Supplemental Indenture was authorized or permitted by the Indenture; and (iv) the Second Supplemental Indenture was duly executed by ALL.  (Trial Exs. 63 & 64)

66.     Orrick Herrington & Sutcliffe, bond counsel on the transaction, issued an opinion letter stating that, as bond counsel, it had reviewed the other opinions of counsel, and that counsel to ALL (Sonnenschein) was of the opinion that, *inter alia*, the Second Supplemental Indenture had been duly executed and delivered by, and constituted a valid and binding obligation of ALL.  (Trial Ex. 67)

67.     Counsel to JPMC issued an opinion stating that JPMC had duly authorized, executed and delivered the Supplemental Indenture and Lloyds SBPA and that both documents were valid and legally binding obligations of JPMC.  (Trial Ex. 66)

68.     Similarly counsel to Lloyds issued an opinion stating that the Lloyds SBPA constituted the legal, valid and binding obligation of Lloyds, and was enforceable against Lloyds in accordance with the terms thereof.  (Trial Ex. 65)

69.     Bond counsel, as well as counsel to Lloyds and the Trustee had each been involved in the 2005 Transaction.  (Stipulated Facts Nos. 11, 12, 16, 17; Roemlein Tr. at 28:17-29:10)

70.     In addition to the opinion letters, ALL issued a "Closing Certificate of the Corporation" further opining as to the validity of the 2006 Transaction.  (Trial Ex. 59)

71.     The Closing Certificate certifies that "[a]ll necessary action required to be taken by [ALL] in connection with, and all conditions precedent to, the authorization, execution, issuance, delivery and performance" of the documents executed in connection with the 2006 Transaction, including the Second Supplemental Indenture and Lloyds SBPA, "have been taken or fulfilled."  (Trial Ex. 59 at 3, ¶ 10)

72.     The Closing Certificate also certifies that the execution and delivery of the transaction documents, including the Second Supplemental Indenture and the Lloyds SBPA, would not conflict with or constitute a breach of any other agreement to which ALL is a party or bound.  (Trial Ex. 59 at 4, ¶ 14)

73.     JPMC executed a Certificate and Receipt of the Trustee (the "Trustee's Certificate").  (Trial Ex. 71)

74.     In the Trustee's Certificate JPMC certified, *inter alia*, that the Indenture, defined to include the Second Supplemental Indenture, were legal, valid and binding obligations of the Trustee, and the Trustee's consent to these documents, including the Lloyds SBPA, do not result in a breach or default under any agreement to which the Trustee is a party or may be bound.  (*Id.*)

75.     On or about October 1, 2006, The Bank of New York Mellon Trust Company, N.A. ("BNY Mellon") succeeded JPM Chase as trustee under the Indenture.  (Stipulated Facts No. 20)

76.     Ambac suffered severe financial difficulties as a result of a downgrade of its credit ratings by all three credit agencies in early 2008.  (Stipulated Facts No. 21)

77.     Attempts to remarket the bonds were unsuccessful, and accordingly Depfa and Lloyds were called upon to purchase all of the bonds in their respective series between February and June 2008.  (Stipulated Facts No. 22)

78.     By the terms of Depfa's SBPA, "[t]he Issuer agree[d] to cause the redemption of Bank Bonds in semiannual installments, commencing on the date which is six months after the Bank Purchase Date, from all amounts on deposit in the Revenue Fund after giving effect to the transfers required pursuant to paragraphs First through Fifth of Section 5.3(B) of the General Indenture; provided that in any event all of the then unpaid principal amount of Bank Bonds shall be redeemed on the date which is the tenth anniversary of the Bank Purchase Date."  (Trial Ex. 4 at § 3.02(a))

79.     The "Bank Purchase Date" is defined in the SBPAs as the date on which Depfa or Lloyds purchases the Bank Bonds.  (Trial Exs. 4 and 5 at 2)

80.     By the terms of Lloyds's SBPA, "[t]he Issuer agree[d] to cause the redemption of Bank Bonds in quareterly installments, commencing on the date which is three months after the

Bank Purchase Date, from all amounts on deposit in the Revenue Fund after giving effect to the transfers required pursuant to paragraphs First through Fifth of Section 5.3(B) of the General Indenture; provided that in any event all of the then unpaid principal amount of Bank Bonds shall be redeemed on the date which is the fifth anniversary of the Bank Purchase Date."  (Trial Ex. 5 at § 3.02(a))

81.    The language referring to "amounts on deposit" in Section 3.02 was required by Ambac, which insisted on "cash flow amortization" not a "set amortization schedule."  (Davis Tr. at 63:17-64:3; 80:9-19))

82.    Whether, when and what amounts of redemption took place would depend on available cash, which would be determined by ALL.  (Peterson Tr. at 244:23-245:3; Roemlein Tr. at 159:14-160:6)

83.    The SBPAs require that ALL calculate amounts available for redemption only after payment or set aside of amounts to ensure payment of expenses in the first five steps of the Indenture waterfall.  (Trial Exs. 4 and 5 at § 3.02)

84.    The SBPAs provide that if the principal amount of any Bank Bond is not paid when due, "such overdue principal payment or other obligation shall bear interest from the date such principal amount . . . was due until paid in full . . . ."  (Trial Exs. 4 and 5 at § 3.03)

85.    The Indenture also provides that Bonds "shall be subject to special redemption at the determination of [ALL], at any time, in whole or in part in Authorized Denominations, at a price of par plus accrued interest to the date of redemption, in an amount not to exceed moneys on deposit in the Loan Account and Revenues or Recoveries of Principal . . . which are not expected to be used to finance Eligible Loans."  (Trial Ex. 1 at § 3.8)

86. The Indenture provides that "Notice of redemption of Bonds, unless otherwise specified by Supplemental Indenture, shall be given by the Trustee, at the Direction of the Corporation . . . ." (*Id.*)

87. The Indenture states that "[p]rior to the date fixed for redemption, funds shall be deposited with the Trustee to pay, and the Trustee is hereby authorized and directed to apply such funds to the payment of, the Bonds called, together with accrued interest and premium, if any, thereon to the redemption date." (*Id.*)

88. Neither of the SBPAs nor the Indenture require the Trustee to cause redemption payments, and all relevant references to redemption in both SBPAs and the Indenture are to the Trustee following the direction of ALL. (*See, e.g.,* Trial Exs. 3 and 4 at § 3.02)

89. Prior to November 2009, the Trustee made redemption payments out of the Payment Account, at all times acting at the direction of ALL. (Stipulated Facts No. 25)

