UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A.,<br><br>               Plaintiff,<br><br>     v.<br><br>DEPFA BANK PLC and LLOYDS TSB BANK PLC,<br><br>               Defendants. | No. 10 CV 4424 (JPO) (AJP)<br><br><br><br>**PRETRIAL MEMORANDUM OF LAW OF DEFENDANT AND THIRD-PARTY PLAINTIFF LLOYDS TSB BANK PLC** |
| DEPFA BANK PLC,<br><br>               Third-Party Plaintiff,<br><br>     v.<br><br>ACCESS TO LOANS FOR LEARNING STUDENT LOAN CORPORATION and JPMORGAN CHASE BANK, N.A.,<br><br>               Third-Party Defendants. | |
| LLOYDS TSB BANK PLC,<br><br>               Third-Party Plaintiff,<br><br>     v.<br><br>ACCESS TO LOANS FOR LEARNING STUDENT LOAN CORPORATION,<br><br>               Third-Party Defendant. | |

Robert I. Bodian
David L. Barres
Omar A. Khondker
MINTZ LEVIN COHN FERRIS
GLOVSKY AND POPEO, P.C.
Chrysler Center
666 Third Avenue, 25th Floor
New York, New York 10017
(212) 935-3000
*Attorneys for Lloyds TSB Bank plc*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ iv

PRELIMINARY STATEMENT ..........................................................................................1

STATEMENT OF FACTS ...................................................................................................3

    A.    The 2005 Transaction. ...........................................................................3

    B.    Development of the 2005 Transaction. ...................................................6

    C.    The 2006 Transaction. ...........................................................................7

    D.    Development of the 2006 Transaction. ...................................................8

    E.    The Series V Bonds Become Bank Bonds. ............................................9

    F.    Procedural History. ...............................................................................12

ARGUMENT ......................................................................................................................13

I.    UNDER THE PLAIN, UNAMBIGUOUS TERMS OF THE DEPFA SBPA AND INDENTURE, THERE WAS NO AMENDMENT OF THE INDENTURE THAT REQUIRED DEPFA'S CONSENT UNDER SECTION 5.03(A) OF THE DEPFA SBPA ..................................................................................................................14

    A.    The Terms "Amend" and "Modify" in Section 5.03(a) of the Depfa SBPA Do Not Refer to Supplemental Indentures to Issue Additional Bonds or Their Supporting Liquidity Facilities. ...................................................14

    B.    The Series V Bonds Are All in Parity. ..................................................19

II.    EVEN IF THE DEPFA SBPA WERE AMBIGUOUS, THE EXTRINSIC EVIDENCE CONFIRMS THAT THERE WAS NO AMENDMENT OF THE INDENTURE THAT REQUIRED DEPFA'S CONSENT UNDER SECTION 5.03(A) OF THE DEPFA SBPA ...................................................................................22

    A.    The Extrinsic Evidence Confirms That the Terms "Amend" and "Modify" in Section 5.03(a) of the Depfa SBPA Do Not Refer to Supplemental Indentures to Issue Additional Bonds or Their Supporting Liquidity Facilities. .............................................................................................22

        1.    Depfa's Practical Construction of the Depfa SBPA Confirms That There Was No Amendment of the Indenture. ...........................22

**Page**

2.    The Drafting and Negotiation History Confirms That There Was No Amendment of the Indenture. ..............................................24

3.    Expert Witness Testimony Confirms the Distinction Between a Supplement and Amendment. ...................................................26

B.    The Extrinsic Evidence Confirms That the Series V Bonds Are All in Parity. ...............................................................................26

1.    Depfa's Practical Construction Confirms That the Series V Bonds Are All in Parity. ...............................................................26

2.    All Parties Understood That Bonds in Parity Are Not Required to Have an Equal or Ratable Redemption Schedule. ...................28

3.    Expert Testimony Confirms That, in Standard Industry Usage, Bonds in Parity Have the Same Priority of Lien but Are Not Required to Have the Same or a Ratable Redemption Schedule. .............29

III.    ALL AND BNY ARE REQUIRED TO USE THE AVAILABLE FUNDS IN BOTH THE REVENUE ACCOUNT AND LOAN ACCOUNT TO REDEEM BONDS ACCORDING TO THE PAYMENT SCHEDULES IN THE SBPA'S ............29

A.    Both Revenue and Loan Account Funds Are Subject to Mandatory Redemption. ........................................................................30

B.    Even if the Loan Account Were Not Subject to Mandatory Redemption, ALL Was Required To Keep the Recoveries of Principal in the Revenue Account, Thus Making Them Available for Mandatory Redemption. .................33

C.    The Court Should Base Its Monetary Award to Lloyds on Scenario 1 of the Report of Lloyds' Economic Expert. ...............................34

IV.    LLOYDS IS ENTITLED TO MONETARY RELIEF ...................................36

A.    Lloyds Is Entitled to the Payment of All of the Principal and Interest Owed to It Through the Present Date. ...................................37

B.    ALL and BNY Failed To Pay Lloyds All of the Principal Owed from May 2008 Through November 2009. ...........................................39

1.    Payment Defaults Occurred in May 2008 Through November 2009. .......39

2.    BNY Is Liable for the Damages Resulting from the Improper Redemptions, Including Overpayment of Bond Interest. .........................40

C.    Lloyds Is Entitled to Damages Resulting from the Overpayment of ALL's Administrative Fees. ..............................................................43

**Page**

D.   Lloyds Is Entitled to Damages Resulting from the Failure to Suspend Loan Recycling When Required. ...................................................................................45

E.   BNY Should Disgorge Its Legal Fees and Expenses Paid from the Trust for This Action. .......................................................................................................46

V.   THE COURT SHOULD DECLARE HOW THE PAYMENTS WILL BE MADE OUT OF THE SERIES V TRUST GOING FORWARD ...................................................47

VI.   LLOYDS IS ENTITLED TO BE INDEMNIFIED FOR ITS ATTORNEYS' FEES AND OTHER LITIGATION EXPENSES ............................................................47

CONCLUSION ....................................................................................................................48

## <u>TABLE OF AUTHORITIES</u>

**Cases** **Page(s)**

*Boghos v. Certain Underwriters at Lloyd's of London*,
  36 Cal. 4th 495, 115 P.3d 68 (2005) ............................................................................. 18

*Command Cinema Corp. v. VCA Labs, Inc.*, 464 F. Supp. 2d 191 (S.D.N.Y. 2006) .................. 13

*Davenport v. Davenport Foundation*, 36 Cal. 2d 67, 222 P.2d 11 (1950) ...................................... 33

*George Backer Mgmt. Corp. v. Acme Quilting Co.*,
  46 N.Y.2d 211, 413 N.Y.S.2d 135 (1978) ..................................................................... 18

*Gordon v. Vincent Youmans, Inc.*, 358 F.2d 261 (2d Cir. 1965) ........................................... 14, 22

*Harm v. Frasher*, 5 Cal. Rptr. 367 (Cal. App. 1960) ............................................................... 14

*Harris v. Spinali Auto Sales, Inc.*, 20 Cal. Rptr. 586 (Cal. App. 1962) ................................. 22

*IBJ Schroder Bank & Trust Co. v. Resolution Trust Corp.*,
  26 F.3d 370 (2d Cir. 1994) ............................................................ 23, 25, 27, 33

*Indu Craft, Inc. v. Bank of Baroda*, 47 F.3d 490 (2d Cir. 1995) ........................................ 36

*Israel Disc. Bank Ltd. v. Gottesman (In re Ore Cargo, Inc.)*,
  544 F.2d 80 (2d Cir. 1976) ............................................................... 16

*National Ins. Underwriters v. Carter*, 17 Cal. 3d 380, 551 P.2d 362 (1976) ............................ 32

*New York Life Ins. Co. v. Hollender*, 38 Cal. 2d 73, 237 P.2d 510 (1951) ............................ 20

*New York Marine & Gen. Ins. Co. v. LaFarge N. America, Inc.*,
  599 F.3d 102 (2d Cir. 2010) ................................................................. 18, 20, 22

*New York State Medical Care Facilities Finance Agency v. Bank of Tokyo Trust
  Co.*, 163 Misc. 2d 551, 621 N.Y.S.2d 466 (Sup. Ct. N.Y. Cty. 1994),
  *aff'd*, 216 A.D.2d 126, 629 N.Y.S.2d 3 (1st Dep't 1995) ............................................ 42

*Old Colony Trust Co. v. Cit of Omaha*, 230 U.S. 100 (1913) ....................................... 23

*Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.*,
  13 N.Y.3d 398, 892 N.Y.S.2d 303 (2009) ..................................................... 13

*Rowe v. Great Atl. & Pac. Tea Co.*, 46 N.Y.2d 62, 412 N.Y.S.2d 827 (1978) .................... 15

*Vermont Teddy Bear Co. v. 538 Madison Realty Co.*,
  1 N.Y.3d 470, 775 N.Y.S.2d 765 (2004) .................................................... 16, 22

**Page(s)**

*Viacom Int'l, Inc. v. Lorimar Prods., Inc.*, 486 F. Supp. 95 (S.D.N.Y. 1980) ........................ 23, 33

*Victoria v. Superior Court*, 40 Cal. 3d 734, 710 P.2d 833 (1985) ................................................. 33

*VKK Corp. v. NFL*, 244 F.3d 114 (2d Cir. 2001) ......................................................... 16

*Whalen v. Ruiz*, 40 Cal. 2d 294, 253 P.2d 457 (1953) ................................................................. 27

**Statutes and Rules**

Fed. R. Civ. P. 30(b)(6) .......................................................................................................25

Fed. R. Civ. P. 54(d)(2) ........................................................................................................48

28 U.S.C. § 2201(a) (2006) ...................................................................................................37

Defendant and third-party plaintiff Lloyds TSB Bank plc ("Lloyds") respectfully submits this pretrial memorandum of law for the upcoming bench trial of this matter.

## PRELIMINARY STATEMENT

This case is about contract interpretation. The dispute primarily is between the two interpleader defendants, DEPFA BANK plc ("Depfa") and Lloyds, concerning payments out of a trust that secures bonds.

In August 2005, Access to Loans for Learning Student Loan Corporation ("ALL" or "the Issuer") issued bonds, secured by student loans, under an Indenture and a First Supplemental Indenture. Depfa entered into a standby bond purchase agreement ("SBPA") that required it, under certain circumstances, to purchase those bonds at the election of the bondholders. Under the Depfa SBPA, any bonds purchased by Depfa must be redeemed (*i.e.*, have the principal paid down) in semi-annual installments over ten years. In August 2006, ALL issued additional bonds under the same Indenture and a Second Supplemental Indenture. Lloyds entered into an SBPA that required it, under certain circumstances, to purchase those additional bonds at the election of the bondholders. Under the Lloyds SBPA, any bonds purchased by Lloyds must be redeemed in quarterly installments over five years. In 2008, each bank was required to purchase bonds in principal amount of $190,000,000 under its respective SBPA.

Depfa now claims that ALL breached the Depfa SBPA by failing to obtain Depfa's consent to the Second Supplemental Indenture and Lloyds SBPA. The Depfa SBPA entitles Depfa to consent to an "amendment" or "modification" of the Indenture that governs both bond issues. The Indenture, however, expressly authorizes supplemental indentures to issue any series of additional bonds, with their supporting SBPA's, and it expressly incorporates their payment terms without any restrictions. The Lloyds transaction, therefore, did not amend the

indenture because it did not change any word of, or any right granted by, the Indenture. The Lloyds transaction did exactly what the Indenture authorizes.

Knowing, then, that a supplement is not an amendment, Depfa argues that the Lloyds transaction amended the Indenture by issuing bonds that are not in "parity" with the Depfa bonds. Depfa apparently believes that bonds in parity must be redeemed on an equal or pro rata basis (*i.e.*, in proportion to each bondholder's outstanding principal amount). In the bond industry, however, "parity" means having the same priority of claim to the pledged collateral, and does not refer to the payment schedule. The Indenture expressly requires the redemption of bonds according to the applicable supplemental indenture and SBPA for each series of bonds. It also specifies the only circumstances when the bonds should instead be paid on a pro rata basis: upon acceleration of all payments due, or when a required payment is missed because of insufficient funds. Neither condition has yet occurred. Depfa's interpretation of "parity" would require the Court to ignore, render superfluous, or rewrite many Indenture provisions.

Lloyds, therefore, is entitled to the enforcement of its SBPA. From May 2008 through November 2009, ALL and the Trustee, The Bank of New York Mellon Trust Company, N.A. ("BNY"), redeemed the bonds in a manner that caused Lloyds to be underpaid and Depfa to be overpaid. Lloyds should receive monetary relief that corrects the underpayment and also gives effect to the payment schedule in its SBPA from November 2009 onward. The contract language and parties' conduct reveal that the quarterly payments should be made from all available student-loan interest and principal collections.

