UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE BANK OF NEW YORK MELLON TRUST
COMPANY, N.A.,

          Plaintiff-Counterclaim Defendant,

  -against-

DEPFA BANK PLC and LLOYDS TSB BANK PLC,

       Defendants-Counterclaimants.

No. 10 Civ. 4424 (JPO)(AJP)

ECF FILED

 

 

 

 

# THIRD-PARTY DEFENDANT/CROSSCLAIMANT
# JP MORGAN CHASE BANK, NA'S
# __PRETRIAL MEMORANDUM OF LAW__

 

 

Satterlee Stephens Burke & Burke LLP
230 Park Avenue
New York, New York  10169
(212) 818-9200
*Attorneys for Third-Party Defendant/*
*Crossclaimant JP Morgan Chase Bank, N.A.*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ....................................................................................1

BACKGROUND ..........................................................................................................5

ARGUMENT ..............................................................................................................10

I.   THE TRUSTEE WAS PROTECTED IN ENTERING INTO
     AND PERFORMING UNDER THE SECOND
     SUPPLEMENTAL INDENTURE BY ADVICE OF COUNSEL ......................11

     A.   The Trustee's Duties and Rights Are Defined
          by the Indenture ......................................................................................11

     B.   The Indenture Protects the Trustee for Good-Faith
          Action in Accordance with the Advice of Counsel ..................................12

     C.   The Trustee Received Written Opinions of Counsel
          Conforming to the Indenture and Opining as to the
          Propriety of the Second Supplemental Indenture .....................................13

     D.   Depfa's Strained Reading of the Opinion Letters
          Does Not Negate the Defense ..................................................................22

II.  DEPFA IS NOT AN INTENDED THIRD-PARTY BENEFICIARY
     OF THE FIRST SUPPLEMENTAL INDENTURE ..........................................26

III. JPMC IS ENTITLED TO INDEMNIFICATION FROM ALL
     FOR ANY LIABILITY AND FOR ITS ATTORNEYS' FEES ..........................31

     A.   ALL's Indemnification Obligation to JPMC Is Clear ...............................31

     B.   The Trustee's Indemnification Rights Are Higher in the
          Waterfall than Payments on the Bonds ....................................................33

IV.  DEPFA HAD NO CONSENT RIGHTS THAT WERE
     VIOLATED BY THE SECOND SUPPLEMENTAL INDENTURE .................34

     A.   Depfa Had No Right to Consent to the Issuance of Subsequent
          Series of Bonds or the Terms of Any Credit Enhancement on
          Those Bonds............................................................................................35

     B.   The 2006 Issuance Did Not Create a "Super-Senior" Series
          of Bonds ..................................................................................................40

V.   DEPFA MUST PROVE PROXIMATE CAUSATION .......................................43

VI.  DEPFA'S CLAIMS ARE BARRED BY WAIVER ...........................................45

CONCLUSION............................................................................................................46

i

Third-party Defendant and Cross-claimant JP Morgan Chase Bank, NA ("JPMC") hereby submits, pursuant to the Court's Individual Practices, its pretrial memorandum of law in advance of the upcoming bench trial in this action.  This memorandum is not intended as a complete statement of all evidence or argument that will be presented at trial, and JPMC respectfully reserves the right to present at trial any evidence or argument otherwise permitted.

## PRELIMINARY STATEMENT

Barring settlement, the upcoming bench trial in this matter will be a somewhat unusual one in that the material facts are, almost entirely, not in dispute.  The dispute here centers on the meaning of the pertinent documents – the Indenture and related documents, and, particularly for purposes of the claims against the Trustee, the various opinion letters of counsel approving the key transaction at issue.  The trial will be, in other words, largely one in which Depfa, the effective plaintiff in this interpleader action, will attempt to convince the Court through parol evidence that its interpretation of the documents – an interpretation, it bears noting, that Judge Cote found unpersuasive, at least at first blush – is the correct one, and that the issuance of a series of bonds in 2006 by ALL violated the consent rights Depfa claims to have obtained by virtue of its role as liquidity provider for a bond issue a year earlier.

This exercise, from JPMC's standpoint, is unnecessary, in that the operative documents are unambiguous that when Depfa signed on as liquidity provider for the bonds issued in 2005, it did not, as it claims, obtain a right to consent to future bond issuances (or to the liquidity provider terms for such bonds), and thus the sole claim against JPMC – that it violated these purported consent rights – is meritless.  Any ambiguity that was found to exist, moreover, should clearly be resolved against Depfa's position.

But regardless of the outcome of this contract interpretation exercise, it is clear that the Trustee – JPMC as the initial Trustee, and interpleader plaintiff Bank of New York Mellon

("BNYM") as successor Trustee – may not be held liable for the failure to respect these putative consent rights.  Not only is there insufficient evidence that the parties intended the Trustee – as opposed to ALL, the issuer – to be contractually liable for these consent rights, but even if there were the Trustee is fully protected by the advice of counsel (both written and oral) universally opining that there was no obstacle to entering the supplemental indenture by which the 2006 bonds were issued.  Further, any Trustee liability would be subject to complete indemnification from ALL.

The specific arguments will be discussed below, but first taking a broader view, it is useful to keep in mind both the nature of the transactions at issue here and the roles of the various players in those transactions.  The fundamental issue in a bond transaction such as this is allocation of risk – chiefly, the risk that the cash stream from the loans purchased or originated by ALL will not be sufficient to repay the bonds that financed those loans.  That risk was borne in this deal – for compensation, of course, in the form of fees and interest – by the insurer (Ambac) and by the two Liquidity Providers, Depfa and Lloyds.

The *Trustee*, on the other hand, is not a financial participant in the transaction.  Its role is as a stakeholder and administrator, subject to the direction of the issuer (ALL) pre-default, and, practically speaking, subject to the direction of the risk-taking parties (Ambac and/or the Liquidity Providers) in the event of a default.  The Trustee is paid to administer, not to take on financial risk, and its compensation – significantly lower than any other participant – reflects that fact.[1]  And the Trustee does not play a role in the negotiation of the terms of the deals; it is ALL, the issuer, that is responsible for such matters.

---

[1] The Trustee's fees were set at 3 basis points per annum (based on the principal of the outstanding bonds); Ambac received 7-9 basis points; Depfa and Lloyds' received 17.5 and 14 basis points, respectively (plus a significant interest rate on any bonds required to be purchased); and ALL received 50 basis points per annum for administration.  *See* Trial Exhibit ("Ex.") 7, at 2-3.

It is important to realize that to the extent that there is now insufficient cash flow or insufficient assets to redeem the Liquidity Providers' bonds in their entirety, that shortfall is entirely the result of the economic downturn that led to, *inter alia*, the collapse of Ambac and to the drain on the trust assets due to the high interest rate due on the Bank Bonds held by the two Liquidity Providers (in particular, Depfa's). But the risk of these occurrences is *precisely* the risk that the Liquidity Providers were paid to take. It is certainly not a risk that the Trustee was paid to take on, nor is this shortfall in any way attributable to the Trustee's actions.

This case, therefore, is really about how that economic risk was allocated, and thus how the shortfall should now be divided, between the two Liquidity Providers. JPMC believes that the clear language of the agreements suggests that Lloyds took on less of that risk, on a *pro rata* basis, than did Depfa (in exchange for lower compensation in the form of fees and interest). But whatever the ultimate conclusion on that point – and it is the main point of the upcoming trial – any conclusion that some or all of the risk of economic downturn was intended to be borne by the *Trustee* cannot be correct. It would fly in the face of the fundamental economics of the transaction. Certainly there is no evidence that the Trustee believed it was taking on that risk, nor that anyone did for that matter. JPMC is confident that the arguments stated herein (and, to the extent referenced, in the memorandum of BNYM) make it clear that the relevant risk was not taken on by the Trustee. Any parsing of the documents here that appears to lead to a contrary conclusion must be, at the very least, seriously questioned, if not rejected out of hand.

The evidence at trial will, JPMC is confident, confirm this basic economic reality. First, Depfa is simply incorrect in its claim that it had a right to consent to the 2006 issuance of bonds for which Lloyds served as liquidity provider. Under its agreement with ALL, ALL agreed not to "amend" or "modify" the Indenture without Depfa's consent, but made no covenant with

3

respect to "supplements" – the means by which new series of bonds are issued.  The evidence will show this omission was deliberate – a liquidity provider almost never has the right to consent to new bond issues.  Most telling is that Depfa not only knew about the 2006 bond issuance but itself bid against Lloyds to be the liquidity provider – and yet, despite its claim now that it had the right to veto any new bond issue, Depfa said nothing at the time.  Clearly, Depfa itself did not think it had such a right at the time; its apparent epiphany on this subject is a recent one – arising at the time of Ambac's failure and the materialization of a significant likelihood of losses (and their hiring of outside counsel).

As for Depfa's claim that its bonds are out of "parity" with those purchased by Lloyds, that claim similarly is without merit.  Both the 2005 bonds backed by Depfa and the 2006 bonds backed by Lloyds were "Senior Bonds" – meaning that, in the event that an event of default required resort to the collateral to repay the bonds, all of the bonds had an equal, ratable claim on that collateral.  The evidence at trial will make clear, however, that nothing about the concept of "parity" requires that all bonds in parity have identical interest rates, payment schedules, or maturities – even if such differences ultimately play out in differing recoveries and/or differing losses.

More importantly from JPMC's standpoint, however, is that it is not the Trustee that may ultimately be held responsible if the foregoing reading of these contracts is incorrect.  First and foremost, the Trustee – consistent with its essentially ministerial role – is entitled to rely on the advice of counsel, and the evidence will show that the 2006 bond issuance (as is typical for such deals) was reviewed by several counsel. These counsel issued opinions (both written and oral) that entry into the Second Supplemental Indenture was authorized and permitted under the Indenture and that such entry presented no conflict or breach with, and required no consents

4

under, any prior agreements (necessarily including, therefore, the Depfa deal).  JPMC as Trustee reasonably and in good faith acted in accordance with these opinions, and thus cannot be held liable even should this Court determine that those opinions were incorrect.

Additionally, to the extent that Depfa did have consent rights under its SBPA with ALL, it was ALL – and not JPMC – that covenanted not to contravene those rights.  Depfa's claim against JPMC requires it to show that the acknowledgment by the Trustee in the Indenture – a contract to which Depfa is not a party – was intended to make Depfa a third-party beneficiary by creating an enforceable obligation against JPMC.  Not only does the contract language suggest otherwise, but it would place JPMC in the position of effectively guaranteeing ALL's performance of its covenant with Depfa.  No evidence suggests JPMC believed it was taking on a role so at odds with its position in the transactions.

Finally, consistent with the Trustee's overall position in the transaction, it is entitled to indemnification from ALL for any liability or expense it incurs in the good-faith performance of its duties.  JPMC was granted (and continues to have) a lien on the trust assets to guarantee performance of that obligation.  Thus, even if there were to be an award of damages against JPMC, ALL would be required to indemnify JPMC and JPMC would be entitled to draw against the trust assets to satisfy any judgment.

## BACKGROUND

As stated earlier, this is a case in which the operative facts are not in dispute.  To avoid duplication with the other parties' briefs, below is a brief summary of the background of this dispute; the facts specific to JPMC's arguments, claims and defenses will be discussed in the pertinent argument sections.

Access to Loans for Learning Student Loan Corporation ("ALL") is a California not-for-profit corporation that specializes in financing and refinancing student loans.  To finance these

1260949_3

loans (or to purchase eligible loans), ALL issues bonds.  Cash flow from the payment of principal and interest on the student loans, in turn, is used to pay back the bonds.  ALL's bonds are issued pursuant to trust indentures whereby ALL pledges assets – essentially, the purchased student loans and any revenues and recoveries of principal thereon – as collateral for the bonds. An indenture trustee serves as the party to whom the assets are pledged (in trust for the bondholders) and serves to administer repayment of the bond obligations.

