UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A.,<br><br>　　　　Plaintiff-Counterclaim Defendant,<br><br>　-against-<br><br>DEPFA BANK PLC and LLOYDS TSB BANK PLC,<br><br>　　　　Defendants-Counterclaimants. | No. 10 Civ. 4424 (JPO)(AJP)<br><br>**PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW** |

Third-party Defendant and Cross-claimant JP Morgan Chase Bank, NA ("JPMC"), by their attorneys Satterlee Stephens Burke & Burke LLP, hereby respectfully submits the following proposed conclusions of law and findings of fact for the upcoming bench trial in this action. JPMC incorporates by reference the Stipulations of Fact jointly entered into between the parties and made a part of the Joint Pre-Trial Order.

## FINDINGS OF FACT

1. This matter is before the Court upon an interpleader action filed by Bank of New York Mellon Trust Company, NA ("BNYM") seeking a declaratory judgment to determine if Lloyd's TSB Bank plc ("Lloyds") is entitled to funds currently held and funds deposited hereafter in the Payment Account of the Trust for the redemption of Bonds held by Lloyds or if DEPFA Bank plc ("DEPFA") is entitled to these same funds for the redemption of Bonds held by DEPFA.

2. In 2005, ALL decided to issue $190 million in senior Series V A-1 and A-2 bonds to be backed by student loans, and solicited bids from banks, including DEPFA and Lloyds, to act as liquidity provider for the bonds. See Trial Ex. 2.

3. DEPFA submitted a bid in June 2005, which ALL accepted. See Trial Ex. 18.

4. DEPFA agreed to provide liquidity for 10 years and to an interest rate of Prime + 1.5%. See Trial Ex. 4.

5. In return for agreeing to provide liquidity, DEPFA received liquidity fees in the amount of 17.5 basis points on the balance of outstanding bonds. See Trial Ex. 7.

6. The Offering Statement for the 2005 bonds summarized the various indenture provisions and sets forth Risk Factors, including that "there can be no assurance that the Insurer [Ambac] will have sufficient revenues to enable it to make timely payments under the Insurance Policy". See Trial Ex. 28.

7. In connection with the 2005 Transaction, the Parties entered into various agreements, including, among others, the Indenture, First Supplemental Indenture and DEPFA Standby Bond Purchase Agreement. See Joint Stipulations of Fact, Nos. 1, 2 and 3.

8. DEPFA and its counsel were involved in negotiating the Indenture and, thus, were aware of its terms. See April 28, 2011 Transcript of the Deposition of Elizabeth Davis ("Davis Tr.") at 22:7 – 23:7; 23:15 – 24:12.

9. DEPFA counsel Elizabeth Davis of Kutak Rock LLP drafted the 2005 DEPFA Standby Purchase Agreement ("SBPA") and reviewed additional documents associated with the 2005 transaction. See Davis Tr.17:6 – 25.

10. The purpose of the Indenture was to facilitate the issuance of Series V bonds. See the March 16, 2011 Transcript of the Deposition of Seamus O'Neill ("O'Neill Tr.") at 171:23 – 173:17.

11. The Indenture was a Master Indenture, as that term is known in the bond industry, because it specifically authorized and contemplated that more than one issuance of bonds

would be made thereunder.  See the March 31, 2011 Transcript of the Deposition of Martha Peterson ("Peterson Tr.") at 53:5-7 and Davis Tr. 128:2 – 21; See the September 21, 2011 Transcript of the Deposition of Robert Landau ("Landau Tr.") at 173:13 – 174:3.

12.  The Indenture contemplated that the issuance of different series of bonds would be accomplished by means of a Supplemental Indenture, which is also standard in the bond industry. See Peterson Tr. 53:8 –11.

13.  ALL, DEPFA and JPMC executed a First Supplemental Indenture simultaneously with the Indenture to effectuate the issuance of Series V A-1 and A-2 bonds. See Trial Ex. 2 and 4.

