UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------------x

THE BANK OF NEW YORK
MELLON TRUST COMPANY, N.A.,

          Plaintiff-Counterclaim Defendant,

    - against -

DEPFA BANK PLC and LLOYDS TSB BANK PLC,

          Defendants-Counterclaimants-
          Crossclaimants-Crossclaim
          Defendants.

:   No. 10 Civ. 4424 (JPO)

----------------------------------------------------------------------x

DEPFA BANK PLC,

         Third-Party Plaintiff-
         Counterclaim Defendant,

    - against -

ACCESS TO LOANS FOR LEARNING STUDENT
LOAN CORPORATION,

         Third-Party Defendant-
Counterclaimant,

    - and -

JPMORGAN CHASE BANK, N.A.,

         Third-Party Defendant.

**DEPFA BANK PLC'S
MEMORANDUM OF LAW IN
SUPPORT OF ITS MOTION
*IN LIMINE* TO EXCLUDE
CERTAIN EXPERT TESTIMONY**

----------------------------------------------------------------------x

LLOYDS TSB BANK PLC,

         Third-Party Plaintiff,

    - against -

ACCESS TO LOANS FOR LEARNING STUDENT
LOAN CORPORATION,

         Third-Party Defendant.

----------------------------------------------------------------------x

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...........................................................................................1

STATEMENT OF FACTS ..................................................................................................2

ARGUMENT.......................................................................................................................3

POINT I    LANDAU'S AND POPE'S LEGAL CONCLUSIONS ARE NOT
           ADMISSIBLE UNDER RULE 702 AND SHOULD BE
           EXCLUDED. ..................................................................................................3

POINT II   POPE AND LANDAU'S OPINIONS ABOUT THE INTENT OF
           THE PARTIES ARE NOT ADMISSIBLE UNDER  RULE 702
           AND SHOULD BE EXCLUDED. ...................................................................8

POINT III  BALIBAN'S TESTIMONY SHOULD BE EXCLUDED IN ITS
           ENTIRETY ...................................................................................................10

     A.    Baliban Is Not Qualified to Opine on the Standard
           of Care Applicable to a Trust Administrator. .......................................10

     B.    Baliban's Legal Conclusions Are Inadmissible...................................11

     C.    Baliban's Testimony Will Not Assist the Trier of Fact. .......................12

CONCLUSION..................................................................................................................17

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Amster v. River Capital Int'l Group LLC,*
  2003 U.S. Dist. LEXIS 4619 (S.D.N.Y. Mar. 25, 2003) ........................................... 8

*Arista Records LLC v. Lime Group LLC,*
  2011 U.S. Dist. LEXIS 47416 (S.D.N.Y. Apr. 29, 2011)....................................... 16

*CMI-Trading v. Quantum Air,*
  98 F.3d 887 (6th Cir. 1996) ................................................................................. 8

*In re Fosamax Prods. Liab. Litig.,*
  645 F. Supp. 2d 164 (S.D.N.Y. 2009)................................................................ 4, 8

*Highland Capital Mgmt., L.P. v. Schneider,*
  551 F. Supp. 2d 173 (S.D.N.Y. 2008)................................................................... 6

*Holowecki v. Fed. Express Corp.,*
  644 F. Supp. 2d 338 (S.D.N.Y. 2009)................................................................. 12

*Hygh v. Jacobs,*
  961 F.2d 359 (2d Cir. 1992).............................................................................. 3, 4

*Loeb v. Hammond,*
  407 F.2d 779 (7th Cir. 1969) ............................................................................... 4

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.,*
  525 F. Supp. 2d 558 (S.D.N.Y. 2007)................................................................. 12

*Marx & Co. v. Diners' Club, Inc.,*
  550 F.2d 505 (2d Cir. 1977)............................................................................. 4, 5

*In re Methyl Tertiary Butyl Ether Prods. Liab. Litig. v. Exxon Mobil Corp.,*
  2009 U.S. Dist. LEXIS 63563 (S.D.N.Y. July 21, 2009) ....................................... 3

*Primavera Familienstiftung v. Askin,*
  130 F. Supp. 2d 450 (S.D.N.Y. 2001).................................................................. 5

*R.F.M.A.S., Inc. v. Mimi So,*
  748 F. Supp. 2d 244 (S.D.N.Y. 2010)................................................................ 11

*Sheet Metal Workers, Local Union No. 24 v. Architectural Metal Works, Inc.,*
  259 F.3d 418 (6th Cir. 2001) ............................................................................... 4

**Page(s)**

**RULES**

Fed. R. Evid. 702 ................................................................................................. *passim*

