UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------------x

THE BANK OF NEW YORK
MELLON TRUST COMPANY, N.A.,

        Plaintiff-Counterclaim Defendant,

        - against -

DEPFA BANK PLC and
LLOYDS TSB BANK PLC,

        Defendants-Counterclaimants-
        Crossclaimants-Crossclaim
        Defendants.

----------------------------------------------------------------------x

DEPFA BANK PLC,

        Third-Party Plaintiff-
        Counterclaim Defendant,

        - against -

ACCESS TO LOANS FOR LEARNING
STUDENT LOAN CORPORATION,

        Third-Party Defendant-
        Counterclaimant-Crossclaim
        Defendant,

        - and -

JPMORGAN CHASE BANK, N.A.,

        Third-Party Defendant-
        Crossclaimant.

----------------------------------------------------------------------x

LLOYDS TSB BANK PLC,

        Third-Party Plaintiff-Counterclaim
        Defendant,

        - against -

ACCESS TO LOANS FOR LEARNING
STUDENT LOAN CORPORATION,

        Third-Party Defendant-
        Counterclaimant.

----------------------------------------------------------------------x

No. 10 Civ. 4424 (JPO)

**DEPFA BANK PLC'S PROPOSED
FINDINGS OF FACT AND
<u>CONCLUSIONS OF LAW</u>**

1048090.5

In accordance with Rule 6(B)(ii)(a) of the Court's Individual Practices in Civil

Cases, DEPFA BANK plc ("Depfa") respectfully submits its proposed findings of fact and

conclusions of law.[1]

## PROPOSED FINDINGS OF FACT[2]

1.      Third-party defendant and counterclaimant Access to Loans for Learning

Student Loan Corporation ("ALL") is a California corporation that originates federally-

guaranteed student loans, which it finances by selling bonds secured by the loans, such as the

Senior Series V bonds at issue in this case.  (Peterson Dep. at 9:15-19, 84:18-21.)

2.      ALL also acts as administrator of the trust that secures the ALL Series V

bonds at issue in this case (the "Trust").  (*Id.* at 86:11-15.)  The ALL employees who played the

most pertinent roles in this case are Martha Peterson, ALL's CFO and chief negotiator;

Christopher Chapman, ALL's CEO when the relevant agreements were negotiated; and Quentin

Wilson, who succeeded Chapman as CEO in 2008.  (Chapman Dep. at 17:21-18:7; Peterson Dep.

at 8:21-9:1, 103:22-104:7, 128:11-15.)

3.      Third-party defendant and crossclaimant JPMorgan Chase Bank, N.A.

("JPMorgan") is a national bank which served as the indenture trustee for the ALL Senior Series

V bonds (the "Trustee") from the time of their issuance until October 2006.  (PTO ¶¶ VI.1, 20;

TX1.)  At that time, JPMorgan sold its indenture trustee business to The Bank of New York

Mellon Trust Company, N.A. ("BNY Mellon").  (Roemlein Dep. at 26:12-16.)  The JPMorgan

(and later BNY Mellon) employee with the most pertinent role in this case is Dennis Roemlein,

the Trustee's relationship manager for ALL.  (*Id.* at 180:6-11.)

---

[1] Depfa reserves its rights to supplement and/or amend its submissions as necessary prior
to and after trial.

[2] All capitalized terms not defined herein shall have the meaning ascribed to them in
Depfa's Pretrial Memorandum of Law.

4.      Plaintiff and counterclaim defendant BNY Mellon is a national banking association, which has served as the Trustee since October 2006.  (PTO ¶ VI.20.)

5.      Defendant, counterclaimant, crossclaimant, crossclaim defendant, third-party plaintiff, and third-party counterclaim defendant Depfa is an Irish public limited company and has served as the "liquidity provider" for the ALL Senior Series V-A-1 and Senior Series V-A-2 bonds since their issuance in August 2005.  (PTO ¶¶ VI.10, 14.)  As liquidity provider, Depfa agreed to purchase the bonds at par under certain circumstances in order to ensure that there would always be liquidity in the market for the bonds.  (TX4 § 2.01; Chapman Dep. at 36:2-37:2.)  In 2008, Depfa was called upon to purchase all $190 million of the Series V-A-1 and V-A-2 bonds and has held all outstanding bonds in these series ever since.  (PTO ¶¶ VI.22, 32.) The key Depfa employees in this case were David Park, who negotiated the 2005 transaction for Depfa, and Nancy Henderson, co-manager of Depfa's New York branch, who has overseen its liquidity facility portfolio since 2008.

6.      Defendant, counterclaimant, crossclaimant, crossclaim defendant, third-party plaintiff, and third-party counterclaim defendant Lloyds TSB Bank plc ("Lloyds") is an English public limited company and has served as liquidity provider for the ALL Senior Series V-A-3, V-A-4, and V-A-5 bonds since their issuance in August 2006.  ( PTO ¶¶ VI.15, 19.)  In 2008, Lloyds was required to purchase all $190 million of Series V-A-3, V-A-4, and V-A-5 bonds and has owned all outstanding bonds in those series ever since.  (*Id.* ¶¶ VI.22, 33.)  The key Lloyds employee in this case is Thea Watkins, the Senior Vice President who negotiated the 2006 transaction for Lloyds.  (Watkins Dep. at 13:3-9, 19:3-20.)

7.      Non-party Ambac Assurance Corporation ("Ambac") is a Wisconsin corporation which became the "credit provider" for the ALL Senior Series V bonds by issuing

2

policies in 2005 and 2006 insuring all payments of principal and interest due on the bonds (including any redemption payments to Depfa and Lloyds not paid when due). (PTO ¶ VI.9; TX34; TX69.) Ambac's role as credit provider was essential to the marketability of the bonds, because ALL issued the bonds on a non-recourse basis, secured only by the Trust's assets.[3] Thus, if the Trust's assets proved insufficient to pay bond interest or principal, then except under limited circumstances, a bond holder's primary remedy would be a claim under the Ambac policies.

        8.      Beginning in January 2008, Ambac suffered a series of downgrades that reduced its credit rating to junk status. (PTO ¶ VI.21.) In March 2010, Wisconsin's Office of the Commissioner of Insurance (the "OCI") commenced rehabilitation proceedings against Ambac in Wisconsin state court, which remain pending. (PTO ¶ VI.28; TX150 ¶ 5(c).) The Wisconsin court has confirmed a plan of rehabilitation which, generally, would limit cash payments on claims under Ambac policies to 25 cents on the dollar. (TX217 ¶ 96.) Thus, there is no likelihood that the relevant Ambac policy would make Depfa whole if there are insufficient funds in the Trust to redeem Depfa's bonds in full.

        9.      On or about August 1, 2005, ALL and JPMorgan, as trustee, entered into a Trust Indenture (the "Indenture"). (PTO ¶ VI.1.) ALL and the Trustee also executed a First Supplemental Indenture pursuant to which ALL issued two series of bonds—the ALL Senior

---

     [3] Indenture § 2.2 provides: "The Corporation [ALL] shall not be obligated to pay the Bonds or the interest thereon or any other obligation incurred by the Corporation hereunder, except from the property and income pledged hereunder, and no recourse shall be had for the payment of the principal thereof or interest thereon against the Corporation or any member thereof or against the property or funds of the Corporation, except to the extent of the property and income pledged expressly thereto." (TX1 § 2.2.) Similarly, ALL's agreement with Depfa provides that "the parties hereto acknowledge that the obligations of the Issuer [ALL] under this Agreement, the Indenture and the Bank Bonds are limited obligations of the Issuer, payable solely from the Pledged Assets . . . ." (TX4 § 8.12.)

Series V-A-1 and V-A-2 bonds (collectively, the "2005 Bonds" or the "Depfa Bonds")—in a

principal amount of $190 million. (*Id.* ¶¶ VI.2, 10.) The 2005 Bonds were to earn interest at a

variable rate, reset on a weekly basis through an auction rate mechanism and payable in arrears

semiannually. (TX2 § 12.2(b), definition of "Interest Payment Date," § 13.2 & Multi-Mode

Annex arts. II-III.)

