UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
THE BANK OF NEW YORK                              :
MELLON TRUST COMPANY, N.A.,                       :
                                                  :
      Plaintiff-Counterclaim Defendant,          :
                                                  :
      - against -                                :
                                                  :    No. 10 Civ. 4424 (JPO) (AJP)
DEPFA BANK PLC and                                :
LLOYDS TSB BANK PLC,                              :
                                                  :
      Defendants-Counterclaimants-               :
      Crossclaimants-Crossclaim                  :
      Defendants.                                :
-----------------------------------------------------------------x
DEPFA BANK PLC,                                   :
                                                  :
      Third-Party Plaintiff-                     :
      Counterclaim Defendant,                    :
                                                  :
      - against -                                :
                                                  :
ACCESS TO LOANS FOR LEARNING                      :
STUDENT LOAN CORPORATION,                         :
                                                  :
      Third-Party Defendant-                     :
      Counterclaimant-Crossclaim                 :    **DEPFA BANK PLC'S**
      Defendant,                                 :    **<u>PRETRIAL MEMORANDUM</u>**
                                                  :
      - and -                                    :
                                                  :
JPMORGAN CHASE BANK, N.A.,                        :
                                                  :
      Third-Party Defendant-                     :
      Crossclaimant.                             :
-----------------------------------------------------------------x
LLOYDS TSB BANK PLC,                              :
                                                  :
      Third-Party Plaintiff-Counterclaim         :
      Defendant,                                 :
                                                  :
      - against -                                :
                                                  :
ACCESS TO LOANS FOR LEARNING                      :
STUDENT LOAN CORPORATION,                         :
                                                  :
      Third-Party Defendant-                     :
      Counterclaimant.                           :
-----------------------------------------------------------------x

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................v

PRELIMINARY STATEMENT ........................................................................................1

STATEMENT OF FACTS ................................................................................................2

      A.     The Parties and Pertinent Actors...................................................................2

      B.     In 2005, ALL Issues the Senior Series V-A-1 and V-A-2 Bonds, and together with the Trustee, Enters Into a Liquidity Facility for the Bonds with Depfa.................................................................................5

              1.     ALL's Obligations to Depfa under the 2005 Bond Documents .....................................................................................7

              2.     The Trustee's Obligations to Depfa under the 2005 Bond Documents .....................................................................................9

              3.     To Protect its Interests, Depfa Bargained for and Obtained an Unqualified Right of Prior Written Consent Over Amendments and Modifications to the Indenture, Binding on Both ALL and the Trustee. .......................................................10

              4.     ALL's Obligations under the Depfa SBPA Were To Be Strictly Performed and Could Not Be Waived by Any Delay by Depfa in Asserting its Rights..........................................13

      C.     In 2006, Without Depfa's Prior Written Consent, ALL and the Trustee Enter Into a Second Supplemental Indenture and a Liquidity Facility with Lloyds. ..................................................................13

      D.     In 2008, Depfa and Lloyds Purchase All Outstanding Bonds, Loan Recycling Is Suspended, and the Trust Begins to Liquidate. ....................16

      E.     ALL and the Trustee Fail to Make Scheduled Mandatory Redemption Payments to Depfa Despite Having Available Funds. ..........18

      F.     ALL and the Trustee Belatedly Begin Making Optional Redemptions to the Two Banks, But Their Payments to Lloyds Are as Much as Twice What They Pay Depfa..................................................21

G.    In Mid-2009, After Repeated Inquiries, Depfa Learns that ALL and the Trustee Had Made Larger Redemption Payments to Lloyds and First Sees the Preferential Payment Terms of the Lloyds SBPA ................................................................................................22

H.    Depfa Promptly Complains to ALL and the Trustee that It Was Not Being Paid On Parity With Lloyds and that the Lloyds SBPA Violated Depfa's Consent Rights ................................................23

I.    ALL Attempts to Justify the Disproportionate Optional Redemptions Based on the Preferential Redemption Schedule in the Lloyds SBPA ..................................................................24

J.    As the Parties' Dispute Grows, Redemptions Are Suspended, and this Litigation Follows. ..............................................26

STATEMENT OF ISSUES FOR TRIAL ........................................................................28

ARGUMENT ................................................................................................................29

POINT I    ALL AND THE TRUSTEES BREACHED CONTRACTUAL AND FIDUCIARY DUTIES TO DEPFA BY ENTERING INTO THE SECOND SUPPLEMENTAL INDENTURE AND LLOYDS SBPA WITHOUT DEPFA'S PRIOR WRITTEN CONSENT AND BY MAKING REDEMPTION PAYMENTS TO LLOYDS UNDER THEM ............29

A.    The Lloyds SBPA and Second Supplemental Indenture Amended or Modified the Indenture and Therefore Required Depfa's Prior Written Consent under Depfa SBPA § 5.03(a). ..........................................29

1.    The Second Supplemental Indenture and Lloyds SBPA "amended" or "modified" the Indenture by issuing additional bonds and by adding to and changing the Indenture's Waterfall. ....................................................30

2.    The Second Supplemental Indenture and Lloyds SBPA "amended" or "modified" the Indenture by issuing a new series of bonds that were not "on a parity with," but senior to, Depfa's Senior bonds. ............................................32

3.    The other parties' arguments to the contrary are not supported by the text of the governing agreements or the weight of the evidence. ..............................................36

B.    ALL's Failure to Obtain Depfa's Consent Caused an Immediate Event of Default under the Depfa SBPA. ..................................41

ii

C.      JPMorgan Breached the First Supplemental Indenture by Failing to Obtain Depfa's Consent. .......................................................................41

D.      BNY Mellon Breached its Fiduciary Duty to Depfa as a Bond Owner by Diverting Pledged Assets to Payments Under the Unauthorized Lloyds SBPA.................................................................43

E.      BNY Mellon Breached the Indenture and First Supplemental Indenture by Making Improper Redemption Payments to Lloyds.............44

F.      Depfa Is Entitled to Declaratory Relief and Damages...............................44

G.      JPMorgan's and BNY Mellon's Alleged Reliance on Opinion Letters and ALL's Directions Do Not Absolve Them of Liability, and JPMorgan Is Not Entitled to Indemnification from ALL. ..................45

        1.      The opinion letters do not protect JPMorgan................................45

        2.      ALL's directions do not protect BNY Mellon..............................48

        3.      JPMorgan is not entitled to indemnification from ALL ...............49

POINT II      ALTERNATIVELY, IF THE OTHER PARTIES ARE CORRECT THAT DEPFA'S CONSENT WAS NOT REQUIRED AND THAT THE DEPFA BONDS ARE ON PARITY WITH THE LLOYDS BONDS, THEN DEPFA IS ENTITLED TO A DECLARATORY JUDGMENT THAT ALL FUTURE REDEMPTIONS SHOULD BE MADE PRO RATA BETWEEN DEPFA AND LLOYDS. .................................................................50

POINT III     ALL FAILED TO PAY DEPFA MANDATORY REDEMPTIONS WHEN DUE, CAUSING AN EVENT OF DEFAULT UNDER THE DEPFA SBPA. ...................................................................................52

A.      Funds were Available for Mandatory Redemptions on One or More of Depfa's Mandatory Redemption Dates........................................53

B.      ALL's Failure to Pay Mandatory Redemptions after Notice of its Breach Constituted an Event of Default under the Depfa SBPA..............55

POINT IV    ALL FAILED TO PROVIDE AN ACCOUNTING AS REQUIRED, CAUSING AN EVENT OF DEFAULT UNDER THE DEPFA SBPA. .............56

POINT V     ALL MUST INDEMNIFY DEPFA FOR ITS FEES AND EXPENSES IN THIS ACTION.......................................................................................57

iii

POINT VI     MESSRS. BALIBAN, LANDAU, AND POPE SHOULD BE PARTLY
OR WHOLLY PRECLUDED FROM TESTIFYING, AND MR.
BLUMENTHAL'S OPINION SHOULD BE GIVEN LITTLE OR NO
WEIGHT...........................................................................................................58

CONCLUSION........................................................................................................................63

1049345.1

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*2619 Realty, LLC v. Fid. & Guar. Ins. Co.,*
    303 A.D.2d 299, 756 N.Y.S.2d 564 (1st Dep't 2003) ............................................30

*Bianco v. Bianco,*
    36 A.D.3d 490, 830 N.Y.S.2d 21 (1st Dep't 2007) ..............................................30

*Jones v. Aetna Cas. & Surety Co.,*
    26 Cal. App. 4th 1717 (1994) ............................................................................42

*Oasis West Realty, LLC v. Goldman,*
    250 P.3d 1115 (Cal. 2011) ...........................................................................41, 43

*Spinks v. Equity Residential Briarwood Apts.,*
    171 Cal. App. 4th 1004 (2009) ..........................................................................42

STATUTES AND RULES

20 U.S.C. § 1087-1(b)(1) ......................................................................................20

20 U.S.C. § 1087(b)(2)(I) ......................................................................................20

Cal. Civ. Code § 1559............................................................................................42

Fed. R. Civ. P. 54(d)(2)....................................................................................58, 65

Fed. R. Evid. 702 ...................................................................................................58

OTHER AUTHORITIES

*Am. Heritage Dictionary* (4th ed. 2006) ...........................................................30, 31

*Collegiate Dictionary* (10th ed. 1996) ...............................................................30, 31

*Shorter Oxford English Dictionary* (5th ed. 2002) .............................................30, 31

U.S. Dep't of Ed., "Reporting Changes for Lenders," DCL ID: FP-06-04 (2006).......................20

## PRELIMINARY STATEMENT

This interpleader action is the direct result of the other parties—Access to Loans for Learning Student Loan Corporation ("ALL"), JPMorgan Chase Bank, N.A. ("JPMorgan"), and Lloyds TSB Bank plc ("Lloyds")—agreeing to an improper amendment of a trust indenture that has materially harmed DEPFA BANK plc ("Depfa"). Although Depfa's bonds were senior to any other bonds under the indenture, ALL and the trustee, JPMorgan, amended the indenture to issue bonds, later purchased by Lloyds, which were more senior, *i.e.*, not in parity. As a result, Depfa has received materially less principal than Lloyds has in bond redemption payments. No such amendment was permitted under the operative agreements without Depfa's consent. Depfa's consent, however, was never requested or given.

This breach of the operative agreements can be rectified by a declaration that there has been an event of default under Depfa's agreement with ALL, that no further redemptions be made to Lloyds until Depfa's bonds are redeemed in full and that Depfa be awarded $24,050,000 in damages against JPMorgan for agreeing to the amendment and against the successor trustee, The Bank of New York Mellon Trust Company, N.A. ("BNY Mellon"), making improper redemption payments under the amendment. Alternatively, if the Court finds that Depfa's and Lloyds' bonds are in "parity," then all future redemptions should be made on a pro rata basis, beginning with a redemption using the cash currently in the indenture trust.

In addition, independent of the Court's determination of the consent and parity issues, ALL breached its agreement with Depfa by failing to make required redemption payments. Accordingly, an event of default should be declared, and Depfa should be awarded damages of all amounts payable under ALL's agreement with Depfa (other than bond principal and interest) and should be indemnified by ALL for all of its costs, expenses and legal fees.

## STATEMENT OF FACTS

Depfa believes the testimony and exhibits to be offered at trial, together with the pleadings and the Stipulated Facts set forth in the Joint Pretrial Order ("PTO"), will show the following facts.  Trial exhibits on the parties' Trial Exhibit List are cited herein as "TX__."  Any facts stated below without citations will be established by the testimony of Depfa's witnesses.[1]

## A.      The Parties and Pertinent Actors

Third-party defendant and counterclaimant Access to Loans for Learning Student Loan Corporation ("ALL") is a California corporation that originates federally-guaranteed student loans, which it finances by selling bonds secured by the loans, such as the Senior Series V bonds at issue in this case.  (Peterson Dep. 9:15-19, 84:18-21.)  ALL also acts as administrator of the trust that secures the ALL Series V bonds at issue in this case (the "Trust").  (*Id.* at 86:11-15.)  The ALL employees who played the most pertinent roles in this case are Martha Peterson, ALL's CFO and chief negotiator; Christopher Chapman, ALL's CEO when the relevant agreements were negotiated; and Quentin Wilson, who succeeded Chapman as CEO in 2008.  (Chapman Dep. 17:21-18:7; Peterson Dep. 8:21- 9:1, 103:22-104:7, 128:11-15.)

Third-party defendant and crossclaimant JPMorgan Chase Bank, N.A. ("JPMorgan") is a national bank which served as the indenture trustee for the ALL Senior Series V bonds (the "Trustee") from the time of their issuance until October 2006.   (PTO ¶¶ VI.1, 20; TX1.)  At that time, JPMorgan sold its indenture trustee business to The Bank of New York

---

[1] The parties have interpreted this Court's Individual Practices not to require designations or deposition excerpts for witnesses expected to appear at trial (namely, Nancy Henderson, David Park, Martha Peterson, Seamus O'Neill, Dennis Roemlein, Thea Watkins, and the parties' putative experts, Jeffrey Baliban, Jack Blumenthal, Scott Friedland, Robert Landau, Robert Dean Pope, Joel Powers, and Prof. Steve Thel).  Accordingly, where those witnesses' depositions are cited herein, corresponding designations and excerpts have not been included with the pretrial order.  Counsel, however, will be happy to provide copies for the Court's reference upon request.

Mellon Trust Company, N.A. ("BNY Mellon"). (Roemlein Dep. 26:12-16.) The JPMorgan (and later BNY Mellon) employee with the most pertinent role in this case is Dennis Roemlein, the Trustee's relationship manager for ALL. (*Id*. at 180:6-11.)

Plaintiff and counterclaim defendant BNY Mellon is a national banking association, which has served as the Trustee since October 2006. (PTO ¶ VI.20.)

Defendant, counterclaimant, crossclaimant, crossclaim defendant, third-party plaintiff, and third-party counterclaim defendant Depfa is an Irish public limited company and has served as the "liquidity provider" for the ALL Senior Series V-A-1 and Senior Series V-A-2 bonds since their issuance in August 2005. (PTO ¶¶ VI.10, 14.) As liquidity provider, Depfa agreed to purchase the bonds at par under certain circumstances in order to ensure that there would always be liquidity in the market for the bonds. (TX4 § 2.01; Chapman Dep. 36:2-37:2.) In 2008, Depfa was called upon to purchase all $190 million of the Series V-A-1 and V-A-2 bonds and has held all outstanding bonds in these series ever since. (PTO ¶¶ VI.22, 32.) The key Depfa employees in this case were David Park, who negotiated the 2005 transaction for Depfa, and Nancy Henderson, co-manager of Depfa's New York branch, who has overseen its liquidity facility portfolio since 2008.

Defendant, counterclaimant, crossclaimant, crossclaim defendant, third-party plaintiff, and third-party counterclaim defendant Lloyds TSB Bank plc ("Lloyds") is an English public limited company and has served as liquidity provider for the ALL Senior Series V-A-3, V-A-4, and V-A-5 bonds since their issuance in August 2006. ( PTO ¶¶ VI.15, 19.) In 2008, Lloyds was required to purchase all $190 million of Series V-A-3, V-A-4, and V-A-5 bonds and has owned all outstanding bonds in those series ever since. (*Id*. ¶¶ VI.22, 33.) The key Lloyds

3

employee in this case is Thea Watkins, the Senior Vice President who negotiated the 2006 transaction for Lloyds.  (Watkins Dep. 13:3-9, 19:3-20.)

Non-party Ambac Assurance Corporation ("Ambac") is a Wisconsin corporation which became the "credit provider" for the ALL Senior Series V bonds by issuing policies in 2005 and 2006 insuring all payments of principal and interest due on the bonds (including any redemption payments to Depfa and Lloyds not paid when due).  (PTO ¶ VI.9; TX34; TX69.) Ambac's role as credit provider was essential to the marketability of the bonds, because ALL issued the bonds on a non-recourse basis, secured only by the Trust's assets.[2]  Thus, if the Trust's assets proved insufficient to pay bond interest or principal, then except under limited circumstances, a bond holder's primary remedy would be a claim under the Ambac policies.

Beginning in January 2008, Ambac suffered a series of downgrades that reduced its credit rating to junk status.  (PTO ¶ VI.21.)  In March 2010, Wisconsin's Office of the Commissioner of Insurance (the "OCI") commenced rehabilitation proceedings against Ambac in Wisconsin state court, which remain pending.  (PTO ¶ VI.28; TX150 ¶ 5(c).)  The Wisconsin court has confirmed a plan of rehabilitation which, generally, would limit cash payments on claims under Ambac policies to 25 cents on the dollar.  (TX217 ¶ 96.)  Thus, there is scant likelihood that the relevant Ambac policy would make Depfa whole if there are insufficient funds in the Trust to redeem Depfa's bonds in full.

