UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A., <br><br>        Plaintiff-Counterclaim Defendant, <br><br> -against- <br><br> DEPFA BANK PLC and LLOYDS TSB BANK PLC, <br><br>        Defendants-Counterclaimants. | Case No.: 10-CV-4424 (JPO) (AJP) |
| DEPFA BANK PLC and LLOYDS TSB BANK PLC, <br><br>        Third-Party Plaintiff, <br><br> -against- <br><br> ACCESS TO LOANS FOR LEARNING STUDENT LOAN CORPORATION and JPMORGAN CHASE BANK, N.A. <br><br>        Third-Party Defendants. | **DECLARATION OF JUDITH A. ARCHER IN OPPOSITION TO MOTION *IN LIMINE* TO EXCLUDE CERTAIN EXPERT TESTIMONY** |
| LLOYDS TSB BANK PLC, <br><br>        Third-Party Plaintiff, <br><br> -against- <br><br> ACCESS TO LOANS FOR LEARNING STUDENT LOAN CORPORATION, <br><br>        Third-Party Defendant. | |

JUDITH A. ARCHER declares as follows pursuant to 28 U.S.C. § 1746(2):

1.     I am a member of the bar of the State of New York and of this Court.  I am a member of the firm of Fulbright & Jaworski, L.L.P., counsel herein for Plaintiff-Counterclaim Defendant The Bank of New York Mellon Trust Company, N.A. ("BNY Mellon").  I submit this declaration in opposition to the Motion *in Limine* of DEPFA Bank plc to Exclude Certain Expert Testimony for the limited purpose of putting documents before the Court.

2.     Attached hereto as Exhibit 1 is a true and correct copy of excerpts of the deposition of Robert I. Landau dated September 21, 2011.

3.      Attached hereto as Exhibit 2 is a true and correct copy of excerpts of the deposition of Jeffrey L. Baliban dated September 29, 2011.

4.      Attached hereto as Exhibit 3 is a true and correct copy of excerpts of the deposition of Scott Friedland dated September 19, 2011.

5.      Attached hereto as Exhibit 4 is a true and correct copy of excerpts of the deposition of Jack E. Blumenthal dated September 20, 2011.

6.      All other documentary exhibits cited in the Memorandum of Law are contained in the Trial Exhibit binders that have been submitted to the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 14, 2011

Judith A. Archer

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

--------------------------------X
BANK OF NEW YORK MELLON TRUST
COMPANY NA,

              Plaintiff,

                      CASE NO. 10-civ-4424 (DLC)

      VS.

DEPFA BANK PLC, et al.,

              Defendants.
--------------------------------X

VIDEOTAPED DEPOSITION

OF

ROBERT I. LANDAU

New York, New York

Wednesday, September 21, 2011

Reported by:
AYLETTE GONZALEZ, CLR
JOB NO. 42105

```
1              ROBERT I. LANDAU-9/21/11

2       A.    I assume so.

3       Q.    So, are you here to provide expert

4    testimony on how the Trust Indenture's term

5    should be interpreted?

6              MS. ARCHER:   Object to the form.

7       A.    I am here to testify as to what is

8    custom and practice in the industry in

9    understanding the terms of an Indenture.   I'm

10   not here in a legal capacity to indicate how a

11   judge would decide that interpretation.

12      Q.    So, if a term in any of the

13   Operative Agreements in this matter is

14   ambiguous, it's not your stated function here

15   to interpret how that ambiguity should be

16   resolved?

17      A.    No, you're mischaracterizing what I

18   said, sir.

19      Q.    Your answer is no?

20      A.    The answer is that I will provide

21   my opinion as to how the term would be

22   interpreted by people within the securities

23   and banking industries.

24      Q.    You're not substituting your

25   opinion for the judge's opinion on how a
```

ROBERT I. LANDAU-9/21/11

1
2    contractual term should be interpreted?

3         A.   No, I don't know whether the judge

4    even has an opinion, so I'm certainly not

5    substituting it.

6         Q.   Did you rely on any summaries of

7    depositions?

8         A.   No, I think what I was given were

9    depositions, page after page, numbered

10   depositions.

11        Q.   Did you read all the depositions?

12        A.   I read the ones that I indicated in

13   my report.

14        Q.   Did anybody provide you with a

15   written summary of what's contained in any of

16   those depositions?

17        A.   No.

18        Q.   Have you reviewed the reports of

19   any other experts in this case?

20        A.   Yes.

21        Q.   Whose report have you reviewed?

22        A.   Mr. Powers, Mr. Thiel, Mr. Pope.

23        Q.   With regard to Professor Thiel's

24   report, do you agree with his conclusions?

25        A.   Absolutely not.

1          ROBERT I. LANDAU-9/21/11

2    to administer the provisions of the contract.

3    That's what they do.

4          Q.   So, when you say, "the essential

5    function," are you using the word "essential"

6    as an another word for "only"?

7          A.   No, because within the four corners

8    of the Indenture, the Trustee could also be

9    pointed, for example, as a conversion agent in

10   a conversion venture issue.  So, that's not a

11   Trustee function.  It's a conversion agent

12   function.  But it's tied to being the Trustee.

13   So, essentially, you -- a synonym would be

14   primary, I guess, as opposed to only.

15         Q.   Given the importance as you say in

16   your report of "administering the provisions

17   of an Indenture," is it important for the

18   Trustee to read and understand the provisions

19   of an Indenture?

20         A.   Yes.

21         Q.   Is it important for the Trustee to

22   determine whether directions from the issuer

23   are consistent with the provisions of the

24   Indenture it must administer?

25              MS. ARCHER:  Objection to the

1                  ROBERT I. LANDAU-9/21/11

2          form.

3          A.   I'm not sure what you mean by the

4    word "consistent."  If you mean consistent as

5    provided for in the Indenture or which

6    comports with the requirements set forth in

7    the Indenture, then the answer is yes.

8          Q.   So, to obviate the objection, let

9    me ask it again.  Is it important for the

10   Trustee to determine whether directions from

11   the issuer are in accordance with the

12   provisions of the Indenture in which the

13   Trustee administers?

14              MS. ARCHER:  Same objection.

15         A.   Same answer.

16         Q.   And that is?

17         A.   The one I gave you.

18         Q.   So, your answer is that -- let me

19   ask it again then.  Is it important for the

20   Trustee to determine whether direction from

21   the Issuer comport with the provisions of the

22   Indenture it must administer, which I believe

23   is the word you used?

24         A.   Correct.

25         Q.   And you think "comport" is

```
 1              ROBERT I. LANDAU-9/21/11

 2   different than "in accordance with"?

 3        A.   Yes, because the Trustee -- if the

 4   directions it -- strike that.

 5              A boilerplate provision of almost

 6   every Indenture will contain a reliance

 7   provision that the Trustee can except/accept

 8   directions given to it by an Issuer, provided

 9   it's in accordance with the provisions of the

10   Indenture.

11              That means that what it receives is

12   supposed to be something that it's supposed to

13   get, and supposed to cover those things which

14   it's supposed to cover, and that it's

15   appropriately signed by an authorized officer.

16   That would be that it comports with what it's

17   supposed to get.

18        Q.   If the Trustee receives a direction

19   from an Issuer to do something that violates a

20   requirement of the Indenture, is the Trustee

21   required to do that for which the Issuer

22   requests?

23              MS. ARCHER:  Object to the form.

24        A.   The Trustee should not accept the

25   direction which -- in which -- in which it
```

```
 1              ROBERT I. LANDAU-9/21/11

 2    would be required to violate the Indenture

 3    with respect to what it's supposed to get.

 4          Q.   What do you mean "with respect to

 5    what it's supposed to get"?

 6          A.   There are three tests to what a

 7    Trustee may accept in terms of direction from

 8    an Issuer, and this is pretty much universally

 9    understood in the industry.  And so, what I'm

10    giving you is custom and practice in the

11    industry.

12              Number one, that the direction that

13    it receives is something which it is supposed

14    to receive pursuant to the terms of the

15    Indenture.  Secondly, what it receives

16    comports with the requirement of the

17    Indenture.  For example, if the obligor is

18    required to give a direction to the Trustee

19    with respect to a conversion rate, then that

20    certification has to include language with

21    respect to the conversion rate, not whether

22    it's correct or not.  That's not the Trustee

23    role, but it's got to contain that.

24              If there's a direction to disburse

25    funds or to cause a redemption, it's got to
```

ROBERT I. LANDAU-9/21/11

1

2     have a language in there the Trustee

3     understands that's something that is

4     appropriate for the obligor to direct us to

5     do.  It has that power.  That's what I mean by

6     "comports with the requirements of the

7     Indenture."

8               The third test is, is it signed by

9     an appropriate person or an authorized person.

