UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A., | No. 10 CV 4424 (JPO) (AJP) |
| Plaintiff, | |
| v. | **PRETRIAL REPLY MEMORANDUM OF LAW OF DEFENDANT AND THIRD-PARTY PLAINTIFF <u>LLOYDS TSB BANK PLC</u>** |
| DEPFA BANK PLC and LLOYDS TSB BANK PLC, | |
| Defendants. | |
| DEPFA BANK PLC, | |
| Third-Party Plaintiff, | |
| v. | |
| ACCESS TO LOANS FOR LEARNING STUDENT LOAN CORPORATION and JPMORGAN CHASE BANK, N.A., | |
| Third-Party Defendants. | |
| LLOYDS TSB BANK PLC, | |
| Third-Party Plaintiff, | |
| v. | |
| ACCESS TO LOANS FOR LEARNING STUDENT LOAN CORPORATION, | |
| Third-Party Defendant. | |

Robert I. Bodian
David L. Barres
Omar A. Khondker
MINTZ LEVIN COHN FERRIS
GLOVSKY AND POPEO, P.C.
Chrysler Center
666 Third Avenue, 25th Floor
New York, New York 10017
(212) 935-3000
*Attorneys for Lloyds TSB Bank plc*

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ...................................................................................................... iii

PRELIMINARY STATEMENT .................................................................................................1

ARGUMENT ...............................................................................................................................2

I.   UNDER THE PLAIN, UNAMBIGUOUS TERMS OF THE DEPFA SBPA AND
     INDENTURE, THERE WAS NO AMENDMENT OF THE INDENTURE THAT
     REQUIRED DEPFA'S CONSENT .....................................................................................3

     A.   The Issuance of Additional Bonds, with Supporting Liquidity Facility, Is
          Not an Amendment of the Indenture. ......................................................................3

     B.   The Series V Bonds Are All in Parity .....................................................................5

II.  IF THE COURT CONSIDERS THE EXTRINSIC EVIDENCE, IT WILL ONLY
     CONFIRM THAT THERE WAS NO AMENDMENT OF THE INDENTURE
     THAT REQUIRED DEPFA'S CONSENT ..........................................................................8

     A.   The Extrinsic Evidence Confirms That the Issuance of Additional Bonds,
          with Supporting Liquidity Facility, Is Not an Amendment of the Indenture. .........8

          1.   Depfa's Practical Construction of the Depfa SBPA Confirms That
               There Was No Amendment of the Indenture. .................................................8

          2.   Depfa's Evidence of Alleged Industry Custom and Practice Is
               Insufficient as a Matter of Law. ...................................................................10

          3.   The Witness Testimony Cited by Depfa Cannot Establish an
               Amendment. ..................................................................................................12

          4.   The Other Evidence Cited by Depfa Cannot Establish an
               Amendment. ..................................................................................................13

     B.   Depfa Cannot Establish an Issuance of Senior Bonds That Are Not in
          Parity. .....................................................................................................................15

III. LLOYDS IS A THIRD-PARTY BENEFICIARY OF THE INDENTURE .......................19

IV.  ALL BREACHED ITS CONTRACTUAL OBLIGATIONS TO LLOYDS ....................21

V.   BNY BREACHED ITS CONTRACTUAL AND FIDUCIARY OBLIGATIONS
     TO LLOYDS .....................................................................................................................23

Page

VI.    DEPFA AND BNY'S ATTACKS ON LLOYDS' ECONOMIC EXPERT ARE
       UNFOUNDED...................................................................................................26

       A.    Depfa's Attacks on Mr. Blumenthal's Methods Have No Merit. ..........................26

       B.    BNY's Attacks on Mr. Blumenthal's Methods Have No Merit. ..........................30

VII.   LLOYDS IS ENTITLED TO BE INDEMNIFIED FOR ITS ATTORNEYS'
       FEES AND OTHER LITIGATION EXPENSES..............................................................32

CONCLUSION.................................................................................................................33

# TABLE OF AUTHORITIES

**Cases**                                                                                                   **Page(s)**

*British Int'l Ins. Co. v. Seguros La Republica S.A.,*
    342 F.3d 78 (2d Cir. 2003) .................................................................... 12

*Cabell v. Markham,*
    148 F.2d 737, 739 (2d Cir.), *aff'd,* 326 U.S. 404 (1945) ................................. 14

*Garratt v. Baker,*
    5 Cal. 2d 745, 56 P.2d 225 (1936) ................................................................ 19

*Health-Chem Corp. v. Baker,*
    915 F.2d 805 (2d Cir. 1990) ........................................................................ 22

*In re Central Medical Center, Inc.,*
    122 B.R. 568 (Bankr. E.D. Mo. 1990) ......................................................... 20

*India.com, Inc. v. Dalal,*
    412 F.3d 315 (2d Cir. 2005) ........................................................................ 6

*Kel Kim Corp. v. Central Markets, Inc.,*
    70 N.Y.2d 900, 524 N.Y.S.2d 384 (1987) ................................................... 21

*LNC Investments, Inc. v. First Fidelity Bank, N.A.,*
    935 F. Supp. 1333 (S.D.N.Y. 1996) ............................................................ 25

*Marx & Co. v. Diners' Club, Inc.,*
    550 F.2d 505 (2d Cir. 1977) ........................................................................ 32

*NML Capital v. Republic of Argentina,*
    17 N.Y.3d 250, 928 N.Y.S.2d 674 (2011) ................................................... 10

*Rowe v. Great Atl. & Pac. Tea Co.,*
    46 N.Y.2d 62, 412 N.Y.S.2d 827 (1978) ..................................................... 10

*Semi-Tech Litig., LLC v. Bankers Trust Co.,*
    353 F. Supp. 2d 460 (S.D.N.Y. 2005), *aff'd in relevant part,*
    *rev'd in part on other grnds*, 450 F.3d 121 (2d Cir. 2006) .............................. 24

*Shelby County State Bank v. Van Diest Supply Co.,*
    303 F.3d 832 (7th Cir. 2002) ...................................................................... 11

*Spinks v. Equity Residential Briarwood Apts.,*
    90 Cal. Rptr. 3d 453 (Ct. App. 2009) .......................................................... 19

**Page(s)**

*Travellers Int'l AG v. Trans World Airlines, Inc.,*
    722 F. Supp. 1087 (S.D.N.Y. 1989)..................................................................... 9

*Zalkind v. Ceradyne, Inc.,*
    124 Cal. Rptr. 3d 105 (Ct. App. 2011) ............................................................. 6


**Statutes and Rules**

Fed. R. Civ. P. 37(c)(1)................................................................................................. 32

Fed. R. Evid. 408(a) ..................................................................................................... 30

Fed. R. Evid. 702 .......................................................................................................... 26


**Other Authorities**

Municipal Securities Rulemaking Board, *Glossary of Municipal Securities Terms*
    (2d ed. 1984) ............................................................................................14, 19

www.msrb.org/About-MSRB.aspx................................................................................14

Defendant and third-party plaintiff Lloyds TSB Bank plc ("Lloyds") respectfully submits this pretrial reply memorandum of law for the upcoming bench trial of this matter, and in response to various legal arguments asserted by Depfa, BNY, ALL, and JPMorgan in their pretrial memoranda.[1]

## PRELIMINARY STATEMENT

Notwithstanding the great length of its brief, Depfa cannot identify a single word or contract right in the Indenture that was changed by the issuance of additional bonds supported by the Lloyds SBPA. Instead, Depfa's claims of "amendment" or "modification" wrongly assume that, at some point, Depfa had the right to be the only the bondholder paid out of the Series V trust collateral. When Depfa entered its SBPA, it bargained to be just one of an unlimited number of Senior Bond holders secured by a single pool of assets. Depfa was unable to obtain through bargaining any restriction whatsoever on the payment terms of any later-issued bonds or liquidity facilities. It should not now be able to obtain such a restriction through litigation.

Unable to prove an amendment, Depfa claims that there is an industry practice for bonds in "parity" to always receive equal or ratable payments of principal. But Depfa's interpretation of "parity" would require the Court to rewrite an Indenture that specifies the limited circumstances when bonds in parity are to be paid ratably (upon acceleration, or upon payment default caused by insufficient funds). Depfa's interpretation of "parity" depends on the opinion of an unqualified expert who, not surprisingly, has never once seen multiple bondholders receive ratable redemptions during pre-acceleration debt service.

---

[1]    All capitalized terms have the same definitions as in the Pretrial Memorandum of Law of Defendant and Third-Party Plaintiff Lloyds TSB Bank plc ("Lloyds' Pretrial Memorandum").

