UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

THE BANK OF NEW YORK
MELLON TRUST COMPANY, N.A.,                          :

      Plaintiff-Counterclaim Defendant,         :

      - against -                                             :

                                 :    No. 10 Civ. 4424 (JPO) (AJP)

DEPFA BANK PLC and
LLOYDS TSB BANK PLC,                                    :

      Defendants-Counterclaimants-           :
      Crossclaimants-Crossclaim
      Defendants.                                          :

-------------------------------------------------------------------x

DEPFA BANK PLC,                                          :

      Third-Party Plaintiff-                       :
      Counterclaim Defendant,

      - against -                                             :

ACCESS TO LOANS FOR LEARNING           :
STUDENT LOAN CORPORATION,

      Third-Party Defendant-                     :
      Counterclaimant-Crossclaim
      Defendant,                                          :

      - and -                                                 :

JPMORGAN CHASE BANK, N.A.,                     :

      Third-Party Defendant-                     :
      Crossclaimant.

-------------------------------------------------------------------x

LLOYDS TSB BANK PLC,                                  :

      Third-Party Plaintiff-Counterclaim   :
      Defendant,

      - against -                                             :

ACCESS TO LOANS FOR LEARNING           :
STUDENT LOAN CORPORATION,

      Third-Party Defendant-                     :
      Counterclaimant.

-------------------------------------------------------------------x

**DEPFA BANK PLC'S
MEMORANDUM OF LAW
IN OPPOSITION TO
THE BANK OF NEW YORK
MELLON TRUST COMPANY
N.A.'S MOTION TO
EXCLUDE PROPOSED
EXPERT TESTIMONY OF JOEL
POWERS AND STEVEN THEL**

## TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ........................................................................................ ii

BACKGROUND ....................................................................................................... 1

    Qualifications of Joel Powers ............................................................................. 1

    Opinions of Joel Powers ..................................................................................... 3

        Liquidity Providers' Consent Rights .......................................................... 3

        Parity ........................................................................................................... 4

    Qualifications of Professor Steven Thel .............................................................. 5

    Opinions of Professor Steven Thel .................................................................... 7

ARGUMENT ........................................................................................................... 8

POINT I   POWERS SHOULD BE ALLOWED TO TESTIFY
         AS AN EXPERT ON CUSTOM AND PRACTICE
         IN THE STUDENT LOAN BOND INDUSTRY ........................................... 9

    A.   Powers Is Qualified To Testify As An Expert Based On His
        Extensive Professional Experience In The Student Loan Bond Industry .............. 9

    B.   Powers' Testimony Will Be Helpful To The Court ................................... 13

    C.   Powers' Testimony Is Based On A Reliable Foundation ........................ 14

        1.   Consent ........................................................................................ 15

        2.   Parity ........................................................................................... 17

POINT II  PROFESSOR STEVEN THEL SHOULD BE ALLOWED
         TO TESTIFY AS A REBUTTAL EXPERT ON CUSTOM AND
         PRACTICE IN THE CORPORATE TRUST INDUSTRY ........................... 18

    A.   Professor Steven Thel Is Qualified ....................................................... 18

    B.   Thel's Opinions Will Be Helpful To This Court .................................... 19

    C.   Thel's Opinion That He Agrees With Powers On
        Consent Rights Is Based On A Reliable Foundation ............................. 20

CONCLUSION ...................................................................................................... 22

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Barban v. Rheem Textile Sys., Inc.*,
    2005 WL 387660 (E.D.N.Y. 2005)............................................................12, 13

*Cary Oil Co., Inc. v. MG Refining & Marketing, Inc.*,
    2003 WL 1878246 (S.D.N.Y. Apr. 11, 2003).......................................................18

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993)........................................................................................1, 8

*Gabel v. Richards Spears Kibbe & Orbe, LLP*,
    2009 WL 1856631 (S.D.N.Y. June 26, 2009) ........................................................13

*Johnson v. PetSmart, Inc.*,
    2007 U.S. Dist. LEXIS 77033 (M.D. Fla. Oct. 15, 2007) ................................19, 20

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ................................................14

*Lion Oil Trading & Transp., Inc. v. Statoil Mktg. and Trading (US) Inc.*,
    2011 WL 855876 (S.D.N.Y. Feb. 28, 2011).........................................8, 11, 15, 17

*Mahoney v. JJ Weiser and Co., Inc.*,
    2007 WL 3143710 (S.D.N.Y. Oct. 25, 2007) ........................................................14

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
    691 F. Supp. 2d 448 (S.D.N.Y. 2010)............................................................. passim

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
    716 F. Supp. 2d 220 (S.D.N.Y. 2010)..........................................................8, 12, 18

*Scientific Components Corp. v. Sirenza Microdevices, Inc.*,
    2008 U.S. Dist. LEXIS 92703 (E.D.N.Y. Nov. 13, 2008).....................................19

*Seneca Ins. Co. v. Wilcock*,
    2007 WL 415141 (S.D.N.Y. Feb. 5, 2007).........................................13, 15, 18, 20

*SR Int'l Bus. Ins. Co., Ltd. v. World Trade Center Props., LLC*,
    467 F.3d 107 (2d Cir. 2006).......................................................................... passim

*TC Sys., Inc. v. Town of Colonie, N.Y.*,
    213 F. Supp. 2d 171 (N.D.N.Y. 2002).................................................................8

OTHER AUTHORITIES

FED. R. EVID. 104.......................................................................................................1

ii

**Page(s)**

**OTHER AUTHORITIES**

FED R. EVID. 402 ................................................................................................................1

FED R. EVID. 403 ................................................................................................................1

FED R. EVID. 702 ...............................................................................................1, 8, 9, 18

DEPFA BANK plc ("Depfa") hereby submits its opposition to The Bank of New York Mellon Trust Company, N.A.'s ("BNY Mellon") motion to exclude proposed expert testimony of Joel Powers and Steven Thel pursuant to FED R. EVID. 104, 402, 403, and 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).[1]

## BACKGROUND[2]

### Qualifications of Joel Powers

Joel J. Powers holds a Bachelor of Arts from Vanderbilt University in economics and political science, a Master of Business Administration degree from Tulane University, and a Juris Doctor from Pepperdine University.  (TX189 (Expert Report of Joel J. Powers), at 1, Ex. 1 at 2.)  Since attaining these degrees, he has devoted his career of more than 25 years to the credit industry in general, and to the student loan industry in particular.