90. ALL advised BNY Mellon as to the dates on which redemption payments should be made and specified which bonds would be redeemed and in what amounts. (*See* Trial Exs. 82, 84, 95, 96, 130, 135, 166)

91. ALL directed BNY Mellon to give notice of redemption to Depfa and Lloyds and provided a form notice. (*Id.*)

92. Upon direction from ALL, BNY Mellon would process the payments through the Depository Trust Company. (Roemlein Tr. at 48:14-49:2; 264:3-10)

93. The following redemption payments were made on the following dates:

| Redemption Date | Series V-A-1 Depfa | Series V-A-2 Depfa | Series V-A-3 Lloyds | Series V-A-4 Lloyds | Series V-A-5 Lloyds |
|---|---|---|---|---|---|
| 10/27/08 | | | $5,300,000 | $3,600,000 | $3,600,000 |
| 11/12/08 | $3,300,000 | $2,900,000 | | | |
| 1/6/09 | $1,700,000 | $1,500,000 | $1,300,000 | $900,000 | $900,000 |
| 4/10/09 | | | $500,000 | $300,000 | $300,000 |

| 4/22/09 | $300,000 | $300,000 | | | |
| 7/1/09 | $1,300,000 | $1,200,000 | $2,100,000 | $1,400,000 | $1,400,000 |
| 10/5/09 | $600,000 | $400,000 | $400,000 | $300,000 | $300,000 |
| 11/5/09 | $870,000 | $580,000 | $580,000 | $435,000 | $435,000 |

(Stipulated Facts No. 25)

94.     A total of $14,950,000 was paid to Depfa for redemption of the Series V A-1 and A-2 bonds, and $24,050,000 was paid to Lloyds for redemption of Series V A-3, A-4 and A-5 bonds. (*Id.*)

95.     Interest was paid by the Trustee on redeemed bonds, confirming calculations with all other parties. (Stipulated Facts No. 27; Roemlein Dep. at 142:15-143:6)

96.     The Trustee also made interest payments semiannually, in January and July, the amounts of which were confirmed by all parties, including Depfa and Lloyds. (Stipulated Facts No. 27; Roemlein Dep. at 245:19-23)

97.     The total interest paid to date is $32,027,100 to Depfa, and $17,575,470 to Lloyds. (*Id.*)

98.     There is no claim in this action by either Depfa or Lloyds that it did not receive the full amount of semiannual interest payments. (*See* Dkt. 26, 39)

99.     By letter dated November 27, 2009, Depfa advised ALL, for the first time, that it believed ALL had no legal right to make any past redemption payments to Lloyds and no right to make any future payments to Lloyds unless and until ALL repaid Depfa any and all amounts due on the outstanding bonds in Series V-A-1 and V-A-2 in full. (Trial Ex. 12)

100.    Depfa further claimed that BNY Mellon would be in breach of its fiduciary duties and contractual obligations as Trustee if it permitted further redemption payments to Lloyds. (*Id.*)

101.    On or about December 1, 2009, Lloyds agreed to suspend payments from the Payment Account, so that the parties could attempt to resolve the dispute and Depfa confirmed its agreement with this approach. (Trial Ex. 141; Stipulated Facts No. 26)

102.    The Trustee received no further communications from either Lloyds or Depfa until it learned from ALL on or about March 2010 that Lloyds wanted payments to resume.

103.    On March 31, 2010, after receiving permission from Depfa, the Trustee communicated Depfa's November 27, 2009 letter to Lloyds, ALL and Ambac, and asked that the parties confirm their positions. (Trial Ex. 154)

104.    By letter to the Trustee dated April 6, 2010, Depfa reasserted its position that ALL had no legal right to make further redemption payments on the Bonds owned by Lloyds until it redeemed all of the outstanding Bonds owned by Depfa. (Trial Ex. 156)

105.    Depfa alleged that ALL and the Trustee had breached the Depfa SBPA by not obtaining its consent to the issuance of the Bonds now owned by Lloyds. (*Id.*)

106.    The unauthorized "Lloyds Transaction," Depfa claimed, did not relieve ALL of its duty to make scheduled mandatory redemptions to Depfa under the Depfa SBPA. (*Id.*)

107.    Lloyds responded by letter dated April 22, 2010, and asserted that ALL was not required to obtain Depfa's consent prior to issuing the Series V-A-3, V-A-4 and V-A-5 bonds,

and even if such consent were required, payments due and owing under the Indenture were not affected by the alleged breach. (Trial Ex. 161)

108.   Lloyds demanded that the Trustee resume redemption payments and alleged that by failing to make payments to Lloyds since November 2009, ALL and the Trustee breached their contractual and fiduciary obligations to Lloyds. (*Id.*)

109.   As a result of the competing positions of Depfa and Lloyds, the Trustee was and remains unable to take action with respect to redemptions without being subject to conflicting claims.

110.   BNY Mellon filed this Interpleader action on June 3, 2010.  (Stipulated Facts No. 30)

111.   As of the filing of the Interpleader Complaint, approximately $7.5 million was held in the Payment Account for redemptions.   That $7.5 million remains in a Redemption Account.

112.   Currently, an additional approximately $32,076,000 is held in the Revenue Account, and $1,330,000 is held in the Loan Account.

113.   Section 10.2(a)(1) of the Indenture provides that prior to the occurrence of an Event of Default of which it has or is deemed to have notice, "the Trustee undertakes to perform such duties *and only such* duties as are specifically set forth in this Indenture, and no implied covenants or obligations shall be read into this Indenture against the Trustee . . . ." (Trial Ex. 1 § 10.2(a)(1) (emphasis added))

114.     Section 10.2(a)(2) provides, *inter alia*, that the Trustee may conclusively rely on the truth of the statements expressed in certificates furnished to the Trustee and conforming to the requirements of the Indenture, absent negligence or bad faith on the part of the Trustee. (Trial Ex. 1 at § 10.2(a)(2))

115.     Section 10.3 provides that the Trustee may rely, and is protected in acting or refraining from acting, upon any "certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, approval, bond, debenture or other paper or document believed by it to be genuine and to have been signed or presented by the proper party."  (Trial Ex. 1 at § 10.3)

116.     More specifically, "whenever in the administration of this Indenture, the Trustee deems it desirable that a matter be proved or established prior to taking suffering or omitting any action hereunder, including payment of moneys out of an account, the Trustee . . . may, in the absence of bad faith on its part, rely upon a Certificate or Direction signed by an Authorized Officer of the corporation."  (Trial Ex. 1 at § 10.3(c))