In addition to its share of the trust assets, Lloyds seeks damages against ALL and BNY. They depleted the funds available for redemption of Lloyds' bonds by (1) overpaying

ALL's administrative fees, (2) failing to timely suspend the origination of new loans, and (3) overpaying bond interest.  BNY is liable because it negligently followed payment instructions from ALL that blatantly violated the contracts.  Based on trust account statements through August 31, 2011 (and to be updated), Lloyds seeks a total monetary award of approximately $48,000,000 plus interest, plus contractual indemnity for its attorneys' fees and expenses.

## STATEMENT OF FACTS

### A.   The 2005 Transaction.

ALL is a California nonprofit public benefit corporation in the business of originating, acquiring, securitizing, and servicing student loans.  (Trial Ex. 1, p. 1.)[1]  On August 1, 2005, ALL and JPMorgan Chase Bank, National Association ("JPMorgan"), as Trustee, entered into a Trust Indenture (the "Indenture"), providing for the issuance of Student Loan Revenue Bonds, Series V, issued by ALL, to finance and refinance the acquisition of eligible student loans.  (*Id.*)  The Indenture is governed by California law.  (Trial Ex. 1, § 11.7.)  On the same date, they entered into the First Supplemental Indenture, which provided for ALL's issuance of the Series V-A-1 and V-A-2 Bonds in the aggregate principal amount of $190,000,000.  (Trial Ex. 2, § 13.1.)  The bonds were issued on August 3, 2005.  (Trial Ex. 36.)

On August 1, 2005, ALL, JPMorgan Chase, and Depfa entered into a Standby Bond Purchase Agreement (the "Depfa SBPA"), which required Depfa to purchase the ALL Series V-A-1 and V-A-2 Bonds if the bondholders elected to tender (or put) them for purchase and they could not be remarketed to other buyers.  (Trial Ex. 4, § 2.01.)  When Depfa purchases bonds under its SBPA, they are called "Bank Bonds" (*id.* § p. 2), and they must be redeemed, to

---

[1]   Citations to the Trial Exhibits are designated "Trial. Ex ___."  The parties have submitted a single set of Trial Exhibits, in binders, to the Court.

the extent of available funds in the Revenue Account on each required payment date, in semi-annual installments until maturity in ten years (*id.* § 3.02).  Such redemptions must be made "after giving effect" to the fund transfers required by Section 5.3(B)(1)-(5) of the Indenture, which lists various required expense and interest payments.

The Indenture is a "master indenture," which provides for the issuance of multiple series of bonds in the future.  (Davis Dep. at 194:2-12.)[2]  The Indenture authorizes the issuance of additional bonds on a parity with outstanding bonds of the same level of seniority (Trial Ex. 1, § 2.1), and it authorizes entry into supplemental indentures "to provide for the issuance of any series of Bonds" (*id.* § 7.1(9)).  The Indenture contains a payment "waterfall" that sets the order of payment out of the Revenue Account.  (*Id.* § 5.3(B)(1)-13).)  The interest and principal on Senior Bonds are paid under the fifth paragraph of the waterfall.  (*Id.* § 5.3(B)(5).)

The Indenture provides that bonds shall be paid as set forth in the Supplemental Indenture pursuant to which such bonds are issued.  (Trial Ex. 1, § 2.4.)  It also provides that "Credit Enhancement may be provided for any series of Bonds" (*id.* § 5.3(E)), and defines "Credit Enhancement" as including "any bond insurance . . . purchase agreement or other credit support or liquidity facility" (*id.*, p. 5).  The Indenture further provides that all amounts due under a Credit Enhancement shall be paid in such order of priority as set forth in Section 5.3(B)(5)-(8) (*id.* § 5.3(E)), which means that amounts due under the Credit Enhancements for Senior Bonds are incorporated into the fifth paragraph of the waterfall.

---

[2]  Citations to deposition testimony are identified by the witness' last name, followed by the page and line numbers, such as "Davis Dep. at ___:___."  The parties agreed that only the depositions of unavailable fact witnesses – Elaine Bayus, Christopher Chapman, and Elizabeth Davis – would be designated and counter-designated as substantive evidence.  The parties also agreed that the depositions of available fact witnesses – Martha Peterson, Seamus O'Neill, Dennis Roemlein, David Park, Nancy Henderson, and Théa Watkins – can be cited, but they are not designated and will not be submitted to the Court unless it so requests.

The bonds are secured by a portfolio of student loans and all collections of principal and interest from the loans.  (*Id.*, p. 2.)  The collections of interest, known as "Revenues," must be deposited into the Revenue Account.  (*Id.* § 5.3(A) & p. 11.)  The collections of principal, known as "Recoveries of Principal," must be deposited into the Loan Account.  (*Id.* § 5.4(A) & p. 10.)  Each month, the servicers of the student loans transfer the loan collections to the Revenue Account, and then ALL instructs the Trustee to transfer the Recoveries of Principal to the Loan Account or Payment Account.  (*See* Trial Ex. 171 (showing monthly account balances and transfers); Peterson Dep. at 88:14-91:10, 93:13-94:19.)  Funds in the Loan Account can be used to pay interest, principal, and some expenses.  (Trial Ex. 1, § 5.4(B).)  The Payment Account receives fund transfers from the Revenue Account and Loan Account to pay principal and interest to the bondholders.  (*Id.* §§ 5.3(B)(5), 5.4(A).)

Normally, funds in the Loan Account can be used to originate new loans, which is called "loan recycling."  (*Id.* §§ 5.4(B)(ii), 6.8(A).)  But different rules apply when the bonds become Bank Bonds.  On August 1, 2005, ALL, JPMorgan as Trustee, and Ambac Assurance Corporation ("Ambac" or "the Insurer") entered into a Certificate and Agreement.  (Trial Ex. 6.)  It provided that, unless waived by Ambac, ALL will cease recycling loans 30 consecutive days after any bonds have become Liquidity Provider Bonds (*i.e.*, Bank Bonds), and then ALL will direct the Trustee to transfer all funds in the Loan Account to the "Redemption Account" to redeem bonds in accordance with the Indenture.  (*Id.* §§ 1.1(iii), 4.2.)  The Indenture, in turn, requires funds in the Loan Account to be transferred to the Payment Account to pay bond interest and principal on the dates when due.  (Trial Ex. 1, § 5.4(A)(ii)).

The Series V-A-1 and V-A-2 Bonds are insured by Ambac.  As insurer, Ambac is directly liable for any default of interest or principal.  (Trial Ex. 34, p. 1.)  Ambac obtained broad

consent rights, including that, without its written consent, ALL cannot "amend or supplement this Indenture" or "issue any additional Senior Bonds" or other bonds.  (Trial Ex. 1, § 8.6(xi)-(xii).)  In contrast, Depfa (as liquidity provider with no direct liability for Issuer default), received a much narrower consent right that applies only to an "amendment" or "modification" of the Indenture, or the equivalent.  (Trial Ex. 4, § 3.02.)

**B.**     **Development of the 2005 Transaction.**

In May 2005, Depfa and Lloyds bid to be the liquidity provider for the Series V-A-1 and V-A-2 Bonds.  Lloyds offered a five-year term-out.  (Trial Ex. 15, p. 4, §3 (C).).)[3]  Depfa offered a term-out of up to ten years and won the bid.  (Trial Ex. 18, p. 5; Trial Ex. 4, § 3.02.)

Depfa's counsel was Elizabeth Davis of Kutak Rock LLP in Atlanta.  (Davis Dep. at 15:16-21.)  She drafted the Depfa SBPA and circulated the first draft to all parties on May 18, 2005.  (*Id.* at 17:6-12, 90:6-91:11, 203:14-23; Trial Ex. 19.)  On May 25, 2005, she circulated a revised draft in which the consent provisions of Section 5.03(a) were in their final form, without material revision.  (Trial Ex. 8, § 5.03(a) and p. KR-DEPFA0001829.)

Ms. Davis and David Park, Associate Director of Depfa, were Depfa's chief negotiators of the Depfa SBPA, Indenture, and First Supplemental Indenture.  (Davis Dep. at 19:18-21:5, 22:7-24:9; Bayus Dep. at 12:21-16:19.)  ALL's chief negotiator was Martha Peterson, its CFO.  (Bayus Dep. at 13:20-24, 15:9-21.)  Elaine Bayus of Orrick, Herrington & Sutcliffe LLP was ALL's counsel and bond counsel.  Her primary responsibility was to draft the Indenture and other closing documents, and to ensure the bonds were validly issued.  (Bayus Dep. at 9:8-25, 10:22-11:20, 12:21-13:9, 15:6-15, 17:22-18:6.)

---

[3]     "Term out" refers to the bank's lending period, either by bond purchase or term loan.

In an early draft of the Indenture, there were separate articles for "SUPPLEMENTAL INDENTURES" (Article VII) and "AMENDMENTS" (Article VIII). (Trial Ex. 27, pp. 48, 52.)  Through handwritten comments, Ms. Davis requested for Depfa the right of consent to amendments (*id.* at 52) but not to Supplemental Indentures (*see id.* at 48).  In contrast, through handwritten comments and emails, Ambac requested a consent right to supplemental indentures, additional bonds, and subsequent liquidity providers.  (Trial Ex. 26; Trial Ex. 25, pp. AMB 00001466-68, 1472.)  To accommodate a new Article VIII on bond insurance, Ms. Bayus merged Articles VII and VIII into a single Article VII entitled "SUPPLEMENTAL INDENTURES; AMENDMENTS," without changing their terms.  (Trial Ex. 30, pp. 39-43; Bayus Dep. at 30:10-31:2.)  She also added provisions, drafted by Ambac, giving it very broad rights to consent to amendments, supplements, and additional bonds.  (Trial Ex. 30, p. 47, § 8.6(b)(xi)-(xii); Bayus Dep. at 31:14-32:13.)

Prior to closing, Mr. Park, Ms. Peterson, and Seamus O'Neill (ALL's financial advisor) discussed Depfa's consent rights.  Mr. Park requested that Depfa have the right to consent to subsequent liquidity providers and liquidity contracts.  Ms. Peterson refused. (Peterson Dep. at 49:25-52:21; O'Neill Dep. at 121:15-24:22.)

## C.    The 2006 Transaction.

On August 1, 2006, ALL and JPMorgan, as Trustee, entered into the Second Supplemental Indenture, which provided for ALL's issuance of the Series V-A-3, V-A-4, and V-A-5 Bonds in the aggregate principal amount of $190,000,000.  (Trial Ex. 3, § 16.1.)  The bonds were issued on August 2, 2006.  (Trial Ex. 57.)

Also on August 1, 2006, ALL, JPMorgan, and Lloyds entered into a Standby Bond Purchase Agreement (the "Lloyds SBPA"), which required Lloyds to purchase the ALL

Series V-A-3, V-A-4, and V-A-5 Bonds if the bondholders elected to tender (or put) them for purchase and they could not be remarketed to other buyers.  (Trial Ex. 5, § 2.01.)  Under the Lloyds SBPA, Bank Bonds must be redeemed, to the extent of available funds in the Revenue Account on each required payment date, in quarterly installments until maturity in five years. (*Id.* § 3.02.)

On August 2, 2006, ALL, JPMorgan as Trustee, and Ambac, as Insurer, entered into a Certificate and Agreement.  (Trial Ex. 7.)  It requires the suspension of loan recycling 30 days after any bonds become Liquidity Provider Bonds, and then the transfer of Loan Account funds to the "Redemption Account" to redeem bonds.  (*Id.* §§ 1.1(iii), 4.2.)

On October 1, 2006, BNY succeeded JPMorgan as Trustee.  (Stipulations ¶ 20.)

**D.    Development of the 2006 Transaction.**

On June 16, 2006, ALL solicited bids for the liquidity provider of the Series V-A-3, V-A-4, and V-A-5 Bonds.  (Trial Ex. 39.)  Four banks responded.  Depfa bid the ten-year schedule in the Depfa SBPA from the previous year.  (Trial Ex. 43, p. 4, § C.)  Bank of Nova Scotia, Fortis Bank, and Lloyds each bid a five-year term-out.  (Trial Ex. 181, p. 2; Trial Ex. 183, p. 3, § 5; Trial Ex. 41, pp. 3, 5, §§ 2(A)(i), 2(D).)

In late June 2006, Mr. Park called Ms. Peterson to learn the result.  She told him that Lloyds won the bid with a five-year term for its bonds.  (Peterson Dep. at 61:5-63:23.)  She also emailed him a link to the Term Supplement and Offering Memorandum (the "Offering Memorandum"), which was issued on July 26, 2006 and describes Lloyds' five-year, quarterly redemption schedule.  (Trial Ex. 52, cover page and pp. TS-6 to TS-7.)  The Offering Memorandum was publicly available as soon as it was issued.  (Peterson Dep. at 64:5-65:18,

66:8-68:7.)  Mr. Park and Ms. Peterson had at least one other phone conversation and email

about the transaction that summer, concerning a change in ALL's administrative fees.  (Trial

Ex. 49.)  At no time in 2006 did Depfa assert that the 2006 transaction amended the Indenture, or

that the new bonds were not in parity with the outstanding bonds.  (Peterson Dep. at 68:16-71:13;

Park Dep. at 153:15-154:8.)