In 2005 ALL determined to issue its Series V bonds and, accordingly, on August 1, 2005 entered into the Indenture at issue here with JPMC as Trustee.  (Stipulation of Fact ("Stip. Fact") ¶ 1; Ex. 1.)  The Indenture serves as a master indenture that authorizes the issuance of bonds pursuant to supplemental indentures.  (Indenture § 2.1.)  Under the Indenture, ALL pledged as collateral the student loans purchased along with interest and principal repayments on those loans (the "Pledged Assets").  (*Id.* at 2 (Granting Clauses).)

Also on August 1, 2005, ALL and JPMC entered into the First Supplemental Indenture (Ex. 2), which authorized the issuance of the Series V-A-1 and V-A-2 Senior Bonds, in a total amount of $190 million (the "2005 Issuance").  (Stip. Fact ¶¶ 2, 10.)  All Series V bonds were variable rate demand obligations (VRDOs).

In conjunction with the 2005 Issuance, Ambac served as the insurer for the bonds – i.e., to ultimately repay the principal and interest due on the bonds should the cash stream from the student loans purchased with the bond proceeds prove insufficient.  (Stip. Fact ¶ 9; Exs. 6, 34.) In addition, ALL selected Depfa to serve as the Liquidity Provider for the 2005 Issuance, that is, Depfa agreed that it would stand ready to purchase any or all of the bonds that were tendered by bondholders and unable to be remarketed. (Stip. Fact ¶ 14.)  The terms of Depfa's liquidity provider arrangement were embodied in the Depfa Standby Bond Purchase Agreement ("Depfa

SBPA"), also entered into on August 1, 2005. (Ex. 3.)  It is the Depfa SBPA that contains the consent provisions that Depfa now purports to assert.  (*Id.* § 5.03(a).)

Under the terms of the Depfa SBPA, any bonds required to be purchased by Depfa (thus becoming "Bank Bonds") earned interest at a rate of Prime + 1.5%.  (*Id.* § 3.01(ii).)  Moreover, the Depfa SBPA provided that ALL would cause the redemption of any Bank Bonds in semiannual installments, but only to the extent that funds were available in the Revenue Fund (which held any interest, but not principal repayment, on the student loans) after accounting for the first five steps of the "waterfall."[2] (*Id.* § 3.02.)  It was further provided that in any case all Bank Bonds would be fully redeemed upon the tenth anniversary of their purchase by Depfa (i.e., there was a ten-year "term out"). (*Id.*)

In 2006, ALL determined to issue another series of Senior Bonds, and did so pursuant to a Second Supplemental Indenture between ALL and JPMC dated August 1, 2006.  (Stip. Fact ¶ 5; Ex. 3.)  The bonds, denominated Series V-A-3, -4, and -5, were in a total value of $190 million (the "2006 Issuance"). (Stip. Fact ¶ 15.)  These bonds were also insured by Ambac.  The student loans to be financed with the proceeds of the bonds (and any interest and principal repayments thereon) became part of the Pledged Assets along with the loans purchased with the Series V-A-1 and -2 bonds.  Interest repayments from the student loans likewise went into the same Revenue Fund as interest repayments on the Series V-A-1 and -2 loans.

Both Depfa and Lloyds bid to be the Liquidity Provider for the 2006 Issuance (Stip. Fact ¶ 18; Lloyds was selected by ALL (*id.* ¶ 19).   Its liquidity provider arrangements were embodied in the Lloyds SBPA. (Ex. 5.)  Under the Lloyds SBPA, Bank Bonds earned interest at

---

[2] The "waterfall" is the provision of the Indenture that provides the order in which payments from the Revenue Account are to be made, i.e., the priority for various expenditures, including interest and principal repayment on the bonds.  The waterfall is § 5.3(B) of the Indenture.  The Revenue Account holds all Revenues received from the student loans (primarily, but not exclusively, interest payments) but does not include repayment of principal on those loans.  *See* Indenture § 5.3(A); 1.2 (definition of "Revenues").

a rate of LIBOR + 1.75% (a lower rate than Depfa's by roughly 2.5-3%). (*Id.* § 3.01.)[3]  Lloyds' Bank Bonds were required to be redeemed on a quarterly basis, but again only to the extent that funds existed in the Revenue Fund after accounting for the first five steps of the "waterfall." (*Id.* § 3.02.) Further, Lloyds' term-out period was five years. (*Id.*)

Other than the Indenture terms specifically addressing the Trustee duties, JPMC did not negotiate the financial terms of either bond issuance or either SBPA; ALL as issuer had primary responsibility for those negotiations.[4]  Also, in or about October 2006, JPMC sold its corporate trust business to BNYM, which succeeded as Trustee under the Series V Indenture. (Stip. Fact ¶ 20.)

In February 2008, the auction rate securities market collapsed, and Ambac failed.  (Stip. Fact ¶ 21.)  The Series V bonds became unattractive to investors, and both Depfa and Lloyds were required under their respective SBPAs to purchase the entire outstanding amount of Series V bonds (i.e., $190 million each). (*Id.* ¶¶ 22-24.)  Pursuant to the SBPAs, ALL then began directing BNYM to redeem the Bank Bonds based on the funds ALL determined were available in the Revenue Account.  Because the Lloyds SBPA required quarterly installments vs. the semiannual installments for Depfa, this initially resulted in a greater redemption of Lloyds Bank Bonds.[5]

---

[3] To date, the total interest paid to Depfa exceeds that paid to Lloyds by approximately $14.5 M.  (Stip. Fact ¶ 27.)

[4] Dennis Roemlein, who was the relationship manager for JPMC prior to October 2006, and then for BNYM after the sale of the corporate trust business, will testify as to the Trustee's limited involvement in negotiations, as he did at his deposition.  *See, e.g.*, Deposition Transcript of Dennis Roemlein ("Roemlein Tr.") 180:19-25. Cites herein to depositions other than for the 3 witnesses who will testify by deposition at trial (Bayus, Chapman, and Davis) will be made in footnote rather than in the text; transcripts of these depositions can be made available to the Court if desired.

[5] Through July 1, 2009, $21.6 M of Lloyds Bank Bonds had been redeemed; $12.5 M of Depfa Bank Bonds had been redeemed.  *See* Stip. Facts ¶ 25.

8

In or about July 2009, Depfa wrote to ALL complaining about the redemption payments. (Ex. 113.)  In that letter, Depfa did not assert that its consent rights had been violated but complained only that, because the Depfa and Lloyds bonds were in parity, they should have been redeemed *pro rata*.  In November 2009, Depfa again wrote to ALL, asserting for the first time its claim that ALL had violated its consent rights under Section 5.03(a) of the Depfa SBPA and that any payments to Lloyds were improper until all of Depfa's bonds had been redeemed. Beginning in December 2009, ALL and BNYM suspended redemptions with the agreement of both Depfa and Lloyds while possible restructuring was discussed.  (Stip. Fact ¶ 26.)  In April 2010, both Depfa and Lloyds asserted their (conflicting) claims to resumption of redemption payments.  (Exs. 156-158.)

Accordingly, on June 3, 2010, BNYM commenced this action by filing an interpleader complaint against Depfa and Lloyds. (Dkt. # 1.)   On August 31, 2010, Depfa and Lloyds each answered the complaint including counterclaims against BNYM and crossclaims against each other. (Dkt. # 20, 21.)  Depfa, in addition, filed a third-party complaint against ALL.  No claim was initially filed against JPMC.

On September 27, 2010, Depfa filed an amended answer which for the first time included a third-party complaint against JPMC. (Dkt. # 26.) The sole claim (Count 6) alleges breach of contract against JPMC, claiming that JPMC breached the First Supplemental Indenture and/or the Depfa SBPA by entering into the Second Supplemental Indenture without obtaining Depfa's written consent.  On December 10, 2010, JPMC answered and denied Depfa's claim (Dkt. # 53), and asserted a cross-claim against ALL for indemnification, which ALL answered on December 30, 2010 (Dkt. # 54).

## <u>ARGUMENT</u>

As stated above, it is JPMC's position that Depfa had no consent right that was violated by the entry into the Second Supplemental Indenture, and thus Depfa cannot succeed in establishing a claim against JPMC for breach of contract.  In order to avoid excessive duplication of argument with the other parties, however, this argument is addressed in summary fashion herein, *see infra* Section IV, and JPMC concurs with and adopts the arguments made by BNYM in Sections II and III of its pretrial memorandum.

Even if there were any breach of Depfa's consent rights under the Depfa SBPA, however, there can be no liability against the Trustee (either JPMC for entry into, or BNYM for performing under, the Second Supplemental Indenture) because such actions were in accordance with, and in reliance upon, the advice of counsel, which provides a complete authorization and protection.  (*See infra* Section I.)  Moreover, whatever ALL's obligations to Depfa under the Depfa SBPA, there is insufficient evidence that the parties intended Depfa to be able to enforce these rights against the Trustee.  (*See infra* Section II.)

Additionally, any liability by Depfa against JPMC (as well as JPMC's cost of defending itself in this action) is subject to indemnification from ALL, including by resort to the Pledged Assets to satisfy such obligation.  (*See* Section III.)  Further, Depfa will not be able to establish that any alleged breach by JPMC has proximately caused it damages.  (*See* Section V.)  And because Depfa was fully aware of the 2006 Issuance of bonds and the presence of Lloyds as liquidity provider and said nothing, it plainly waived any claims it had with respect to the 2006 Issuance.  (*See* Section VI.)

10

I.    **THE TRUSTEE WAS PROTECTED IN ENTERING
INTO AND PERFORMING UNDER THE SECOND
SUPPLEMENTAL INDENTURE BY ADVICE OF COUNSEL**[6]

A.    **The Trustee's Duties and Rights Are Defined by the Indenture**

Under California law (as is true more or less universally) a trust indenture "does not

create a trust relationship in the customary sense." *Dell'Oca v. Bank of N.Y. Trust Co.*, 71 Cal.

Rptr. 737, 742-43 (Cal. Ct. App. 2008) (citing Robert Landau and John Krueger, *Corporate*

*Trust Administration & Mgmt.* 23 (5th ed.1998)).[7]  Rather,

> An indenture trustee is not subject to the ordinary trustee's duty of undivided
> loyalty.  Unlike the ordinary trustee, who has historic common-law duties
> imposed beyond those in the trust agreement, an indenture trustee is more like a
> stakeholder whose duties and obligations are exclusively defined by the terms of
> the indenture agreement.

*Id.* at 743 (quoting *Meckel v. Continental Resources Co.*, 758 F.2d 811, 816 (2d Cir. 1985)).

Thus, "'the trust indenture is mainly a contract, the courts have been in almost unanimous

agreement in applying contractual principles to this relationship.'"  *Id.* at 743 n.3 (quoting

Landau & Krueger 27).[8]

As is clear from the Indenture, pre-default the Trustee "undertakes to perform such duties

and only such duties as are specifically set forth in this Indenture, and no implied covenants or

obligations shall be read into this Indenture against the Trustee."  (Indenture § 10.2(a)(1).)  The

Trustee's pre-default duty, in other words, is to act primarily in an administrative role for the

issuer. It is only post-default that the so-called "prudent person standard" applies.  (*Id.* § 10.2(b).)

---

[6] JPMC concurs with the arguments made by BNY Mellon in Section IV of its pretrial memorandum as well.

[7] Section 11.7 of the Indenture provides that it "shall in all respects be governed by the laws of the State of California applicable to contracts made and performed in such State."

[8] The Indenture is not governed by the federal Trust Indenture Act of 1939 ("TIA"), 15 U.S.C. § 77aaa *et seq.*

**B.     The Indenture Protects the Trustee for Good-Faith
        <u>Action in Accordance with the Advice of Counsel</u>**

The Indenture contains a number of provisions that afford the Trustee the right to rely on

statements, representations and advice in the conduct of its duties and to be protected from

liability should it in good faith act accordingly.  Two of these provisions specifically address

counsel opinions:

> the Trustee may rely and is protected in acting or refraining from acting upon any
> resolution, certificate, statement, instrument, opinion, report, notice, request,
> direction, consent, order, approval, bond, debenture or other paper or document
> believed by it to be genuine and to have been signed or presented by the proper
> party or parties

Indenture § 10.3(a).  And:

> the Trustee may consult with counsel, who may be counsel to the Corporation,
> and the written opinion of such counsel shall be full and complete authorization
> and protection in respect of any action taken or suffered by it hereunder in good
> faith and in accordance therewith; provided that such opinion is addressed to the
> Corporation or expressly states that the Corporation may rely thereon.