14.  On August 2, 2005 ALL selected DEPFA as liquidity provider for the Student Loan Program Revenue Bonds, Senior Series V-A-1, Senior Series V-A-2 and entered into the DEPFA SBPA.  See Joint Stipulations of Fact No. 3.

15.  The First Supplemental Indenture was drafted by bond counsel Elaine Bayus of Orrick Herrington & Sutcliffe LLP ("Orrick"). See the May 19, 2011 Transcript of the Deposition of Elaine Bayus ("Bayus Tr.") at 15:6 -15.

16.  As trustee JPMC did not negotiate the financial terms of the DEPA SBPA. See the May 11, 2011 Transcript of the Deposition of Dennis Roemlein ("Roemlein Tr.") at 43:16 – 25.

17.  The DEPFA SBPA and was drafted by DEPFA's counsel and is governed by New York law. See Davis Tr. 23:15 – 24:4; Trial Ex. 4.

18.  DEPFA was obligated to serve as the buyer of last resort for all outstanding Series A-1 and A-2 Bonds under certain circumstances.  See Trial Ex. 4.

19. In the event that DEPFA was required to purchase the bonds, the DEPFA SBPA provides that they be redeemed in semiannual installments over ten years from available funds in the Revenue account, after taking into consideration certain waterfall expenses. See Trial Ex. 4.

20. The bank bond interest rate on the Senior Series V-A-1 and V-A-2 Bonds is prime + 1.5% as of 90 days after the date of purchase of such Bonds. See Trial Ex. 4.

21. In 2006, ALL decided to issue an additional $190 million in senior Series V bonds under the Indenture. See Trial Exs. 39 and 40.

22. ALL once again invited several banks to bid to act as liquidity providers for the new bond issuance. Both DEPFA and Lloyds received a Request for Proposal ("RFP") to serve as liquidity provider for the Senior Series V-A-3, Senior Series V-A-4 and Senior Series V-A-5 Bonds. See Trial Exs. 39 and 40.

23. As bidder for its services as a liquidity provider for the 2006 Series V bonds, DEPFA was aware that other banks were competing bidders and that a second series of bonds would be issued that may have different terms, different interest rates and different redemption periods. See the June 16, 2011 Transcript of the Deposition of David Park ("Park Tr.") at 204:8 – 205:6.

24. As it had in 2005, DEPFA bid a 10 year term out with a higher interest rate. See Trial Ex. 43.

25. Lloyds bid a 5 year liquidity term, with a lower interest rate. See Trial Ex.41.

26. DEPFA was known in the industry for bidding longer terms. See the June 23, 2011 Transcript of the Deposition of Thea Watkins ("Watkins Tr.") at 193:7 – 23.

27. It was typical in the industry for different liquidity providers to bid different terms. See Davis Tr. 71:10 - 13.

28. Ultimately, ALL chose Lloyds as the liquidity provider for the 2006 bonds. See Trial Ex. 5.

29. Part of the reason for ALL's choice of Lloyds was to give it diversity in credit exposure. See Peterson Tr. 60:5 - 18.

30. Martha Peterson notified DEPFA that it was not the winning bidder for the 2006 transaction. When asked by David Park of DEPFA, Peterson informed Park that Lloyds was the winning bidder. See Peterson Tr. 61:5 – 24.

31. Park had experience in bidding as a liquidity provider. He knew that not all banks bid the same term length or interest rate, and Peterson told him that Lloyds had bid a shorter liquidity term. See Park Tr. 204:8 – 205:6; Peterson Tr. 61:9 – 24.

32. Neither in 2006, nor at any point thereafter until 2009, did Park assert that ALL could not issue additional bonds or that ALL could not enter into a Supplemental Indenture without DEPFA's consent. See Park Tr. 120:2 – 5; 97:2 – 18.

33. Nor did he tell Peterson that ALL should have gotten DEPFA's consent to the Lloyds liquidity facility See Park Tr. 219:18 - 25.