Fed. R. Evid. 704 ..........................................................................................................6

DEPFA BANK plc ("Depfa") hereby moves *in limine* to exclude certain testimony of putative expert witnesses designated by The Bank of New York Mellon Trust Company, N.A. ("BNY Mellon"), JPMorgan Chase Bank, N.A. ("JPMorgan" and, together with BNY Mellon, the "Trustees"), and Lloyds TSB Bank plc ("Lloyds") on the ground that they do not meet the requirements for expert opinion testimony under Federal Rule of Evidence 702.[1]

## PRELIMINARY STATEMENT

The law regarding opinion testimony of expert witnesses is well-settled in a number of respects:  Expert witnesses may not offer legal conclusions; expert witnesses may not speculate about others' intent, knowledge, or state of mind; expert witnesses may only testify regarding matters on which they are qualified to opine based on experience, knowledge, or education; and expert witnesses can only offer testimony if it will assist the trier of fact.  One of Lloyds' expert's, and both of the Trustees' experts', intended testimony runs afoul of one or more of these well-settled principles.

Robert Dean Pope ("Pope"), a practicing attorney proffered by Lloyds, Robert I. Landau ("Landau"), an attorney by training proffered by the Trustees, and Jeffrey L. Baliban ("Baliban"), proffered by BNY Mellon, all devote substantial portions of their expert reports to interpreting the agreements at issue in this case, and then drawing legal conclusions from those agreements.  While they often couch their legal conclusions in terms of "custom and practice" or "industry practice," that does not change the fact that the testimony they seek to offer is inadmissible.  In addition, Pope and Landau repeatedly speculate about the intent and motivations of corporate entities and individuals.  For his part, Baliban opines on the need to

---

[1]  All capitalized terms not defined herein shall have the meaning ascribed to them in Depfa's Pretrial Memorandum of Law.

defer to the judgment of a trust administrator, yet does not even claim to have any experience, knowledge, or education in the field of trust administration, he offers inadmissible legal conclusions, and his testimony is so inconclusive as to be utterly unhelpful to the trier of fact.

For these reasons, Depfa seeks an order precluding these experts from testifying at trial regarding matters clearly prohibited under the Federal Rules of Evidence and binding case law.

## STATEMENT OF FACTS[2]

On August 5, 2011, Pope, a partner at the law firm Hunton & Williams LLP, submitted an expert report on behalf of Lloyds regarding the meaning of the word "parity" in Section 2.1 of the Indenture, which provides that additional bonds "may be issued on a parity with Senior Bonds." (*See* October 31, 2011 Declaration of Scott M. Berman In Support of Depfa Bank plc's Motion *In Limine* to Exclude Certain Expert Testimony (the "Berman Decl."), Ex. A.) On August 31, 2011, Pope submitted a rebuttal report (*see id.*, Ex. B), in response to the August 5, 2011 expert report of Joel J. Powers (*see id.*, Ex. G), who opined on behalf of Depfa regarding the parity issue and whether the Lloyds Liquidity Facility and Second Supplemental Indenture amended the Indenture in violation of Section 5.03(a) of the Depfa Liquidity Facility.

On August 5, 2011, Landau, an attorney by training who works as a consultant and advisor, submitted an expert report on behalf of BNY Mellon and JPMorgan regarding the Trustees' duties under the relevant agreements. (*See id.*, Ex. D.) Landau opined on the scope of the Trustees' duties under Article X of the Indenture, contractual provisions in the Indenture concerning the Trustees' reliance on directions from ALL and opinions of counsel, and language

---

[2] For a complete recitation of the facts of this case, Depfa respectfully refers the Court to its Pretrial Memorandum of Law.

in the opinion letters relied upon by the Trustees prior to entering into the Lloyds Liquidity Facility and Second Supplemental Indenture.  In formulating these opinions, Landau speculated on the intent and state of mind of the parties at the time they entered into various agreements.

On August 31, 2011, Baliban, a litigation consultant at a firm specializing in business valuation, submitted an expert report (*see id.*, Ex. E), on behalf of BNY Mellon in response to the reports of Jack E. Blumenthal and Scott Friedland, who submitted reports on behalf of Lloyds and Depfa, respectively.  Baliban's testimony is predicated on the notion that ALL's judgment in administering the trust is entitled to deference.  This testimony is wholly inadmissible, however, because Baliban has no experience or education in trust administration, he uses the business judgment rule to offer legal conclusions, and his "analysis" is so indeterminate and ambivalent that it does not assist the trier of fact to better understand any of the issues raised in the Blumenthal and Friedland Reports.