      10.    The 2005 Bonds were denominated as "Senior Bonds" (*id.* § 13.1), which

the Indenture defined as "any Bonds which are secured by a lien on and payable from the [Trust]

Assets prior to all other Bonds except those issued on a parity as to payments therewith." (TX1

§ 1.2.) Senior Bonds thus were the most senior of four classes of bonds contemplated by the

Indenture, the other classes being "Senior Subordinate Bonds," Subordinate Bonds," and "Junior

Subordinate Bonds" (TX1 § 1.2). Section 2.1 of the Indenture provided that additional bonds

could later be "issued on a parity with Senior Bonds . . . theretofore outstanding." (*Id.* § 2.1.)

      11.    The Indenture provides for the creation of a "Revenue Account" to hold

interest payments on the student loans in the Trust. (TX1 § 1.2, definitions of "Revenues" and

"Recoveries of Principal," § 5.2(1), § 5.3(A).) These funds were to be used to pay the Trust's

expenses as well as interest and principal on the bonds. (*Id.* § 5.3(B).) Payments from the

Revenue Account were to be made according to a sequence of priorities set forth in § 5.3(B) of

the Indenture, a provision colloquially referred to as the "Waterfall."

      12.    Paragraphs First through Fifth of the Waterfall provide for payments from

the Revenue Account in the following order of priority:  first, payments into a "Rebate Account"

to cover certain tax liabilities; second, payments into an "Operating Account" for amounts

payable to the Department of Education; third, payments into the Operating Account for the fees

of the student loan servicers and certain fees of the Trust's administrator (*i.e.*, ALL); fourth,

payments into the Operating Account to cover the fees and expenses of the Trustee, any liquidity provider, bond insurer, and certain other vendors; and fifth, payments into a "Payment Account" to pay interest on the bonds semiannually and to bond principal due at maturity. (TX1 § 5.3(B)(1)-(5).)

13.     The Indenture also provides for a "Loan Account" to hold payments of principal on the student loans. Unless certain so-called "Recycling Suspension Events" (described below) occurs, funds in the Loan Account are to be "recycled" to make new student loans, thus replenishing the Trust's income-earning assets as old student loans were paid off. (TX1 §§ 5.3, 5.4; TX6 § 4.2.) In certain circumstances, Loan Account funds can also be used to pay interest and principal on the bonds. (TX1 § 5.4(A)-(B).)

14.     At the same time that the Indenture and First Supplemental Indenture were executed, ALL and JPMorgan (as Trustee) entered into a "Certificate and Agreement" with Ambac. (PTO ¶ VI.4.) That agreement places additional conditions, discussed below, on the use of funds in various Trust accounts, as long as bonds insured by Ambac's policy remain outstanding. (TX6.)

15.     Finally, ALL and the Trustee also entered into what it is known as a "liquidity facility" with Depfa, memorialized in a Standby Bond Purchase Agreement dated as of August 1, 2005 (the "Depfa Liquidity Facility" or the "Depfa SBPA"). (PTO ¶ VI.3.) Under the Liquidity Facility, Depfa was obligated to purchase the 2005 Bonds at par if bond holders exercised certain rights to put the bonds back to ALL and thereafter the bonds could not be remarketed. (TX2, Multi-Mode Annex § 5.03; TX4 § 2.01.)

1048090.5

16.     The key provisions of the Indenture, the First Supplemental Indenture, the Certificate and Agreement, and Depfa SBPA (the "2005 Bond Documents") establishing Depfa's rights with respect to the 2005 Bonds are described below.

17.     Under the Depfa SBPA, if Depfa was called upon to purchase any bonds, ALL agreed to redeem Depfa's bonds in semiannual installments ("Mandatory Redemptions") out of certain funds, after allowing for certain Trust expenses, beginning six months after the purchase dates of the bonds, with principal due in full within 10 years:

> The Issuer [ALL] agrees to cause the redemption of Bank Bonds [*i.e.*, bonds that had been purchased by Depfa] in semiannual installments, commencing on the date which is six months after the Bank Purchase Date, from all amounts on deposit in the Revenue Fund[4] after giving effect to the transfers required pursuant to paragraphs First through Fifth of Section 5.3(B) of the General Indenture; provided that in any event all of the then unpaid principal amount of Bank Bonds shall be redeemed on the date which is the tenth anniversary of the Bank Purchase Date. (TX4 § 3.02.)

18.     Depfa SBPA § 3.02 also permitted ALL to make "Optional Redemptions" on dates other than Mandatory Redemption dates, subject to certain conditions:

> Notwithstanding the foregoing, the Issuer may optionally redeem any Bank Bond without penalty on 15 days' notice; provided, however, that any such optional redemption shall be in a minimum aggregate principal amount of the lesser of (i) $1,000,000, and (ii) the aggregate principal amount of the Bank Bonds then Outstanding, and only one such optional redemption shall occur in any calendar month.  (TX4 § 3.02.)

All of the redemption provisions of the Depfa Liquidity Facility were expressly incorporated into the Indenture through §§ 13.3 and 14.4(d)-(e) of the First Supplemental Indenture (TX2), making Depfa an intended third-party beneficiary of the Indenture and First Supplemental Indenture.

---

[4] The term "Revenue Fund" is not defined in any of the relevant agreements.

6

19.     In addition, in the Certificate and Agreement ALL agreed that if Depfa were called upon to purchase 2005 Bonds (such a purchase being defined in the Certificate and Agreement as a "Recycling Suspension Event") and ALL was unable to remarket the bonds to third parties within 30 days, then ALL would cease using principal payments on the student loans to make new student loans.  (TX6 §§ 1.1(iii), 4.2.)  Instead, after such a Recycling Suspension Event continued uncured for 30 days, ALL was to direct the Trustee to use principal payments on the student loans then on deposit in the Loan Account or later collected, to redeem Depfa's bonds "in accordance with the procedures set forth in the Indenture."  (*Id*. § 4.2.)

20.     The referenced "procedures set forth in the Indenture" include the Mandatory and Optional Redemption provisions of the Depfa SBPA that were incorporated into the Indenture by the First Supplemental Indenture.  The Indenture's redemption procedures also include those in Indenture § 3.8(ii), which provides that, on 15 days' notice to the bond owners,

> the Bonds . . . shall be subject to special redemption at the determination of the Corporation [ALL], at any time, in whole or in part in Authorized Denominations, at a price of par plus accrued interest to the date of redemption, in an amount not to exceed moneys on deposit in the Loan Account and Revenues [*i.e.*, student loan interest payments] or Recoveries of Principal [*i.e.*, student loan principal payments] . . . which are not expected to be used to finance Eligible Loans.  (TX1 § 3.8(ii).)

ALL is also required to pay interest on any 2005 Bonds purchased by Depfa pursuant to the Depfa Liquidity Facility.  If Depfa continues to own the bonds for more than 90 days, Depfa's bonds are to earn interest at a variable rate equal to the Prime Rate plus 1.5%, payable in arrears semiannually.  (TX4 § 1.01, definition of "Base Rate," § 3.01.)

21.     While an indenture trustee's duties prior to an event of default are sometimes said to be purely contractual in nature, the Indenture in this case provided that the Trustee had a fiduciary duty to Depfa as a bond owner once Depfa was called upon to purchase

7

bonds. In the Indenture, the Trustee expressly accepted its status as a fiduciary to the bond

owners, which Depfa became in 2008 (*see* TX2 § 14.4(e)):

> The Trustee shall signify its acceptance of the duties and
> obligations of Trustee as a fiduciary for the Owners by
> executing this Indenture. (TX1 § 10.1.)