---

[2] Indenture § 2.2 provides:  "The Corporation [ALL] shall not be obligated to pay the Bonds or the interest thereon or any other obligation incurred by the Corporation hereunder, except from the property and income pledged hereunder, and no recourse shall be had for the payment of the principal thereof or interest thereon against the Corporation or any member thereof or against the property or funds of the Corporation, except to the extent of the property and income pledged expressly thereto."  (TX1 § 2.2.)  Similarly, ALL's agreement with Depfa provides that "the parties hereto acknowledge that the obligations of the Issuer [ALL] under this Agreement, the Indenture and the Bank Bonds are limited obligations of the Issuer, payable solely from the Pledged Assets . . . ."  (TX4 § 8.12.)

**B.    In 2005, ALL Issues the Senior Series V-A-1 and V-A-2 Bonds, and together with the Trustee, Enters Into a Liquidity Facility for the Bonds with Depfa.**

On or about August 1, 2005, ALL and JPMorgan, as trustee, entered into a Trust Indenture (the "Indenture").  (PTO ¶ VI.1.)  ALL and the Trustee also executed a First Supplemental Indenture pursuant to which ALL issued two series of bonds—the ALL Senior Series V-A-1 and V-A-2 bonds (collectively, the "2005 Bonds" or "Depfa Bonds")—in a principal amount of $190 million.  (*Id.* ¶¶ VI.2, 10.)  The 2005 Bonds were to earn interest at a variable rate, reset on a weekly basis through an auction rate mechanism and payable in arrears semiannually.  (TX2 § 12.2(b), definition of "Interest Payment Date," § 13.2 & Multi-Mode Annex arts. II-III.)

The 2005 Bonds were denominated as "Senior Bonds" (*id.* § 13.1), which the Indenture defined as "any Bonds which are secured by a lien on and payable from the [Trust] Assets prior to all other Bonds except those issued on a parity as to payments therewith" (TX1 §1.2).  Senior Bonds thus were the most senior of four classes of bonds contemplated by the Indenture, the other classes being "Senior Subordinate Bonds," Subordinate Bonds," and "Junior Subordinate Bonds" (TX1 § 1.2).  Section 2.1 of the Indenture provided that additional bonds could later be "issued on a parity with Senior Bonds . . . theretofore outstanding."  (*Id.* § 2.1.)

The proceeds of the 2005 Bond offering were to be deposited in the Trust and used to originate, purchase, and refinance student loans.  (TX2, Recitals, at 1.)  Over time, substantially all of the proceeds of the 2005 offering and a subsequent bond offering in August 2006 were used to make or purchase more than 30,000 student loans.  (TX200; TX201.)

The Indenture provides for the creation of a "Revenue Account" to hold interest payments on the student loans in the Trust.  (TX1 § 1.2, definitions of "Revenues" and "Recoveries of Principal," § 5.2(1), § 5.3(A).)  These funds were to be used to pay the Trust's

expenses as well as interest and principal on the bonds.  (*Id*. § 5.3(B).)  Payments from the Revenue Account were to be made according to a sequence of priorities set forth in § 5.3(B) of the Indenture, a provision colloquially referred to as the "Waterfall."

Paragraphs First through Fifth of the Waterfall provide for payments from the Revenue Account in the following order of priority:  first, payments into a "Rebate Account" to cover certain tax liabilities; second, payments into an "Operating Account" for amounts payable to the Department of Education; third, payments into the Operating Account for the fees of the student loan servicers and certain fees of the Trust's administrator (*i.e.*, ALL); fourth, payments into the Operating Account to cover the fees and expenses of the Trustee, any liquidity provider, bond insurer, and certain other vendors; and fifth, payments into a "Payment Account" to pay interest on the bonds semiannually and to bond principal due at maturity.  (TX1 § 5.3(B)(1)-(5).)

The Indenture also provides for a "Loan Account" to hold payments of principal on the student loans.  Unless certain so-called "Recycling Suspension Events" (described below) occurs, funds in the Loan Account are to be "recycled" to make new student loans, thus replenishing the Trust's income-earning assets as old student loans were paid off.  (TX1 §§ 5.3, 5.4; TX6 § 4.2.)  In certain circumstances, Loan Account funds can also be used to pay interest and principal on the bonds.  (TX1 § 5.4(A)-(B).)

At the same time that the Indenture and First Supplemental Indenture were executed, ALL and JPMorgan (as Trustee) entered into a "Certificate and Agreement" with Ambac.  (PTO ¶ VI.4.)  That agreement places additional conditions (described below at pp. 8-9) on the use of funds in various Trust accounts, as long as bonds insured by Ambac's policy remain outstanding.  (TX6.)

6

Finally, ALL and the Trustee also entered into what it is known as a "liquidity facility" with Depfa, memorialized in a Standby Bond Purchase Agreement dated as of August 1, 2005 (the "Depfa Liquidity Facility" or "SBPA").  (PTO ¶ VI.3.)  Under the Liquidity Facility, Depfa was obligated to purchase the 2005 Bonds at par if bond holders exercised certain rights to put the bonds back to ALL and thereafter the bonds could not be remarketed.  (TX2, Multi-Mode Annex § 5.03; TX4 § 2.01.)

The key provisions of the Indenture, the First Supplemental Indenture, the Certificate and Agreement, and Depfa SBPA (the "2005 Bond Documents") establishing Depfa's rights with respect to the 2005 Bonds are as follows:

**1.      ALL's Obligations to Depfa under the 2005 Bond Documents**

Under the Depfa SBPA, if Depfa was called upon to purchase any bonds, ALL agreed to redeem Depfa's bonds in semiannual installments ("Mandatory Redemptions") out of certain funds, after allowing for certain Trust expenses, beginning six months after the purchase dates of the bonds, with principal due in full within 10 years:

> The Issuer [ALL] agrees to cause the redemption of Bank Bonds [*i.e.*, bonds that had been purchased by Depfa] in semiannual installments, commencing on the date which is six months after the Bank Purchase Date, from all amounts on deposit in the Revenue Fund[3] after giving effect to the transfers required pursuant to paragraphs First through Fifth of Section 5.3(B) of the General Indenture; provided that in any event all of the then unpaid principal amount of Bank Bonds shall be redeemed on the date which is the tenth anniversary of the Bank Purchase Date. (TX4 § 3.02.)

Although ALL and the Trustee object to characterizing these redemptions as "mandatory," the attorney who drafted the Indenture and First Supplemental Indenture for ALL, Elaine Bayus, has testified that, in her understanding, the quoted provision did not give ALL any discretion not to

---

[3] The term "Revenue Fund" is not defined in any of the relevant agreements.

redeem Depfa's bonds if funds were available on the dates specified.  (Bayus Dep. 12:21-13:9,

15:6-15, 80:22-81:4.)  Likewise, BNY Mellon's Dennis Roemlein testified that he did not

understand ALL to have such discretion either.  (Roemlein Dep. 50:15-21.)

Depfa SBPA § 3.02 also permitted ALL to make "Optional Redemptions" on

dates other than Mandatory Redemption dates, subject to certain conditions:

> Notwithstanding the foregoing, the Issuer may optionally redeem
> any Bank Bond without penalty on 15 days' notice; provided,
> however, that any such optional redemption shall be in a minimum
> aggregate principal amount of the lesser of (i) $1,000,000, and
> (ii) the aggregate principal amount of the Bank Bonds then
> Outstanding, and only one such optional redemption shall occur in
> any calendar month.  (TX4 § 3.02.)

All of the redemption provisions of the Depfa Liquidity Facility were expressly incorporated into

the Indenture through §§ 13.3 and 14.4(d)-(e) of the First Supplemental Indenture (TX2), making

Depfa an intended third-party beneficiary of the Indenture and First Supplemental Indenture.

In addition, in the Certificate and Agreement ALL agreed that if Depfa were

called upon to purchase 2005 Bonds (such a purchase being defined in the Certificate and

Agreement as a "Recycling Suspension Event") and ALL was unable to remarket the bonds to

third parties within 30 days, then ALL would cease using principal payments on the student

loans to make new student loans.  (TX6 §§ 1.1(iii), 4.2.)  Instead, after such a Recycling

Suspension Event continued uncured for 30 days, ALL was to direct the Trustee to use principal

payments on the student loans then on deposit in the Loan Account or later collected, to redeem

Depfa's bonds "in accordance with the procedures set forth in the Indenture."  (*Id*. § 4.2.)

The referenced "procedures set forth in the Indenture" include the Mandatory and

Optional Redemption provisions of the Depfa SBPA that were incorporated into the Indenture by

8

the First Supplemental Indenture, as well as those in Indenture § 3.8(ii) which provides that on

15 days' notice to the bond owners,

> the Bonds . . . shall be subject to special redemption at the
> determination of the Corporation [ALL], at any time, in whole or
> in part in Authorized Denominations, at a price of par plus accrued
> interest to the date of redemption, in an amount not to exceed
> moneys on deposit in the Loan Account and Revenues [*i.e.*, student
> loan interest payments] or Recoveries of Principal [*i.e.*, student
> loan principal payments] . . . which are not expected to be used to
> finance Eligible Loans.  (TX1 § 3.8(ii).)

ALL is also required to pay interest on any 2005 Bonds purchased by Depfa

pursuant to the Depfa Liquidity Facility.  If Depfa continues to own the bonds for more than 90

days, Depfa's bonds are to earn interest at a variable rate equal to the Prime Rate plus 1.5%,

payable in arrears semiannually.  (TX4 § 1.01, definition of "Base Rate," § 3.01.)

### 2.    The Trustee's Obligations to Depfa under the 2005 Bond Documents

While an indenture trustee's duties prior to an event of default are sometimes said

to be purely contractual in nature, the Indenture in this case provided that the Trustee had a

fiduciary duty to Depfa as a bond owner once Depfa was called upon to purchase bonds.  In the

Indenture, the Trustee expressly accepted its status as a fiduciary to the bond owners, which

Depfa became in 2008 (*see* TX2 § 14.4(e)):

> The Trustee shall signify its acceptance of the duties and
> obligations of Trustee as a fiduciary for the Owners by
> executing this Indenture.  (TX1 § 10.1.)

BNY Mellon's putative expert on trustee custom and practice, Robert Landau, testified that this

provision, which designates the Trustee as a fiduciary, "is a very unusual provision in an

Indenture," and in his opinion, "means what it says."  (Landau Dep. 91:5-92:11.)

In addition, in the First Supplemental Indenture the Trust's assets were pledged, among other things, to secure amounts owed to Depfa under the Depfa Liquidity Facility, including amounts to redeem bonds purchased by Depfa:

> The Corporation [ALL] hereby declares . . . that the grant to the Trustee for the benefit of the Bondholders of a security interest in the Pledged Assets shall also be for the benefit of . . . the Liquidity Provider [Depfa] . . . to secure the obligations of the Corporation to reimburse . . . the Liquidity Provider for amounts paid pursuant to . . . the [Depfa] Liquidity Facility . . . and to pay amounts due to . . . the Liquidity Provider as fees, indemnification or other amounts, such pledge to be in the order of priority set forth in Section 5.3(B)(5), in the case of amounts due as reimbursement for the payment of the . . . purchase price of the Bonds . . . .  The Trustee hereby acknowledges the foregoing.  (TX2 § 14.4(d).)

By its terms, this provision also had the effect of adding redemption payments to Depfa into the fifth level of payment priority in the Indenture's Waterfall, *i.e.*, Indenture § 5.3(B)(5).  As Section 14.4(d)'s drafter Elaine Bayus put it, the provision's purpose was "[t]o put the bank [Depfa] into the waterfall at the appropriate places."  (Bayus Dep. 82:4-11.)

**3.  To Protect its Interests, Depfa Bargained for and Obtained an Unqualified Right of Prior Written Consent Over Amendments and Modifications of the Indenture, Binding on Both ALL and the Trustee.**

For a liquidity provider such as Depfa, amendments or modifications to the trust indenture can be a source of significant risk—if, for example, the indenture were modified to lower the priority of payments to the liquidity provider in the waterfall.  Because of this risk, liquidity providers often bargain for "consent rights," which prevent the issuer from amending or modifying the indenture without the liquidity provider's consent.  (TX189 at 7.)  For their part, issuers will usually seek limits on a liquidity provider's consent rights (and usually obtain such limits) so that they retain the flexibility to issue later bond series with varying terms.  (*Id*. at 8.)

In this case, Depfa successfully bargained for consent rights over amendments and modifications of the Indenture <u>without qualification</u>.  As agreed to by ALL and the Trustee,

the Depfa Liquidity Facility prohibited ALL from amending, modifying, or acting or omitting to

act in a manner equivalent to amending or modifying the Indenture, without Depfa's prior

written consent:

> During the Bank Purchase Period, and so long as any obligation is owed to the Bank hereunder, <u>the Issuer [ALL] shall not</u>:
>
> (a) *Amendments.*  <u>Amend, modify</u>, terminate or grant, or permit the amendment, modification, termination or grant of, any waiver under, or consent to, <u>or permit or suffer to occur any action or omission which</u> results in, or <u>is equivalent to, an amendment, modification</u>, or grant of a waiver under, the Policy or <u>the Indenture without the prior written consent of the Bank</u>. (TX4 § 5.03(a), emphasis added.)

The specific language of Depfa's consent rights provision in this case is unusually

broad in scope and relatively rare in the student loan bond industry in that it does not have a

carve out for the issuance of additional bonds.  As Depfa's expert on the student loan bond

industry, Joel Powers, will testify, liquidity providers' consent rights provisions "typically

incorporate language that <u>excludes</u> any requirement that liquidity provider consent be obtained

before new bonds can be issued."  (TX189 at 4, emphasis added; *accord* Henderson Dep. 47:20-

24, "In many documentation [sic], there is a specific carveout provision that says you do not

have – as a bond holder, you do not have the right to object or consent to additional issuance of

bonds.")  Customarily, a liquidity provider's consent right has a carve-out for the issuance of

additional bonds, as exemplified in the SBPA for a prior bond deal which apparently served as

the model for the first draft of the Depfa SBPA:

> The [issuer] shall not:
>
> (a) *Amendments*.  Amend, modify, terminate or grant, or permit the amendment, modification, termination or grant of, any waiver under, or consent to   . . . any amendment, modification, or grant of a waiver under, the Policy or any Related Document [defined to include the Indenture] without the prior written consent of the [liquidity provider] Bank, <u>except the amendments relating to</u>

> the issuance from time to time of additional bonds under the
> Indenture or other amendments which do not affect the Policy, the
> terms of the Bonds or the obligations of the Bank hereunder.
> (TX21, emphasis added.)[4]

As a matter of industry custom and practice, absence of this usual carve-out indicates that the liquidity provider has a consent right over the issuance of additional bonds.  (TX189 at 8-9.)

Prior to entering into the Depfa Liquidity Facility, ALL was aware of how broadly Depfa's consent rights provision was drafted.  In commenting on a draft of the agreement, ALL's (then) CEO Christopher Chapman wrote the following comment next to Section 5.03:  "This is rather broad, can it be modified to eliminate changes that would not result in a material adverse change?"  (TX23 at KR-DEPFA3548.)  Ultimately, however, ALL acceded to Depfa's proposed language with no material changes.  (TX4 § 5.03.)

The Trustee also agreed to be bound by Depfa's unqualified consent right over Indenture amendments and modifications.  In § 14.4(f) of the First Supplemental Indenture, the Trustee expressly acknowledged and agreed that the Depfa Liquidity Facility required Depfa's consent for certain actions under the Indenture:

> Consent of Liquidity Provider.  The Trustee hereby acknowledges
> that the Issuer [ALL] has entered into an agreement [the Depfa
> SBPA] with the Liquidity Provider [Depfa] pursuant to which the
> consent of the Liquidity Provider is required for certain actions
> under the Indenture, and the Trustee and the Issuer agree that no
> such action shall be taken without such consent.  (TX2 § 14.4(f).)

---

[4] The quoted language is from an SBPA that Depfa's counsel on the 2005 transaction (Elizabeth Davis) was involved in, for which the issuer was the Utah State Board of Regents. (TX21; Davis Dep. 147:4-9.)  Ms. Davis's first circulated draft of the Depfa SBPA contained a vestigial reference to Utah law (TX19 at KR-DEPFA0004407), which ALL struck in its comments on the draft (TX23 at KR-DEPFA0003543).

**4.      ALL's Obligations under the Depfa SBPA Were To Be Strictly Performed and Could Not Be Waived by Any Delay by Depfa in Asserting its Rights.**

The Depfa Liquidity Facility provides that ALL's obligations under the agreement

are absolute and to be performed strictly in accordance with the agreement's terms:

> [T]he obligations of the Issuer [*i.e.*, ALL] under this Agreement shall be absolute, unconditional and irrevocable and shall be performed strictly in accordance with the terms of this Agreement under all circumstances whatsoever . . . . (TX4 § 8.11.)

And contrary to ALL and the Trustee's assertion that Depfa's claims in this case are barred by

laches, they expressly agreed that no delay by Depfa in asserting its rights under the Depfa

Liquidity Facility would constitute a waiver of its rights:

> No failure or delay on the part of the Bank [*i.e.*, Depfa] is exercising any right, power or privilege hereunder and no course of dealing shall operate as a waiver thereof.  (*Id.* § 8.01.)