10         Q.   Can the Trustee disburse monies

11    under the Trust at the direction of the Issuer

12    to a source not permitted under the Trust to

13    be disbursed to?

14         A.   I guess the answer, in general, is

15    no.

16         Q.   Does the Trustee have any

17    discretion in administering the provisions of

18    an Indenture Trust?

19         A.   Pre-default or post-default?

20         Q.   Pre-default.

21         A.   The only discretion it has is in

22    how it complies with the requirement.

23         Q.   What do you mean by that?

24         A.   Well, there's nothing in the

25    Indenture that says you've got to keep your

1              ROBERT I. LANDAU-9/21/11

2      Certificate, and then it may immediately

3      read -- that is, the individual account

4      officer, may then read the relevant section of

5      the Indenture to which that Certificate

6      pertains to determine whether or not it is

7      what it's supposed to be.

8              Or, the account officer may be a

9      very experienced one, very knowledgeable, very

10     conversant with the requirements and not read

11     the Indenture.

12     Q.   And when you say the account

13     officer would read the Indenture, you're

14     referring to the Indenture as well as any of

15     its supplements; isn't that right?

16     A.   Yeah.  Let me make a point, sir.

17     When we use the term, "Indenture," it's always

18     as supplemented, if supplemented.

19              It's like the president is required

20     to swear that he will uphold and defend the

21     Constitution of the United States.  It doesn't

22     say the Constitution of the United States as

23     amended by amendments 1 through 27.  It's the

24     entire Constitution, including the amendments.

25              So that when the term, "Indenture"

1           ROBERT I. LANDAU-9/21/11

2    in 2005; is that correct?

3           A.    That's correct.

4           Q.    And the DEPFA Standby Purchase

5    Agreement was executed in 2005; isn't that

6    correct?

7           A.    I believe that's correct, yes.

8           Q.    Landau Exhibit 2 and Landau Exhibit

9    3 references an examination of the Indenture

10   dated as of August 1, 2005, and Second

11   Supplemental Indenture; is that correct?

12          A.    Yes.  And certainly in the second

13   paragraph, Landau 2, now, in the first

14   sentence of the second paragraph, it refers to

15   the Trust Indenture as well as the second

16   supplement.

17          Q.    Right.  And it does the same thing

18   in the second paragraph of Landau Exhibit 3,

19   correct?

20          A.    Well, let's see, second paragraph,

21   yes, it does.

22          Q.    There's no reference in either of

23   those paragraphs to the First Supplemental

24   Indenture there?

25          A.    No, doesn't have to.

1            ROBERT I. LANDAU-9/21/11

2        Q.   Did you ask anyone at Sonnenschein

3    whether or not their definition of the word,

4    "Indenture" in Landau 2 and 3 included the

5    First Supplemental Indenture?

6        A.   I did not ask them that, but

7    that's -- when we talk about a Trust

8    Indenture, we use the word, "Indenture," it

9    always means whatever supplements are attached

10   to it, just like the reference to the

11   Constitution.  Does not have to say "as

12   amended."  Everybody understands that an

13   Indenture in a transaction means the Indenture

14   if -- when, as and if it's amended, it

15   includes all amendments or supplements, I

16   should say, just as the Constitution is

17   amended.

18       Q.   So, sir, you're interpreting Landau

19   Exhibit 2 and 3 where it refers to Indenture

20   to include the First Supplemental Indenture;

21   isn't that correct?

22           MS. ARCHER:  Object to the form.

23       A.   I am.  I understand what the

24   reference is because it's a common way in the

25   industry that Counsel refers to Indentures

1          ROBERT I. LANDAU-9/21/11

2   that have supplements.

3          Q.   Are you an expert on the custom and

4   practice of Counsel's Opinion Letters in the

5   bonds industry?

6          MS. ARCHER:   Object to the form.

7          A.   That relate to Bond Indentures,

8   yes.

9          Q.   So, it's your testimony that

10  interpreting Landau Exhibit 2 and 3, you look

11  at the term, "Indenture," which refers to a

12  specific document, dated as of August 1, 2005,

13  and is defined as such to believe that also

14  includes the First Supplemental Indenture?

15         MS. ARCHER:   Objection.

16         A.   Yes, because the Indenture dated as

17  of August 2, 2005 will be the same document

18  with the same date.  Regardless of how many

19  times it's amended, it still would be

20  characterized with that date.

21         Q.   So, are you saying that if there

22  was a Supplemental Indenture of, say,

23  August 10, 2005, that when there's a reference

24  to an Indenture of August 1, 2005, that would

25  still include the August 10, 2005 Supplemental

1              ROBERT I. LANDAU-9/21/11

2   Indenture?

3        A.   If you're using the word,

4   "Indenture," subsequent to that date, yes.

5        Q.   And, again, sir, there's no

6   reference in either of these letters to using

7   any of the definitions set forth in the

8   Indenture.  This is just you interpreting

9   these letters?

10            MS. ARCHER:  Object to the form.

11            Feel free to go through the letters,

12            if you need.

13        A.   You're miss -- I don't agree with

14   your conclusion, Counselor.  It is my

15   understanding, having read hundreds and

16   hundreds of these opinions of Counsel, as to

17   how they're constructed, what they say, not

18   precisely word-for-word, but as to what they

19   say, what they cover, and what is meant when

20   they refer to an Indenture.

21            And based upon that knowledge in

22   the industry, I consider myself to be an

23   expert on what the industry does with respect

24   to these.  This is a very, very common way.

25        Q.   Have you seen any evidence, sir, in

```
 1              ROBERT I. LANDAU-9/21/11
 2   this case of Sonnenschein having actually
 3   reviewed the First Supplemental Indenture?
 4        A.   I don't recall reading any
 5   testimony about any attorney from
 6   Sonnenschein.
 7        Q.   Have you seen any evidence that the
 8   Trustee ever asked anyone at Sonnenschein
 9   whether they reviewed the First Supplemental
10   Indenture?
11             MS. ARCHER:  Object to the form.
12        A.   I don't recall.
13        Q.   If Sonnenschein had not reviewed
14   the First Supplemental Indenture in connection
15   with issuing these opinions, would it be
16   inappropriate for the Trustee to refer to
17   Landau 2 and 3?
18        A.   Only if it had actual knowledge
19   that the law firm did not review it.
20   Anything -- actual knowledge overrides any
21   other consideration.
22        Q.   That's your legal interpretation?
23        A.   No, that's my understanding of how
24   people in the industry believe the conduct of
25   the Trustee is governed, based upon years and
```

```
 1              ROBERT I. LANDAU-9/21/11

 2   years of being involved with the industry and

 3   attorneys in the industry.  So, it's an

 4   understanding of industry custom and practice.

 5   It's not a legal opinion.

 6        Q.   In your report, Exhibit 1,

 7   paragraph 21, you say, "The Trustee properly

 8   relied upon the directions it received to

 9   redeem student loan program revenue bonds."

10   Do you see that?

11        A.   Yes.

12        Q.   Was the Trustee permitted to rely

13   on directions from the Issuer without first

14   determining such payments were consistent with

15   the Indenture?

16             MS. ARCHER:  Object to the form.

17        A.   I don't know what you mean by

18   "consistent with the Indenture."

19             If, again, this is a direction, it

20   has to meet the test that I described earlier

21   this morning in this deposition.  If it meets

22   the requirements of that test, three-part

23   test, then the Trustee can rely upon it.

24        Q.   Can the Trustee rely upon an

25   opinion by ALL to make a payment into a Swiss
```

```
 1              ROBERT I. LANDAU-9/21/11

 2   before?

 3        A.   Yes, I've read it.

 4        Q.   In addition to today?

 5        A.   Yes.  You asked me questions about

 6   it and, yes, as long as the Trustee had actual

 7   knowledge with respect to these items, then he

 8   might have to take action.  Without actual

 9   knowledge, there's nothing in there that it

10   can do.

11        Q.   The word, "amend," can an amendment

12   consist of solely adding new rights and

13   obligations rather than changing existing

14   rights and obligations?

15        A.   Under custom and practice in the

16   industry, an amendment changes.

17        Q.   And a change could be the addition

18   of new rights?  That's a change?

19             MS. ARCHER:  Object to the form.

20             MR. KHONDKER:  Object to the form.

21        A.   It would have to -- to amend an

22   Indenture, number one, there's a requirement.

23   One has to refer to very specific provisions

24   of the Indenture.  The amendment is not just a

25   general catchall.  It changes existing
```

1           ROBERT I. LANDAU-9/21/11

2    that constitutes a change or modification of

3    the agreement, correct?