Because Depfa's claims have no merit, Lloyds is entitled to monetary relief from ALL (paid from the trust) and BNY (paid from its own pocket) that will make Lloyds whole for all amounts due on its bonds from May 2008.  ALL claims that it was impossible to redeem bonds on the quarterly and semi-annual dates in the Lloyds and Depfa SBPA's because the servicers did not report the student-loan collections until month end.  But if ALL could not know the amount of available collections on each mid-month redemption date, then, at very least, it should have redeemed bonds with the collections known to be available through the end of the preceding month.  It was not permitted to ignore the payment terms of the SBPA's.

Nor could BNY fulfill its contractual and fiduciary duties by executing ALL's defective payment instructions without question.  BNY apparently believes that it was free to do nothing other than check that ALL's signature was not forged on the payment directions.  But the terms of the Indenture, and the applicable law, do not define an indenture trustee's duties so narrowly.   Had BNY been slightly attentive, it would have seen that ALL was overpaying its administrative fees and underpaying the principal owed to Lloyds.  BNY easily could have prevented the resulting harm by refusing to execute the instructions and, if necessary seeking relief from the Court.  BNY therefore, is liable for the resulting damages.

## **ARGUMENT**

Depfa's contract interpretations are based almost entirely on extrinsic evidence, most notably the opinions of Joel Powers, the Utah transaction, and dictionary definitions. Conspicuously absent from Depfa's brief is any meaningful analysis of the language of the Depfa SBPA and Indenture.  The reason, of course, is that their plain terms confirm that there was no amendment of the Indenture.  But even if the Court were to find an ambiguity and consider extrinsic evidence, the evidence cited by Depfa cannot establish a breach.

**I.**

**UNDER THE PLAIN, UNAMBIGUOUS TERMS OF THE DEPFA
SBPA AND INDENTURE, THERE WAS NO AMENDMENT
OF THE INDENTURE THAT REQUIRED DEPFA'S CONSENT**

As fully explained in Point I of Lloyds' opening brief, there was no amendment of the Indenture though the issuance of (a) additional bonds with supporting SBPA, or (b) non-parity bonds.  Depfa can cite no contract language that shows otherwise.

**A.    The Issuance of Additional Bonds, with Supporting
Liquidity Facility, Is Not an Amendment of the Indenture.**

Depfa claims that the waterfall of the Indenture was amended because Depfa's redemption schedule was added to the Indenture waterfall in 2005, and then Lloyds' redemption schedule was added to the waterfall in 2006.  (*See* Depfa's Pretrial Memorandum, pp. 10, 32.)  Although both banks are entitled to be paid under the fifth paragraph of the waterfall, it does not follow that there was an amendment.

Section 5.3(B)(5) of the Indenture provides for the payment of interest and principal when due on Senior Bonds, but it does not specify when and how the payments are to be made on different series of Senior Bonds.  (*See* Trial Ex. 1.)  That information must be obtained from the Supplemental Indentures and Credit Enhancements.  Section 5.3(E) requires payment of any amount due under a Credit Enhancement (including an SBPA) "in such order of priority with respect to clauses (5) through (8) of subsection (B) above as may be specified in such Supplemental Indenture."  (*Id.*)  Then, consistent with Section 5.3(E) of the Indenture, the Supplemental Indentures confirm that the principal and interest owed to a liquidity provider are paid under the fifth paragraph of the waterfall.  (Trial Ex. 2, § 14.4(d); Trial Ex. 3, § 17.4(d).)  There provisions, however, do not operate to change the waterfall.

When Depfa entered its SBPA, it could not reasonably believe that, if it were forced to buy bonds under its SBPA, they would be the only Senior Bonds paid under the waterfall. The Indenture expressly authorizes the issuance of additional bonds with Credit Enhancements, and it requires that they be paid according to the terms of their Supplemental Indentures and Credit Enhancements. (*See* Trial Ex. 1, §§ 2.1, 2.4, 5.3(E), 7.1(9).) Depfa, therefore, bargained to be one of potentially many Senior Bond holders being paid under the fifth paragraph of the waterfall. Indeed, the very purpose of a master indenture is to provide for multiple bond issues.

For this reason, Depfa is wrong to dismiss Section 7.1(9) as irrelevant merely because Depfa was not yet a bondholder. (Depfa's Pretrial Memorandum, p. 38.) Depfa, of course, knew that it could become a bondholder. That was the whole point of its SBPA, which was entered on the same date as the Indenture. Also, Section 7.1(9) authorizes Supplemental Indentures "to provide for the issuance of any series of Bonds, and in connection therewith to provide for rights, preferences, privileges, terms and conditions applicable only to such series of Bonds." It was one of several provisions of the Indenture that put Depfa on notice that, at any time, new bonds with different terms could be issued. Because the waterfall provides generally for the payment on Senior Bonds without restricting the number of such bonds or bondholders (*see* Trial Ex. 1, § 5.3(B)(5)), the issuance of new Senior Bonds could not amend the waterfall.

Equally unavailing is Depfa's citation of Section 7.5 of the Indenture and Section 14.4(f) of the First Supplemental Indenture. (Depfa's Pretrial Memorandum, p. 38.) These provisions incorporate the consent provisions of the Depfa SBPA, but they do not in any way change or add to those provisions. Thus, there is no violation of Sections 7.5 and 14.4(f) for all

of the same reasons there is no violation of Section 5.03(a) of the Depfa SBPA.  (*See* Lloyds'

Pretrial Memorandum, Points I-II.)

Ironically, Depfa cites Section 8.11 of its SBPA (Depfa's Pretrial Memorandum,

p. 13), which reads in relevant part:

> [T]he obligations of the Issuer under this Agreement shall be absolute,
> unconditional and irrevocable and shall be . . . performed strictly in accordance
> with the terms of this Agreement under all circumstances whatsoever, including,
> without limitation, the following circumstances:
> . . . .
> (b)      any amendment to . . . the terms of . . . any of the Related Documents.
> (Trial Ex. 4, § 8.11(b).)

The definition of "Related Documents" includes the Indenture.  (*Id.*, p. 5.)  Under Section 8.11,

ALL's obligations (including those concerning amendments to the Indenture) are absolute and

unconditional, but are to be performed only "strictly" according to the contract's terms.  This

clause suggests that ALL's consent obligations should be read literally and narrowly, not

expansively.  For this additional reason, there is no violation of Section 5.03(a), which by its

plain terms requires Depfa's consent only to amendments and not supplements to the Indenture.

**B.    The Series V Bonds Are All in Parity.**

Depfa's interpretation of "parity" is based almost entirely on extrinsic evidence

that, as will be explained later, is legally insufficient.  The only contract provision cited by Depfa

is the definition of "Senior Bonds" in the Indenture.  (Depfa Pretrial Memorandum, pp. 5, 35.)

That provision should be read in context with the other bond definitions:

> "Senior Bonds" means any Bonds which are secured by a lien on and
> payable from the Pledged Assets prior to all other Bonds except those issued on a
> parity as to payments therewith.

"Senior Subordinate Bonds" means any Bonds which are secured by a lien on and payable from the Pledged Assets on a basis subordinate to the Senior Bonds and prior to the Subordinate Bonds and the Junior Subordinate Bonds.

"Subordinate Bonds" means any Bonds which are secured by a lien on and payable from the Pledged Assets on a basis subordinate to the Senior Bonds and the Senior Subordinate Bonds and prior to the Junior Subordinate Bonds.

"Junior Subordinate Bonds" means any Bonds which are secured by a lien on and payable from the Pledged Assets on a basis subordinate to the Senior Bonds, the Senior Subordinate Bonds and the Subordinate Bonds.
(Trial Ex. 1, pp. 6, 11-12, emphasis in original.)

These definitions correspond to the waterfall steps for each of the four levels of bonds that can be issued under the Indenture. (Trial Ex. 1, § 5.3(B)(5)-(8)). These definitions indicate that Senior Bonds are on a parity with each other, which means they have an equal-priority lien against the Pledged Assets, and a higher-priority lien than subordinate series of bonds. The phrase "on a parity as to payments therewith," in the definition of "Senior Bonds," simply means that the bonds get paid at the same level of the waterfall, but it does not specify the timing or amount of such payments. It cannot mean pro rata payments at all times. Such an interpretation would (a) conflict with the clauses that require the payment of all bonds according to whatever terms are set in their Supplemental Indentures and Credit Enhancements (*see id.*, §§ 2.4, 5.3(E), 7.1(9)); and (b) render superfluous the clauses of Section 9.4(A) that specify when Senior Bonds are to be paid on a pro rata basis. The law prohibits such an interpretation. *See Zalkind v. Ceradyne, Inc.*, 124 Cal. Rptr. 3d 105, 116 (Ct. App. 2011) ("The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other."); *India.com, Inc. v. Dalal*, 412 F.3d 315, 323 (2d Cir. 2005) ("[U]nder New York law, effect and meaning must be given to every term of the contract, and reasonable effort must be made to harmonize all of its terms.").