In 1984, Powers began working at the National State Bank in Elizabeth, New Jersey as a junior credit analyst.  (*Id.* at 1, Ex. 1 at 2.)  There, among other responsibilities, he assessed credit risk in order to render credit recommendations.  (*Id.*)  Two years later, he moved to the Capital Markets Group of the Bank of Montreal as an Assistant Manager.  (*Id.* at 2, Ex. 1 at 2.)  In 1989, he joined Yasuda Trust in New York as a Vice President in the corporate lending group.  (*Id.*)  At Yasuda Trust, among other functions, he originated and negotiated lending and liquidity transactions (including liquidity and letter of credit facilities), managed a portfolio of loans, reviewed legal documentation, and managed relationships with Fortune 1000 companies.

---

[1] Lloyds TSB Bank plc ("Lloyds"), Access to Loans for Learning Student Loan Corporation ("ALL"), and JPMorgan Chase Bank, N.A. ("JPMorgan") join in the instant motion.

[2] All capitalized terms not defined herein shall have the meaning ascribed to them in Depfa's Pretrial Memorandum of Law, filed on October 31, 2011.

(*Id.*)  In 1998, Powers moved to BNY Financial Corporation where he negotiated and analyzed credit transactions and drafted term sheets and offering memoranda.  (*Id.* at Ex. 1 at 2.)

In 1999, Powers joined the New York branch of Dexia Credit Local ("Dexia")— at the time a large Belgian, commercial bank—as a Vice President.  (*Id.* at 2, Ex. 1 at 1.)  Dexia entrusted Powers with building the bank's student lending business.  (*Id.*; Declaration of Scott M. Berman, dated November 14, 2011 ("Berman Decl.") Ex. A (Powers Dep.), at 38:15-39:12.)  Over the course of his 10 years at Dexia, Powers developed student loan bond expertise through meetings with numerous industry participants including student loan originators, issuers, servicers, bankers, traders, and rating agencies.  (TX189, at 2, Ex. 1 at 1.)

Powers participated in the purchase of more than 100 student loan bonds, as well as the origination, structuring, and execution of 10-15 liquidity facilities.  (*Id.* at 2, Ex. 1 at 1; Berman Decl. Ex. A, at 26:18-27:5, 28:8-15.)  The vast majority of these liquidity facilities were standby bond purchase agreements ("SBPAs").  Powers negotiated and commented on the business terms of these SBPAs, including consent rights.  (Berman Decl. Ex. A, at 22:10-15, 24:14-22, 40:19-25.)  Powers also reviewed and commented on bond indenture provisions.  (*Id.* at 21:17-23.)  In connection with the purchase of student loan bonds, Powers analyzed deal terms, risk, and structure, and as part of the due diligence process, he reviewed offering memoranda, term supplements, and indentures.  (Tx 189, at 2, Ex. 1 at 1.)  After negotiating and executing a deal, Powers was responsible for monitoring the transaction.  (Berman Decl. Ex. A, at 38:15-39:12.)

While at Dexia, Powers had regular discussions with the bank's senior management and credit department concerning the meaning of terms in bond agreements.  (*See id.* at 17:24-18:6.)  Powers also had the opportunity to consider consent rights during credit

committee meetings.  (*See id.* at 19:12-25.)  Moreover, Powers gave internal presentations, and had conversations with other Dexia employees, concerning the structure of, and specific provisions in, student loan bonds.  (*Id.* at 18:23-19:6, 52:12-16.)

By the time Powers left Dexia in 2009, he had built a successful, multibillion dollar portfolio for the bank.  In particular, he was responsible for the bank's purchase of $10 billion of student loan securities which generated income of about $25 million per year.  (TX189, at Ex. 1 at 1.)  Additionally, the bank earned about $3 million per year on the $500 million in SBPA and letters of credit transactions he had originated and structured.  (*Id.*)

## Opinions of Joel Powers

Drawing on his extensive experience in the student loan securitization industry, Powers' report describes custom and practice concerning liquidity provider consent rights, the industry meaning of the term "parity," and how parity is customarily applied.

### Liquidity Providers' Consent Rights

Powers opined that as a matter of custom and practice, issuers typically retain the right to issue additional bonds without the consent of the liquidity provider.  (*Id.* at 8.)  In Powers' experience, this was achieved through language "carving out" from the liquidity provider's consent right the right to consent to additional bond issuances.  (*Id.*; Berman Decl. Ex. A, at 71:16-23, 74:23-75:3.)  Powers noted that this typical carve-out is contained in the SBPA that Depfa executed in April 2005 in connection with an issuance of bonds by the State Board of Regents of the State of Utah, and in the other student loan SBPAs that he worked on.  (TX189, at 8; Berman Decl. Ex. A, at 74:4-75:3.)  The Depfa SBPA, in contrast, contained no such carve-out.  (TX189, at 8-9.)  Accordingly, Powers opined that "Depfa's consent right was atypically broad" and that its consent was required for ALL to issue additional bonds.  (*Id.*)

3

Powers further opined that the Second Supplemental Indenture and Lloyds SBPA "amended the Indenture by creating a priority of repayment among Senior Bond holders in favor of Lloyds, to the detriment of Depfa." (*Id.* at 11.)  In particular, by incorporating Lloyds' preferential redemption schedule under its SBPA—which afforded it twice as many opportunities to receive all available cash in certain trust accounts—the Second Supplemental Indenture effectively granted Lloyds a higher position in the Waterfall.[3] (*Id.* at 11-12.)  Powers concluded that these agreements therefore amended and/or modified the Indenture, which required Depfa's prior written consent.  (*Id.* at 14.)