117.     The Indenture defines Direction to mean a written direction, order, request, requisition or similar instrument signed by an authorized officer of ALL and permitted by the Indenture.  (Trial Ex. 1 at 5)

118.     "[T]he Trustee is not required to make any inquiry or investigation into the facts or matters stated in any Certificate, Direction, resolution, statement, instrument, opinion, report, notice, request, consent, order, approval, bond, debenture or other paper or document . . . ." (Trial Ex. 1 at § 10.3(f))

119.    ALL agreed to indemnify the Trustee from "any loss, liability or expense incurred without negligence or bad faith on its part, arising out of . . . [the] administration of the office of the Trustee under this Indenture."  (Trial Ex. 1 at § 10.5(c))

120.    As security for the performance by ALL of its obligation under Section 10 of the Indenture, the Trustee has a lien upon all property it holds thereunder (with certain exceptions).  (Trial Ex. 1 at § 10.5)

121.    The Trustee's fees were 3 basis points per annum for its services.  (Trial Ex. 6, 7)

122.    ALL earned 50 basis points as program administrator.  (*Id.*)

123.    Depfa earned 17.5 points per annum as liquidity provider.  (Trial Ex. 6)

124.    Lloyds earned 14 points per annum as liquidity provider.  (Trial Ex. 7)

125.    Article X of the Indenture contains standard provisions relating to the Indenture Trustee.  (Bayus Tr. at 93:15-94:2; Trial Ex. 186 at ¶ 18)

126.    Section 10.1 was not intended to create any duties or obligations for the Trustee that were not specifically provided for in Section 10.2.  (Bayus Tr. at 94:10-23)

127.    The Indenture distinguishes the trustee's pre-default duties from its post-default duties.  (*Compare* Trial Ex. 1 at § 10.2(a) ("Prior to the occurrence of an Event of Default . . . .") *with* Trial Ex. 1 at § 10.2(b) ("In case of Event of Default . . . .").)

128.    The purpose of Section 10.2(b) of the Indenture is to describe the Trustee's post-default duty of care:

> In case of an Event of Default . . . the Trustee shall exercise such
> of the rights and powers vested in it by this Indenture, and use the
> same degree of care and skill in their exercise, as a prudent person
> would exercise or use in the conduct of such person's own affairs.

(Trial Ex. 1 at § 10.2(b).)

129.    Depfa SBPA Section 5.03(a) states that the Issuer shall not: "[a]mend, modify,

terminate or grant, or permit the amendment, modification, termination or grant of, any waiver

under, or consent to, or permit or suffer to occur any action or omission which results in, or is

equivalent to, an amendment, modification, or grant of a waiver under the Policy or the Indenture

without the prior written consent of [Depfa]." (Trial Ex. 4 at § 5.03)

130.    The word supplement does not appear in Section 5.03(a). (*Id.*)

131.    A supplement to an indenture is a term of art in the industry and is generally the

mechanism for issuing additional bonds under a Master Indenture.   (Trial Ex. 192 at 2-3;

Peterson Tr. at 53:5-7; Roemlein Tr. at 130:22-131:11; Chapman Tr. at 44:20-24)

132.    Section 14.4(f) of the First Supplemental Indenture, provides that the Trustee

"acknowledges that the Corporation has entered into an agreement with the Liquidity Provider

pursuant to which the consent of the Liquidity Provider is required for certain actions under the

Indenture, and the Trustee and the Corporation agree that no such action shall be taken without

such consent." (Trial Ex. 2 at §14.4(f))

133.    In the course of negotiating Depfa's SBPA and the Indenture, ALL explained that

the Indenture would be a "Master Trust," to support multiple bond issues, that the transaction's

structure was intended to facilitate ALL's issuance of additional bonds and that ALL would need

flexibility as to future liquidity providers.  (Peterson Tr. at 191:23-192:14; O'Neill Tr. at 121:15-

123:14; *see also* Landau Tr. at 173:13-174:3)

134. When Depfa voiced a concern about future liquidity providers, ALL told Depfa that it would not give Depfa "gatekeeper control over subsequent liquidity providers. That's just not going to happen." (O'Neill Tr. at 121:15-123:14)

135. Retaining flexibility over future issuances was so critical that, had Depfa not agreed to go forward on these terms, ALL would have found a different liquidity provider. (Peterson Tr. at 191:23-192:14)

136. Depfa was aware of and had numerous opportunities to object to the 2006 Bond Transaction and subsequent redemptions on the basis of its purported consent right. (*See, e.g.,* Peterson Tr. at 61:5-62:16)

137. Depfa raised no objection until 2009. (*See* Trial Ex. 12; Peterson Tr. at 84:7-17)

138. In or around June 2006, after ALL chose Lloyds over Depfa to be the liquidity provider on the 2006 Bond Transaction, Peterson informed David Park of Depfa that Lloyds was the winning bidder. (Peterson Tr. at 61:5-62:12)

139. Depfa had offered ALL an even longer term than the 10 years it had unsuccessfully bid. (Trial Ex. 43)

140. Depfa was known in the industry for bidding longer terms. (Watkins Tr. at 193:17-25)

141. Park did not ask Peterson what the terms of Lloyds' bid were. (Peterson Tr. at 61:9-62:20)

142. Park did not ask anyone at the Trustee what the terms of Lloyds' bid were. (Park Tr. at 57:20-24)

143.    Park was familiar with the fact that additional bonds would be issued by Supplemental Indenture, as that is typical in the industry and how the Depfa bonds were issued in 2005. (Trial Ex. 2; Park Tr. at 31:18-32:22; Landau Tr. at 173:13-174:3)

144.    Around the time of the 2006 Bond Transaction, Park never told Peterson that ALL could not issue additional bonds without Depfa's consent. (Peterson Tr. at 84:7-17)

145.    Park did not tell Peterson that ALL should have gotten Depfa's consent to the Lloyds liquidity facility. (*Id.*)

146.    Depfa also stood silent as to its alleged consent right in 2008, when the bonds became bank bonds and ALL began making redemption payments to Depfa and Lloyds. (*See, e.g.,* Trial Ex. 81 (raising question of timing of redemptions, not consent); Trial Ex. 83 (raising questions about timing and methodology of redemptions, not consent))

147.    Park did not tell anyone at the Trustee in or around 2006 that ALL or the Trustee should have gotten Depfa's consent to the transaction. (Park Tr. at 219:18-220:5)

148.    Depfa's counsel in connection with the 2005 Bond Transaction did not suggest to anyone, and did not believe, in 2005 or 2006 that Depfa had any right to consent to supplemental indentures. (Davis Tr. at 208:21-209:9)