**E.**     **The Series V Bonds Become Bank Bonds.**

         In January 2008, Ambac's credit rating was downgraded because of its heavy

exposure to subprime mortgages.  (Stipulations ¶ 21.)  The Series V bondholders elected to no

longer hold the bonds, and they could not be remarketed.  Under their SBPA's, Depfa and

Lloyds were required to purchase all of the bonds in the principal amount of $190,000,000 each

on the dates and in the amounts listed below (*id.* ¶¶ 22-24):

| Depfa Purchase Date | Series | Purchase Amount |
|---|---|---|
| 2/11/08 | V-A-1 | $99,265,000 |
| 2/13/08 | V-A-1 | $100,000 |
|  |  |  |
| 2/19/08 | V-A-2 | $100,000 |
| 2/26/08 | V-A-2 | $90,000,000 |
| 2/27/08 | V-A-1 | $100,000 |
| 2/29/09 | V-A-1 | $135,000 |
|  |  |  |
| 3/11/08 | V-A-1 | $100,000 |
|  |  |  |
|  |  |  |
| 3/25/08 | V-A-1 | $100,000 |
|  |  |  |
| 6/05/08 | V-A-1 | $100,000 |
|  |  |  |
|  |  |  |

| Lloyds Purchase Date | Series | Purchase Amount |
|---|---|---|
| 2/11/08 | V-A-5 | $42,410,000 |
| 2/13/08 | V-A-5 | $4,065,000 |
| 2/14/08 | V-A-5 | $600,000 |
| 2/19/08 | V-A-5 | $500,000 |
| 2/26/08 | V-A-3 | $80,000,000 |
| 2/27/08 | V-A-5 | $2,425,000 |
| 2/29/08 | V-A-5<br>V-A-4 | $3,900,000<br>$30,000,000 |
|  |  |  |
| 3/12/08 | V-A-5 | $200,000 |
| 3/17/08 | V-A-5 | $500,000 |
|  |  |  |
| 5/22/08 | V-A-5 | $100,000 |
|  |  |  |
| 6/16/08 | V-A-5 | $300,000 |
| 6/19/08 | V-A-4 | $25,000,000 |

No bonds issued pursuant to the Indenture are held by any party other than Depfa and Lloyds. (*Id.* ¶ 22.)

Before they became Bank Bonds, the Series V Bonds all had a maturity period of 35 years (2040 for the Depfa-supported bonds, and 2041 for the Lloyds-supported bonds).  (*See* Trial Ex. 2, § 13.2; Trial Ex. 3, § 16.2.)  The Depfa Bank Bonds have a maturity period of ten years at a variable interest rate of Prime plus 1.5%, which is currently 4.75%.  (Trial Ex. 4, §§ 3.01-3.02.)  The Lloyds Bank Bonds have a maturity period of five years at a variable interest rate of LIBOR plus 1.75%, which is currently approximately 2.18%.  (Trial Ex. 5, §§ 3.01-3.02.)

Although Lloyds' first quarterly payment date fell on May 11, 2008, ALL did not redeem any bonds until October 27, 2008.  At the direction of ALL, BNY redeemed the Series V Bonds on the dates and in the amounts listed below (Stipulations ¶ 25):

| Redemption Date | Series V-A-1 Depfa | Series V-A-2 Depfa | Series V-A-3 Lloyds | Series V-A-4 Lloyds | Series V-A-5 Lloyds | Depfa Total | Lloyds Total |
|---|---|---|---|---|---|---|---|
| 10/27/08 | | | $5,300,000 | $3,600,000 | $3,600,000 | | $12,500,000 |
| 11/12/08 | $3,300,000 | $2,900,000 | | | | $6,200,000 | |
| 1/6/09 | $1,700,000 | $1,500,000 | $1,300,000 | $900,000 | $900,000 | $3,200,000 | $3,100,000 |
| 4/10/09 | | | $500,000 | $300,000 | $300,000 | | $1,100,000 |
| 4/22/09 | $300,000 | $300,000 | | | | $600,000 | |
| 7/1/09 | $1,300,000 | $1,200,000 | $2,100,000 | $1,400,000 | $1,400,000 | $2,500,000 | $4,900,000 |
| 10/5/09 | $600,000 | $400,000 | $400,000 | $300,000 | $300,000 | $1,000,000 | $1,000,000 |
| 11/5/09 | $870,000 | $580,000 | $580,000 | $435,000 | $435,000 | $1,450,000 | $1,450,000 |
| Total Redemptions | | | | | | $14,950,000 | $24,050,000 |

The last redemption, on November 5, 2009, purportedly was an optional redemption under the second sentence of Section 3.02 of the SBPA's.  All other redemptions were mandatory redemptions intended to give effect to the semi-annual and quarterly payment schedules under the first sentence of Section 3.02 of the SBPA's.  (Trial Ex. 178, last page; Trial Exs. 4-5, § 3.02; Trial Exs. 10-11.)  ALL used Recoveries of Principal to pay these redemptions, and Revenues to pay the interest.  (Peterson Dep. at 92:14-94:19, 125:11-126:16.)  ALL also planned two more redemptions, both favorable to Lloyds (Trial Ex. 178, last page):

| Planned Redemption Date | Series V-A-1 Depfa | Series V-A-2 Depfa | Series V-A-3 Lloyds | Series V-A-4 Lloyds | Series V-A-5 Lloyds | | Depfa Total | Lloyds Total |
|---|---|---|---|---|---|---|---|---|
| 11/30/08 | | | $420,000 | $290,000 | $290,000 | | | $1,000,000 |
| | | | | | | | | |
| 12/31/09 | $677,000 | $612,000 | $511,000 | $900,000 | $900,000 | | $1,289,000 | $2,311,000 |
| | | | | | | | | |
| **Total Planned Redemptions** | | | | | | | **$1,289,000** | **$3,311,000** |

These two redemptions were never made because BNY, in November 2009, suspended all redemptions out of the trust because of the dispute that developed between the banks.  (Stipulations ¶ 26.)  To date, BNY has paid a total of $32,027,100 in interest on Depfa's bonds, and $17,575,000 in interest on Lloyds' bonds.  (*Id.* ¶ 27.)

On July 16, 2009, Depfa sent a letter to ALL complaining about Lloyds' receiving higher redemption payments.  (Trial Ex. 9, p. 2.)  In letters dated August 4 and November 24, 2009, ALL responded that Lloyds was entitled to higher redemption payments than Depfa because of the differences in the banks' payment rights under their SBPA's.  (Trial Exs. 10-11.)  In a letter dated November 27, 2009, Depfa asserted for the first time that the Lloyds transaction amended the Indenture in violation of Section 5.03(a) of the Depfa SBPA.  (Trial Ex. 12.)

F.       **Procedural History.**

After months of unsuccessful negotiations among the parties, BNY filed its

Interpleader Complaint on June 3, 2010 (Docket No. ("Dkt.") 1), requesting that the Court

determine the banks' rights, under their SPBA's, to approximately $7,500,000 in the Payment

Account, plus further amounts deposited therein, available for redemption of bonds.  That

amount grew to approximately $48,700,000 as of July 31, 2011.  (Trial Ex. 190.)

On March 24, 2010, the Circuit Court of Wisconsin, Dane County, issued an

injunction relating to the rehabilitation of Ambac, barring holders of Ambac-insured bonds from

exercising default remedies under their indentures.  (Trial Ex. 151.)  On August 31, 2010, both

Lloyds and Depfa sent letters to ALL and BNY declaring various Events of Default under their

SBPA's.  (Trial Exs. 13, 174.)  Before the injunction was issued, neither bank tried to exercise

any remedy available upon default under the Indenture, such as acceleration of amounts due on

the bonds.  (Park Dep. at 178:2-179:21.)

On September 27, 2010, Depfa filed an amended answer with claims against all

other parties, including third-party defendants ALL and JPMorgan.   (Dkt. 26.)  Depfa primarily

complained that ALL and the Trustee's entry into the Second Supplemental Indenture and

Lloyds SBPA violated Section 5.03(a) of the Depfa SBPA, which prohibits amendments to the

Indenture without Depfa's consent; and Section 5.01(a), which requires notice of material

adverse developments.  Depfa also asserted claims against Lloyds for conversion and tortious

interference with contract. [4]

---

[4]       On October 31, 2011, Depfa confirmed by email to the parties that it was dropping its claim
for breach of contract based on material adverse effect, and its crossclaims against Lloyds for
conversion and tortious interference with contract.  These claims, therefore, are not addressed in
Lloyds' pretrial submissions.

On October 15, 2010, Lloyds filed an amended answer with claims against all other parties except JPMorgan.  (Dkt. 39.)  Lloyds primarily sought (1) a declaration that Lloyds is entitled to payment of all principal and interest owed on the bonds in accordance with its SBPA; (2) damages against ALL and BNY resulting from any underpayment to Lloyds during the period up to November 5, 2009; and (3) award of attorneys' fees and other costs.

## ARGUMENT

The central issue in this case is whether the Indenture was amended, without Depfa's consent, in violation of Section 5.03(a) of the Depfa SBPA, through the issuance of (a) additional bonds supported by the Lloyds SBPA, or (b) non-parity bonds.  As the party claiming these breaches of contract, Depfa bears the burden of proof.  *See Command Cinema Corp. v. VCA Labs, Inc.*, 464 F. Supp. 2d 191, 198 (S.D.N.Y. 2006) (applying New York law).

The SBPA's are governed by New York law and applicable federal law.  (Trial Exs. 4-5, § 8.02.)  Under New York law, a contract must be enforced according to its terms, and a court may consider extrinsic evidence only if the contract is ambiguous.  *Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.*, 13 N.Y.3d 398, 403-04, 892 N.Y.S.2d 303, 307 (2009).  Whether an ambiguity exists must be determined solely within the four corners of the document, without consideration of outside sources.  The entire contract must be reviewed so that the words at issue can be considered in context.  *Id.* at 404, 892 N.Y.S.2d at 307.

As demonstrated below, the unambiguous terms of the Depfa SBPA and Indenture establish that there was no breach of Depfa's contract rights.  But even if there were an ambiguity, the overwhelming weight of the extrinsic evidence confirms that there was no breach.  Lloyds therefore is entitled to payment, from all available funds in the Revenue Account and Loan Account, in accordance with the quarterly schedule in its SPBA.

**I.**

**UNDER THE PLAIN, UNAMBIGUOUS TERMS OF THE DEPFA
SBPA AND INDENTURE, THERE WAS NO AMENDMENT
OF THE INDENTURE THAT REQUIRED DEPFA'S
<u>CONSENT UNDER SECTION 5.03(A) OF THE DEPFA SBPA</u>**

Depfa claims that ALL's entry into the Second Supplemental Indenture and

Lloyds SBPA, without Depfa's consent, was an "amendment" or "modification" of the

Indenture, and an issuance of Senior Bonds not in "parity" with its earlier-issued Senior Bonds.

Depfa's interpretations are inconsistent with the plain meaning of its SBPA and the Indenture.

**A.     The Terms "Amend" and "Modify" in Section 5.03(a) of the
Depfa SBPA Do Not Refer to Supplemental Indentures to
<u>Issue Additional Bonds or Their Supporting Liquidity Facilities.</u>**

The Depfa SBPA provides that:

[T]he Issuer shall not:

(a) ***Amendments.***  Amend, modify, terminate or grant,  or permit the
amendment, modification, termination or grant of, or consent to, or permit or
suffer to occur any action or omission which results in, or is equivalent to, an
amendment, modification, or grant of a waiver under, the Policy or the Indenture
without the prior written consent of the Bank.  (Trial Ex. 4, § 5.03(a).)

To determine what constitutes an amendment to Indenture, the Depfa SBPA must be read in

context with the related, simultaneously executed Indenture.  *See Gordon v. Vincent Youmans,*

*Inc.*, 358 F.2d 261, 263 (2d Cir. 1965) (New York law requires that all writings that form part of

a single transaction be read together, even though executed on different dates and not all between

the same parties); *Harm v. Frasher*, 5 Cal. Rptr. 367, 372-73 (Cal. App. 1960) (same, under

California law.  Depfa cannot establish a breach of Section 5.03(a), for at least four reasons.

First, the Second Supplemental Indenture and Lloyds SBPA are not an

amendment to the Indenture because the Indenture repeatedly and expressly authorizes the

issuance of additional series of bonds and the execution of the related supplemental indentures and liquidity facilities:

> Additional Bonds may be issued on a parity with Senior Bonds, Senior Subordinate Bonds, Subordinate Bonds or Junior Subordinate Bonds theretofore Outstanding . . . .  (Trial Ex. 1, § 2.1)

> The Corporation and the Trustee, without the consent of or notice to any of the Owners, may enter into an agreement or agreements supplemental to this Indenture, or to any Supplemental Indenture . . . (9) to provide for the issuance of any series of Bonds . . . ."  (*Id.*, § 7.1(9).)

> Credit Enhancement may be provided for any series of Bonds, in accordance with the provisions of the Supplemental Indenture providing for the issuance of such Bonds.  (*Id.* § 5.3(E).)

The definition of "Credit Enhancement" includes purchase agreements and liquidity facilities (*id.*, p. 5), which includes SBPA's.