*Id.* § 10.3(d).

The Indenture further provides that the Trustee has no duty of inquiry as to the opinions it

receives:

> the Trustee is not required to make any inquiry or investigation into the facts or
> matters stated in any Certificated, Direction, resolution, statement, instrument,
> opinion, report, notice, request, consent, order, approval, bond, debenture or other
> paper or document…

*Id.* § 10.3(f).

The Trustee is further protected from liability for "any error of judgment made in good

faith by a Responsible Officer, unless it is proven that the Trustee was negligent in ascertaining

the pertinent facts."  *Id.* § 10.2(c)(2).

In addition to these express reliance provisions in the Indenture, it has long been held as a

matter of common law that a trustee may rely upon the advice of counsel in carrying out its

12

duties and is protected in so doing.  *See LNC Invs., Inc. v. First Fidelity Bank*, 2000 WL 1211584

(S.D.N.Y. 2000) ("*LNC II*"); *LNC Invs., Inc. v. First Fidelity Bank* ("*LNC I*"), 1997 WL 528283,

at \*21-22; *see also In re Joost's Estate*, 50 Misc. 78, 82-83 (N.Y. Sur. 1906), *aff'd sub nom. In

re Voelbel*, 126 A.D. 932 (1908).[9]  The common-law defense requires that the trustee show "the

advice it received and that it relied upon that advice, and that it made complete disclosure to

counsel." *LNC I*, at \*22. [10] (It appears that § 10.2(a) – which does not require an opinion to be

written – is substantially an incorporation of this common-law defense.)

It is well-established that an opinion of counsel need not actually be correct to afford the

Trustee protection; such a requirement would, of course, render the protection illusory.  *See

Cruden v. Bank of New York*, 957 F.2d 961, 972 (2d Cir. 1992).  By the same token, whether

counsel in fact performed an adequate analysis cannot be a prerequisite for protection.

Moreover, it is clear from § 10.3(f) that the Trustee is under no obligation to interrogate counsel

as to counsel's investigation or analysis, the basis for its opinion or the scope of the opinion.

Provided that the opinion is otherwise in proper form, then the Trustee is protected– "full and

complete authorization" – so long as its actions can reasonably and in good faith be read as being

"in accordance with" the opinion.

C.     **The Trustee Received Written Opinions of Counsel
       Conforming to the Indenture and Opining as to
       the Propriety of the Second Supplemental Indenture**

In connection with the 2006 Issuance, various counsel issued a number of written opinion

letters addressing the validity of the transaction (or various aspects of it).  Of chief importance

---

[9] Although *LNC* involved application of the "prudent person" standard, as stated above that standard does not apply pre-default.  If anything, the defense of advice of counsel is even more appropriate pre-default given the limited duties of the trustee.  The protections in the Indenture for opinions, § 10.3(a) and (d), apply by their terms at any time under the Indenture.

[10] The fact that the Indenture contains protections based on the written advice of counsel does not imply an intent to abrogate the common-law protections for advice of counsel (oral or written). *See LNC II*, at \*4.

here were two letters written by Shirley E. Curfman of Sonnenschein Nath & Rosenthal LLP,

counsel for ALL, both dated August 2, 2006.  *See* Exs. 63, 64.

The first of these letters ("Curfman I") (Ex. 63) was addressed to ALL, Lloyds and

Ambac, and states, *inter alia*, that Sonnenschein

- Has acted as counsel to ALL in connection with the 2006 Issuance (p.1);

- In that capacity, "examined and reviewed," *inter alia*, "that certain Trust Indenture (the "Trust Indenture") dated as of August 1, 2005, by and between [ALL and JPMC], and that certain Second Supplemental Indenture thereto dated as of August 1, 2006" [referred to together as the "Indenture"] (p.1); and

- Had "examined such other documents and instruments as we have deemed necessary in order to render the opinions expressed herein" (p.2);

and that Sonnenschein was of the opinion that, *inter alia*,

- The Indenture and the Lloyds SBPA "constitute valid and binding obligations of [ALL]" (p.4); and

- "The execution and delivery of the Indenture [and] the Liquidity Facility … will not conflict with or constitute a breach of or default under, or provisions of each thereof will not conflict with or constitute a breach of or default under … (ii) … any loan agreement, note, indenture, resolution, certificate, contract, agreement or other instrument to which [ALL] is a party or by which [ALL] is bound and of which we are aware." (pp. 4-5).

The second of these letters ("Curfman II") (Ex. 64) was addressed to ALL, JPMC (as

Trustee & Tender Agent) and the three remarketing agents, First Southwest, UBS, and J.P.

Morgan Securities Inc.  In addition to the same representations as in Curfman I about

Sonnenschein's role and the information reviewed (*see* pp. 1-2), the letter states, *inter alia*, that

Sonnenschein was of the opinion that, *inter alia*,

- "The Second Supplemental Indenture is authorized or permitted by the provisions of the Trust Indenture" (p.5);

- the Second Supplemental Indenture had been "duly executed by [ALL]" (*id.*); and

- the Trust Indenture and Second Supplemental Indenture "are valid and binding upon" ALL (*id.*).

In addition to the two Sonnenschein letters, counsel for JPMC, Charles Waters, issued an opinion letter (also dated August 2, 2006) (Ex. 66), addressed to all parties and counsel (including ALL), stating, *inter alia*, that Waters

- had acted as counsel to JPMC in connection with the 2006 Issuance of the Bonds, "authorized and issued pursuant to a Second Supplemental Indenture dated as of August 1, 2006 (the "Supplemental Indenture"), supplementing a Trust Indenture (the "Indenture") dated as of August 1, 2005" (p. 1);

- had reviewed, *inter alia*, "the Indenture" and "the Supplemental Indenture" (*id.*); and

- had reviewed "such other documents and matters of law as I have deemed necessary or advisable as a basis for the opinions herein expressed" (*id.*);

and that Waters was of the opinion that, *inter alia*,

- JPMC "has full right, power and authority to execute and deliver the Supplemental Indenture as Trustee" and "the [Lloyds] Standby Bond Purchase Agreement as Trustee and Tender Agent" and "to perform its obligations under and consummate all of the transactions contemplated" by both agreements (p.2, ¶ 2);

- JPMC had "duly authorized, executed and delivered" the Supplemental Indenture and Lloyds SBPA (*id.* ¶ 3); and

- The Indenture and the Lloyds SBPA "are valid and legally binding obligations of" JPMC (p.3, ¶ 5).

Additionally, bond counsel for ALL, Elaine Bayus of Orrick Herrington & Sutcliffe, issued an opinion letter on August 2, 2006 addressed to ALL (Ex. 67), stating that Orrick had, *inter alia*,

- Acted as bond counsel to ALL in connection with the 2006 Issuance of bonds "pursuant to the provisions of a trust indenture, dated as of August 1, 2005 … as supplemented by a Second Supplemental Indenture, dated as of August 1, 2006 …(as so supplemented, the "Indenture") (p.1); and

- Had reviewed the Indenture, "opinions of counsel to the Corporation and the Trustee and such other documents, opinions and matters to the extent we deemed necessary to render the opinions set forth herein" (*id.*);

and that Sonnenschein was of the opinion that, *inter alia*,

15

- The Indenture has been duly executed and delivered by, and constitutes the valid and binding obligation of, the Corporation" (p. 3, ¶ 2).

*See also* Bayus Tr. 113-18.  Both Waters and Bayus, moreover, had served as counsel to the Trustee and bond counsel, respectively, with respect to the 2005 Issuance (Stip. Fact ¶¶ 11, 16)[11] – and were thus familiar with the First Supplemental Indenture and the Depfa SBPA.  (Indeed, Bayus was the lead drafter of both the original Indenture and the First Supplement.  (Bayus Tr. 12:21-13:9; 15:6-15.)

Finally, Elizabeth Davis of Kutak Rock LLP – who had actually represented *Depfa* in the 2005 transaction and was the lead drafter of the Depfa SPBA containing the consent rights on which Depfa purports to rely (Stip. Fact ¶ 12; Davis Tr. 17:6-12) – issued an opinion letter as counsel for Lloyds opining, *inter alia*, that the Lloyds SBPA constituted the "legal, valid and binding obligation of [Lloyds], enforceable against [Lloyds] in accordance with the terms thereof." (Ex. 65.)

At trial, the evidence will show, through exhibits and through the expected testimony of Dennis Roemlein, that these counsel opinion letters were circulated among all of the relevant parties and counsel (including Roemlein and Waters), and that they were revised by counsel before finalization based on comments received.  (Exs. 51, 53, 54.)  Roemlein is also expected to testify that he read these letters and believed that they not only satisfied any requirements for opinion letters necessary for the 2006 Issuance, but that the collective opinion being expressed by counsel was that the 2006 Issuance was authorized, valid, and consistent with all prior agreements – including the First Supplemental Indenture and the Depfa SPBA – and that any necessary consents or other conditions precedent had been obtained.  Roemlein is further

---

[11] *See also* Roemlein Tr. 181:13-21 (Charles Waters was Trustee's counsel for 2005 Issuance).

expected to testify that, had he not believed the opinion letters to be adequate, he would not have signed for JPMC on the 2006 Issuance.

In addition to the written opinions of counsel, JPMC received the advice of its own counsel, Charles Waters, that the 2006 Issuance documents were acceptable, valid and consistent with JPMC's obligations.  Specifically, in connection with the closing Dennis Roemlein signed, on behalf of JPMC, a Certificate and Receipt of the Trustee, dated August 2, 2006 (Ex. 71).  In this Certificate, JPMC certified, *inter alia*, that

- The "Indenture" – defined as "that certain Trust Indenture, dated as of August 1, 2005, between [ALL] and the Trustee, as heretofore supplemented and as supplemented by the Second Supplemental Indenture dated as of August 1, 2006" – and the Lloyds SBPA were "legal, valid and binding agreements of the Trustee" (¶ 3); and

- "The acceptance of the duties and obligations of the Trustee under the Trustee Documents [which included the Indenture and the Lloyds SBPA], the consummation of the transactions on the part of the Trustee contemplated in the Trustee Documents and any and all instruments and documents required to be executed or delivered pursuant to or in connection therewith and the compliance by the Trustee with the terms, conditions and provisions of all such documents and instruments … do not require any consent under, or result in a breach or default under, any loan agreement, resolution, indenture, note, contract, agreement or other instrument to which the Trustee is a party or by which it may be bound." (¶ 5).

Roemlein is expected to testify at trial that this Certificate was either prepared or at least edited and reviewed by JPMC's counsel, Charles Waters, and that Waters presented the Certificate to Roemlein for signature and assured Roemlein that the statements therein were accurate and that Roemlein could safely execute it on behalf of JPMC.   Roemlein is further expected to testify that he relied upon this assurance in so executing the Certificate.