34. Nor did Park tell anyone at the Trustee in or around 2006. Id.

35. In fact, Park did not believe in 2006 that DEPFA had any right to consent. See Park Tr. 98:20 – 99:9.

36. A Second Supplemental Indenture between ALL and JPMC, as Trustee, dated as of August 1, 2006 (the "Second Supplemental Indenture"), was executed with respect to the issuance of the Lloyds' Bonds. See Joint Stipulations of Fact No. 5.

37. The Second Supplemental Indenture was drafted by bond counsel Elaine Bayus of Orrick. See Bayus Tr. 17:22 – 18:6.

38. As with the DEPFA SBPA, the Lloyds SPBA obligated Lloyds to serve as the buyer of last resort for all outstanding Series A-3, A-4 and A-5 Bonds under certain circumstances. See Trial Ex. 5.

39. Unlike the DEPFA SBPA, however, the Lloyds SBPA provides that the Series A-3, A-4 and A-5 Bonds would be redeemed in quarterly installments over five years. See Trial Ex. 5.

40. Lloyds interest rate for Bank Bonds under the SBPA was LIBOR + 1.75 % over a term of five years payable in quarterly installments. See Trial Ex. 5.

41. DEPFA's interest rate for Bank Bonds under the SBPA was significantly higher than Lloyds and payable in semi-annual installments over a term of ten years. See Trial Exs. 4 and 5.

42. Student loans purchased with proceeds from the Senior Series V-A-3, Senior Series V-A-4 and Senior Series V-A-5 Bonds became part of the Pledged Assets thereby increasing the collateral of the Senior Series V-A-1, V-A-2, V-A-3, V-A-4 and V-A-5 Bonds. See Park Tr. 164:14 – 165:8.

43. After the collapse of the auction rate securities market in February 2008 and the downgrade of Ambac's credit rating there was no market for the Series V Bonds and both DEPFA and Lloyds were required to purchase all outstanding Bonds. See O'Neill Tr. 68:24 – 69:11.

44. On July 16, 2009 Nancy Henderson and David Park of DEPFA sent a letter to Martha Peterson at ALL raising an issue regarding the redemption payments made pursuant to the DEPFA and Lloyds Liquidity Facilities. See Trial Ex. 9.

45. Ms. Peterson responded to Ms. Henderson and Mr. Park's July 16 Letter by letter dated August 4, 2009. See Trial Ex. 11.

46. On November 27, 2009 Ms. Henderson of DEPFA sent a letter dated November 27, 2009 to Ms. Peterson and Quentin Wilson of ALL, advising ALL of its objections to the past and future redemptions of the Lloyds Bonds and asserting that its consent rights had been violated. See Trial Ex. 12

47. DEPFA confirmed to ALL and Lloyds, in an email dated December 3, 2009, that DEPFA, ALL and Lloyds had agreed that redemption payments of the Bonds be suspended pending future discussions regarding restructuring of the trust. See Trial Ex. 141

48. On or about March 31, 2010, ALL informed the Trustee that Lloyds had requested that redemption payments be resumed. See Trial Ex. 154.

49. Richard A. Rosen of Paul, Weiss, Rifkind, Wharton & Garrison LLP, counsel for DEPFA, sent a letter dated April 6, 2010 to Kathleen R. Ellison of Fulbright & Jaworski L.L.P., counsel for BNY Mellon, by which DEPFA reasserted its position that ALL had no legal right to make further redemption payments on the Bonds owned by Lloyds until it redeemed all of the outstanding Bonds owned by DEPFA. See Trial Ex. 156. DEPFA alleged that ALL and the Trustee had breached the DEPFA SBPA by not obtaining its consent to the issuance of the Bonds now owned by Lloyds. Id, See Trial Ex. 156. The unauthorized "Lloyds

Transaction," DEPFA claimed, did not relieve ALL of its duty to make scheduled mandatory redemptions to DEPFA under the DEPFA SBPA. Id.