## ARGUMENT

### POINT I

### LANDAU'S AND POPE'S LEGAL CONCLUSIONS ARE NOT ADMISSIBLE UNDER RULE 702 AND SHOULD BE EXCLUDED.

Expert testimony stating a legal conclusion is inadmissible under Federal Rule of Evidence 702.  The Second Circuit has expressly held that "expert testimony that expresses a legal conclusion" requires exclusion.  *Hygh v. Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992); *accord In re Methyl Tertiary Butyl Ether Prods. Liab. Litig. v. Exxon Mobil Corp.*, 2009 U.S. Dist. LEXIS 63563, at **28-29 (S.D.N.Y. July 21, 2009) (holding that "although an expert may opine on an issue of fact within the jury's province, he may not give testimony stating ultimate legal conclusions based on those facts") (internal citation and quotation marks omitted).  "[E]xpert testimony on law is excluded because 'the tribunal does not need the witness' judgment. . . . The

special legal knowledge of the judge makes [such] witness testimony superfluous." *Marx & Co. v. Diners' Club, Inc.*, 550 F.2d 505, 510 (2d Cir. 1977) (quoting VII WIGMORE ON EVIDENCE § 1952, at 81); *see also In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 173 (S.D.N.Y. 2009).

Moreover, although the rule prohibiting witnesses from testifying on any "ultimate issue" has been abolished, legal conclusions masquerading as expert opinions remain inadmissible. As the Second Circuit has explained, "[e]ven if a jury were not misled into adopting outright a legal conclusion proffered by an expert witness, the testimony would remain objectionable by communicating a legal standard—explicit or implicit—to the jury." *Hygh*, 961 F.2d at 364.

The exclusion of testimony stating a legal conclusion is particularly important in cases involving the interpretation of a contract, as "'[t]he question of interpretation of the contract is for the jury and the question of legal effect is for the judge. In neither case do we permit expert testimony.'" *Diners' Club, Inc.*, 505 F.2d at 510 (quoting *Loeb v. Hammond*, 407 F.2d 779, 781 n.13 (7th Cir. 1969)); *see also Sheet Metal Workers, Local Union No. 24 v. Architectural Metal Works, Inc.*, 259 F.3d 418, 424 (6th Cir. 2001) (noting that "the opinions of percipient or expert witnesses regarding the meaning(s) of contractual provisions are irrelevant and hence inadmissible") (citation omitted).

As discussed below, much of Pope's and Landau's reports are devoted to offering legal conclusions, rather than opinion based on "scientific, technical, or other specialized knowledge." Fed. R. Evid. 702. Their testimony as to legal conclusions should be excluded because its "admission . . . would give the appearance that the court was shifting to witnesses the responsibility to decide the case." *Diners' Club, Inc.*, 505 F.2d at 510.

Landau repeatedly offers legal conclusions in his report.  (*See, e.g.*, Berman Decl.,

Ex. D,  ¶¶ 19, 20, 21, 24, 27, 29.)  For example, he offers legal conclusions based on his

interpretation of the relevant agreements and opinions of counsel:

- In connection with the execution of the Second Supplemental Indenture dated as of August 1, 2006, the Trustee received the appropriate Opinion of Counsel (DEPFA10002193) as mandated by Indenture Section 7.3(B) which it relied upon as to the matters contained in it pursuant to Sections 10.2(a)(2), 10.3(a) and (d).  It was not required to conduct an independent review or examination of such opinion under Section 10.3(f).  (*Id.* ¶ 19.)

- In connection with the receipt of Directions and Certificates from the Issuer, the Trustee had the right to rely upon them as provided by Sections 10.2(a)(2), 10.3(a) and (b).  The Trustee was not required to perform a substantive review of the matters set forth in such documents, as set forth in Section 10.3(f).  (*Id.* ¶ 20.)

- The Trustee properly relied upon the Directions it received to redeem Student Loan Program Revenue Bonds (Series V) ("Bonds") and give the required notice of redemption under Section 3.8 of the Indenture.  It was not required to question the content of the Directions pursuant to Sections 10.3(a) and (f).  Its role was essentially that of a "processor" of the Issuer's responsibility to cause redemptions of Bonds under Section 3.02 of the [liquidity facilities].  (*Id.* ¶ 21.)

- In this Indenture, the drafters repeatedly distinguished between supplements and amendments.  (*Id.* ¶ 24.)

- Section 7.2 specifically addresses the use of Supplemental Indentures "in accordance with and subject to the provisions of Section 7.5."  Section 7.5 lays out the very specific requirements in terms of modification or amendment, meaning changing a specific Indenture provision, which is understood in the industry to mean add to, change or delete a specific provision in the Indenture.  (*Id.* ¶ 27.)