22.    In addition, in the First Supplemental Indenture the Trust's assets were

pledged, among other things, to secure amounts owed to Depfa under the Depfa Liquidity

Facility, including amounts to redeem bonds purchased by Depfa:

> The Corporation [ALL] hereby declares . . . that the grant to the
> Trustee for the benefit of the Bondholders of a security interest in
> the Pledged Assets shall also be for the benefit of . . . the Liquidity
> Provider [Depfa] . . . to secure the obligations of the Corporation to
> reimburse . . . the Liquidity Provider for amounts paid pursuant to
> . . . the [Depfa] Liquidity Facility . . . and to pay amounts due to
> . . . the Liquidity Provider as fees, indemnification or other
> amounts, such pledge to be in the order of priority set forth in
> Section 5.3(B)(5), in the case of amounts due as reimbursement for
> the payment of the . . . purchase price of the Bonds . . . . The
> Trustee hereby acknowledges the foregoing. (TX2 § 14.4(d).)

By its terms, this provision also had the effect of adding redemption payments to Depfa into the

fifth level of payment priority in the Indenture's Waterfall, *i.e.*, Indenture § 5.3(B)(5). As

Section 14.4(d)'s drafter Elaine Bayus put it, the provision's purpose was "[t]o put the bank

[Depfa] into the waterfall at the appropriate places." (Bayus Dep. at 82:4-11.)

23.    For a liquidity provider such as Depfa, amendments or modifications to

the trust indenture can be a source of significant risk—if, for example, the indenture were

modified to give payments to the liquidity provider a lower priority in the waterfall. Because of

this risk, liquidity providers often bargain for "consent rights," which prevent the issuer from

amending or modifying the indenture without the liquidity provider's consent. (TX189 at 7.)

For their part, issuers will usually seek limits on a liquidity provider's consent rights (and usually

8

obtain such limits) so that they retain the flexibility to issue later bond series with varying terms. (*Id.* at 8.)

      24.     In this case, Depfa successfully bargained for consent rights over amendments and modifications of the Indenture <u>without qualification</u>. As agreed to by ALL and the Trustee, the Depfa Liquidity Facility prohibited ALL from amending, modifying, or acting or omitting to act in a manner equivalent to amending or modifying the Indenture, without Depfa's prior written consent:

> During the Bank Purchase Period, and so long as any obligation is owed to the Bank hereunder, <u>the Issuer [ALL] shall not</u>:
>
> (a) *Amendments.* <u>Amend, modify</u>, terminate or grant, or permit the amendment, modification, termination or grant of, any waiver under, or consent to, <u>or permit or suffer to occur any action or omission which</u> results in, or <u>is equivalent to, an amendment, modification,</u> or grant of a waiver under, the Policy or <u>the Indenture without the prior written consent of the Bank</u>.
> (TX4 § 5.03(a), emphasis added.)

The specific language of Depfa's consent rights provision in this case is unusually broad in scope and relatively rare in the student loan bond industry in that it does not have a carve out for the issuance of additional bonds. As Depfa's expert on the student loan bond industry, Joel Powers, testified, liquidity providers' consent rights provisions "typically incorporate language that <u>excludes</u> any requirement that liquidity provider consent be obtained before new bonds can be issued." (TX189 at 4, emphasis added; *accord* Henderson Dep. at 47:20-24, "In many documentation [sic], there is a specific carveout provision that says you do not have – as a bond holder, you do not have the right to object or consent to additional issuance of bonds.") Customarily, a liquidity provider's consent right has a carve-out for the issuance of additional bonds, as exemplified in the SBPA for a prior bond deal which apparently served as the model for the first draft of the Depfa SBPA:

The [issuer] shall not:

> (a) *Amendments*. Amend, modify, terminate or grant, or permit the amendment, modification, termination or grant of, any waiver under, or consent to . . . any amendment, modification, or grant of a waiver under, the Policy or any Related Document [defined to include the Indenture] without the prior written consent of the [liquidity provider] Bank, <u>except the amendments relating to the issuance from time to time of additional bonds under the Indenture</u> or other amendments which do not affect the Policy, the terms of the Bonds or the obligations of the Bank hereunder. (TX21, emphasis added.)

As a matter of industry custom and practice, absence of this usual carve-out indicates that the liquidity provider has a consent right over the issuance of additional bonds. (TX189 at 8-9.)

25.     Prior to entering into the Depfa Liquidity Facility, ALL was aware of how broadly Depfa's consent rights provision was drafted. In commenting on a draft of the agreement, ALL's (then) CEO Christopher Chapman wrote the following comment next to Section 5.03: "This is rather broad, can it be modified to eliminate changes that would not result in a material adverse change?" (TX23 at KR-DEPFA3548.) Ultimately, however, ALL acceded to Depfa's proposed language with no material changes. (TX4 § 5.03.)

26.     The Trustee also agreed to be bound by Depfa's consent right over Indenture amendments and modifications. In § 14.4(f) of the First Supplemental Indenture, the Trustee expressly acknowledged and agreed that the Depfa Liquidity Facility required Depfa's consent for certain actions under the Indenture:

> <u>Consent of Liquidity Provider</u>. The Trustee hereby acknowledges that the Issuer [ALL] has entered into an agreement [the Depfa SBPA] with the Liquidity Provider [Depfa] pursuant to which the consent of the Liquidity Provider is required for certain actions under the Indenture, and the Trustee and the Issuer agree that no such action shall be taken without such consent. (TX2 § 14.4(f).)

10

27.     The Depfa Liquidity Facility provides that ALL's obligations under the

agreement are absolute and to be performed strictly in accordance with the agreement's terms:

> [T]he obligations of the Issuer [*i.e.*, ALL] under this Agreement
> shall be absolute, unconditional and irrevocable and shall be
> performed strictly in accordance with the terms of this Agreement
> under all circumstances whatsoever . . . . (TX4 § 8.11.)

28.     The Depfa Liquidity Facility also expressly provides that any delay by

Depfa in asserting its rights under the Depfa Liquidity Facility would not constitute a waiver of

its rights:

> No failure or delay on the part of the Bank [*i.e.*, Depfa] is exercising any
> right, power or privilege hereunder and no course of dealing shall operate
> as a waiver thereof.  (*Id.* § 8.01.)

29.     In June 2006, ALL requested bids on a liquidity facility for additional

bonds that were to be issued pursuant to the Indenture.  (Peterson Dep. at 54:16-56:6.)  Both

Depfa and Lloyds submitted bids for the 2006 liquidity facility.  (PTO ¶ VI.18.)  ALL accepted

Lloyds' bid because, according to ALL's Martha Peterson, Lloyds' bid offered a lower interest

rate in the event Lloyds was called upon to purchase bonds and because ALL wished to diversify

its liquidity providers.  (PTO ¶ VI.19; Peterson Dep. at 59:4-60:12.)

30.     On or about August 1, 2006, ALL and the Trustee executed a Second

Supplemental Indenture Relating to ALL V and Amending the Trust Indenture (the "Second

Supplemental Indenture"), and entered into a Standby Bond Purchase Agreement with Lloyds

(the "Lloyds Liquidity Facility" or the "Lloyds SBPA").  (PTO ¶¶ VI.5, 6.)  Pursuant to the

Second Supplemental Indenture, ALL issued its Senior Series V-A-3, V-A-4 and V-A-5 bonds

(the "2006 Bonds" or "Lloyds Bonds"), in a principal amount of $190 million.  (*Id.* ¶ VI.15.)

Like the Depfa Bonds, the Lloyds Bonds were denominated as "Senior Bonds."  (TX3 §16.1.)

The 2006 Bonds were to earn interest at variable rates, reset on a daily or weekly basis through

11

an auction rate mechanism and payable in arrears semiannually.  (*Id.* § 15.2(b), definition of

"Interest Payment Date," § 16.2 & Multi-Mode Annex arts. II-III.)  Under the Lloyds SBPA,

Lloyds agreed to be the liquidity provider for the Lloyds Bonds.  (TX5.)