**C.      In 2006, Without Depfa's Prior Written Consent, ALL and the Trustee Enter Into a Second Supplemental Indenture and a Liquidity Facility with Lloyds.**

In June 2006, ALL requested bids on a liquidity facility for additional bonds that

were to be issued pursuant to the Indenture.  (Peterson Dep. 54:16-56:6.)  Both Depfa and Lloyds

submitted bids for the 2006 liquidity facility.  (PTO ¶ VI.18.)  ALL accepted Lloyds' bid

because, according to ALL's Martha Peterson, Lloyds' bid offered a lower interest rate in the

event Lloyds was called upon to purchase bonds and because ALL wished to diversify its

liquidity providers.  (PTO ¶ VI.19; Peterson Dep. 59:4-60:12.)

On or about August 1, 2006, ALL and the Trustee executed a Second

Supplemental Indenture Relating to ALL V and Amending the Trust Indenture (the "Second

Supplemental Indenture"), and entered into a Standby Bond Purchase Agreement with Lloyds

(the "Lloyds Liquidity Facility" or "SBPA").  (PTO ¶¶ VI.5, 6.)  Pursuant to the Second

Supplemental Indenture, ALL issued its Senior Series V-A-3, V-A-4 and V-A-5 bonds

(collectively, the "2006 Bonds" or "Lloyds Bonds"), in a principal amount of $190 million.  (*Id.* ¶ VI.15.)  Like the Depfa Bonds, the Lloyds Bonds were denominated as "Senior Bonds."  (TX3 §16.1.)  The 2006 Bonds were to earn interest at variable rates, reset on a daily or weekly basis through an auction rate mechanism and payable in arrears semiannually.  (*Id.* § 15.2(b), definition of "Interest Payment Date," § 16.2 & Multi-Mode Annex arts. II-III.)  Under the Lloyds SBPA, Lloyds agreed to be the liquidity provider for the Lloyds Bonds.  (TX5.)

The Lloyds SBPA is virtually a carbon copy of the Depfa SBPA, as a redacted copy of the Depfa SBPA was provided to bidders for the 2006 liquidity facility with an instruction that the winning bidder would be expected to execute an SBPA in substantially the same form.  (TX39.)  Among other things, the Lloyds SBPA gave Lloyds a right of prior written consent over amendments and modifications of the Indenture which is worded identically to that in the Depfa SBPA.   (*Compare* TX4 § 5.03(a), *with* TX5 § 5.03(a).)

The Lloyds SBPA, however, differs from Depfa's in a critical aspect:  Section 3.02 of the Lloyds SBPA provides for Lloyds' bonds to be Mandatorily Redeemed twice as often and twice as fast as Depfa's bonds.  Specifically, Lloyds was entitled to quarterly Mandatory Redemptions, beginning three months after a purchase of bonds, and full repayment within five years, whereas Depfa was entitled to only semiannual Mandatory Redemptions, beginning six months after a purchase of bonds, without a requirement of full redemption until the tenth year:

> The Issuer agrees to cause the redemption of Bank Bonds in quarterly installments, commencing on the date which is three months after the Bank Purchase Date, from all amounts on deposit in the Revenue Fund after giving effect to the transfers required pursuant to paragraphs First through Fifth of Section 5.3(B) of the General Indenture; provided that in any event all of the then unpaid principal amount of Bank Bonds shall be redeemed on the date which is the fifth anniversary of the Bank Purchase Date.
> (TX5 § 3.02, emphasis added.)

These earlier and more frequent Mandatory Redemption payments to Lloyd were to be made out of the same source—"all amounts on deposit in the Revenue Fund"—as any such payments to Depfa.  (*See* TX4 § 3.02.)  Thus, any Mandatory Redemption of Lloyds' bonds would consume all cash collateral otherwise available for Mandatory Redemption of Depfa's bonds.

   The Lloyds SBPA also differs from Depfa's in terms of the interest rate to be paid to Lloyds if it was required to purchase bonds.  In accordance with its winning, low bid, Lloyds agreed that any bonds that it was required to purchase and continued to own for more than 180 days would earn interest at a variable rate equal to the 3-month LIBOR rate plus 1.75%, payable in arrears semiannually.  (TX5 §1.01, definition of "LIBOR," § 3.01.)  At almost all times since Depfa and Lloyds were required to purchase Series V bonds, the interest rate on Lloyds' bonds has been lower than the interest rate on Depfa's bonds under the SBPAs, with the result that to date, Depfa has been paid more interest than Lloyds (PTO ¶ VI.27).

   The Second Supplemental Indenture incorporated ALL's and the Trustee's redemption obligations to Lloyds under the Lloyds Liquidity Facility into the Indenture and extended the pledge of the Trust's assets to secure redemption payments to Lloyds:

> . . . Liquidity Provider Bonds [*i.e.*, bonds purchased by Lloyds pursuant to the Lloyds SBPA] shall be redeemed as provided in the [Lloyds] Liquidity Facility . . . .  (TX3 § 16.3.)
>   . . . .
> The Corporation [ALL] hereby declares . . . that the grant to the Trustee . . . of a security interest in the Pledged Assets shall also be for the benefit of . . . the Liquidity Provider [Lloyds] . . . to secure the obligations of the Corporation to reimburse . . . the Liquidity Provider for amounts paid pursuant to . . . the [Lloyds] Liquidity Facility . . ., such pledge to be in the order of priority set forth in Section 5.3(B)(5), in the case of amounts due as reimbursement for the payment of the . . . purchase price of the Bonds . . . .  The Trustee hereby acknowledges the foregoing.  (*Id*. § 17.4(d).)

As its drafter Elaine Bayus testified, § 17.4(d) added a new term to the Indenture's Waterfall which did not previously exist, namely, payments to Lloyds.  (Bayus Dep. 88:2-3, 89:4-20.)

Prior to entering into the Second Supplemental Indenture and the Lloyds SBPA, neither ALL nor the Trustee sought Depfa's consent (written or otherwise) to the incorporation of the Lloyds SBPA's preferential payment terms into the Indenture, nor did Depfa ever provide such consent.  (Peterson Dep.152:1-16; Roemlein Dep. 124:13-17, 129:17-130:8, 141:19-142:4.)

Shortly after Depfa submitted its bid for the 2006 deal, David Park learned that ALL had selected Lloyds' bid.  (Park Dep. 51.)  Park recalls discussing with Peterson the facility fee that Lloyds was charging, but nothing else.  (*See id.* at 55-57.)  Depfa did not learn about any other terms of the Lloyds SBPA until 2009 (*id.* at 28-29; Henderson Dep. 35-36) and thus never had the opportunity to review or consent to the Lloyds Bonds' payment terms.

**D.    In 2008, Depfa and Lloyds Purchase All Outstanding Bonds,
        Loan Recycling Is Suspended, and the Trust Begins to Liquidate.**

Beginning in January 2008, the credit rating of the ALL Series V bonds' insurer, Ambac, was downgraded by the major rating agencies.  (PTO ¶ VI.21.)  At the same time, the market for auction rate securities—of which the Series V bonds were examples—ceased to function.  (O'Neill Dep. 68:24-70:15.)  With Ambac's future in doubt and the failure of the auction-rate market generally, demand for the Series V bonds collapsed.  (*Id.*)

As a result, beginning on February 11, 2008, Depfa and Lloyds were called upon to purchase Series V bonds pursuant to their respective SBPAs.  By the end of June 2008, Depfa had been required to purchase all $190 million in principal amount of the 2005 Bonds at par, and Lloyds all $190 million in principal amount of the 2006 Bonds at par.  Depfa and Lloyds continue to hold all outstanding Series V bonds to this day.  (PTO ¶¶ VI.22-24, 32-33.)

Depfa's purchase and continued holding of ALL Series V had three significant consequences.  **First**, Depfa's purchase of the bonds triggered its right, under § 3.02 of the Depfa Liquidity Facility, to receive redemptions every six months "commencing on the date which is

16

six months after the Bank Purchase Date [*i.e.*, the date when Depfa purchased bonds], from all amounts on deposit in the Revenue Fund" after allowing for payments and reserves required by the first five levels of the Indenture's Waterfall.

   **Second**, pursuant to the Certificate and Agreement, a Recycling Suspension Event occurred on March 12, 2008—30 days after Depfa's first purchase of Series V bonds on February 11, 2008.  (TX6 § 1.1(iii).)  ALL therefore could no longer use cash in the Trust's Loan Account from principal payments on the student loans to finance additional student loans.  (*Id.* § 4.2; Roemlein Dep. 145:10-12.)   Instead, beginning on April 11, 2008—30 days after the Recycling Suspension Event first occurred—ALL was required to "Direct the Trustee to transfer amounts in the Loan Account to the Redemption Account[5] for the purpose of redeeming bonds" unless Ambac gave ALL written consent to resume financing student loans.  (TX6 § 4.2.)  There is no evidence that Ambac ever gave ALL such consent.

   **Third**, as a result of Recycling Suspension, the Trust began and continues to liquidate (*i.e.*, its student loan assets are being converted to cash), and it will never have sufficient assets to fully redeem both banks' bonds.  ALL used the proceeds from sale of the Series V bonds issued in 2005 and 2006, as well as principal payments on loans already purchased, to build a portfolio that included some 30,672 student loans with a principal amount of $363 million at its peak in September 2007.  (TX200; TX201.)  After Recycling Suspension occurred, the Trust's acquisition of new loans ceased, and as existing loans were paid off, the number of loans in the Trust and their principal amount steadily declined.  (*Id.*)  Thus, as of June

---

   [5] In an apparent drafting error, the "Redemption Account" referred to in the Certificate and Agreement is not defined therein or in any of the other Bond Documents, and none of the parties who have been deposed on the question had an understanding whether it was intended as a reference to the Trust's Revenue Account, Payment Account, or some other account.  (Park Dep. 171:3-17; Roemlein Dep. 259:18-24.  *But see* Bayus Dep. 71:18-24 (bond counsel for ALL testifying that the "Redemption Account" "would have to be" the Payment Account.)

30, 2011, the Trust contained fewer than 22,000 loans, with a total principal of less than $261 million.  (TX200; TX201.)

Because the interest paid to Lloyds and Depfa on their bonds is substantially higher than the interest the Trust receives on the student loans (so-called "negative arbitrage"), the total value of the Trust's assets—student loans and cash generated by the loans—has also steadily declined.  (*Id*.)  This fact is particularly problematic because from the time Depfa and Lloyds first purchased bonds to the present, the total value of the Trust's assets has been less than the outstanding principal amount of the bonds.  (*Id*.)  Over time, this deficit has only increased.  (*Id*.)  As of June 30, 2011, the Trust had total assets of $322 million supporting liabilities which include $341 million of outstanding bonds held by Depfa and Lloyds.  (*Id*.)  Thus, as ALL's financial advisor Seamus O'Neill admitted in deposition, from the time the banks purchased the bonds, the Trust has been in "a liquidating state" (O'Neill Dep. 272:15-18), and it is becoming ever more insufficient to repay both Depfa and Lloyds in full.

E.   **ALL and the Trustee Fail to Make Scheduled Mandatory Redemption Payments to Depfa Despite Having Available Funds.**

The following table sets forth Depfa's Bank Purchase Dates and the first three sets of semiannual Mandatory Redemption dates under Depfa SBPA § 3.02:

| Depfa Bank Purchase Date | Principal Amount of Bonds Purchased | First Mandatory Redemption Date | Second Mandatory Redemption Date | Third Mandatory Redemption Date |
|---|---|---|---|---|
| Feb. 11, 2008 | $99,265,000 | Aug. 11, 2008 | Feb. 11, 2009 | Aug. 11, 2009 |
| Feb. 13, 2008 | $100,000 | Aug. 13, 2008 | Feb. 13, 2009 | Aug. 13, 2009 |
| Feb. 19, 2008 | $100,000 | Aug. 19, 2008 | Feb. 19, 2009 | Aug. 19, 2009 |
| Feb. 26, 2008 | $90,000,000 | Aug. 26, 2008 | Feb. 26, 2009 | Aug. 26, 2009 |
| Feb. 27, 2008 | $100,000 | Aug. 27, 2008 | Feb. 27, 2009 | Aug. 27, 2009 |
| Feb. 29, 2008 | $135,000 | Aug. 29, 2008 | Feb. 29, 2009 | Aug. 29, 2009 |
| Mar. 11, 2008 | $100,000 | Sept. 11, 2008 | Mar. 11, 2009 | Sept. 11, 2009 |
| Mar. 25, 2008 | $100,000 | Sept. 25, 2008 | Mar. 25, 2009 | Sept. 25, 2009 |
| June 5, 2008 | $100,000 | Dec. 5, 2008 | June 5, 2009 | Dec. 5, 2009 |
| *Source*:  PTO ¶ VI.23; TX178 (ALL's Responses to Lloyds Requests for Interrogatories, Ex. C). | | | | |

ALL and the Trustee never made a single redemption payment to Depfa on these or any subsequent Mandatory Redemption dates that have come and gone in the years since. (PTO ¶ VI.25.)  ALL asserted that there were insufficient funds in the Revenue Account as of these dates, and that it was impossible, as a practical matter, to determine whether there were sufficient funds on the scheduled redemption dates.  (Peterson Dep. 204:23-206:2.)

The fact, however, is that ALL did not actually make any attempt to determine whether it had funds available for redemptions until after Depfa's first eight redemption dates had already passed (*i.e.*, those on August 11 through September 25, 2008).  On October 14, 2008, Martha Peterson first asked one of her staff members, Michael Grace, to determine whether funds were available for redemption.  (TX79, "Michael, We should do an analysis to determine the amount, if any, of the Bank Bonds that can be redeemed . . . .")  Grace completed the analysis shortly thereafter.  (*See* TX83, at 2.)

Moreover, the documentary evidence contradicts ALL's explanations for why it did not make begin making redemptions sooner and why it never made the Mandatory Redemptions contemplated by § 3.02 of the Depfa SBPA.  **First**, Peterson asserted that, to determine available funds for redemption, it is necessary for ALL to estimate certain future expenses, and that it is not practically possible for ALL to estimate future expenses until after a month-end closing.  Consequently, according to Peterson, ALL could not make redemptions on dates that occur mid-month:  as she put it, "you can't go in the middle of a month on a random date and determine available funds."  (Peterson Dep. 77:22-24.)  Yet, documents produced by ALL show that ALL's staff did exactly that on numerous occasions at Ms. Peterson's request.[6]

---

[6] *E.g.*, TX93 (E-mail chain among Peterson, Grace, and others attaching redemption analysis dated March 19, 2009); TX105 (E-mail from Grace to Peterson attaching redemption analysis dated June 22, 2009); TX126 (E-mail from Grace to Peterson attaching redemption

**Second**, Peterson testified that it was difficult to estimate the Trust's liability to the Department of Education ("DOE") for certain quarterly "special allowance payments" because the DOE was (supposedly) often late in providing ALL with a so-called "LaRS" report that showed the amount of ALL's liability.  (Peterson Dep. 77:8-79:6, 207:12-208:3, 217:14-25.)[7]  As explained in a DOE bulletin, however, the LaRS report is a quarterly report that a student lender submits to the DOE, not the other way around.  U.S. Dep't of Ed., "Reporting Changes for Lenders," DCL ID: FP-06-04 (2006), at 1, *available at* http://www.ifap.ed.gov/dpcletters/attachments/FP0604.pdf.  Moreover, the liability is determined by a statutory formula, all the inputs of which were items available to ALL:  benchmark interest rates published by the Federal Reserve, certain spreads fixed by statute, and certain characteristics of the loans in ALL's portfolio (balances, repayment status, and interest rates).  *See* 20 U.S.C. § 1087-1(b)(2)(I)(i)-(iv).  Consistent with this reality, ALL's documents show that, upon her request Peterson's staff prepared estimates of the Trust's future DOE liabilities on numerous occasions.[8]

---

analysis dated September 17, 2009; TX134 (E-mail from Grace to BNY Mellon attaching redemption analyses as of November 19, 2009, October 29, 2009, August 25, 2009, June 22, 2009, and April 3, 2009, ALL 17120-38); TX160 (E-mail from Grace to Peterson attaching redemption analysis dated April 16, 2010).

[7] Federally-guaranteed student lenders are allowed and guaranteed to earn interest at certain statutory fixed spreads above a variable benchmark rate, namely, the rate for 3-month, financial commercial paper reported by the Federal Reserve in its Publication H-15.  20 U.S.C. § 1087(b)(2)(I)(i)-(iv).  This rate is published by the Federal Reserve on its website, on a weekly basis, every Monday.  *See* http://www.federalreserve.gov/releases/h15/current.  If the interest collected by a student lender falls below this level, the DOE will make a "special allowance payment" to the lender equal to the shortfall.  20 U.S.C. § 1087-1(b)(1), (b)(2)(I).  On the other hand, if the interest collected by the student lender exceeds the allowed level, the lender must make a payment to the DOE equal to the excess.  *Id*. § 1087-1(b)(2)(I)(v).  In either case, the payments are made on a quarterly basis.  (Peterson Dep. 207:23-208:2.)