4           MS. ARCHER:  This object to form.

5       A.   I don't have a problem with you

6    using the words, "amend, modify, supplement,

7    enhance."  All those things can fit in terms

8    of how -- what the words mean.

9           It's what is intended to be

10   accomplished by the document, by the

11   provisions, and it's clear that this -- that

12   this financing, this financing document

13   envisions multiple series of bonds.  And

14   that's actually what happened.

15      Q.   Is that your legal interpretation

16   of the document?

17          MS. ARCHER:  Object to the form.

18      A.   I never gave you a legal

19   interpretation ever.

20      Q.   But you're providing a legal

21   interpretation of the agreement.  You're not

22   testifying about custom and practice, are you?

23      A.   Yes, I am.

24          MS. ARCHER:  Object to the form.

25          Go ahead.

1              ROBERT I. LANDAU-9/21/11

2         A.   I'm testifying to the understanding

3    in the industry as to what these kinds of

4    provisions mean, and how they're applied and

5    understood.  At the end of the day, the

6    transaction is there to facilitate someone

7    borrowing money and to provide some

8    protections to the people who lend the money.

9         Q.   As well as to provide protection to

10   the bondholders; is that correct?

11        A.   The bondholders are normally the

12   people that provide the money.  I mean,

13   they're the creditors.

14        Q.   If you look back, sir, at Section

15   5.03 of the DEPFA Standby Purchase Agreement,

16   do you see the phrase, "or permit or suffer to

17   occur any action or omission which results in

18   or is equivalent to an amendment, modification

19   or grant of a waiver under the policy of the

20   Indenture," et cetera?

21             Do you see that?

22        A.   Yes, this isn't.

23        Q.   Sir, I haven't asked you a question

24   yet.

25        A.   Oh, I thought you did.  Excuse me.

```
 1                ROBERT I. LANDAU-9/21/11

 2        Q.    I mean Lloyd's payment terms;

 3   repayment of their bank bonds versus DEPFA

 4   repayment terms.  And DEPFA didn't know that,

 5   did they?

 6              MS. ARCHER:  Object to the form.

 7        A.    Certainly did not.  Certainly did

 8   not.  If you say they didn't know.  I don't

 9   have any knowledge if they did or didn't know,

10   so I can't give you an opinion on that.

11        Q.    And those payment terms, which I'm

12   referring to, if the effect of those payment

13   terms was for DEPFA to receive substantially

14   less money than it would have received if

15   there had been no Lloyd's, isn't that a change

16   to the substantive rights of DEPFA?

17              MS. ARCHER:  Object to the form.

18              MR. KHONDKER:  Object to the form.

19        A.    In my opinion, no, because that was

20   possible under the provisions of the Indenture

21   that they agreed to.

22        Q.    Even though there was a consent

23   right for DEPFA, if anything changed their

24   substantive rights?

25              MS. ARCHER:  Object to the form.
```

```
 1              ROBERT I. LANDAU-9/21/11
 2              MR. KHONDKER:  Object to the form.
 3         A.   And that consent right did not
 4    apply to a subsequent series of senior bonds
 5    under the terms of the Indenture.
 6         Q.   That's your legal interpretation?
 7         A.   I'm not giving a legal
 8    interpretation, Mr. Berman.  I'm giving you my
 9    common understanding in the industry of what
10    these terms mean and are understood to cover.
11         Q.   If we go back to paragraph 24, you
12    see --
13              MS. ARCHER:  Of his report?
14         Q.   Of your report.  Thank you.
15              Page 10, third sentence says,
16    "Although some Issuers and Indenture drafters
17    use the term, "Supplemental Indenture"
18    generically, especially on the cover, section
19    headers and/or provisions will always refer to
20    amending the Indenture when such or
21    substantive rights to existing rights,
22    obligations, responsibilities or liabilities
23    of the parties to or beneficiaries of the
24    Indenture provisions?"
25              Do you see that?
```

1              ROBERT I. LANDAU-9/21/11

2    will reflect the wishes of the parties to the

3    transaction.

4          Q.   In paragraph 29 of your report, you

5    give the opinion that you would expect to see,

6    spelled out explicitly in the Indenture, any

7    right to consent to the issuance of an

8    additional series of bonds.  Is that opinion

9    based on your experience?

10         A.   Yes.

11         Q.   How so?

12         A.   Well, I've never seen an Indenture

13   in which subsequent potential purchasers of

14   bonds have to pass -- have to be agreed to by

15   prior purchasers of bonds.

16              In other words, Series A is

17   issued -- and all this would be spelled out in

18   the Indenture.  Series A is issued, and the

19   Indenture says that the holders of Series A

20   bonds shall have the absolute right at any

21   time, and from time to time, to approve,

22   disapprove the purchasers of any subsequent

23   series of bonds, or the issuance of any

24   subsequent series.

25              In other words, the absolute --

```
 1              ROBERT I. LANDAU-9/21/11
 2    what I would call the absolute veto right.
 3    I've never seen that provision because the
 4    underwriters tell me they couldn't sell the
 5    bond issue.
 6         Q.   So, it would be unusual, in your
 7    experience, for an Issuer to grant that right
 8    to a liquidity provider?
 9         A.   It would be more than unusual.  It
10    is just highly unlikely that that would
11    happen.
12         Q.   Do you know whether liquidity
13    providers ask for that right?
14         A.   I don't know.
15         Q.   Do you know whether DEPFA asked for
16    that right?
17              MR. BERMAN:  Object to the form.
18         A.   I don't know.
19         Q.   I'm sorry, let me withdraw the
20    question.
21              Do you know whether DEPFA asked for
22    the right to consent to the issuance of
23    additional bonds?
24         A.   I'm trying to remember.  I don't
25    think so.  I know that DEPFA was a contender
```

```
 1              ROBERT I. LANDAU-9/21/11
 2   to be the liquidity provider for the so-called
 3   second series.  What they -- I don't recall
 4   reading anything as to what provisions they
 5   wanted or insisted upon as a condition of
 6   participation.
 7        Q.   In how many deals have you seen an
 8   Issuer grant the right to consent to the
 9   issuance of additional bonds to a liquidity
10   provider?
11        A.   None.
12        Q.   Do you agree with the idea that
13   consent of the liquidity provider is required
14   on an amendment or modification of an
15   Indenture unless the particular amendment or
16   modification is carved out as an exception?
17             MR. BERMAN:  Object to the form.
18        Q.   Do you understand the question?
19        A.   No, you lost me.  I'm sorry, I
20   apologize.  I can't -- could you rephrase it?
21        Q.   Okay.  Have you seen consent
22   provisions in Indentures that have a carveout
23   saying that Indentures or Standby Liquidity
24   Agreements that say that have a carveout that
25   says that consent is not required for the
```

1              ROBERT I. LANDAU-9/21/11

2    issuance of additional bonds?

3         A.   No, it would never -- based upon my

4    knowledge of the industry in how this worked,

5    it would not be -- it would not -- it would

6    just be the reverse.  If the consent has to be

7    given, it has to be spelled out.  It's not the

8    reverse.  Consent is required is what would go

9    into the Indenture.

10        Q.   Please take a look at Chapman 7,

11   the DEPFA SBPA that we've been discussing

12   today.

13             Have you reviewed this document in

14   connection with the preparation of your

15   report?

16        A.   Yes.

17        Q.   Where in Chapman 7, if you recall,

18   does it say that DEPFA's consent is required

19   for the issuance of additional bonds?