As provided in Section 9.4(A), the principal on Senior Bonds is paid ratably only when (a) there is a failure to pay principal when due, and there are insufficient funds available to fully pay the amount then due (*id.*, § 9.4(A)(1)(SECOND)), and (b) when all amounts due have been accelerated (*id.*, § 9.4(A)(2)).  As explained previously, these conditions have not yet occurred. (Lloyds' Pretrial Memorandum, pp. 12, 20.)  Depfa may try to argue that these conditions are satisfied because, but for the Wisconsin court injunction of March 24, 2010 (Trial Ex. 151), it would have caused an acceleration.  But it would be inappropriate to speculate on what Depfa would have done under different circumstances.  The Indenture conditions ratable payments on an acceleration of the principal due of all of the bonds.  (Trial Ex. 1, § 9.4(A)(2).) It does not matter why an acceleration has or has not occurred.

Nor does it matter that the asset-liability ratio of the trust is deteriorating.  (*See* Depfa's Pretrial Memorandum, pp. 17-18.)  The Indenture does not provide for pro rata payment when a future payment default becomes foreseeable.  It provides for pro rata payment only if there are insufficient funds to pay principal "then due on the Bonds" (Trial Ex. 1, § 9.4(A)), and "which shall have become due" and "according "to the amounts of principal due on such date" (*id.* § 9.4(A)(1)(SECOND)).  Thus, absent acceleration, pro rata payments are to be made only *after* a required payment is missed because of insufficient funds.  Because the SBPA's use a cash-sweep system (requiring redemption only if there are available funds prior to maturity in five or ten years), this condition cannot be satisfied until the Lloyds bonds begin to mature in 2013.  At that point, payment will be due on the bonds regardless of whether any funds are available.

Given the language of the Indenture, Depfa cannot establish that it was ever entitled to pro rata payments of principal.

## II.

### IF THE COURT CONSIDERS THE EXTRINSIC EVIDENCE, IT WILL ONLY CONFIRM THAT THERE WAS NO AMENDMENT OF THE INDENTURE THAT REQUIRED DEPFA'S CONSENT

As explained above and in Lloyds' opening brief, the Court should dismiss Depfa's claims for breach of contract based on the unambiguous terms of the contracts. But even if the Court were to consider extrinsic evidence, Depfa still cannot prove a breach.

**A.     The Extrinsic Evidence Confirms That the Issuance of Additional Bonds, with Supporting Liquidity Facility, Is Not an Amendment of the Indenture.**

**1.     Depfa's Practical Construction of the Depfa SBPA Confirms That There Was No Amendment of the Indenture.**

There is a factual dispute as to when Depfa learned of the payment terms in the Lloyds SPBA. Depfa says it was in June or July 2009. (Depfa's Pretrial Memorandum, p. 23.) Lloyds says it was in June 2006, when Ms. Peterson told Mr. Park about Lloyds' five-year term-out, and again in July 2006, when she sent him the Offering Memorandum describing those terms. (Lloyds Pretrial Memorandum, pp. 8-9, 24.)

It is *undisputed*, however that Depfa knew, before the closing of the 2006 transaction, that ALL was going to issue the Series V-A-3, V-A-4, and V-A-5 Bonds pursuant to a Second Supplemental Indenture supported by a Lloyds SBPA. Depfa obtained such knowledge by bidding to be the liquidity provider for the transaction, and through oral and written communications with Ms. Peterson. (*See* Trial Exs. 43, 49; Trial Ex. 176, p. 8.) Yet Depfa did not complain about an alleged amendment until three years later. Depfa therefore understood, at the very least, that a supplemental indenture to issue additional bonds, with SBPA, is not an amendment to the Indenture within the meaning of Section 5.03(a) of the Depfa SBPA.

In response, Depfa cites Section 8.01, which provides that "[n]o failure or delay . . . in exercising any right, power or privilege hereunder and no course of dealing shall operate as a waiver thereof." (Trial Ex. 4.) But for three years, Depfa knew about the 2006 transaction and did not assert its right of consent, while it reaped the benefit of that transaction in the form of new collateral securing the bonds supported by its SBPA. So even if Depfa had the right to consent, it waived that right notwithstanding any no-waiver clause. *See, e.g., Travellers Int'l AG v. Trans World Airlines, Inc.*, 722 F. Supp. 1087, 1098 (S.D.N.Y. 1989) (although contract contained a no-waiver clause, defendant waived its right to cancel the contract by continuing to accept the benefit of the contract for over a year after the event that would have permitted termination).

Furthermore, Section 8.01 concerns only waiver. It does not concern the doctrine of practical construction, which holds that a party's conduct is the best evidence of the meaning of a contract. (*See* Lloyds' Pretrial Memorandum, pp. 22-23, citing cases and record.) By allowing years to pass without objecting to the Lloyds transaction, and then objecting only after the Insurer collapsed and Depfa faced a risk of loss, Depfa confirmed by its practical construction that its SBPA did not grant a right to consent to the issuance of additional bonds.

Nor can ALL be faulted for not drawing Depfa's attention to Lloyds' payment terms in 2006. The transaction did not fall within Depfa's consent right, and ALL was not required to alert Depfa anyway just in case Depfa might want to manufacture a groundless claim (as it did three years later). In 2006, both Depfa and ALL acted consistently with there being no right of consent – which, in fact, was the case.

Finally, Depfa continues today to act inconsistently with its theory of the case. Depfa requests that the Court declare the 2006 transaction illegal and bar further redemption of

Lloyds' bonds until Depfa's bonds are paid in full. (Depfa's Pretrial Memorandum, p. 63.) But if the 2006 transaction were illegal, Depfa's remedy would be the payments it would have received if the 2006 transaction had never occurred. That amount would equal the bond redemptions and interest that would have been paid if approximately $190,000,000 of new collateral had not been added to the trust in 2006. Such a computation would require complex expert analysis. By not even attempting it, Depfa implicitly concedes that it had no right to consent to an issuance of additional bonds with an SBPA.

      2.      **Depfa's Evidence of Alleged Industry Custom and Practice Is Insufficient as a Matter of Law.**

Depfa argues that Section 5.03(a) of the Depfa SBPA requires its consent to the issuance of additional bonds because it does not expressly carve-out such a right. Depfa also alleges that such a carve-out is standard industry practice. (Depfa's Pretrial Memorandum, pp. 11-12, 38-39.) In substance, Depfa argues that a contract right not expressly excluded should be considered included.

The law, however, says the opposite. Terms that are not expressly included are presumed to be excluded, especially in contracts among commercially sophisticated parties. *See, e.g., Rowe v. Great Atl. & Pac. Tea Co.*, 46 N.Y.2d 62, 72, 412 N.Y.S.2d 827, 833 (1978) ("[C]ourts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include. . . ."); *NML Capital v. Republic of Argentina*, 17 N.Y.3d 250, 259-60, 928 N.Y.S.2d 666, 674 (2011) (role of court is to enforce parties' agreement, "not to add, excise or distort the meaning of the terms they chose to include").

Depfa relies primarily on the expert opinion of Joel Powers. He acquired all of his bond-transaction experience working for only one bank from 1999-2009. (Trial Ex. 189, pp. 2-3.) He has worked on only 8-12 SBPA's, and he never once drafted or negotiated the consent provision of an SBPA. (Powers Dep. at 22:10-15, 26:5-15, 42:11-16.) He is not qualified to give an expert opinion on industry custom and practice with respect to consent provisions like the one at issue here. For all of the reasons stated in BNY's Motion to Exclude Proposed Expert Testimony of Joel Powers and Steve Thel, the Court should not permit Mr. Powers to testify.

Depfa also relies on an SBPA between Depfa and the State of Utah which, in its consent provision, refers to "amendments relating to the issuance from time to time of additional bonds under the Indenture." (Depfa's Pretrial Memorandum, pp. 11-12, quoting Trial Ex. 21.) But a contract between Depfa and Utah is irrelevant to construction of a contract between Depfa and ALL. *See, e.g., Shelby County State Bank* v. *Van Diest Supply Co.*, 303 F.3d 832, 837 (7th Cir. 2002). Depfa can cite no evidence that ALL and BNY ever saw the consent provision of the Utah SBPA, or that it played any role in the negotiation of the Depfa SBPA. Depfa can cite only a "vestigial" reference to a usury provision under Utah law which appeared in the first draft of the Depfa SBPA circulated to the parties. (Depfa's Pretrial Memorandum, p. 12 n.4, citing Trial Ex. 19, § 4.08.) That usury provision is not relevant to any issue in this case.