**Parity**

Powers opined that parity requires that securities rank equally and ratably with one another with respect to their rights to pledged collateral.  (*Id.* at 15.)  Powers further opined that when collateral is liquidated—i.e., when it is converted into cash through sales or principal repayments—parity bondholders should receive a ratable share of any distributions of such liquidated collateral.  (*Id.* at 8.)  Powers testified that in accordance with custom and practice, in every deal he worked on involving bonds that became bank bonds, Dexia received its pro rata share of liquidated collateral.  (Berman Decl. Ex. A, at 55:9-22.)  Powers was able to verify this by working with loan operations and reviewing the servicer reports in those transactions.  (*See id.* at 57:14-19.)

Powers then described a framework pursuant to which parity should be applied in this case.  (TX189, at 17.)  In particular, he observed that to be on a parity, half of all revenues available on a Lloyds redemption date should be held back to redeem Depfa's bonds, and half of

---

[3] The "waterfall" is the colloquial name for a provision that sets forth a sequence of payment priorities from indenture trust accounts.  In this case, § 5.3(B) of the Indenture is the "Waterfall."

all revenues available on a Depfa redemption date should be held back to redeem Lloyds' bonds. Further, all optional redemptions should be split 50/50 between Depfa and Lloyds.  (*Id.*)

Powers also analyzed parity from a risk of loss perspective, and opined that under industry custom and practice, outstanding parity bonds should share risk equally if there are insufficient funds to pay back principal on both bonds.  (*Id.* at 19-20.)  Finally, he opined that parity bonds have equal rights to repayment of their contracted-for interest rates.  (*Id.* at 20-22.) Powers observed that Depfa's and Lloyds' bonds are on a parity with respect to interest because "both have been paid 100% of their contracted-for interest on each interest payment date."  (*Id.* at 22.)

**Qualifications of Professor Steven Thel**

Steven Thel has been a law professor since 1985 and regularly teaches courses in and researches and writes scholarly articles about corporate finance, corporate law, securities regulation, and contract law.  (TX194 (Rebuttal Report of Professor Steve Thel), at ¶ 2, Ex. 1.) Thel received a Bachelor of Arts *summa cum laude* in economics from North Texas State University.  (*Id.* at Ex. 1 at 1.)  He received his J.D. *cum laude* from Harvard Law School.  (*Id.*) Thel subsequently served as a clerk to The Honorable Albert J. Henderson of the United States Court of Appeals for the Fifth Circuit.  (*Id.*)

Prior to becoming a law professor, Thel participated in various capacities in the securities industry for approximately 4 years.  In 1981, he joined the Securities and Exchange Commission ("SEC") where he worked in the Office of the General Counsel, Enforcement & Disclosure Policy Group.  (*Id.* at Ex. 1 at 1.)  Thel was responsible for independently reviewing all corporate finance matters the Commissioners faced, as well as reviewing securities filings which were flagged as potentially not containing proper or sufficient disclosure.  (*See* Berman Decl. Ex. B (Thel Dep.), at 15:2-16:11, 17:3-18:8.)  Thel's work at the SEC involved both trust

indentures and methods of credit enhancements.  (*See id.* at 18:9-11, 18:22-23.)  In 1983, he became an associate in the corporate group of the Atlanta law firm of Kilpatrick & Cody. (TX194, at Ex. 1 at 1; Berman Decl. Ex. B, at 20:3-17.)  Among other responsibilities, Thel drafted 2-4 trust indentures, and likely had other occasions to review and comment on indentures.  (Berman Decl. Ex. B, at 20:25-21:6, 22:5-10.)

In 1985, Thel became an associate professor at the University of Mississippi School of Law.  (TX194, at Ex. 1 at 1.)  He moved to Fordham University School of Law in 1989, where he was tenured and became the I. Maurice Wormser Professor of Law just 3 years later.  (*Id.* at Ex. 1 at 1.)  Since then, Thel has served as a visiting or adjunct professor at Cornell Law School in 1992, Columbia Law School in 2000, 2002, 2005, and 2008, and New York University Law School in 2009 and 2011.  (*Id.*)

Several of the classes Thel teaches involve trust indentures.  In particular, he has taught corporate finance at Fordham at least 15 times.  (*Id.* at ¶ 2; Berman Decl. Ex. B, at 24:15-18.)  This class devotes considerable attention to the rights of bondholders under trust indentures, how such indentures are construed, the rights and obligations of indenture trustees, the Trust Indenture Act, and securitization.  (Berman Decl. Ex. B, at 24:24-26:11, 32:21-25, 35:15-24.) Thel also teaches securities regulation in which trust indenture issues are discussed with some frequency.  (*Id.* at 28:22-29:9.)  Moreover, in his "Advanced Business Law" seminar, Thel invites speakers to present their research, and at least one of those speakers has presented papers about trust indentures.  (*See id.* at 27:19-28:21.)

In addition, Thel writes scholarly articles and books and serves as an expert witness in securities and contract cases.  Thel's articles on contracts and securities law have been published in the Stanford, Yale, Michigan, and Cornell law reviews, as well as others.  (TX194,

at Ex. 1 at 2-3.)  Among the books Thel has authored, *Investment Management Law and Regulation* covers topics such as the trust indenture industry and indenture trustees.  (Berman Dexl. Ex. B, at 198:22-199:12.)  Additionally, several firms—including Bank of New York Company, Inc. in its capacity as indenture trustee—have retained Thel as an expert in matters involving trust indentures.  (*Id.* at 23:19-24, 38:25-39:8; TX194 ¶ 3, Ex. 2.)