149.    Davis was the primary drafter of Depfa's SBPA. (Davis Tr. at 17:6-12)

150.    The word supplement was intentionally omitted from section 5.03(a). (Davis Tr. at 39:12-40:25)

151.    Davis knew that Lloyds had a shorter, faster redemption schedule than Depfa. (Davis Tr. at 205:19-206:4)

152.    Davis never believed that that fact was a breach of Depfa's agreements or that Depfa and Lloyds had any conflicting positions. (Davis Tr. at 30:16-23)

153.    Davis continued to represent Depfa for years after the 2006 Bond Transaction, until 2010, and no one from Depfa has ever indicated to her that they intended to assert any claim against her.  (Davis Tr. at 201:21-202:6)

154.    Park did not believe in 2006 that Depfa had the right to consent to any of those things.  (Park Tr. at 97:2-18)

155.    It was not until after Depfa had to purchase the Bank Bonds that it asked about the terms of the Lloyds deal.  (Park Tr. at 73:23-74:7)

156.    The Indenture specifically contemplated and authorized subsequent bond issuances by way of supplemental indentures. (Trial Ex. 1 at 3)

157.    A right of Depfa to consent to additional bonds would have made it more difficult to issue subsequent bonds.  (Peterson Tr. at 191:23-192:14)

158.    ALL did not and would not have agreed to it.  (*Id.*)

159.    The first "Whereas" clause of Depfa's SBPA refers to the Indenture "as amended and supplemented from time to time."  (Trial Ex. 4 at 1)

160.    The definitions of "Series V-A-1 Remarketing Agreement" and "Series V-A-2 Remarketing Agreement" include the phrase "as the same may be amended, modified or supplemented from time to time."  (Trial Ex. 4 at 5)

161.    "Supplemental Indenture" is defined as "any indenture, supplemental to or amendatory of this Indenture." (Trial Ex. 1 at 12)

162.    The Indenture states, "This Trust Indenture, together with any and all Supplemental Indentures, may hereafter be cited by the Corporation and is hereinafter sometimes referred to as the Indenture.  (Trial Ex. 1 at ¶ 1.1)

163.    Section 7.1 of the Indenture permits ALL and the Trustee, "without consent of or notice to any of the Owners," to enter into any agreement supplemental to the Indenture or Supplemental Indenture "to provide for the issuance of any series of Bonds, and in connection therewith to provide for rights, preferences, privileges, terms and conditions applicable only to such series of Bonds . . . ." (Trial Ex. 1 at § 7.1)

164.    At the time of the 2006 Transaction, Depfa was not an "Owner" – it only became one after it purchased the bonds. (*See* Trial Ex. 4 at 5.03(a))

165.    Section 7.2 provides that supplemental indentures may be entered into "from time to time" and that nothing in Section 7.2 shall be construed to limit any requirement in any other document requiring "the consent of any other party to any Supplemental Indenture." (*Id*. at § 7.2)

166.    Section 7.5 addresses the requirements for certain modifications or amendments of the Indenture, and provides that "[n]othing herein shall be construed to limit any requirement in any other document . . . which requires the consent of any other party to *any modification to or amendment of* this Indenture." (*Id*. at § 7.5 (emphasis added))

167.    The very first draft of the Indenture contains separate sections addressing supplements separately from amendments. (Bayus Tr. at 29:10-31:2)

168.    The sections were combined by bond counsel, though they retain the distinction between the terms supplement and amendment. (*Id*.)

169.    The terms supplement and amendment were used distinctively, and not as synonyms. (Bayus Tr. at 35:21-36:6)

170.    Supplements were intended to be different than amendments. (Davis Tr. at 39:12-21; 41:10-24)

55756112.3

171.   It was not industry custom to permit liquidity providers to consent to supplemental indentures and that the 2006 Bond Transaction followed custom.  (Davis Tr. at 208:21-209:9)

172.   The right of a liquidity provider to consent to subsequent bond issues – whether under the same indenture, a supplemental indenture or a subsequent liquidity facility – was not and is not typical or customary in the bond industry.  (Pope Tr. at 65:12-66:8; Landau Tr. at 179:4-180:5; Davis Tr. at 208:14-209:9)

173.   In an early draft of the Indenture, Davis marked a handwritten comment stating "no amendments without consent of liquidity provider" next to the section entitled "Amendments."  (Trial Ex. 12 at KR-DEPFA0001127)

174.   No such comment appeared next to the section entitled "Supplements."  (*See* Trial Ex. 12)

175.   Had Depfa been given the right to consent to subsequent bond issues or liquidity providers, it would have been spelled out expressly and clearly in the SBPA or other transaction document.  (Trial Ex. 186; Trial Ex. 187)

176.   The "Whereas" clauses of the Second Supplemental Indenture state, *inter alia*, that ALL seeks to "provide for the issuance of Bonds in the amounts and designated as provided herein" and "*also* desires to amend certain provisions of the Indenture." (Trial Ex. 3 at 1 (emphasis added).

177.   Second Supplemental Indenture Section 17.5 is expressly entitled "Amendments" and amended the language of several Indenture provisions.  (Trial Ex. 49)

178.   The *Glossary of Municipal Securities Terms*, Second Edition, published by the Municipal Securities Rulemaking Board, defines "parity bonds" as "two or more issues of bonds

that have the same priority of claim or lien against pledged revenues or other security." (Trial Ex. 191)

179.    All parties in this case have a similar understanding of parity. (*See* Watkins Tr. at 60:15-25 (parity means "an equal interest in the underlying collateral security"); Peterson Tr. at 34:13-35:1 (senior bonds have equal interest to and equal rights in the underlying collateral); Park Tr. at 124:6-125:11 (parity means "equal as to collateral"); Roemlein Tr. at 86:9-18 ("on a parity with . . . would be two or more series of bonds that . . . have the same level of claim or lien on trust assets"). Industry experts confirm this interpretation. (Trial Ex. 187 ("Parity is a simple security concept under which multiple series of bonds are secured as to timely payment by a common claim, at the same level of priority, against specific security granted by the borrower."); Trial Ex. 186 (parity understood in the securities industry "to apply to the level of seniority of a bond issue as compared to another bond issue from the same issuer").