Thus, the Indenture expressly authorized the acts that Depfa now claims, incorrectly, were amendments or modifications of the Indenture:  (1) entry into a Supplemental Indenture to issue new series of bonds; and (2) entry into a Credit Enhancement such as the Lloyds SBPA.  If these sophisticated parties intended to give Depfa the right to consent to such acts, they would have expressly included such a restriction among the negative covenants in Section 5.03 of the Depfa SBPA.  At very least, they would have used the word "supplement" in Section 5.03(a).  The Court should not read Section 5.03(a) to require Depfa's consent to supplemental indentures or related SBPA's where the parties themselves did not include such terms, especially where the Indenture expressly contemplated the issue of additional bonds under supplemental indentures with supporting liquidity facilities.  *See, e.g., Rowe v. Great Atl. & Pac. Tea Co.*, 46 N.Y.2d 62, 72, 412 N.Y.S.2d 827, 833 (1978) ("[C]ourts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have

-15-

neglected to specifically include. . . .  [L]ack of foresight does not create rights or obligations.");

*Vermont Teddy Bear Co. v. 538 Madison Realty Co.*, 1 N.Y.3d 470, 475, 775 N.Y.S.2d 765, 768

(2004) ("[C]ourts may not by construction add or excise terms, nor distort the meaning of those

used and thereby make a new contract for the parties under the guise of interpreting the

writing.").

        Furthermore, the Indenture expressly incorporates the payment terms of any

supplemental indentures and SBPA's.  In Section 2.4, it provides that "[b]onds of any series shall

bear interest, mature, be subject to redemption or tender, and have such other terms as shall be

set forth in the Supplemental Indenture pursuant to which such Bonds are authorized."  (Trial

Ex. 1, § 2.4.)  Supplemental Indentures, in turn, incorporate the redemption provisions of

SBPA's.  (*See* Trial Ex. 2, § 13.3; Trial Ex. 3, § 16.3.)  In Section 5.3(E), the Indenture provides

that "the Trustee shall pay to the related Credit Provider, as reimbursement for any amounts paid

pursuant to such Credit Enhancement together with interest thereon, such amount as shall be due

from the Corporation or the Trustee thereunder . . . .  (Trial Ex. 1, § 5.3(E), emphasis added.)

Thus, in Sections 2.4 and 5.3(E), the Indenture directs that bonds be paid in accordance with

their supplemental indentures and SPBA's, but it does not restrict the payment schedule or

interest rate.  ALL, therefore, was free to negotiate different terms with Depfa and Lloyds under

their respective SBPA's, without changing a single term of the Indenture.

        Second, under the doctrine of *expressio unius est exclusio alterius*, the expression

of certain items ("[a]mend, modify, terminate or grant") in Section 5.03(a) of the Depfa SBPA

means the exclusion of others ("supplement").  *See, e.g., Israel Disc. Bank Ltd. v. Gottesman (In*

*re Ore Cargo, Inc.)*, 544 F.2d 80, 82 (2d Cir. 1976) (contract giving security interest in "claims"

and other property rights could not be construed to confer a right not conferred by the UCC – a

security interest in tort claims – where sophisticated commercial lender failed to include specific reference to tort claims); *VKK Corp. v. NFL*, 244 F.3d 114, 130 (2d Cir. 2001) (release signed by sophisticated commercial actor did not encompass persons not specifically listed).

Third, the parties' intentional omission of "supplement" in Section 5.03(a) of the Depfa SBPA is confirmed by their use of "supplement" elsewhere in the contract.  The parties consistently used *both* "supplement" and "amend" when they wanted to describe a contract or legal instrument along with any later changes and additions to it.  For example, the parties refer to the Trust Indenture and Supplemental Indenture "as *amended and supplemented* from time to time."  (Trial Ex. 4, p. 1, first WHEREAS clause, emphasis added.)  They refer to the Series V-A-1 Remarketing Agreement and Series V-A-2 Remarketing Agreement "as the same may be *amended, modified or supplemented* from time to time."  (*Id.*, p. 5, emphasis added.)  They also refer to any offering circular, placement memorandum, or similar document "and any *supplements* thereto and updates *and amendments* thereof" (*id.* § 5.01(f)(iii), emphasis added), and to the Offering Memorandum "or in any *amendment or supplement* thereof" (*id.* § 8.05(b), emphasis added).

The Indenture draws the same distinction.  It defines "Indenture" as "this Trust Indenture and any *amendments or supplements* made in accordance with its terms."  (Trial Ex. 1, p. 6, emphasis added.)  It defines "Supplemental Indenture" as "any indenture *supplemental to or amendatory of* this Indenture . . . as any such supplemental indenture may itself be *supplemented or amended* pursuant to such provisions."  (*Id.*, p. 12, emphasis added.)  Article VII is entitled "SUPPLEMENTAL INDENTURES; AMENDMENTS" (*id.*, p. 39) and contains three provisions which authorize the Issuer "*to modify, alter, amend or supplement* this Indenture" to

take certain actions.  (*Id.* § 7.1(10)-(12).)  Thus, the Indenture repeatedly distinguishes between supplementation (adding terms) and amendment (changing terms).

The words "amend" and "modify," therefore, cannot mean supplement, because then the word "supplement" improperly would be rendered superfluous.  *See New York Marine & Gen. Ins. Co. v. LaFarge N. America, Inc.*, 599 F.3d 102, 116 (2d Cir. 2010) ("a court must strive to give meaning to every sentence, clause, and word" of a contract); *Boghos v. Certain Underwriters at Lloyd's of London*, 36 Cal. 4th 495, 503, 115 P.3d 68, 72 (2005) (same).

In Section 5.03(a) of the Depfa SBPA, however, the parties describe the process of changing the Indenture by using "amend" and "modify" without using "supplement."  The word "supplement" is a key word in this transaction and in the bond business because issuers use supplemental indentures to issue new series of bonds (*see, e.g.,* Trial Ex. 1, § 7.1(9); Trial Exs. 2-3), and have them backed by liquidity facilities.  If these sophisticated parties intended to give Depfa a veto over those crucial rights, it would have been extremely easy for them to refer to a "supplement," "supplemental indenture," or "issuance of additional bonds" in Section 5.03(a).  *See George Backer Mgmt. Corp. v. Acme Quilting Co.*, 46 N.Y.2d 211, 218, 413 N.Y.S.2d 135, 138 (1978) (where parties easily could have added a term if it were intended, but did not do so, the omission is presumed intentional).

Indeed, that is exactly what the parties did in Ambac's consent provision:

> Without the prior written approval of the Insurer, the Corporation shall not
> . . . (xi) *amend or supplement this Indenture* or the Insured Bonds; (xii) *issue any additional Senior Bonds* or any Senior Subordinate Bonds, Subordinate Bonds or Junior Subordinate Bonds under this Indenture.  (Trial Ex. 1, § 8.6(xi)-(xii), emphasis added.)

Thus, when these parties intended to grant a consent right to the issuance of additional bonds – a major limitation on a bond issuer's rights – they did so very clearly and explicitly.  They did not rely only on the words "amend" or "modify."

Fourth, the Second Supplemental Indenture contains only minor, immaterial amendments that Depfa does not and cannot claim caused it any harm.  (*See* Trial Ex. 3, § 17.5.) The acts that Depfa complains about – supplementation of the Indenture to provide the terms of the additional series of bonds backed by the Lloyds SBPA (*see id.*, §§ 15.1-17.4) – did not change any term of the Indenture, but instead were consistent with, contemplated by, and anticipated by its terms.  The Lloyds transaction therefore did not amend the Indenture but rather carried out its terms in exactly the manner that was intended by the parties.

## B.  The Series V Bonds Are All in Parity.

Depfa apparently claims that "parity" means different series of Senior Bonds must (a) have the same redemption schedule, or (b) can have different redemption schedules if the principal is paid pro rata based on each bondholder's outstanding principal amount.[5]  Either way, it amounts to the same thing:  disregarding Lloyds' shorter redemption schedule, while enforcing the much higher interest rate that Depfa received in exchange for its longer redemption schedule.

In fact, "parity" means only that the bonds have the same priority of lien against the collateral securing the bonds.  Bonds in parity can have different payment terms as to principal and interest.  This interpretation is entirely consistent with the Indenture, while Depfa's interpretation is not.

---

[5]    For example, if ALL had $2,000,000 available for redemption, Depfa would claim that ALL must pay $1,000,000 each to Lloyds and Depfa, with Lloyds getting four quarterly payments of $250,000 and Depfa getting two semi-annual payments of $500,000.

Take, for example, Section 2.1, which provides that "Additional Bonds may be issued on a parity with Senior Bonds . . . theretofore Outstanding."  (Trial Ex. 1, § 2.1.)  If the additional bonds have the same maturity period as the earlier ones (e.g., a ten-year bond issued in 2005 followed by a ten-year bond issued in 2006), the earlier-issued bonds will have the advantage of earlier redemption from the Pledged Assets.  If the additional bonds instead mature on an earlier or later date than the earlier bonds, then their maturity period will be faster or slower than the earlier bonds.  Equality of redemption schedule is impossible.

Furthermore, the Indenture requires that all series of Senior Bonds are to be paid in accordance with whatever terms are set forth in their respective supplemental indentures and SBPA's.  (*See id.* §§ 2.4, 5.3(E).)  Depfa's interpretation of "parity" improperly would conflict with those terms, or render them superfluous, because then the first issue of Senior Bonds would dictate the payment terms of all later issues.  *See New York Life Ins. Co. v. Hollender*, 38 Cal. 2d 73, 81, 237 P.2d 510, 514 (1951) ("[T]he entire contract is to be construed together for the purpose of giving force and effect to each clause."); *LaFarge*, 599 F.3d at 116 (same).

For the same reasons, "parity" cannot require pro rata principal payments.  In Section 9.4, the Indenture specifies the very limited circumstances when available funds must be paid pro rata.  First, it must be "upon the happening and continuance of any Event of Default the funds held by the Trustee are insufficient for the payment of principal and interest then due on the Bonds."  (Trial Ex. 1, § 9.4(A).)  This condition is not yet satisfied.  Under Section 3.02 of the SBPA's, the banks are due whatever funds are available on their payment dates, and they are due nothing if no funds are available.  So there cannot be a default through insufficiency of funds before February 11, 2013, when the first Series V bonds will mature.

Then, if there has been no acceleration of the principal due, the interest and principal then due are to be paid "ratably . . . without any discrimination or preference (other than Senior Bonds prior to Senior Subordinate Bonds . . . .)." (*Id.* § 9.4(A)(1)(FIRST) & (SECOND).)  Or, if there has been an acceleration of principal due, the unpaid principal and interest then due must be paid "without preference or priority . . . of any Senior Bond over any other Senior Bond . . . to the person entitled thereto without any other discrimination or preference except as to any difference in the respective rates of interest." (*Id.* § 9.4(A)(2), emphasis added.)  Thus, if the Court were to interpret "parity" as always requiring ratable payment of principal, it would render superfluous the provisions in Section 9.4(A) that specify when to pay principal ratably.  Also, by expressly the preserving the different rates of interest on different Senior Bonds, Section 9.4(A)(2) recognizes that there could be different payment terms for principal on different Senior Bonds, but those terms are suspended after acceleration.

Furthermore, Depfa's interpretation of "parity" conflicts with the collateral pledge clause.  It provides a first-priority security interest in the collateral "in order to secure equally and ratably on a parity basis one with the other (except as hereinafter provided), (1) the payment of the principal of and the interest . . . on the Bonds at any time issued . . . according to their tenor and effect." (Trial Ex. 1, p. 2.)  This clause provides that payment on the bonds is "secure[d]" rather than "made" equally and ratably.  Although bonds in parity have an equal lien, they each get paid "according to their tenor and effect," which means according to whatever terms were negotiated for each series.

Also, the Form of Bonds, an exhibit to the Indenture, provides that all Senior series of bonds "rank on a parity . . . with any other senior Bonds issued under the Indenture" (*id.*, p. A-2), without any restriction as to the payment terms of any Senior Bonds.

Finally, Depfa bargained for a ten-year term at a higher interest rate (currently 4.75%), while Lloyds bargained for a five-year term at a much lower interest rate (currently about 2.18%).  Yet Depfa would have the Court interpret "parity" in a manner that enforces literally the banks' interest provisions, while disregarding Lloyds' redemption provisions.  The law forbids an interpretation that selectively enforces some terms and not others.  *See Vermont Teddy Bear*, 1 N.Y.3d at 475, 775 N.Y.S.2d at 768 (contract interpretation cannot serve to add, excise, or change terms); *Harris v. Spinali Auto Sales, Inc.*, 20 Cal. Rptr. 586, 589 (Cal. App. 1962) (same).  In contrast, the other parties' interpretation of parity, as referring to the same priority of lien on the collateral, does not conflict with or negate any contract terms.