Thus, the evidence at trial will clearly show that JPMC as trustee received both written and oral opinions from at least three counsel – Shirley Curfman, Charles Waters, and Elaine Bayus – which state, separately or in combination, that (1) entry into the Second Supplemental

Indenture and the Lloyds' SPBA required no consents and would not constitute a breach of any contractual obligations by either ALL or JPMC; (2) the Second Supplemental Indenture was permitted and authorized by the Indenture; and (3) the Second Supplemental Indenture and Lloyds SPBA would constitute valid and binding obligations of both ALL and JPMC.  The written opinions are all addressed to ALL as required by § 10.3(d), and all of the opinions were certainly believed by the Trustee to be genuine and "presented by the proper party" pursuant to § 10.3(a).[12]

Moreover, it is clear that the Trustee legitimately could rely upon these opinions in entering into the Second Supplemental Indenture, and that such entry was "in accordance with" those opinions.  First and foremost, this is because Curfman I stated that ALL's entry into the Second Supplemental Indenture would not conflict with or constitute a breach of *any* "indenture, … contract, [or] agreement" to which ALL was a party (thus necessarily including both the Depfa SBPA and the First Supplemental Indenture and any purported consent rights Depfa had under either).  Similarly, Charles Waters advised Roemlein that he could certify that entry into the 2006 Issuance documents required no consents nor breached any obligation that JPMC had under any prior agreements (again, necessarily including both the Depfa SPBA and the First Supplement).  Moreover, in Curfman II Sonnenschein expressed the opinion that the Second Supplemental Indenture was "authorized or permitted by the provisions of the Trust Indenture."  And, finally, all counsel expressed the opinion that the Second Supplemental Indenture represented valid and binding obligations on both ALL and JPMC.

---

[12] In addition, ALL (specifically, its CEO Christopher Chapman) executed a Closing Certificate stating, *inter alia*, that its entry into and performance of the agreements related to the 2006 Issuance (including both the Second Supplemental Indenture and the Lloyds SBPA) "will not conflict with or constitute a breach of or default under … any loan, agreement, note, resolution, certificate, contract, agreement or other instrument to which the Corporation is a party or is otherwise subject or bound."  (Ex. 61, ¶ 14.)  While not an opinion of counsel, this is certainly a "certificate" on which the Trustee was entitled to rely pursuant to § 10.2(a)(2) and § 10.3(a).

18

These opinions are necessarily inconsistent with the idea of Depfa having any right to consent to the Second Supplemental Indenture.  It is not necessary that the opinions have expressly addressed this issue – counsel cannot be expected to have listed and negate every possible objection to the agreements.  *See, e.g., Cruden*, 957 F.2d at 971-72.[13]  And, pursuant to § 10.3(f), the Trustee was not required to make any inquiry or investigation into whether counsel had considered Depfa's consent rights – particularly given that (as discussed below) there was no reason for the Trustee to have believed there was any consent right issue.  The evidence is clear, therefore, that the Trustee's entry into the Second Supplemental Indenture – even if Depfa were correct that its consent was required – was "in accordance with" the opinions of counsel received and that the Trustee's reliance on those opinions was proper.

Finally, the evidence at trial will make clear that the Trustee's reliance on these counsel opinions was neither negligent nor in bad faith, for a number of reasons.[14]  First, Dennis Roemlein will testify at trial that he genuinely believed that there was no issue with consent rights and that, if there had been, counsel would have raised it.[15]  He will also testify (as he did at his deposition) that during the negotiations of the 2006 Issuance, there was no discussion among the parties or their counsel about the issue, and certainly no one from Depfa ever raised a

---

[13] In *Cruden*, plaintiffs claimed that the indenture trustee had improperly entered into a supplemental indenture and that the defense of advice of counsel was unavailing because, *inter alia*, the opinion of counsel did not expressly address the provisions of the main indenture regarding bondholder consent.  The Second Circuit rejected this argument, noting that the opinions stated (as Curfman I does here, and as Waters advised Roemlein) that "The Supplemental Indenture does not conflict with or result in a breach of the terms, conditions or provisions of … any … indenture … known to us to which the Company or National is a party or by which it is bound."  957 F.2d at 971.  The court held that "by clear implication," counsel had found that the provisions regarding supplemental indentures had been complied with.

[14] Depfa in its third-party complaint against JPMC does not allege that JPMC acted negligently or in bad faith.

[15] *See* Roemlein Tr. 123:15-124:12.

19

1260949_3

concern with the Trustee[16] – despite the fact that Depfa had bid to be the 2006 liquidity provider

and was thus aware of the deal, and had even been asked to consent to an amendment to the

waterfall included in the Second Supplemental Indenture (*see* Ex. 49).[17]  *See also* Davis Tr.

189:11-25, 193:11-25; Bayus Tr. 15-24.  There were, in other words, no "red flags" that would

have caused the Trustee to have a particular concern about this issue.

Nor should the Trustee have had a particular concern about Depfa consent rights.  First,

as discussed *infra* Section IV, it is not only not unreasonable or in bad faith to believe that Depfa

had no such rights, it is clearly the correct conclusion.  But even assuming that the Court were

ultimately, following trial, to determine that Depfa did have such rights, that conclusion is far

from obvious.  It certainly was not apparent to any counsel on the transaction, including Elaine

Bayus, who drafted all of the indentures and supplementals, and Elizabeth Davis, who, as

counsel for Depfa in 2005, had drafted the very consent provision at issue.  (Bayus Tr. 2125:-

22:18; Davis Tr. 193:11-25.)  It is not apparent to Robert Landau or Robert Pope, two highly

experienced trust industry experts who have concluded no such rights existed.[18]  It was certainly

not evident to Judge Cote, who in December reached the preliminary conclusion that there were

no such rights.  This Court may of course ultimately reach a different view, but if so, that will be

based on its sifting through several days' worth of parol evidence purporting to bear on the

meaning of the Depfa SBPA – evidence that for the most part the Trustee could not have known

---

[16] Roemlein Tr. 140:10-18; *see also* Peterson Tr. 152:17-21.  David Park of Depfa admitted at deposition that Depfa did not raise any issue with the Trustee in 2006.  Park Tr. 219:18-220:10.  Indeed, Park was quite candid that in 2005, he did not understand § 5.03(a) to afford Depfa a consent right over supplemental indentures or subsequent liquidity providers; he only came to this conclusion once Depfa's bonds became bank bonds.  Park Tr. 97:2-18; 98:20-99:9.

[17] The Second Supplemental Indenture included an amendment – in a section specifically titled, "Amendments" – to place the "Base Administrative Fee" (30 bps of the 50 bps administrative fee due ALL) at the third step in the waterfall.  *See* Ex. 3, § 17.5.

[18] Expert Report of Robert I. Landau (Ex. 186), ¶¶ 22-29; Rebuttal Expert Report of Robert Dean Pope (Ex. 192), pp. 1-5).

and certainly could not have been expected to analyze.  *See Craig v. Bank of New York*, 2002 WL 1543893, at *4 n.6 (S.D.N.Y. 2002) (fact that the legal advice the trustee received "was not so objectively unreasonable that non-lawyers would have recognized it as incorrect" was evidence demonstrating a lack of bad faith), *aff'd*, 59 Fed. Appx. 388 (2d Cir. 2003).

In short, the evidence will show that the Trustee had absolutely no reason to believe that there was a problem with Depfa's consent rights, and every reason to believe that if there had been, one of the numerous counsel reviewing the transaction – or, of course, Depfa itself – would have raised the issue.  Robert Landau is also expected to testify that in his opinion the trustee behaved reasonably and in accordance with customary practice in relying upon the opinions here.[19]  And there is simply no evidence of any bad faith conduct – e.g., of the Trustee seeking out different counsel to obtain a different opinion, *see Cruden*, 957 F.2d at 972, or withholding pertinent evidence from counsel.  The evidence at trial will show clearly that the Trustee believed that counsel had given the green light to the 2006 Issuance and that there was no reason to question that conclusion.

Thus, even if this Court were to determine that Depfa did have a right to consent to the 2006 Issuance, and that this right was otherwise enforceable against the Trustee, it is clear that the opinions of counsel offer complete authorization and protection to the Trustee as to both the entry into, and also performance under, the Second Supplemental Indenture, at least with respect to any claim that Depfa had consent rights that were not obtained.  This is true under both the express provisions of the Indenture and the common law as well.[20]  Judgment for JPMC on Depfa's claim is, therefore, warranted.

---

[19] *See* Ex. 186, ¶ 19.

[20] To the extent that the Trustee erred in its conclusion regarding the authorization for the 2006 Issuance, that was plainly at most an error of judgment made in good faith by a Responsible Officer (i.e., Dennis Roemlein), and the Trustee may not be held liable for such good-faith errors pursuant to § 10.2(c)(2) of the Indenture.

21

**D.     Depfa's Strained Reading of the
        Opinion Letters Does Not Negate the Defense**

Depfa's arguments against the validity of JPMC's opinion-of-counsel defense were

presented by its proffered expert witness, Steve Thel.  It is the position of JPMC (along with

BNY, Lloyds and ALL), as outlined in the motion in limine simultaneously filed with the pretrial

order, that Thel's testimony should not be admitted given that he has insufficient experience in

the trust industry either to be qualified as an expert or to provide a valid basis for his opinions as

to industry practice.  Indeed, his "opinion" amounts largely to providing his own interpretation of

the counsel letters – and this Court clearly needs no help in that task.  But even if his testimony is

admitted, his strained readings of the counsel letters are utterly unpersuasive and cannot negate

the Trustee's defense.

Depfa's argument, as presented by Thel, amounts to the claim that, because the opinion

letters mention the "Indenture" but did not expressly mention the First Supplement, then the

letters do not purport (and cannot be read) to opine on the consistency of the Second Supplement

with the First (and any consent rights from the Depfa SBPA incorporated therein).  This strained

reading of the term "Indenture" ignores the meaning of the term as used in the Indenture itself, as

used in common practice in the industry, and as plainly used by the parties and their counsel in

this deal.  It is clear that any reference to the "Indenture" necessarily included the terms of the

First Supplement.

As an initial matter, even if there were any ambiguity in the term "Indenture" – and there

is not – that would have no bearing on the opinion stated in Curfman I that the entry into the

2006 Issuance documents did not breach *any* "indenture, agreement or contract" that ALL was a

party to.  That opinion is no way limited to consistency with the "Indenture" and necessarily

includes both the First Supplemental Indenture and the Depfa SBPA.  Likewise, the Trustee's

Certificate also states that JPMC's entry into the 2006 Issuance documents will not require any consent under or constitute a breach of *any* obligations – again, necessarily including any obligations that may have been imposed under the First Supplemental Indenture or the Depfa SBPA – and thus Waters' advice to Roemlein that this statement was accurate necessarily was an opinion that there was no conflict, regardless of any claimed ambiguity in the word "Indenture."

In fact, however, there is no basis for Depfa's claim that the absence of an explicit reference to the First Supplement rendered any of the opinion letters inadequate, because – as Thel himself stated in his opinion – the "Indenture" necessarily incorporates any prior supplements or amendments.  This is confirmed in a number of ways:

- Section 1.2 of the Indenture itself defines "Indenture" to mean "this Trust Indenture and any amendments or supplements made in accordance with its terms";

- Similarly, Robert Landau will testify at trial (as he did at his deposition) that it is understood in the industry that a reference to an "Indenture" necessarily includes any amendments or supplements, and that it is not necessary to specifically refer to such supplements or amendments;[21]

- In accordance with this understanding, the copy of the Indenture that was certified by ALL and included in the closing documents for the 2006 Issuance incorporated the terms of the First Supplement (Ex. 73); and

- Both Waters and Bayus – who acted as counsel on the 2005 Issuance and therefore plainly were aware of the First Supplemental Indenture – likewise referred to the "Indenture" generally and not specifically to the First Supplemental (Exs. 66, 67).

Indeed, it is perhaps most telling as to the universal understanding as to the meaning of the term "Indenture" that Depfa's own counsel, when writing in 2010 to complain (for the first time) about the purported violation of Depfa's consent rights, referred not to any violation of the "First Supplemental Indenture" but simply to the "Trust Indenture." (Ex. 156.)

---

[21] Landau Tr. 99:12-100:4; 115:17-116:3;120:2-17; Pope Tr. 126:2-21. As Landau suggested by analogy, it is unnecessary to (and, accordingly, no one does) refer to the United States Constitution "as amended"; reference to the "Constitution" itself necessarily means including the 27 amendments thereto.  Landau Tr. 99:19-24.