50.  David L. Barres of Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., counsel for Lloyds, sent a letter dated April 22, 2010 to Richard A. Rosen, Lloyds responding to DEPFA's April 6, 2010 letter and asserted that ALL was not required to obtain DEPFA's consent prior to issuing the Series V-A-3, V-A-4 and V-A-5 bonds, and even if such consent were required, payments due and owing under the Indenture were not affected by the alleged breach.  (Trial Ex. 161).  Lloyds demanded that the Trustee resume redemption payments and alleged that by failing to make payments to Lloyds since November 2009, ALL and the Trustee breached their contractual and fiduciary obligations to Lloyds. See Trial Ex 161.

51.  As a result of the competing positions BNY Mellon filed this interpleader action on June 3, 2010, seeking to have the Court determine the dispute between DEPFA and Lloyds. See Joint Stipulations of Fact No. 30.

52.  On September 2, 2010 DEPFA filed an amended answer, which included a third party claim against JPMC for breach of contract.  DEPFA claims against JPMC allege that by entering into the Second Supplemental Indenture with Lloyds without obtaining prior written consent from DEPFA, JPMC breached the First Supplemental Indenture and the DEPFA SBPA.  See Court Docket, No. 26.

53.  Prior to the closing of the 2006 Transaction, various counsel issued opinion letters addressing the validity of the transaction. See Trial Exs. 53, 54, 59, 60, 63, 64 and 66.

54.  Opinion letters of all counsel were sent to all relevant parties prior to and as a part of the closing. See e.g. Trial Exs. 51, 53 and 54.

55. Sonnenschein Nath & Rosenthal LLP, issued two letters stating, inter alia, that the (i) Indenture (defined to include the Second Supplemental Indenture) and the Lloyds SBPA were valid and binding obligations of ALL; (ii) the execution and delivery of the Indenture and the Lloyds SBPA would not conflict with or constitute a breach of any other agreement to which ALL is a party or bound; (iii) the Second Supplemental Indenture is authorized or permitted by the Indenture; and (iv) the Second Supplemental Indenture was duly executed by ALL. See Trial Exs. 63 & 64.

56. DEPFA counsel Elizabeth Davis of Kutak Rock LLP represented DEPFA in the 2005 Series V Bond Transaction and drafted the DEPFA SBPA. See Davis Tr. 17:6 – 17:12.

57. Kutak Rock LLP issued an opinion letter dated August 2, 2006, addressed to ALL, JPM Chase, First Southwest Company, UBS Securities LLC, J.P. Morgan Securities, Inc., and Ambac. Trial Ex. 67, stating that Kutak Rock, on behalf of Lloyds, had reviewed the Agreement and other documentation deemed necessary and offering the opinion that, inter alia, the Second Supplemental Indenture had been duly executed and constituted a legal, valid and binding obligation upon Lloyds. See Trial Exh. 65.

58. Orrick issued an opinion letter stating that, as bond counsel, it had reviewed the other opinions of counsel, and that counsel to ALL (Sonnenschein) was of the opinion that, *inter alia*, the Second Supplemental Indenture had been duly executed and delivered by, and constituted a valid and binding obligation of ALL. See Trial Ex. 67

59. Similarly counsel to Lloyds issued an opinion stating that Lloyds SBPA constituted the legal, valid and binding obligation of Lloyds, and was enforceable against Lloyds in accordance with the terms thereof. See Trial Ex. 65.

60. Attorney Charles Waters served as counsel to JPMC for both the 2005 and 2006 Series V transactions. See Roemlein Tr. 28:17 – 29:10.

61. He issued an opinion stating that JPMC had duly authorized, executed and delivered the Supplemental Indenture and Lloyds SBPA and that both documents were valid and legally binding obligations of JPMC. See Trial Ex. 66.

62. Bond counsel, as well as counsel to Lloyds and the Trustee had each been involved in the 2005 Transaction and were familiar with the documents that had been executed in connection with that transaction. See Joint Stipulations of Fact Nos. 11, 12, 16 and 17.

63. Elizabeth Davis did not perceive any conflict of interest in working on both the 2005 and 2006 bond issuances. See Davis Tr. 66:9 – 67:24.

64. In addition to the opinion letters, ALL issued a "Closing Certificate of the Corporation" further opining as to the validity of the 2006 Transaction. See Trial Ex. 59.