Landau seeks to instruct the Court on what he believes is the proper construction of certain

contract provisions and opinion letters.  The law is clear that such statements are inappropriate

for expert testimony.  *See Primavera Familienstiftung v. Askin*, 130 F. Supp. 2d 450, 528

(S.D.N.Y. 2001) (holding that an expert opinion "should not be admitted where it 'would merely

tell the jury what result to reach'") (quoting advisory committee note to Federal Rule of Evidence 704(a)).

Similarly, Pope repeatedly offers legal interpretations of provisions of the relevant agreements. (*See, e.g.*, Berman Decl., Ex. A, at pp. 4 and 10; *id.*, Ex. B, at pp. 3, 4, 5, 6, 7, and 8.) For example, Pope opines as follows:

- Article IX of the Indenture contains standard remedy provisions specifying the *limited circumstances* under which Bonds are not to be paid on the dates and in the amounts specified in the applicable Supplemental Indenture and any related Credit Enhancement. (*Id.*, Ex. A, at p. 4) (emphasis added.)

- Indeed Section 5.3(E) of the Indenture specifically authorizes and contemplates incorporation into the waterfall of all the payment terms set forth in any applicable credit enhancement for additional bonds. (*Id.*, Ex. B, at 5.)

- Because the Indenture did not implement Mr. Powers' [Depfa's expert witness] erroneous and impractical definition of parity, he asserts that the Depfa Bonds and the Lloyds Bonds "are not in 'parity'" (page 5) and "were not on a parity" (page 19). This bizarre conclusion is inconsistent with the terms of the Indenture and the SBPAs . . . . (*Id.* at 8.)

In these examples—and in many others—Pope is merely offering an interpretation of the Indenture that he believes is the correct one. Indeed, the Pope Reports are replete with legal conclusions—carefully couched in terms of Pope's "industry practice" (*see, e.g.*, Berman Decl., Ex. A, at pp. 7, 10; Berman Decl., Ex. B, at pp. at 1, 2)—based on nothing more than his textual analysis of the agreements. The law is clear, however, that regardless how many times Pope repeats the talismanic phrase "industry practice," he should not be permitted to provide legal conclusions based on his interpretation of the relevant documents. *See Highland Capital Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 181 (S.D.N.Y. 2008), *rev'd on other grounds*, 2010 U.S. App. LEXIS 12735 (2d Cir. June 22, 2010) (precluding expert from offering

legal opinions even when "couched in terms of industry practices") (internal citation and

quotation marks omitted).

In contrast to Pope and Landau, the report of Joel J. Powers—Depfa's expert who,

alone among the putative experts, has specialized in student loan-backed bonds and related

liquidity facilities for twenty-five years—is based on his extensive experience in, and first-hand

knowledge of, the student loan bond industry.  For example, Powers concludes that Depfa had a

broad consent right based solely on his knowledge of custom and practice in the bond industry:

> • In my experience, SBPA's typically incorporate language that
>   excludes any requirement that liquidity provider consent be
>   obtained before new bonds can be issued if new bonds are issued
>   on similar terms.  However, in the Depfa SBPA, there is no such
>   explicit exclusion that allows the issuance of additional bonds
>   without liquidity provider consent.  Depfa therefore enjoyed
>   broader than usual covenant rights and its consent was required
>   before new bonds could be issued.  (Berman Decl., Ex. G, at p. 4.)

> • Bonds issued on a parity basis share equally in the risk of principal
>   loss due to insufficient collateral.  Because ALL's principal
>   payments to Lloyds resulted in Lloyds receiving in excess of their
>   pro rata share of collateral, Depfa's bonds are subject to a greater
>   amount of principal loss than would be the case if the collateral
>   had been distributed ratably.  This is inconsistent with the assertion
>   that Depfa's and Lloyds' bonds were issued on a parity basis.  (*Id.*,
>   at p. 6.)

These conclusions do not flow from a legal analysis of the provisions of agreements; rather,

Powers opines on the breadth of Depfa's consent rights and the application of "parity" to the

facts here based on his extensive industry experience.