> 31.     The Lloyds SBPA is virtually a carbon copy of the Depfa SBPA, as a

redacted copy of the Depfa SBPA was provided to bidders for the 2006 liquidity facility with an

instruction that the winning bidder would be expected to execute an SBPA in substantially the

same form.  (TX39.)  Among other things, the Lloyds SBPA gave Lloyds a right of prior written

consent over amendments and modifications of the Indenture which is worded identically to that

in the Depfa SBPA.  (*Compare* TX4 § 5.03(a), *with* TX5 § 5.03(a).)

> 32.     The Lloyds SBPA, however, differs from Depfa's in one critical aspect:

The Mandatory Redemption provision in § 3.02 of the Lloyds SBPA provides for Lloyds' Bonds

to be redeemed twice as often and twice as fast as Depfa's Bonds.  Specifically, Lloyds was

entitled to quarterly Mandatory Redemptions, beginning three months after a purchase of bonds,

and full repayment within five years, whereas Depfa was entitled to only semiannual mandatory

redemptions, beginning six months after a purchase of bonds, without a requirement of full

redemption until the tenth year:

> The Issuer agrees to cause the redemption of Bank Bonds in
> quarterly installments, commencing on the date which is three
> months after the Bank Purchase Date, from all amounts on deposit
> in the Revenue Fund after giving effect to the transfers required
> pursuant to paragraphs First through Fifth of Section 5.3(B) of the
> General Indenture; provided that in any event all of the then unpaid
> principal amount of Bank Bonds shall be redeemed on the date
> which is the fifth anniversary of the Bank Purchase Date.
> (TX5 § 3.02, emphasis added.)

These earlier and more frequent Mandatory Redemption payments to Lloyd were to be made out

of the same source—"all amounts on deposit in the Revenue Fund"—as any such payments to

Depfa. (*See* TX4 § 3.02.) Thus, any Mandatory Redemption of Lloyds' bonds would consume

all cash collateral otherwise available for Mandatory Redemption of Depfa's bonds.

33.     The Lloyds SBPA also differs from Depfa's in terms of the interest rate to

be paid to Lloyds if it was required to purchase bonds.  In accordance with its winning, low bid,

Lloyds agreed that any bonds that it was required to purchase and continued to own for more

than 180 days would earn interest at a variable rate equal to the 3-month LIBOR rate plus 1.75%,

payable in arrears semiannually.  (TX5 §1.01, definition of "LIBOR," § 3.01.)  At almost all

times since Depfa and Lloyds were required to purchase Series V bonds, the interest rate on

Lloyds' bonds has been lower than the interest rate on Depfa's bonds under the SBPAs, with the

result that, to date, Depfa has been paid more interest than Lloyds (PTO ¶ VI.27).

34.     The Second Supplemental Indenture incorporated ALL's and the Trustee's

redemption obligations to Lloyds under the Lloyds Liquidity Facility into the Indenture and

extended the pledge of the Trust's assets to secure redemption payments to Lloyds:

> . . . Liquidity Provider Bonds [*i.e.*, bonds purchased by Lloyds
> pursuant to the Lloyds SBPA] shall be redeemed as provided in the
> [Lloyds] Liquidity Facility . . . .  (TX3 § 16.3.)
>           . . . .
> The Corporation [ALL] hereby declares . . . that the grant to the
> Trustee . . . of a security interest in the Pledged Assets shall also be
> for the benefit of . . . the Liquidity Provider [Lloyds] . . . to secure
> the obligations of the Corporation to reimburse . . . the Liquidity
> Provider for amounts paid pursuant to . . . the [Lloyds] Liquidity
> Facility . . ., such pledge to be in the order of priority set forth in
> Section 5.3(B)(5), in the case of amounts due as reimbursement for
> the payment of the . . . purchase price of the Bonds . . . .  The
> Trustee hereby acknowledges the foregoing. (*Id.* § 17.4(d).)

As its drafter Elaine Bayus testified, § 17.4(d) added a new term to the Indenture's Waterfall

which did not previously exist, namely, payments to Lloyds.  (Bayus Dep. at 88:2-3, 89:4-20.)

35.     Prior to entering into the Second Supplemental Indenture and the Lloyds

SBPA, neither ALL nor the Trustee sought Depfa's consent (written or otherwise) to the

13

incorporation of the Lloyds SBPA's preferential payment terms into the Indenture, nor did Depfa ever provide such consent. (Peterson Dep. at 152:1-16; Roemlein Dep. at 124:13-17, 129:17-130:8, 141:19-142:4.)

36.    Shortly after Depfa submitted its bid for the 2006 deal, David Park learned that ALL had accepted Lloyds' bid. Park recalls discussing with Peterson the facility fee that Lloyds was charging, but nothing else. Depfa did not learn about any other terms of the Lloyds SBPA until 2009.

37.    Beginning in January 2008, the credit rating of the ALL Series V bonds' insurer, Ambac, was downgraded by the major rating agencies. (PTO ¶ VI.21.) At the same time, the market for auction rate securities—of which the Series V bonds were instances—ceased to function. (O'Neill Dep. at 68:24-70:15.) With Ambac's future in doubt and the failure of the auction-rate market generally, demand for the Series V bonds collapsed. (*Id.*)

38.    As a result, beginning on February 11, 2008, Depfa and Lloyds were called upon to purchase Series V bonds pursuant to their respective SBPAs. By the end of June 2008, Depfa had been required to purchase all $190 million in principal amount of the 2005 Bonds at par, and Lloyds all $190 million in principal amount of the 2006 Bonds at par. Depfa and Lloyds continue to hold all outstanding Series V bonds to this day. (PTO ¶¶ VI.22-24, 32-33.)

39.    Depfa's purchase and continued holding of ALL Series V had three significant consequences.

40.    First, Depfa's purchase of the bonds triggered its right, under § 3.02 of the Depfa Liquidity Facility, to receive redemptions every six months "commencing on the date which is six months after the Bank Purchase Date [*i.e.*, the date when Depfa purchased bonds],

14

from all amounts on deposit in the Revenue Fund" after allowing for payments and reserves required by the first five levels of the Indenture's Waterfall.

41.     Second, pursuant to the Certificate and Agreement, a Recycling Suspension Event occurred on March 12, 2008—30 days after Depfa's first purchase of Series V bonds on February 11, 2008.  (TX6 § 1.1(iii).)  ALL therefore could no longer use cash in the Trust's Loan Account from principal payments on the student loans to finance additional student loans.  (*Id.* § 4.2; Roemlein Dep. at 145:10-12.)  Instead, beginning on April 11, 2008—30 days after the Recycling Suspension Event first occurred—ALL was required to "Direct the Trustee to transfer amounts in the Loan Account to the Redemption Account, for the purpose of redeeming bonds" unless Ambac gave ALL written consent to resume financing student loans.  (TX6 § 4.2.) There is no evidence that Ambac ever gave ALL such consent.

42.     Third, as a result of Recycling Suspension, the Trust began and continues to liquidate (*i.e.*, its student loan assets are being converted to cash), and it will never have sufficient assets to fully redeem both banks' bonds.  ALL used the proceeds from the sale of the Series V bonds issued in 2005 and 2006, as well as principal payments on loans already purchased, to build a portfolio that included some 30,672 student loans with a principal amount of $363 million at its peak in September 2007.  (TX200; TX201.)  After Recycling Suspension occurred, the Trust's acquisition of new loans ceased, and as existing loans were paid off, the number of loans in the Trust and their principal amount steadily declined.  (*Id.*)  Thus, as of June 30, 2011, the Trust contained fewer than 22,000 loans, with a total principal of less than $261 million.  (*Id.*)

43.     Because the interest paid to Lloyds and Depfa on their bonds is substantially higher than the interest the Trust receives on the student loans (so-called "negative

arbitrage"), the total value of the Trust's assets—student loans and cash generated by the loans—has also steadily declined. (*Id.*) This fact is particularly problematic because from the time Depfa and Lloyds first purchased bonds to the present, the total value of the Trust's assets has been less than the outstanding principal amount of the bonds. (*Id.*) Over time, this deficit has only increased. (*Id.*) As of June 30, 2011, the Trust had total assets of $322 million supporting liabilities which include $341 million of outstanding bonds held by Depfa and Lloyds. (*Id.*) Thus, as ALL's financial advisor Seamus O'Neill admitted in deposition, from the time the banks purchased the bonds, the Trust has been in "a liquidating state" (O'Neill Dep. at 272:15-18), and it is becoming ever more insufficient to repay both Depfa and Lloyds in full.