[8] For examples, see the redemption analyses cited in note 6 above and the annual estimates of liability for special allowance payments and consolidation loan rebate fees therein.

**Third**, Peterson testified that no redemptions were made on the scheduled dates because there were no available funds for Mandatory Redemptions on those dates.  (Peterson Dep. 77:8-20.)  But as Depfa's accounting expert Scott Friedland, CPA will demonstrate at trial, an analysis of the Trust's account statements, expense records, and ALL management's contemporaneously prepared expense projections, shows that on every set of assumptions advocated by ALL or the Trustee, funds were available for redemptions on Depfa Mandatory Redemption dates when no redemptions were made.  (TX188 & Ex. C thereto.)

**F.      ALL and the Trustee Belatedly Begin Making Optional Redemptions to the Two Banks, But Their Payments to Lloyds Are as Much as Twice What They Pay Depfa.**

Despite ALL's purported inability to calculate whether sufficient funds were available to make Mandatory Redemptions, on October 27 and November 12, 2008, at ALL's direction, the Trustee began to make Optional Redemption payments to Lloyds and Depfa, respectively.  (Peterson Dep. 209:16-210:5.)  These payments were not made on any of the Mandatory Redemption dates called for by the SBPAs.  Rather, ALL directed the Trustee to make these Optional Redemptions pursuant to Indenture § 3.8 (*see* above p. 9), on a haphazard smattering of dates as follows:

| Optional Redemption Paid On | To Lloyds | To Depfa |
| --- | --- | --- |
| October 27, 2008 | $12,500,000 | |
| November 12, 2008 | | $6,200,000 |
| January 6, 2009 | $3,200,000 | $3,100,000 |
| April 10, 2009 | $1,100,000 | |
| April 22, 2009 | | $600,000 |
| July 1, 2009 | $4,900,000 | $2,500,000 |
| October 5, 2009 | $1,000,000 | $1,000,000 |
| November 5, 2009 | $1,450,000 | $1,450,000 |
| **Total** | **$24,050,000** | **$14,950,000** |
| *Source*:   PTO ¶ VI.25. | | |

21

As can be seen above, despite the fact that the Depfa Bonds and Lloyds Bonds were both denominated as "Senior" bonds and as such were required to be on parity with one another, at ALL's direction, the Trustee allocated redemption payments disproportionately—often two-to-one—in favor of Lloyds.  Thus, over the course of the following year, Lloyds received Optional Redemption payments totaling $24.05 million, while Depfa received payments totaling only $14.95 million.  Nothing, however, in the language of Indenture § 3.8 or any other provision of the relevant agreements permitted or required ALL to allocate a greater share of these Optional Redemptions to the Lloyds Bonds than to the Depfa Bonds.

**G.    In Mid-2009, After Repeated Inquiries, Depfa Learns that ALL and the Trustee Had Made Larger Redemption Payments to Lloyds and First Sees the Preferential Payment Terms of the Lloyds SBPA.**

The Lloyds SBPA was not publicly available in 2006.  (Chapman Dep. 138:12-21.)  Neither ALL, nor the Trustee, nor Lloyds provided Depfa with a copy of the Lloyds SBPA in 2006 or for years thereafter.  (Bayus Dep. 63:9-13, 107:4-6; Chapman Dep. 135:5-7; Davis Dep. 78:18-20, 120:21-24, 121:7-9; Roemlein Dep. 212:3-6; Watkins Dep. 141:8-22.)

On February 9, 2009, Depfa's David Park emailed Quentin Wilson (who by that time had replaced Christopher Chapman as ALL's CEO), and asked him to confirm whether there was money available for the Depfa redemptions scheduled for that month pursuant to Depfa SBPA § 3.02.  (TX92, at 2.)  In the same email, Park asked Wilson to provide the dates and amounts of redemption payments Lloyds had received.  (*Id*. at 3.)

In a February 11, 2009 e-mail, rather than answer Park's question, Wilson defensively responded:  "We believe we have made all Series V interest payments and bank bond principal redemptions in a manner consistent with industry standards and in compliance with both the indenture and the Standby Loan [sic] Purchase Agreement."  (*Id*. at 1.)  Mr. Wilson's email failed to provide the dates and amounts of redemption payments Lloyds had

22

received.  (TX92, at 2.)  In or around March 2009, someone at Depfa may have learned that Lloyds had a shorter redemption schedule than Depfa, but does not appear to have been aware of the exact period or the fact that the Lloyds' schedule called for redemptions twice as often.

On May 4, 2009, Park e-mailed Lloyds' Thea Watkins, asking about the frequency of Lloyds' redemption dates and the end date (or "term-out") for redemption of Lloyds' bonds under the Lloyds SBPA.  (TX97, at LB015242.)  Park volunteered the corresponding information about Depfa's bonds to Ms. Watkins.  (*Id*.)  Watkins forwarded Park's email to another Lloyds' employee, Charlene Balfour, who asked, "Why can't he get this info from the docs?"  Watkins responded:  "Their documents are different to ours and they don't have out [sic] sbpa."  (*Id*. at LB015241.)  It is unclear whether Watkins replied to Park's e-mail.

On June 5, 2009, Park e-mailed Lloyds' Michelle White with a similar request for Lloyds' redemption dates.  (TX99.)  This time, Lloyds responded with the requested information, disclosing that "Our amortization dates are quarterly. . . ."  (*Id*. at DEPA0000981.)

Within an hour of Lloyds' disclosure on June 5, 2009, Park began requesting copies of the Second Supplemental Indenture and the closing binder for the 2006 issuance from BNY Mellon—requests that he was forced to repeat throughout June and into July.  (TX100; TX106; TX107; TX112.)  Apparently sometime after July 13, 2009, BNY Mellon sent Depfa a copy of the closing binder for the 2006 Bonds, which contained the Lloyds SBPA.  (TX112; TX72.)  Before that time, neither Park nor anyone else at Depfa had ever seen the Lloyds SBPA.

## H.   Depfa Promptly Complains to ALL and the Trustee that It Was Not Being Paid On Parity With Lloyds and that the Lloyds SBPA Violated Depfa's Consent Rights.

Upon receiving the Lloyds SBPA, Park reviewed it and observed that § 3.02 granted Lloyds a redemption schedule that was preferential to Depfa's.  After this discovery, Park spoke with Peterson about the terms of the Lloyds SBPA.  Park asked her how redemption

payments would be made.  Peterson responded that she did not know how such payments would

be effected, other than that Depfa would have multiple payment dates.  (Park Dep. 73:23-75:8.)

On July 16, 2009—shortly after receiving the agreements related to Lloyds'

bonds—Park and Nancy Henderson sent a letter to Peterson observing that ALL had failed to

make payments on all scheduled redemptions under the Depfa SBPA.  (TX9, at 1.)  Park and

Henderson's letter further stated that

> it recently has come to our attention that . . . notwithstanding that
> the DEPFA Bonds and the Lloyds Bonds are on parity with each
> other, as of the date hereof, the payments to LIoyds have exceeded
> the payments to DEPFA in the amount of $9, 100,000.  Since the
> DEPFA Bonds and the Lloyds Bonds are on parity with each other
> DEPFA should receive $9,100,000 so that the amount paid in
> respect of the DEPFA Bonds is equivalent to the amount paid in
> respect of the Lloyds Bonds.
>
> . . . The DEPFA Bonds are secured by the same collateral pool as
> the Lloyds Bonds.  It is inappropriate to exercise the Issuer's
> optional redemption right under the Lloyds SBPA to the detriment
> of DEPFA.  We request that you address this immediately.
> (TX9, at 2.)

I.   **ALL Attempts to Justify the Disproportionate Optional Redemptions
     Based on the Preferential Mandatory Redemption Schedule in the Lloyds SBPA.**

On August 4, 2009, Martha Peterson wrote back to Henderson and Park.  (TX10.)

In her letter, Peterson observed that "Payments have been made to the Banks as required by the

respective SBPA, which due to the accelerated repayment rights [of Lloyds] did result in Lloyds

receiving $9,100,000 more in principal payments than Depfa."  (*Id*. at DEPFA10108223,

emphasis added.)[9]

---

[9] *Accord* TX117 (E-mail from Peterson to Lloyds of 7/28/2009, "We have consistently
made payments as required by the SBPAs, which has resulted in Lloyds receiving greater
principal payments.  I felt that providing Depfa (David) with the relevant dates [for redemptions
under the SBPAs] would make it evident that Lloyds had clear priority to payments due to the
quarterly amortization." (emphasis added)).

24

Despite ALL's present litigating position that entry into the Lloyds SBPA did not amend the Indenture and therefore did not require Depfa's consent and the fact that the consent right provisions of Depfa SBPA § 5.03(a) and Lloyds SBPA § 5.03(a) are identical, in her letter Ms. Peterson took the wholly inconsistent position that any change to the Depfa SBPA would require <u>Lloyds'</u> consent:  "We understand that it is Depfa's desire to be on equal footing with Lloyds with regard to principal payments on Bank Bonds.  <u>This is not something ALL Student Loan can affect</u>, <u>as</u> both Ambac and <u>Lloyds would have to agree to any amendment to the Depfa SBPA</u>."  (TX10, emphasis added.)[10]  Because Lloyds' only consent right under the bond documents is over amendments to the Indenture, Peterson's statement makes no sense unless ALL considered a change to the Depfa SBPA to be an amendment of the Indenture, which would imply that entry into the Lloyds SBPA was also an amendment of the Indenture.

On November 19, 2009, Park asked Ms. Peterson by e-mail when she thought ALL would be able to provide an estimate of funds available for future redemptions, and how ALL planned on splitting any such redemptions between Depfa and Lloyds.  (TX136.)

On November 24, 2009, Peterson mailed Park and Henderson a letter responding to Park's November 19 email.  (TX11.)  She advised that "it takes time to obtain all the information required to close the general ledger and verify the amount required by paragraphs First through Fifth" of the Waterfall.  (*Id*. at 1.)  Even though nothing in the Indenture or SBPAs requires Optional Redemptions to track the SBPAs' schedules for Mandatory Redemptions, Peterson added that if funds turned out to be available for <u>Optional</u> Redemptions, they would be paid entirely to Lloyds because "November is a month when Lloyds TSB has a quarterly

---

[10] *Accord* Peterson Dep. 70:1-9 ("I said [to David Park], 'Well, I can't change your agreement, David, because Lloyds would have to consent to that and if you want that amendment then you should talk to Lloyds and see if they would agree to amending yours to be quarterly.'").

anniversary date of The Bank Purchase Date" and "Depfa does not have a semiannual anniversary date of its Bank Bond Purchase dates in November." (TX11, at 1.)

Peterson also observed that "the more frequent quarterly amortization schedule for Lloyds results in potentially greater principal payments based on the cash available under Section 5.3(B) of the Indenture. . . ." (*Id.* at 1-2, emphasis added.) And once again she stated that any change in payment terms of the Depfa SBPA would trigger Lloyds' consent right: "We understand that it is Depfa's desire to be on equal footing with Lloyds with regard to principal payments on Bank Bonds. This is not something ALL Student Loan can affect, as . . . Lloyds would have to agree to any amendment to the Depfa SBPA." (*Id.* at 2, emphasis added.)

### J.   As the Parties' Dispute Grows, Redemptions Are Suspended, and this Litigation Follows.

On November 27, 2009, Henderson wrote to ALL and BNY Mellon. (TX12.) Henderson gave notice that ALL had breached the Depfa SBPA by failing to make Mandatory Redemption payments to Depfa, by making Optional Redemption payments to Lloyds at Depfa's expense, and by failing to obtain Depfa's prior written consent to the Lloyds SBPA. (*Id.* at 1, 2.) She stated that because Depfa had not consented to the Lloyds SBPA, ALL had no right to make any redemptions to Lloyds before redeeming Depfa in full, and that BNY Mellon would breach its contractual and fiduciary duties if it permitted further redemption payments to Lloyds. (*Id.*)

By early December 2009, the parties agreed that further redemptions should be suspended while the parties attempted to resolve the matter. (PTO ¶ VI.26.) In March 2010 Lloyds requested in writing that redemptions under the Lloyds SBPA resume, Depfa objected, and rounds of formal correspondence among the parties and their counsel followed.

On May 19, 2010, Peterson e-mailed ALL's CEO with a recommendation "for the allocation of available cash now and in the future between Depfa and Lloyds." (TX164 at

26

ALL8666.)  "It is recommended that the Liquidity Providers agree to split [the cash now available for redemptions] and any subsequent cash available for redemptions pro-rata, based on aggregate Bank Bond principal outstanding, payable monthly."  (*Id*. at ALL8667.)  Peterson observed that this would result in an allocation of 51.3% to Depfa and 48.7% to Lloyds and noted that "this recommended approach results in a fair and equitable allocation of available cash which will allow us to move forward to [an] ultimate restructuring [of the Trust]."  (*Id*. at ALL8666-67.)  Peterson's belated recommendation to allocate redemptions on a "fair and equitable" basis was never implemented.

On June 3, 2010, BNY Mellon filed an interpleader complaint in this Court against Depfa and Lloyds seeking a declaratory judgment resolving the allocation between Depfa and Lloyds of some $7.5 million then available for redemptions as well as any funds that later became available for redemptions. (Dkt. No. 1, ¶ 25.)

Depfa responded with counterclaims against BNY Mellon for breach of contract and breach of fiduciary duty, crossclaims against Lloyds, a third-party claim against JPMorgan for breach of contract, third-party claims against ALL for breach of contract and indemnification, and a claim for a declaratory judgment resolving the parties' rights and obligations vis-à-vis redemptions.  (Dkt. No. 26.)  Depfa's contract claim against JPMorgan is based on its entry into the Lloyds SBPA and Second Supplemental Indenture, which amended the Indenture without Depfa's prior written consent in violation of First Supplemental Indenture § 14.4(f).  (*Id*.)  Depfa's contract and fiduciary counterclaims against BNY Mellon are based on its improper payment of Trust assets to Lloyds under the unauthorized Lloyds SBPA.  (*Id*.)  Depfa's contract claims against ALL are based on ALL's breach of Depfa's right of prior written consent to Indenture amendments under Depfa SBPA § 5.03(a), and its failure to make Mandatory

27

Redemptions in breach of Depfa SBPA § 3.02.  (*Id.*)  Depfa's indemnification claim against ALL seeks Depfa's attorney's fees and expenses in this action pursuant Depfa SBPA § 8.05.  (*Id.*)

Lloyds also brought counterclaims against BNY Mellon for breach of contract and breach of fiduciary duty, a crossclaim against Depfa, third-party claims against ALL for breach of contract and indemnification, and a claim for a declaratory judgment resolving the dispute over redemptions.  (Dkt. No. 39.)  ALL responded with third-party counterclaims for declaratory judgment against Depfa and Lloyds.  (Dkt. Nos. 37, 43.)  Finally, JPMorgan filed a third-party crossclaim against ALL for indemnification pursuant to Indenture § 10.5(c) of any liability, attorney's fees, and expenses incurred in this action.  (Dkt. No. 53.)

Since this litigation began, no further redemptions have been made to either bank, and the monies in the Trust potentially available for redemptions has grown far beyond the figure cited in the Interpleader Complaint.  In August 2011, ALL advised Depfa and Lloyds that, as of July 31, 2011, the Trust held $48,722,600 in cash and investments.  (TX 190.)

## STATEMENT OF ISSUES FOR TRIAL

Depfa submits that the Court's determination of the following four issues for trial would be dispositive of all claims and defenses in this action:

1. Was Depfa's prior written consent required for the Second Supplemental Indenture and the Lloyds SBPA because they amended the Indenture and the Lloyds Bonds were not issued "on a parity with" the Depfa Bonds?

2. If the Depfa Bonds and Lloyds Bonds are "on a parity with" with one another, should they receive Mandatory and Optional Redemptions on a pro rata basis?

3. Were there sufficient funds in the applicable Trust accounts to make Mandatory Redemption payments to Depfa on the dates contemplated by the Depfa SBPA?

4. Do opinion letters delivered at the closing of the 2006 Bond issuance or ALL's directions absolve JPMorgan or BNY Mellon, respectively, of liability?