20             MR. BERMAN:  Objection.

21        A.   Well, let's just say since this is

22   not supposed to be a memory test, I don't

23   recall reading that.

24        Q.   Do you know whether the Trust

25   Indenture or the first Supplemental Trust

# EXHIBIT 2

Page 1

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

--------------------------------X
BANK OF NEW YORK MELLON TRUST
COMPANY NA,

         Plaintiff,

               CASE NO. 10-civ-4424 (DLC)

     VS.

DEPFA BANK PLC, et al.,

         Defendants.
--------------------------------X


VIDEOTAPED DEPOSITION

OF

JEFFREY L. BALIBAN

New York, New York

Thursday, September 29, 2011


Reported by:
AYLETTE GONZALEZ, CLR
JOB NO. 42110

 1                  JEFFREY L. BALIBAN-9/29/11

 2             MS. ARCHER:  Object to the form.

 3        A.   Can you repeat it?

 4             (Whereupon, the referred to

 5        question was read back by the

 6        Reporter.)

 7        A.   Yes, I think there's some

 8   confusion.

 9        Q.   In your report, do you take any

10   position as to how that ambiguity should be

11   resolved?

12        A.   I don't.

13        Q.   Is that outside the scope of your

14   engagement?

15        A.   It is.

16        Q.   Is it outside the scope of your

17   engagement to opine upon whether the

18   redemption schedules in Section 3.02 of the

19   SBPAs apply to loan account funds?

20        A.   The scope of my work was to review

21   the reports of Mr. Friedland and

22   Mr. Blumenthal and provide rebuttal where I

23   believe necessary on their methodologies and

24   findings.

25             So, to the extent that their

```
 1              JEFFREY L. BALIBAN-9/29/11
 2   methodologies and findings make certain
 3   assumptions, I reviewed the same agreements I
 4   think that they did, or that they said they
 5   did, and where I believe there was ambiguity
 6   and they didn't, I pointed out that issue.
 7        Q.    Okay.
 8              But are you offering an opinion as
 9   to how the Court should resolve any ambiguity
10   in the contracts as to how or when to use loan
11   account funds for bank bond redemptions?
12        A.    At this time, no.
13        Q.    And if there's an ambiguity in the
14   documents, does that mean that there's more
15   than one reasonable interpretation?
16        A.    It could.
17        Q.    And could one of those reasonable
18   interpretations be that both revenue and loan
19   account funds are subject to the redemption
20   schedules in the SBPAs?
21              MS. ARCHER:  Object to the form.
22        A.    Perhaps.
23              MR. BARRES:  I'm handing the
24        witness a document previously marked
25        Chapman Exhibit 8.
```

```
 1              JEFFREY L. BALIBAN-9/29/11
 2    reasonable minds could differ on how much
 3    should be accrued by the individual making the
 4    decision contemporaneously with issues
 5    arising.  And that not every person would
 6    accrue the exact same amount.
 7              And so, if you're going to make a
 8    calculation of how much is owed in a damages
 9    sense by one party to another, it's got to
10    presuppose that the decisions that were made
11    were somehow incorrect or wrong.
12         Q.   Well, is an expert required to copy
13    the contemporary activities of a trust
14    administrator when he believes they are wrong?
15              MS. ARCHER:  Object to the form.
16         A.   I think an expert is required to
17    give due consideration in a matter like this
18    to what was done by the parties at the time
19    contemporaneously with the issues arising,
20    even if he disagrees with the amounts that
21    they used.
22              Unless, in his or her opinion, he
23    believes that the decisions that were made
24    were made without due professional care or
25    made incorrectly, improperly, irresponsibly or
```

1              JEFFREY L. BALIBAN-9/29/11

2    in an imprudent matter.

3         Q.   Would you agree an expert is not

4    required to copy the contemporary activities

5    of a trust administrator when they are wrong?

6              MS. ARCHER:   Object to the form.

7         A.   When they are wrong is a difficult

8    aspect of your question.   When you say "when

9    they are wrong," do you mean if I were to

10   think that a lower or a higher amount of an

11   accrual would have been more correct, that

12   doesn't necessarily mean that what was

13   actually accrued was wrong.   I may just think

14   it's less correct.

15             But if I think that it was

16   irresponsible or imprudent or certainly did

17   not reflect professional due care in their

18   work, and I reached that opinion, then I would

19   think there would be, certainly, a correct way

20   to.   You know, I would come up with my own

21   opinion of what I think should have been

22   accrued.

23        Q.   So, when the damages expert

24   reasonably believes that the trust

25   administrator did something wrong at the time,

1             JEFFREY L. BALIBAN-9/29/11

2    then it is all right for the damages expert to

3    make a different assumption from the trust

4    administrator?

5             MS. ARCHER:  Object to the form.

6         A.   A damages expert can make whatever

7    assumption he or she wants.  And if I'm

8    retained and am asked -- regardless of what

9    was done at the time, I want you to

10   reconstruct this and tell me what you think

11   should have been done.  I can do that and I

12   might come up with a different response than

13   what was originally done.

14             But if I'm going to go into -- then

15   go into calculations to say, and as a result

16   of my work, party A owes money to party B or

17   party B is owed money by party -- by some

18   other party, that's a whole different thing.

19             Then I have to look at whether or

20   not there is -- there was some, you know, duty

21   to apply due professional care or whether

22   there was decisions made by the by the

23   individual who originally made them were

24   somehow inappropriate beyond just the fact

25   that the dollar amount may disagree with mine.

```
                        JEFFREY L. BALIBAN-9/29/11
 1
 2         A.    It would depend on the assumption
 3   that you're changing.  I think he agreed that
 4   if you changed certain assumptions
 5   underpinning his analysis, that the numbers
 6   may change significantly, insignificantly,
 7   would depend on the assumption.  I'm just
 8   saying the same thing.
 9         Q.    In paragraph 14 of your report --
10         A.    Okay.
11         Q.    You write that BNY Mellon has
12   retained Navigant in this matter to "Review
13   Mr. Friedland and Mr. Blumenthal's report and
14   provide, where we believe necessary,
15   appropriate rebuttal to the opinions in the
16   two experts' reports.
17              In so doing, we analyze the key
18   assumptions and methodologies in light of the
19   terms and conditions in the Trust Indenture,
20   First and Second Supplemental Indenture, SBPAs
21   and/or other pertinent agreements."
22              Is that correct?
23         A.    That's correct.
24         Q.    Do you have an opinion as to
25   whether any of Mr. Friedland's key assumptions
```

```
 1              JEFFREY L. BALIBAN-9/29/11
 2    and methodologies were consistent or
 3    inconsistent with the terms and conditions of
 4    the various contracts that you read?
 5              MS. ARCHER:  Object to the form.
 6         A.   Well, I think that -- I think that
 7    Mr. Friedland does assume the one pot of money
 8    kind of theory.  And unlike Mr. Blumenthal,
 9    who also assumes the one pot of money, but
10    gives a second scenario assuming that the
11    Court ultimately finds that's not the case,
12    based on his recognition of the fact that
13    there is ambiguity.  I note that Mr. Friedland
14    hasn't made -- hasn't made that.  So, in
15    preparing his analysis, he assumed the one pot
16    of money.
17              In reading the agreements, just as
18    a financial person, I find that there is
19    inconsistent see or uncertainty or confusion
20    and would and there is nothing that
21    Mr. Friedland said in his report or his
22    deposition that convinced me that there was no
23    confusion or inconsistently.
24              And so by doing his calculations in
25    accordance with one specific interpretation,
```

1        JEFFREY L. BALIBAN-9/29/11

2   that may or may not be consistent with the

3   documents.

4        Q.   It may or may not be consistent

5   with the documents?

6        A.   Yes, if the Court were to come down

7   and say this is one pot of money and should be

8   treated as such.

9        Q.   Isn't that true of anything?

10        A.   Then I think that's consistent.

11        Q.   Do you agree that it is or isn't

12   consistent with the documents?

13        MS. ARCHER:  Object to the form.

14        That was a phrase you built into your

15        question.