Because a right to consent to additional bonds is so extraordinary, the industry practice is to expressly include such a right when it is intended. (*See* Trial Ex. 192, pp. 3, 5; *see also* Trial Ex. 1, § 8.6(b)(xii), expressly including Ambac's right to consent to additional bonds.) There is no industry practice of expressly carving out the right to consent to additional bonds when it is not intended. (Trial Ex. 192, p. 2.) But even if there were, Depfa cannot meet its burden of proving that ALL and BNY were aware of that alleged practice and contracted in

reference to it.  *See British Int'l Ins. Co. v. Seguros La Republica S.A.*, 342 F.3d 78, 84 (2d Cir. 2003).  For all of the reasons stated in Lloyds' Motion *in Limine* to Exclude Evidence of Utah Transaction, Including Trial Exhibit 21, Depfa should not be permitted to rely on the Utah SBPA or any other evidence of that transaction.

**3.    The Witness Testimony Cited by Depfa Cannot Establish an Amendment.**

Depfa cites testimony of Elaine Bayus (bond counsel) and Théa Watkins (Lloyds officer) that an Indenture can be amended through the addition of terms.  (Depfa's Pretrial Memorandum, p. 30.)  But both witnesses testified that they understand the terms "supplement" and "amend" to normally be distinct, with "supplement" referring to the performance of an act authorized to be done by supplemental indenture, such as issue additional bonds, while "amend" means changing the terms of the indenture.  (Bayus Dep. at 98:9-13, 99:22-100:6; Watkins Dep. at 107:24-108:20.)  It is not necessary for the Court to decide whether, in some other circumstance, adding a term to the Indenture could change a term.  The contract language and extrinsic evidence each establish overwhelmingly that the issuance of additional bonds with an SBPA was not an amendment, which is all that matters.

Depfa purports to cite testimony by Ms. Bayus (given in response to leading and suggestive questions) about how Section 17.4(d) of the Second Supplemental Indenture added a new term to the waterfall.  (Depfa's Pretrial Memorandum, p. 15, citing Bayus Dep. at 89:4-20.)  But as she explained only moments earlier, the Indenture already contained a provision, Section 5.3(E), that provided a place in the waterfall for payments to providers of Credit Enhancements.  (Bayus Dep. at 86:15-87:7.)  Section 17.4(d), therefore, did not change any term of the waterfall.  It confirmed that the amounts due as principal and interest under the Lloyds SBPA will be paid under the fifth paragraph of the waterfall in accordance with Section 5.3(E).  (*See* Trial Ex. 3,

§ 17.4(d).)  Because Section 5.3(E) provides that the Credit Enhancements of all present and future series of bonds will be paid under the waterfall, the payment of a subsequent liquidity provider under the waterfall does not change it, but rather applies it as originally contemplated. (*See* Trial Ex. 1, § 5.3(E).)

Depfa also cites testimony of Christopher Chapman, ALL's former president, that a supplemental indenture is an amendment.  (Depfa's Pretrial Memorandum, p. 37.)  Depfa describes him as "the least biased" witness (*id.* at 34), but they could more accurately have described him as the least informed witness.  Mr. Chapman testified that the transaction was negotiated for ALL by Ms. Peterson rather than himself (Chapman Dep. at 22:10-15, 40:25-41:10, 46:4-8, 47:9-15. 98:14-99:9); that he spent only 5% of his work time on the Series V transaction when it was being negotiated (*id.* at 20:23-22:9); and that he does not remember what ALL intended when it signed the Indenture and Depfa SBPA (*id.* at 145:9-146:7, 147:10-13).  He also testified that a supplemental indenture can be distinct from an amendment.  (*Id.* at 118:12-16.)  His testimony, therefore, cannot establish an amendment.

Ms. Peterson, as ALL's lead negotiator, has far greater knowledge of ALL's intent.  She testified in her deposition, and is expected to testify at trial, that she understood that a supplement is not an amendment (Peterson Dep. at 49:5-13), and that Depfa was not being given the right to consent to supplemental indentures that issue additional bonds or subsequent liquidity providers (*id.* at 51:9-54:2).  Ms. Peterson also testified that Depfa having that right of consent "clearly was something we could not and would not accept."  (*Id.* at 51:9-15.)

4.    **The Other Evidence Cited by Depfa Cannot Establish an Amendment.**

The other extrinsic evidence cited by Depfa is equally unpersuasive.  For example, Depfa cites to dictionary definitions of "amend," and notes that some of them include

-13-

adding terms to a document.  (Depfa's Pretrial Memorandum, p. 30.)  But as aptly stated by Judge Hand in the analogous area of statutory construction, "it is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary; but to remember that [writings] always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning."  *Cabell v. Markham*, 148 F.2d 737, 739 (2d Cir.), *aff'd*, 326 U.S. 404 (1945).  In a complex, industry-focused transaction like this one, resort to a standard dictionary is of little use.  The parties' usage of the terms "supplement" and "amend," and their pre-dispute conduct, confirms that they did not consider a routine, authorized issuance of additional bonds to be an amendment.

If the Court wishes to consult a glossary, it should use one in the industry.  The Municipal Securities Rulemaking Board ("MSRB") is a self-regulatory organization created by Congress to oversee firms engaged in municipal securities business.  *See* www.msrb.org/About-MSRB.aspx.  Its glossary defines a "Supplemental Indenture" as:

> An agreement entered into by an issuer that supplements the issuer's master indenture or trust indenture.  *Often, a supplemental indenture is executed in connection with the issuance of one or more series of additional bonds under the master or trust indenture*.  In some cases, a supplemental indenture merely *amends terms* of the master or trust indenture without providing for the issuance of additional bonds.  (MSRB Glossary, Trial Ex. 191, emphasis added.)

This industry definition, like the Indenture, distinguishes between a supplemental indenture that issues additional bonds (*see* Trial Ex. 1, § 7.1(9)) and one that amends the Indenture (*see id.* § 7.5).

Depfa also cites the statement of Martha Peterson, in two letters, that Depfa cannot be given the same payment terms as Lloyds without the consent of both Ambac and Lloyds.  (Depfa's Pretrial Memorandum, p. 36, citing Trial Exs. 10-11.)  It appears that Ms.

Peterson overstated the required consents.  Ambac has the right to consent to any amendment of the Indenture or the Insured Bonds (Trial Ex. 1, § 8.6(xi)), and a change of Depfa's payment schedule would be an amendment of its bonds.  Lloyds, in contrast, has the right to consent only to amendments of the Indenture (Trial Ex. 5, § 5.03(a)), and it appears that a change in Depfa's payment terms would amend the Depfa SBPA but not the Indenture.  Of course, there is no need to speculate about Lloyds' consent rights in a transaction that was never done.  The Court need only decide whether the Second Supplemental Indenture and Lloyds SBPA amended the Indenture, which, as already explained, they did not.

Even if ALL were willing and able to place Depfa on the Lloyds payment schedule, it can be safely assumed that ALL would have extracted a much lower interest rate from Depfa in return.  Depfa bargained for the much higher interest rate, and higher investment risk, that goes with having a longer maturity period.  In the absence of any contract language that limits the payment terms of any additional bonds, a sophisticated party like Depfa had absolutely no right to assume that a future liquidity provider would make the same risk-versus-return decision as Depfa, or would structure its own deal to serve Depfa's interests.

## B.    Depfa Cannot Establish an Issuance of Senior Bonds That Are Not in Parity.

To a large extent, Depfa's position on parity depends on the misunderstanding of the term "liquidation."  Several parties testified in their depositions that, if the trust collateral is liquidated after payment default, the proceeds of the sale will be distributed pro rata to the bondholders.  (*See, e.g.,* Bayus Dep. at 46:16-22; Davis Dep. at 178:13-179:3, 213:21-214:2; Chapman Dep. at 103:3-104:8; Roemlein Dep. at 90:2-9.)  Depfa, however, uses the term "liquidation" loosely to refer to any conversion of student loans to cash, even during normal, pre-

acceleration debt service, and argues that all student-loan collections be distributed pro rata at all times.  Again, Depfa asks the Court to ignore or rewrite contract terms.