**Opinions of Professor Steven Thel**

Thel opined that he agrees with Joel Powers that the execution of the Second Supplemental Indenture and the Lloyds SBPA violated Depfa's consent rights.  (TX194 ¶¶ 10-14.)  Thel is familiar with such provisions based on his experiences teaching contract law, working on contracts and consent provisions, practicing law at a corporate law firm and at the SEC, reading case law, and through his discussions with other attorneys.  (Berman Decl. Ex. B., at 62:11-16, 283:18-23, 284:10-16; 290:21-25.)

Thel's report also directly rebuts the report of the Trustee's expert, Robert I. Landau, about custom and practice in the corporate trust industry.  Landau opined that the opinion letters that the Trustee received in 2006 satisfied certain provisions of the Indenture that insulated the Trustee from liability.  (*See* TX186 (Report of Robert I. Landau) ¶¶ 19-20.)  Thel, in contrast, opined that the letters did not satisfy these Indenture clauses because, among other reasons, they did not mention the First Supplemental Indenture or the Depfa SBPA.  (*See* TX194 ¶¶ 14-17.)  Landau also concluded that the Trustee could rely on the directions it received from ALL to make redemption payments to Lloyds.  (*See* TX186 ¶¶ 20-21.)  Thel, on the other hand, opined that because the Second Supplemental Indenture never became part of the Indenture, the Trustee could not rely upon those directions.  (TX194 ¶¶ 23-25.)  Rather, under custom and practice in the corporate trust industry, the Trustee was first required to determine whether such payments were consistent with the Indenture.  (*Id.* at ¶ 25.)

**ARGUMENT**

Under FED R. EVID. 702, a proposed expert witness must meet three requirements: "*First*, the witness must be 'qualified as an expert by knowledge, skill, experience, training, or education[.]' . . . *Second*, the expert's knowledge must be of the type that will 'assist the trier of fact to understand the evidence or to determine a fact in issue[.]' . . . *Third*, the proposed expert testimony must be based 'on a reliable foundation.'" *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 691 F. Supp. 2d 448, 457-58 (S.D.N.Y. 2010) (citing Fed. R. Evid. 702; *Daubert*, 509 U.S. at 597.) ("Pension Committee I").

"Rule 702 embodies a liberal standard of admissibility for expert opinions." *Lion Oil Trading & Transp., Inc. v. Statoil Mktg. and Trading (US) Inc.*, 2011 WL 855876, at *1 (S.D.N.Y. Feb. 28, 2011) (internal citations and quotation marks omitted); *see also Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 716 F. Supp. 2d 220, 223 (S.D.N.Y. 2010) ("Courts within the Second Circuit have 'liberally construed expert qualification requirements.'") (quoting *TC Sys., Inc. v. Town of Colonie, N.Y.*, 213 F. Supp. 2d 171, 174 (N.D.N.Y. 2002)) (internal citation and quotation marks omitted) ("Pension Committee II"); *Pension Committee I*, 691 F. Supp. 2d at 457 (same). District Courts are advised to "remember they are ruling on the admissibility of evidence and not its weight or credibility," issues which are more appropriately addressed through cross-examination as well as the presentation of contrary evidence. *Pension Committee II*, 716 F. Supp. 2d at 224-25. Under these standards, Powers' and Thel's proposed testimony should be admitted.

**POINT I**

**POWERS SHOULD BE ALLOWED TO TESTIFY
AS AN EXPERT ON CUSTOM AND PRACTICE
IN THE STUDENT LOAN BOND INDUSTRY**

**A.     Powers Is Qualified To Testify As An Expert Based On His
Extensive Professional Experience In The Student Loan Bond Industry**

Under the "liberal" Rule 702 standards, Powers is eminently qualified to testify

on custom and practice within the student loan bond industry.  Indeed, Powers is the *only* expert

offered by the parties as an expert on the student loan bond industry.

In *Pension Committee I*, the court permitted Collins to testify as an expert on

hedge fund administration, despite the fact that he developed his expertise at a single firm.  691

F. Supp. 2d at 472-474.  In reaching this holding, Judge Scheindlin stated:

> Although an expert will generally have more in-depth knowledge
> of industry standards if he or she has worked at more than one
> firm, Collins's years of experience at RK and RK–Consulting
> provide a reliable basis for Collins to aid the jury in determining
> whether CFS–Curacao acted in accordance with industry practice.

*Id.* at 473.  The court further pointed out that Collins gained relevant expertise "through personal

relationships and industry conferences."  *Id.* at 473-74.  Although Collins could not remember

any details concerning conversations with industry participants, the court determined that "these

sorts of memory gaps are more appropriately addressed through cross-examination and do not

warrant the exclusion of Collins's proposed testimony."  *Id.* at 474.

Powers has spent his entire career working in the credit industry and has devoted

over 10 years to the student loan bond industry.  Even before joining Dexia and building its

student lending business into a multibillion dollar portfolio, Powers originated and negotiated

lending and liquidity facilities, managed a loan portfolio, and managed relationships with

Fortune 1000 companies.  (TX189, at 1, Ex. 1 at 2.)