180.    The Indenture contemplated several possible series of bonds:  Senior Bonds, Senior Subordinate Bonds, Subordinate Bonds and Junior Subordinate Bonds.  (Trial Ex. 1 at 4)

181.    The concept of parity most often comes into play when there is a shortfall of some type, occurring most often in bankruptcy liquidation or other acceleration.  (Trial Ex. 187 at 8; Trial Ex. 186 at 13)

182.    If the debt has been accelerated, making all principal and accrued interest immediately due and payable, payments are then made pro rata to each parity debt holder.  (Trial Ex. 187 at 8)

183.    In the absence of default or acceleration, payments are made pursuant to the terms of the bond documents.  (Trial Ex. 187 at 8)

184.    BNY Mellon relied on instructions from ALL regarding the timing and amount of redemptions. (*See* Trial Exs. 82, 84, 95, 96, 130, 135, 166)

185.    Any permissive right of the Trustee to act under any provision of the Indenture does not create a duty or obligation to so act. (Trial Ex. 1 at § 10.3(l))

186.    "Certificate" is defined, in part, as "a signed document either attesting to or acknowledging the circumstances, representations or other matters therein stated or set forth or setting forth matters to be determined pursuant to this Indenture." (Trial Ex. 1 at § 1.2.)

187.    The Trustee is not required to make any inquiry or investigation into the facts or matters stated in any paper or document on which it is authorized to rely. (Trial Ex. 1 at § 10.3(f))

188.    The Trustee must verify that any instruction from the Issuer regarding a redemption or other payment of funds from the trust simply comports with the Indenture. (Landau Tr. at 57:4 – 58:8)

189.    The same is true for counsel opinion letters. (Trial Ex. 1 at § 10.3(d))

190.    The Issuer's directions were required under the indenture for the Trustee to process redemption payments (*see generally* Trial Ex. 1 at § 3.8; Trial Ex. 4 at § 3.02; Trial Ex. 5 at § 3.02).

191.    The Trustee did not have the obligation or authority to process redemption payments without direction from the Issuer. (Trial Exs. 1, 4)

192.    The First and Second Opinion Letters verified that the opinions were based on an analysis of all of the governing documents. (*See* Trial Ex. 1 at § 7.3(B)(ii))

193.    The opinion letters were signed by authorized attorneys for counsel entitled to issue such opinions to the Trustee. (*See* Trial Exs. 63, 64)

194.    The Trustee may rely on an opinion of counsel without directly consulting with the counsel issuing the opinion. (*Id.* at 105:9-13, 106:16-107:4.; Trial Ex. 1 at § 10.3(a), (d))

195.    The counsel opinion letters certified that the Indenture, defined to include the Second Supplement, did not "conflict or constitute a breach or default under . . . any agreement, contract, or other instrument to which the corporation is a party or by which the corporation is bound." (Trial Ex. 63)

196.    That certification was not limited to documents expressly named in the opinion letter. (*Id.*)

197.    The Indenture defines "Indenture" as meaning "this Trust Indenture and any amendments or supplements made in accordance with its terms." (Trial Ex. 1 at 6)

198.    Indenture § 7.3(B) provides that prior to any supplement becoming effective, the Trustee must receive opinions of counsel "to the effect that" the supplement has been "duly and lawfully entered into in accordance with the provisions of this Indenture, is authorized or permitted by this Indenture, and is valid and binding upon the Corporation and the Trustee." (Trial Ex. 1 at § 7.3(B))

199.    The SBPAs state that the Issuer shall "cause the redemption of Bank Bonds." (Trial Ex. 4 at § 3.02; Trial Ex. 5 at § 3.02)

200.    The SBPA's provide that the Issuer decides whether to cause special redemptions. (Trial Ex. 1 at § 3.8)

201.    BNY Mellon did not have sufficient information to calculate whether cash was available for redemption – that was a duty of ALL. (Peterson Tr. at 244:23-245:3; Roemlein Tr. at 159:14-160:6)

202.     The Indenture provides procedures for the Trustee to issue notice and redemption at the direction of the Issuer.  (Trial Ex. 1 at § 3.8; *id*. at § 5.4(a))

203.     The first sentence of § 3.02(a) of the Depfa SBPA only refers to the amount in the "Revenue Account" being used for redemptions.  (Trial Ex. 4 at § 3.02)

## PROPOSED CONCLUSIONS OF LAW

1.     Where, as here, the Indenture contains a limiting clause to the effect that the trustee's obligations are confined to the scope of the contract, claims for breach of fiduciary duty are properly dismissed  *Shawmut Bank, N.A. v. Kress Assocs.*, 33 F.3d 1477, 1502 (9th Cir. 1994).  *See also Alitalia Linee Aeree Italiane, S.p.A. v. Airline Tariff Publ'g Co.*, 580 F. Supp. 2d 285, 294 (S.D.N.Y. 2008) ("Where a fiduciary duty is based upon a comprehensive written contract between the parties, a claim for breach of fiduciary duty is duplicative of a claim for breach of contract." (citations omitted)).

2.     An indenture trustee's "responsibilities, obligations and legal liability as indenture trustee are not to be confused with those of the [ordinary] trustee or the administrator." *Dell'Oca v. The Bank of N.Y. Trust Co., N.A.*, 159 Cal. App. 4th 531, 537 (1st App. Dist. 2008).

3.     "The duty which is imposed under an indenture of trust is not a traditional fiduciary duty." *Shawmut Bank, N.A.*, 33 F.3d at 1491.

4.     "Unlike the ordinary trustee, who has historic common-law duties imposed beyond those in the trust agreement, an indenture trustee is more like a stakeholder whose duties and obligations are exclusively defined by the terms of the indenture agreement." *Id.* (quoting *Meckel v. Cont'l Res. Co.*, 758 F.2d 811, 816 (2d Cir. 1985; citing *Elliot Assocs. v. J. Henry Schroder Bank & Trust Co.*, 838 F.2d 66, 71 (2d Cir. 1988)); *Dell'Oca*, 159 Cal. App. 4th at 537 (quoting same).

5.      There is no basis for holding that the trustee owes to each holder duties or obligations not specifically spelled out in the contract or required of it by statute or regulation. *Dell'Oca*, 159 Cal. App. 4th at 537 & n.3 (quoting Robert I. Landau & John E. Krueger, Corporate Trust Administration and Management 30 (5th ed. 1998)).

6.      The relationship of the indenture trustee to the security and security holders is essentially contractual rather than fiduciary. *Id.*

7.      Under New York law, the pre-default duties of an indenture trustee generally are limited to the duties imposed by the indenture. *LNC Invs., Inc. v. First Fid. Bank*, 935 F. Supp 1333, 1346 (S.D.N.Y. 1996) (citing *Elliot Assocs. V. J. Henry Schroder Bank & Trust Co.*, 838 F.2d 66, 71 (2d Cir. 1988); *Meckel v. Cont'l Res. Co.*, 758 F.2d 811, 816 (2d Cir. 1985) (citing *Hazzard v. Chase Nat'l Bank*, 159 Misc. 57, 287 N.Y.S. 541 (Sup. Ct. N.Y. Cnty. 1936), *aff'd*, 257 A.D. 950, 14 N.Y.S.2d 147 (1st Dep't 1939), *aff'd*, 282 N.Y. 652, 26 N.E.2d 801, *cert. denied*, 311 U.S. 708 (1940)); *see also N.Y. State Med. Care Facilities Fin. Agency v. Bank of Tokyo Trust Co.*, 163 Misc. 2d 551, 621 N.Y.S.2d 466, 470 (Sup. Ct. N.Y. Cnty. 1994).