## II.

### EVEN IF THE DEPFA SBPA WERE AMBIGUOUS, THE EXTRINSIC EVIDENCE CONFIRMS THAT THERE WAS NO AMENDMENT OF THE INDENTURE THAT REQUIRED DEPFA'S CONSENT UNDER SECTION 5.03(A) OF THE DEPFA SBPA

The Court should rule against Depfa's breach of contract claims based on the unambiguous terms of the contracts.  But if extrinsic evidence were considered, it would only confirm that there was no breach.

**A.    The Extrinsic Evidence Confirms That the Terms "Amend" and "Modify" in Section 5.03(a) of the Depfa SBPA Do Not Refer to Supplemental Indentures to Issue Additional Bonds or Their Supporting Liquidity Facilities.**

**1.    Depfa's Practical Construction of the Depfa SBPA Confirms That There Was No Amendment of the Indenture.**

"There is no better way of ascertaining the meaning and construction of a written contract than to look at the acts and conduct of the parties under it."  *Gordon v. Youmans, Inc.*, 358 F.2d 261, 264 (2d Cir. 1965) (applying New York law); *accord LaFarge*, 599 F.2d at 119 (same).  A practical construction that has occurred "for any considerable period of time before it

comes to be the subject of controversy is deemed of great, if not controlling, influence." *IBJ Schroder Bank & Trust Co. v. Resolution Trust Corp.*, 26 F.3d 370, 374 (2d Cir. 1994) (quoting *Old Colony Trust Co. v. City of Omaha*, 230 U.S. 100, 118 (1913)); *Viacom Int'l, Inc. v. Lorimar Prods., Inc.*, 486 F. Supp. 95, 98 n.3 (S.D.N.Y. 1980) (applying New York law).

In June 2006, Depfa bid to be the liquidity provider for the Series V-A-3, V-A-4, and V-A-5 Bonds, and thus competed against Lloyds for the transaction.  (Trial Ex. 43; Trial Ex. 40, pp. DEPFA0017092-93).  Depfa therefore knew since at least June 2006 that these bonds were going to be issued with a supporting SBPA.  Yet Depfa did not object until over *three years* later, when it complained in a letter to ALL on July 16, 2009 that Lloyds was receiving higher redemption payments.  (Trial Ex. 9.)  Depfa did not assert that there was an amendment of the Indenture, triggering its right of prior consent, until *three years and five months* later, on November 27, 2009.  (Trial Ex. 12.)  Depfa's internal documents do not even mention any amendment of the Indenture until October 8, 2009.  (Trial Ex. 132, § 6.) During those intervening years, Depfa reaped the benefit of the additional bonds providing extensive new collateral to support the payments owed on the Series V-A-1 and V-A-2 Bonds backed by its SBPA.  Depfa started complaining only after it was forced to buy all of the Series V-A-1 and V-A-2 Bonds and no longer had reliable insurance coverage against default.

Thus, Depfa's conduct confirms its understanding that it had no right under Section 5.03(a) of the Depfa SBPA to consent to the issuance of additional bonds or its supporting SBPA.  Because that conduct occurred over a period of years, it has "controlling" weight on interpretation of the contract.  *See IBJ Schroder*, 26 F.3d at 374; *Viacom*, 486 F. Supp. at 98 n.3.

In addition, Depfa was entitled under its SBPA to a $2,500 fee "upon any consent required by the Bank." (Trial Ex. 4, § 2.05(b).) This fee provision was so important to Depfa that it was included both its 2005 and 2006 bids. (Trial Ex. 18, p. 3; Trial Ex. 43, p. 3.) Yet Depfa never requested payment of its fee for an amendment of the Indenture.

During the summer of 2006, Depfa kept informed of the transaction. In a phone conversation in late June 2006, Ms. Peterson told Mr. Park that Lloyds won the bid with a five-year term out. (Peterson Dep. at 61:5-63:23, 145:22-147:16.) On July 18, 2006, Ms. Peterson had a phone conversation with Mr. Park, confirmed in an email to him, concerning a change in ALL's administrative fees to which Mr. Park orally consented. (Trial Ex. 49.) From July 26, 2006 onward, Depfa had access to the Offering Memorandum, a publicly available document, which described the whole transaction in detail. (Trial Ex. 52; Peterson Dep. at 66:8-68:7.) Depfa admitted in its interrogatory answers that it knew, in 2006, that ALL was entering into a second supplemental indenture to issue additional Series V bonds, and that Lloyds would or might be the liquidity provider. (Trial Ex. 176, Response No. 5.) Mr. Park testified in his deposition that he knew, by summer 2006, that Lloyds would provide an SBPA. (Park Dep. at 32:23-33:4, 34:22-35:8.)

Thus, Depfa understood that the Second Supplemental Indenture and Lloyds SBPA did not amend the Indenture within the meaning of Section 5.03(a) of the Depfa SBPA.

**2.      The Drafting and Negotiation History Confirms
          <u>That There Was No Amendment of the Indenture.</u>**

In her handwritten remarks to the draft Indenture, Depfa's counsel requested only the right to consent to "Amendments," not to "Supplemental Indentures." (Trial Ex. 27, pp. 48, 52.) During her deposition, which is designated as evidence, she testified:

Q:      Why did you put that comment at the beginning of Article VIII, entitled "Amendments," and not put such a comment at the beginning of Article VII, entitled "Supplemental Indentures"?

. . . .

THE WITNESS:  Well, in my experience, it's not customary for liquidity providers in insured transactions to have consent rights over supplemental indentures.

Q:      (By Mr. Barres)  And did this transaction follow the normal custom, in your understanding, in 2005?

A:      In that regard, yes.  (Davis Dep. at 208:21-209:9.)

Thus, Depfa's counsel, the drafter of the Depfa SBPA, understood at the time of contracting that Depfa did not have the consent right that it now seeks.

In contrast, Ambac demanded and obtained a consent right to supplemental indentures, additional bonds, and subsequent liquidity providers.  (*See* Trial Ex. 1, § 8.6(xi)-(xii); Trial Ex. 26; Trial Ex. 25, pp. AMB 00001466-68, 1472.)  As Insurer, it was directly liable for any payment default and thus had greater bargaining power than a liquidity provider.

During a conference in summer 2005, Mr. Park requested that Depfa receive the right to consent to subsequent liquidity providers and liquidity contracts.  Ms. Peterson said no.  (Peterson Dep. at pp. 50-52; O'Neill Dep. at pp. 121:15-24:22.)

During his deposition, Mr. Park testified, as Depfa's Rule 30(b)(6) witness, that in 2005, he did not interpret Section 5.03(a) as giving Depfa the right to consent to supplemental indentures that issue additional bonds, or to subsequent liquidity contracts or liquidity providers.  He did not begin to interpret Section 5.03(a) as granting such a consent right until 2008, after the bonds became Bank Bonds.  (Park Dep. at 97:2-99:11.)

At trial, the representatives of all other parties are expected to testify that they understood, in accordance with normal industry practice, that an "amendment" is not a "supplement" and does not include the issuance of additional bonds.  Lloyds has an identical consent provision as Depfa (*see* Trial Ex. 5, § 5.03(a)) and always understood that it does not provide a right to consent to additional bonds.  (Watkins Dep. at 103:9-108:20.)

### 3.     Expert Witness Testimony Confirms the Distinction Between a Supplement and Amendment.

Lloyds' expert, Robert Dean Pope, has been a bond lawyer for 37 years and has worked on over 1,000 bond issues, including many with SBPA's and other credit enhancements. (Trial Ex. 187, p. 1.)  In his experience, bond documents routinely distinguish between addenda that issue additional bonds and those that make substantive changes to the indenture, and the liquidity provider virtually always obtains consent only over the latter.  (*Id.* at 1-3.)

### B.     The Extrinsic Evidence Confirms That the Series V Bonds Are All in Parity.

Depfa's interpretation of "parity" would require the Court to force all Senior Bonds to have equal or ratable payment schedules as to principal.  But Depfa's conduct, plus other evidence, confirms that Depfa had the opposite understanding during the relevant period.

### 1.     Depfa's Practical Construction Confirms That the Series V Bonds Are All in Parity.

In its bid on the 2006 transaction, Depfa incorporated the Bank-Bond redemption provisions of the Depfa SBPA, and made no comment to suggest that those provisions somehow limited ALL's payment options.  (Trial Ex. 43, p. 4, § C.)  By competitively bidding on the payment terms, Depfa confirmed its understanding that its SBPA did not dictate the payment terms for any later-issued Senior Bonds or their liquidity facilities.

In his deposition, Mr. Park confirmed that, when he submitted Depfa's bid, he understood that there might be competing bidders, and that ALL was free to choose whatever redemption schedule it wanted.  (Park Dep. at 203:25-205:6.)

Throughout the summer of 2006, Depfa knew about the Lloyds transaction.  Yet Depfa did no investigation of its terms.  (*Id.* at 34:5-18.)  If a commercially sophisticated party like Depfa believed it had an important right to have all subsequent Senior Bonds paid principal on the same basis as its own bonds, it would have safeguarded those rights by checking the terms of the Lloyds transaction.  It easily could have done so through the publicly available Offering Memorandum, which discloses Lloyds' five-year, quarterly schedule.  (Trial Ex. 52, pp. TS-6 to TS-7.)

Depfa, instead, did not start objecting to unequal redemptions on parity bonds until three years later, on July 16, 2009.  (Trial Ex. 9.)  Just as with the "amendment" issue, Depfa's prolonged practical construction of its contract rights concerning "parity" is entitled to great, even controlling, weight.  *See IBJ Schroder*, 26 F.3d at 374; *Whalen v. Ruiz*, 40 Cal. 2d 294, 301, 253 P.2d 457, 461 (1953).

In contrast, the conduct of the other parties in 2006 onward was entirely consistent with there being no amendment through issuance of non-parity bonds.  There is no record that any party or its counsel thought that Depfa's consent was required for the bond issue or liquidity facility.  ALL represented in the Lloyds SBPA and its corporate Certificate that the 2006 transaction would not violate the terms of any law or agreement.  (Trial Ex. 5, §§ 4.03, 4.11; Trial Ex. 61, ¶ 14.)  ALL's counsel issued formal opinions confirming the legality of the 2006 bond issue.  (Trial Ex. 63, pp. 4-5; Trial Ex. 67, p. 3; Trial Ex. 68.)  On August 2, 2006, ALL issued bonds that explicitly state that all five series of bonds "rank on a parity" with each

other and with any other Senior Bonds issued under the Indenture.  (Trial Ex. 57, pp. ALL0001523, ALL0001528, ALL0001533.)  ALL always understood that the different payment terms in its SBPA's did not take the bonds out of parity.

### 2.   All Parties Understood That Bonds in Parity Are Not Required to Have an Equal or Ratable Redemption Schedule.

The representatives of all parties have testified that bonds in parity can have different redemption schedules and amounts, interest rates, and maturity periods, and that those terms are set forth in the supplemental indentures and SBPA's applicable to each series of bonds. They also testified that bonds are paid pro rata only upon acceleration and liquidation of the collateral.  (Bayus Dep. at 43:7-49:11; Roemlein Dep. at 86:9-90:14, 197:12-201:2; Peterson Dep. at 34:6-39:3; Davis Dep. at 171:6-179:3, 212:21-214:25; Watkins Dep. at 60:15-61:8, 79:5-83:3, 96:9-18; Park Dep. at 124:2-128:21.)

On May 25, 2005, in her comments on a draft First Supplemental Indenture, Depfa's counsel wrote that "Bank Bonds are parri passu with all other Bonds."  (Trial Ex. 24, last page.)  In her deposition, she explained her comments as follows:  "Pari passu" and "parity" are synonymous.   Bank Bonds and non-Bank Bonds are in parity even though the former typically have shorter payment schedules.  The consequence of parity is that "[i]f there's not enough money to pay everybody, then it's done ratably," but so long as there is enough money to make the required payments, each bond gets paid according to its own schedule.  (Davis Dep. at 212:21-214:25.)  Her deposition is designated as substantive evidence.  Thus, Depfa's counsel understood in 2005 that bonds in parity can have different payment schedules and get paid ratably only in the shortfall situation described in Section 9.4(A) of the Indenture.

Also, in June 2006, ALL received bids from four liquidity banks:  Depfa, which

bid a ten-year term-out (Trial Ex. 43, p. 4, § C), and from Lloyds, Bank of Nova Scotia, and

Fortis Bank, all of whom bid five-year term-outs (Trial Ex. 41, pp. 3, 5, §§ 2(A)(i), 2(D); Trial

Ex. 181, p. 2; Trial Ex. 183, p. 3, § 5).  None of these sophisticated industry players understood

"parity" as requiring anybody to match the term-out in the Depfa SBPA from the previous year.

### 3. Expert Testimony Confirms That, in Standard Industry Usage, Bonds in Parity Have the Same Priority of Lien but Are Not Required to Have the Same or a Ratable Redemption Schedule.

Lloyds' expert, Mr. Pope, has worked on hundreds of indentures with similar

parity provisions as the ALL Series V Indenture.  (Trial Ex. 187, p. 10.)  He testified that

"parity" is a term of art in the bond industry that means a common priority of claim by multiple

bonds on pledged collateral.  It does not require that parity bonds have equal payment terms, and

it is normal industry practice for them not to.  (*Id*. at 7-9.)  In rebuttal to Depfa's expert, he also

opined that it is standard industry practice to pay principal according to the terms of the

supplemental indentures and credit enhancements of each series of bonds, and to pay principal

ratably only when there are insufficient funds to make a required payment then due on a specific

payment date, or on acceleration.  (Trial Ex. 193, pp. 6-7.)