Thus, as of August 2, 2006 – the date of the various opinion letters – there can be no doubt that a reference to the "Indenture" meant as supplemented by the First Supplemental Indenture.  Indeed, since the First Supplemental Indenture was dated the same as the base Indenture – August 1, 2005 (*see* Ex. 2) – then any reference to the Indenture "dated August 1, 2005" likewise necessarily includes the First Supplemental Indenture.  Thus, when Sonnenschein opines that the Second Supplemental Indenture is "authorized or permitted by the provisions of the Trust Indenture," that is clearly an opinion as to consistency with the First Supplemental Indenture as well.  And when all counsel stated that they had reviewed the Indenture – and, indeed, *all* documents necessary to render their opinions – plainly that included the terms of the First Supplement as well.

To even allow for the possibility that the foregoing is not the proper reading – much less that, as Depfa apparently will try to argue, that its reading is the *best* one – requires one to adopt a completely unreasonable set of assumptions.  Namely, it requires one to assume that several experienced trust counsel undertook to opine on the validity of a *Second* Supplemental Indenture without being aware of the *First* Supplemental, or (even more preposterously) deliberately meaning to exclude the earlier supplement from their analysis.[22]  Recall, moreover, that Bayus and Waters at least had personally participated in the 2005 Issuance, so clearly they knew of the First Supplemental Indenture.  Curfman, moreover, stated that Sonnenschein was intending to provide the opinions that the Nossaman firm had given in the 2005 deal; clearly, then she *was* aware of the prior deal.  (Ex. 50.)  And, further, one would have to assume that not one of the numerous parties or their counsel to whom these opinions were circulated in advance spoke up about this apparent omission from the various letters.

---

[22] *See also* Pope Tr. 168:7-17 ("Any competent lawyer giving that opinion [that the Second Supplemental Indenture did not conflict with or breach any other agreement] would feel obligated to look in all of the documents incorporated through supplemental addendum in referencing the Indenture.").

Certainly, it cannot be the case that the Trustee was required to conceive of this remote possibility (if indeed it is even a possibility) and that it acted unreasonably or in bad faith in not doing so.  Robert Landau will testify as to his opinion that the Trustee's actions in accepting the opinion letters as clearing the 2006 Issuance were in accordance with reasonable and customary practice in the industry.[23]  Moreover, any claim that the Trustee was required to ask counsel whether they had reviewed the First Supplemental Indenture or meant to include it in their analysis runs up against the clear dictate of § 10.3(f) that the Trustee had no duty "to make any inquiry or investigation into the facts or matters stated in any … opinion."

Depfa's expert further opined that the Trustee could not rely on the opinion letters because they did not satisfy the requirements laid out in § 7.3(B), which states that prior to any supplement becoming effective, the Trustee must receive counsel opinions "to the effect that" the supplement has been "duly and lawfully entered into in accordance with the provisions of this Indenture, is authorized or permitted by this Indenture, and is valid and binding upon the Corporation and the Trustee."[24]  This argument is flawed because, first, there is nothing in any of the provisions of Article X (or, obviously, the common law) that would limit the Trustee's protections from counsel opinions to those that conform to § 7.3(B).   As previously discussed, any and all requirements in Article X (e.g., that the opinions were addressed to ALL) were plainly met.

More fundamentally, though, the opinion letters – and in particular, Curfman II – plainly were intended to, and do satisfy § 7.3(B).[25]  The three requirements of that section – due entry,

---

[23] *See* Ex. 186, ¶ 19.

[24] This argument about failure to satisfy § 7.3(B) was largely based on the supposed failure to mention the First Supplemental Indenture, which is meritless for the reasons already discussed.

[25] Curfman II states that it is being provided pursuant to subparagraph 8(e)(iv) of the Bond Purchase Agreement.  (Ex. 64, at 3.)  This provision of the Bond Purchase Agreement (Ex. 167) states that the obligation of the offering managers to enter into the agreement was conditioned upon receipt from Sonnenschein of an opinion "to

25

authorization/permission by the Indenture, and the valid and binding nature of the supplement –
are all addressed in paragraph (f) of Curfman II.  This paragraph is further supported by the
opinion in Curfman I that there would be no breach of any agreement to which ALL was a party,
and by the further opinions of Waters and Bayus that the Second Supplement was valid and
binding on both ALL and the Trustee.  While the exact words of § 7.3(B) are not used, they do
not need to be: § 7.3(B) by its terms only requires opinions "to the effect of" the three
requirements.  All that is required are opinion letters that substantively address the three
requirements, which the letters plainly do.[26]

## II.    DEPFA IS NOT AN INTENDED THIRD-PARTY BENEFICIARY OF THE FIRST SUPPLEMENTAL INDENTURE

Depfa's claim against JPMC fails for another reason.  Even if it had the consent rights it
claims – and, again, they do not – those consent rights in the Depfa SBPA are covenanted by
ALL, not the Trustee (even though the Trustee was a party to the SBPA and could easily have
done so if that was the parties' intent).  To bring a claim against JPMC, it is forced to claim
under the Indenture, to which it is not a party – thus requiring them to prove a clear intent on the
part of ALL and JPMC to make Depfa a third-party beneficiary.  No such intent appears from the
Indenture, and thus any contract claim against JPMC is barred.

The consent rights that Depfa claims were breached are found in the Depfa SBPA, which
states that "the *Issuer* shall not amend, modify [etc.]."  (Ex. 4, § 5.03(a) (emphasis added).)

---

the effect that … (F) the Second Supplemental Indenture has been duly and lawfully entered into in accordance with,
and is authorized or permitted by, the provisions of the Trust Indenture" and that "the Trust Indenture [and] the
Second Supplemental Indenture … are valid and binding upon the Corporation."  (Ex. 167, ¶ 8(e)(iv)(F).)  This is
precisely the language of § 7.3(B) of the Indenture.  Thus, Sonnenschein was clearly intending and representing that
its opinion satisfied the requirements of § 7.3(B).

[26] It was the opinion of Depfa's expert, as expressed in his report and at deposition, that the failure to
satisfy § 7.3(B) meant that the Second Supplemental Indenture never became part of the Indenture.  As stated above,
JPMC disagrees that § 7.3(B) was not satisfied.  But if Depfa's expert were correct, then Depfa's claim against
JPMC must fail because it would necessarily mean that JPMC had not, in fact, amended or modified the Indenture
without Depfa's consent.

There is no promise by, or obligation of, the Trustee stated in this section.  (Indeed, Article V is entitled, "Covenants of the Issuer.")  Thus, it is clear that there is no basis for Depfa to claim any liability by the Trustee under the Depfa SPBA itself.

In its complaint, Depfa also claims against JPMC under § 14.4(f) of the First Supplemental Indenture, which states,

> The Trustee hereby acknowledges that the Corporation has entered into an agreement with the Liquidity Provider pursuant to which the consent of the Liquidity Provider is required for certain actions under the Indenture, and the Trustee and the Corporation agree that no such action shall be taken without such consent.

(Ex. 2, § 14.4(f).)  Depfa, however, is not itself a party to the Indenture.  Accordingly, it can only make any claim against the Trustee under the Indenture if it can demonstrate that it is entitled to enforce § 14.4(f) as a third-party beneficiary.

Under California law, a contract may be enforced by one not a party only if that party shows that it was an *intended* beneficiary of the provision, i.e., was either a "donee beneficiary" or a "creditor beneficiary".  *See, e.g.*, *Souza v. Westlands Water Dist.*, 38 Cal. Rptr. 3d 78, 90 (Ct. App. 2006).  It is the burden of the party seeking enforcement to prove such intent, and is "largely a question of interpreting the written contract."  *Sessions Payroll Mgmt., Inc. v. Noble Constr. Co.*, 101 Cal. Rptr. 2d 127, 133 (Ct. App. 2000); *see also Hammes Co. Healthcare, LLC v. Tri-City Healthcare Dist.*, 2011 WL 2708493, at *5 (S.D. Cal. 2011) (beneficiary status "involves construction of the intention of the parties, gathered from reading the contract as a whole in light of the circumstances under which it was entered").  The intent to benefit the third party must be made "in an express manner; in direct or unmistakable terms; explicitly; definitely; directly."  *Smith v. Microskills San Diego L.P.*, 63 Cal. Rptr. 3d 608, 613 (Ct. App. 2007); *Northstar Fin. Advs., Inc. v. Schwab Invs.*, 781 F. Supp. 2d 926, 942 (N.D. Cal. 2011) ("Under

27

California law, a contract must be clear in its intention to benefit a third party in order for that party to establish beneficiary status.").[27]

It is clear that Depfa cannot be considered a donee beneficiary. "A donee beneficiary is a party to whom a promisee intends to make a gift (i.e., a benefit the promisee had no duty to confer) of a promisor's performance." *Souza*, 38 Cal. Rptr. at 90. There is clearly no evidence that ALL intended to make a "gift" to Depfa of the Trustee's purported promise not to take certain actions without Depfa's consent.

Nor is there evidence that Depfa is a creditor beneficiary. "A person cannot be a creditor beneficiary unless the promisor's performance of the contract will discharge some form of legal duty owed to the beneficiary by the promisee." *Martinez v. Socoma Cos.*, 11 Cal. 3d 394, 400 (1974). To the extent that ALL owed Depfa a duty under the Depfa SBPA not to take certain actions without Depfa's consent, extracting a promise from the Trustee not to do so would neither be necessary to discharge ALL's duty – since ALL was fully capable of performing that promise regardless of the Trustee – nor, to the extent that ALL could "amend" or "modify" (or the equivalent thereto) the Indenture without the Trustee's involvement, sufficient to discharge ALL's duty. Indeed, § 8.11 of the Depfa SBPA makes ALL's obligations under that agreement "absolute, unconditional and irrevocable and shall be paid or performed strictly in accordance with the terms of this Agreement under all circumstances whatsoever." *See also Souza*, 38 Cal. Rptr. 3d at 91 ("We are aware of no case in which a third-party-beneficiary contract was formed when a promisee bargained for and obtained a promisor's engagement to force the promisee to satisfy its own obligation to the third party.").

---

[27] It should also be remembered that under the Indenture the Trustee "undertakes to perform such duties and only such duties as are specifically set forth in this Indenture, and no implied covenants or obligations shall be read into this Indenture against the Trustee." Indenture § 10.2(a)(1). This further supports the notion that any purported covenant by the Trustee, enforceable by Depfa, must be stated clearly and unmistakably.

1260949_3

A number of factors further indicate that the parties to the Indenture – ALL and JPMC – did not intend for § 14.4(f) to create a right enforceable by Depfa, at least as against the Trustee. First, note that JPMC was, in fact, a party to the Depfa SPBA, and yet the parties to the SBPA made the negative covenant in § 5.03(a) a covenant of ALL *only*.[28]   It would have been quite simple, had the parties so intended, for JPMC to join in this covenant so as to allow Depfa to enforce it directly against the Trustee.  It is certainly an odd drafting choice for the parties to instead incorporate those consent rights into § 14.4(f) of the Indenture if what they intended was that by that provision Depfa be able to enforce §5.03(a) of the SPBA against the Trustee.

Second, where the parties to the Indenture intended third-party beneficiary rights, they stated so expressly and clearly.  Notable here are the various rights that Ambac insisted upon as the insurer of the Bonds.  The Indenture states expressly that "to the extent that this Indenture confers upon or gives or grants the Insurer any right, remedy or claim under or by reason of this Indenture, the Insurer is hereby explicitly recognized as being a third-party beneficiary hereunder and may enforce any such right, remedy or claim conferred, given or granted hereunder."  Indenture § 8.10.  The lack of any such statement in § 14.4(f) with respect to Depfa suggests it was not so intended.  *See In re Winn Trust*, 2009 WL 4441833, at *7 (Cal. Ct. App. 2009) (inclusion of phrase in one part of contract and omission in other indicates the omission was intentional).