65. The Closing Certificate certifies that "[a]ll necessary action required to be taken by [ALL] in connection with, and all conditions precedent to, the authorization, execution, issuance, delivery and performance" of the documents executed in connection with the 2006 Transaction, including the Second Supplemental Indenture and Lloyds SBPA, "have been taken or fulfilled." See Trial Ex. 59 at 3, ¶ 10.

66. The Closing Certificate also certifies that the execution and delivery of the transaction documents, including the Second Supplemental Indenture and the Lloyds SBPA,

would not conflict with or constitute a breach of any other agreement to which ALL is a party or bound. See Trial Ex. 59 at 4, ¶ 14.

67. Dennis Roemlein received the advice of JPMC's counsel Charles Waters that the documents associated with the 2006 Transaction were acceptable, valid and consistent with the Trustee's obligations. (Expected testimony of Roemlein.)

68. Relying on such advice, Dennis Roemlein executed a Certificate and Receipt of the Trustee (the "Trustee's Certificate"). See Trial Ex. 71.

69. At the time Dennis Roemlein signed the Certificate and Receipt of the Trustee on August 2, 2005 on behalf of JPMC, he relied on the opinions of counsel in determining that all required consents and approvals had been provided. See Roemlein Tr. 123:15 – 124:12.

70. In the Trustee's Certificate JPMC certified, *inter alia*, that the Indenture, defined to include the Second Supplemental Indenture, were legal, valid and binding obligations of the Trustee, and the Trustee's consent to these documents, including the Lloyds SBPA, do not result in a breach or default under any agreement to which the Trustee is a party or may be bound. The Trustee received, and relied upon, the opinion of its counsel in executing the Trustee's Certificate. See Trial Ex. 7.

71. In the bond industry series of bonds are typically issued through a supplement to the indenture. See Roemlein Tr. 207:15 – 23; Peterson Tr. 53:5 – 7; O'Neill Tr. 173:18 - 25.

72. "Amendment" and "supplement" have distinct meanings in the trust industry; Amendments change existing rights/obligations while, supplements relate to the issuance of new bonds. See Peterson Tr. 48:20 – 49:9.

73. The parties used amendment and supplement as distinct terms in the 2005 documents in accordance with industry practice. See Bayus Tr. 35:12 – 36:6.

74. In drafting the Indenture, Elaine Bayus originally included Supplemental Indentures and Amendments in separate articles; she later combined them for convenience. See Bayus Tr. 29:10 - 31:2.

75. As counsel for Depfa in 2005, Davis commented on the original draft of the Indenture, "no amendments without consent of liquidity provider," on the "Amendments" but not the "Supplemental Indentures" article. See Trial Exh. 12.

76. In 2006, Davis knew that Lloyd's had a shorter, faster redemption schedule than Depfa did for its bank bonds. See Davis Tr. 205:19-206:4

77. Davis did not consider that Lloyds different redemption schedule represented any conflict with Depfa's position or a breach of Depfa's SBPA. See Davis Tr. 30:16-23.

78. Section 17.5 of the Second Supplemental Indenture sets forth minor amendments to the Indenture, including an amendment to the place for administrative fees in the "waterfall." See Trial Exh. 3.

79. ALL consulted with representatives of Depfa about the amendment to the waterfall in § 17.5 of the Second Supplemental Indenture and received consent. See Trial Ex. 49.

80. The Indenture expressly authorized ALL to enter into a Supplemental Indenture for the issuance of additional series of bonds, and to do so without the consent of any bondholders. See O'Neill Tr. 120:7 – 121:12; Trial Ex. 1.

81. In 2005 ALL rejected DEPFA's request for consent rights to subsequent liquidity providers because it wanted the ability to issue additional Series of bonds without DEPFA's

1277962_1

consent. Seamus O'Neill specifically told DEPFA it would not grant the right to stand as "gatekeeper" against future issuances. See Peterson 53:12 – 54:2; O'Neill Tr. 120:7 – 121:12.