**POINT II**

**POPE AND LANDAU'S OPINIONS ABOUT THE INTENT OF THE PARTIES
ARE NOT ADMISSIBLE UNDER RULE 702 AND SHOULD BE EXCLUDED.**

Expert witnesses are not permitted to testify regarding an individual or entity's knowledge, motivation, intent, state of mind, or purposes, because they cannot possibly be qualified to do so. *See In re Fosamax,* 645 F. Supp. 2d at 192 (excluding portions of expert testimony purporting to opine on a corporation's and the FDA's knowledge on the ground that the expert "conceded . . . that her regulatory expertise does not give her the ability to read minds"); *Amster v. River Capital Int'l Group LLC*, 2003 U.S. Dist. LEXIS 4619, at *4 (S.D.N.Y. Mar. 25, 2003) (precluding expert witness from "opin[ing] as to the intent of the parties or witnesses" in a case involving a dispute over the proper interpretation of an agreement); *see also CMI-Trading v. Quantum Air*, 98 F.3d 887, 890 (6th Cir. 1996) ("The intent of the parties is an issue within the competence of the jury and expert opinion testimony will not assist the jury, within the meaning of Federal Rule of Evidence 702, in determining the factual issue of intent."). Yet, Pope and Landau repeatedly do just that.

For example, Pope opines about the intent, knowledge, and state of mind of the agreements' drafters (based on analysis of the language of the agreements and application of canons of contract interpretation):

- The Indenture obviously was drafted to give ALL broad flexibility to incur additional indebtedness secured by a liquidity facility or other credit enhancement. (Berman Decl., Ex. B, at 4.)

- All of these opinions and actions evidence that the parties to the issuance of the Depfa Bonds did not *intend* to give Depfa a veto over the issuance of additional bonds. (*Id.* at 4) (emphasis added.)

- Instead, as described in Paragraphs 25-29 of the Landau Report, the language of Sections 7.1, 7.2, and 7.5 of the Indenture and of Section 5.03(a) of the Depfa SPBA evidences *a collective intent* to honor the customary dichotomy and to provide Depfa with a veto

over only substantive changes to the original terms of the Indenture.  If the parties had *intended* to depart from industry practice, they would have, in my opinion, spelled out with great specificity the veto power of the liquidity facility provider over the issuance of additional bonds.  (*Id.* at 5) (emphases added.)

- And once again, Mr. Powers' conclusions ignore *the understanding of the documentation by all parties at the time*, including, ALL, its counsel, the Trustee, Bond Counsel as drafter of the Indenture, and the law firm that served as counsel to both Depfa and Lloyds.  (*Id.* at 6) (emphasis added.)

- I'm gauging the *intent* of the parties by the standard industry practices as to how additional bonds are implemented—the provisions of additional bonds are implemented into a waterfall as well as the actual language of the waterfall itself, and of Section 5.3(e).  (Berman Decl., Ex. C, at 119:14-20) (emphasis added.)

Landau, for his part, opines on Depfa's intent based on the language—or, more precisely, the lack of certain language—in the agreements:

- If the right to consent to the issuance of a series of bonds was *desired* by the Liquidity Provider it had to be, and would have been, spelled out in the Indenture, the First Supplemental Indenture or the SBPA. . . .  Similarly, if DEPFA had *desired* to have the right to consent to the terms of a subsequent Liquidity Facility, such right would have been spelled out in the Indenture, the First Supplemental Indenture or the SBPA.  No such express right appears in those documents.  (*Id.*, Ex. D, ¶ 29) (emphases added.) (*See also id.* ¶ 35.)

Pope and Landau should be precluded from offering any testimony at trial regarding the intent, knowledge, or state of mind of others.

## POINT III

## <u>BALIBAN'S TESTIMONY SHOULD BE EXCLUDED IN ITS ENTIRETY</u>

The testimony of Baliban should be excluded in its entirety for three reasons:  He is not qualified to opine on many of the issues he addresses; he regularly draws inadmissible legal conclusions; and his testimony will not assist the trier of fact.

### A.      <u>Baliban Is Not Qualified to Opine on the Standard of Care Applicable to a Trust Administrator.</u>

In his report, Baliban repeatedly offers opinions regarding ALL's exercise of judgment as the Issuer, despite the fact that he has no qualifications to opine on the standard of care applicable to trust administrators.  For example, Baliban repeatedly criticizes other experts on the ground that they are attempting to "supplant ALL's real-time judgment with their own ex-post view of the timing and amounts of accruals that should have been made."  (Berman Decl. Ex. E, ¶ 43; *see also id.* ¶¶ 18, 20, 30, 38, 45.)  Nowhere in his report or deposition, however, does Baliban indicate any experience or expertise in trust indentures or the standard of care applicable to administrators of a trust.  As he testified:

- Q.  Do you consider yourself to be an expert on the bond industry?

  A.  I'm an economist and I'm an accountant.  I get involved in investments and investment questions all the time.  I've never been—I've never focused my career solely on the bond industry.  (*Id.*, Ex. F, at 25:11-17.)