44.     The following table sets forth Depfa's Bank Purchase Dates and the first three sets of semiannual Mandatory Redemption dates under Depfa SBPA § 3.02:

| Depfa Bank Purchase Date | Principal Amount of Bonds Purchased | First Mandatory Redemption Date | Second Mandatory Redemption Date | Third Mandatory Redemption Date |
|---|---|---|---|---|
| Feb. 11, 2008 | $99,265,000 | Aug. 11, 2008 | Feb. 11, 2009 | Aug. 11, 2009 |
| Feb. 13, 2008 | $100,000 | Aug. 13, 2008 | Feb. 13, 2009 | Aug. 13, 2009 |
| Feb. 19, 2008 | $100,000 | Aug. 19, 2008 | Feb. 19, 2009 | Aug. 19, 2009 |
| Feb. 26, 2008 | $90,000,000 | Aug. 26, 2008 | Feb. 26, 2009 | Aug. 26, 2009 |
| Feb. 27, 2008 | $100,000 | Aug. 27, 2008 | Feb. 27, 2009 | Aug. 27, 2009 |
| Feb. 29, 2008 | $135,000 | Aug. 29, 2008 | Feb. 29, 2009 | Aug. 29, 2009 |
| Mar. 11, 2008 | $100,000 | Sept. 11, 2008 | Mar. 11, 2009 | Sept. 11, 2009 |
| Mar. 25, 2008 | $100,000 | Sept. 25, 2008 | Mar. 25, 2009 | Sept. 25, 2009 |
| June 5, 2008 | $100,000 | Dec. 5, 2008 | June 5, 2009 | Dec. 5, 2009 |
| *Source*: PTO ¶ VI.23; TX178 (ALL's Responses to Lloyds Requests for Interrogatories, Ex. C). | | | | |

ALL and the Trustee never made a single redemption payment to Depfa on these or any subsequent Mandatory Redemption dates that have come and gone in the years since. (PTO ¶ VI.25.) ALL asserted that there were insufficient funds in the Revenue Account as of these dates, and that it was impossible, as a practical matter, to determine whether there were sufficient funds on the scheduled redemption dates. (Peterson Dep. at 204:23-206:2.)

45.     The fact, however, is that ALL did not actually make any attempt to determine whether it had funds available for redemptions until after Depfa's first eight redemption dates had already passed (*i.e.*, those on August 11 through September 25, 2008).  On October 14, 2008, Martha Peterson first asked one of her staff members, Michael Grace, to determine whether funds were available for redemption.  (TX79, "Michael, We should do an analysis to determine the amount, if any, of the Bank Bonds that can be redeemed . . . .")  Grace completed the analysis shortly thereafter.  (*See* TX83, at 2.)

46.     Moreover, the documentary evidence contradicts ALL's explanations for why it did not make begin making redemptions sooner and why it never made the Mandatory Redemptions contemplated by § 3.02 of the Depfa SBPA.

47.     First, Peterson asserted that, to determine available funds for redemption, it is necessary for ALL to estimate certain future expenses, and that it is not practically possible for ALL to estimate future expenses until after a month-end closing.  Consequently, according to Peterson, ALL could not make redemptions on dates that occur mid-month: as she put it, "you can't go in the middle of a month on a random date and determine available funds."  (Peterson Dep. at 77:22-24.)  Yet, documents produced by ALL show that ALL's staff did exactly that on numerous occasions at Ms. Peterson's request.[5]

48.     Second, Peterson testified that it was difficult to estimate the Trust's liability to the Department of Education ("DOE") for certain quarterly "special allowance

---

[5] *E.g.*, TX93 (E-mail chain among Peterson, Grace, and others attaching redemption analysis dated March 19, 2009); TX105 (E-mail from Grace to Peterson attaching redemption analysis dated June 22, 2009); TX126 (E-mail from Grace to Peterson attaching redemption analysis dated September 17, 2009; TX134 (E-mail from Grace to BNY Mellon attaching redemption analyses as of November 19, 2009, October 29, 2009, August 25, 2009, June 22, 2009, and April 3, 2009, ALL 17120-38); TX160 (E-mail from Grace to Peterson attaching redemption analysis dated April 16, 2010).

payments" because the DOE was (supposedly) often late in providing ALL with a so-called

"LaRS" report that showed the amount of ALL's liability.  (Peterson Dep. at 77:8-79:6, 207:12-

208:3, 217:14-25.)  As explained in a DOE bulletin, however, the LaRS report is a quarterly

report that a student lender submits to the DOE, not the other way around.  U.S. Dep't of Ed.,

"Reporting Changes for Lenders," DCL ID: FP-06-04 (2006), at 1, *available at*

http://www.ifap.ed.gov/ dpcletters/attachments/FP0604.pdf.  Moreover, the liability is

determined by a statutory formula, all the inputs to which were items available to ALL:

benchmark interest rates published by the Federal Reserve, certain spreads fixed by statute, and

certain characteristics of the loans in ALL's portfolio (balances, repayment status, and interest

rates).  *See* 20 U.S.C. § 1087-1(b)(2)(I)(i)-(iv).  Consistent with this reality, ALL's documents

show that, upon her request Peterson's staff prepared estimates of the Trust's future DOE

liabilities on numerous occasions.

   49. Third, Peterson testified that no redemptions were made on the scheduled

dates because there were no available funds for Mandatory Redemptions on those dates.

(Peterson Dep. at 77:8-20.)  But as Depfa's accounting expert Scott Friedland, CPA

demonstrated at trial, an analysis of the Trust's account statements, expense records, and ALL

management's contemporaneously prepared expense projections, shows that on every set of

assumptions advocated by ALL or the Trustee, funds were available for redemptions on Depfa

Mandatory Redemption dates when no redemptions were made.  (TX188 & Ex. C thereto.)

   50. Despite ALL's purported inability to calculate whether sufficient funds

were available to make Mandatory Redemptions, on October 27 and November 12, 2008, at

ALL's direction, the Trustee began to make Optional Redemption payments to Lloyds and

Depfa, respectively.  (Peterson Dep. at 209:16-210:5.)  These payments were not made on any of

the Mandatory Redemption dates called for by the SBPAs.  Rather, ALL directed the Trustee to make these Optional Redemptions pursuant to Indenture § 3.8 on a haphazard smattering of dates as follows:

| Optional Redemption Paid On | To Lloyds | To Depfa |
|---|---|---|
| October 27, 2008 | $12,500,000 | |
| November 12, 2008 | | $6,200,000 |
| January 6, 2009 | $3,200,000 | $3,100,000 |
| April 10, 2009 | $1,100,000 | |
| April 22, 2009 | | $600,000 |
| July 1, 2009 | $4,900,000 | $2,500,000 |
| October 5, 2009 | $1,000,000 | $1,000,000 |
| November 5, 2009 | $1,450,000 | $1,450,000 |
| **Total** | **$24,050,000** | **$14,950,000** |
| *Source*:   PTO ¶ VI.25. | | |

51.      As can be seen above, despite the fact that the Depfa Bonds and Lloyds Bonds were both denominated as "Senior" bonds and as such should have been on parity with one another, at ALL's direction, the Trustee allocated redemption payments disproportionately—often two-to-one—in favor of Lloyds.  Thus, over the course of the following year, Lloyds received Optional Redemption payments totaling $24.05 million, while Depfa received payments totaling only $14.95 million.  Nothing, however, in the language of Indenture § 3.8 or any other provision of the relevant agreements permitted or required ALL to allocate a greater share of these Optional Redemptions to the Lloyds Bonds than to the Depfa Bonds.