**ARGUMENT**

**POINT I**

**ALL AND THE TRUSTEES BREACHED CONTRACTUAL AND FIDUCIARY DUTIES TO DEPFA BY ENTERING INTO THE SECOND SUPPLEMENTAL INDENTURE AND LLOYDS SBPA WITHOUT DEPFA'S PRIOR WRITTEN CONSENT AND BY MAKING REDEMPTION PAYMENTS TO LLOYDS UNDER THEM.**

The Second Supplemental Indenture and Lloyds SBPA amended or modified the Indenture and created a new series of bonds with a more senior interest in the Trust's collateral than Depfa's Senior bonds.  (Point I.A.)  By thus amending the Indenture without obtaining Depfa's prior written consent, ALL caused an immediate Event of Default under the Depfa SBPA (Point I.B), and JPMorgan, as Trustee, breached the First Supplemental Indenture which incorporated Depfa's consent rights (Point I.C).  In addition, by paying Trust assets to Lloyds under the unauthorized Lloyds SBPA, BNY Mellon, as successor Trustee, breached its fiduciary duty to Depfa as a bond owner (Point I.D) as well as its contractual obligations under the Indenture and First Supplemental Indenture (Point I.E).  Depfa should be awarded damages and declaratory relief to redress the harm caused by ALL and the Trustees' breaches and to prevent further prejudice to its interest in the Trust's collateral due to the unauthorized Lloyds SBPA. (Point I.F.)  The Trustees' alleged reliance on opinion letters and directions from ALL do not shield them from liability, nor are they entitled to indemnification from ALL. (Point I.G.)

**A.      The Lloyds SBPA and Second Supplemental Indenture Amended or Modified the Indenture and Therefore Required Depfa's Prior Written Consent under Depfa SBPA § 5.03(a).**

Section 5.03(a) of the Depfa SBPA provides that ALL "shall not" "amend, modify," "or permit or suffer to occur any action or omission which results in, or is equivalent to, an amendment [or] modification" of, "the Indenture without the prior written consent of" Depfa.

(TX4.)  As will be shown at trial, the Second Supplemental Indenture and Lloyds SBPA

"amended" or "modified" the Indenture for several independent reasons.

> **1.      The Second Supplemental Indenture and Lloyds SBPA
> "amended" or "modified" the Indenture by issuing additional
> bonds and by adding to and changing the Indenture's Waterfall.**

New York law governs the Depfa SBPA.  (TX4 § 8.02.)   Under New York law,

words in a written contract generally are accorded their plain and ordinary meanings, as

evidenced in dictionaries.  *Bianco v. Bianco,* 36 A.D.3d 490, 491,830 N.Y.S.2d 21, 23 (1st Dep't

2007); *2619 Realty, LLC v. Fid. & Guar. Ins. Co.,* 303 A.D.2d 299, 300-01, 756 N.Y.S.2d

564,565-66 (1st Dep't 2003).

Dictionaries consistently define "amendment" and "to amend" as "the process of

formally altering or adding to a document or record," *Am. Heritage Dictionary* 57 (4th ed. 2006);

"a change or addition to a document," *Shorter Oxford English Dictionary* 67 (5th ed. 2002); and

"to alter formally by modification, deletion, or addition," *Merriam-Webster's Collegiate*

*Dictionary* 36 (10th ed. 1996) (emphases added).

The meaning of "amend" in the bond industry accords with its ordinary meaning

of change or add to.  Depfa's bond industry expert, Joel Powers, formerly a banker with Dexia

Credit, will testify that "amend" means "add to or change."  (TX189 at 6.)  Similarly, ALL's

bond counsel Elaine Bayus testified that in her understanding of the customary meaning of

"amendment" in the context of indentures, an amendment can include the addition of terms to a

document that did not previously exist in the document.  (Bayus Dep. 98:6-25.)  And Lloyds'

chief negotiator on the 2006 deal, Thea Watkins, testified that an "amendment" as used in SBPA

§ 5.03(a) can potentially be made by simply adding new language, if it involves a change to the

Indenture.  (Watkins Dep. 106:15-107:18.)

Dictionary definitions of "modify" include "to make minor changes in," *Merriam-Webster's Collegiate Dictionary* 748 (10th ed. 1996), "make partial or minor changes to; alter without radical transformation," *Shorter Oxford English Dictionary* 1807 (5th ed. 2002);and "[t]o change in form or character; alter," *Am. Heritage Dictionary* 877 (4th ed. 2006).

"Modify" does not appear to have a distinctive meaning in the bond industry. Some fact and putative expert witnesses in this case have testified that "modify" simply means the same thing as "amend." ALL's former CEO, Christopher Chapman, stated that "I would describe 'amend' and 'modify' as one and the same." (Chapman Dep. 82:19-21.) Similarly, Mr. Powers has testified that "In my experience, amend, modify mean the same thing." (Powers Dep. 76:13-14.) Other witnesses have testified that they do not believe the term "modification" has any special meaning in the context of bond indentures (Roemlein Dep. 119:24-120:5; *see also* Pope Dep. 90:19-91:12, "Q. What source would you look to for the definition of the words, 'modify' or 'modification'? A. Same source as I just described, the standard meaning of the English language . . . ."), which would imply that its ordinary meaning controls.

Under any of these ordinary and bond industry meanings, the Second Supplemental Indenture and Lloyds SBPA "amended" or "modified" the Indenture in several ways. To begin with, as Mr. Powers will explain at trial, any supplemental indenture that changes the amount of issued bonds modifies the original indenture and any prior supplement.[11] Consistent with Mr. Powers' opinion, the Trustees' putative expert, Mr. Landau, admitted in deposition that an agreement between the issuer and trustee to create and provide for the terms of additional securities is referred to in the bond industry as an "amendment" and that he himself

---

[11] For that reason, issuers typically incorporate an express carve-out in liquidity provider consent provisions so that they can issue additional bonds without having to obtain liquidity provider consent. The Depfa SBPA, however, contains no such exclusion. (TX189, at 8-9.)

described such agreements as "amendments" in a text he authored on corporate trust administration.  (Landau Dep. 156:4-158:10.)

  In addition, the Second Supplemental Indenture constituted an "amendment" or "modification" of the Indenture, as those terms are understood in the bond industry, because (among other things) it added the Lloyds SBPA's provisions for Mandatory Redemption payments into the Indenture's payment Waterfall.  As Mr. Powers will testify at trial, the Second Supplemental Indenture's incorporation of Lloyds' redemption schedule constituted an amendment because it add terms to the Indenture's Waterfall.  (TX189 at 9-12.)

> **2.** **The Second Supplemental Indenture and Lloyds SBPA "amended" or "modified" the Indenture by issuing a new series of bonds that were not "on a parity with," but senior to, Depfa's Senior bonds.**

  Section 2.1 of the Indenture provides that "Additional Bonds may be issued on a parity with Senior Bonds . . . theretofore outstanding."  When the Lloyds Bonds were issued, the only Senior Bonds theretofore outstanding were the Depfa Bonds.  Upon deposition, the parties' witnesses agreed that bonds with a higher priority than Senior bonds could not be issued without an amendment of the Indenture.  (*E.g.*, Chapman 71:16-72:18; Roemlein 36:24-37:5; Watkins 35:20-23; 63:13-65:3.)  As will be shown at trial, although the Lloyds Bonds and Depfa Bonds are both denominated as "Senior" bonds, the Lloyds Bonds were granted a priority over the Depfa Bonds with respect to principal payments from the Trust's collateral and thus were not issued on a "parity" with the Depfa Bonds as that term is understood in the bond industry.

  All of the parties except ALL have designated putative experts on the industry meaning of "parity."  Depfa's expert, Mr. Powers, is alone among the putative experts in having specialized in student loan-backed bonds and related liquidity facilities.  (TX189, at 2-3.)

  Mr. Powers will testify that, as understood in the industry, senior bond parity means that senior bond holders have an equal and ratable claim to proceeds from liquidated

collateral.  Bond series are not in parity if liquidated collateral is not distributed ratably, whether before or after an event of default or an acceleration of principal.  If the available liquidated collateral is insufficient to repay all bonds in full, parity means that principal losses among senior bond holders are shared on a pro rata basis.  (TX189, at 15-16.)

As Mr. Powers will explain, although different senior bond series may certainly have different maturities and payment dates, parity requires that the amount of principal repaid on each series is proportionate to its ratable interest in the collateral, irrespective of the dates on which each is paid.  Thus, if the amount of funds available on a particular payment date exceeds a particular senior bond holder's pro rata share of the collateral, then the excess amount should be retained in the trust and applied to make future principal payments to the other senior bond holders on a pro rata basis.  (TX189, at 16-17.)[12]

Counsel for BNY Mellon, JPMorgan, and Lloyds, and their putative experts, all assert that the governing agreements permit and/or require the Lloyds Bonds to be paid more than their ratable share of the Trust's collateral to the detriment of the Depfa Bonds, even though the Trust's collateral is plainly insufficient to cover all principal on both.  Indeed, Lloyds' chief complaint is that principal should have been paid even more disproportionately in favor of Lloyds over Depfa.  According to what Lloyds' putative accounting expert opines is the "more appropriate basis" for computing redemption payments, during the period that redemptions were actually made in this case, redemptions should have been <u>more than 8-to-1 in favor of Lloyds over Depfa</u>, with $37.6 million to Lloyds and only $4.6 million to Depfa.  (TX195, at 17-18.)  Mr. Powers will testify that if the other parties are correct that the governing documents permit

---

[12] As Mr. Powers will also testify, parity does not require equality of interest payments. Different bonds may be issued on a parity and have different interest rates.  Parity as to interest payments simply refers to equality in the right to be paid contracted-for interest from collateral available to pay interest.  (TX189 at 20-21.)

the Lloyds Bonds a priority over Depfa Bonds with respect to payment from the Trust collateral,

then the Lloyds Bonds were <u>not</u> issued on a parity with the Depfa Bonds.  (TX189 at 17.)

        The testimony of the fact witnesses in this case also sheds light on the industry

meaning of "parity" and its application here.  Each of the party fact witnesses deposed in this

action is a seasoned participant in the bond industry, whether as an issuer, a liquidity provider, or

a trustee.  All agreed that in the bond industry, "parity" is understood to indicate an equality (in

some sense or other) of rights or interest in the collateral securing a debt.  (Henderson Dep. 56:7-

12; Park Dep. 123:4-124:21; Peterson Dep. 34:4-16; Roemlein Dep. 86:9-18; Watkins Dep.

80:11-81:2)  For example, ALL's Martha Peterson testified that bond series that rank on a parity

have "equal rights to the collateral in the trust," and Lloyds' Thea Watkins similarly described

parity as "an equal interest in the underlying collateral security."  (Peterson Dep. 34:13-16;

Watkins Dep. 60:15-61:8.)  Beyond that level of generality, the witnesses either could or would

not further articulate the meaning of the term "parity" or else diverged in their professed view of

how it applies in this case.

        Of the witnesses who did testify as to a more specific understanding of the term

"parity," arguably the least biased among them was Christopher Chapman, ALL's former CEO

from 2001 to 2007 (Chapman Dep. 17:16-19:17).  Having left ALL years ago and having had no

responsibility for how ALL redeemed Depfa's and Lloyds' bonds in 2008 and 2009, Mr.

Chapman has no apparent personal interest or pride at stake in the Court's determination of this

issue.  Mr. Chapman's testimony about parity is revealing.

        Based on his experience in the student loan industry, Chapman testified that it is

generally <u>not</u> the case that one senior bond holder would receive larger and more frequent

payments than an equally senior bond holder, because that would not be equal treatment.

(Chapman Dep. 67:9-68:4.)  According to Chapman, "parity," as used in the Indenture, requires that all bonds with the same level of priority be treated equally in all respects; therefore, additional bonds with higher seniority than senior bonds could not be issued consistent with Indenture § 2.1.  In Chapman's industry experience, parity includes equal treatment with respect to payments of principal, and this requirement of equal treatment is not even limited to situations involving "liquidation."  (*Id*. at 70.2-79:23.)

Consistent with Chapman's understanding, the Indenture defines "Senior Bonds" as "any Bonds which are secured by a lien on and payable from the Pledged Assets prior to all other Bonds except those issued <u>on a parity as to payments therewith</u>."  (*Id*. § 1.2, emphasis added.)  The Indenture's drafter, Ms. Bayus, testified that "payments" in this definition meant "any payments" and could include payments of principal.  (Bayus Dep. 93:4-10.)

As Mr. Powers will testify, the Lloyds Bonds were <u>not</u> issued on a parity with Depfa's Senior bonds as to payments of principal.  (TX189, at 5-6, 18-19.)  Under the quarterly, five-year Mandatory Redemption schedule in Lloyds SBPA § 3.02, the Lloyds Bonds could draw down the Trust's collateral—to the extent of "all amounts" available for redemption—twice as often and twice as fast as the Depfa Bonds.  By incorporating the Lloyds SBPA's preferential redemption schedule into the Indenture's Waterfall, the Second Supplemental Indenture accorded the Lloyds "Senior" bonds a priority as to principal payments over the Depfa "Senior" bonds and thus an unequal and greater share of the collateral.  (*Id*.)

Prior to this litigation, Ms. Peterson acknowledged that the Lloyds Bonds' faster Mandatory Redemption schedule gave the Lloyds Bonds a priority over the Depfa Bonds.  In a July 2009 email to Lloyds, she wrote:  "We have consistently made payments as required by the SBPAs, <u>which has resulted in Lloyds receiving greater principal payments</u>.  I felt that providing

35

Depfa (David) with the relevant dates [for redemptions under the SBPAs] would make it evident that Lloyds had a <u>clear priority</u> to payments due to quarterly amortization."  (TX117, emphasis added.)  The report of Lloyds' accounting expert dramatically illustrates the effect of this "clear priority":  Mr. Blumenthal opines that if ALL had made Mandatory Redemption payments strictly as required by Lloyds SBPA, Lloyds should have received a more than 8-to-1 share of the collateral available for redemption payments through November 2009.  (TX195, at 17-18.)

Again, ALL's prior admissions undermine its (and the other parties') present position that Lloyds' redemption schedule and the Lloyds Bonds' resulting priority as to principal payments did not implicate Depfa's consent right under SBPA § 5.03(a).  As shown above (pp. 23-24), Ms. Peterson repeatedly indicated that an <u>identical</u> consent provision in the Lloyds SBPA required ALL to obtain Lloyds' consent before the Depfa SBPA could be amended to put Depfa on the same redemption schedule as Lloyds.  (TX10; TX11.)  It is simply inconsistent for ALL to maintain that a change to Depfa's Mandatory Redemption rights to bring them in line with Lloyds' would constitute an amendment of the Indenture requiring Lloyds' consent, but that the addition of Lloyds' Mandatory Redemption rights into the Indenture in the first place was not an amendment of the Indenture requiring Depfa's consent.

For all these reasons, the Lloyds Bonds were not issued on a parity with the Depfa's Senior bonds, and their issuance therefore constituted an amendment of the Indenture requiring Depfa's prior written consent.

3.   **The other parties' arguments to the contrary are not supported by the text of the governing agreements or the weight of the evidence.**

In this action, all of the other parties have interests in seeing the 2006 Bond transactions validated, and assert various objections to the conclusion that the Second

36

Supplemental Indenture and Lloyds SBPA constitute an amendment which required Depfa's consent.  The evidence and the text of the relevant agreements do not bear out any of them.

**First,** the other parties say that the Second Supplemental Indenture did not "amend" the Indenture but only "supplemented" it; they note that Depfa SBPA § 5.03(a) does not refer to "supplements"; and from that, they conclude Depfa had no consent right over the Second Supplemental Indenture.  To prop up this argument, their retained experts (Messrs. Landau and Pope) insist that the bond industry recognizes a strict dichotomy between "amendments" and "supplements."

The Indenture itself, however, contradicts this supposedly rigid distinction between supplements and amendments.  Indenture § 1.2 defines "Supplemental Indenture" as "any indenture supplementary to or amendatory of this Indenture."  (TX1.)  Consistent with this definition, ALL's bond counsel testified that the terms "amendment" and "supplement" are <u>not</u> understood in the bond industry as mutually exclusive.  (Bayus Dep. 100:7-19.)

On the contrary, as ALL's former CEO Chapman testified based on his experience in the bond industry, "<u>by definition a supplemental indenture is an amendment</u>," and he described "the entire supplemental indenture to be an amendment."  (Chapman Dep. 83:6-7, 22-23, emphasis added.)  Similarly, at trial Mr. Powers will explain that, within the student loan bond industry, a supplement to a master trust indenture necessarily entails an amendment or modification of that master trust indenture.  (Powers Dep. 76:22-77:22.)  Indeed, Powers has testified that he "can't recall a case where a Supplemental Indenture did not, in some way, change the original Indenture."  (*Id.* at 83:3-5.)

**Second**, the other parties erroneously contend that article VII of the Indenture authorized ALL and the Trustee to enter into supplemental indentures providing for the issuance

of additional series of bonds without Depfa's consent.  They point to Indenture § 7.1(9), which provides that ALL and the Trustee, "without the consent of or notice to any of the Owners, may enter into an agreement or agreements supplemental to this Indenture . . . to provide for the issuance of any series of Bonds, and in connection therewith to provide for rights, preferences, privileges, terms and conditions applicable only to such series of Bonds."  (TX1.)

This provision does not avail the other parties for several reasons.  To begin with, Section 7.1(9) is irrelevant, since Depfa was not an owner of any Series V bonds when ALL and the Trustee amended the Indenture in August 2006.  (Depfa only became an owner in 2008, as noted above.)