16        A.   No, I'm saying -- you're asking me

17   whether what he's done is consistent or

18   inconsistent with the documents what he's done

19   is consistent with one interpretation of the

20   documents, and absent the Court coming and

21   instructing us how they're to be interpreted,

22   my reading of it, my lay reading of it, shows

23   there's other interpretations.  And to the

24   extent that those other interpretations are

25   correct, then what he's done is not consistent

```
 1            JEFFREY L. BALIBAN-9/29/11

 2    to amounts to be set aside pursuant to the

 3    waterfall for bond interest payments to the

 4    Department of Education perhaps other things;

 5    is that correct?

 6         A.    The report says what it says.

 7         Q.    Do you believe that Mr. Friedland

 8    supplanted management's judgment -- do you

 9    believe that Mr. Friedland supplanted ALL's

10    realtime judgment with his own espoused view

11    with the timing and amounts of approvals that

12    should have been made?

13         A.    So, your question is, do I -- am

14    I -- do I believe Mr. Friedland's calculation

15    supplants ALL's realtime judgment using his X

16    paused view yes that's my judgment.

17         Q.    And are you opining that

18    management's judgment realtime judgment as to

19    the amounts to set aside and the timing of

20    accruals should be given some deference?

21         A.    Define deference for me, if you

22    would.  What do you mean by that?

23         Q.    Well, let me see if I can remember

24    your words.  Do you believe that management's

25    realtime judgment as to the timing and amount
```

```
 1              JEFFREY L. BALIBAN-9/29/11
 2   of set asides or items under the waterfall
 3   should not be -- well, should not be disturbed
 4   unless there has been a failure of due care,
 5   professional responsibility or imprudence?
 6              MS. ARCHER:  Object to the form.
 7         A.   I certainly feel that management's
 8   or ALL's realtime judgment needs to be
 9   considered strongly before statements such as
10   there was sufficient money to redeem bonds or
11   money that should have been used for bond
12   redemption or any other characterization of
13   where that money should have gone when that
14   opinion conflicts with what ALL had done in
15   the circumstances.
16              So, if ALL were to say or, I'm
17   sorry, if Mr. Friedland were to say on this
18   particular day, there's $24,387,469.15 that's
19   available for redemption and ALL, in their
20   realtime judgment, didn't use that money for
21   redemption.  Unless you can show that they
22   were unreasonable in making -- in reaching
23   that conclusion or acted imprudently, then
24   before you say that money is available for
25   redemption, you have to understand the basis
```

```
 1              JEFFREY L. BALIBAN-9/29/11

 2     of why redemptions were not made and what

 3     might have been going through Martha

 4     Peterson's, or anyone else at ALL's, mind when

 5     they reached the conclusion that

 6     redemptions -- that money should not be used

 7     for redemption before you can say it should

 8     have been.

 9         Q.   Can you tell me what area of

10     scientific, technical or other specialized

11     knowledge you're drawing upon when you opine

12     that management realtime judgment needs to be

13     considered strongly before statements such as

14     there was sufficient money to redeem bonds or

15     money that should have been used for bond

16     redemption or any other characterization of

17     where that money should have gone when that

18     opinion conflicts with what ALL had done in

19     the circumstances?

20              MS. ARCHER:  Object to the form.

21         A.   I'm saying the hypothesis isn't

22     specifically specified.  There's variables

23     that drive the decisions made that, obviously,

24     haven't been considered and may, in fact, be

25     important.
```

```
 1            JEFFREY L. BALIBAN-9/29/11
 2       Q.   I asked you what area of
 3   scientific, technical or other specialized
 4   knowledge you're drawing upon when you gave --
 5   I'm not going to repeat it again.  The answer
 6   that you gave two answers ago.
 7            MS. ARCHER:  Objection; asked and
 8       answered.
 9       Q.   Were you announcing an accounting
10   principal?  Were you announcing a forensic
11   accounting principal, a principal trust
12   administration?
13            Please tell me what area of
14   scientific or technical knowledge you are
15   drawing upon when you gave that answer?
16            MS. ARCHER:  Same objection.
17       A.   I'm drawing upon the application of
18   the scientific method as is generally
19   understood to economic, financial and
20   accounting decisions.  Since in this case,
21   you're dealing with something that is, in
22   effect, an economic financial or accounting
23   decision whether or not certain amounts should
24   be used for this versus that.
25            And before you reach a conclusion
```

```
 1              JEFFREY L. BALIBAN-9/29/11
 2    that based on the evidence you see or that
 3    you've considered at least there are amounts
 4    of money that could have been used for purpose
 5    A, although you see it has not been used for
 6    purpose A, an economist will look at that and
 7    say that either there was another reason, when
 8    there was no other reason.
 9              So, before you draw that
10    conclusion, you have to determine whether
11    there was another reason whether or not
12    another variable has to be considered in
13    making your forecast of amounts that would be
14    available under accounting rules or under
15    financial economic theory to be available to
16    be used to pay for bond redemption.  And if he
17    hasn't considered -- there's certain variables
18    he hasn't considered, then I don't see how
19    his -- his calculation could only be correct
20    coincidentally.
21         Q.   So, your statement that the
22    realtime judgment of management should be
23    strongly considered, that's principal of
24    economics?
25              MS. ARCHER:  Objection; asked and
```

1           JEFFREY L. BALIBAN-9/29/11

2   Unless I fit -- unless I understand what that

3   is -- if I could know what that is it and then

4   dismiss it and say, well, it's not an

5   appropriate reason, then I might be able to

6   draw a conclusion.

7           But without making the inquiry,

8   without knowing what it is, drawing a

9   conclusion, an economic conclusion or

10  mathematical conclusion, is premature.

11      Q.   Are you opining that ALL -- that

12  ALL's management practices with respect to

13  set-asides or redemptions in this case did

14  conform to the applicable standard of

15  professional care for a Trust administrator?

16          MS. ARCHER:  Objection.

17      A.   I'm -- I'll take the same position

18  I think that Mr. Friedland and Mr. Blumenthal

19  take, and that is, I'm not reaching a

20  conclusion on that and I have not seen

21  anything that leads me to believe -- leads me

22  to reach a conclusion one way or the other.

23          I mean, it's certainly outside of

24  the scope of what I was asked to do.  I was

25  not asked to opine on ALL's behavior.

1            JEFFREY L. BALIBAN-9/29/11

2    administrator was -- what was in their

3    consideration at the time.  And that's not to

4    say that their consideration is right wrong or

5    indifferent.  It just depends on what they

6    were thinking at the time.  And for me or

7    anyone else to come back on an espouse basis

8    and say, well, gee, I subtract out these

9    required transfers and there's money left,

10   therefore, that should have been used to

11   redeem bonds, there could be a very good

12   reason why that money was not used to redeem

13   bonds, and that it was in the best interest --

14   turns out to be in the best interest of the

15   Trust and in DEPFA and/or Lloyds that it

16   wasn't used to make those redemptions.  I

17   don't know what they were and I wasn't asked

18   to figure that out.  I'm just saying until you

19   -- until you analyze that and make a

20   determination as to what that could be, you

21   really can't say how much is available for

22   redemptions?

23        Q.   What's -- what, sir, are you doing

24   other than -- what are you doing to assist the

25   trier of fact in this case?

1           JEFFREY L. BALIBAN-9/29/11

2           MS. ARCHER:   Objection.

3      Q.   Determine any dispute at issue and

4  specifically the dispute at issue whether

5  redemptions should or should not have been

6  made in any amount on at least some of the

7  dates on Friedland Exhibit C?

8           MS. ARCHER:   Objection.

9      A.   I'm assisting the trier of fact

10  understand what the potential limitations are

11  or rebuttals are that Mr. Friedland and/or

12  Mr. Blumenthal had said.

13           In particular with Mr. Friedland he

14  said there's money available for redemptions

15  on all of these dates.   That may or may not be

16  a true statement.   That's my rebuttal.

17           Nor does he say -- it could be that

18  he's saying there's money available for

19  redemptions and you should redeem four bonds

20  on each of those dates which for the first

21  four, five months is a de minimus amount and

22  is immaterial.   And I don't know that I'd take

23  much issue with it.

24      Q.   How are you assisting the trier of

25  fact by saying that Mr. Friedland's opinion

1             JEFFREY L. BALIBAN-9/29/11

2    may or may not be correct?

3             MS. ARCHER:   Objection.

4        A.   I'm saying that there are aspects

5    that I believe Mr. Peterson should have

6    considered -- I'm sorry, Mr. Friedland -- all

7    these names.  That I believe Mr. Friedland

8    should have considered before making the

9    statement that funds are available for

10   redemption.