The Indenture uses the term "liquidation" to refer only to the liquidation of the assets of an entity, as occurs in a bankruptcy.  (*See* Trial Ex. 1, pp. 6, 7, 11, 44, definitions of "Fitch," "Moody's," "S&P," and "Insurer Event of Insolvency.")  Student-loan collections, instead, are classified either as "Recoveries of Principal" or "Revenues."  (*Id.* at 10-11.)  The Indenture instructs that Revenues are to be used to pay interest and principal on bonds after paying certain higher-priority expenses (*see id.* § 5.3(B)(1)-(5)), while "Recoveries of Principal" are also to be used to pay interest and principal on bonds on the required payment dates, when those funds are not permissibly being used for loan recycling and other expenses (*see id.* § 5.4(A), (B)(i)-(iv)).  But whatever amounts are held by the trust are paid pro rata only upon acceleration or payment default caused by insufficient funds.  (*Id.* § 9.4(A)(1)-(2).)  The provisions of Section 9.4(A) refer to "the funds held by the Trustee" and "any other amounts received or collected by the Trustee" (*id.* § 9.4(A)), and to "the amount available" or "amounts available" (*id.* § 9.4(A)(1)(FIRST) and (SECOND)).  They draw no distinction between principal and interest collections.

So it does not matter whether one calls the student-loan collections "liquidated collateral" or anything else.  The Indenture specifies the limited circumstances when any trust funds are to be paid pro rata, and those conditions have not yet occurred.

Repeatedly, Depfa refers to Lloyds having received an improper "priority" of payment, or "preferential" payment terms.  (*See* Depfa's Pretrial Memorandum, pp. 16, 22-23, 25.)  But as already explained, bonds in parity have an equal priority of lien on the collateral, which causes them to be paid ratably under certain circumstance specified in the Indenture.

Depfa can cite no provision that requires parity bonds to be paid ratably from the collateral under all circumstances.  Depfa's complaints about "priority" and "preference" ignore the fact that it obtained a much higher interest rate than Lloyds and, as a result, has received higher payments overall from the trust.  (Trial Ex. 185, showing total payment of $46,977,100 to Depfa and $41,625,470 to Lloyds.)

For its interpretation of "parity," Depfa relies heavily on the opinion of Mr. Powers, a former banker, who claims it is standard industry practice for principal to be paid pro rata from available funds during pre-acceleration debt service, no matter what the contract terms, while interest gets paid according to the contract terms.  (*See* Trial Ex. 189, pp. 5, 16 & n.17, 21.)  But Mr. Powers testified has he has seen only three transactions in which a bondholder was paid its pro rata share of principal, and in those transactions, he had no knowledge of what any bondholder other than his own employer was being paid.  (Powers Dep. at 56:8-58:8.)  He therefore lacks the experience to give an expert opinion on the alleged custom and practice.

In contrast, Lloyds' expert, Robert Dean Pope, is a bond lawyer who has worked on hundreds of indentures that contain substantially identical parity provisions as the Series V Indenture.  (Trial Ex. 187, p. 10.)  He opined that it is the normal industry practice for parity bonds to be paid according to whatever schedule is set by their issuing documents, including any credit enhancement.  Payments are made pro rata only when the parity debt has been accelerated. (*Id.* at 8.)  He further testified that what Mr. Powers says should not be done – payments to bondholders above their pro rata shares – is done every day in the bond industry.  (Trial Ex. 192, p. 7.)

Depfa also relies on the testimony of Mr. Chapman that bonds in parity typically get paid in equal shares. (Depfa's Pretrial Memorandum, pp. 34-35, citing Chapman Dep. at 67:15-68:4.) But Mr. Chapman also testified that he does not know if bonds in parity must receive equal redemptions or interest payments. (Chapman Dep. at 73:21-74:14, 108:8-11.) He also testified that, in his experience, bonds in parity can have different maturity dates and periods. (*Id.* at 107:21-108:7.) Depfa touts his industry experience (Depfa's Pretrial Memorandum, p. 34), but Mr. Chapman had worked on only five or six bond deals as an associate in a law firm, in which he never negotiated an indenture or served as lead counsel (Chapman Dep. at 12:15-24, 14:4-17:3), and on another ten or fewer bond deals at ALL, where he was not involved in the negotiations (*id.* at 20:8-22:9). In addition, he signed several documents in 2006 that confirmed the legality of that transaction (Trial Ex. 5, §§ 4.03, 4.11; Trial Ex. 61, ¶ 14), and that all five series of bonds are in parity (Trial Ex. 57, pp. ALL0001523, 1528, 1533). Given his conflicted testimony, limited experience, and lack of knowledge of ALL's intentions (*see supra* p. 11, citing his deposition), his testimony cannot support Depfa's definition of parity.

Finally, Depfa complains that the ALL made optional redemption payments favorably to Lloyds, rather than on a pro rata basis. (Depfa's Pretrial Memorandum, pp. 21, 51-52.) But as ALL confirmed in its interrogatory answers and correspondence, all of the redemptions (except the one on November 5, 2009) were mandatory rather than optional redemptions intended to give effect to the banks' contractual redemption schedules. (Trial Ex. 178, last page; Trial Ex. 10.) Depfa's argument also fails because there are no terms requiring optional redemptions to be pro rata. Instead, the SBPA's provide that optional redemptions shall be in an amount no less than the lesser of $1,000,000 or the outstanding

principal amount.  (Trial Exs. 4-5, § 3.02.)  Once again, Depfa is trying to read restrictions into the bond payment terms that do not exist.

## III.

### LLOYDS IS A THIRD-PARTY BENEFICIARY OF THE INDENTURE

Incorporating an argument made by JPMorgan against Depfa (JPMorgan's Pretrial Brief, Point II), BNY incorrectly asserts that Lloyds and Depfa cannot recover for breaches of the Indenture because they are not third-party beneficiaries thereof.  (BNY's Pretrial Memorandum, p. 47 n.21.)

A third party may enforce a contract when he or she is a member of a class of persons for whose benefit the contract was made.  *Garratt v. Baker*, 5 Cal. 2d 745, 748, 56 P.2d 225, 226 (1936).  The test is whether an intent to benefit a third person appears from the terms of the contract.  *Spinks v. Equity Residential Briarwood Apts.*, 90 Cal. Rptr. 3d 453, 468 (Ct. App. 2009).  A trust indenture is, by definition, "A contract between the issuer of municipal securities and a trustee for the benefit of the bondholders," under which "[t]he trustee administers the funds or property specified in the indenture in a fiduciary capacity on behalf of the bondholders." (MSRB Glossary, Trial Ex. 191, definition of "Trust Indenture.")

The Indenture states, right up front, that the Issuer and Trustee have entered into it to secure "(1) the payment of the principal of and the interest . . . on the Bonds at any time issued and Outstanding under the Indenture according to their tenor and effect," and "(2) the performance and observance of all of the covenants and conditions in said Bonds."  (Trial Ex. 1, p. 2.)  To achieve this purpose, the Indenture grants a first-priority lien "forever *for the benefit of the owners of the Bonds (and for the benefit of (i) any Credit Provider . . .* )."  (Trial Ex. 1, p. 2, emphasis added.)  Thus, the very purpose of the document is to benefit the bondholders by

securing the bonds and providing for their payment.  *See In re Central Medical Center, Inc.*, 122 B.R. 568, 573-74 (Bankr. E.D. Mo. 1990) (construing similar clause as making bondholders the intended beneficiaries of the indenture).

The Indenture also requires the timely payment of principal and interest to the bondholders (*id.* § 5.3(B)(5)-(8), (F)), and it requires the payment to any Credit Provider of all amounts due under a Credit Enhancement (*id.* § 5.3(E); Trial Ex. 2, § 13.3; Trial Ex. 3, § 16.3). Not only does the Indenture incorporate the payment terms of the SBPA's; the SBPA's, in turn, incorporate the terms of the Indenture.  (*See* Trial Exs. 4-5, containing over 70 references to the "Indenture" and "Related Documents.")

So it is obvious that Lloyds and Depfa, as bondholders and liquidity providers, are third-party beneficiaries of the Indenture.  The Indenture, in turn, incorporates the provisions of the Certificate and Agreement (Trial Exs. 6-7) that specify when Loan Account funds must be used for bond redemption rather than loan recycling.  (*See* Trial Ex. 1, §§ 5.4(C)(2)(c), 6.8(B)(3).)  Lloyds and Depfa therefore have the right to enforce the relevant provisions of the Certificate and Agreement as well.

Also, potential liquidity providers review the Indenture and the Certificate and Agreement to understand their rights to the trust collateral that will be held for their benefit, and to understand the restrictions on the use of that collateral imposed on the Issuer and Trustee.  It is absurd to suggest that the Issuer and Trustee are free to disregard the terms of these documents while the bondholders must helplessly watch.