After joining Dexia in 1999, Powers gained further experience in meetings with numerous industry participants including student loan originators, issuers, servicers, bankers, traders, and rating agencies.[4]  (*Id.*)  Courts view this kind of experience—i.e., learning an industry in order to help one's firm enter the relevant market—very favorably in making qualification determinations.  *See Pension Committee I*, 691 F. Supp. 2d at 473 ("Collins's experience with hedge fund administration was neither tangential nor short-lived.  To the contrary, for a substantial portion of his career, he played a primary role in forming, developing and running RK and RK–Consulting's administration business.").[5]

Powers' student loan experience at Dexia was quite extensive:  (1) he was involved in the purchase of more than 100 student loan bonds, as well as the origination, structuring, and execution of 10-15 liquidity facilities (TX189, at 2, Ex. 1 at 1; Berman Decl. Ex. A, at 26:18-27:5, 28:8-15); (2) most of these liquidity facilities were memorialized in SBPAs (Berman Decl. Ex. A, at 22:10-15, 40:18-25); (3) Powers negotiated and commented on the business terms of these SBPAs, including consent covenants (*See id.* at 24:14-22); (4) Powers reviewed and commented on indenture provisions (*Id.* at 21:17-23); (5) he discussed with Dexia's senior management and credit department the meaning of terms in bond agreements (*See*

---

[4] BNY Mellon argues that Powers' conversations with industry participants should be disregarded because "he could [not] recall [them] with specificity."  (BNY Mellon Br. at 9.)  However, "these sorts of memory gaps are more appropriately addressed through cross-examination and do not warrant the exclusion of [Powers'] proposed testimony."  Pension Committee I, 691 F. Supp. 2d at 474.

[5] BNY Mellon characterizes Dexia and Powers as "newcomers to the student loan lending business" who needed to "learn the industry."  (BNY Mellon Br. at 9.)  Moreover, BNY Mellon tries to downplay Powers' interactions with industry participants because "[t]he purpose of such . . . was to build the student loan business at Dexia. . . ."  However, the law is clear that learning about an industry and developing a business are precisely what courts look favorably upon in assessing the qualifications of an expert.  *See Pension Committee I*, 691 F. Supp. 2d at 473.

*id.* at 17:24-18:6); and (6) he delivered internal presentations, and had conversations with other Dexia employees, concerning student loan bonds (*Id.* at 18:23-19:6, 52:12-16).

In his current role as a student loan industry consultant, he has been retained by Dominion Bond Rating Agency in order to help revise and update its student loan bond rating methodology.  (TX189, at 3, Ex. 1 at 1.)  This experience also weighs strongly in favor of finding Powers qualified to give expert testimony about custom and practice within that industry.

Powers' more than 25 years of work experience in the credit industry in general, and his decade long building and growing Dexia's student loan business in particular, render him qualified to testify about custom and practice in the student loan bond industry.  *See Lion Oil*, 2011 WL 855876, at *2 (holding that expert who had worked for 12 years as a senior trader and subsequently general manager of two oil companies had "extensive experience" which qualified him to testify about the oil industry); *Pension Committee I*, 691 F. Supp. 2d at 473-74 (expert qualified to testify based on his experience building consulting firm's fund administration business and conversations with industry participants).

BNY Mellon's principal quibble with Powers' substantial qualifications is that Powers worked on 10-15 liquidity facilities at a single bank, and three such transactions resulted in bank bonds.[6]  (BNY Mellon Br. at 7-9.)  Of course, no other party has proffered an expert in the student loan bond industry.  In any event, the fact that most of Powers' experience in the student loan bond industry was developed from his Dexia experience does not render him

---

[6] BNY Mellon also asserts that Powers is unqualified because he has only limited experience in purchasing or providing liquidity for ALL's bonds.  (BNY Mellon's Memorandum of Law In Support of Its Motion to Exclude Proposed Expert Testimony of Joel Powers and Steven Thel ("BNY Mellon Br.") at 9, 11.)  This argument is ridiculous:  ALL is just one issuer in the student loan bond world, and Powers is testifying about industry custom and practice.  And, of course, none of the other parties' experts have dealt with ALL.

unqualified to testify.[7]  *See Pension Committee I*, 691 F. Supp. 2d at 473.  Moreover, working on

10-15 liquidity facilities, three of which resulted in bank bonds, *is* substantial experience.

BNY Mellon further argues that Powers is unqualified because he "has never

testified in any legal proceeding and has never been retained as an expert.  (BNY Mellon Br. at

8.)  This contention is antithetical to the law of this district:  "The *only* category of experience

that courts are generally wary of is experience gained as a litigation consultant and expert

witness."  *Pension Committee II*, 716 F. Supp. 2d at 225 (emphasis added).  That Powers served

for years as an industry participant, rather than a professional expert witness, actually enhances

his credibility.  *See id.*

BNY Mellon also claims that Powers is not qualified because "[h]e has not

published any books or articles, taught any courses, given any formal presentations regarding

student-loan bonds or any bonds, or received any formal awards for his work regarding bonds."

Notwithstanding that Joel Powers testified that he *has* given presentations about the student loan

industry (Berman Decl. Ex. A, at 18:23-19:6, 52:12-16), BNY Mellon's arguments are still

unavailing.  It is well-established that experts are allowed to testify "based upon . . . experience

in the [relevant] industry rather than on published scholarship or existing data.  *See Pension

Committee I*, 691 F. Supp. 2d at 463.

Moreover, the cases BNY Mellon cites are inapposite.  *Barban v. Rheem Textile

Sys., Inc.*, for example, involved a putative expert who sought to testify about the design of a

laundry press.  2005 WL 387660, at *3 (E.D.N.Y. 2005).  However, he had *never* designed a

machine, nor did he ever work with laundry machines.  *Id.* at **3-4.  Instead, he purchased real

estate, consulted property owners concerning safety issues, and gave "testimony regarding

---

[7] BNY Mellon also ignores the experience Powers gained as a student loan consultant to
Dominion Bond Rating Agency.

design safety for different products, such as tools, and in the building maintenance industry generally." *Id.* at *3.  Such experience stands in stark contrast to Powers, who actually developed the student loan bond business of a large European bank.