8.      New York and California common law is also consistent with the federal Trust Indenture Act of 1939 ("TIA"), which expressly limits the liability of an indenture trustee to the "performance of such duties as are specifically set out in such indenture." TIA at § 315. *See AG Cap. Funding Partners, L.P. v. State St. Bank & Trust Co.*, 11 N.Y.3d 146, 156, 866 N.Y.S.2d 578 (2008) ("New York state and federal case law are consistent with [the TIA]."); *Elliot Assocs.*, 838 F.2d at 71 ("It is equally well-established under state common law that the duties of an indenture trustee are strictly defined and limited to the terms of the indenture.") (citation omitted).

9.      Unlike an ordinary trustee, an indenture trustee acts in the interest of both the issuer and the bondholders, and therefore its loyalties are divided. *See Dell'Oca*, 159 Cal. App. 4th at 537 ("An indenture trustee is not subject to the ordinary trustee's duty of undivided loyalty." (quoting *Meckel*, 758 F.2d at 816)); *Shawmut*, 33 F.3d at 1491 (same); *LNC Invs.*, 935 F. Supp. at 1347 ("The role of an indenture trustee differs from that of an ordinary trustee because the indenture trustee must consider the interests of the issuer as well as the investors, and because its obligations are defined primarily by the indenture rather than by the common law of trusts.").

10.     Such divided loyalty is antithetical to the existence of a fiduciary duty to the bondholders, which would require an undivided loyalty to those bondholders. *See Wolf v. Sup. Ct.*, 107 Cal. App. 4th 25, 30 (Ct. App. 2003) (observing that the duty of undivided loyalty is "inherent" in fiduciary relationships); *Birnbaum v. Birnbaum*, 73 N.Y.2d 461, 466, 541 N.Y.S.2d 746, 748 (1989) ("[I]t is elemental that a fiduciary owes a duty of undivided and undiluted loyalty to those whose interests the fiduciary is to protect.")

11.     Prior to default, the indenture trustee is simply the administrator of a contract; its purely ministerial duties are always spelled out in the indenture and other controlling documents." *See Dell'Oca*, 159 Cal. App. 4[th] at 537 & n.3 (quoting Landau & Krueger 23, 27-29).

12.     The language of Section 10 precludes inference of any relationship or duty not explicitly set out in the Indenture.  (*See* TIA § 315(a)(1) (providing that, absent contrary language in the indenture, the indenture is automatically deemed to protect the indenture trustee from liability for any duty not specifically set out in the indenture).

13.     "The use of the word fiduciary . . . cannot alone establish fiduciary duties on the part of the named person or entity." *SNS Bank, N.V. v. Citibank, N.A.*, 7 A.D.3d 352, 356 (1st Dep't 2004) (internal quotation omitted) (affirming dismissal of fiduciary duty claim against financial manager where existence of fiduciary relationship was supported solely by use of the word "fiduciary" in brochure). *See also Irving v. Ebix, Inc.*, No. 10-CV-762, 2010 U.S. Dist. LEXIS 80443, at *21 (S.D. Cal. Aug. 10, 2010) ("Moreover, California courts 'consider the contract as a whole and interpret the language in context, rather than interpret a provision in isolation.'" (quoting *Am. Alternative Ins. Corp. v. Superior Court*, 37 Cal Rptr. 3d 918, 922 (Ct. App. 2006).)

14.     The intent of the parties at the time of execution of the agreements is the relevant time period for inquiry. *Cachil Dehe Band of Wintun Indians v. California*, 618 F.3d 1066, 1073 (9th Cir. 2010) (courts should "'give[] effect to the mutual intention of the parties as it existed' at the time the contract was executed" (quoting Cal. Civ. Code § 1636)). *Accord Israel v. Chabra*, 601 F.3d 57, 65 n.2 (2d Cir. 2010) ("[I]n the absence of circumstances requiring us to apply judicial estoppels, our role in interpreting a contract is to give effect to the intent of the parties at the time of the contract's making, not the position they found it necessary to adopt during litigation.")

15.     When a general and a particular provision are inconsistent, the particular and specific provision is paramount to the general provision. *Irving*, 2010 U.S. Dist. LEXIS 80443, at *21 (quoting *Jadwin v. Cnty. of Kern*, 610 F. Supp. 2d 1129, 1190 (E.D. Cal. 2009)).

16.     Boilerplate provisions spring from, and are intended to efficiently express, well-worn industry standards. *See Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1048 (2d Cir. 1982) (holding that boilerplate provisions "are thus not the consequence of

the relationship of particular borrowers and lenders and do not depend upon particularized intentions of the parties to an indenture").

17.     Uniformity should be a guiding principle when interpreting boilerplate provisions to preserve the industry standards that form the basis of boilerplate provisions and the efficiency of the capital markets. *Id.*

18.     Extrinsic evidence of the parties' mutual understanding of boilerplate provisions is admissible only where it shows a "deliberate and enduring course of conduct" contrary to the standard industry interpretation. *Sharon Steel*, 691 F.2d at 1049 (affirming trial court's rejection of plaintiff's unique interpretation of boilerplate provisions based on "a few statements over a two-week period").

19.     The Trustee's duty of care post-default is elevated because, after an event of default, the Trustee acts solely in the interests of the bondholders. *LNC Invs.*, 935 F. Supp. at 1347 ("After an event of default, however, the loyalties of an indenture trustee no longer are divided between the issuer and the investors, and as a consequence, New York law reallocates the indenture trustee's fiduciary duties to reflect that change.")

20.     The prudent person standard is an articulation of the duties of a fiduciary. *See, e.g., Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996) (discussing the application of the prudent person standard to ERISA fiduciaries) (citing *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir.), *cert. denied*, 459 U.S. 1069 (1982)).

21.     A contractual interpretation that would render a provision superfluous conflicts with the principle of contract construction that a contract should be read to give effect to all its provisions. *See* Cal. Civ. Code § 1641 ("The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other.");

*Kaiser Cement v. Ins. Co. of State of Pennsylvania*, 196 Cal. App. 4th 140, 155 (2d App. Dist. 2011) (citing § 1641).