### III.

### ALL AND BNY ARE REQUIRED TO USE THE AVAILABLE FUNDS IN BOTH THE REVENUE ACCOUNT AND LOAN ACCOUNT TO REDEEM BONDS ACCORDING TO THE PAYMENT SCHEDULES IN THE SBPA'S

Because the Lloyds transaction did not violate any right of Depfa, the Court

should direct payment to Lloyds and Depfa as if their payment schedules are both in effect.  But

first, there is a question of contract interpretation that affects how the payments will be made:

whether the quarterly and semi-annual schedules for mandatory redemptions apply to both the funds in the Revenue Account and Loan Account, or just the Revenue Account.  Over 80% of the student loan collections are Recoveries of Principal (which normally get transferred to the Loan Account) rather than Revenues (which normally stay in the Revenue Account).  (*See* Trial Ex. 1, §§ 5.3(A), 5.4(A).)

A.      **Both Revenue and Loan Account Funds Are Subject to Mandatory Redemption.**

Section 3.02 of the SBPA's provides for mandatory quarterly and semi-annual redemptions "from all amounts on deposit in the Revenue Fund" (Trial Exs. 4-5, § 3.02), which is the Revenue Account.  Other contract provisions, however, require that Loan Account funds also be used for the mandatory redemptions.[6]

The 2005 and 2006 closing documents each include a Certificate and Agreement, which provides:

> If a Recycling Suspension Event continues for 30 consecutive days, then the Corporation shall Direct the Trustee to transfer amounts in the Loan Account to the Redemption Account for the purpose of redeeming Bonds in accordance with the procedures set forth in the Indenture . . . .  (Trial Exs. 6-7, § 4.2.)

A Recycling Suspension Event occurred on March 11, 2008, which is 30 days after the first Bank Bond was purchased.  (*See id.* §§ 1.1(iii); Stipulations ¶¶ 23-24.)  So as of April 11, 2008, ALL was required to direct the transfer of any Loan Account funds to the "Redemption Account," which is not mentioned in the Indenture.  The Redemption Account must be either the Revenue

---

[6]      Lloyds uses the term "mandatory redemptions" to refer to the quarterly and semi-annual redemptions required by the first sentence of Section 3.02 of the SBPA's, and to distinguish them from (1) optional redemptions under the second sentence of Section 3.02 of the SBPA's, and (2) special redemptions under Section 3.8(ii) of the Indenture.

Account or the Payment Account, which are the only two accounts used to pay bondholders. (*See* Trial Ex. 1, §§ 5.3(B)(5), 5.3(F), 5.4(A)(ii).)

Most likely, "Redemption Account" is a typo for Revenue Account, which means that all Loan Account funds are transferred to the Revenue Account and become Revenue Account funds captured by Section 3.02 of the SBPA's. But even if the "Redemption Account" were the Payment Account, the end result is the same. The Certificate and Agreement requires that the Loan Account funds be used to redeem bonds "in accordance with the procedures set forth in the Indenture." (Trial Exs. 6-7, § 4.2.) The Indenture incorporates the payment schedules of the SBPA's. (*See* Trial Ex. 1, § 5.3(E); Trial Ex. 2, § 13.3; Trial Ex. 3, § 16.3.) The Indenture further provides:

> The Trustee shall, as directed by the Corporation, . . . (ii) transfer from the Loan Account to the Payment Account *on each Interest Payment Date or other redemption date* the amounts required for the payment of the principal, if any . . . due on the Outstanding Bonds on such date not provided for pursuant to Section 5.3(B)(5) . . . . (Trial Ex. 1, § 5.4(A)(ii), emphasis added.)

The references to "Interest Payment Date" (which is defined to include "any date of redemption," *id.*, p. 6) and "other redemption date" must include the mandatory redemption dates under Section 3.02 of the SBPA's. So this section requires that, on each quarterly and semi-annual redemption date – which are dates when principal is "due on the Outstanding Bonds" – ALL must direct the funds to be transferred into the Payment Account for payment to the bondholders. The concluding phrase "not provided for pursuant to Section 5.3(B)(5)" must modify "the payment of the principal."[7] The payment of bond principal with Loan Account

---

[7]    The phrase "not provided for pursuant to Section 5.3(B)(5)" cannot modify "Interest Payment Date" or "such date" because then it would be irreconcilable with Section 5.3(B)(5), which expressly provides for payment "[o]n each Interest Payment Date or other Payment Date." The definitions of Interest Payment Date and of Payment Date encompass all possible payment dates. (Trial Ex. 1, pp. 6, 8.)

funds is not provided for under Section 5.3(B)(5) because, like all waterfall provisions, it provides for payment only with Revenues.  So Section 5.4(A)(ii) means that available Loan Account funds must be paid to Lloyds and Depfa on the quarterly and semi-annual mandatory redemption dates set by Section 3.02 of their SBPA's.

This reading is confirmed by Section 5.4(B), which commands that "[a]mounts in the Loan Account *shall be* expended . . . (iv) to pay when due the principal . . . at maturity *or earlier redemption*."  (*Id.* § 5.4(B)(iv), emphasis added.)

It is anticipated that BNY or ALL will argue that the Loan Account funds could be used to redeem bonds by special redemptions under Section 3.8(ii) of the Indenture, which are not tied to any schedule.  But Section 3.8(ii) is a general grant of power to the Issuer to use excess funds to redeem bonds.  Section 3.8(ii), unlike Sections 5.4(A)(ii) and 5.4(B)(iv), does not specifically address situations in which Loan Account funds must be used to pay principal on redemption dates prior to maturity.  If ALL could use available Loan Account funds for special redemptions when it chooses under Section 3.8(ii), those same funds would not be available for mandatory redemptions on the required quarterly and semi-annual dates.  Under well-established contract principles, this tension must be resolved in favor of the more specific provisions, which means using the Loan Account funds for mandatory redemptions.  *See National Ins. Underwriters v. Carter*, 17 Cal. 3d 380, 386, 551 P.2d 362, 366 (1976) (a specific provision trumps an inconsistent general provision).

But if any doubt still remains, ALL's conduct and testimony easily resolve it.  On seven dates over the course of a year – October 27 and November 12, 2008, and January 6, April 10, April 22, July 1, and October 5, 2009 – ALL used the available Recoveries of Principal (*i.e.*, funds held normally in the Loan Account) to make or attempt mandatory quarterly and semi-

annual redemptions to the banks.  (Peterson Dep. at 92:20-94:19, 121:20-122:9; Stipulations ¶ 25.)  In letters dated August 4 and November 24, 2009, ALL informed Depfa that it was obligated to give effect to the banks' mandatory redemption schedules, resulting in higher payments to Lloyds.  (Trial Exs. 10-11.)  In its interrogatory answers, ALL confirmed that the payments were made on the banks' "Quarterly Anniversary Date" or "Semi-Annual and Quarterly Anniversary Date."  (Trial Ex. 178, last two pages.)  ALL's practical construction of the payment terms, over a year, is entitled to great weight in contract interpretation.  *See Davenport v. Davenport Foundation*, 36 Cal. 2d 67, 73-74, 222 P.2d 11, 16 (1950) (trust administrator's practical construction of trust instrument is entitled to great weight in its interpretation); *IBJ Schroder*, 26 F.3d at 374; *Viacom*, 486 F. Supp. at 98 n.3.

Furthermore, Ms. Bayus testified in her deposition (designated as substantive evidence) that she understood in 2005 that Loan Account funds would be paid on the SBPA schedule after suspension of loan recycling.  (Bayus Dep. at 73:11-74:16.)  She served as ALL's counsel and bond counsel.  (*Id.* at 10:13-11:20.)  So ALL, the party with primary responsibility for bond redemption, always understood that Loan Account funds had to be used for mandatory redemptions under the schedule in the SBPA's.

As a final aid to construction, the Court should construe Section 5.4(A)(ii) against ALL, the party that drafted it.  *See Victoria v. Superior Court*, 40 Cal. 3d 734, 745, 710 P.2d 833, 839 (1985).

**B.     Even if the Loan Account Were Not Subject to Mandatory Redemption, ALL Was Required To Keep the Recoveries of Principal in the Revenue <u>Account, Thus Making Them Available for Mandatory Redemption.</u>**

Without the Insurer's prior written approval, ALL could not "transfer any funds to the Loan Account or acquire any Eligible Loans after a Recycling Suspension Event."  (Trial

Ex. 1, § 8.6(xiii).)  There is no evidence that Ambac ever gave such approval.  ALL therefore

was required, no later than April 11, 2008, to cease transferring the principal collections from the

Revenue Account to the Loan Account.  The practical effect of such a required suspension is to

keep both the Revenues and the Recoveries of Principal in the Revenue Account, making all

those funds available for redemption under Section 3.02 of the SBPA's.

      Indeed, that is what ALL did, belatedly.  In fall 2008, ALL stopped transferring

the Recoveries of Principal from the Revenue Account to the Loan Account, and instead

transferred them to the Payment Account to be used for bond redemption.  ALL's cash-flow

reports show an extreme decline in the Loan Account balances after September 2008.  (*See* Trial

Ex. 171, p. ALL001726, Loan Account balance of $27,219,718 in September 2008;

p. ALL0017246, Loan Account balance of $85,232 on April 3, 2009; p. ALL0017245, Loan

Account balance of $35,841 on June 22, 2009.)  In June 2010, ALL continued this practice by

creating a redemption sub-account to the Payment Account to hold Recoveries of Principal for

bond redemption.  (Trial Ex. 166.)  Thus ALL confirmed by its conduct that, after the bonds

become Bank Bonds, Recoveries of Principal are no longer supposed to be Loan Account funds.

**C.**  **The Court Should Base Its Monetary Award to Lloyds**
        **on Scenario 1 of the Report of Lloyds' Economic Expert.**

      The contract language and extrinsic evidence establish that both Revenue and

Loan Account funds were meant to be used for mandatory redemptions.  Nevertheless, out of

caution, Lloyds requested that its economic expert, Jack E. Blumenthal, compute the amounts

owed to each bank under two scenarios.

Scenario 1 is the base case that assumes both available Revenue Account and Loan Account funds must be used for mandatory redemptions.  (Trial Ex. 195, pp. CDM00004-5.)

Scenario 2 is the alternative case, which applies if the Court disagrees with Point III.A-B above, and concludes that only Revenue Account funds (*i.e.*, interest collections) must be used for mandatory redemptions under Section 3.02 of the SPBA's, while Loan Account funds (*i.e.*, Recoveries of Principal) must be used for special redemptions under Section 3.8(ii) of the Indenture.  Because Section 3.8(ii) gives ALL discretion as to date and allocation of special redemptions, Scenario 2 assumes that ALL's redemption dates through November 5, 2009 were permitted, and that ALL would have continued to redeem bonds in the same ratio (61.67% to Lloyds, 38.33% to Depfa) and frequency.  (*Id.* at CDM00005, 14-15.)  Under Scenario 2, there are no funds available in the Revenue Account to redeem bonds after paying the higher-priority interest and expenses owed under Section 5.3(B)(1)-(5) of the Indenture.  (*Id.* at CDM00016, ¶ 2.2.1.)

Thus, if only Revenue Account funds are used for mandatory redemptions, the redemption schedules in Section 3.02 of the SBPA's would be worthless to the banks.  The parties could not have intended that result.  The purpose of the schedule is to redeem bonds promptly in a crisis situation, and to minimize the bonds left outstanding at maturity.  That purpose would be frustrated if principal collections (which are most of the collections) could be distributed by the Issuer to Bank Bond holders however and whenever it wanted.  For this additional reason, the Court should use Mr. Blumenthal's Scenario 1 as the model for any monetary award.

**IV.**

**LLOYDS IS ENTITLED TO MONETARY RELIEF**

"The general rule for measuring damages for breach of contract has long been settled. It is the amount necessary to put the plaintiff in the same economic position he would have been in had the defendant fulfilled his contract." *Indu Craft, Inc. v. Bank of Baroda*, 47 F.3d 490, 495 (2d Cir. 1995). As explained in subsections IV.A through E below, Lloyds seeks an award of money damages and/or distribution of the stake in the following amounts, based on Scenario 1 in Mr. Blumenthal's expert report, to make Lloyds whole for all amounts owed to it under the Lloyds SBPA:

(1)  Payment by ALL from the trust of all principal and interest owed to date, which is $41,273,337 as of August 31, 2011 (the date of the most recently available trust account statements). This figure includes $12,639,949 of damages for underpayment through November 5, 2009, to be paid by ALL out of the trust.

(2)  $2,007,872 in damages for overpayment of bond interest as of August 31, 2011, which in turn resulted from improper redemption payments, to be paid by BNY or, alternatively, by ALL out of the trust.