Similarly, in Article VI of the Indenture, the covenants of ALL (including payment of all amounts due under the bonds) are expressly stated to run to the bondowners:  "The Corporation covenants and agrees with the Trustee, and the owners of the Bonds as follows…"  In § 14.4(f), the Trustee does not "covenant" to do anything, much less to Depfa.  Indeed, the statement in §

---

[28] JPMC's obligations under the Depfa SBPA were limited to its role (as Trustee and Tender Agent) of notifying Depfa in the event bonds were put to Depfa due to inability to remarket.  *See* Ex. 4, § 2.02.

14.4(f) that the Trustee and the Corporation "agree" that no such actions shall be taken without consent does not, as can be seen from the intro to Article VI, necessarily indicate an obligation on the part of both parties to the "agreement" (since Article VI clearly contains covenants of ALL only). Contrast this language to, for example, § 10.14 of the Indenture, in which the Trustee expressly "covenants" to take a number of actions.

Even if it were clear from the Indenture that the parties intended to create an enforceable obligation of the Trustee to Depfa, as a third-party beneficiary Depfa "cannot assert greater rights than those of the promisee under the contract." *Marina Tenants Ass'n v. Dauville Marina Dev. Co.*, 226 Cal. Rptr. 321, 326-27 (Ct. App. 1986). But it is plain here that the putative promisee, ALL, could not possibly enforce the Trustee's purported promise not to amend or modify the Indenture without Depfa's consent, given that if such a "amendment" or "modification" took place – and, again, JPMC believes the evidence is clear that it did not – it was ALL that was responsible.

The Depfa SBPA is, at bottom, a deal between Depfa and ALL, one in which ALL's agreement not to take certain actions without Depfa's consent was the price (or part of the price) for obtaining Depfa's liquidity commitment, thus improving the prospects for the bonds that ALL desired. These consent rights are clearly an obligation primarily of ALL. It is inconsistent with the Trustee's limited role – i.e., as an administrator or quasi-agent of the issuer, not a principal in the transaction – for it to take on enforcement of those consent obligations, i.e., to in effect become a guarantor of ALL's performance. It is much more consistent with the Trustee's role to read § 14.4(f) as being an obligation that runs from ALL to the Trustee – i.e., a provision

30

that gives the Trustee a basis to refuse to comply with directions that it deems to be in violation of Depfa's consent rights, but imposing no enforceable obligation on the Trustee to do so.[29]

## III.   JPMC IS ENTITLED TO INDEMNIFICATION FROM ALL FOR ANY LIABILITY AND FOR ITS ATTORNEYS' FEES

Even if JPMC could be held liable for entering into the Second Supplemental Indenture, it is nevertheless entitled under the terms of the Indenture to complete indemnification from ALL for any liability or expense incurred, including its attorneys' fees in connection with defending this action.[30]  Moreover, to the extent that ALL asserts that any such award must be made against the Pledged Assets, it is clear from the Indenture that payment takes priority in the waterfall over any payments due on the Bonds themselves.

### A.   ALL's Indemnification Obligation to JPMC Is Clear

Section 10.5 of the Indenture sets out the terms of the compensation due the Trustee for its performance under the Indenture.  Included within this section is an express indemnification clause, whereby ALL covenants and agrees

> To indemnify, defend and hold the Trustee harmless from and against any loss, liability, or expense incurred without negligence or bad faith on its part, arising out of or in connection with the acceptance or administration of the office of Trustee under this indenture, including the costs of defending itself against any claim or liability in connection with the exercise or performance of any of its powers or duties hereunder or thereunder.

---

[29] While the lack of any clear intent of third-party beneficiary status is evident from the documents themselves, it is worth noting that the initial communications of both Depfa and its counsel – even once they began to assert their purported consent rights under § 5.03(a) – did not assert a breach of those rights by anyone other than ALL.  *See, e.g.*, Ex. 156 (letter to BNYM repeatedly stating only that ALL breached § 5.03(a).) Even Depfa's initial answer and third-party complaint in this action stated only that ALL had breached the consent provisions.  *See* Dkt. # 20.  It was not until Depfa's amended answer that it had the epiphany that these provisions might be enforceable against the Trustee.

[30] The parties have agreed amongst themselves – subject, of course, to any contrary direction from the Court – that evidence of attorneys' fees and litigation expenses incurred in this action are not to be submitted with the pretrial order but will be dealt with in post-trial motions.  As discussed herein, however, indemnification for the Trustee's attorneys' fees and expenses, to the extent it is to be paid from the Pledged Assets, takes priority over any payments of principal or interest on the outstanding bonds, and thus any final judgment that draws upon the Pledged Assets must await the determination of attorneys' fees (or, at least, set aside sufficient amounts from the Pledged Assets to cover the award).

Indenture § 10.5(c).  Such indemnification clauses are determined "in accordance with the contractual provision."  *Finisar Corp. v. U.S. Bank Trust Nat'l Ass'n*, 2008 WL 3916050, at *7 (N.D. Cal. 2008) (indenture trustee was entitled to indemnification for litigation expenses despite Court's disagreement with the trustee's interpretation of the indenture).

As security for the performance of this obligation (as for the entirety of the obligations of § 10.5), the Trustee was granted a lien upon the Pledged Assets.  Moreover, the indemnification obligations of ALL are expressly stated to survive "the resignation or removal of the Trustee." *Id.*  Thus, despite the fact that BNY replaced JPMC as Trustee in 2006, it is clear that not only does ALL still have a duty to defend and indemnify JPMC, but that JPMC continues to have a lien against the Pledged Assets to secure the performance of these obligations.  (ALL, of course, maintains a similar obligation towards BNY.)

There can simply be no dispute that Depfa's claim against JPMC, and the costs to JPMC to defend against the claim, arise "out of or in connection with the acceptance of the office of Trustee" under the Indenture and "in connection with the exercise or performance of any of [the Trustee's] powers or duties" under the Indenture.  Further, as discussed *supra* at 19-21, the evidence at trial will demonstrate clearly that JPMC was neither negligent, nor did it act in bad faith, in entering into the Second Supplemental Indenture (the sole basis alleged by Depfa for liability).[31]  ALL's obligation is to indemnify JPMC for any liability that Depfa may obtain against JPMC, as well as for JPMC's attorneys' fees and litigation expenses.  Judgment on JPMC's crossclaim against ALL is therefore warranted.

---

[31] Indeed, ALL does not appear to dispute this in its answer.  Although it "denied as stated" JPMC's allegations of good faith and reasonable care, it did so on the grounds that they were "conclusions of law to which no response is required." Dkt. # 54, ¶ 2.  It would, of course, be difficult for ALL, who was responsible for developing and negotiating the terms of the 2006 Issuance, to claim that it was *the Trustee* who agreed to that deal negligently or in bad faith.  This is especially true in light of ALL's own closing certificate stating that the 2006 Issuance had been authorized by the ALL board of directors and certifying that entry into the 2006 Issuance documents would not constitute a breach of any agreement to which ALL was a party.  *See* Ex. 61, ¶ 14.

**B.      The Trustee's Indemnification Rights Are
        <u>Higher in the Waterfall than Payments on the Bonds</u>**

The introduction of § 10.5 of the Indenture makes it obligations "subject to Section 11.2."

Section 11.2, in turn, is a non-recourse provision which purports to limit ALL's liability under

the Indenture to the Pledged Assets.  Although ALL did not assert this provision as a defense to

JPMC's indemnification claim, to the extent that ALL is entitled to look to the Pledged Assets to

satisfy its indemnification obligations to JPMC (or to BNY), then it is clear that any such

payments have first claim to those assets, ahead of any payments of principal or interest on the

Bonds.

Section 5.3(B) of the Indenture – the "waterfall" – provides that the fourth level of

priority of payments includes amounts "sufficient to pay fees and expenses of the Trustee

…which are then payable."  Indenture § 5.3(B)(4).  Payment of interest due on the Senior Bonds

is in the fifth step of the waterfall, *see id.* § 5.3(B)(5), and redemptions of Bank Bonds come

after all payments due under steps 1-5 of the waterfall.  *See* Exs. 4, 5 § 3.02; Ex. 2 § 14.4(d); Ex.

3 § 17.4(d) (security interest of Liquidity Providers in Pledged Assets "to be in the order of

priority set forth in Section 5.3(B)(5), in the case of amounts due as reimbursement for the

payment of the principal of or interest on or purchase price of the Bonds").  Similarly, the

Indenture provides that post-default, payments of principal and interest on the Bonds are to be

made "after making provision … for the payment of the charges, expenses and liabilities

incurred and advances made by the Trustee in the performance of its duties under this

Indenture."  Indenture § 9.4(A).

The Trustee's right to reimbursement, including its right to indemnification, is therefore

higher in the waterfall than either of the two Liquidity Providers' rights to redemption of the

Bank Bonds (or interest on those bonds).  Provided that any judgment against the Trustee(s) does

not exceed the amount of Pledged Assets – and it is clear from the evidence that the amount of any possible such claim is not so large – then the practical result is that no liability will obtain against the Trustees.

## IV.    DEPFA HAD NO CONSENT RIGHTS THAT WERE VIOLATED BY THE SECOND SUPPLEMENTAL INDENTURE

In the foregoing sections, JPMC focused on the issues that are specific to it as Trustee, but this should not obscure the fact that the most fundamental reason why Depfa's claim fails is that it had no consent rights in the Depfa SBPA that were violated by the 2006 Issuance, period. To avoid burdening the Court with duplicative argument, JPMC highlights below the most important points and concurs in the arguments made by BNY Mellon in Sections II and III of its pretrial memorandum.

The  Depfa SBPA is governed by New York law. (Ex. 4, § 8.02.)  Under New York law, a contract must be interpreted so as to give effect to the intent of the parties, as expressed in the words they used.  *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (2002).  The Court must first determine, from the contract itself, whether it is ambiguous.  In making this determination, it is proper for the Court to consider together all contracts entered into in the same transaction.  *This is Me, Inc. v. Taylor*, 157 F.3d 139, 143 (2d Cir. 1998);  *MBIA Ins. Corp. v. Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A.*, 2011 WL 1197634, at *6 (S.D.N.Y. 2011).  The Court should examine the contract as "viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business."  *Alexander & Alexander Servs., Inc. v. Lloyd's*, 136 F.3d 82, 86 (2d Cir. 1998); *see also Jordan v. Can You Imagine, Inc.*, 485 F. Supp. 2d 493, 503 (S.D.N.Y. 2007) ("In determining whether a contract is ambiguous, a court considers the customs, practices, usages

and terminology as generally understood in the particular trade or business"); *Brad H. v. City of New York*, 17 N.Y.3d 180, 185-86 (2011) ("the contract must be considered as a whole").

It is only upon a determination that the contract is ambiguous in some material fashion that the Court may then turn to parol evidence. *Brad H.*, 17 N.Y.3d at 186. A contract is ambiguous if it is reasonably susceptible of two conflicting interpretations. *Id.* Upon a finding of ambiguity, the Court may look to evidence of negotiations or the parties' performance or practical construction of the contract for further evidence of meaning. It is the burden of the party asserting breach to prove the terms of the contract. *See Allied Sheet Metal Works, Inc. v. Kerby Saunders, Inc.*, 206 A.D.2d 166, 169 (1st Dep't 1994).

### A.   Depfa Had No Right to Consent to the Issuance of Subsequent Series of Bonds or the Terms of Any Credit Enhancement on Those Bonds

Depfa relies for its claimed consent right upon the 'Negative Covenants" section of Article V ("Covenants of the Issuer") of its SBPA:

> During the Bank Purchase Period, and so long as any obligation is owed to [Depfa] hereunder, the Issuer shall not:
>
> *(a)      Amendments.*   Amend, modify, terminate or grant, or permit the amendment, modification, termination or grant of, any waiver under, or consent to, or permit or suffer to occur any action or omission which results in, or is equivalent to, an amendment, modification, or grant of a waiver under, the [Ambac] Policy or the Indenture without the prior written consent of [Depfa].

(Ex. 4, § 5.03(a).) As discussed in Section II *supra*, Depfa claims that this provision is enforceable against the Trustee via § 14.4(f) of the First Supplemental Indenture.