82. Had Depfa insisted on an ability to veto future issuances or liquidity providers, the loss of flexibility to ALL would have been so critical that ALL would not have gone forward with the deal on those terms. See Peterson Tr. 191:23-192:14.

83. It would be highly unusual for a liquidity provider to have the right to consent to subsequent bond issues or subsequent liquidity providers. See Davis 208:14-209:9; See the September 23, 2011 Transcript of the Deposition of Robert Pope ("Pope Tr.") at 65:12-66:8; Landau 179:4-180:5.

84. DEPFA did not voice any objections to the issuance of the 2006 Series V Bonds to JPMC or any of the relevant parties in 2006. See Park Tr. 120:2 – 120:5.

85. DEPFA did not tell JPMC or anyone else in 2006 that it had a consent right. See Park Tr. 97:10 – 98:25.

86. In 2005 DEPFA did not possess an understanding of the term parity as detailed in Section 2.1 of the Indenture. See Park Tr. 122:2 – 122:10.

87. As understood in the trust industry, bonds are in "parity" if they have any equivalent claim upon the collateral in the event the collateral must be resorted to in order to satisfy the obligations due on the bonds, such as a liquidation or event of default. Ex. 186 (Report of Robert Landau); Ex.187 (Report of Robert Pope); Ex 191 (Municipal Securities Rulemaking Board Glossary of Municipal Securities Terms, printed August 20, 2011.

88. It is understood in the industry that bonds may be in "parity" even though they have different redemption schedules, different interest rates, different maturities and different payment schedules. *Id.*

89. The parties to the transactions here understood "parity" consistently with the industry understanding. <u>See</u> Park Tr. 125:8 -11; 134:4 – 8; Roemlein Tr. 94:11 – 95:7; 197:12 – 198:6; Peterson Tr. 37:10 – 38:7; 165:3 – 163:12; Davis Tr. 175:4 – 12; 213:8 - 20.

## **CONCLUSIONS OF LAW**

90. The Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) and 28 U.S.C. § 1367(a).

91. The Indenture is governed by California law.

92. Prior to an event of default, the Trustee has only those duties and obligations expressly stated in the Indenture.

93. Bank of New York Mellon assumed the responsibilities of Trustee under the Indenture in or about October 2006.

94. At least as of October 2006, there had been no event of default under the Indenture.

95. The DEPFA SBPA is governed by New York law.

96. DEPFA had no right under the DEPFA SBPA or under the Indenture, to consent to subsequent bond issues.

97. DEPFA had no right, under the DEPFA SBPA or under the Indenture, to consent to future liquidity provider contracts or the terms thereof.

98. The Series V-A-3, 4 and 5 bonds are in parity with the Series V-A-1 and 2 bonds.

99. The Bonds held by Lloyds are in parity with the Bonds held by DEPFA.

100. DEPFA had no right under the Indenture or the SBPA to redemptions from Recoveries of Principal or amounts neither in the Loan Account, nor to redemptions of its bonds from such sources would be in any particular amounts or proportions relative to other bonds.

101. Except for § 17.5, the Second Supplemental Indenture did not amend or modify the Indenture, nor was it the equivalent thereof.

102. Entry into the Second Supplemental Indenture and related documents did not breach any right of, or obligation owed to, DEPFA.

103. JPMC's entry into the Second Supplemental Indenture did not require consents under or breach any obligation under any contract to which JPMC was a party or by which it was bound.

104. Section 14.4(f) of the First Supplemental Indenture does not constitute an enforceable promise by JPMC to ALL to refrain from actions in violation of any consent rights DEPFA may have under the DEPFA SBPA.

105. The Indenture, including the First Supplemental Indenture, does not evince a clear intent on the part of JPMC and ALL to give DEPFA a right to enforce the terms of § 14.4(f) against JPMC.

106. DEPFA is not a third-party beneficiary of § 14.4(f) of the First Supplemental Indenture and thus may not claim against JPMC for any alleged breach of that provision.

107. DEPFA has no greater rights as a third-party beneficiary under the First Supplemental Indenture than ALL has against JPMC.