- I've never actually been an administrator of an Indenture Trust.  (*Id.* at 167:17-18.)

- Q.  And you've never been a trustee or an employee of a Trustee of an Indenture Trust?

  A.  That's correct.  (*Id.* at 168:3-6.)[3]

---

[3]  All objections to form have been omitted from the deposition testimony excerpted herein.

If an expert lacks skill, experience, training or education in the subject matter on

which he seeks to opine, his testimony is inadmissible. *See R.F.M.A.S., Inc. v. Mimi So*, 748 F.

Supp. 2d 244, 268 (S.D.N.Y. 2010) (excluding testimony where experts had no "skill,

experience, training, or education" in the subject matter on which they sought to opine). Because

Baliban, by his own admission, has absolutely no experience in administering trusts, he is not

qualified to opine on the standard of care applicable to a trust administrator.

**B.      Baliban's Legal Conclusions Are Inadmissible.**

In his report, Baliban repeatedly offers legal conclusions, and does not even

bother to couch them in terms of experience in or knowledge of the industry.  (*See, e.g.*, Berman

Decl., Ex. E, ¶¶ 28, 39, 40.)  For example, he invokes what appears to be the business judgment

rule—a legal doctrine, not a principle of scientific, technical or other specialized knowledge—

presumably to render ALL's actions beyond this Court's purview:

> • In the ALL Series V Cashflow Analysis reports, it appears ALL, *in
> its business judgment*, made its bond interest accruals such that the
> full amount of the next six-month interest payment is available in
> the Payment account at all times.  This practice of accruing for six
> months *was consistent* with accruals for other Indenture waterfall
> expenses based on the terms of the Trust Indenture.

(*Id.* ¶ 40 (footnote omitted) (emphases added).)  His deposition testimony was similarly rife with

legal opinions, including his apparent belief that ALL's decisions should be accorded deference:

> • I certainly feel that management's or *ALL's realtime judgment*
> needs to be considered strongly before statements such as there
> was sufficient money to redeem bonds or money that should have
> been used for bond redemption or any other characterization of
> where that money should have gone when that opinion conflicts
> with what ALL had done in the circumstances.
>
> So, if ALL were to say or, I'm sorry, if Mr. Friedland were to say
> on this particular day, there's $24,387,469.15 that's available for
> redemption and ALL, in their *realtime judgment*, didn't use that
> money for redemption.  Unless you can show that they were

*unreasonable* in making—in reaching that conclusion or *acted improudently*, then before you say that money is available for redemption, you have to understand the basis of why redemptions were not made and what might have been going through Martha Peterson's, or anyone else at ALL's, mind when they reached the conclusion that redemptions—that money should not be used for redemption before you can say it should have been. (*Id.*, Ex. F, at 187: 7- 188:8) (emphases added.)

- I think an expert is required to give due consideration in a matter like this to what was done by the parties at the time contemporaneously with the issues arising, even if he disagrees with the amounts that they used.

  Unless, in his or her opinion, he believes that the decisions that were made were made *without due professional care* or made incorrectly, improperly, irresponsibly or in an imprudent matter. (*Id.* at 63:16-64:2) (emphasis added.)

This testimony as to ALL's judgment and whether it exercised that judgment in a reasonable or prudent way is an inadmissible legal conclusion, and should therefore be excluded.

C.   **Baliban's Testimony Will Not Assist the Trier of Fact.**

Under Rule 702, "scientific, technical, or other specialized knowledge" is only admissible if it "will assist the trier of fact to understand the evidence or to determine a fact in issue." Where expert testimony is not helpful to the trier of fact, it is not admissible. *See Holowecki v. Fed. Express Corp.*, 644 F. Supp. 2d 338, 356 (S.D.N.Y. 2009) (excluding expert testimony on the ground that it is "unhelpful to the trier of fact"). And while objections to the helpfulness of an expert's testimony often go to weight and not admissibility, in certain circumstances "questions of weight, when sufficiently accumulated, become so serious as to require exclusion." *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 679 (S.D.N.Y. 2007). This is just such a circumstance.

The stated purpose of Baliban's testimony is to rebut the Friedland and Blumenthal Reports. (Berman Decl., Ex. E, ¶ 14.) Rather than actually rebut the substance of

either report, however, Baliban simply states that, to the extent either expert declined to defer to

ALL's "real-time judgment," that expert's opinion may or may not be flawed in certain,

unspecified, respects.  At no point does Baliban attempt to determine the propriety of ALL's

judgment, nor does he attempt to refute the substance of either expert.[4]  Accordingly, his

testimony will not assist the trier of fact to analyze the Friedland and Blumenthal Reports, and

should therefore be excluded.