52.      On the contrary, Section 2.1 of the Indenture provides that additional bonds may only be "issued on a parity with" Senior bonds, such as the Depfa Bonds.  Senior bond parity, as understood in the bond industry, means that senior bond holders have an equal

19

and ratable claim to proceeds from liquidated collateral.[6]  Bond series are not in parity if liquidated collateral is not distributed ratably, whether before or after an event of default or an acceleration of principal (*i.e.*, a declaration following an event of default that all principal is immediately due and payable).  If the available liquidated collateral is insufficient to repay all bonds in full, parity means that principal losses among senior bond holders are shared on a pro rata basis.

53.     Although different senior bond series may certainly have different maturities and payment dates, parity requires that the amount of principal repaid on each series is proportionate to its ratable interest in the collateral, irrespective of the dates on which each is paid.  Thus, if the amount of funds available on a particular payment date exceeds a particular senior bond holder's pro rata share of the collateral, then the excess amount should be retained in the trust and applied to make future principal payments to the other senior bond holders on a pro rata basis.

54.     The testimony of the fact witnesses in this case also sheds light on the industry meaning of "parity" and its application here.  Each of the party fact witnesses deposed in this action is a seasoned participant in the bond industry, whether as an issuer, a liquidity provider, or a trustee.  All agreed that in the bond industry, "parity" is understood to indicate an equality (in some sense or other) of rights or interest in the collateral securing a debt. (Henderson Dep. at 56:7-12; Park Dep. at 123:4-124:21; Peterson Dep. at34:4-16; Roemlein Dep. at 86:9-18; Watkins Dep. at 80:11-81:2)  For example, ALL's Martha Peterson testified that bond series that rank on a parity have "equal rights to the collateral in the trust," and Lloyds'

---

[6] An asset is liquidated when it is converted into cash.  (Powers Report at 16 n.7.)  Here, the student loans pledged to the Trust as collateral could be converted to cash through (1) the payment of principal on the student loans as a result of the loans' monthly amortization payments, (2) prepayments of principal on student loans, or (3) sales of the loans.  *Id.*

Thea Watkins similarly described parity as "an equal interest in the underlying collateral security." (Peterson Dep. at 34:13-16; Watkins Dep. at 60:15-61:8.) Beyond that level of generality, the witnesses either could or would not further articulate the meaning of the term "parity" or else diverged in their professed view of how it applies in this case.

55.     Of the witnesses who did testify as to a more specific understanding of the term "parity," arguably the least biased among them was Christopher Chapman, ALL's former CEO from 2001 to 2007 (Chapman Dep. at 17:16-19:17). Having left ALL years ago and having had no responsibility for how ALL redeemed Depfa's and Lloyds' bonds in 2008 and 2009, Mr. Chapman has no apparent personal interest or pride at stake in the Court's determination of this issue. Mr. Chapman's testimony about parity is revealing.

56.     Based on his experience in the student loan industry, Chapman testified that it is generally <u>not</u> the case that one senior bond holder would receive larger and more frequent payments than an equally senior bond holder, because that would not be equal treatment. (Chapman Dep. at 67:9-68:4.) According to Chapman, "parity," as used in the Indenture, requires that all bonds with the same level of priority be treated equally in all respects; therefore, additional bonds with higher seniority than senior bonds could not be issued consistent with Indenture § 2.1. In Chapman's industry experience, parity includes equal treatment with respect to payments of principal, and this requirement of equal treatment is not even limited to situations involving "liquidation." (*Id.* at 70.2-79:23.)

57.     The Lloyds SBPA was not publicly available in 2006. (Chapman Dep. at 138:12-21.) Neither ALL, nor the Trustee, nor Lloyds provided Depfa with a copy of the Lloyds SBPA in 2006 or for years thereafter. (Bayus Dep. at 63:9-13, 107:4-6; Chapman Dep. at 135:5-

21

7; Davis Dep. at 78:18-20, 120:21-24, 121:7-9; Roemlein Dep. at 212:3-6; Watkins Dep. at 141:8-22.)

58.     On February 9, 2009, Depfa's David Park emailed Quentin Wilson (who by that time had replaced Christopher Chapman as ALL's CEO), and asked him to confirm whether there was money available for the Depfa redemptions scheduled for that month pursuant to Depfa SBPA § 3.02. (TX92, at 2.)  In the same email, Park asked Wilson to provide the dates and amounts of redemption payments Lloyds had received. (*Id.* at 3.)

59.     In a February 11, 2009 e-mail, rather than answer Park's question, Wilson responded as follows: "We believe we have made all Series V interest payments and bank bond principal redemptions in a manner consistent with industry standards and in compliance with both the indenture and the Standby Loan [sic] Purchase Agreement." (*Id.* at 1.)  Mr. Wilson's email failed to provide the dates and amounts of redemption payments Lloyds had received. (*Id.*)  In or around March 2009, someone at Depfa may have learned that Lloyds had a shorter redemption schedule than Depfa, but does not appear to have been aware of the exact period or the fact that the Lloyds' schedule called for redemptions twice as often.

60.     On May 4, 2009, Park e-mailed Lloyds' Thea Watkins, asking about the frequency of Lloyds' redemption dates and the end date (or "term-out") for redemption of Lloyds' bonds under the Lloyds SBPA. (TX97, at LB015242.)  Park volunteered the corresponding information about Depfa's bonds to Ms. Watkins. (*Id.*)  Watkins forwarded Park's email to another Lloyds' employee, Charlene Balfour, who asked, "Why can't he get this info from the docs?"  Watkins responded: "Their documents are different to ours and they don't have out [sic] sbpa." (*Id.* at LB015241.)  It is unclear whether Watkins replied to Park's e-mail.

22

61.     On June 5, 2009, Park e-mailed Lloyds' Michelle White with a similar request for Lloyds' redemption dates. (TX99.) This time, Lloyds responded with the requested information, disclosing that "Our amortization dates are quarterly. . . ." (*Id.* at DEPA0000981.)

62.     Within an hour of Lloyds' disclosure on June 5, 2009, Park began requesting copies of the Second Supplemental Indenture and the closing binder for the 2006 issuance from BNY Mellon—requests that he was forced to repeat throughout June and into July. (TX100; TX106; TX107; TX112.) Apparently sometime after July 13, 2009, BNY Mellon sent Depfa a copy of the closing binder for the 2006 Bonds, which contained the Lloyds SBPA. (TX112; TX72.) Before that time, neither Park nor anyone else at Depfa had ever seen the Lloyds SBPA.

63.     Upon receiving the Lloyds SBPA, Park reviewed it and noticed that § 3.02 granted Lloyds a redemption schedule that was preferential to Depfa's. After this discovery, Park spoke with Peterson about the terms of the Lloyds SBPA. Park asked her how redemption payments would be made. Peterson responded that she did not know how such payments would be effected, other than that Depfa would have multiple payment dates. (Park Dep. at 73:23-75:8.)

64.     On July 16, 2009—shortly after receiving the agreements related to Lloyds' bonds—Park and Nancy Henderson sent a letter to Peterson observing that ALL had failed to make payments on all scheduled redemptions under the Depfa SBPA. (TX9, at 1.) Park and Henderson's letter further stated that

> it recently has come to our attention that . . . notwithstanding that the DEPFA Bonds and the Lloyds Bonds are on parity with each other, as of the date hereof, the payments to Lloyds have exceeded the payments to DEPFA in the amount of $9,100,000. Since the DEPFA Bonds and the Lloyds Bonds are on parity with each other DEPFA should receive $9,100,000 so that the amount paid in

23

respect of the DEPFA Bonds is equivalent to the amount paid in
respect of the Lloyds Bonds.

. . . The DEPFA Bonds are secured by the same collateral pool as
the Lloyds Bonds.  It is inappropriate to exercise the Issuer's
optional redemption right under the Lloyds SBPA to the detriment
of DEPFA.  We request that you address this immediately.
(TX9, at 2.)