Moreover, article VII elsewhere provides that Depfa's consent rights under the Depfa SBPA override any contrary provisions of article VII.  Specifically, § 7.5 clarifies that: "Nothing herein shall be construed to limit any requirement in any other document to which [ALL] is a party which requires the consent of any other party to any . . . amendment of this Indenture."  Depfa's consent right over "amendments" and their "equivalents" under Depfa SBPA § 5.03(a) and First Supplemental Indenture § 14.4(f) is a "requirement in an[] other document to which [ALL] is a party which requires the consent of an[] other party to any . . . amendment of this Indenture."  Therefore, under the savings clause of Indenture § 7.5, Depfa's consent right—and the Trustee's agreement in First Supplemental Indenture § 14.4(f) to honor Depfa's consent right—trump any right ALL or the Trustee may have under article VII to enter into supplemental indentures or issue new bonds without bond owners' consent.

As Mr. Powers will testify, the specific language of Depfa's consent right in this case would be understood in the student loan bond industry as extending to supplements issuing new bonds.  (TX189 at 9.)  Issuers typically insist that provisions giving a liquidity provider

consent rights over amendments include an explicit carve-out for amendments relating to the issuance of additional bonds.  (*Id*. at 8.)  During the negotiation of the Depfa SBPA, ALL's CEO specifically commented on the breadth of Depfa's proposed consent language, which did not include such a carve-out, but ultimately acquiesced to it.  (*See* pp. 10-12 above.)  ALL's failure to obtain an exclusion in Depfa SBPA § 5.03(a) for additional bond issuances is significant and would be understood by industry participants to give Depfa a consent right over all amendments, including those that provide for additional bond issuances.  (TX189 at 9.)

**Third**, the other parties contend that the Second Supplemental Indenture should not be considered an amendment or modification of the Indenture because (supposedly) it merely implemented an action already contemplated by the Indenture, namely, the issuance of additional series of Senior bonds "on a parity with" the existing Senior bonds (*i.e.*, the Depfa Bonds).  As shown above, however, the Lloyds Bonds were not issued "on a parity with" the Depfa Bonds, but were senior to them.  As several key witnesses have acknowledged, the issuance of bonds with a higher priority than the existing Senior bonds was <u>not</u> contemplated by Section 2.1 or any other provision of the Indenture, and could only be accomplished through an amendment.  (Bayus Dep. 89:21-90:12; Chapman Dep. 71:16-72:3; Watkins Dep. 35:20-23.)

**Fourth**, the Trustees' putative bond expert asserts in his report that any provision in a supplemental indenture that constitutes an amendment will "always" be included under a section heading that labels it as an amendment.  (TX186 ¶ 24.)  Mr. Landau observes that there was a section (17.5) in the Second Supplemental Indenture entitled "Amendments" and that the provisions that Depfa complains about (*e.g.*, § 17.4(d), which added redemption payments to

Lloyds into the Indenture's Waterfall) were not included within § 17.5, and concludes this demonstrates they were not amendments.[13]

Mr. Landau's assertion that labels control is contradicted by the Indenture itself, which provides that "any heading preceding the texts of the several Articles and Sections of this Indenture . . . shall be solely for convenience of reference and shall not constitute a part of this Indenture, nor shall they affect its meaning, construction or effect." (TX1 § 1.3(4).)  Moreover, Depfa SBPA § 5.03(a) apparently contemplated that an amendment might not be labeled as one, and therefore provided that Depfa's consent right extends to "any action or omission which . . . is equivalent to . . . an amendment." (TX4.)  Indeed, in deposition, Mr. Landau conceded that in determining whether a provision is an amendment "one also looks at the substance." (Landau Dep. 144:14-15.)  For all the reasons above, whatever the labels placed on them, the content and effect of the Second Supplemental Indenture and the Lloyds SBPA here undoubtedly constituted an amendment, as it added new terms to the Indenture that materially prejudiced and subordinated Depfa's  "Senior" interest in the Trust's collateral.

**Last**, the other parties variously argue that Depfa did not contemporaneously understand the agreements or its consent rights in this manner, or that it lost them by laches, because it did not raise the issue until 2009.  The Depfa SBPA, however, expressly provides that "No failure or delay by the Bank on the part of the Bank in exercising any right, power or

---

[13] None of the parties disputes that the provisions in Second Supplemental Indenture § 17.5 constituted amendments of the Indenture.  These amendments included a change in the priority of the payment of ALL's administrative fees.  (TX3 § 17.5(a)(i), (b).)  ALL may have asked for Depfa's oral consent to this amendment, but neither ALL nor the Trustee sought or obtained Depfa's written consent.  (Peterson Dep. 152:1-16; Roemlein Dep. 141:19-142:4.)  The amendments in § 17.5 also included changes in certain consent requirements, changes in the requirements for the entry into supplemental indentures, and an additional indemnity obligation to the bond insurer.  (TX2 § 17.5(a)(ii), (c)-(g).)  ALL and the Trustee did not seek or obtain Depfa's consent, written or oral, to any of these undisputed amendments.  (Peterson Dep. 152:4-21, 179:18-25; Roemlein Dep.141:19-142:4.)

privilege hereunder and no course of dealing shall operate as a waiver thereof."  (TX4 § 8.01.)

And in any event, as the facts stated above bear out (pp. 16, 22-23), Depfa never saw the Lloyds

SBPA and its preferential payment terms until the middle of 2009.

   The other parties' timing argument also ignores the fact that Depfa SBPA

§ 5.03(a) and First Supplemental Indenture § 14.4(f) are phrased as negative covenants, which

put the burden on ALL and the Trustee to bring matters requiring Depfa's consent to Depfa.

Depfa cannot be faulted because ALL and the Trustee failed to seek its prior consent as required.

Had they done so and disclosed the proposed terms of the Lloyds Bonds, Depfa would not have

consented to "the clear priority" (TX117) that the 2006 Bond Documents gave to Lloyds.  (*See*

Park Dep. 214:5-23.)

**B. ALL's Failure to Obtain Depfa's Consent Caused an
  Immediate Event of Default under the Depfa SBPA.**

   Depfa SBPA § 7.01(h) provides that a "breach by the Issuer [ALL] of any of the

terms or provisions of Section . . . 5.03(a)" shall constitute an "Event of Default" under the

Depfa SBPA, without any requirement of notice or a cure period.  (TX4.)  ALL's failure to

obtain Depfa's prior written consent to the amendment of the Indenture caused by the Second

Supplemental Indenture and the Lloyds SBPA, was a breach of Depfa SBPA § 5.03(a) and hence

an immediate Event of Default under Depfa SBPA § 7.01(h).

**C. JPMorgan Breached the First Supplemental Indenture
  by Failing to Obtain Depfa's Consent.**

   California law governs the Indenture, including the First Supplemental Indenture.

(TX1 § 11.7.)  Under California law, "the elements of a cause of action for breach of contract are

(1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance,

(3) defendant's breach, and (4) the resulting damages to the plaintiff."  *Oasis West Realty, LLC v.*

*Goldman*, 250 P.3d 1115, 1121 (Cal. 2011).  Although Depfa was not a party to the First

Supplemental Indenture, a non-signatory may recover on a claim for breach of contract if it is third-party beneficiary. Cal. Civ. Code § 1559. To prove third party beneficiary status, Depfa must show the contracting parties (ALL and JPMorgan) intended to benefit it. *Spinks v. Equity Residential Briarwood Apts.*, 171 Cal. App. 4th 1004, 1022 (2009). "Whether a third party is an intended beneficiary . . . to the contract involves construction of the parties' intent, gleaned from reading the contract as a whole in light of the circumstances under which it was entered." *Jones v. Aetna Cas. & Surety Co*., 26 Cal. App. 4th 1717, 1725 (1994).

Under these standards, there can be no question that JPMorgan is liable to Depfa for breach of the First Supplemental Indenture. The parties do not dispute that the First Supplemental Indenture was an existing contract at all relevant times. (*See* PTO ¶ VI.2.) Nor does anyone dispute that Depfa has performed all of its obligations in this case, having purchased all Series V bonds that it was called upon to purchase. (*Id*. ¶¶ VI.22-23.)

It is also clear from the First Supplemental Indenture that ALL and JPMorgan intended to benefit Depfa. In it, ALL and JPMorgan expressly named Depfa and provided for payments to and rights of Depfa under the Indenture. In particular, in § 14.4(f) of the First Supplemental Indenture, JPMorgan explicitly acknowledged that the Depfa Liquidity Facility gave Depfa consent rights over certain actions under the Indenture, and agreed not to take those actions without Depfa's consent. (TX2.) Those actions included amendments of the Indenture, which were subject to Depfa's prior written consent under Depfa Liquidity Facility § 5.03(a).

JPMorgan breached First Supplemental Indenture § 14.4(f) by amending the Indenture without Depfa's prior written consent. As shown above (Point I.A), the Second Supplemental Indenture and Lloyds SBPA amended the Indenture, but JPMorgan entered into them without Depfa's prior written consent in violation of § 14.4(f).

JPMorgan's breach has resulted in damages to Depfa in the amount of the Trust assets that were diverted to Lloyds under the unauthorized Lloyds SBPA executed by JPMorgan, namely, $24,050,000. Those monies otherwise would have been available to satisfy ALL and the Trustee's redemption obligations to Depfa under the First Supplemental Indenture (§§ 13.3 and 14.4(d)-(e)), but now have been irretrievably lost because of JPMorgan's breach.

**D.      BNY Mellon Breached its Fiduciary Duty to Depfa as a Bond Owner by Diverting Pledged Assets to Payments Under the Unauthorized Lloyds SBPA.**

A claim for breach of fiduciary duty requires the existence of a fiduciary relationship, breach of fiduciary duty, and damages. *Oasis West Realty*, 250 P.3d at 1121.

Here, a fiduciary relationship existed between BNY Mellon and Depfa beginning in February 2008. Section 10.1 of the Indenture expressly provides that BNY Mellon accepted "the duties and obligations of Trustee as a fiduciary for the Owners by executing this Indenture" (TX1), which it did by accepting its appointment as successor Trustee.[14] Depfa became such an "Owner" when it purchased Series V bonds pursuant to the Depfa SBPA on February 11, 2008 and has remained an Owner at all times thereafter, because under the terms of the First Supplemental Indenture, "any Liquidity Provider Bond [*i.e.*, any Series V-A-1 or V-A-2 bond purchased by Depfa] . . . shall be registered in the name of . . . the Liquidity Provider, which shall be treated as the owner thereof for all purposes of this Indenture." (TX2 § 14.4(e).)

---

[14] Indenture § 10.9 provides that: "Any successor Trustee appointed under this Indenture shall execute, acknowledge and deliver to its predecessor Trustee and to the Corporation an instrument accepting such appointment as a fiduciary for the Owners, and thereupon such successor Trustee, without any further act, deed or conveyance, shall become fully vested with all moneys, estates, properties, rights, powers, duties and obligations of such predecessor Trustee, with like effect as if originally named as Trustee . . . ." (TX1, emphasis added.)

BNY Mellon breached its fiduciary duty to Depfa as an Owner of bonds by expending Pledged Assets for an improper purpose—namely, when it paid $24,050,000 of the Trust's moneys to Lloyds under the unauthorized Lloyds SBPA.

Depfa has undeniably suffered damages as a result of BNY Mellon's use of millions of dollars of Trust Assets to make payments under the unauthorized Lloyds SBPA. Those funds are now gone from the Trust, and as a fiduciary, BNY Mellon should be required to make its beneficiary, Depfa, whole.

**E.**   **BNY Mellon Breached the Indenture and First Supplemental Indenture by Making Improper Redemptions to Lloyds.**

Indenture §§ 5.3 and 5.4 and First Supplemental Indenture § 14.4(d) enumerated an exclusive list of uses for which the Trustee was permitted to disburse funds from the Trust's Revenue and Loan Accounts. Payments to Lloyds under the unauthorized Lloyds SBPA and Second Supplemental Indenture are not among those permitted uses. BNY Mellon therefore breached the Indenture and First Supplemental Indenture by using funds in the Trust's Revenue and Loan Accounts to make redemption payments to Lloyds under the unauthorized Lloyds SBPA and Second Supplemental Indenture.

Depfa has been damaged by BNY Mellon's contractual breaches in the amount of the redemption payments that BNY Mellon improperly made to Lloyds, because those funds would have otherwise been available to redeem Depfa's bonds in accordance with the Depfa SBPA and First Supplemental Indenture.

**F.**   **Depfa Is Entitled to Declaratory Relief and Damages.**

Because ALL and the Trustees entered into and disbursed Trust assets pursuant to the unauthorized Second Supplemental Indenture and Lloyds SBPA in violation of their contractual and fiduciary obligations to Depfa as set out above, this Court should enter judgment:

(1)      declaring that (a) there has been an Event of Default under the Depfa

SBPA; (b) no further Mandatory or Optional Redemptions may be made under the unauthorized

Lloyds SBPA until Depfa's bonds are redeemed in full; and (c) Depfa will retain all rights of

accorded to a majority bond holder under the Indenture until Depfa's bonds are redeemed in full,

as would have been the case if the unauthorized Lloyds transaction had not occurred; and

(2)      awarding Depfa damages against BNY Mellon and JPMorgan, jointly and

severally, in the amount of the redemption payments improperly made to Lloyds, namely,

$24,050,000; provided that, Depfa shall surrender ALL Series V bonds in a principal amount of

$24,050,000 to ALL or the Trustee upon full payment of judgment.

**G.      JPMorgan's and BNY Mellon's Alleged Reliance on Opinion
        Letters and ALL's Directions Do Not Absolve Them of Liability
        and JPMorgan Is Not Entitled to Indemnification from ALL.**

The Trustees contend that, even if the Second Supplemental Indenture and Lloyds

SBPA required Depfa's consent, they are shielded from liability by JPMorgan's alleged reliance

on certain opinions of counsel delivered in connection with the closing of the 2006 Bond

issuance, and BNY Mellon's reliance on directions from ALL to redeem Lloyds Bonds.

JPMorgan also claims that if it is held liable in this action, it is entitled under the Indenture to

indemnification from ALL (which would be paid using monies from the Trust).  Neither

JPMorgan nor BNY Mellon can escape responsibility for their breaches on these grounds.

**1.      The opinion letters do not protect JPMorgan.**

The Indenture provides that "the Trustee may rely on and is protected from acting

or refraining from acting upon any . . . opinion . . . presented by the proper party or parties."

(TX1 § 10.3(a).)   JPMorgan cites two opinion letters from the Sonnenschein law firm included

in the closing binder for the 2006 Bond issuance, and suggests they provide it with a defense to

Depfa's breach of contract claim.  (TX63; TX64.)  Whether JPMorgan reviewed either of them

before signing the Second Supplemental Indenture and Lloyds SBPA remains to be proven.

But even if JPMorgan read the Sonnenschein letters, it could not have relied on

them to conclude that Depfa's prior written consent to the Second Supplemental Indenture and

Lloyds SBPA either had been given or was not required, for neither letter opines on that issue.

In fact, neither makes any mention of Depfa's consent right, or the Depfa SBPA, or the First

Supplemental Indenture at all.

The first letter (TX63) is addressed only to ALL, Ambac, and Lloyds, and warns

that it is "solely for your [ALL's, Ambac's, and Lloyds'] benefit" and "and may not be used,

circulated, quoted or otherwise referred to without our prior written consent."  (*Id.* at 8, emphasis

added.)  JPMorgan has not proffered any evidence that it had Sonnenschein's prior written

consent to rely on the letter when it entered into the 2006 Bond Documents or that it now has

Sonnenschein's permission to use the letter in this litigation.

Moreover, even if JPMorgan had given permission to use the letter, it still would

not establish a defense for JPMorgan.  The letter contains an opinion that the execution and

delivery of the "Indenture" (defined in the letter as the original Indenture together with the

Second Supplemental Indenture) and the Lloyds Liquidity Facility "will not conflict with or

constitute a breach of" "any . . . indenture, . . ., contract, agreement, or other instrument to which

[ALL] is a party or by which [ALL] is bound and of which we are aware."  (TX63 at 5, ¶ (c)

(emphasis added).)  There is no indication in the letter that the Sonnenschein firm was aware of

the terms of the Depfa SBPA or the First Supplemental Indenture.  The letter contains a long list

of documents reviewed by Sonnenschein in preparing its opinion, but the Depfa SBPA and First

Supplemental Indenture are conspicuously absent.  (*See id.* at 1-2.)