11             And I'm further observing that

12   there's limited value to the statement that

13   funds are available for redemption unless

14   you're going to offer some opinion as to how

15   much of those funds are available for

16   redemption.

17             If you have 4 million in the

18   account and you're offering the opinion that a

19   hundred thousand of it is available for

20   redemption, that's fine.  That's different

21   from saying 22 million of 249 million is

22   available for redemption or all of the whole

23   24 million or half of it.

24             To say that funds are available for

25   redemption in and of itself without an amount

```
 1              JEFFREY L. BALIBAN-9/29/11

 2   is of limited value.  And even without that,

 3   unless an expert does the requisite analysis

 4   to make certain that there's not any other

 5   reason why funds were not used to make

 6   redemptions, they can't necessarily draw that

 7   conclusion.

 8        Q.   But you don't know what any of

 9   those other reasons are?

10             MS. ARCHER:  Objection; asked and

11        answered.

12        A.   Again, I wasn't asked to determine

13   what those reasons are.  I can look at the --

14   I can make my own observations as to what was

15   going on at time and what -- what Martha

16   Peterson was facing in terms of redemptions --

17   you know, sitting there in May, redemptions

18   coming up later in the month, two, three

19   months from then, further on down the line in

20   amounts that were enormous compared to what

21   was being carried on even both the revenue and

22   the loan account and -- but -- but what I was

23   asked to do is offer an opinion on what

24   Mr. Friedland is saying.

25             And my opinion on what
```

```
 1              JEFFREY L. BALIBAN-9/29/11
 2    redemption, and as a result does not make a
 3    fair redemption, has the Trust administrator
 4    act in a professionally responsible manner
 5    with due care and prudently?
 6              MS. ARCHER:  Objection.
 7         A.   I don't know.  I haven't -- I
 8    haven't really considered that.  So, I really
 9    wouldn't be able to say.
10         Q.   And are you opining that setting
11    aside six months of bond interest at all times
12    was a reasonable practice if that, indeed, was
13    the practice?
14         A.   I am not opining that it was or was
15    not reasonable.
16         Q.   And you're not opining that setting
17    bond interests on a -- or setting aside for
18    bond interests on a period to date basis would
19    be reasonable one way or the other?
20         A.   That's right, I'm not.
21         Q.   And in paragraph 44 of your report,
22    in summarizing Mr. Friedland's analysis, you
23    refer it -- you use the phrase, "claimed
24    redemption dates" for May 11, 2008 through
25    November 29, 2009.  And by using the
```

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------x

BANK OF NEW YORK MELLON TRUST
COMPANY NA,

          Plaintiff,

                         Civil Action No.
       vs.               10 Civ 4424 (DLC)

DEPFA BANK PLC, et al.,

          Defendants.
------------------------------------x


VIDEOTAPED DEPOSITION OF SCOTT FRIEDLAND

New York, New York

September 19, 2011


Reported by:

KATHY S. KLEPFER, RMR, RPR, CRR, CLR

JOB NO. 42103

1                         S. Friedland

2      certificate and second is my knowledge of

3      Section 148.

4           Q.    Independent of this case?

5           A.    Independent of this case.

6           Q.    Okay.  Please look at the bottom of

7      page 1 of your report.  Near the bottom of the

8      page, it says you have been involved in

9      investigations of securitizations of student

10     loans and the loan originator.  Do you see that?

11     It's in Romanette iii.

12          A.    Yes.

13          Q.    How many of those types of

14     investigations?

15          A.    It was one investigation, but there

16     were seven securitizations, I believe seven.

17          Q.    Did you work on this investigation at

18     FTI?

19          A.    Yes, sir.

20          Q.    What kind of investigation was this?

21          A.    An internal investigation.

22          Q.    What was your role?

23          A.    I -- as I guess senior managing

24     director on the matter, on the investigation.

25          Q.    Why was there a need for an internal

1                    S. Friedland

2    investigation?

3        A.     I think it originated from

4    discrepancies found during the audit.

5        Q.     Were the student loans that you

6    investigated in this engagement, were those held

7    in a trust?

8        A.     Yes.

9        Q.     Were bonds issued to investors?

10       A.     In some of the trusts, yes.

11       Q.     How many of the trusts?

12       A.     I believe six of the seven.

13       Q.     And how many investors were --

14       A.     You know what, it may have been -- I

15   don't know if you're making a distinction

16   between bonds and notes.  They may have been

17   notes as opposed to bonds.

18       Q.     For each of the trusts?

19       A.     For six of the seven, yes.

20       Q.     They were notes instead of bonds?

21       A.     That's right.

22       Q.     Okay.  How many investors were issued

23   notes in each trust?

24       A.     I do not know.

25       Q.     More than five?

```
 1                    S. Friedland
 2       A.    Most likely.
 3       Q.    For each trust?
 4       A.    I believe so.
 5       Q.    Okay.  How many series of notes?
 6       A.    I don't recall.
 7       Q.    What government -- I'm sorry, what
 8  document governed the repayment of the bonds
 9  issued by these trusts -- or, the notes?  I'm
10  sorry.
11       A.    There were indentures for each of the
12  trusts.
13       Q.    Was there a waterfall in place to pay
14  the costs associated with the trust?
15       A.    Yes.
16       Q.    And to repay bondholders?
17       A.    Or noteholders, yes.
18       Q.    Okay.  Did you analyze whether
19  redemptions could be made?
20       A.    I believe that was part of our
21  analysis, yes.
22       Q.    What was your -- what was your
23  analysis designed to accomplish?
24       A.    The correct reporting for the
25  transactions of these -- of the -- primarily of
```

1                    S. Friedland

2    the company, the --

3        Q.    There was a concern that the reporting

4    had been inaccurate?

5        A.    Yes.

6        Q.    In what regard?

7        A.    The -- there was a variety of issues.

8    There was a concern of fraud; there was concern

9    of theft of funds; there was a concern of

10   inappropriate use of the collateral in the

11   different trusts.

12       Q.    And did these concerns affect how

13   redemptions were made?

14       A.    Yes.

15       Q.    In what way?

16       A.    They would impact the availability of

17   funds for redemptions.

18       Q.    Meaning that there would be more funds

19   available or less funds available?

20       A.    Less.

21       Q.    And how were -- how did the trustee

22   for the trust know how to make redemptions?

23            MR. FOURMAUX:  Objection.

24       Q.    Was there a document that governed or

25   guided the trustee in terms of how redemptions

1                     S. Friedland

2   were made?

3       A.    Yes.

4       Q.    And what was that?

5       A.    The indenture.

6       Q.    For each of the trusts?

7       A.    That's right.

8       Q.    Okay.  Did you analyze how to pay

9   expenses from the trust under each of the

10  indentures?

11      A.    It was part of the analysis, yes.

12      Q.    And how to pay interest to bondholders

13  or noteholders?

14      A.    Same answer, yes.

15      Q.    Did you analyze how to make accruals

16  according to the indenture documents?

17      A.    Accruals were required, the analysis

18  included accruals, but I don't think an analysis

19  was necessary to figure out how to do the

20  accruals.

21      Q.    Were the accruals different for each

22  of the trusts?

23      A.    I don't think so.

24      Q.    Please look at the top of page 2 of

25  Friedland 1.  When you say, "I have performed

1                          S. Friedland

2        Q.    Okay.  Do you know whether bonds or

3    notes were issued?

4        A.    I don't recall.  I presume if there

5    were bonds issued, there would have been a trust

6    involved.

7        Q.    Were you asked to do any analysis

8    concerning bonds or notes for this engagement?

9        A.    No.

10       Q.    Were you asked to do an analysis of an

11   indenture or the waterfall within an indenture

12   for this engagement?

13       A.    No.

14       Q.    Were you asked to analyze how

15   redemptions could be made --

16       A.    No.

17       Q.    -- for this engagement?

18             What about accruals or interest

19   payments to bondholders?

20       A.    Same answer.  No.

21       Q.    Okay.  If I refer to standby bond

22   purchases agreements as SBPAs, will you know

23   what I'm referring to?