**IV.**

**ALL BREACHED ITS CONTRACTUAL OBLIGATIONS TO LLOYDS**

As explained in Lloyds' opening brief, ALL failed to redeem Lloyds' bonds according to the schedule in Section 3.02 of the Lloyds SBPA.  (Lloyds' Memorandum, pp. 39-40.)  ALL's primary defense is that it was impossible to pay on the banks' quarterly and semi-annual redemption dates, measured from each purchase date, because ALL received the servicers' reports (concerning the collections on the student loans) only once per month, and also needed to accrue for the higher-priority expenses and interest.  (*See* ALL's Pretrial Memorandum, pp. 19-20.)  ALL claims that it made the required payments to the extent possible. (*Id.* at 18, 27.)  But that is not the case.

"Impossibility excuses a party's performance only when the destruction of the subject matter of the contract or the means of performance makes performance objectively impossible.  Moreover, the impossibility must be produced by an unanticipated event that could not have been foreseen or guarded against in the contract."  *Kel Kim Corp. v. Central Markets, Inc.*, 70 N.Y.2d 900, 902, 524 N.Y.S.2d 384, 385 (1987).  Because ALL entered into two SBPA's requiring payments keyed off of bank purchase dates (*see* Trial Exs. 4-5, § 3.02), and because it knew about the other expenses to be paid under the waterfall (*see* Trial Ex. 1, § 5.3(B)(1)-(5)), ALL easily could have anticipated the present situation.  ALL might have guarded against it by seeking a simpler payment schedule, such as all redemptions on calendar quarter-end dates.

The defense also fails because performance, while administratively inconvenient, has not been rendered impossible.  Ms. Peterson testified that the servicers reported the loan collections on a monthly basis, and that their reports were issued in the early part of the

-21-

following month.  (Peterson Dep. at 78:1-8.)  She also testified that the amount of some waterfall

expenses, like payments to the Department of Education, were not known until the following

month.  (*Id.* at 78:8-79:6.)  Although ALL did not know the amount of student-loan collections

on each redemption date, it knew the amount of collections through the end of the preceding

month.  So for example, when Lloyds had a redemption date on May 11, 2009, ALL could have

redeemed bonds on that date based on the amounts known to be available through April 30,

2009.

Had ALL done so, it might then argue "that it took virtually every action within

its power to perform its duties under the contract," which is a required element of the defense of

impossibility.  *Health-Chem Corp. v. Baker*, 915 F.2d 805, 810 (2d Cir. 1990).  Instead, ALL

totally disregarded the payment schedule and (as explained in Point VI.B) reserved far more than

necessary to cover estimated interest and expenses.

BNY cites Section 3.03 of the SBPA's, which provides that if principal is not paid

when due, "such overdue principal . . . shall bear interest from the date such principal amount . . .

was due until paid in full . . . at a rate per annum equal to the Default Rate, such interest to be

payable upon demand of the Bank."  (Trial Exs. 4-5.)  Section 3.03 is a penalty provision that

allows the banks to charge a higher interest rate upon payment default – an option neither bank

has exercised.  Section 3.03 does not authorize missing redemption dates, and therefore is

irrelevant.

JPMorgan and BNY argue that Depfa (and by implication, Lloyds) were only

entitled to redemptions from available Revenues and not Recoveries of Principal.  (*See, e.g.,*

JPMorgan's Pretrial Memorandum, pp. 42-43.)  As previously explained, Sections 5.4(A)(ii) and

5.4(B)(iv) of the Indenture entitled the banks to the payment of scheduled redemptions with

Recoveries of Principal (*i.e.*, Loan Account funds) once loan recycling was suspended.  (Lloyds'

Pretrial Memorandum, Point III.)

JPMorgan tries to dismiss Section 4.2 of the Certificate and Agreement (Trial

Exs. 6-7) as being only within Ambac's control.  But whether the banks had control is

immaterial.  Because Ambac never exercised its right to authorize the resumption of loan

recycling, ALL was required by the Certificate and Agreement, and by the Indenture provisions

incorporating it, to use the Recoveries of Principal to redeem bonds rather than recycle loans.

The fact that ALL used those funds to redeem bonds (albeit not on the required schedule)

confirms that ALL understood that the Bank Bond holders were entitled to those funds.

## V.

## BNY BREACHED ITS CONTRACTUAL AND FIDUCIARY OBLIGATIONS TO LLOYDS

The substance of BNY's argument is that, as indenture Trustee, it was not

required to do anything more than confirm that ALL's payment instructions were signed by an

authorized officer.  BNY greatly understates its obligations.

For example, BNY asserts that there are no contract provisions that require it to

make redemption payments without direction from ALL.  Actually, Section 5.3(B)(5) and 5.3(E)

require the Trustee to pay principal when due on Senior Bonds, including any that are Bank

Bonds being paid under a Credit Enhancement.  (Trial Ex. 1.)  But even if BNY had no payment

obligations absent an instruction, BNY still would not be permitted to carry out obviously

defective payment instructions.  The clauses that permit BNY to rely on directions or certificates

from ALL do not apply if BNY is negligent.  (*See, e.g., id.* §§ 10.2(a)(2), 10.2(c), 10.2(c)(2),

10.5(b)-(c).)

Even BNY concedes that the Trustee must verify that an instruction "comports with the requirements of the Indenture" (BNY's Memorandum, p. 50) and is not "totally out of whack" (*id.* at 55).  Here BNY followed obviously non-comporting directions when (a) it paid ALL 50 rather than 30 basis points of administrative fees, and (b) redeemed bonds on the wrong dates and in amounts that significantly undervalued Lloyds' advantageous redemption schedule. BNY's reliance on *Semi-Tech Litig., LLC v. Bankers Trust Co.*, 353 F. Supp. 2d 460 (S.D.N.Y. 2005), *aff'd in relevant part, rev'd in part on other grnds*, 450 F.3d 121 (2d Cir. 2006), is misplaced.  There, the Court held that the trustee breached its duty to examine officers' and accountants' certificates for conformity to the indenture.  *Id.* at 478-79.  Had BNY done even a superficial examination, it would have seen that ALL's payment directions were defective.

BNY cites the testimony of bond counsel, Ms. Bayus, that its fiduciary duties are listed in the Indenture.  (BNY Pretrial Memorandum, p. 26, citing Bayus Dep. at 94:10-23.)  But Ms. Bayus testified immediately afterward that the Trustee is responsible to determine whether a direction complies with the indenture, and is supposed to follow only complying directions. (Bayus Dep. at 95:5-25.)

BNY argues that the single use of the word "fiduciary" in Section 10.1 is insufficient to make the Trustee a fiduciary.  (BNY's Pretrial Memorandum, p. 58.)  But that cannot be the case, or otherwise the drafters of contracts would be forced to be repetitive and redundant.

BNY further argues that, because Section 10.2(b) imposes a prudent-person standard of care upon default, it owes no fiduciary duties pre-default.  (*Id.* at 28.)  Although Section 10.2(b) heightens BNY's fiduciary duties upon default, it does not follow that BNY lacks fiduciary duties pre-default.  An indenture trustee always must properly perform its

ministerial and administrative tasks, regardless of any contract term or default.  *See, e.g., LNC Investments, Inc. v. First Fidelity Bank, N.A.*, 935 F. Supp. 1333, 1347 (S.D.N.Y. 1996) (indenture trustee owes extra-contractual, pre-default duties of loyalty and of performance of basic ministerial tasks).

Also, BNY forgets that an Event of Default exists upon "the failure of [ALL] to pay the principal of . . . any Bond or the redemption price . . . thereof *when and as the same shall become due*, whether at maturity or otherwise."  (Trial Ex. 1, § 9.1(1), emphasis added.)  Events of Default occurred, for example, when ALL missed all of Lloyds' mandatory quarterly redemptions when due prior to October 27, 2008, and instead made partial payments on incorrect dates.  Because ALL's violation of the required payment schedule was open and obvious, BNY had or can be deemed to have had notice of the defaults, therefore triggering the heightened care standard of Section 10.2(b).

But even if only pre-default fiduciary duties applied, or even if none applied, BNY still would be liable for breach of contract because of its negligence in executing ALL's obviously defective payment instructions.  The damages owed by BNY would be the same. BNY argues that it could not have stopped ALL from redeeming bonds the way it did, and that BNY likely would have been replaced as Trustee if it tried.  (BNY's Pretrial Memorandum, p. 60.)  But BNY's fear of removal is based entirely on speculation, because ALL never removed or threatened to remove BNY as Trustee.  Because the trust funds are held by BNY (*see* Trial Ex. 1, p. 2 & § 5.2(B)), ALL could not have done any improper bond redemptions or administrative-fee payments without BNY's cooperation.  BNY could have refused to execute the payment instructions and filed an action in court, as it eventually did.  BNY never was a helpless bystander.