**B.**     **Powers' Testimony Will Be Helpful To The Court**

Expert testimony meets the helpfulness requirement when it will assist the finder of fact to understand issues that are not within common experience.  *See Gabel v. Richards Spears Kibbe & Orbe, LLP*, 2009 WL 1856631, at *4 (S.D.N.Y. June 26, 2009) ("An ordinary lay person would not necessarily be informed about what a successful job search consists of. . . . I cannot say that it would be unhelpful for the jurors to have before them the testimony of someone who has worked in the executive placement field.").  It is settled law that expert testimony on the customary usage of contract terms is admissible to assist the finder of fact.  *See e.g.*, *SR Int'l Bus. Ins. Co., Ltd. v. World Trade Center Props., LLC*, 467 F.3d 107, 132-34 (2d Cir. 2006) (upholding district court's decision allowing insurance expert to testify on the customary use of the term "per occurrence"); *Seneca Ins. Co. v. Wilcock*, 2007 WL 415141, at **9-10 (S.D.N.Y. Feb. 5, 2007) (permitting, in the context of a bench trial, insurance industry expert to testify about the industry usage of the terms "loss" and "claim").  Similarly, because custom and practice in the student loan bond industry is outside of common experience, Powers' opinions will assist this Court.  Indeed, at a pretrial hearing, Judge Cote indicated that she would be willing to hear expert testimony as to the industry meaning and application of the term "parity."

BNY Mellon argues that Powers' testimony would not assist the Court because it "impinges on the Court's role as trier of fact and law by proffering interpretations of various provisions in the parties' agreements."  (BNY Mellon Br. at 17.)  The heart of Powers' opinions, however, is *not* based on a legal analysis.  Rather, his opinions concern, and are based on,

custom and practice in the student loan bond industry.  Powers opined that Depfa had a broader

than customary consent right because Section 5.03(a) of the Depfa SBPA did not contain the

carve-out Powers had seen in every SBPA he previously worked on—a carve-out which is

customary in the student loan bond industry.  (TX189, at 4.)  Powers' opinions about parity flow

logically from the definition of "parity" that even BNY Mellon's and Lloyds' experts admit is

customary in the securities industry:

> Bonds issued on a parity basis share equally in the risk of principal
> loss due to insufficient collateral.  Because ALL's principal
> payments to Lloyds resulted in Lloyds receiving in excess of their
> pro rata share of collateral, Depfa's bonds are subject to a greater
> amount of principal loss than would be the case if the collateral
> had been distributed ratably.  This is inconsistent with the assertion
> that Depfa's and Lloyds' bonds were issued on a parity basis.

(*Id.*, at p. 6; TX186 ¶ 32 ("The term 'pari passu' is understood in the securities industry to have a

similar meaning, i.e. equally and without preference to the collateral or security."); TX187

(Expert Report of Robert Dean Pope), at 7 ("'Parity' . . . designates a common priority of claim

by multiple bonds or other debt obligations against the collateral securing such indebtedness.").)

Neither of these conclusions is based on a legal analysis of the provisions in the agreements.

**C.**    **Powers' Testimony Is Based On A Reliable Foundation**

BNY Mellon argues that Powers' testimony is unreliable because (1) "it is not

based on sufficient facts or data", (2) "[i]t contradicts well-settled law", and (3) it contradicts the

substantive evidence presented in this case."  (BNY Mellon Br. at 11.)  That is *not* the proper

standard of reliability where expert testimony is based on the witnesses' experience.  Rather,

where a witness proffers expert testimony on custom and practice, the reliability requirement

focuses on "the relationship between the experience and the opinion and whether the latter is

rationally related to the former."  *See Mahoney v. JJ Weiser and Co., Inc.*, 2007 WL 3143710, at

*5 (S.D.N.Y. Oct. 25, 2007) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999));

*see also SR Int'l*, 467 F.3d at 132 (an expert who is testifying based on his experience "must

show how his or her experience . . . led to his conclusion or provided a basis for his opinion.")

(internal citation d quotation marks omitted); *Seneca Ins.*, 2007 WL 415141, at *9 (testimony

concerning industry usage of terms "is of course testable, in the sense that industry practice is

provable (or disprovable) by equivalent testimony by experienced participants in the industry").

      For example, in *SR Int'l*, the Second Circuit found that an insurance expert

satisfied the reliability test based on general industry experience even though he had no

experience with the facts at issue.  467 F.3d at 132-33.  The Court of Appeals stated:

> McKinley . . . was able to satisfy the [reliability] criteria.  He
> testified that he had over 30 years of experience in the insurance
> industry (as both an underwriter and a broker) and he was familiar
> with practices in the industry, including the practices that related to
> "per occurrence" property provisions.  *He explained that through
> these experiences, he was able to identify a practice whereby
> insurers tie the definition of occurrence to a physical cause of loss
> in order to maximize the number of deductibles that an insured
> would be required to pay.*  And he testified that insurers used
> "hours" clauses when they wished to aggregate the losses
> associated with specific perils-e.g., hurricanes and earthquakes.
> *The fact that McKinley was not aware of any instance where his
> understanding of custom and practice had been applied to a
> terrorism case is hardly surprising given the unprecedented nature
> of the September 11 attacks*. . . .

*Id.* (internal citations omitted) (emphasis added).  *See also Lion Oil*, 2011 WL 855876, at **1-2.

      Here, Powers' proposed testimony about consent rights and parity is admissible

because he clearly demonstrates how his experience formed the basis for his conclusions.