22.     In order to establish a breach of contract, Depfa and Lloyds bear the burden of proving the following elements: "(1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) damage to the plaintiff therefrom." *Wall St. Network, Ltd. v. N.Y. Times Co.*, 164 Cal. App. 4th 1171 (2d App. Dist. 2008); *see also Fischer & Mandell LLP v. Citibank, N.A.*, 632 F.3d 793, 799 (2d Cir. 2011).

23.     "The objective in any question of the interpretation of a written contract, of course, is to determine what is the intention of the parties as derived from the language employed." *Pantone, Inc. v. Esselte Letraset Ltd.*, 691 F. Supp. 768, 771 (S.D.N.Y. 1988) (quotation omitted).

24.     "[C]ourts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include." *Rowe v. Great Atl. & Pac. Tea Co., Inc.*, 46 N.Y.2d 62, 72 (1978).

25.     Under the doctrine of *expressio unius est exclusio alterius*, the expression of certain terms – *i.e.,* amendment modification – means the exclusion of others. *VKK Corp. v. Nat'l Football League*, 244 F.3d 114, 130 (2d Cir. 2001); *Israel Disc. Bank Ltd v. Gottesman*, 544 F.2d 80, 82 (2d Cir. 1976).

26.     The Depfa SBPA is unambiguous that consent to supplemental indentures and additional bond issuances was not required. *Goldman v. Comm'r of Internal Revenue*, 39 F.3d 402, 406 (2d Cir. 1994) ("[W]here the language of a contract is unambiguous, its meaning must be determined from the four corners of the instrument without resort to extrinsic evidence of any nature." (internal quotations removed)); *see also S.N.J. Rail Grp., LLC v. Lumbermens Mut. Cas.*

*Co.*, No. 06-Civ.-4946, 2007 U.S. Dist. LEXIS 58510, *22-25 (S.D.N.Y. Aug. 13, 2007) (collecting cases on contract interpretation).

27.   Where contract language is ambiguous, the Court may look to the negotiations of the parties to determine their intent.   *Pantone*, 691 F. Supp. at 774 (looking to parties' negotiations, since "the consideration of a written instrument is always open to inquiry, and a party may show that the design and object of the agreement was different from what the language, if considered alone, would indicate" (internal quotation omitted)).

28.   Ambiguity may be determined after examining "the context of the entire integrated agreement and . . . the customs, practices, usages and terminology generally understood in a particular trade or business." *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London*, 136 F.3d 82, 86 (2d Cir. 1998).

29.   "'Where an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement.'" *New Windsor Volunteer Ambulance Corps, Inc. v. Meyers*, 442 F.3d 101, 112 (2d Cir. 2006) (quoting Restatement (Second) of Contracts § 202(4) (1979)).

30.   "There is no better way of ascertaining the meaning and construction of a written contract than to look at the acts and conduct of the parties under it." *GFordon v. Vincent Youmans, Inc.*, 358 F. 2d 261, 264 (2d Cir. 1965) (quotation removed). *See also New Windsor Volunteer Ambulance Corps., Inc.*, 442 F.3d at 112 ("There is no surer way to find out what parties meant, than to see what they have done . . . Parties in such cases often claim more, but rarely less than they are entitled to." (internal quotations omitted))

31.      Conduct in preparation for litigation should be disregarded.   *Compagnia Importazioni Esportazioni Rappresentanze v. L-3 Communs. Corp.*, 703 F. Supp. 2d 296, 307 & n.12 (S.D.N.Y. 2010) (defendant's course of performance, which contradicted defendants' claims in court, "suggests that defendant's argument here is litigation driven").

32.      To the extent that the scope of the consent right in Depfa's SBPA is ambiguous, it should be construed against Depfa, the drafter of the SBPA.   *McCarthy v. Am. Int'l Group, Inc.*, 283 F.3d 121, 124 (2d Cir. 2002).

33.      "[A]ll writings that form part of a single transaction and are designed to effectuate the same purpose be read together, even though they were executed on different dates and were not all between the same parties."   *Gordon*, 358 F.2d at 263.

34.      The Parties' omission of the word "supplement" in Section 5.03 of the Depfa SBPA demonstrates their intent that Depfa not have a right to consent to supplemental indentures.   *See MBIA Ins. Corp. v. Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A.*, No. 09-Civ.-10093, 2011 U.S. Dist. LEXIS 31307, *23-26 (S.D.N.Y. Mar. 25, 2011) (declining to imply term omitted from a particular provision where the parties' sophisticated draftspeople had repeatedly used the term elsewhere in the agreement). *See also Rowe v. Great Atl. & Pac. Tea Co.*, 385 N.E.2d 566, 571-72 (N.Y. 1978) ("[C]ourts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include. . . . [L]ack of foresight does not create rights or obligations.")

35.      Article X of the Indenture establishes the bounds of the Trustee's liability. *Shawmut*, 33 F.3d at 1491 (holding that the indenture trustee's "duties and obligations are *exclusively* defined by the terms of the indenture agreement" (emphasis added) (quoting *Merkel*, 758 F.2d at 816; citing *Elliot Assocs.*, 838 F.2d at 71)).

36.     The Trustee lacks discretionary authority and must follow instructions given to it by those persons/entities that it reasonably believes to have the proper authority to do so under the appropriate provisions of the Indenture. *See Dell'Oca*, 159 Cal. App. 4th at 537 n.3 ("[The trustee] has only the authority and powers granted by the indenture and is subject to all its restrictions and limitations. Except to the limited extent specified, the trustee has no right or authority to represent or act for the security holders or to substitute its judgment for theirs." (quoting Landau & Krueger at 27-30)).

37.     To determine whether a document comports with the Indenture, the Trustee must verify that: (1) the document received is a type of direction the Trustee is supposed to receive under the Indenture; (2) the document "comports with the requirements of the Indenture"; and (3) the document is signed by an appropriate or authorized person.

38.     The second step of the test of "comportment" only requires the Trustee to examine the form of the document it relies on to confirm that it contains the recitations and representations required by the Indenture; it does not require the Trustee to undertake an independent analysis of the accuracy of the individual representations in the direction or opinion. *See Semi-Tech Litig., LLC v. Bankers Trust Co.*, 353 F. Supp. 2d 460, 477, *aff'd in part and rev'd in part on other grounds*, Nos. 05-1155-bk, 05-1485-bk, 2006 U.S. App. LEXIS 17496 (2d Cir. May 31, 2006) (finding that officers certificates did not conform with the requirements of the indenture because they did not contain certain recitals specifically required by the indenture).