(3)  $1,487,677 in damages for overpayment of ALL's administrative fees as of August 31, 2011, to be paid by BNY or, alternatively, by ALL out of the trust.

(4)  $2,768,790 in damages for failure to timely suspend loan recycling, to be paid by ALL out of the trust.

(5)  Disgorgement into the trust of $436,147 of the legal fees and expenses of BNY, which were paid out of the trust for defense of the claims against it in this action.

The total judgment would be $47,973,823, of which BNY is potentially liable for $3,931,696, plus prejudgment interest.  If the Court instead awards damages under Scenario 2 of the Blumenthal report, Lloyds seeks $25,490,586 for principal and interest owed (including $1,968,843 through November 5, 2009); $803,651 for overpayment of bond interest; $1,139,812 for overpayment of ALL's administrative fees; $1,755,763 for improper loan recycling; and $436,147 for disgorgement of BNY's legal fees.  The total judgment then would be $29,525,959, of which BNY is potentially liable for $2,379,610, plus prejudgment interest.

Because ALL's liability is limited to the Pledged Assets (Trial Ex. 5, § 8.12), Lloyds requests that, whenever both BNY and ALL are liable, the payment come from BNY so that Lloyds does not get paid out of the trust with its own money.

Because ALL's liability is limited to the Pledged Assets, Lloyds suggests that all amounts owed by ALL to both banks be paid in the form of bond redemptions.  If, for any reason, the trust lacks sufficient cash to make any payment that the Court orders to be made from the trust, then ALL should be ordered to use incoming student-loan collections to make such payment before resuming debt service on the bonds.

## A.      Lloyds Is Entitled to the Payment of All of the Principal and Interest Owed to It Through the Present Date.

Lloyds requests a declaration and monetary award of all amounts owed through the present.  A federal court may declare the rights of interested parties "[i]n a case of actual controversy . . . whether or not further relief is or could be sought."  28 U.S.C. § 2201(a) (2006).  A substantial and immediate controversy exists between the parties as to how the Series V trust funds should be distributed to Lloyds and Depfa.  (Stipulations ¶ 34.)

Mr. Blumenthal computed all amounts owed to Lloyds and Depfa in principal and interest through August 31, 2011.  He also subtracted all amounts previously paid to the banks as principal and interest.  The total amounts owed, minus payments made, equals the net amount due to each bank as of August 31, 2011.  The net amount owed to Lloyds through August 31, 2011 is $41,273,337 under Scenario 1, or $25,490,586 under Scenario 2.  Depfa, in turn, should be awarded $2,793,303 under Scenario 1 or $15,416,670 under Scenario 2.  (Trial Ex. 195, pp. CDM00019-20, 41-42.)

These amounts also account for any overpayment and underpayment to both banks through November 5, 2009, including an overpayment to Depfa of $10,219,480 in Scenario 1, which is subtracted from the total owed to Depfa as of August 31, 2011.  (*Id.* at CDM00018-19, 41.)  This way, each bank gets the total amount that it was entitled to under its SBPA.

Because these amounts represent what each bank should have been paid in principal and interest out of the Pledged Assets, Lloyds requests that ALL be directed to pay them out of the Pledged Assets.  These figures, of course, should be updated.  The amounts owed to each bank will change as new student-loan collections enter the trust, and as interest is paid out.  Mr. Blumenthal's report relies on the monthly trust account statements to determine the cash flows in and out of the trust.  Lloyds will be prepared to submit updated computations at the trial, and will, if the Court requests, do so at any time afterward.

**B.      ALL and BNY Failed To Pay Lloyds All of the Principal
          Owed from May 2008 Through November 2009.**

During the period from May 11, 2008 (Lloyds' first redemption date) through

November 5, 2009 (the date of the last redemption actually made), ALL and BNY failed to

redeem Lloyds' bonds with available funds on the quarterly anniversaries.

**1.      Payment Defaults Occurred in May 2008 Through November 2009.**

ALL was obligated to pay principal and interest when due on the Lloyds bonds

under Sections 3.01 and 3.02 of the Lloyds SBPA, Section 6.1 of the Indenture, and Sections

16.1 to 16.3 of the Second Supplemental Indenture.

Section 3.02 of the Lloyds SBPA provides, "The Issuer agrees to cause the

redemption of Bank Bonds in quarterly installments, commencing on the date which is three

months after the Bank Purchase Date . . . ." This clause requires redemptions on the quarterly

dates measured from each of Lloyds' purchase dates, and gives no discretion as to the dates.

ALL was aware of the dates and listed them in its correspondence. (Trial Ex. 116,

p. BNY0008125; Trial Ex. 10, p. DEPFA10108226.) The Lloyds SPBA provides that ALL's

obligations are "absolute, unconditional and irrevocable and shall be paid or performed strictly in

accordance with the terms of this Agreement under all circumstances whatsoever." (Trial Ex. 5,

§ 8.11.) Yet ALL redeemed Lloyds' bonds only on other dates: October 27, 2008, and January

6, April 10, July 1, October 5, and November 5, 2009. The failure to pay when due is, by itself,

an Event of Default. (*See* Trial Ex. 1, § 9.1(1); Trial Ex. 5, § 7.01(a).)[8] But ALL also underpaid

Lloyds.

---

[8]      A finding of an Event of Default is legally significant regardless of any damages because it
enables the bondholder to exercise remedies under the Indenture, such as acceleration. (*See* Trial
Ex. 1, § 9.2.) Those remedies will be exercisable if and when the Wisconsin injunction is lifted.

Mr. Blumenthal's report tracks the daily balances in the trust accounts from January 2008 onward.  As shown in Scenario 1, funds were available for mandatory redemption of Series V-A-3, V-A-4, and V-A-5 Bonds on 37 quarterly dates from May 12, 2008 through September 21, 2009.  (*See* Trial Ex. 195, pp. CDM00310-18.)  ALL first redeemed Lloyds bonds on October 27, 2009 in the total amount of $12,500,000.  (Stipulations ¶ 25.)  But there was $24,300,000 available for redemption of Lloyds bonds on May 12, 2008 alone (Trial Ex. 195, p. CDM000310), plus an additional $3,400,000, in total, available for redemption on the quarterly dates running from May 13 to September 25, 2008 (*id.* at CDM00310-12).  During the period through November 5, 2009, after accounting for all required principal and interest payments subtracting all payments actually made, Lloyds was underpaid a total of $12,639,949, while Depfa was overpaid a total of $10,219,480.  (*Id.* at CDM00018-19, 41-42.)

But even under Scenario 2 of the Blumenthal report, which assumes ALL had discretion to redeem bonds on the dates that it chose, ALL failed to use all of the funds available for redemptions, resulting in Lloyds being underpaid $1,968,842.  (*Id.* at CDM00019, 42.)

## 2.     BNY Is Liable for the Damages Resulting from the Improper Redemptions, Including Overpayment of Bond Interest.

BNY, as Trustee, had payment obligations.  Section 5.3(B)(5) of the Indenture provides that "[t]he Trustee shall pay out of the Revenue Account" the interest and principal on Senior Bonds.  Section 5.3(E) provides that "the Trustee shall pay to the related Credit Provider [of a Credit Enhancement] . . . such amount as shall be due from the Trustee or Corporation thereunder . . . ."  Section 5.4(A)(ii) requires the Trustee, as directed by the Corporation, to use Loan Account funds to redeem bonds on required redemption dates.  Sections 16.1 to 16.3 of the Second Supplemental Indenture require the payment of all principal and interest on bonds,

without restricting that obligation to either the Issuer or Trustee.  In addition, in Section 10.1 of the Indenture, BNY agreed to be the fiduciary of all bondholders.

BNY, presumably, will cite Indenture provisions that allow it to rely on certificates and directions of the Issuer, without investigation.  (*See* Trial Ex. 1, §§ 10.3(a), (f).)  But these protections apply "[e]xcept as otherwise provided in Section 10.2."  (*Id.* § 10.3.)  That section, in turn, provides that the Trustee is never relieved from liability "for its own negligent action, its own negligent failure to act."  (*Id.* § 10.2(c).)  The Trustee, furthermore, is not liable for the good-faith error in judgment of a Responsible Officer "unless it is proven that the Trustee was negligent in ascertaining the pertinent facts."  (*Id.* § 10.2(c)(2).)  And the Trustee's right to rely on certificates from the issuer applies "only in the absence of negligence or bad faith on its part," and only if the certificates "conform[] to the requirements of this Indenture."  (*Id.* § 10.2(a)(2).)  So if BNY was negligent, it is liable for the damages caused by underpayment to Lloyds through November 2009.

ALL was required to redeem Lloyds' bonds on the quarterly dates.  The language of Section 3.02 leaves no room for discretion.  In correspondence with BNY, ALL acknowledged the required payment schedule.  (Trial Ex. 10, pp. DEPFA10108223-26; Trial Ex. 116, p. BNY0008125.)  It should have been obvious to BNY that ALL was not redeeming bonds on the quarterly dates required by the Lloyds SBPA.

Furthermore, Lloyds has a total of 52 payment days per year (13 purchase dates, times 4), while Depfa has only 18 (9 purchase dates, times 2).  Virtually all of Depfa's purchase dates are also Lloyds' purchase dates.  Depfa purchased only $300,000 out of $190,000,000 of its bonds on dates other than Lloyds purchase dates.  (*See supra* p. 9, table listing bank purchases.)  The result is that Lloyds has many payment dates when it does not have to share

available funds with Depfa, while Depfa has no significant payment dates when it does not share with Lloyds. This fortuitous alignment compounds the advantages of Lloyds' faster redemption schedule. It should have been obvious to BNY that ALL's method for redeeming bonds – alternating between a mechanical 67-33 split in favor of Lloyds, and a mechanical 50-50 split (Trial Ex. 178, last 2 pages) – could not possibly be correct, or give Lloyds the full advantage of its redemption schedule.

Here, BNY followed redemption instructions from ALL that obviously violated the payment terms of the Indenture and the SBPA's. BNY, therefore, acted negligently and is not entitled to the protection of the liability-limiting clauses of the Indenture. *See, e.g., New York State Medical Care Facilities Finance Agency v. Bank of Tokyo Trust Co.*, 163 Misc. 2d 551, 556-61, 621 N.Y.S.2d 466, 470-72 (Sup. Ct. N.Y. Cty. 1994) (indenture trustee that negligently performs ministerial and administrative tasks is liable for resulting injury), *aff'd*, 216 A.D.2d 126, 629 N.Y.S.2d 3 (1st Dep't 1995). BNY, therefore, is liable for any damages suffered by Lloyds through November 5, 2009 resulting from improper bond redemption.

To avoid double recovery, Lloyds is not seeking damages from BNY for the net underpayment of principal and interest of $12,639,949 under Scenario 1, or $1,968,842 in Scenario 2, through November 5, 2009. Those amounts were owed to Lloyds from the trust and should be paid by ALL from the trust. Lloyds, however, seeks damages from BNY for the additional loss suffered by the trust (and by Lloyds) as a result of the improper redemption payments: the overpayment of bond interest in the amount of $2,007,872 under Scenario 1, or $803,651 under Scenario 2. (*See* Trial Ex. 195, p. CDM00020, "Interest Owed.") This overpayment of interest resulted from the improper under-redemption of Lloyds' bonds beginning in May 2008. Mr. Blumenthal's report reconstructs how the principal and interest

should have been paid and subtracts the overpayment of interest from the total amount owed to Lloyds (and does the same with Depfa).  (*Id.* at CDM00019-20, 41-42.)  But Lloyds cannot be made whole just by receiving what should have been paid.  The overpayment of interest removed $2,007,872 from the Pledged Assets that otherwise would have been available to redeem Lloyds' bonds, and this amount must be paid to Lloyds to make it whole.  Lloyds also is entitled to that interest because its bonds were redeemed later than required.  There is no double recovery because Mr. Blumenthal subtracted that amount from the total owed to Lloyds.

In addition, BNY should be required to pay the prejudgment interest on the underpayment of $12,639,949 in Scenario 1, or $1,968,842 in Scenario 2.  Although Lloyds can and should be compensated for these underpayments from the trust, BNY's breaches of contract and fiduciary duty, in making the improper redemption payments, caused Lloyds to lose the time value of that money.  If the prejudgment interest were instead paid by ALL out of the trust, Lloyds would be paid, in substantial part, with its own money.

## C.   Lloyds Is Entitled to Damages Resulting from the Overpayment of ALL's Administrative Fees.

The Certificate and Agreement provides that certain fees of ALL "shall not be exceeded without the prior written consent of Ambac, notwithstanding anything in the Indenture."  (Trial Exs. 6-7, § 3.)  They include administrative fees of 50 basis points (*i.e.*, 50 x .01%) per year of the principal amount of eligible loans, of which 30 basis points are the Base Administrative Fee.  (*Id.* § 3.5.)

The Base Administrative Fee is in the third paragraph of the waterfall (Trial Ex. 3, § 17.5(b)), while bond principal is in the fifth paragraph, and other administrative fees are in the tenth paragraph (Trial Ex. 1, §§ 5.3(B)(5), (10) & p. 10, definition of "Program Expenses").