As JPMC understands Depfa's position, at least as expressed through its proffered expert witnesses, it is that *any* subsequent supplemental indenture providing for the issuance of a new series of bonds, and any provision for the payment to any subsequent liquidity provider on those bonds, necessarily was an "amendment" or "modification" to the Indenture, or at least the "equivalent" thereof. This position fails, for a number of reasons.

First, the Court will hear from two trust industry experts, Robert Landau and Robert

Pope, that there is a well-understood distinction in the trust industry between "amendments" and

"supplements" to an indenture.  "Supplements" are used to add terms to the Indenture, and in

particular, it is the common mechanism by which future series of bonds are issued under a

"master" indenture – as was provided for and carried out here with respect to both the 2005 and

2006 Issuances.  *See* Indenture, § 2.1; § 7.1(9).  "Amendments," on the other hand, change or

modify existing provisions.[32]

Section 5.03(a) of the Depfa SBPA, as can plainly be seen, refers only to "amendments"

or "modifications" – not "supplements."  This language is in stark contrast to numerous

provisions in the Indenture referring to "amendments" and "supplements" – i.e., indicating

clearly that the parties believed them to mean something different.  *See, e.g.*, Indenture § 7.1(10)

(Corporation and Trustee may "modify, alter, amend or supplement this Indenture"); *id.* §

7.1(11), (12) (same); *id.* § 1.2 (defining "Supplemental Indenture" to mean "any indenture

supplemental to or amendatory of this Indenture").[33]  Notable among these are the Ambac

consent rights, i.e., that "without the prior written approval of the Insurer, the Corporation shall

not … amend or supplement this Indenture or the Insured Bonds."  (Ex. 1, § 8.6(b).)  The use of

"amend" and "modify" in § 5.03(a) – but not "supplement" – is telling.  Where parties use a

parallel construction but omit a word or words, the Court should assume that omission was

---

[32] *See* Landau Report (Ex. 186) ¶¶ 22-29; Pope Rebuttal Report (Ex. 192) at 1-6.  Both Martha Peterson, the lead negotiator for ALL, and Dennis Roemlein of JPMC (now BNYM) are expected to testify, as they did at their depositions, that their understanding of the terms "amendment" and "supplement" are consistent with Landau and Pope's opinion.  (*See, e.g.*, Peterson Tr. 49:5-15; Roemlein Tr. 207:2-23.)

[33] As can be seen, Article VII of the Indenture is entitled "Supplemental Indentures; Amendments."  Elaine Bayus testified that she had originally had two separate articles, Article VII for "Supplemental Indentures" and Article VIII for "Amendments."  (Bayus Tr. 35:12-36:6.)  This can be seen clearly in Ex. 27.  Further, Elizabeth Davis wrote a comment on then-Article VIII, i.e., "Amendments," stating "please provide no amendments w/o consent of Liquidity Provider," but did not do so with respect to Article VII, "Supplemental Indentures."  Ex. 27, at KR-DEPFA0001127.  *See* Davis Tr. 196:4-198:8.

deliberate.  *See, e.g.*, *U.S. Fidelity & Guar. Co. v. Annunziata*, 67 N.Y.2d 229, 233 (1996);

*MBIA*, 2011 WL 1197634, at *8.[34]  And, in fact, Depfa's counsel testified it was deliberate.  *See*

*infra* at 40.

Additionally, a number of witnesses agreed that it would be unusual, even highly so, for a

liquidity provider for one series of bonds to have veto rights over the issuance of a new series, or

over the terms of a subsequent liquidity provider agreement for those bonds.[35]  Notable among

these witnesses was Depfa's counsel, Elizabeth Davis:

| | |
|---|---|
| A (Davis): | Well, in my experience, it's not customary for liquidity providers in insured transactions to have consent rights over supplemental indentures. |
| Q: | And did this transaction follow the normal custom, in your understanding, in 2005? |
| A: | In that regard, yes. |

(Davis Tr. 209:2-9.)  There is no evidence suggesting that such a right for a liquidity provider

would be a common practice.[36]

Had the parties intended such an unusual result, they most certainly would have been

careful to say so, and to say so clearly, in the SBPA.  Where, as here, the documents are "drafted

by sophisticated, counseled parties and involving the loan of substantial sums of money," the

court should be particularly keen to "enforce the agreement made by the parties—not to add,

---

[34] Similarly, in the Second Supplemental Indenture, § 17.5 was specifically set apart as an "Amendments" section, and there was no such section in the First Supplemental Indenture.  Elaine Bayus, the drafter of both documents, testified that this was deliberate, "because we amended the Indenture in the second one and we didn't amend it in the first."  Bayus Tr. 24:2-25:4.

[35] *See* Landau Report (Ex. 186, ¶ 29), and Landau Tr. 179:4-180:11; Pope Rebuttal Report (Ex. 192) at 2-3 and Pope Tr. 61:4-21.  Even Nancy Henderson of Depfa conceded that "typically, … liquidity providers do not get the right to consent [to Supplemental Indentures that issue additional bonds]".  Henderson Tr. 52:24-53:13

[36] As Pope explains in his rebuttal report, it is not unusual for a credit enhancer such as an insurer (here, Ambac) to extract complete veto rights over additional debt (as Ambac did do here, *see* Indenture § 8.6(b)(xi) and (xii)), but it is unheard of for a liquidity provider to obtain such rights.  Ex. 192, at 3.

excise or distort the meaning of the terms they chose to include." *NML Capital v. Republic of Argentina*, 17 N.Y.3d 250, 259-60 (2011).

The foregoing, JPMC believes, establishes that there is in fact no ambiguity in the Depfa SBPA: Depfa had a right to consent to amendments or modifications of the Indenture, but not to a supplement that provided for the issuance of new bonds. Even if there were an ambiguity, however, Depfa cannot carry its burden to show evidence that the parties intended for it to have as broad a consent right as it claims. To the contrary, the evidence weighs convincingly against any such intent on the part of the parties to the Indenture.

First, given the highly unusual nature of the consent right Depfa claims, it is striking not only that there is no clear indication in the contracts themselves that such a right was intended, but also that there is a complete lack of any contemporaneous evidence of negotiations suggesting this intent. *See, e.g.*, Davis Tr. 37:8-38:12; 45:24-46:7 (no recollection of any discussions or requests by Depfa in 2005 to consent to supplements or subsequent liquidity provider terms); Bayus Tr. 37:22-38:4, 39:9-12 (same).[37]

Indeed, the evidence is to the contrary. Martha Peterson of ALL is expected to testify (as she did at deposition) that Depfa specifically requested a right to consent to subsequent liquidity provider contracts, which was rejected.[38] Seamus O'Neill, the financial consultant who helped negotiate the 2005 deal on behalf of ALL, testified that he had a specific conversation with Depfa representatives where he told them in no uncertain terms that ALL could not accept

---

[37] *See also* Park Tr. 102:14-23 (In 2005, Depfa never requested limits on redemption schedule or maturity of future bank bonds.)

[38] Peterson Tr. 52:8-54:2.

making Depfa a "gatekeeper" for subsequent liquidity providers, and that Depfa understood and agreed to that.[39]

Even more telling, however, is what happened in 2006. There is no dispute that Depfa was aware that a new series of bonds was being issued, with a new liquidity provider – because Depfa bid against Lloyds to get that liquidity provider contract. Moreover, Martha Peterson of ALL testified at deposition that in 2006 she specifically informed David Park of Depfa (when he called up to find out if Depfa had won the bid) that Lloyds had a 5-year term out for its bank bonds.[40] And yet, despite Depfa's claim now that the mere issuance of a new set of bonds it itself a "modification" that required its consent, there is no evidence that Depfa ever complained or asserted its supposed consent rights in 2006.[41] Indeed, even once it was forced to purchase the bonds and well into the disputes with ALL and BNY Mellon over redemptions, Depfa did not assert any supposed consent right (until, apparently, it hired outside counsel). As discussed *infra* Section VI, this failure to assert its rights in the face of (what it now claims is) a clear breach amounts to a waiver. At the very least it is powerful evidence of Depfa's own understanding of its rights. *See, e.g., Fed. Ins. Co. v. Americas Ins. Co.*, 258 A.D.2d 39, 44 (1st Dep't 1999) ("The parties to an agreement know best what they meant, and their action under it is often the strongest evidence of their meaning."); *Oceanside 84, Ltd. v. Fidelity Fed. Bank*, 66 Cal. Rptr. 2d 487, 492-93 (Ct. App. 1997) ("[T]he conduct of the parties after the execution of the contract,

---

[39] O'Neill Tr. 120-131.

[40] Peterson Tr. 61:5-63:23. Peterson also testified that she sent Park both the preliminary offering memorandum and the link to the final. *Id.* 64:5-66:7. The Offering Memorandum lays out the terms for redemption of bank bonds under the Lloyds SBPA. *See* Ex. 52, at TS-6–7. *See also* Park Tr. 203:20-209:10.

[41] Evidence indicates, moreover, that Depfa *was* asked to, and did, consent to the only amendment in the Second Supplemental Indenture, an amendment of the waterfall to place the Base Administrative Fee into the third step. *See* Ex. 49.

39

and before any controversy arose, may be considered in order to attempt to ascertain the parties' intention.").

Similarly, Depfa's counsel in the 2005 Issuance, Elizabeth Davis – who was responsible for drafting the very consent provisions Depfa now relies upon – served as counsel to Lloyds in the 2006 deal. She testified at her deposition that she perceived no conflict with her prior representation of Depfa and did not think that the deal she negotiated for Lloyds was prohibited by the terms of the 2005 deal. (Davis Tr. 67:6-13; 32:5-18.) This is despite her being aware that the redemption schedule for Lloyds was shorter and faster than that for Depfa. (Davis Tr. 52:19-53:6.)

Finally, even if the foregoing evidence did not clearly establish that the parties did not intend Depfa to have the consent rights it claims, New York law follows the well-established rule of *contra proferentem*, i.e., that "'equivocal contract provisions are generally to be construed against the drafter.'" *McCarthy v. Am. Int'l Group, Inc.*, 283 F.3d 121, 124 (2d Cir. 2002). The Depfa SBPA was drafted by Depfa's attorney, Elizabeth Davis. (Davis Tr. 17:6-12.) Indeed, she testified at deposition that there was a reason why she did not include the word "supplement" in § 5.03(a) – though upon direction of counsel she would not testify why. (Davis Tr. 39:12-41:24; 205:10-18.) Clearly, then, any remaining ambiguity that the Court may perceive in § 5.03(a) in light of the foregoing evidence – and JPMC submits there is none – must be construed against Depfa.

The evidence to be presented, in other words, will clearly demonstrate that Depfa had no right to consent to future bond issuances or future liquidity provider terms.

**B.**      **The 2006 Issuance Did Not Create a "Super-Senior" Series of Bonds**

Depfa's other argument, as JPMC understands it, is that by granting Lloyds bank bonds a shorter and more frequent redemption schedule, the 2006 Issuance effectively amended the

Indenture by creating what Depfa is fond of referring to as a "super-senior" class of bonds, in purported violation of § 2.1 of the Indenture.  This argument rests, at heart, on a strained and unfamiliar interpretation of the word "parity," contrary to its well-understood meaning in the industry.

Expert testimony at trial, in the person of Robert Landau and Robert Pope, will show that "parity" simply means an equivalent claim on the collateral, should there need to be resort to the collateral in order to satisfy its purpose – i.e., to fulfill obligations that would otherwise go unmet in the event of default, acceleration, bankruptcy or similar events.[42]  Absent such an event, however, then bonds are paid out according to their terms, and there is nothing about the concept of "parity" that requires all bonds on the same parity level to have the same interest rate, maturity, or redemption schedule – as numerous witnesses (including Depfa's) admitted at deposition.[43]

Indeed, Depfa's definition of "parity," if accepted, would mean that its *own* SBPA was invalid under the Indenture.  Suppose the situation arose in which some of the Series V-A-1 or -2 bonds were tendered to Depfa, but some remained in the market.[44]  Under the terms of the Depfa SBPA and the First Supplemental Indenture, Depfa's bonds would be required to be redeemed before any redemptions of non-bank bonds.  *See* First Supplemental § 14.4(e).  By Depfa's

---

[42] *See* Landau Report (Ex. 186) ¶¶ 30-35; Pope Report (Ex. 187) at 8 ("Parity security is relevant to bond holders as a practical matter only when there are insufficient funds to make timely principal and interest payments as set forth in the terms of the relevant bonds and related documents.  In the absence of a default and acceleration, payments of the parity debt are made on the terms specified in the issuing bond documents, including relevant credit enhancement documents.").