108. Because ALL is itself responsible for any breach of DEPFA's consent rights occasioned by the Second Supplemental Indenture, it would be barred from asserting any claim against JPMC for such breach, and thus DEPFA cannot assert a breach against JPMC either.

109. JPMC's entry into the Second Supplemental Indenture and related documents was not the proximate cause of any damages or loss suffered by DEPFA.

110. Any shortfall in redemptions owed to DEPFA vis-à-vis Lloyds may first be remedied by "catching up" DEPFA prior from the Pledged Assets prior to any further distribution of those assets.

111. DEPFA waived any claim against JPMC arising out of the entry by JPMC into the Second Supplemental Indenture and related documents.

112. JPMC's entry into the Second Supplemental Indenture and related documents was in accordance with the written opinions of counsel issued in connection with the 2006 Issuance.

113. The use of the word "Indenture" in the opinion letters issued in connection with the 2006 Issuance means, or at least can reasonably be read as meaning, the Indenture including the First Supplemental Indenture

114. The statements in the opinion letters and certificates issued in connection with the 2006 Issuance that entry into the Second Supplemental Indenture and related documents would not constitute a breach of any prior agreement necessarily meant, or at least can reasonably be read as meaning, that there was no conflict with the First Supplemental Indenture or the DEPFA SBPA.

115. The written opinions of counsel issued in connection with the 2006 Issuance satisfied the requirements of § 7.3(B) of the Indenture.

116. The written opinions of counsel issued in connection with the 2006 Issuance did not need to satisfy § 7.3(B) of the Indenture in order for the Trustee to be entitled to rely upon them.

1277962_1

117.     JPMC's entry into the Second Supplemental Indenture and related documents was not negligent.

118.     JPMC's entry into the Second Supplemental Indenture and related documents was done in good faith.

119.     JPMC had no obligation to inquire into or investigate the opinions of counsel issued in connection with the 2006 Issuance.

120.     The written opinions of counsel issued in connection with the 2006 Issuance are full and complete authorization and protection for JPMC's entry into the Second Supplemental Indenture and related documents and afford a complete defense to any claim of breach by DEPFA, pursuant to § 10.3(d) of the Indenture.

121.     JPMC was entitled to rely upon, and is protected by, the written and oral opinions of counsel, and the Closing Certificate of the Corporation, in connection with the 2006 Issuance, and such opinions and certificates afford a complete defense to any claim of breach by DEPFA, pursuant to § 10.3(a) of the Indenture and the common law.

122.     To the extent that any entry into the Second Supplemental Indenture and related documents was in violation of DEPFA's consent rights under the DEPFA SBPA, JPMC's actions were a good-faith error of judgment by a Responsible Officer of JPMC for which JPMC is not liable, pursuant to § 10.(2)(c)(2) of the Indenture.

123.     JPMC is not liable to Depfa for breach of contract.

124.     The claim by DEPFA against JPMC in this action arises out of or in connection with JPMC's acceptance or administration of the office of Trustee under the Indenture and in connection with JPMC's exercise or performance of its powers and duties under the Indenture.

125. ALL is obligated under § 10.5 of the Indenture to indemnify JPMC for any liability incurred in this action.

126. ALL is obligated under § 10.5 of the Indenture to indemnify JPMC for all expenses incurred in defending against the claims in this action, including JPMC's attorneys' fees.

127. JPMC has a valid lien against the Pledged Assets as security for this indemnification obligation.

128. JPMC's claim against the Pledged Assets for indemnification is higher priority than the claim of either DEPFA or Lloyds for payment of principal or interest on the Bonds.

Dated:  October 31, 2011
        New York, NY

                SATTERLEE STEPHENS BURKE & BURKE LLP

                By: /s/Glenn C. Edwards
                James J. Coster
                Walter A. Saurack
                Glenn C. Edwards

                230 Park Avenue, 11th Floor
                New York, NY 10169
                (212) 818-9200
                (212) 818-9606 (fax)

                Attorneys for Third-Party Defendant/
                Crossclaimant JP Morgan Chase Bank, N.A.