For example, when asked which assumptions in the Blumenthal Report he

believes are incorrect, Baliban's response was that there are simply too many assumptions to

consider:

> It's difficult for me to answer that question because in his—in his
> reconstruction process, Mr. Blumenthal makes a variety of
> assumptions.  He reconstructs each day of activity in these
> accounts, and makes countless different assumptions throughout
> this process, in that there are, you know, people have talked about
> it.  There's 1,500 pages of a grouping of schedules.
>
> And those 1,500 pages are single row analyses that are 20 or so, or
> more, columns wide, showing individual amounts coming in,
> specific transfers, payments of individual expenses, dates that the
> amounts—that should be paid, amounts that should be paid,
> recalculations of interest, transfers between the accounts.  Each
> and every one of those are based on Mr. Blumenthal's assumptions
> of what he thinks should have occurred.
>
> And so, to the extent that he is saying that his assumptions are
> somehow—are somehow better, I don't believe that he's done—I
> don't believe what he's done is an appropriate methodology for
> that.

---

[4]  It is hardly surprising that Baliban is unable to refute the substance of the Friedland and
Blumenthal Reports, as he has never performed such an analysis himself.  (*See* Berman Decl.,
Ex. F, at 10:20-11:2 ("Q.  Have you ever testified in any case where the primary purpose of your
engagement was to determine how many payments, either principal or interest, were to be made
on bonds?  A. I don't—I don't know."); 11:24-12:6 ("Q.  [H]ave you ever worked in any case in
which you had to determine how payments should be made under a Standby Bond Purchase
Agreement?  A.  None that come to mind.").)

13

(Berman Decl., Ex. F, at 57:15-58:15.)  And by "somehow better," Baliban means better than the

assumptions ALL presumably used in the exercise of its "real-time judgment."  As he explained:

- Q.  Do you believe that Mr. Blumenthal was required to accept all of ALL's directions as to accrual and payment?

  A.  In making the kind of calculations that he made, I think he had to give them a significant amount of consideration before saying that certain amounts are owed or owed by DEPFA and are owed to or owed by Lloyds.

  I think he had to—he had to consider to the extent that his decisions on how things should be accrued were different from how ALL considered how things should be accrued. Whether or not ALL's were either improper, irresponsible or imprudent, because if—unless someone takes a position, it seems to me, that what ALL it [sic] was improper, imprudent or lack due professional care, then I think Mr. Blumenthal would agree that reasonable minds could differ on how much should be accrued by the individual making the decision contemporaneously with issues arising.  And that not every person would accrue the exact same amount.

  And so, if you're going to make a calculation of how much is owed in a damages sense by one party to another, it's got to presuppose that the decisions that were made were somehow incorrect or wrong.

(*Id.* at 62:8-63:11.)

Testimony like this *could* be helpful to the fact finder if Baliban had conducted a

substantive analysis as to what ALL's judgment was, and how Friedland and Blumenthal

deviated from it, but Baliban repeatedly makes clear that he performed no such analysis.

- Q.  [H]ave you made your own attempt to quantify the amount of funds, if any, that were available on any of the [redemption] dates that are listed in Exhibit C to Mr. Friedland's report?

  A.  Independent calculation, no.  (*Id.* at 175:18-24.)

- A.  Do I have any knowledge of what was of concern [to Martha Peterson in determining whether to redeem bonds]?

Q. Yes.

A. To her specifically, no.  Do I have any knowledge of what was not of concern, no.  I'm not certain I know what she was thinking. (*Id.* at 217:14-19.)

- Q. Is it your opinion that if on a date that was a quarterly anniversary of a bank—of a bank purchase date and after giving effect to the transfers required pursuant to paragraph first through fifth of Section 5.3(b) of the Indenture, if there were still some remaining amount on deposit in the revenue account, that that remainder does not constitute funds available for redemption on that date?

   A. It may not.

   Q. Why not?

   A. And, again, I was not asked to do an analysis as to what would be available or would not be available for redemption on any particular date.  (*Id.* at 225:5-21.)

- In particular with Mr. Friedland he said there's money available for redemptions on all of these dates.  *That may or may not be a true statement.*  (*Id.* at 227:13-16) (emphasis added.)

- Q. But you don't know what any of those other reasons [for ALL choosing to make the redemptions it did] are?

   A. Again, I wasn't asked to determine what those reasons are.  (*Id.* at 229:8-13.)

- Q. All right.  And you have done no analysis to understand why funds were not available on any of those dates.