65.     On August 4, 2009, Martha Peterson wrote back to Henderson and Park.

(TX10.)  In her letter, Peterson observed that "Payments have been made to the Banks as

required by the respective SBPA, which <u>due to the accelerated repayment rights [of Lloyds]</u> did

result in Lloyds receiving $9,100,000 more in principal payments than Depfa." (*Id.* at

DEPFA10108223, emphasis added.)[7]

66.     Despite ALL's present litigation position that entry into the Lloyds SBPA

did not amend the Indenture and therefore did not require Depfa's consent, and the fact that the

consent right provisions of Depfa SBPA § 5.03(a) and Lloyds SBPA § 5.03(a) are identical, in

her letter Ms. Peterson took the position that any change to the Depfa SBPA would require

<u>Lloyds'</u> consent:  "We understand that it is Depfa's desire to be on equal footing with Lloyds

with regard to principal payments on Bank Bonds.  <u>This is not something ALL Student Loan can

affect,</u> <u>as</u> both Ambac and <u>Lloyds would have to agree to any amendment to the Depfa SBPA</u>."

(*Id.*, emphasis added.)[8]  Because Lloyds' only consent right under the bond documents is over

amendments to the Indenture, Peterson's statement makes no sense unless ALL considered a

---

[7] *Accord* TX117 (E-mail from Peterson to Lloyds of 7/28/2009, "We have consistently
made payments as required by the SBPAs, <u>which has resulted in Lloyds receiving greater
principal payments</u>.  I felt that providing Depfa (David) with the relevant dates [for redemptions
under the SBPAs] would make it evident that Lloyds had <u>clear priority</u> to payments due to the
quarterly amortization." (emphasis added)).

[8] *Accord* Peterson Dep. at 70:1-9 ("I said [to David Park], 'Well, I can't change your
agreement, David, because Lloyds would have to consent to that and if you want that amendment
then you should talk to Lloyds and see if they would agree to amending yours to be quarterly.'").

24

change to the Depfa SBPA to be an amendment of the Indenture, which would imply that entry into the Lloyds SBPA was also an amendment of the Indenture.

67.     On November 19, 2009, Park asked Ms. Peterson by e-mail when she thought ALL would be able to provide an estimate of funds available for future redemptions, and how ALL planned on splitting any such redemptions between Depfa and Lloyds.  (TX136.)

68.     On November 24, 2009, Peterson mailed Park and Henderson a letter responding to Park's November 19 email.  (TX11.)  She advised that "it takes time to obtain all the information required to close the general ledger and verify the amount required by paragraphs First through Fifth" of the Waterfall.  (*Id.* at 1.)  Even though nothing in the Indenture or SBPAs requires Optional Redemptions to track the SBPAs' schedules for Mandatory Redemptions, Peterson added that if funds turned out to be available for <u>Optional</u> Redemptions, they would be paid entirely to Lloyds because "November is a month when Lloyds TSB has a quarterly anniversary date of The Bank Purchase Date" and "Depfa does not have a semiannual anniversary date of its Bank Bond Purchase dates in November."  (*Id.*)

69.     Peterson also observed that "<u>the more frequent quarterly amortization schedule for Lloyds results in potentially greater principal payments based on the cash available under Section 5.3(B) of the Indenture</u>. . . ."  (*Id.* at 1-2, emphasis added.)  And once again she stated that any change in payment terms of the Depfa SBPA would trigger Lloyds' consent right: "We understand that it is Depfa's desire to be on equal footing with Lloyds with regard to principal payments on Bank Bonds.  This is not something ALL Student Loan can affect, as . . . <u>Lloyds would have to agree to any amendment to the Depfa SBPA</u>."  (*Id.* at 2, emphasis added.)

70.     On November 27, 2009, Henderson wrote to ALL and BNY Mellon. (TX12.)  Henderson gave notice that ALL had breached the Depfa SBPA by failing to make

25

Mandatory Redemption payments to Depfa, by making Optional Redemption payments to Lloyds at Depfa's expense, and by failing to obtain Depfa's prior written consent to the Lloyds SBPA. (*Id.* at 1, 2.) She stated that because Depfa had not consented to the Lloyds SBPA, ALL had no right to make any redemptions to Lloyds before redeeming Depfa in full, and that BNY Mellon would breach its contractual and fiduciary duties if it permitted further redemption payments to Lloyds. (*Id.*)

71.     By early December 2009, the parties agreed that further redemptions should be suspended while the parties attempted to resolve the matter. (PTO ¶ VI.26.) In March 2010 Lloyds requested in writing that redemptions under the Lloyds SBPA resume, Depfa objected, and rounds of formal correspondence among the parties and their counsel followed.

72.     On May 19, 2010, Peterson e-mailed ALL's CEO with a recommendation "for the allocation of available cash now and in the future between Depfa and Lloyds." (TX164 at ALL8666.) "It is recommended that the Liquidity Providers agree to split [the cash now available for redemptions] and any subsequent cash available for redemptions pro-rata, based on aggregate Bank Bond principal outstanding, payable monthly." (*Id.* at ALL8667.) Peterson observed that this would result in an allocation of 51.3% to Depfa and 48.7% to Lloyds and noted that "this recommended approach results in a fair and equitable allocation of available cash which will allow us to move forward to [an] ultimate restructuring [of the Trust]." (*Id.* at ALL8666-67.) Peterson's belated recommendation to allocate redemptions on a "fair and equitable" basis was never implemented.

73.     On June 3, 2010, BNY Mellon filed an interpleader complaint in this Court against Depfa and Lloyds seeking a declaratory judgment resolving the allocation between Depfa and Lloyds of some $7.5 million then available for redemptions as well as any funds that

26

later became available for redemptions. (Dkt. No. 1, ¶ 25.) Since this litigation began, no further redemptions have been made to either bank, and the monies in the Trust potentially available for redemptions has grown far beyond the figure cited in the Interpleader Complaint. In August 2011, ALL advised Depfa and Lloyds that, as of July 31, 2011, the Trust held $48,722,600 in cash and investments. (TX 190.)

## PROPOSED CONCLUSIONS OF LAW

74.     The Lloyds SBPA and Second Supplemental Indenture amended or modified the Indenture by issuing additional bonds.

75.     The Lloyds SBPA and Second Supplemental Indenture amended or modified the Indenture by adding the payment terms of a Lloyds SBPA to the Indenture's Waterfall.

76.     The Second Supplemental Indenture and Lloyds SBPA "amended" or "modified" the Indenture by issuing a new series of bonds that were not "on a parity with," but senior to, Depfa's Senior bonds.

77.     Because the Lloyds SBPA and Second Supplement Indenture amended or modified the Indenture, Depfa's prior written consent was required under § 5.03(a) of the Depfa SBPA and §14.4(f) of the First Supplemental Indenture.

78.     Depfa SBPA § 7.01(h) provides that a "breach by the Issuer [ALL] of any of the terms or provisions of Section . . . 5.03(a)" shall constitute an "Event of Default" under the Depfa SBPA, without any requirement of notice or a cure period. (TX4.) ALL's failure to obtain Depfa's prior written consent to the amendment of the Indenture caused by the Second Supplemental Indenture and the Lloyds SBPA, was a breach of Depfa SBPA § 5.03(a) and hence an immediate Event of Default under Depfa SBPA § 7.01(h).

27

79.     Under California law, Depfa was an intended third party beneficiary of the First Supplemental Indenture entitled to sue for its breach. *See* Cal. Civ. Code § 1559; *Spinks v. Equity Residential Briarwood Apts.*, 171 Cal. App. 4th 1004, 1022 (2009); *Jones v. Aetna Cas. & Surety Co.*, 26 Cal. App. 4th 1717, 1725 (1994).

80.     JPMorgan breached the First Supplemental Indenture by failing to obtain Depfa's prior written consent to the Second Supplemental Indenture and the Lloyds SBPA.

81.     JPMorgan's breach has resulted in damages to Depfa in the amount of the Trust assets that were diverted to Lloyds under the unauthorized Lloyds SBPA executed by JPMorgan, namely, $24,050,000.