46

The second letter (TX64), while addressed to JPMorgan among others, is even less helpful to JPMorgan's defense. It states an opinion that "The Second Supplemental Indenture is authorized or permitted by the provisions of the Trust Indenture" (*id*. at 5, ¶ (f)), but the letter specifically defines "Trust Indenture" as the original Indenture alone, and <u>not</u> as the original Indenture together with the First Supplemental Indenture (*id*. at 1). Indeed, the letter does not list the First Supplemental Indenture, the Depfa SBPA, or even the Lloyds SBPA as among the documents reviewed by its author (*see id*. at 1-2), and does not otherwise allude to them or Depfa's consent right in any way. Thus, the letter expresses no opinion that the Second Supplemental Indenture was permitted by the First Supplemental Indenture, which incorporated Depfa's consent rights.[15]

JPMorgan and its putative trustee industry expert, Robert Landau, contend that the actual content of the Sonnenschein opinion letters does not really matter, because the Indenture provides that "the Trustee is not required to make any inquiry or investigation into the facts or matters stated in any . . . opinion." (TX1 § 10.3(f).) The absence of a duty to investigate facts or matters stated in an opinion, however, does not mean that the Trustee is excused from reading the opinion letters or that the Trustee may "rely" on an opinion letter that does not actually contain an opinion on the issue at hand. As Depfa's expert on trustee custom and practice, Professor Steven Thel, aptly puts it: "the problem in this case is not that the facts or matters underlying any opinion . . . are in dispute, but instead that no opinion . . . addresses the critical issues." (TX194 ¶ 22.)

---

[15] The second letter also contains an opinion that the Second Supplemental Indenture is "valid and binding upon the Corporation [ALL]" (TX65 at 5, ¶ (f)), but the letter narrowly defines the phrase "valid and binding upon" in a way that excludes any opinion whether all conditions precedent had been satisfied or whether all necessary consents and approvals had been received. (*See id*. at 3, 1st full ¶.)

47

Because JPMorgan can point to no opinion relevant to Depfa's breach of contract claim against it, JPMorgan's reliance-on-opinions defense necessarily fails.

### 2.    ALL's directions do not protect BNY Mellon.

Indenture § 10.3(a) provides that "the Trustee may rely and is protected in acting upon any . . . direction . . . believed by it to be genuine and to have been signed or presented by the proper party or parties."  (TX1.)  BNY Mellon contends that it cannot be held liable for making redemption payments to Lloyds out of the Trust's assets because it was acting upon directions signed by authorized officers of ALL, on which it was entitled to rely under § 10.3(a).

"Direction," however, is defined in the Indenture to be limited to "a written direction, order, request, requisition or similar instrument signed by an Authorized Officer of [ALL] and permitted by this Indenture."  (TX1 § 1.2, emphasis added.)  Thus, the Trustee is not protected by § 10.3(a) if it acts upon a direction from ALL that is not permitted by the Indenture.

Consistent with this definition, the Indenture's drafter, Elaine Bayus, testified to her understanding that the Trustee would not be required to follow every direction of the Issuer regardless of its content.  (Bayus Dep. 94:24-95:4.)  Her "understanding was that if the issuer gave the trustee a direction which complied with the conditions or provisions of the indenture, that the trustee had to follow it.  If it didn't comply, it didn't have to follow it."  (*Id.* at 95:13-17.) According to Bayus, the Trustee has some responsibility when it receives a direction from the issuer to determine whether the direction complies with the terms of the Indenture.  (*Id.* at 95:18-25.)  Similarly, Professor Thel will testify that "[t]o ignore the terms of the Indenture or blindly follow instructions would not be consistent with custom and practice in the corporate trust industry."  (TX194 ¶ 24.)  Indeed, even BNY Mellon's own putative expert grudgingly conceded

in deposition that it is important for a trustee to determine whether a direction it is given comports with the requirements of the indenture.  (Landau Dep. 54:21-55:7.)

Here, ALL's instructions to redeem Lloyds Bonds were not permitted by the Indenture, because the Second Supplemental Indenture and Lloyds SBPA, pursuant to which the Lloyds Bonds were issued and redeemed, were executed in breach of Depfa's consent right under the First Supplemental Indenture and thus never validly entered into.

**3.      JPMorgan is not entitled to indemnification from ALL.**

In its third-party crossclaim against ALL, JPMorgan seeks indemnification pursuant to Indenture § 10.5(c) for any liability that it might incur on Depfa's claim against it for entering into the Lloyds SBPA and Second Supplemental Indenture without Depfa's required prior written consent.  (Dkt. No. 53, Crossclaim ¶ 3.)  Section 10.5(c) of the Indenture provides that ALL will indemnify the Trustee against "any loss, liability or expense incurred <u>without negligence</u> or bad faith on its part, arising out of or in connection with the acceptance or administration of the office of Trustee."  (Emphasis added.)

JPMorgan is not entitled to indemnification under § 10.5(c) because it acted negligently by failing to make any effort to determine whether Depfa's consent to the Second Supplemental Indenture and Lloyds SBPA was required or had been obtained.  JPMorgan's responsible officer, Dennis Roemlein, has testified that to his knowledge nobody at JPMorgan did anything to determine whether Depfa's consent had been given, other than to rely on counsel opinions and certificates delivered at the closing.  (Roemlein Dep. 129:22-130:8.)  Those are unavailing for the reasons discussed above (Point I.F.1).  In the absence of any independent consideration of Depfa's consent right, any liability incurred by JPMorgan for its breach of First

Supplemental Indenture § 14.4(f) was the result of its own negligence.  Accordingly, JPMorgan's

crossclaim for indemnification from ALL under Indenture § 10.5(c) should be dismissed.

## POINT II

**ALTERNATIVELY, IF THE OTHER PARTIES ARE CORRECT THAT DEPFA'S CONSENT WAS NOT REQUIRED AND THAT THE DEPFA BONDS ARE ON PARITY WITH THE LLOYDS BONDS, THEN DEPFA IS ENTITLED TO A DECLARATORY JUDGMENT THAT ALL FUTURE REDEMPTIONS SHOULD BE MADE PRO RATA BETWEEN DEPFA AND LLOYDS.**

For the reasons stated in Point I.A above, Depfa firmly believes that its consent

was required for the Second Supplemental Indenture and the Lloyds SBPA and that the Depfa

Bonds and Lloyds Bonds are not on a parity.  But if the Court finds otherwise and determines

that the Depfa Bonds and Lloyds Bonds are on a parity (as the other parties contend), then the

Court should also find that, to date, the Depfa Bonds have not been redeemed in the manner that

parity requires and should enter an appropriate declaratory judgment to ensure that they are

redeemed on a parity basis going forward.

As Depfa's expert Joel Powers will testify, it is generally understood in the bond

industry that senior bonds issued "on a parity" have equal priority to payment of liquidated

collateral distributed to pay bond principal.  This means that each senior bond series should

receive its pro rata share of liquidated collateral based on the principal amount of the series, prior

to payment of liquidated collateral to any lower priority bond series.  Consequently, no bonds on

a parity with one another should receive redemption payments that in total exceed their ratable

interest in the collateral.  (TX189, at 16.)

As Mr. Powers will further testify, although the frequency of repayment and

stated maturity dates may differ among bond series that are in parity, the amounts of principal

repaid during their respective terms should still equal their respective pro rata interests in the

distributed collateral as required for parity.  It would be improper for a series of senior bonds

50

with more frequent principal payments to receive distributed collateral in excess of that series'

pro rata share because that would effectively provide the more frequently paid senior series with

a superior interest in the collateral.  (TX189 at 16-17.)

In this case, when redemptions commenced, the outstanding principal amounts of

the Depfa Bonds and Lloyds Bonds were equal—both series had a total principal amount of $190

million outstanding.  Therefore, parity required that half of all funds available for making

Mandatory Redemptions on a Lloyds Mandatory Redemption date should have been retained by

the Trust and distributed to Depfa on its next Mandatory Redemption date.  Likewise, half of all

funds available for Mandatory Redemptions on a Depfa Mandatory Redemption date should

have been retained by the Trust and distributed to Lloyds on its next Mandatory Redemption

date. (TX189, at 17.)  ALL, however, never actually made any Mandatory Redemptions.

Instead, as shown above (p. 21), ALL made a series of Optional Redemptions

pursuant to the second sentence of § 3.02 of the Depfa and Lloyds SBPAs.  These Optional

Redemptions were made in whole or part from liquidated collateral in the Trust's Loan Account.

(Peterson Dep. 93, 94, 125-26.)  If the Depfa and Lloyds Bonds are on a parity, these Optional

Redemptions should have been applied to the Depfa and Lloyds Bonds in equal amounts.

(TX189, at 18.)  ALL and the Trustee, however, paid the Optional Redemptions

disproportionately in favor of the Lloyds Bonds over the Depfa Bonds:  $24.05 million in

principal amount of the Lloyds Bonds were optionally redeemed, leaving $165.95 million

outstanding; while only $14.95 million in principal amount of the Depfa Bonds were optionally

redeemed, leaving $175.05 million outstanding.  (*See* PTO ¶ VI.25.)

To rectify this situation, if the Court finds that Lloyds' bonds were issued "on a

parity with" Depfa's, it should enter a judgment declaring that (1) any future Mandatory or

Optional Redemptions should be allocated on a pro rata basis, namely, 51.3% to the Depfa

Bonds and 48.7% to the Lloyds Bonds; and (2) if one of the banks has a Mandatory Redemption

date that is not a Mandatory Redemption date for the other bank, then the other bank's pro share

should be retained in the Trust for payment on the other bank's next redemption date.

      In addition, because redemptions have been suspended for nearly two years and

because (as reported by ALL, *see* TX190) as much as $48 million appears to have been available

for redemption as recently as July 31, 2011, the Court should direct ALL and the Trustee to

make a pro rata Optional Redemption from these funds as soon as practicable.

**POINT III**

**ALL FAILED TO PAY DEPFA MANDATORY REDEMPTIONS WHEN
DUE, CAUSING AN EVENT OF DEFAULT UNDER THE DEPFA SBPA.**

      Depfa's purchase of bonds on February 11, 2008 triggered ALL's mandatory

obligation to redeem Depfa's bonds with available funds in semiannual installments beginning

six months thereafter, on August 11, 2008. (TX4 § 3.02, first sentence.) ALL, however, made

no redemption payments to Depfa until months after that date. And even when it began making

redemptions, ALL never once made a payment on the dates required by the Depfa SBPA.

      ALL's two stated reasons for failing to make Mandatory Redemptions on the

schedule required by Depfa SBPA § 3.02 have no merit. ALL repeatedly asserted that it was

difficult or impossible to calculate the amount of funds available for redemption on any given

day, but as ALL's internal emails show, ALL's staff did so whenever Ms. Peterson occasionally

asked them to. (*See* pp. 19-20 above.) In any event, whatever difficulty ALL allegedly

encountered did not relieve ALL from its "absolute, unconditional and irrevocable" obligations

under the Depfa SBPA and the duty it assumed to "perform[] strictly in accordance with terms of

th[e] Agreement under all circumstances whatsoever." (TX4 § 8.11.)

52

ALL's other explanation—that there were insufficient funds on the scheduled dates—is clearly disproven by Depfa's accounting expert as discussed below. ALL's failure to make Mandatory Redemptions when required, despite having sufficient funds, caused an Event of Default under the Depfa SBPA.

### A.   Funds were Available for Mandatory Redemptions on One or More of Depfa's Mandatory Redemption Dates.

At trial, Depfa's accounting expert, Scott Friedland, CPA will show that on most if not all of 27 Depfa Mandatory Redemption dates that occurred before the parties suspended redemptions, "there was cash available in the trust accounts to satisfy the higher priority requirements of the Waterfall and still redeem some amount of Bank Bonds on those dates." (TX188, at 4.) For example, even using a number of highly conservative assumptions, there was over $28 million available, after reserving for higher priority expenses, as of Depfa's first Mandatory Redemption date on August 11, 2008. (*Id.*, Ex. C.)

Depfa expects the Trustees to contend that Mr. Friedland's opinions should be discounted as "ex post," "hindsight," "second-guessing" of ALL management's "real-time judgment" about whether funds there were available for redemption, but the facts are to the contrary. (TX193 ¶¶ 18, 20, 30, 38, 43, 45.) To begin with, in most instances, ALL's management did not make any real-time judgment about redemptions at all; ALL's internal documents show that it did not even begin considering whether redemptions could be made until months after Depfa's Mandatory Redemption dates commenced. (*See* pp. 17-18 above.) In any event, Mr. Friedland's analysis is based on ALL management's own contemporaneously-prepared projections of the Trust's expenses and historical data available to ALL on each Mandatory Redemption date. (TX188, at 2-5.)

The Trustees may also suggest that Mr. Friedland should have used certain more conservative assumptions (*see* TX193 ¶¶ 20, 37, 41, 44), some of which are contrary to ALL's own approach to calculating redemptions as testified to by its CFO Martha Peterson.[16]  But as Mr. Friedland will show at trial, even if one adopted all of the Trustees' suggested assumptions, the resulting analysis would show that the Trust had sufficient funds to make Mandatory Redemptions of between half a million and five million dollars on several of the Depfa Mandatory Redemption dates that occurred before the parties suspended redemptions.

Last, the Trustees may argue that, if ALL had made Mandatory Redemptions on earlier dates (thus expending the Trust's surplus cash), the Trust would not have had sufficient or at least fewer available funds to make Mandatory Redemptions on some of the subsequent dates. (*See* TX193 ¶ 19.)  This might be true, but it is irrelevant.  The fact is that ALL did not use available cash for redemptions on Depfa's first Mandatory Redemption date, and thus breached Depfa SBPA § 3.02.  As a result, those funds remained available on Depfa's second Mandatory Redemption date, and when ALL again failed to redeem Depfa's bonds on that second date, it breached Depfa SBPA § 3.02 again.  And so on.

In sum, unless ALL or the Trustee can show that on every single one of the 85 Depfa Mandatory Redemption dates that occurred before redemptions were suspended, funds were insufficient to redeem even a single bond, then ALL breached its Mandatory Redemption

---

[16] For example, the Trustees' putative expert, Mr. Baliban, has suggested that it is unclear whether amounts in the Loan Account may be combined with amounts in Revenue Account to make Mandatory Redemptions after Recycling Suspension has occurred, as Mr. Friedland's report assumes, or instead whether Mandatory Redemptions can only be made from the amounts in the Revenue Account.  (TX193 ¶¶ 22, 24, 27.)  But on behalf of ALL, Martha Peterson testified that there was no point in time where she was of the view that Bank Bond redemptions under the SBPAs could only be made from the Revenue Account.  (Peterson Dep. 222:15-18.)

54

obligation under Depfa SBPA § 3.02 at least once.  Neither ALL nor the Trustee has undertaken

that showing, nor could they given the robustness of Friedland's analysis to the contrary.[17]

**B.      ALL's Failure to Pay Mandatory Redemptions after Notice of its**
**         Breach Constituted an Event of Default under the Depfa SBPA.**

Section 7.01(i) of the Depfa SBPA provides that an "Event of Default" under the

SBPA will occur if there has been a "breach by the Issuer [ALL] of any of the other terms or

provisions of this Agreement that is not remedied within 60 days after written notice thereof

shall have been received by the Issuer from the Bank [Depfa.]"  (TX4.)  If an Event of Default

under the Depfa SBPA occurs, "all amounts payable [t]hereunder (other than payments of

principal and interest on the Bonds) shall become immediately due and payable without

presentment, demand, protest or notice of any kind. . . ."  (*Id*. § 7.02(c).)

ALL's failure to cause Mandatory Redemptions of the Depfa Bonds on one or

more of Depfa's Mandatory Redemption dates, despite having available funds after giving effect

to the transfers required by Indenture § 5.3(B)(1)-(5), constituted a breach of the provisions of

the first sentence of Depfa SBPA § 3.02.  Depfa gave ALL written notice of this breach by letter

dated July 16, 2009.  (TX9, at 1.)  ALL's Martha Peterson admits that she received Depfa's

notice on or about July 16, 2009.  (Peterson Dep. 68:18-69:2.)  ALL, however, did not cure the

---

[17] In his report, the Trustees' putative rebuttal expert, Jeffrey Baliban, criticizes some aspects of Friedland's analysis (*see, e.g.*, TX193 ¶¶ 19, 22, 27), but admitted in deposition that he has not tried to quantify what difference, if any, these criticisms make to Friedland's calculations.  Baliban further admitted that he cannot say, and is not opining, that any of his criticisms, alone or combined, would change Friedland's conclusion that funds were available for Mandatory Redemptions on at least some of the semiannual dates contemplated by Depfa SBPA § 3.02.  (Baliban Dep. at 225:18-21, "I was not asked to do an analysis as to what would be available or would not be available for redemption on any particular date."; *id*. at 227:13-16, "In particular with Mr. Friedland he said there's money available for redemptions on all of these dates.  That may or may not be a true statement." (emphasis added).)  Tellingly, ALL itself is proffering no expert rebuttal to Mr. Friedland's opinion at all.

breach within 60 days after receiving the notice or at any time thereafter.  ALL's breach

therefore ripened into an Event of Default under Depfa SBPA § 7.01(i).