24       A.    Yes.

25       Q.    Have you worked on any deals involving

1                    S. Friedland

2      Q.     Who asked you to do that?

3      A.     Counsel.

4      Q.     Okay.   Why?

5      A.     My understanding is, subsequent to

6   November 29, 2009, that there were -- there were

7   agreements amongst the parties not to have any

8   more redemptions.

9      Q.     Does your report indicate what

10  damages, if any, the banks suffered?

11     A.     No, sir.

12     Q.     Does your report show what payments

13  should have been made to Lloyds or DEPFA?

14     A.     No, sir.

15     Q.     Please turn to page 1 of Exhibit C.

16  May 11, 2008 is the first date you analyze?

17     A.     Yes, sir.

18     Q.     And why did you select that date?

19     A.     Because that is, according to the

20  schedule of liquidity payments -- I'm not sure

21  if I'm using the right term, but I think you

22  know what I mean -- according to the schedule of

23  payments made by the liquidity providers and by

24  the terms of the standby bond purchase agreement

25  for Lloyds, this is the first date possible for

```
 1                    S. Friedland

 2    counsel to examine records of the trust's

 3    accounts and expenses, to apply the indenture

 4    waterfall on each of the mandatory redemption

 5    dates in the period May 11, 2008 through

 6    November 29, 2009, and determine whether there

 7    were sufficient funds to meet the higher

 8    priority expenses and still redeem bonds on

 9    those dates."  Is that a correct explanation of

10    what you were asked to do?

11         A.    Yes.

12         Q.    Were you at any time asked to opine on

13    any other topic?

14         A.    No.

15         Q.    Do you intend to offer any opinion on

16    economic damages?

17         A.    I have not been asked to do that.

18         Q.    And you don't intend to, correct?

19         A.    Not unless I'm asked to.

20         Q.    Do you intend to express an opinion as

21    to whether DEPFA has suffered any damages?

22         A.    The same answer.

23         Q.    You haven't been asked to?

24         A.    And -- right.

25         Q.    Same question with respect to Lloyds,
```

1                          S. Friedland

2        A.      So I don't have an opinion one way or

3    the other.

4        Q.      Would that have been an appropriate

5    exercise of judgment for ALL to make a

6    determination as to what its accrual should be

7    being in that position?

8        A.      Again, I have not considered this

9    question and I do not have an opinion on it.

10       Q.      Now, given that a portion of the

11   period was during some tough economic times,

12   would it have been justified, would ALL have

13   been justified in being more conservative in its

14   accruals?

15              MR. KHONDKER:  Objection to form.

16              MR. FOURMAUX:  Objection.

17       Q.      For example, in 2008 and 2009.

18       A.      I think it was required to follow the

19   indenture consistently.

20       Q.      Does the indenture specify exactly how

21   interest is to be accrued?

22       A.      In my mind, it does.

23       Q.      It's -- it's absolutely clear in your

24   mind, no ambiguity?

25       A.      I think the application of the

1                      S. Friedland

2        Q.     Okay.  If that were the case, would it

3    be reasonable for an issuer to determine a --

4    or, to decide on a conservative method of

5    setting aside funds for the interest payments?

6               MR. KHONDKER:  Objection to form.

7        A.     Well, I believe they're tied to what

8    the indenture states.  If "conservative" means

9    making a judgment that is still within what's

10   allowable under the indenture -- well, first of

11   all, you know, I wasn't asked to make -- have an

12   opinion as to what reasonable judgments are

13   for -- for -- for ALL to have made.  So I don't

14   have an opinion one way or the other.  I was

15   just stating that, generally speaking, one has

16   to follow the indenture.

17       Q.     So you don't have an opinion one way

18   or the other if -- if inability to pay interest

19   payments was an event of default, if that would

20   justify a more conservative method under the

21   indenture?

22       A.     That's right.  I think the indenture

23   was written to balance between making funds

24   available and avoiding default, and I don't

25   think one has to add more to what the indenture

1                         S. Friedland

2        Q.     Did you form any opinions about the --

3   the net numbers, principal owed, interest owed

4   and total owed in any of the tables on page 16

5   through 18 of Mr. Blumenthal's report?

6        A.     No, I was not asked to, and I think we

7   discussed before I did not attempt to do any

8   damages analysis.  So I have no opinion one way

9   or the other.

10              MS. ARCHER:  Can we mark as Friedland

11         Exhibit 4 the rebuttal report of Jeffrey L.

12         Baliban dated August 31, 2011.

13              (Friedland Exhibit 4, Rebuttal Report

14         of Jeffrey L. Baliban, August 31, 2011,

15         marked for identification, as of this date.)

16   BY MS. ARCHER:

17        Q.     Did you review Mr. Baliban's report,

18   Mr. Friedland?

19        A.     I have.

20        Q.     Have you been asked to prepare a

21   rebuttal or any supplement to your report to

22   redress -- to address his opinions?

23        A.     I have not.

24        Q.     Do you intend to?

25        A.     Only if I'm asked to.

# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

--------------------------------X
BANK OF NEW YORK MELLON TRUST
COMPANY NA,

               Plaintiff,

                      CASE NO. 10-civ-4424 (DLC)
         VS.

DEPFA BANK PLC, et al.,

               Defendants.
--------------------------------X

VIDEOTAPED DEPOSITION

OF

JACK E. BLUMENTHAL

New York, New York

Tuesday, September 20, 2011

Reported by:
AYLETTE GONZALEZ, CLR
JOB NO. 42104

```
 1              JACK E. BLUMENTHAL-9/20/11
 2        A.    Okay.
 3        Q.    Now, Mr. Fourmaux referred you to
 4   page 3 of your report earlier today.
 5        A.    Which one?
 6        Q.    The initial report.
 7        A.    I mean which Mr. Fourmaux.  No,
 8   number 3, the first report?
 9        Q.    Yes.  Specifically the paragraph
10   under "Overview Of Economic Loss Calculation"?
11        A.    Yes.
12        Q.    You read that paragraph into the
13   record?
14        A.    Yes.
15        Q.    Were you asked to opine on any
16   other topic than what's expressed in that
17   first paragraph?
18        A.    No.
19        Q.    And that --
20        A.    Excuse me.  When you say the first
21   paragraph, you really mean that section called
22   "Overview Of Economic Loss Calculation"?
23        Q.    Yes.
24        A.    The answer is no.  This is all
25   we've been asked to opine on.
```

1             JACK E. BLUMENTHAL-9/20/11

2        Q.    Okay.  Now, do you intend to

3    express an opinion as to the liability or

4    fault of ALL in this case?

5        A.    Not that I'm aware of at this time.

6        Q.    You haven't been asked to express

7    such an opinion?

8        A.    That's correct.

9        Q.    Do you intend to express an opinion

10   as to liabilities or fault of the trustee in

11   this case?

12       A.    Not at this time.

13       Q.    And you haven't been asked to?

14       A.    That's correct.

15       Q.    Do you intend to express any

16   opinion as to whether ALL breached the

17   Indenture or any other transaction document?

18       A.    I don't believe so.

19       Q.    You haven't been asked to express

20   such an opinion?

21       A.    That's correct, at this time.

22       Q.    If you were asked to express an

23   opinion as to whether ALL breached the

24   Indenture, would you have to do other work to

25   develop such an opinion?

```
1              JACK E. BLUMENTHAL-9/20/11

2        A.   Yes.

3        Q.   What would that consist of, as you

4   sit here today?

5        A.   Well, I don't even know.  When you

6   say, if I were to asked to do that, I don't

7   know if I could even do it.  It depends.  When

8   you talk about breaching an agreement, you're

9   talking about a lot of legal issues, and I'm

10  not a lawyer.  And I'm not licensed to

11  practice law, nor do I practice law.

12           So, it would depend on what I were

13  asked to do, and I haven't given any thought

14  to that.

15       Q.   Okay.

16       A.   Nor was I asked to consider it or

17  anything else.  I just simply haven't thought

18  about it at all.

19       Q.   Were you asked to express any

20  opinion as to whether the trustee breached the

21  Indenture or any other bond document?

22       A.   Was I asked whether --

23       Q.   To express an opinion as to whether

24  the trustee breached the Indenture of any of

25  the other bond documents?
```

1              JACK E. BLUMENTHAL-9/20/11

2        A.   No, I wasn't asked to do that.

3        Q.   And you don't intend to express any

4   such opinion as you sit there today?