Finally, BNY argues that to the extent redemptions were delayed, Lloyds has been compensated by interest payments.  (*See* BNY's Memorandum, pp. 60-61.)  BNY thus acknowledges that Lloyds is entitled to any excess interest paid as a result of late or improper redemptions.  If the Court awards monetary relief to Lloyds based on the expert report of Jack Blumenthal, the excess interest paid ($2,007,872 in his Scenario 1 and $803,651 in his Scenario 2) will not be included because Mr. Blumenthal subtracted all amounts actually paid from all amounts owed.  (Trial Ex. 195, p. CDM00020.)  To make Lloyds whole, that excess interest would have to be awarded as a separate item of damages against BNY.  Awarding it against ALL would be an inferior remedy because then Lloyds would be paid out of the Pledged Assets with its own money.

**VI.**

**DEPFA AND BNY'S ATTACKS ON LLOYDS'
ECONOMIC EXPERT ARE UNFOUNDED**

Lloyds' expert, Mr. Blumenthal, is the only expert offered by any party that has computed the total amounts of principal and interest owed on Lloyds' and Depfa's bonds to date.  Although no party has made a motion under Federal Rule of Evidence 702 to exclude any of his opinions, Depfa and BNY nevertheless attack him unfairly in their pretrial briefs.

**A.    Depfa's Attacks on Mr. Blumenthal's Methods Have No Merit.**

As explained previously, Mr. Blumenthal's report contains a Scenario 1 that assumes that both Revenue Account and Loan Account funds must be used for mandatory redemptions, while Scenario 2 assumes that only Revenue Account funds must be used for mandatory redemptions, while Loan Account funds must be used for special redemptions.  (Trial Ex. 195, pp.  CDM00004-6, 14-15.)  Depfa's economic expert, Scott Friedland, counted both

-26-

Revenue Account and Loan Account funds as being available for redemptions (Trial Ex. 188, p. 5 & n.10), thus conceding the basic premise of Scenario 1.

In its pretrial brief, Depfa attacks Scenario 1 for assuming that the Lloyds SBPA was valid, and that bonds in parity need not be paid pro rata. But as previously explained, the language of the governing contracts, the parties' conduct, and the other extrinsic evidence confirm the accuracy of those assumptions. (Lloyds' Pretrial Memorandum, Points I-II.)

Depfa also attacks Scenario 1 for not following Mr. Blumenthal's principle that bonds should be redeemed promptly to reduce negative arbitrage, which is the deterioration of the trust estate that occurs when the interest and expenses paid on the bonds are higher than the interest earned on the student-loan collateral. (*See* Trial Ex. 196, ¶¶ 3.2.1–3.2.4.) Depfa asserts that redemptions should have begun optionally on April 11, 2008 (the date of loan recycling suspension) rather than mandatorily on May 12, 2008 (the first quarterly redemption date). (*See* Depfa's Pretrial Memorandum, p. 60.)

But Depfa misunderstands Mr. Blumenthal's opinion. His Scenario 1 assumes ALL was required to use all available funds to redeem bonds on the banks' quarterly and semi-annual redemption dates under Section 3.02 of the SBPA's. (Trial Ex. 195, pp. CDM00011.) This model assumes that payments would be made as required by contract. It appropriately does not assume any optional redemptions because such redemptions are discretionary, and would cause the model unnecessarily to be less certain by assuming that ALL did something it was not required to do. As Mr. Blumenthal testified, the goal of reducing negative arbitrage does not trump the requirement of following the contract. (Blumenthal Dep. at 102:3-104:15.) Depfa's expert, likewise, examined whether funds were available only for mandatory redemptions, not optional ones. (Trial Ex. 188, p. 15.)

Repeatedly, Depfa criticizes Scenario 1 for computing a principal split that favors Lloyds by 8-1 as of November 5, 2009:  $4,600,000 for Depfa versus $37,600,000 for Lloyds, or 10.9% versus 89.1%.  (Trial Ex. 195, pp. CDM00018-19.) [2]  But this ratio is the result of the literal application of the Lloyds and Depfa payment schedules.  Each year, Lloyds has 52 quarterly payment dates based on 13 purchase dates, while Depfa has 18 semi-annual payment dates based on 9 purchase dates.  Virtually all of Depfa's payment dates are shared with Lloyds, while the reverse is not true.  (See Lloyds' Pretrial Memorandum, pp. 9, 41-42.)  Lloyds' advantage is further enhanced by the fact that the first mandatory redemption date, May 12, 2008, is for a series of Lloyds bonds.  The result is that 100% of the available $24,300,000 must be paid to Lloyds on that date.  (See id. at CDM00310; Trial Ex. 196, ¶ 1.5.1.) [3]  For these reasons, the ratio computed by Mr. Blumenthal does not show any flaw in his computations, but rather shows how badly Lloyds was underpaid, and Depfa overpaid, by ALL and BNY's making improper redemptions.

Depfa attacks Mr. Blumenthal's Scenario 2 because it assumes that ALL would have split special redemptions 62-38 in favor of Lloyds, instead of 50-50.  But there is no contract language that requires that either special or optional redemptions of parity bonds be made equally or ratably during pre-acceleration debt service.

Depfa also attacks the 62-38 split for failing to minimize negative arbitrage, which Depfa believes is better achieved by redeeming its higher-interest bonds first.  But Depfa

---

[2]    If measured as of August 31, 2011, the split is $17,100,000 for Depfa versus $70,100,000 for Lloyds, or 19.6% versus 80.4%.  (Trial Ex. 195, pp. CDM00019-20.)

[3]    The Friedland report confirmed the reasonableness of this figure by computing that $25,048,595 was available for redemption on May 11, 2008 if bond interest is accrued through the redemption date (Trial Ex. 188 at Ex. C, p. 1 of 8), which is similar to the cumulative monthly accrual used by Mr. Blumenthal (Trial Ex. 195, ¶ 1.6.1.2).

forgets that the reason to minimize negative arbitrage is to minimize any default. (Blumenthal Dep. at 39:21-40:6.) Because the Lloyds bonds mature in five years instead of ten, a rational issuer would want to redeem the Lloyds bonds first in order to delay default for as long as possible, and minimize the amount of the default when it occurs.

Depfa also attacks the 62-38 split as speculative because ALL allegedly did not intend to continue that split, but instead preferred 50-50. But from October 2007 through November 2009, ALL redeemed bonds as shown in the table below. Also shown in the table are the two planned redemptions that were not made because of the suspension of redemptions.

| Date of Mandatory Redemption | Date of Optional Redemption | Depfa Total | Lloyds Total | Approximate Ratio |
|---|---|---|---|---|
| 10/27/08 and 11/12/08 | | $6,200,000 | $12,500,000 | 67-33 favoring Lloyds |
| 1/6/09 | | $3,200,000 | $3,100,000 | 50-50 |
| 4/10/09 and 4/22/09 | | $600,000 | $1,100,000 | 67-33 favoring Lloyds |
| 7/1/09 | | $2,500,000 | $4,900,000 | 67-33 favoring Lloyds |
| 10/5/09 | | $1,000,000 | $1,000,000 | 50-50 |
| | 11/5/09 | $1,450,000 | $1,450,000 | 50-50 |
| | | | | |
| Date of Planned Mandatory Redemption | | | | |
| 11/30/09 | | | $1,000,000 | 100% favoring Lloyds |
| 12/31/09 | | $1,289,000 | $2,311,000 | 64-36 favoring Lloyds |

(Stipulations ¶ 25; Trial Ex. 178, last 2 pages.) ALL roughly alternated between Lloyds-favored splits and even splits through October 5, 2009 to give rough effect to the banks' anniversary

dates under their SPBA's.  (Trial Ex. 178, last 2 pages.)  The 50-50 split on November 5, 2009 was the only optional redemption.  (*Id.*; Peterson Dep. at 121:20-122:9.)  That one, small redemption cannot demonstrate an intent to continue 50-50, especially when the two redemptions planned for the next two months heavily favored Lloyds.

The 62-38 split was the most reasonable and least speculative assumption possible because it assumed that ALL would continue redeeming bonds as it had done for a prolonged period of time before suspension.  If the Court wants to achieve even greater certainty in the computation of amounts owed, it should apply Scenario 1, in which all payments to the banks are made on fixed, mandatory schedules with no discretion involved.