    **1.**    **Consent**

      Powers' report states that over the course of his career in student lending, he

became familiar with the terms of liquidity providers' consent rights.  In particular, he observed

that through the use of an express carve-out in consent covenants, issuers typically retained the

right to issue additional bonds without the consent of the liquidity provider.  (TX189, at 8;

Berman Decl. Ex. A, at 71:16-25, 74:23-75:3.)  Powers testified at deposition that every SBPA he worked on contained a carve-out similar to the one in the Utah SBPA.  (TX189, at 8; Berman Decl. Ex. A, at 74:4-75:3.)  Yet, Depfa's SBPA contained no such proviso.  (TX189, at 8-9.)  His opinions concerning customary consent clauses, in general, and Depfa's consent right in this case, are therefore directly linked to his observations during his career in the student loan securitization field.  *See SR Int'l*, 467 F.3d at 132-33.  His conclusion, that Depfa's consent right was broader than the customary consent right, and that it conferred upon Depfa the right to consent to additional bonds, is a direct application of his experience to these facts.

Powers' proposed testimony about the meaning of the terms "amendment" and "modification" is also reliable, and confirmed by the testimony and actions of the other parties. Powers opined that based on his experience in the student loan bond industry, custom and practice dictates that changes in the waterfall of an indenture constitute "amendments" or "modifications" of that indenture.  (TX189, at 11-12.)  His understanding was confirmed by Thea Watkins, a Senior Vice President at Lloyds who was its lead negotiator for the 2006 transaction, who testified that as a matter of industry practice, a change in the waterfall constitutes an amendment.  (Berman Decl. Ex. C (Watkins Dep.), at 109:20-25.)  Powers also opined that a detrimental change in a liquidity provider's rights in respect of its lien constitutes an amendment to the indenture.  (*See* TX189, at 13-14.)  This opinion is supported by Elaine Bayus—the bond attorney drafter of the Indenture, First Supplemental Indenture, and the Second Supplemental Indenture—who testified that an amendment is used to issue a class of bonds that had superior rights to collateral.  (*See id.* at 14; Berman Decl. Ex. D (Bayus Dep) at 90:6-12.)

BNY Mellon argues that Powers' testimony should be excluded because it violates canons of contract interpretation.  (BNY Mellon Br. at 14-15.)  However, Powers'

16

opinions concern the customary meanings of certain terms in Depfa's consent provision, and the Court can determine whether such testimony will assist it in deciding this action. Unsurprisingly, BNY Mellon did not cite a single case in which a court excluded expert testimony because it was inconsistent with a canon of interpretation.

   **2.**  **Parity**

    Powers' proposed testimony about the customary usage of the term parity is similarly reliable. His opinion that under custom and practice, parity requires that securities rank equally and ratably with one another with respect to their rights to pledged collateral is undisputed. (TX189, at 15; TX186 ¶ 32; TX187, at 7.)

    Powers testified at his deposition that over the course of his career, he observed that Dexia was always paid its ratable share of liquidated collateral on its bank bonds. (Berman Decl. Ex. A, at 55:9-22.) He opined that under custom and practice in the student loan bond industry, parity requires each bondholder to receive its ratable share of liquidated collateral. (TX189, at 8.) His proposed testimony concerning the relationship between parity and liquidated collateral is therefore admissible because his opinion is directly linked to his observations at Dexia. *See SR Int'l*, 467 F.3d at 132-33.

    Powers next applied his experience to the facts of this case, which is appropriate for an expert. *See id.* Based on his experience, the customary definition of parity requires ALL and the Trustee to accrue for principal payments to ensure that Depfa receives its ratable share of collateral. Under controlling law, this opinion is admissible because Powers is merely applying his extensive experience in the student loan world to novel situations. *See id.*; *Lion Oil*, 2011 WL 855876, at **1-2.

    Finally, BNY Mellon argues that "Powers' theory of parity is . . . contrary to the testimony of *virtually* every witness in this case as well as universally accepted standards in the

bond industry." (BNY Mellon Br. 15 (emphasis added).) However, Powers' parity theory is well-supported by the evidence in this case. (*See* Depfa's Pretrial Memorandum of Law at 32-36.) Even so, BNY Mellon fails to cite a single case—or any authority for that matter—for the proposition that expert testimony on industry practice can be excluded because it conflicts with the other party's theory of custom and practice. *Cf. Seneca Ins.*, 2007 WL 415141, at *9 (testimony concerning industry usage of terms "is of course testable, in the sense that industry practice is provable (or disprovable) by equivalent testimony by experienced participants in the industry").

### POINT II

### PROFESSOR STEVEN THEL SHOULD BE ALLOWED TO TESTIFY AS A REBUTTAL EXPERT ON CUSTOM AND PRACTICE IN THE CORPORATE TRUST INDUSTRY

**A.    Professor Steven Thel Is Qualified**

"Rule 702 does not distinguish between direct and indirect experience, and courts in the Second Circuit generally take a liberal approach to the qualifications requirement." *Pension Committee II*, 716 F. Supp. 2d at 225. Professor Thel, through his over 25-years experience as a law professor teaching and studying corporate finance, securities, contracts, and corporations, as well as his prior experience with the SEC[8] and in private practice, is qualified to testify as a rebuttal expert on the corporate trust industry. *See Cary Oil Co., Inc. v. MG Refining & Marketing, Inc.*, 2003 WL 1878246, at **5-6 (S.D.N.Y. Apr. 11, 2003) (admitting law professor to testify about corporate governance matters). Indeed, entities related to BNY Mellon,

---

[8] BNY Mellon argues that Thel is unqualified because he "had no recollection" at deposition of the details of his work experience related to trust indentures at the SEC. However, "these sorts of memory gaps are more appropriately addressed through cross-examination and do not warrant the exclusion of [Thel's] proposed testimony." *Pension Committee I*, 691 F. Supp. 2d at 474.

including its former holding company, have retained Thel as an expert in the corporate trust industry.  (*See* TX194 ¶ 3.).