39.     Requiring the Trustee to look behind opinions of counsel would obviate the Indenture provisions authorizing the Trustee to rely on such opinions and would violate the well-established rules that a contract is to be read so as to give effect to all of its provisions. *New*

*York Marine and Gen. Ins. Co.*, 599 F.3d 102, 116 (2d Cir. 2010); Cal. Civ. Code § 1641; *Kaiser Cement*, 196 Cal. App. 4th at 155.

40.     A separate reference to a specific provision or document incorporated into the Indenture is not required for a general certification of compliance with the Indenture. *See Cruden v. Bank of N.Y.*, 957 F.2d 961, 971 (2d Cir. 1992) (inferring compliance with indenture provisions not named in opinion letter based on counsel's reference to compliance with related provisions and its statement that the supplemental indenture did not breach the terms of any indenture known to counsel by which its client was bound).

41.     Depfa's expert testimony that the Trustee was not entitled to rely on the Sonnenschein opinions letters is improper contract construction from an expert witness. *See Marx & Co.*, 550 F.2d 505, 510 (2d Cir. 1977); *Am. Home Assurance Co.*, 462 F. Supp. 2d 435, 449 (S.D.N.Y. 2006);  1999 U.S. Dist. LEXIS 16035, *9 (S.D.N.Y. Oct. 19, 1999); *Luizzi v. Pro Transport, Inc.*, 2011 WL 1655567, at *2-3 (E.D.N.Y. 2011)

42.     "Good faith" and other such protective provisions act solely as exculpatory provisions to protect the indenture trustee from unintended liability; they do not create an independent duty of care that would increase the trustee's liability. *Masonek v. Wells Fargo Bank, Nat'l Assoc.*, No. SA ML 10-2145 DOC (RNBx), 2010 U.S. Dist. LEXIS 143439, at *28-29 (C.D. Cal. Aug. 31, 2010) (holding that clause protecting the indenture trustee from liability for actions it took or refrained from taking in good faith and in the absence of willful misconduct or negligence was exculpatory and did not impose an affirmative duty of care) (citing *Banco Espirito Santo de Investimento, S.A. v. Citibank, N.A.*, 2003 U.S. Dist. LEXIS 23062 (S.D.N.Y. Dec. 22, 2003)).

43.    The "good faith" provisions impose a duty on a trustee only if it obtains *actual knowledge* that the document or opinion on which it seeks to rely is incorrect. *Masonek*, 2010 U.S. Dist. LEXIS 143439 at *23 ("In the indenture trustee context, acting in good faith means that the trustee does not have actual knowledge contradicting information in the particular certificate or opinion.") (citing Landau & Krueger at 67); *see also* Landau Tr. at 123:13-126:10 (Trustee could rely on opinion of counsel unless it had actual knowledge that representations in the opinion were false; Trustee empowered to act under Section 5.03(a) of Depfa Liquidity Facility only upon actual knowledge relevant to the provision).

44.    Depfa and Lloyds must demonstrate that their claimed damages were caused by and are directly traceable to a breach by BNY Mellon. *Shawmut Bank*, 33 F.3d at 1498, n. 19, 20; *Postal Instant Press, Inc. v. Sealy*, 43 Cal. App. 4th 1704, 1709 (2d App. Dist. 1996); *Nat'l Market Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir. 2004).

45.    Damages must not be remote or the result of other intervening causes. *See Wells Fargo Bank v. FSI, Financial Solutions*, 196 Cal. App. 4th 1559, 1574 (4th App. Dist. 2011); *Fruition, Inc. v. Rhoda Lee, Inc.*, 1 A.D.3d 124, 125 (1st Dep't 2003).

46.    Depfa has failed to meet its obligations to disclose its damage calculations and methodology as against the Trustee and it failed to respond to discovery requests seeking documents supporting such damages. (FED. R. CIV. P. 26, 37(c)) Such failure was neither substantially justified nor harmless to BNY Mellon.

47.    Lloyds has failed to meet its obligations to disclose its damage calculations and methodology as against the Trustee and it failed to respond to discovery requests seeking documents supporting such damages. (FED. R. CIV. P. 26, 37(c)) Such failure was neither substantially justified nor harmless to BNY Mellon.

48.     Depfa did not have the right under its SBPA to consent to supplemental indentures, additional bond issuance or subsequent liquidity provider terms.

49.     The Trustee did not owe any pre-default fiduciary duty to Depfa or Lloyds.

50.     The Trustee did not breach any fiduciary or other duties it may have owed to Depfa or Lloyds.

51.     The Trustee was entitled to and protected in relying on opinions of counsel and other documents as to the propriety of the 2006 transaction.

52.     The Trustee was entitled to and protected in relying on directions of ALL with respect to redemption payments.

53.     The Trustee did not breach any obligation under the Indenture, the First Supplemental Indenture or the Second Supplemental Indenture.

54.     The Trustee did not breach any obligation under the Depfa SBPA or the Lloyds SBPA.

55.     Depfa and Lloyds are not intended third party beneficiaries under the Indenture or Supplemental Indentures.

56.     Depfa and Lloyds failed to mitigate any damages they may have suffered.

57.     Depfa and Lloyds suffered no damage caused by BNY Mellon.

58.     BNY Mellon is not liable to Depfa under its Seventh Claim for Relief for breach of contract for failure to make mandatory redemption payments.

59.     BNY Mellon is not liable to Depfa under its Eight Claim for Relief for breach of fiduciary duty for improper redemption payments.

60.     BNY Mellon is not liable to Lloyds under its First Counterclaim for breach of contract for failure to make mandatory redemption payments.

61.     BNY Mellon is not liable to Lloyds under its Second Counterclaim for breach of fiduciary duty.

62.     BNY Mellon is entitled to a declaration as to the respective rights of Depfa and Lloyds to the trust assets.

63.     BNY Mellon is entitled to an award of its costs and attorneys' fees in brining this action.

64.     BNY Mellon is entitled to be released from this action after depositing the stake with the Court.

Dated:  October 31, 2011
       New York, New York              Respectfully submitted,


By: _____
         Judith A. Archer
Sarah E. O'Connell
Fulbright & Jaworski, LLP
666 Fifth Avenue
New York, New York 10103
Tel.:  (212) 318-3000
Fax:  (212) 318-3400
jarcher@fulbright.com
soconnell@fulbright.com

*Attorneys for Plaintiff/Counterclaim Defendant*
*The Bank of New York Mellon Trust Company, N.A.*