Therefore, only the Base Administrative Fee has priority over Bank Bond redemptions.  As

shown in ALL's statement of fees, and confirmed by the trust account statements, ALL directed

payment to itself of $4,625,860 in administrative fees[9] after the bonds became Bank Bonds.

(Trial Ex. 184; Trial Exs. 204-05.)  As computed in the Blumenthal report, ALL should have

paid itself only Base Administrative Fees totaling $2,775,516.  (Trial Ex. 195, p. CDM00007,

¶ 1.3.1.2, & p. CDM00045, Summary Ex. E.)  Thus, ALL overpaid itself $1,850,344, thereby

reducing the funds available for bond redemption.

      Mr. Blumenthal's report shows that Lloyds was entitled to 80.4% of all principal

payments due as of August 31, 2011 under Scenario 1, and 61.6% of all principal payments

under Scenario 2.[10]  These percentages should be used to allocate Lloyds and Depfa's respective

shares of the $1,850,344.  Thus, Lloyds should get $1,487,677 under Scenario 1, or $1,139,812

under Scenario 2.

      BNY is a party to the Certificate and Agreement, which restricts the payment of

administrative fees.  (Trial Ex. 7, §§ 3, 3.5.)  BNY is required by the Indenture to make the fee

payments out of the waterfall pursuant to "a Certificate of an Authorized Officer" of ALL.  (Trial

Ex. 1, § 5.3(B)(3), (10); Trial Ex. 3, § 17.5(b).)  Where, as here, Certificates "are specifically

required to be furnished to the Trustee, the Trustee is under a duty to examine same to determine

whether or not they conform to the requirements of the Indenture."  (Trial Ex. 1, § 10.2(a)(2).)

---

[9]    To be conservative, Lloyds includes only the administrative fees paid after all of the bonds became Bank Bonds, even though, during the period of February-June 2008, some of the bonds already were Bank Bonds and should have yielded only the Base Administrative Fee.

[10]   These percentages are calculated as follows.  In Scenario 1, as of August 31, 2011, Lloyds is entitled to $70,100,000 of principal, and Depfa to $17,100,000, which is a total of $87,200,000. (Trial Ex. 195, pp. CDM00019-20.)  Lloyds percentage of the whole is 80.4%.  In Scenario 2, Lloyds is entitled to $52,100,000 of principal, and Depfa to $32,500,000, for a total of $84,600,000.  (*Id.*)  Lloyds' percentage is 61.6%.

Had BNY done even a cursory examination, such as comparing the fee amount to the outstanding student-loan principal amounts, it would have seen that ALL was directing overpayment of its fees through non-conforming Certificates. Yet BNY paid the fees without objection or inquiry. BNY, therefore, is liable for the amounts specified in the previous paragraph.

Lloyds demands damages from BNY for (1) overpayment of bond interest resulting from improper bond redemption; and (2) overpayment of ALL's administrative fees. These amounts were permanently lost to the trust and to Lloyds as a result of BNY's misconduct. BNY should have been aware that its contracts required key changes when the banks became Bank Bonds, which is a crisis situation. Those changes include new redemption schedules and a 40% in reduction in ALL's fee. BNY should have had basic controls in place to alert it to those requirements. Instead, BNY did nothing but carry out obviously incorrect payment instructions, thereby breaching its contractual and fiduciary duties.

**D.**     **Lloyds Is Entitled to Damages Resulting from the
Failure to Suspend Loan Recycling When Required.**

Both Lloyds and Depfa first purchased bonds on February 11, 2008. (Stipulations ¶¶ 23-24.) ALL therefore was required to suspend loan recycling on March 12, 2008, and use those funds to redeem bonds in accordance with the Indenture. (Trial Exs. 6-7, §1.1(iii), 4.2.) As shown in the Blumenthal Report, ALL spent a total of $2,859,205 on loan recycling from March 12 through September 26, 2008. (Trial Ex. 195, p. CDM00009, ¶ 1.3.4.2; p. CDM00044.) The trust account statements from that period show these expenditures as entries entitled "FUNDS WIRED TO JPMORGAN CHASE BANK, REQUISITION [number]." (Trial Ex. 202.) Requisitions confirm that those expenditures were for loan origination. (Trial

Ex. 203.)  Of the amounts spent for improper loan recycling, $2,768,790 should have gone to

Lloyds in bond redemptions under Scenario 1; and $1,755,763 should have gone to Lloyds under

Scenario 2.  (Trial Ex. 195, pp. CDM00044.)

Because the improperly spent amounts were used to purchase new loans that

became trust collateral, Mr. Blumenthal removed the $2,859,205 from the net amount owed to

both banks as of August 31, 2011 to prevent double-counting.  (*Id.* at CDM00009, ¶ 1.3.4.2;

CDM00019-20, 41-42.)  But it does not change the fact that ALL's failure to timely suspend loan

recycling caused Lloyds to lose $2,768,790 (or alternatively, $1,755,763) that would otherwise

have been used to redeem bonds.  ALL therefore is liable to pay that amount to Lloyds out of the

Pledged Assets.

**E.     BNY Should Disgorge Its Legal Fees and**
**        Expenses Paid from the Trust for This Action.**

On August 31, 2010, Lloyds and Depfa asserted their claims against BNY for

failure to make proper redemptions.  (Dkt. 20-21.)  BNY's representative, Dennis Roemlein,

testified that some of BNY's legal fees for this litigation have been paid out of the trust.

(Roemlein Dep. at 271:17-272:22.)  From September 2010 onward, at least $436,147 of fees

have been paid out of the trust to BNY's counsel.  (Trial Ex. 195, pp. CDM00243-50, "Fulbright

& Ja. Legal Fees" column.)

Under Section 10.5(c) of the Indenture, the Trustee is entitled to be indemnified

for the costs of defending itself against a claim or liability arising from the performance of its

duties, but only if such liability or expense was "incurred without negligence."  If the Court

agrees that BNY was negligent in the performance of its duties (*see supra* Point IV.B-C), then it

should order BNY to disgorge, back into the trust, the $436,147 that have been paid to its

counsel out of the trust.  If any further fees and expenses of BNY are paid out of the trust with respect to this litigation, they also should be disgorged.

## V.

### THE COURT SHOULD DECLARE HOW THE PAYMENTS WILL BE MADE OUT OF THE SERIES V TRUST GOING FORWARD

After paying whatever monetary relief is ordered by the Court, ALL and BNY need direction on how to pay any leftover trust funds and future collections to the banks.  For all of the reasons set forth in Points I-III above, the Court should declare that ALL and BNY shall use all available funds to redeem bonds on the precise quarterly and semi-annual dates provided under Section 3.02 the Lloyds and Depfa SBPA's.  All Revenues and Recoveries of Principal in the Revenue Account, Loan Account, and Payment Account should be considered available funds for the purpose of redeeming bonds, after accounting for the interest and expense payments required by Section 5.3(B)(1)-(5) of the Indenture.  No payments below the fifth step of the waterfall (including any administrative fees of ALL above 30 basis points) should be made out of the trust.  If, for any reason, ALL lacks the ability to direct payment according to the banks' schedules, then ALL should be required to engage somebody who can.

## VI.

### LLOYDS IS ENTITLED TO BE INDEMNIFIED FOR ITS ATTORNEYS' FEES AND OTHER LITIGATION EXPENSES

Under Section 8.05(a) of the Lloyds SBPA, Lloyds is entitled to payment of all expenses "including reasonable counsel fees and expenses" in connection with enforcing the SBPA if "specifically related to the loans in the Pledged Assets."  (Trial Ex. 5, § 8.05(a)(B).) This action relates to enforcement with respect to how the student-loan collections will be paid.

Under the even broader provisions of Section 8.05(b) of the Lloyds SBPA, ALL must indemnify Lloyds for:

> any and all costs, charges, damages, *counsel fees and other expenses* that the Bank may, at any time, sustain or incur by reasons of or in consequence of or arising out of the transactions contemplated by this Agreement or the Related Documents, including without limitation . . . (ii) the execution, delivery and performance of this Agreement, (iii) the failure to pay hereunder . . . . (Id., § 8.05(b), emphasis added.)

This action concerns the transactions contemplated by the SBPA and Indenture, as well as performance of the SBPA and failure to make required payments.   Lloyds, therefore, is entitled to be indemnified for its legal fees, expert fees, and other litigation costs under Section 8.05(b). Lloyds requests that the judgment include an award of such fees and costs, so that Lloyds can then make a motion under FRCP 54(d)(2).

## **CONCLUSION**

For all the above reasons, the Court should issue its verdict and judgment in favor of Lloyds and against the other parties, as follows:

(1)      Declaring that the Second Supplemental Indenture and Lloyds SBPA are valid and enforceable contracts, including the five-year, quarterly schedule for mandatory redemption of Bank Bonds;

(2)      Declaring that Events of Default have occurred under the Indenture and Lloyds SBPA, resulting from the failure to make all principal payments when due to Lloyds;

(3)      Declaring that Lloyds is entitled to payment, from all available Revenues and Recoveries of Principal, of all principal due on its quarterly redemption dates until maturity of its bonds, plus interest on any applicable interest payment dates;

(4)     Awarding Lloyds damages from BNY for the overpayment of ALL's administrative fees and the overpayment of bond interest, and ordering BNY to pay the prejudgment interest on any underpayment of total principal and interest owed as of November 5, 2009;

(5)     Alternatively to No. 4, awarding the same damages against ALL to be paid out of the Pledged Assets;

(6)     Awarding Lloyds all principal and interest due from May 2008 through the date of judgment;

(7)     Directing BNY to disgorge to the trust all legal fees and expenses that have been incurred by it, and paid out of the trust, for the defense of the claims against it in this action.

(8)     Dismissing the claims of all parties against Lloyds, and dismissing Depfa's claims against all parties;

(9)     Awarding the attorneys' fees, expert fees, and costs incurred by Lloyds in this action; and

(10)    Awarding prejudgment and post-judgment interest, and such further relief as the Court deems just and proper.

Dated: October 31, 2011
      New York, New York

MINTZ LEVIN COHN FERRIS
GLOVSKY AND POPEO, P.C.

By: _David L. Barres_

    Robert I. Bodian
    David L. Barres
    Omar A. Khondker
Chrysler Center
666 Third Avenue, 25th Floor
New York, New York 10017
(212) 935-3000

*Attorneys for defendant and third-party plaintiff*
*Lloyds TSB Bank plc*

## CERTIFICATE OF SERVICE

On October 31, 2011, I caused to be served by email a true and accurate copy of the following (except item (3), which is to be served by overnight mail) on the counsel listed below:

1.　Pretrial Memorandum of Law of Defendant and Third-Party Plaintiff Lloyds TSB Bank plc;

2.　Proposed Findings of Fact and Conclusions of Law of Defendant and Third-Party Plaintiff Lloyds TSB Bank plc;

3.　Notice of Motion *in Limine* to Exclude Evidence of Utah Transaction, Including Trial Exhibit 21;

4.　Declaration of Omar A. Khondker in Support of Motion *in Limine*;

5.　Memorandum of Law of Lloyds TSB Bank plc in Support of Motion *in Limine* to Exclude Evidence of Utah Transaction, Including Trial Exhibit 21; and

6.　A binder containing the Deposition Designations and Counter-Designations of Lloyds TSB Bank plc.

Scott M. Berman, Esq.
Eric Seiler, Esq.
Jeffrey C. Fourmaux, Esq.
Alexander D. Levi, Esq.
FRIEDMAN KAPLAN SEILER &
ADELMAN LLP
7 Times Square
New York, NY 10036-6516
eseiler@fklaw.com
sberman@fklaw.com
jfourmaux@fklaw.com
alevi@fklaw.com

*Attorneys for defendant*
*DEPFA BANK plc*

Scott R. Kipnis, Esq.
Nicholas B. Malito, Esq.
HOFHEIMER GARTLIR & GROSS, LLP
530 Fifth Avenue
New York, NY  10036
skipnis@hgg.com
nmalito@hgg.com

Dean C. Waldt, Esq.
Mariah Murphy, Esq.
BALLARD SPAHR LLP
210 Lake Drive East, Suite 200
Cherry Hill, NJ  08002-1163
waldtd@ballardspahr.com
murphym@ballardspahr.com

*Attorneys for third-party defendant Access to*
*Loans for Learning Student Loan*
*Corporation*

James J. Coster, Esq.
Glenn Edwards, Esq.
Walter Saurack, Esq.
SATTERLEE STEPHENS BURKE &
BURKE LLP
230 Park Ave.
New York, NY  10169
jcoster@ssbb.com
gedwards@ssbb.com
wsaurack@ssbb.com

*Attorneys for third-party defendant
JP Morgan Chase Bank, N.A.*

Dated:  October 31, 2011
         New York, New York

Judith A. Archer, Esq.
Sarah E. O'Connell, Esq.
FULBRIGHT & JAWORSKI L.L.P
666 Fifth Ave.
New York, NY  10103-3198
jarcher@fulbright.com
soconnell@fulbright.com

*Attorneys for plaintiff The Bank of New York
Mellon Trust Company, N.A.*

_____
Omar Khondker