[43] Roemlein Tr. 197:12-198:9; Peterson Tr. 37:3-38:16; Park Tr. 127:12-128:21; Henderson Tr. 59:17-60:3. 65:21-66:4; *see also* Davis Tr. 213:5-20.  Elaine Bayus testified that she believed in 2006 that all five series of bonds were in parity even with the differing redemption schedules.  Bayus Tr. 44:19-46:15; *see also* Bayus Tr. 50:7-52:19 ("parity" does not tell you sequence of payments among senior bonds, for which you have to look to their terms).

[44] In fact, this actually took place.  Depfa did not purchase all $190 M of the Series V-A-1 and -2 bonds on the same date (nor did Lloyds with respect to its bonds).  *See* Stip. Facts ¶¶ 23, 24.

41

reasoning, this means that its bonds would be out of parity with, i.e., would be "super-senior" to,
the Senior Bonds that were not tendered to Depfa, just as Depfa claims that the faster redemption
of Lloyds' bonds rendered them "super-senior" to Depfa's.  Of course, under the accepted
definition of "parity," this problem does not and cannot arise, and thus this interpretation is
preferred.  *See, e.g., James v. Jamie Towers Housing Co.*, 294 A.D.2d 268, 269-70 (1st Dep't
2002) ("As a matter of law, we should adopt the construction of the contract that reasonably
harmonizes these provisions and avoids the inconsistency.").

      Depfa's claim on this point fails for yet another reason.  Even under Depfa's
construction, its right to be in "parity" extends only to the proceeds from liquidation of the
collateral.  It claims that the redemption payments resulted from just such a liquidation, i.e.,
principal repayment on the underlying student loans.  But under its SPBA, Depfa had a right to
interim redemptions *only* to the extent there were monies in the "Revenue Account."  (Exs. 4, 5 §
3.02.)  The Revenue Account, however, only contains cash from interest payments on the
underlying student loans (and certain other payments), but expressly does *not* include recoveries
of principal.  (Ex. 1 § 5.3(A); *id.* at 11, § 1.2 (definition of "Revenues".)  Even under Depfa's
theory, therefore, redemptions from available Revenues were not the proceeds from liquidation
of the collateral and thus did not need to be in parity.

      Use of recoveries of principal to redeem Bank Bonds, at least for interim payments, was
not a right that Depfa had under its SBPA.  Any use recoveries of principal to redeem bonds was
due to the fact that Ambac, in its Certificate and Agreement, had the right in the event of a
"Recycling Suspension Event" to direct the Issuer to cease using the principal repayments in the
Loan Account to purchase student loans and to instead use those funds to redeem bonds.  (Ex. 6
§ 4.2.)  Plainly, this was a provision for *Ambac*'s protection, and one within its control.  Depfa,

in other words, had no enforceable claim to interim redemptions from the recoveries of principal, much less that it had an enforceable claim to any particular share that was then "amended" by the entry into the 2006 Issuance.[45]

In sum, under its SBPA Depfa (1) had the right to redemption of its bonds after 10 years; (2) had the right to semiannual interim redemptions *only* to the extent there was revenue (i.e., interest payments on the student loans) available; and (3) knew that future bond issues (with credit enhancements such as liquidity providers) were possible but did not obtain a right to veto such issues.  After the 2006 Issuance was entered into, Depfa had exactly these same rights. There was no amendment, no modification, nor any equivalent thereto, and accordingly, there was no breach of any purported consent rights.

## V.     DEPFA MUST PROVE PROXIMATE CAUSATION

Depfa must also demonstrate that any claimed damage was proximately caused by JPMC's purported breach.[46]   *See, e.g.*, *Thompson Pacific Const., Inc. v. City of Sunnyvale*, 66 Cal. Rptr. 3d 175, 188 (Ct. App. 2007) ("in any contract action, it is essential to establish a causal connection between the breach and the damages sought"); *St. Paul Fire & Marine Ins. Co. v. Am. Dynasty Surplus Lines Ins. Co.*, 124 Cal. Rptr. 2d 818, 835 (Ct. App. 2002) ("Causation

---

[45] Even if Depfa could claim that the concept of "parity" required that any optional redemptions made from the recoveries of principal had to be pro rata among all bank bonds, *nothing* in the Second Supplemental Indenture, the Lloyds SBPA, or any of the 2006 Issuance documents that purports to change that.  Neither the Certificate and Agreement, nor the Second Supplemental, nor the Lloyds SBPA says anything about how such optional redemptions are to be made.  Thus, it cannot form the basis for a claim that JPMC amended the Indenture without Depfa's consent.

Furthermore, assuming Depfa had some right to a pro rata share of any optional redemptions from the recoveries of principal, it is evident that the remedy for this is to use any recoveries of principal currently available to first "catch up" Depfa, and then redeem pro rata from that point forward.  Thus, Depfa would be unable to demonstrate damages even if there had been any breach (particularly in light of the higher interest rate it has been earning on its unredeemed bonds).

[46] As outlined in BNY Mellon's motion filed today, in which JPMC joins, Depfa should be precluded from offering any damages evidence under Fed. R. Civ. P. 37(c) due to its failure to disclose an adequate computation of damages as required by Rule 26(a) and (e).

43

of damages in contract cases requires that the damages be proximately caused by the defendant's breach.").  Depfa will not be able to carry this burden.

First, given the fact that no one at ALL or Lloyds, nor their counsel, nor anyone associated with the 2006 Issuance for that matter saw any conflict with Depfa's rights under the 2005 Issuance, it is far from clear that the Trustee's refusal would have resulted in the 2006 Issuance not going forward (or going forward under different terms).  At least as likely is that JPMC would simply have been removed as Trustee – which ALL could do unilaterally and without cause, *see* Indenture § 10.7.  Given the fact that the Trustee did not participate in negotiation of the financial terms of the deal, and its ministerial role in the transaction, it is unrealistic to lay the impropriety of the 2006 Issuance – even if it had been improper, which it was not – at the Trustee's feet.

Further, had the Trustee insisted on seeking Depfa's consent, Depfa cannot show that it would not have been given.  Remember, first and foremost, that Depfa clearly *did* know about the 2006 Issuance and did not complain.  Moreover, in 2006 Ambac was still believed by all to be a reliable, AAA-rated insurer; thus, it is unlikely that Depfa would have seen the difference in redemption schedules for Lloyds to have been any problem, particularly in light of the much higher interest rate Depfa was to earn on bank bonds (if they were called upon to purchase them, which hadn't happened yet).  ALL, moreover, had the option to simply replace Depfa as liquidity provider on the Series V-A-1 and -2 bonds; Depfa's leverage would have been minimal.  Hence, it is highly unlikely that Depfa would have seen the deal that had been attractive to it just one year earlier as suddenly unattractive merely because of the additional issuance of bonds and the different terms for Lloyds.

44

Of course, in 2008 Ambac's weaknesses *did* become apparent, but this only serves to underscore the real cause of Depfa's losses: the economic downturn and the failure of Ambac.

## VI.    DEPFA'S CLAIMS ARE BARRED BY WAIVER

Finally, even if Depfa had a legitimate claim that it had a right to consent to the 2006 Issuance, it plainly waived and/or is estopped from asserting that right.  Waiver, which may be express or implied, requires "an existing right, a knowledge of its existence, an actual intention to relinquish it, or conduct so inconsistent with the intent to enforce the right as to induce a reasonable belief that it has been relinquished."  *Pacific Business Connections, Inc. v. St. Paul Surplus Lines Ins. Co.*, 58 Cal. Rptr. 3d 450, 455 (Ct. App. 2007).  As already noted *supra* at 39, Depfa knew full well that there was a new series of bonds being issued in 2006, and that there would be a liquidity provider for those bonds – since Depfa itself bid to be the provider for the deal.  Moreover, Depfa was asked to, and did, consent to the amendment of the waterfall included in the Second Supplemental Indenture.  Depfa also knew that the Lloyds SBPA termout was 5 years and had access to the complete redemption terms via the Offering Memorandum.  These actions are flatly inconsistent with an intent to stand on its purported right to consent.  Assuming Depfa had a right to consent to any new issuance of bonds, its failure to raise the issue with anyone until well into 2009 amounted to an intentional relinquishment of that right.[47]

---

[47] Depfa may attempt to rely upon the provisions of its SBPA that preclude oral waiver.  But as already discussed, any rights Depfa has against the Trustee arise not out of the SBPA but, if at all, as a third-party beneficiary under the First Supplemental Indenture.  There is no prohibition on oral waivers in the Indenture.  A party claiming as a third-party beneficiary must take the contract as it finds it, and cannot pick and choose the provisions it seeks to be bound by, and has no greater rights than the purported promisee that extracted the promise for the third party's benefit.  *See Souza*, 38 Cal. Rptr. 3d at 91.  ALL has no rights against oral waivers under the Indenture, and thus neither does Depfa.  Moreover, it does not appear Depfa even has rights against oral waivers under the SBPA, because it is governed by New York law, and it is clear that the enforceability of no-oral-*modification* clauses found in Gen. Oblig. L. §15-301 does not apply to prohibitions against oral *waiver*.  *See Nassau Trust Co. v. Montrose Concrete Prods. Corp.*, 56 N.Y.2d 175, 186 (1982); *Madison Ave. Leasehold, LLC v. Madison Bentley Assocs. LLC*, 30 A.D.3d 1, 6 (1st Dep't 2006).

Moreover, the proceeds from the 2006 Issuance were either used to purchase and/or originate new loans (*see* Davis Tr. 78:21-79:10; Bayus Tr. 63:14-19), or (to the extent they were left as cash) generated income; in either case, this created increased Revenues, in combination with any proceeds from the 2005 Issuance.   Depfa, in turn, benefited and partook of that cash stream due to not only the annual liquidity provider fees it received but also from the redemptions of its bonds.  At no time in its demands upon ALL or the Trustee did it seek to exclude the proceeds from the loans purchased in 2006; rather, it claimed full entitlement to the entire pool.  This claim simply further confirms the waiver by Depfa of any claimed breach by entry into the 2006 Issuance.

## CONCLUSION

For the reasons stated above, JPMC is confident that the upcoming trial will demonstrate that Depfa had no consent rights that were violated by the 2006 Issuance; that even to the extent it had such consent rights they were not enforceable against the Trustee; that Depfa cannot demonstrate damages caused by any alleged breach; and that any claim for breach of those rights was waived.  Even to the extent that Depfa were to have an enforceable right against the Trustee, the Trustee's conduct was fully protected by the good-faith and reasonable reliance on advice of counsel (both oral and written).  Judgment for JPMC on Depfa's third-party claim is thus dictated.

Finally, JPMC's right to indemnification from ALL, and from the pledged assets, for its expenses and attorneys' fees, and for any liability that may be found in favor of Depfa, is indisputable.  Judgment in favor of JPMC on its indemnification claim against ALL is also warranted.

Dated:    October 31, 2011
          New York, NY

                         SATTERLEE STEPHENS BURKE & BURKE LLP


                         By: /s/Glenn C. Edwards
                         James J. Coster
                         Walter A. Saurack
                         Glenn C. Edwards

                         230 Park Avenue, 11th Floor
                         New York, NY 10169
                         (212) 818-9200
                         (212) 818-9606 (fax)

                         Attorneys for Third-Party Defendant/
                         Crossclaimant JP Morgan Chase Bank, N.A.