   A. That's correct.  (*Id.* at 230:12-17.)

In a similar case involving a putative expert witness who, like Baliban, sought to testify without offering an actual opinion or conducting any independent analysis, the court did not hesitate to exclude the testimony as unhelpful.  In *Arista Records LLC v. Lime Group LLC*, a case involving copyright infringement against an online file-sharing website, the plaintiffs sought to exclude the defendant's damages expert under Rule 702 on the ground that his testimony was

1048199.2                                    15

not helpful. 2011 U.S. Dist. LEXIS 47416, at **29-32 (S.D.N.Y. Apr. 29, 2011). Specifically, the plaintiffs argued that the putative expert's opinion was not an opinion at all, but rather an inconclusive and uncritical regurgitation of facts about which the expert had done no independent analysis. The court agreed, citing the following evidence:

- When asked if he was offering an opinion that a causal relationship exists between downloading music and legal purchases, he responded, "Well, not per se. I mean, what I'm doing is summarizing what I have read and what others have said. But I haven't studied the issue specifically." *Id.* at *31.

- When asked if he was offering an opinion on the merit of the studies analyzing the effect of online downloading on music sales, he responded, "[I]t's not my mission to render a professional opinion on each of these studies. . . . I make no independent assessment of any of these other studies." *Id.*

- Finally, when asked what he did to ensure the studies he relied upon were accurate and reliable, he responded, "I did not do anything to determine the accuracy or validity of these studies." *Id.*

Based on this evidence, the court excluded the expert from testifying regarding causation, concluding that the putative expert's "failure to perform any independent analysis results in an opinion that is only a summary of what other experts have said, without application of his own expertise." *Id.* at *34.

This case involves strikingly similar facts—like the expert in *Arista Records*, Baliban has offered no independent analysis, and he does not appear to have "studied the issue [on which he purports to opine] specifically." *Id.* at *31. Indeed, Baliban's testimony can be summarized as follows: The Blumenthal and Friedland Reports may or may not be correct to the extent they deviated from ALL's real-time judgment as to the appropriate way to calculate redemption payments, but analyzing ALL's judgment, and any deviations made to it by Blumenthal and Friedland, is beyond the scope of what Baliban was asked to do. Depfa

respectfully submits that this testimony not only will not assist the trier of fact, but is also utterly useless and a waste of time.  It should therefore be excluded.

## CONCLUSION

For the foregoing reasons, Depfa respectfully requests an order excluding the following testimony from the trial in this action:

(A)     All testimony of Robert Dean Pope in which he offers legal opinions, including, but not limited to, pages 4 and 10 of his report (Berman Decl. Ex. A), and pages 3, 4, 5, 6, 7, and 8 of his rebuttal report (Berman Decl. Ex. B);

(B)     All testimony of Robert I. Landau in which he offers legal opinions, including, but not limited to, paragraphs 19, 20, 21, 24, 27, and 29 of his report (Berman Decl. Ex. D);

(C)     All testimony of Robert Dean Pope in which he opines on the intent, knowledge, or state of mind of an entity or an individual other than himself, including, but not limited to, pages 4, 5, and 6 of his rebuttal report (Berman Decl. Ex. B);

(D)     All testimony of Robert I. Landau in which he opines on the intent, knowledge, or state of mind of an entity or an individual other than himself, including, but not limited to, paragraphs 29 and 35 of his report (Berman Decl. Ex. D); and

(E)     All testimony of Jeffrey L. Baliban or, in the alternative, all testimony of Jeffrey L. Baliban in which he offers legal opinions, including, but not limited to, paragraphs 28, 39, and 40 of his report (Berman Decl. Ex. E), and all testimony in which he opines on the standard of care applicable to a trust administrator, including, but not limited to, paragraphs 18, 20, 30, 38, 43, and 45 of his report (Berman Decl. Ex. E).

Dated:   New York, New York
          October 31, 2011

                                        Respectfully submitted,


                                        FRIEDMAN KAPLAN SEILER
                                            & ADELMAN LLP


                                        By:     /s/ Scott M. Berman
                                                Scott M. Berman
                                                Eric Seiler
                                                Jeffrey C. Fourmaux
                                                Christopher L. McCall
                                                Alexander D. Levi

                                        7 Times Square
                                        New York, New York  10036
                                        (212) 833-1100

                                        *Attorneys for Defendant, Counterclaimant,
                                        Crossclaimant, Crossclaim Defendant,
                                        Third-Party Plaintiff, and Third-Party
                                        Counterclaim Defendant Depfa BANK plc*