82.     A fiduciary relationship existed between BNY Mellon and Depfa beginning in February 2008. Section 10.1 of the Indenture expressly provides that BNY Mellon accepted "the duties and obligations of Trustee as a fiduciary for the Owners by executing this Indenture" (TX1), which it did by accepting its appointment as successor Trustee.[9] Depfa became such an "Owner" when it purchased Series V bonds pursuant to the Depfa SBPA on February 11, 2008 and has remained an Owner at all times thereafter, because under the terms of the First Supplemental Indenture, "any Liquidity Provider Bond [*i.e.*, any Series V-A-1 or V-A-2 bond purchased by Depfa] . . . shall be registered in the name of . . . the Liquidity Provider, which shall be treated as the owner thereof for all purposes of this Indenture." (TX2 § 14.4(e).)

---

[9] Indenture § 10.9 provides that: "Any successor Trustee appointed under this Indenture shall execute, acknowledge and deliver to its predecessor Trustee and to the Corporation an instrument accepting such appointment as a fiduciary for the Owners, and thereupon such successor Trustee, without any further act, deed or conveyance, shall become fully vested with all moneys, estates, properties, rights, powers, duties and obligations of such predecessor Trustee, with like effect as if originally named as Trustee . . . ." (TX1, emphasis added.)

28

83.     BNY Mellon breached its fiduciary duty to Depfa as an Owner of bonds by expending Trust assets for an improper purpose—namely, when it paid $24,050,000 of the Trust's moneys to Lloyds under the unauthorized Lloyds SBPA, *i.e.* $24,050,000.

84.     Depfa has suffered damages in the amount of the improper redemption payments under the Lloyds SBPA.

85.     Indenture §§ 5.3 and 5.4 and First Supplemental Indenture § 14.4(d) enumerated an exclusive list of uses for which the Trustee was permitted to disburse funds from the Trust's Revenue and Loan Accounts.  Payments to Lloyds under the unauthorized Lloyds SBPA and Second Supplemental Indenture are not among those permitted uses.  BNY Mellon therefore breached the Indenture and First Supplemental Indenture by using funds in the Trust's Revenue and Loan Accounts to make redemption payments to Lloyds under the unauthorized Lloyds SBPA and Second Supplemental Indenture.

86.     Depfa has been damaged by BNY Mellon's contractual breaches in the amount of the redemption payments that BNY Mellon improperly made to Lloyds, *i.e.* $24,050,000.

87.     Because ALL and the Trustees entered into and disbursed Trust assets pursuant to the unauthorized Second Supplemental Indenture and Lloyds SBPA in violation of their contractual and fiduciary obligations to Depfa as set out above, (a) there has been an Event of Default under the Depfa SBPA; (b) no further Mandatory or Optional Redemptions may be made under the unauthorized Lloyds SBPA until Depfa's bonds are redeemed in full; (c) Depfa will retain all rights of accorded to a majority bond holder under the Indenture until Depfa's bonds are redeemed in full, as would have been the case if the unauthorized Lloyds transaction had not occurred; and (d) Depfa is entitled to damages against BNY Mellon and JPMorgan,

29

jointly and severally, in the amount of the redemption payments improperly made to Lloyds, namely, $24,050,000; provided that, Depfa shall surrender ALL Series V bonds in a principal amount of $24,050,000 to ALL or the Trustee upon full payment of judgment.

88.     JPMorgan is not relieved of liability by reason of its reliance on opinion letters delivered in connection with the closing of the 2006 Bond issuance, because those letters expressed no opinion concerning Depfa's consent right.

89.     BNY Melon is not relieved of liability by reason of reliance on ALL's directions to make redemption payments to Lloyds because those directions were not permitted by the Indenture.

90.     JPMorgan is not entitled to indemnification from ALL because JPMorgan acted negligently in failing to consider whether Depfa's consent was required for the Second Supplemental Indenture and Lloyd's SBPA.

**The following are alternative conclusions of law in the event that this court determines that Depfa's prior written consent was not required and that the Depfa Bonds and the Lloyds Bonds were issued on a parity:**

91.     [The Depfa and Lloyds bonds were issued on a parity.

92.     Senior bonds issued "on a parity" have equal priority to payment of a liquidated collateral distributed to pay bond principal.

93.     Each senior bond series on a parity is entitled to receive a pro rata share of liquidated collateral based on the principal amount of the series.

94.     Any future Mandatory or Optional Redemptions should be allocated on a pro rata basis, namely, 51.3% to the Depfa Bonds and 48.7% to the Lloyds Bonds.

1048090.5

95.    If one of the banks has a Mandatory Redemption date that is not a Mandatory Redemption date for the other bank, then the other bank's pro share should be retained in the Trust for payment on the other bank's next redemption date.

96.    ALL and the Trustee must make a pro rata Optional Redemption from these funds to Depfa and Lloyds as soon as practicable.]

**[The following conclusions of law are independent of this Court's determination on the issues of parity and consent.]**

97.    ALL's failure to cause Mandatory Redemptions of the Depfa Bonds on one or more of Depfa's Mandatory Redemption dates, despite having available funds after giving effect to the transfers required by Indenture § 5.3(B)(1)-(5), constituted a breach of the provisions of the first sentence of Depfa SBPA § 3.02.

98.    Section 7.01(i) of the Depfa SBPA provides that an "Event of Default" under the SBPA will occur if there has been a "breach by the Issuer [ALL] of any of the other terms or provisions of this Agreement that is not remedied within 60 days after written notice thereof shall have been received by the Issuer from the Bank [Depfa.]"  (TX4.)  If an Event of Default under the Depfa SBPA occurs, "all amounts payable [t]hereunder (other than payments of principal and interest on the Bonds) shall become immediately due and payable without presentment, demand, protest or notice of any kind. . . ."  (*Id.* § 7.02(c).)

99.    There has been an Event of Default under the Depfa SBPA since September 14, 2009 by reason of ALL's uncured failure, after 60 day's written notice, to make Mandatory Redemptions as required by Depfa SBPA § 3.02.

100.    Pursuant to Depfa SBPA § 7.02(c), all amounts payable to Depfa under the SBPA (other than principal and interest) became immediately due and payable on and after September 14, 2009 as a result of that Event of Default.

31

101.    Depfa is entitled to an award of damages against ALL equal to all such unpaid amounts.

102.    Under § 5.01(f) of the Depfa SBPA, ALL had an obligation to comply promptly with reasonable requests from Depfa for information regarding the Trust's assets:

> The Issuer will maintain an accounting system in accordance with generally accepted accounting principles applicable to nonprofit corporations consistently applied and all applicable regulations and will furnish to the Bank:
>
> . . .
>
> (v) promptly, from time to time, such information regarding the Pledged Assets as the Bank may reasonably request.  (TX4.)

103.    ALL's continuing failure to provide the accounting requested by Depfa on July 16, 2009, after 60 days notice of ALL's breach, constituted an Event of Default under Depfa SBPA § 7.01(i) as of October 30, 2010.

104.    Because of such event of default, all amounts payable under the Depfa SBPA (other than principal and interest) on and after October 30, 2010 are immediately due and payable.

105.    Depfa is entitled to damages equal to all such unpaid amounts and a direction that ALL provide the requested accounting.

106.    Depfa is entitled to indemnification from ALL pursuant to Depfa SBPA § 8.05 of all counsel fees, expenses, and costs incurred in this action.

Dated:   New York, New York
         October 31, 2011

                              FRIEDMAN KAPLAN SEILER
                                  & ADELMAN LLP


                              By:    /s/ Scott M. Berman
                                   Scott M. Berman
                                   Eric Seiler
                                   Jeffrey C. Fourmaux
                                   Christopher L. McCall
                                   Alexander D. Levi

                                   7 Times Square
                                   New York, New York  10036
                                   (212) 833-1100

                              *Attorneys for Defendant, Counterclaimant,
                              Crossclaimant, Crossclaim Defendant, Third-Party
                              Plaintiff, and Third-Party Counterclaim Defendant
                              DEPFA BANK plc*

33

1048090.5