Accordingly, Depfa is entitled to a declaration that (1) there has been an Event of

Default under the Depfa SBPA since September 14, 2009 by reason of ALL's uncured failure,

after 60 day's written notice, to make Mandatory Redemptions as required by Depfa SBPA

§ 3.02; and (2) pursuant to Depfa SBPA § 7.02(c), all amounts payable to Depfa under the SBPA

(other than principal and interested) became immediately due and payable on and after

September 14, 2009 as a result of that Event of Default.  Therefore, Depfa is also entitled to an

award of damages against ALL equal to all such unpaid amounts, which totaled $505,187.42 as

of August 31, 2010 (TX13, at 4) and have continued to accrue since then.

## POINT IV

### ALL FAILED TO PROVIDE AN ACCOUNTING AS REQUIRED, CAUSING AN EVENT OF DEFAULT UNDER THE DEPFA SBPA.

Under § 5.01(f) of the Depfa SBPA, ALL had an obligation to comply promptly

with reasonable requests from Depfa for information regarding the Trust's assets:

> The Issuer will maintain an accounting system in accordance with
> generally accepted accounting principles applicable to nonprofit
> corporations consistently applied and all applicable regulations and
> will furnish to the Bank:
> . . .
> (v) promptly, from time to time, such information regarding the
> Pledged Assets as the Bank may reasonably request.  (TX4.)

In Depfa's July 16, 2009 letter to ALL discussed above (p. 24), Depfa requested

that ALL "deliver to us by August 1, 2009 a proper accounting for all receipts and payments

from the Revenue Fund from February 1, 2008 to the present."  (TX9, at 3.)  ALL did not

provide the requested accounting.  By letter dated August 31, 2010, Depfa notified ALL of its

breach of Section 5.01(f).  (TX13 at 3.)  ALL, however, did not cure the breach within 60 days

after receiving the notice or at any time thereafter.  ALL's breach therefore ripened into an Event of Default under Depfa SBPA § 7.01(i).

Accordingly, Depfa is entitled to a declaration that there was an Event of Default under Depfa SBPA on October 30, 2010, acceleration of amounts payable under the Depfa SBPA (other than principal and interest) on and after October 30, 2010, damages equal to all such unpaid amounts, and a direction that ALL provide the requested accounting.

**POINT V**

**ALL MUST INDEMNIFY DEPFA FOR ITS
FEES AND EXPENSES IN THIS ACTION.**

In the Depfa SBPA, ALL agreed to indemnify Depfa for any counsel fees and other expenses incurred by Depfa in actions brought against it arising out of transactions under the Depfa SBPA, the performance thereof, or payments or failures to pay thereunder:

> [T]o the maximum extent permitted by law and solely from sources pledged under the Indenture, the Issuer [*i.e.*, ALL] hereby agrees at all times to protect, indemnify and save harmless the Bank [*i.e.*, Depfa] . . . from and against any and all claims, actions, . . . and other legal proceedings, and from and against any and all . . . costs, charges, counsel fees and other expenses that the Bank may, at any time, sustain or incur by reason of . . . or arising out of the transactions contemplated by this Agreement or the Related Documents [*e.g.*, the Indenture and the First Supplemental Indenture], including, without limitation, . . . (ii) the execution, delivery and performance of this Agreement, [and] (iii) payment or failure to pay hereunder . . . . (TX4 § 8.05(b).)

Depfa's defense in this action is covered under Depfa SBPA § 8.05(b) because it arises out of transactions contemplated by the Depfa SBPA and the related bond documents, including without limitation the performance of the SBPA, payments of Optional Redemptions under the SBPA, and failures to pay Mandatory Redemptions under the SBPA.

57

ALL also agreed to pay all costs and expenses of Depfa for the enforcement of the

Depfa SBPA and related bond documents:

> In addition, the Issuer agrees to pay promptly all costs and
> expenses of the Bank for . . . (B) the enforcement of this
> Agreement or any of the Related Documents or the Policy, but
> only to the extent such enforcement is specifically related to the
> loans in the Pledged Assets or to the Policy . . . . (TX4 § 8.05(a).)

Depfa's claims in this action are covered by Depfa SBPA § 8.05(a) because they

seek enforcement of its rights under the SBPA, the Indenture, and First Supplemental Indenture,

and relate to redemption payments that were or will be made from the student loans in the Trust.

Accordingly, Depfa is entitled to indemnification from ALL of all costs, counsel

fees and other expenses incurred in this action, in an amount to be determined upon a post-

judgment motion by Depfa under Federal Rule of Civil Procedure 54(d)(2).

## POINT VI

**MESSRS. BALIBAN, LANDAU, AND POPE SHOULD BE
PARTLY OR WHOLLY PRECLUDED FROM
TESTIFYING, AND MR. BLUMENTHAL'S OPINION
SHOULD BE GIVEN LITTLE OR NO WEIGHT.**

Paragraph 6(B)(ii)(b) of this Court's Individual Practices in Civil Cases requires

the parties' pretrial memoranda of law to "address[] any evidentiary issues."  In addition to the

objections to particular trial exhibits and designations listed in the PTO, Depfa submits that the

principal evidentiary issues at trial and their appropriate resolution are as follows.

Certain putative experts offered by BNY Mellon, JPMorgan, and Lloyds—

namely, Jeffrey Baliban, Robert I. Landau, and Robert Dean Pope—should be wholly or partly

precluded from testifying because some or all of the opinions disclosed in their reports do not

meet the standards for expert opinion testimony under Federal Rule of Evidence 702 and the

applicable case law.  Specifically, Messrs. Baliban, Landau, and Pope should be precluded to the

extent that they (1) offer legal conclusions; (2) speculate about other parties' intent, knowledge, or state of mind; (3) seek to testify regarding matters on which they are not qualified to opine based on experience, knowledge, or education; and (4) offer opinions that will not assist the trier of fact, all as more fully set forth in Depfa's Motion *in Limine* to Exclude Certain Expert Testimony, to which we respectfully refer the Court.

There are also material defects in the opinion of Lloyds' accounting expert Jack Blumenthal.  While Depfa does not believe that the defects (described below) in Mr. Blumenthal's analyses are of a nature that would render his opinion inadmissible, they do materially affect the weight that it should be given.

As support for Lloyds' claim that most of the Trust's limited pool of collateral should be given to Lloyds at Depfa's expense Mr. Blumenthal offers analyses of redemption payments that he opines should or would have been paid to Depfa and Lloyds under two assumed scenarios:  In what he labels "Scenario 1," Blumenthal assumes that, after Recycling Suspension occurred, monies in the Loan Account, in addition to those in the Revenue Account, could have been used for making Mandatory Redemptions under the schedules of the two banks' respective SBPAs.  (TX195, at 4-5.)  Blumenthal then calculates the payments to Depfa and Lloyds that he believes should have been made under these assumptions, and concludes that redemption payments should have been allocated more than 8-to-1 in favor of Lloyds.  (*Id*. at 17-18.)  In his "Scenario 2," Blumenthal calculates Optional Redemptions that he opines could have been made using monies in the Loan Account if redemptions had not been suspended after November 2009 and were arbitrarily allocated 62% to Lloyds and 38% to Depfa.  (*Id*.)

Mr. Blumenthal's opinions concerning the allocation of funds for redemption between Depfa and Lloyds merit little credit for the following reasons, among others:

1049345.1

**First**, to the extent that Blumenthal's Scenario 1 is intended to show what redemptions ALL *should* have made, it is entitled to no weight for several reasons. To begin with, Blumenthal's Scenario 1 depends on the erroneous assumptions that the Lloyds SBPA was validly entered into (which it was not) and that bonds on a parity need not be paid on a pro rata basis when an indenture trust is liquidating (as was the Trust here, *see* above pp. 17-18).

More fundamentally, Blumenthal's analysis is internally inconsistent. According to Blumenthal, when an asset-backed bond trust is suffering from negative arbitrage—*i.e.*, when the trust must pay a higher interest rate on the bonds than it receives on the assets securing the bonds—prudent trust administration requires that (1) the bonds be redeemed on the earliest possible date and (2) the bonds that bear the highest interest rate be redeemed first, in order to mitigate the erosion of the trust's assets. (TX196, at 4.) Blumenthal also recognizes that Optional Redemptions could have been made from Loan Account monies as soon as Recycling Suspension began on April 11, 2008 and that about $25 million was available in the Loan Account on that date. (Blumenthal Dep. 102:3-106:12.)

On these facts, Blumenthal's stated principles of prudent trust administration would suggest that an Optional Redemption using the $25 million should have been made on the earliest possible date (April 11, 2008) in accordance with Indenture § 3.8(ii) and allocated 100% to the higher interest Depfa Bonds, or at least to Depfa and Lloyds on a 50/50 basis. Instead, Blumenthal posits that ALL should have allowed the negative arbitrage to continue for another month and then paid a substantial part of the $25 million exclusively to Lloyds on its first Mandatory Redemption date of May 11, 2008. These assumptions are inconsistent with Blumenthal's principle of redeeming negative arbitrage bonds at the earliest possible date and

appear to be result-driven—the desired result being to allocate the lion's share of redemption

funds to his client, Lloyds.

   **Second**, to the extent that Blumenthal's Scenario 2 is an analysis of what

redemption payments ALL <u>should</u> have made had it continued to make Optional Redemptions

after November 2009, it should be given no weight because he does not attempt explain <u>why</u>

ALL should have allocated redemptions 62% to Lloyds and 38% to Depfa, as his calculations

assume.  On the contrary, because parity requires that optional redemptions be allocated pro rata

among senior bonds, in Blumenthal's Scenario 2, his hypothetical redemptions should have been

allocated between the two Senior Bond owners on a 50/50 basis.  And even if one leaves aside

what parity permits or requires, Blumenthal's principle of reducing negative arbitrage as quickly

as possible suggests that the Optional Redemptions should have been allocated more than 50%,

if not 100%, to paying down the higher interest Depfa Bonds first.  Blumenthal's assumed 62/38

split in favor of Lloyds does of course give Lloyds more money than do those other assumptions,

but that it is not a principled reason why redemptions should have been allocated on that basis.

   **Finally**, to the extent that Blumenthal's Scenario 2 is instead intended only to be

an analysis of what redemption payments ALL <u>would</u> have made if Optional Redemptions had

not been suspended after November 2009, it should be given little or no weight because it is

inherently speculative and ignores evidence of how ALL intended to make future redemptions.

   In his Scenario 2, Blumenthal assumes that, after November 2009, ALL would

have continued to make Optional Redemptions at the same frequency as it did in the period

October 2008 to November 2009 (roughly six per year).  (TX195, § 2.2.2.1.)  He further assumes

that redemptions would be split 62/38 in favor of Lloyds because that is the arithmetic average of

the splits between the redemptions ALL actually made between October 2008 and November 2009.  (TX195 § 2.2.2.2; Blumenthal Dep. 93:4-20.)

Blumenthal ignores the fact that there is no evidence that ALL was attempting to adhere to a 62/38 split between Lloyds and Depfa in making redemptions.  On the contrary, Martha Peterson testified that she had final responsibility for ALL's redemption decisions and that there was no fixed rule governing how ALL allocated the redemptions actually made between Depfa and Lloyds.  (Peterson Dep. 103:19-104:4, 213:10-17.)  Indeed, ALL made its last two redemptions on a roughly 50/50 basis between Depfa and Lloyds.  (PTO ¶ VI.25.)  Peterson has testified that ALL shifted to a roughly 50/50 split for those redemptions because of a change in its reading, at least at that time, of a particular term in § 3.02 of the SBPAs.  (*See* Peterson Dep. 120:12-121:13, testifying that the allocation moved to 50/50 because "We changed our interpretation" of "the term 'installment.'")

Worse still, Blumenthal ignores the fact that, in May 2010, Martha Peterson gave her CEO a written recommendation that, going forward, ALL make redemptions on a monthly basis, split pro rata based on the banks' then outstanding principal—48.7% to Lloyds and 51.3% to Depfa.  (TX164.)  Blumenthal offers no basis to conclude that ALL was more likely to have continued making Optional Redemptions six times a year on a 62/38 split than to have followed the ALL CFO's recommendation of making Optional Redemptions twelve times a year on a 49/51 split, other than his own *ipse dixit*.

In short, one can readily construct any number of "scenarios" of how ALL might have made redemptions differently in the past.  Because the assumptions underlying Blumenthal's two scenarios contradict his own stated principles, violate parity, and ignore

pertinent evidence, this Court should give Blumenthal's opinions little or no weight as evidence of how ALL either should or would have made redemptions had the facts been different.

## CONCLUSION

Based on the foregoing facts which will be shown at trial and the applicable law, this Court should enter judgment after trial:

(1)      Declaring that:  (a) there has been an Event of Default under the Depfa SBPA § 7.01(h) since August 2, 2006 by reason of ALL's failure to obtain Depfa's prior written consent to the Second Supplemental Indenture and Lloyds SBPA, in violation of Depfa SBPA § 5.03(a); (b) all amounts payable under the Depfa SBPA (other than principal and interest on Depfa's bonds) became immediately due and payable on and after August 2, 2006 pursuant to Depfa SBPA § 7.02(c); (c) no further Mandatory or Optional Redemptions may be made under the unauthorized Lloyds SBPA until Depfa's Bank Bonds are redeemed in full; and (d) Depfa will retain all rights accorded to a majority bond holder under the Indenture until Depfa's bonds are redeemed in full, as would have been the case if the unauthorized Lloyds transaction had not occurred;

(2)      Awarding Depfa damages against BNY Mellon and JPMorgan, jointly and severally, in the amount of the redemption payments improperly made to Lloyds (namely, $24,050,000); provided that, Depfa shall surrender ALL Series V bonds in a principal amount of $24,050,000 to ALL or the Trustee upon full payment of judgment; and

(3)      Dismissing with prejudice JPMorgan's third-party crossclaim against ALL for indemnification pursuant to Indenture § 10.5(c).

63

Alternatively, if this Court determines that Depfa's prior written consent was not required for the Second Supplemental Indenture and Lloyds SBPA and that the Lloyds Bonds were issued on a parity with the Depfa Bonds, then for the reasons set forth above (Point II), this Court should enter judgment after trial:

(1)      Declaring that any future Mandatory or Optional Redemptions paid by the ALL or the Trustee should be allocated between the Depfa Bonds and Lloyds Bonds on a pro rata basis, according to their respective total outstanding principal amounts, *i.e.*, 51.3% to the Depfa Bonds and 48.7% to the Lloyds Bonds;

(2)      Further declaring that (a) if a sum is available for making a Mandatory Redemption on a date that is a Mandatory Redemption date for Depfa but not for Lloyds, then 51.3% of such sum should be paid on such date to Depfa and 48.7% should be reserved for payment to Lloyds on Lloyds' next occurring Mandatory Redemption date; and (b) if a sum is available for making a Mandatory Redemption on a date that is a Mandatory Redemption date for Lloyds but not for Depfa, then 48.7% of such sum should be paid on such date to Lloyds and 51.3% should be reserved for payment to Depfa on Depfa's  next occurring Mandatory Redemption date; and

(3)      Directing ALL and BNY Mellon, as Trustee, to effect an Optional Redemption from all available amounts in the Loan Account as soon as practicable and allocated between Depfa and Lloyds in a manner consistent with the foregoing.

In either event, however the Court rules on the consent and parity issues, the judgment should:

   (4) Declare that (a) there has been an Event of Default under the Depfa SBPA since September 14, 2009 by reason of ALL's uncured failure, after 60 day's written notice, to make Mandatory Redemptions as required by Depfa SBPA § 3.02; (b) there has been an Event of Default under the Depfa SBPA since October 30, 2010 by reason of ALL's uncured failure, after 60 days' written notice, to provide an accounting as required by Depfa SBPA s 5.01(f) and requested in Depfa's July 16, 2009 letter to ALL; and (c) all amounts payable to Depfa under the Depfa SBPA (other than principal and interest on Depfa's bonds) became immediately due and payable pursuant to Depfa SBPA § 7.02(c) on and after September 14, 2009;

   (5) Award Depfa damages against ALL equal to all such unpaid amounts, which total not less than $505,187.42;

   (6) Direct ALL to provide the requested accounting;

   (7) Declare that Depfa is entitled to indemnification from ALL of all costs, counsel fees and other expenses incurred in this action, in an amount to be determined upon a post-judgment motion by Depfa under Federal Rule of Civil Procedure 54(d)(2); and

   (8) Grant such further relief as the Court deems just and appropriate.

Dated:   New York, New York
         October 31, 2011

Respectfully submitted,

FRIEDMAN KAPLAN SEILER
   & ADELMAN LLP


By:        /s/ Scott M. Berman
          Scott M. Berman
          Eric Seiler
          Jeffrey C. Fourmaux
          Christopher L. McCall
          Alexander D. Levi

7 Times Square
New York, New York  10036
(212) 833-1100

*Attorneys for Defendant, Counterclaimant,
Crossclaimant, Crossclaim Defendant,
Third-Party Plaintiff, and Third-Party
Counterclaim Defendant DEPFA BANK plc*

66