5        A.   I have no intention at this time,

6   correct.

7        Q.   Have you been asked to express any

8   opinion as to whether ALL breached a duty to

9   Lloyds or DEPFA?

10       A.   No.

11       Q.   As you sit here today, you don't

12   intend to express such an opinion?

13       A.   I don't.

14       Q.   Same question with respect to the

15   trustee; have you been asked to express such

16   an opinion as to whether the trustee breached

17   any such duty to Lloyds or DEPFA?

18       A.   No.

19       Q.   Do you intend to express any such

20   opinion, as you sit here today?

21       A.   I have no -- I'm not aware of any

22   plan to change it.

23       Q.   Okay.

24            Do you -- have you been asked to

25   express any opinion as to the scope of the

```
 1              JACK E. BLUMENTHAL-9/20/11
 2   trustee's duties to DEPFA and Lloyds?
 3        A.   No.
 4        Q.   With respect to any of the matters
 5   that we've just discussed, whether there's
 6   liability or fault on the part of ALL or the
 7   trustee, whether there were breaches of the
 8   Indenture or duty by ALL or the trustee to
 9   Lloyds or DEPFA, do you, as you sit here
10   today, have any opinions on those topics?
11        A.   No.
12        Q.   Do you have an opinion as to
13   whether ALL acted negligently in its
14   performance of its duties as a program
15   administrator?
16        A.   Do I have an opinion?
17        Q.   Yes.
18        A.   To express?
19        Q.   Yes.
20        A.   With respect to that?
21        Q.   Yes.
22        A.   No.
23        Q.   Do you have an opinion as to
24   whether ALL acted reasonably or unreasonably
25   in connection with its performance of its
```

1                   JACK E. BLUMENTHAL-9/20/11
2    duties as a program administrator?
3          A.    That was outside the scope of what
4    I've been asked to do.
5          Q.    Do you have a -- do you have an
6    opinion as to whether ALL acted consistent
7    with the standard of professional care in
8    connection with its responsibilities as
9    program administrator?
10         A.    Excuse me; could you please reread
11   the first one or two sentences of that?
12         Q.    I think it was one sentence, but it
13   was just really long.
14               (Whereupon, the referred to
15               question was read back by the
16               Reporter.)
17         A.    No, I have no opinion on that.
18         Q.    Do you have an opinion as to
19   whether ALL acted prudently or imprudently
20   with respect to its responsibilities as a
21   program administrator?
22         A.    That's outside the scope of my
23   engagement.
24         Q.    Okay.
25               Have you been involved in or worked

```
 1                 JACK E. BLUMENTHAL-9/20/11

 2    on any bond transactions in which ALL was an

 3    issuer or was otherwise involved?

 4         A.    Not to my knowledge.

 5         Q.    What is your opinion as to whether

 6    there are monies owed by the trust estate to

 7    Lloyds?

 8         A.    Again, please, I'm sorry; can you

 9    please repeat the question?

10              (Whereupon, the referred to

11              question was read back by the

12              Reporter.)

13         A.    I think it's stated in my report.

14         Q.    And would the -- well, let's take

15    it this way:  Is it your opinion that the

16    trust estate owes money to Lloyds?

17         A.    Yes.

18         Q.    And would the amount of that money

19    vary based on your Scenario 1 and Scenario 2

20    in your report?

21         A.    Yes.

22         Q.    Do you have any opinion, other than

23    the amounts set forth on the last couple of

24    pages of your report, as to the amount of

25    monies owed by the trust estate to Lloyds?
```

Page 194

```
 1              JACK E. BLUMENTHAL-9/20/11
 2         A.   No.
 3         Q.   Are you expressing an opinion in
 4    your report as to whether ALL or the trustee
 5    owe money to Lloyds?
 6         A.   Could you repeat that question?
 7         Q.   Does your report express an opinion
 8    as to whether ALL or the trustee owe money to
 9    Lloyds?
10         A.   I'm not sure that I understand that
11    question.  Are you referring to whether Bank
12    of New York Mellon owes money to Lloyds above
13    and beyond what I've computed?  Whether they
14    owe the money or the trust estate owes the
15    money?
16         Q.   Yes.  Can you answer that question?
17    Are you expressing an opinion as to that?
18         A.   It would be helpful if you could
19    break apart --
20         Q.   ALL and the trustee?
21         A.   ALL, the trustee and the trust
22    estate from each other because that's where
23    we -- it could get a little confusing in terms
24    of what the -- how I would answer those
25    questions.
```

Page 195

1                    JACK E. BLUMENTHAL-9/20/11

2          Q.    In your report, page 16, your

3     conclusions, okay, you state, "It's my opinion

4     that the following amounts are owed to DEPFA

5     and Lloyds respectfully from the trust account

6     for the bonds, as of November 5, 2009 and as

7     of July 1, 2011."

8                    Have I accurately read that?

9          A.    Yes.

10         Q.    Are you expressing an opinion in

11    your report that there are amounts owed to

12    DEPFA and Lloyds from ALL as opposed to the

13    trust account?

14         A.    The figures expressed here are what

15    should have been paid by the trust account.

16    Now, basically, these are the figures that are

17    owed, in my opinion, under the different

18    scenarios or time frames or certain periods of

19    time with respect to what is owed to Lloyds

20    and what is owed to DEPFA --

21         Q.    Yes.

22         A.    -- under these documents by the

23    trust estate.  Now, whether or not -- that's

24    all I'm computing.

25         Q.    So, you're not expressing an

1              JACK E. BLUMENTHAL-9/20/11

2     opinion that there are amounts that ALL should

3     pay to Lloyds or DEPFA?

4          A.    That is correct.  That's outside

5     the scope of my engagement.

6          Q.    And would the same answer be true

7     for the trustee; that you're not expressing an

8     opinion that there are amounts that the

9     trustee owes to Lloyds or DEPFA?

10         A.    That is correct.

11         Q.    Earlier in your report when you say

12    "Overview Of Economic Loss Calculations" on

13    page 3 --

14         A.    Excuse me.  Is this the --

15         Q.    The original report, yes, yes.

16    What do you mean by, "economic loss"?

17         A.    Well, in this case, what I mean by

18    economic loss is, given the two scenarios and

19    given the two different points in time, it

20    really -- it doesn't -- it doesn't incorporate

21    what the interest on the money is that should

22    have been paid out to either of the party.

23              When I say, "interest," I'm not

24    talking about interest on the bond.  I'm

25    talking about interest on the fact -- interest

```
 1              JACK E. BLUMENTHAL-9/20/11

 2   associated with the payments that were not

 3   made in a timely fashion.

 4              Have I made myself clear there.

 5        Q.   That you are not including that

 6   interest?

 7        A.   If any, that's correct.

 8        Q.   You're referring to the time value

 9   of money?

10        A.   Yes, ma'am.

11        Q.   So, I understand it doesn't include

12   that.  What does it include?

13        A.   It includes, very simply, the

14   amount of money -- it's the net amount -- that

15   is to say -- if we look at it this way; what

16   should have been paid to Lloyds and what

17   should have been paid to DEPFA, minus what was

18   paid to Lloyds and what was paid to DEPFA,

19   without incorporating the concept of the time

20   value of those amounts over time that should

21   have been paid out or should not have been

22   paid out.

23        Q.   In your view, is economic loss

24   equal to economic damages?  Is it the same

25   concept?
```

1              JACK E. BLUMENTHAL-9/20/11

2         A.    Economic damages, as I understand

3    them, incorporate the concept of legal

4    measures of damage which is a legal -- has a

5    legal framework that can be set apart from an

6    economic framework.  And so when we talk

7    about -- when I talk about damages -- this is

8    my personal understanding.

9              To me, damages incorporate the

10   legal interpretation of the measure of damages

11   under those circumstances and directly to the

12   points here, I did not consider that.

13        Q.    So, is it correct that you are not

14   offering an opinion on damages suffered by

15   either Lloyds or DEPFA?

16             MR. BARRES:  Object to the form.

17        A.    I don't know if I'm going to be

18   asked to or not.

19        Q.    Is it correct that you haven't been

20   thus far asked to?

21        A.    That's correct.

22        Q.    As you sit here today, do you have

23   an opinion on whether Lloyds suffered damages

24   as distinct from how you've defined economic

25   loss?