Finally, the Court should give no weight to Ms. Peterson's recommendation, in May 2010, that the banks split the trust cash pro rata.  (Trial Ex. 164.)  She made this proposal to "allow us to move forward to ultimate restructuring" (*id.* at 1), and because "to move forward in a timely manner it is imperative that the parties reach agreement as to the allocation of available cash now and in the future" (*id.* at 2).  On its face, this document is a settlement proposal, which Depfa is improperly trying to use to prove its claim for a 50-50 distribution of the trust assets.  It should not be admitted into evidence.  *See* Fed. R. Evid. 408(a).

## B.    BNY's Attacks on Mr. Blumenthal's Methods Have No Merit.

BNY accuses Mr. Blumenthal of substituting his judgment for ALL's with respect to the timing and amounts of accruals (*i.e.*, amounts reserved for paying the interest and expenses required by Section 5.3(B)(1)-(5) of the Indenture) and payments on the bonds.  (BNY's Pretrial Memorandum, pp. 55-57.)

The SBPA's give no discretion as to the dates when mandatory redemptions are to be made, so Mr. Blumenthal cannot be faulted, in Scenario 1, for using the quarterly and semi-annual dates measured from each bank purchase date. (*See* Trial Exs. 4-5, § 3.02.) If the Court instead chooses to apply Scenario 2, Mr. Blumenthal assumed that ALL would have specially redeemed bonds in the same manner as it had done for over a year, which is the most conservative assumption possible.

The SBPA's require ALL to cause the redemption of bonds "after giving effect" to the transfers required by Section 5.3(B)(1)-(5) of the Indenture. (*Id.*) This clause requires ALL to pay certain interest and expenses ahead of redemptions, but it does not give ALL unfettered discretion in its accruals for such expenses. As Mr. Blumenthal explained, the trust accounts consistently contained cash balances that were far in excess of the interest and expenses coming due. (Blumenthal Dep. at 224:17-228:23.) ALL, therefore, did not need to hold back nearly as much money as it did.

For example, on October 27 and November 12, 2008, ALL paid the first set of redemptions of the Lloyds and Depfa bonds in the total amount of $18,700,000. (Stipulations ¶ 25.) But there was $24,300,000 available for redemption on the first redemption date of May 12, 2008, and an additional $4,900,000 available on all other redemption dates for both banks through the end of September 2009. (Trial Ex. 195, pp. CDM00310-12.)[4] This huge disparity cannot be explained by a reasonable disagreement over expense accruals. It could have resulted only from mismanagement of the trust.

---

[4]    Mr. Friedland computed that a range of $22,462,291 to $30,194,535 was available on May 11, 2008 depending on whether he (a) accrued six months of bond interest, (b) accrued bond interest through the redemption date, or (c) did no accrual.

BNY also attacks Mr. Blumenthal for not giving an opinion on whether ALL or BNY breached their duties as program administrator and Trustee. (BNY's Pretrial Memorandum, p. 57.) Lloyds had Mr. Blumenthal do what is appropriate for an accountant: compute the cash flows in and out of the trust based on the available financial records. The Indenture and SBPA's will speak for themselves as to whether ALL and BNY breached any duties to Lloyds. If Mr. Blumenthal had given an opinion on "whether ALL and BNY breached the indenture or any duty" – as BNY says he should have done (BNY's Pretrial Memorandum, p. 57) – then his opinion would have been excludable. *See Marx & Co. v. Diners' Club, Inc.*, 550 F.2d 505, 509-10 (2d Cir. 1977) (experts cannot opine on the interpretation or legal effect of a contract).

Finally, BNY accuses Lloyds of not disclosing its theory and calculation of damages, and the underlying documents, during discovery. These accusations are the subject of BNY's motion, under Federal Rule of Civil Procedure 37(c)(1), to exclude evidence of damages for alleged discovery violations. That motion should be denied for all of the reasons stated in Lloyds' papers in opposition to that motion, filed today.

**VII.**

**LLOYDS IS ENTITLED TO BE INDEMNIFIED FOR ITS**
**ATTORNEYS' FEES AND OTHER LITIGATION EXPENSES**

ALL claims that Lloyds is not entitled to be indemnified for its attorneys' fees and expenses because it did not incur them through enforcement of the governing documents, but rather through the defense of Depfa's meritless claims. (ALL's Pretrial Memorandum, pp. 25-26.)

Lloyds is entitled to be reimbursed for all expenses, "including reasonable counsel fees and expenses," in connection with "the enforcement of this Agreement." (Trial Ex. 5, § 8.05(a)(B).) Lloyds also is entitled to be indemnified for all "counsel fees and other expenses that the Bank may, at any time, sustain or incur by reason of or in consequence of or arising out of the transactions contemplated by this Agreement or the Related Documents." (Trial Ex. 5, § 8.05(b).)

These provisions easily are broad enough to include all of Lloyds' fees and expenses in this action, including the portion spent defending against Depfa's claims. This entire action arises out of the Lloyds SBPA and Indenture, and it seeks enforcement of the Lloyds SBPA. If Depfa were to prevail on its claims, Lloyds' payment rights under its SBPA would be diminished or extinguished. The above-cited indemnity terms do not distinguish between expenses incurred in a plaintiff or defendant posture. Lloyds, therefore, is entitled to be paid out of the trust for all of its legal fees and expenses in this action.

## **CONCLUSION**

For all of the reasons stated above, the Court should grant Lloyds the judgment and verdict requested on Pages 48-49 of its Pretrial Memorandum, and dismiss all of Depfa's claims.

Dated: November 14, 2011
        New York, New York

                                MINTZ LEVIN COHN FERRIS
                                GLOVSKY AND POPEO, P.C.

                                By: _David L. Barres_____
                                      Robert I. Bodian
                                      David L. Barres
                                      Omar A. Khondker
                                Chrysler Center
                                666 Third Avenue, 25th Floor
                                New York, New York 10017
                                (212) 935-3000

                                *Attorneys for defendant and third-party plaintiff*
                                *Lloyds TSB Bank plc*

## CERTIFICATE OF SERVICE

On November 14, 2011, I caused to be served by email a true and accurate copy of the following on the counsel listed below:

1.  Pretrial Reply Memorandum of Law of Defendant and Third-Party Plaintiff Lloyds TSB Bank plc;

2.  Memorandum of Law of Defendant and Third-Party Plaintiff Lloyds TSB Bank plc in Opposition to Motion in Limine to Exclude Evidence of Damages;

3.  Declaration of David L. Barres in Opposition to Motion in Limine to Exclude Evidence of Damages;

4.  Memorandum of Law of Defendant and Third-Party Plaintiff Lloyds TSB Bank plc in Opposition to Motion in Limine to Exclude Expert Testimony of Robert Dean Pope; and

5.  Declaration of Omar A. Khondker in Opposition to Motion in Limine to Exclude Expert Testimony of Robert Dean Pope.

Scott M. Berman, Esq.
Eric Seiler, Esq.
Jeffrey C. Fourmaux, Esq.
Alexander D. Levi, Esq.
FRIEDMAN KAPLAN SEILER &
ADELMAN LLP
7 Times Square
New York, NY 10036-6516
eseiler@fklaw.com
sberman@fklaw.com
jfourmaux@fklaw.com
alevi@fklaw.com

*Attorneys for defendant*
*DEPFA BANK plc*

Scott R. Kipnis, Esq.
Nicholas B. Malito, Esq.
HOFHEIMER GARTLIR & GROSS, LLP
530 Fifth Avenue
New York, NY 10036
skipnis@hgg.com
nmalito@hgg.com

Dean C. Waldt, Esq.
Mariah Murphy, Esq.
BALLARD SPAHR LLP
210 Lake Drive East, Suite 200
Cherry Hill, NJ 08002-1163
waldtd@ballardspahr.com
murphym@ballardspahr.com

*Attorneys for third-party defendant Access to*
*Loans for Learning Student Loan*
*Corporation*

James J. Coster, Esq.
Glenn Edwards, Esq.
Walter Saurack, Esq.
SATTERLEE STEPHENS BURKE &
BURKE LLP
230 Park Ave.
New York, NY  10169
jcoster@ssbb.com
gedwards@ssbb.com
wsaurack@ssbb.com

*Attorneys for third-party defendant
JP Morgan Chase Bank, N.A.*

Judith A. Archer, Esq.
Sarah E. O'Connell, Esq.
FULBRIGHT & JAWORSKI L.L.P
666 Fifth Ave.
New York, NY  10103-3198
jarcher@fulbright.com
soconnell@fulbright.com

*Attorneys for plaintiff The Bank of New York
Mellon Trust Company, N.A.*

Dated:  November 14, 2011
       New York, New York

_____
Omar Khondker