BNY Mellon argues that Thel is not qualified because he lacks experience in the student loan bond industry.  (BNY Mellon Br. at 20 ("Nor did he have any recollection of having worked on *student loan liquidity facilities*, *student loan securitizations*, *student loan revenue bonds* or methods of credit enhancement."), 21 ("None of Thel's work at Kilpatrick & Cody related to *student loan liquidity facilities*, *student loan securitizations*, *student loan revenue bonds* or methods of credit enhancement."  "Thel does not claim familiarity with *student loan liquidity bonds*."  "Rather than experience relating to the *student loan bond industry* . . . Thel relies on his experience 'as a law professor dealing with the rights of security holders and the obligations of trustees for the last 30 years.'") (emphasis added).)  Of course, Powers is the *only* expert proffered by any of the parties who has specialized in the student loan bond industry.  In any event, Thel is not opining about custom and practice in that industry.  Rather, he is rebutting Landau's opinions concerning custom and practice in the corporate trust industry.

## B.     Thel's Opinions Will Be Helpful To This Court

BNY Mellon argues that "[r]ather than offer constructive opinions as to the custom and practice in the industry regarding opinion letters . . . Thel's report merely applies his version of the law to the facts of this case to offer an opinion on the propriety of the parties' conduct."  (BNY Mellon Br. at 23.)  BNY Mellon neglects to mention that Landau interpreted various provisions in the Indenture and Depfa SBPA, as well as the opinion letters at issue. Thel's report was proffered simply to rebut Landau's report.  *See Scientific Components Corp. v. Sirenza Microdevices, Inc.*, 2008 U.S. Dist. LEXIS 92703, at *7 (E.D.N.Y. Nov. 13, 2008) ("This is archetypal rebuttal testimony: it identifies a flawed premise in an expert report that casts doubt on both that report's conclusions and its author's expertise"); *see also Johnson v.*

19

*PetSmart, Inc.*, 2007 U.S. Dist. LEXIS 77033, at **3-5 (M.D. Fla. Oct. 15, 2007) (denying motion to strike plaintiff's rebuttal expert report where it responded to points made in defendant's expert report). Accordingly, the Court should not exclude Thel's testimony unless it also excludes Landau's testimony. *Cf. Seneca Ins.*, 2007 WL 415141, at *9 (testimony concerning industry usage of terms "is of course testable, in the sense that industry practice is provable (or disprovable) by equivalent testimony by experienced participants in the industry").

## C.   Thel's Opinion That He Agrees With Powers On Consent Rights Is Based On A Reliable Foundation[9]

Thel testified at deposition that he became familiar with consent provisions in corporate finance contracts, and their well-understood meaning within the corporate finance world, through his experiences teaching contract law, working on contracts and consent provisions, practicing at a law firm and the SEC, reading case law, and through his conversations with other lawyers. (Berman Decl. Ex. B, at 62:11-16, 283:18-23, 284:10-16; 290:21-25.) Such experiences form a reliable basis for Thel's opinion that he agrees with Joel Powers that the execution of the Second Supplemental Indenture and the Lloyds SBPA violated the rights of Depfa. *See SR Int'l*, 467 F.3d at 132-133; (TX194 ¶¶ 10-14).

BNY Mellon argues that Thel's opinion regarding his concurrence with Powers should be inadmissible as an "impermissible *ipse dixit*." (BNY Mellon Br. at 22.) To support its argument, BNY Mellon selectively and misleadingly quotes Thel's deposition testimony. *Id.* However, when that testimony is read in context with the rest of Thel's testimony, it is clear that Thel based his opinion on his experiences as a practicing attorney and as a law professor:

---

[9] BNY Mellon does not dispute that Thel's opinions that rebut Landau's opinions are reliable. In any event, all such other testimony is also directly linked to Thel's experience in the corporate trust industry, and therefore admissible. *See SR Int'l*, 467 F.3d at 132-33.

- Q.  What experience do you need to agree with Mr. Powers' conclusions?

  A.  I have the experience I have with—as a law professor dealing with the rights of security holders and the obligations of trustees for the last 30 years.  (Berman Decl. Ex. B, at 62:11-16.)

- Q.  Is this opinion based on your work experience?

  A.  I think my opinion on that is based on, yes, my work experience, my teaching experience.  My experience dealing with contracts and consent provisions.  (*Id.* at 283:18-23.)

- Q.  And is this based on your experience today as a professor?

  A.  It is based in part on my experience as a professor, as a practicing lawyer, as a reader of cases, as a discusser with lawyers.  All of my experience is based on that.  (*Id.* at 284:10-16.)

- Q.  Is this opinion based on your work experience?

  A.  It is based on my work experience and my other experience.  Yes, my work—yes.  On my work experience.

  Q.  What custom or practice of the bond industry is the basis of your opinion in paragraph 12?

  A.  Here, it is the custom and practice of the corporate finance industry in dealing with relatively standardized contracts and consent provisions, which are common and generally well understood."
  (*Id.* at 290:21-291:9.)

## <u>CONCLUSION</u>

For the foregoing reasons, Depfa respectfully requests that the Court deny BNY

Mellon's motion to exclude the proposed expert testimony of Joel Powers and Steven Thel.

Dated:   New York, New York
        November 14, 2011

                                   Respectfully submitted,

                                   FRIEDMAN KAPLAN SEILER
                                     & ADELMAN LLP


                                 By:       /s/ Scott M. Berman
                                        Scott M. Berman
                                        Eric Seiler
                                        Jeffrey C. Fourmaux
                                        Christopher L. McCall
                                        Alexander D. Levi

                                 7 Times Square
                                 New York, New York  10036
                                 (212) 833-1100

                                 *Attorneys for Defendant,*
                                 *Counterclaimant, Crossclaimant,*
                                 *Crossclaim Defendant, Third-Party*
                                 *Plaintiff, and Third-Party Counterclaim*
                                 *Defendant DEPFA BANK plc*